IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PHOTOGRAPHIC ILLUSTRATORS
CORPORATION,

       Plaintiff,

v.

THE GILLETTE COMPANY,

       Defendant.

Civil Action No. 04-CV-10913-WGY

## MEMORANDUM IN SUPPORT OF PIC'S AND PAUL PICONE'S MOTION TO DISMISS GILLETTE'S COUNTERCLAIMS

Michael A. Albert, BBO #558566
Michael N. Rader, BBO # 646990
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
Tel: (617) 646-8000

COUNSEL FOR PLAINTIFF AND
COUNTERCLAIM-DEFENDANT
PHOTOGRAPHIC ILLUSTRATORS CORP.

and

ADDITIONAL COUNTERCLAIM-DEFENDANT
PAUL PICONE

## TABLE OF CONTENTS

I.   BACKGROUND ....................................................................................................1

     A.   Overview Of The Case.................................................................................1

     B.   The Facts Pled By Gillette In Its Counterclaims ......................................2

          1.   The Contract-Related Counterclaims.................................................2

          2.   The Trademark Counterclaim .............................................................5

II.  ARGUMENT .......................................................................................................6

     A.   Applicable Standards ..................................................................................6

     B.   Gillette Fails To State Counterclaims On Which Relief Can Be Granted ...............7

          1.   Breach Of Contract ............................................................................7

               a.   Gillette Alleges Nothing More Than An 'Agreement To Agree' ....7

               b.   The Counterclaim Is Barred By The Parol Evidence Rule .............9

               c.   Gillette Fails To Allege Performance ...........................................10

          2.   Estoppel............................................................................................10

          3.   Fraud ................................................................................................12

          4.   Chapter 93A .....................................................................................15

          5.   Trademark Infringement ..................................................................15

III. CONCLUSION...................................................................................................19

Gillette's counterclaims against Plaintiff and Counterclaim-Defendant Photographic Illustrators Corp. ("PIC") and its principal, additional Counterclaim-Defendant Paul Picone, should be dismissed under Fed. R. Civ. P. 12(b)(6).

Taking all of Gillette's allegations as true (as the Court must for purposes of this motion), Gillette fails to state counterclaims upon which relief can be granted.

## I.    BACKGROUND

### A.    <u>Overview Of The Case</u>

This case is about Gillette's systematic wrongful conduct toward its longtime product photographer, PIC.  The key facts are undisputed.  For example, notwithstanding a contractual provision (standard in the industry) requiring that Gillette return PIC's original photographic materials within thirty days of first publication, Gillette refused to do so. (2d Am. Compl. ¶¶ 14, 17, 18).  Gillette admits this. <u>See</u> Am. Answer ¶ 17 ("Defendant admits that it did not return all photographs provided to it by plaintiff.").

After retaining thousands of PIC's original images in breach of its contracts with PIC, Gillette proceeded to bypass PIC in satisfying its copying needs – wrongfully duplicating the images through third-party laboratories instead of through PIC. (2d Am. Compl. ¶¶ 24-26). Gillette admits that it did this too. <u>See</u> Am. Answer ¶ 25 ("Defendant admits that … it purchased from third-party laboratories … duplicate prints of photographs provided by plaintiff.").

Gillette also infringed PIC's copyrights by using PIC's images outside the scope of the one-year license that it purchased. (2d Am. Compl. ¶¶ 20-22).  Indeed, Gillette admits that PIC's images were still posted on its web site even after this suit was filed. (Am. Answer ¶¶ 21-22).

In short, although Gillette purchased *limited licenses* to use PIC's images (for one year in the United States only), Gillette systematically treated PIC's images as if they were Gillette's own, using them far beyond the geographic and temporal scope of these licenses.

Gillette's disregard for PIC and PIC's rights did not end there. For instance, in Spring 2004, notwithstanding the existence of outstanding disputes between the parties, Gillette employee Beth Cooper entreated PIC to assist with a series of "emergency" photography projects of significant scope. As a goodwill gesture, PIC agreed to help. (2d Am. Compl. ¶¶ 34-37).

To complete the projects in the short time available, Mr. Picone and his staff had to work day and night for weeks. During this time, Gillette effusively thanked PIC and conveyed its satisfaction with the high quality of PIC's work. (Id. ¶¶ 34-38). Nevertheless, upon completion of the projects, Gillette refused to pay PIC's invoices and would not even take Mr. Picone's phone calls. (Id. ¶¶ 43-44). Once again, Gillette concedes this. (Am. Answer ¶ 43).

### B.    The Facts Pled By Gillette In Its Counterclaims

Gillette attempts to deflect attention from its conduct by introducing baseless counterclaims against PIC and Mr. Picone. Even taking the alleged facts as true, for purposes of this motion, Gillette fails to state counterclaims upon which relief can be granted.

### 1.    The Contract-Related Counterclaims

Four of Gillette's five counterclaims (breach of contract, estoppel, fraud and violation of Mass. Gen. L. ch. 93A) are based on alleged discussions between Ms. Cooper and Mr. Picone in March and April 2004. Gillette apparently hopes to argue that, in those discussions, PIC agreed to perform the Spring 2004 projects without requiring Gillette to accept its standard terms and conditions, then breached that agreement by including the terms and conditions on its invoices.

The suggestion that PIC would agree to omit its terms and conditions – an industry standard contract that governed every one of PIC's previous jobs for Gillette – is untrue.[1]

---

[1] Indeed, given the disputes that Mr. Picone was having with Gillette regarding rampant misuse of his images, he was particularly careful *not* to agree to forego his standard terms and conditions.

But for purposes of this motion, which is brought under Rule 12 and not Rule 56, the important point is that Gillette's own allegations fail to assert any agreement, and in fact establish that there was no such agreement. According to Gillette's pleading, Ms. Cooper and Mr. Picone did *not* finalize contractual terms, but rather "agreed to agree" at a later date.

As a matter of law, an "agreement to agree" is not an enforceable contract. Gillette's related counterclaims (estoppel, fraud and violation of Mass. Gen L. ch. 93A) fail as a matter of law for the same reason – Gillette has not pled facts (because it cannot truthfully do so) amounting to an oral agreement on which it could reasonably have relied.

According to Gillette, Ms. Cooper and Mr. Picone met on March 1, 2004 and spoke again by telephone in April 2004. In the first meeting they "***discussed … memorializing terms***" that, if and when entered into, "***would govern*** the parties' relationship." (Am. Counterclaim ¶¶ 20-21).[2]

Taking Gillette's own allegations about the March 1, 2004 meeting as true, no contract was formed at that meeting. Gillette's allegations about the later (April) conversation confirm this: "In or around April 2004 … Picone offered to withhold invoicing Gillette for the Spring 2004 Projects ***until Gillette and PIC memorialized terms concerning ownership and use of he photographs***." (Id. ¶ 25).

Thus, according to Gillette's own allegations (which must be accepted as true for purposes of this motion), the parties manifestly did not enter into an agreement during the March 1, 2004 meeting or the April 2004 telephone call.

---

[2] In its original Counterclaim, Gillette alleged that, in the March 1, 2004 meeting, Ms. Cooper and Mr. Picone "***discussed … negotiating a new agreement***." (Docket #21 ¶ 21) (emphasis added). In its Amended Counterclaim, Gillette attempts to back away from language explicitly describing the discussion as an "agreement to agree," but the result is the same. Gillette still alleges that contractual terms remained to be "memorialized" *at a later time*. (Am. Counterclaim ¶ 21). The Amended Counterclaim alleges an unenforceable "agreement to agree."

For convenience, a summary of the key contract-related allegations in Gillette's

Amended Counterclaim, and their significance, follows below:

| Allegations in Gillette's Counterclaim (emphasis added) | Significance |
|---|---|
| 19.  Notwithstanding the fact that PIC and Gillette were in a dispute which was not settled, on March 1, 2004, Picone met with Beth Cooper … to discuss the possibility of PIC creating photographs of certain of Gillette's consumer products for use in an upcoming housewares trade show. | Background to alleged meeting between Ms. Cooper and Mr. Picone. |
| 20.  During the March 1, 2004 meeting, Picone and Ms. Cooper **discussed**, *inter alia*, **memorializing terms** to cover all future work performed by PIC for Gillette. | According to Paragraphs 20-22, Ms. Cooper and Mr. Picone were in accord that the terms of any "contract" would have to be "memorialized" *in the future*.  These paragraphs thus allege nothing more than an "agreement to agree." |
| 21.  During the meeting, PIC and Picone expressly agreed that they would not claim that the Purported Terms [PIC's standard terms and conditions] applied to future work performed by them for Gillette and that **additional terms to be memorialized by the parties would govern the parties' relationship**. | |
| 22.  PIC and Picone agreed to perform work for Gillette in connection with the March 2004 housewares show (the "2004 Housewares Project") subject to the terms expressly and/or impliedly agreed to by PIC and Picone at the March 1, 2004, meeting.  Such terms included, *inter alia*, that (i) Gillette was to provide PIC with Gillette products for PIC to photograph, (ii) PIC was to photograph such products and provide such photographs to Gillette for Gillette's use, (iii) PIC was to charge Gillette no more than its customary rate, (iv) **the parties were to memorialize additional terms that would govern other aspects of the parties' relationship**, and (v) PIC and Picone would not claim that the Purported Terms contained in the past on the reverse of PIC's invoices applied to the Spring 2004 Projects. | |
| 23.  Thereafter, as a direct result of the March 1, 2004, meeting and subject to the terms of the parties' **oral and/or implied agreement at such meeting**, Gillette and PIC agreed that PIC would perform three other projects for Gillette in March and April 2004 (collectively, with the 2004 Housewares Project, the "Spring 2004 Projects"). | Again, the only "agreement" pled by Gillette is an "agreement to agree." |
| 24.  In partial performance of the parties' agreement, Gillette provided Gillette products to PIC and Picone and permitted[3] PIC and Picone to photograph Gillette products for the Spring 2004 Projects in reliance upon **Mr. Picone's express and/or implied representations** at the March 1, 2004, meeting. | Among Mr. Picone's alleged "representations" was that the parties still had to agree on terms and conditions. See ¶ 21 above. |

---

[3] Although Gillette's allegations are to be taken as true for purposes of this motion, it is worth noting that, in point of fact, Gillette entreated PIC to do this work on short notice. (2d Am. Compl. ¶¶ 35-36).  Gillette's choice of words, in alleging that Gillette "permitted" PIC to do this work, is disingenuous to say the least.

| | |
|---|---|
| 25. In or around April 2004, after completing the Spring 2004 Projects and delivering the photographs, but before submitting invoices to Gillette for payment, ***Picone offered to withhold invoicing Gillette for the Spring 2004 Projects until Gillette and PIC memorialized terms concerning ownership and use of the photographs***. Because Ms. Cooper wanted PIC to be paid for the Spring 2004 Projects, however, she instead ***invited him to send the invoice with the Purported Terms voided*** and thereby manifested that Gillette was ready, willing and able to complete performance of the contract once PIC provided Gillette with an invoice conforming to the parties' agreement that, among other things, PIC would not charge Gillette more than PIC's customary rate and that PIC and Picone would not claim that the Purported Terms on the back of PIC's invoices applied to the Spring 2004 projects. | This paragraph conclusively establishes that no "agreement" was entered into – according to Gillette, Mr. Picone was still contemplating the possibility that an agreement might be consummated *in the future*. Gillette does not say how Mr. Picone responded to Ms. Cooper's "invitation" to omit PIC's standard terms and conditions. |
| 26. In reliance upon ***Mr. Picone's representations at the March 1, 2004, meeting, and the April 2004 telephone conversation***, Gillette went forward with use of the photographs provided by PIC and Picone in connection with the Spring 2004 Projects. | Again, according to Gillette, Mr. Picone "represented" that the parties had not yet agreed on terms and conditions. See ¶¶ 21, 25 above. |
| 27. Thereafter, much to Gillette's surprise, on May 21, 2004, Gillette received invoices for each of the Spring 2004 Projects which, ***contrary to PIC's and PIC's and Picone's agreement with Ms. Cooper and express and implied promises to her***, still contained the Purported Terms that PIC and Picone had acknowledged would not govern the parties' relationship. | At most, Mr. Picone and Ms. Cooper had come to an "agreement to agree." As discussed below, one cannot breach an "agreement to agree" as a matter of law. |

In summary, these allegations amount to nothing more than an "agreement to agree." While Mr. Picone is (falsely) said to have "represented" that the Spring 2004 Projects would not be subject to PIC's terms and conditions, *Gillette's pleading also concedes that he and Ms. Cooper agreed that the parties would have to agree on and memorialize the key terms of their contract – "ownership and use of the photographs" – later.* (Am. Counterclaim ¶ 20, 21, 22, 25). Assuming the truth of every allegation made by Gillette, as the Court must for purposes of this motion, the parties entered into nothing more than an "agreement to agree." As explained in detail below, an "agreement to agree" is unenforceable as a matter of law.

## 2.    The Trademark Counterclaim

In its final counterclaim, Gillette alleges, "upon information and belief," that "PIC's and Picone's recent insistence upon the return of photographs of Gillette's products bearing Gillette's trademarks is based upon PIC's and Picone's intention to make use of such photographs in commerce without Gillette's authorization." (Am. Counterclaim ¶ 56).

Analogous to Gillette's "agreement to agree" argument described above, this counterclaim apparently seeks relief for "intent to commit trademark infringement." Because no such cause of action exists under the Lanham Act, this counterclaim too must be dismissed.

## II.    ARGUMENT

### A.    <u>Applicable Standards</u>

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, courts "assume the truth of all well-pleaded facts contained in" the complaint. <u>Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico</u>, 332 F.3d 6, 18 (1st Cir. 2003).

Despite this generous standard, the First Circuit has emphasized that "Rule 12(b)(6) is not entirely a toothless tiger." <u>Id.</u> at 19 (citation omitted). To survive a Rule 12(b)(6) motion to dismiss, the complaint must set forth "factual allegations … respecting each material element necessary to sustain recovery under some actionable legal theory." <u>Id.</u> (citation omitted).

In applying Rule 12(b)(6), courts should "eschew any reliance on bald assertions [and] unsupportable conclusions." <u>Educadores Puertorriquenos En Accion v. Hernandez</u>, 367 F.3d 61, 68 (1st Cir. 2004). Indeed, bald "conclusions" set forth in the complaint are not the same – and do not suffice – as factual allegations required for stating a claim on which relief can be granted. "It is only when such conclusions are logically compelled, or at least supported, by the stated facts … that 'conclusions' become 'facts' for pleading purposes." <u>The Dartmouth Review v. Dartmouth College</u>, 889 F.2d 13, 16 (1st Cir. 1989).

The policy rationale underlying the First Circuit's insistence that the plaintiff plead *facts* supporting each of its causes of action is straightforward:

> [T]he discovery process is not available where, at the complaint stage, a plaintiff has nothing more than unlikely speculations… *the reason is to protect society from the costs of highly unpromising litigation*.

<u>DM Rsch., Inc. v. Coll. of Am. Pathologists</u>, 170 F.3d 53, 56 (1st Cir. 1999) (emphasis added).

Gillette's baseless counterclaims are intended to divert attention from Gillette's *admitted* wrongful conduct and, undoubtedly, to needlessly increase the cost of this litigation to PIC. The counterclaims are not just "highly unpromising," but fail to entitle Gillette to relief as a matter of law. They should be dismissed.

**B.    Gillette Fails To State Counterclaims On Which Relief Can Be Granted.**

**1.    Breach Of Contract**

**a.    Gillette Alleges Nothing More Than An 'Agreement To Agree'.**

As discussed above, the factual allegations of Gillette's  amount to nothing more than an "agreement to agree." Two key facts pled by Gillette establish this. First, in their March 1, 2004 meeting, Ms. Cooper and Mr. Picone "discussed … memorializing terms" *in the future*. (Am. Counterclaim ¶¶ 20-21). Second, during the April 2004 conversation, Mr. Picone "offered to withhold invoicing Gillette … ***until Gillette and PIC memorialized terms concerning ownership and use of the photographs***." (Id. ¶ 25) (emphasis added).

The "ownership and use of the photographs," – admittedly a source of dispute (and obviously a key term of any contract) – still had not been agreed upon as of the April 2004 telephone call. Thus, according to Gillette's own pleading, there was no enforceable contract even at that time, let alone during the earlier March 1 meeting. Gillette's allegations must be taken as true for purposes of this motion (and, indeed, constitute judicial admissions).

At most, the facts alleged by Gillette suffice to plead that Ms. Cooper and Mr. Picone agreed to contract in the future. It is well-established, however, that an "agreement to agree" is without effect as a matter of law. "An agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto." Metrowest Med. Group, Inc. v. Mount Auburn Hospital, 1994 WL 902895 (Mass. Super. Dec. 14, 1994) (dismissing breach of contract claim); Rosenfield v. U.S. Trust Co., 195 N.E. 323, 326 (Mass. 1935) (same quote).

Notably, Gillette's counterclaim says nothing about the *affirmative* terms of any alleged agreement (such as, for example, the scope of the license to be granted by PIC). Where discussion is limited to terms that will *not* be present in the contract (like the "Purported Terms," as Gillette dismissively calls them), there can of course be no enforceable contract as a matter of law. PDC-El Paso Meriden, LLC v. Alstom Power, Inc., 2004 WL 1588201, *11 (Mass. Super. June 14, 2004) ("A purported contract which … does not adequately specify essential terms, ordinarily will be unenforceable."); Purcell Assoc., Ltd. v. Royal Caribbean Cruise Line, Inc., 1990 WL 106793, *1-2 (S.D.N.Y. July 24, 1990) (dismissing contract claim that failed to allege agreement on material terms and thus amounted to a mere "agreement to agree").

As in Metrowest, Gillette's counterclaim for breach of an "agreement to agree" must be dismissed. In that case, the plaintiff employer alleged that the defendant employees breached an oral contract that "a more formal arrangement would be consummated." 1994 WL 902895 at *5. The court granted the defendants' motion to dismiss under Rule 12(b)(6) because the agreement alleged was no more than an "agreement to agree," and "[o]nly where all material terms have been agreed to can there be an enforceable contract." Id.

Finally, it should be noted that although Paragraph 32 of Gillette's First Counterclaim contains the "bald assertion," Educadores, 367 F.3d at 68, that PIC "breached its oral and/or implied agreement with Gillette," this assertion should not be credited because it is unsupported – and, indeed, undermined – by the *facts* pled concerning the two discussions between Ms. Cooper and Mr. Picone. Gillette's factual allegations, accepted as true, establish that Ms. Cooper and Mr. Picone "discussed … memorializing terms" on March 1, and that in the subsequent April discussion Mr. Picone made clear that no agreement had yet been reached. Thus, not only is there an absence of facts supporting a contract claim – the facts pled affirmatively establish the *absence* of a contract. The First Count of Gillette's counterclaim should be dismissed.

**b.      The Counterclaim Is Barred By The Parol Evidence Rule.**

The First Count should also be dismissed because it violates the parol evidence rule, which prohibits a party to a written contract from contradicting the plain terms of that contract with prior statements. Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995).  "The rule that written agreements may not be varied or added to by parol evidence of antecedent or contemporaneous negotiations is not one merely of evidence, but is a rule of substantive law." Sound Techniques, Inc. v. Hoffman, 737 N.E. 2d 920, 923 (Mass. App. Ct. 2000).

When Gillette – as it admits – accepted and used the photographs sent by PIC in May 2004 (Am. Answer ¶ 45), it thereby agreed to the terms and conditions printed on the invoice that accompanied the images. E.g., Alloy Comp. Prods., Inc. v. N. Telecom, Inc., 683 F. Supp. 12, 14 (D. Mass. 1988) ("General Terms and Conditions" accompanying shipment of goods became part of contract where recipient accepted goods); I. Lan Sys., Inc. v. Netscout Service Level Corp., 183 F. Supp. 2d 328 (D. Mass. 2002) (Young, C.J.) (enforcing shrinkwrap license provision where licensee accepted and used the software).  If Gillette did not want to be bound by the terms and conditions which accompanied the photographs, it should simply have declined to accept the images. See ProCD, Inc. v. Zeidenberg, 86 F.3d 1447, 1452-53 (7th Cir. 1996) (licensee could have rejected terms of copyright license by returning the product).  Instead, Gillette "admits having used the photographs," (Am. Answer ¶ 45), and thereby to having accepted PIC's terms and conditions.

The terms and conditions of a written contract cannot be modified by an antecedent agreement, particularly one that is directly contradictory to the writing. Turner v. Johnson & Johnson, 809 F.2d 90, 96 (1st Cir. 1986); Merillat Indus., Inc. v. Johnston, 865 F. Supp. 60, 64 (D. Mass. 1994) ("Such alleged oral assertions are inadmissible when they directly contradict the written contractual provisions").

- 9 -

Accordingly, where a breach of contract claim necessarily relies on parol evidence, the claim should be dismissed for failure to state a claim on which relief can be granted. E.g., Genesis Bio-Pharm., Inc. v. Chiron Corp., 27 Fed. Appx. 94 (3d Cir. 2002) (affirming Rule 12(b)(6) dismissal of breach of contract claim that depended on parol evidence); Quorum Health Res. v. Carbon-Schulykill Hosp., 49 F. Supp. 2d 430, 432-33 (E.D. Pa. 1999) (dismissing fraud and breach of warranty claims that depended on parol evidence).

### c.    **Gillette Fails To Allege Performance**.

To state a claim for breach of contract, Gillette must allege that (1) a contract existed between the parties; (2) Gillette performed its contractual obligations; (3) PIC breached the contract; and (4) Gillette suffered damages as a result of PIC's breach. Persson v. Scotia Prince Cruises, 330 F.3d 28, 34 (1st Cir. 2003).

Gillette has not only failed to plead performance, it has affirmatively pled a refusal to perform, i.e., a refusal to pay PIC's invoices. (Am. Answer ¶ 43). Gillette's breach of contract counterclaim must therefore be dismissed as a matter of law. Persson, 330 F.3d at 35 (pleading that failed to allege performance by plaintiff did not state claim for breach of contract).

### 2.    **Estoppel**

A cause of action for promissory estoppel requires both "an unambiguous promise" and "that the party to whom the promise was made reasonably relied on the representation." Fontneau v. Town of Sandwich, 251 F. Supp. 2d 994, 1002 (D. Mass. 2003) (Young, C.J.).

Gillette's estoppel counterclaim fails for two independent reasons: **first,** because it is predicated on the same vague and unenforceable "agreement to agree" as the contract counterclaim; and **second,** because Gillette could not *reasonably* have relied on alleged representations that conflict directly with the written terms and conditions that Gillette later accepted when it received and used PIC's images.

- 10 -

Fontneau is instructive.  That case involved a dispute between a boat owner and the harbormaster over the rights to a slip.  The boat owner, alleging that the harbormaster had orally promised that he would be able to continue his deceased father's slip lease, sued for breach of contract and promissory estoppel.  This Court granted summary judgment on the breach of contract claim, finding that the promise was "better characterized as an 'agreement to agree' rather than as a contract," because "several material terms" were absent therefrom. Id.

This Court also held that the promissory estoppel claim was without merit because it was based on an "agreement to agree." Id. at 1003 ("[T]he ambiguity of the Harbormaster's alleged statement to [plaintiff] – in  that it failed to include such material terms as duration and price – is as fatal to [plaintiff's] promissory estoppel claim as it is to his contract claim.").

In the instant case, Gillette's estoppel counterclaim is based on the alleged "agreement to agree" that PIC's terms and conditions would not apply under a later contract (one that was never consummated and is not alleged to have been consummated).  This cannot serve as a basis for relief because reliance by Gillette under these circumstances could not have been reasonable as a matter of law. See Pitts v. Lucey, 1995 WL 1146866, *2 (Mass. Super. Dec. 28, 1995) (dismissing promissory estoppel claim: "Pitts' action in leaving his previous job in Waltham without an assurance of employment for even a minimal specific duration with Wakefield does not constitute reasonable reliance as a matter of law.").

What is more, where a written statement conflicts with a prior representation, reliance on the representation is unreasonable as a matter of law. Sands v. Ridefilm Corp., 212 F.3d 657, 665 (1st Cir. 2000) ("We agree with the district court that the plaintiff's reliance upon the defendants' alleged oral representations was *not reasonable as a matter of law*.") (emphasis added); Coll, 50 F.3d at 1124.

- 11 -

In <u>Coll</u>, for example, the plaintiff CEO argued that he was entitled to damages from his employer under a promissory estoppel theory based on a promise, in pre-hire discussions, of a long-term incentive package. <u>Id.</u> at 1124.  Because the written employment offer did not include a commitment for the incentive offer, however, the First Circuit upheld the lower court's holding that the plaintiff could not reasonably have relied on such prior representations.  The First Circuit held that the plaintiff had "acquiesced to the language" in the written offer and therefore could not "now second-guess his negotiating strategy and claim the benefit of a bargain he did not negotiate." <u>Id.</u> at 1124.

So too here, even assuming the truth of Gillette's allegation that PIC "promised … to allow Gillette to use the photographs … without claiming that such use is subject to the" terms and conditions (Am. Counterclaim ¶ 37), such a representation cannot be the basis for reasonable reliance by Gillette because it is directly at odds with the terms and conditions later delivered to and accepted by Gillette.  The Second Count of Gillette's counterclaim should be dismissed.

### 3.    <u>Fraud</u>

Gillette's fraud counterclaim should be dismissed for two independent reasons: **first**, any alleged misrepresentation could not reasonably have been relied upon by Gillette because it would directly contradict the unambiguous language of the parties' written contract; and **second**, any alleged misrepresentation did not cause cognizable harm to Gillette.

To state a claim for fraud, Gillette must allege that (1) PIC knowingly made a false statement (2) with the intent to deceive; (3) the statement was material; (4) Gillette reasonably relied thereon; and (5) Gillette was injured as a result of its reliance. <u>Turner</u>, 809 F.2d at 95.

Gillette's pleading fails the fourth prong because, even if Mr. Picone had made the representation attributed to him, Gillette could not reasonably have relied on such a statement – as a matter of law – because it directly contradicts the parties' later written agreement.

- 12 -

In <u>Turner</u>, a company alleged that it was fraudulently induced to sell its assets below value by the defendant's misrepresentations and omissions during negotiations. <u>Turner</u>, 809 F.2d at 92.  The defendant argued that, "as a matter of law, a jury may not find fraud when the alleged misrepresentations directly contradict the specific terms of a subsequently entered written contract between the parties." <u>Id.</u> at 95.  While recognizing that there must be a "balance struck between two competing values: contractual certainty and protecting innocent parties from fraud," the court had "no doubt that the balance shifts when the party asserting fraud is not seeking to avoid an ambiguous or deceptive 'contractual device[ ],' but is trying to reverse the precise terms of an agreement." <u>Id.</u> at 95-96.  The court therefore rejected the fraud claim as a matter of law, holding that "plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point at issue." <u>Id.</u> at 97.

So too here, "reasonable reliance" by Gillette on an allegedly fraudulent "prior oral assertion" is foreclosed because that alleged prior assertion is directly contradicted by the terms and conditions which Gillette accepted when it received – *and used* – PIC's images.

Indeed, Gillette cannot revive an otherwise unenforceable contract claim simply by re-labeling it as a tort claim. <u>See</u> <u>Mackintosh v. Chambers</u>, 190 N.E. 38, 39 (Mass. 1934) ("The statement of a different form of liability is not a different cause of action, provided it grows out of the same transaction, act, agreement, and seeks redress for the same wrong."); <u>TLT Construction Corp. v. A. Anthony Tappe and Assoc., Inc.</u>, 716 N.E. 2d 1044, 1051 (Mass. App. Ct. 1999) ("Notwithstanding the [plaintiff's] cause of action nomenclature for its tort claims in this litigation and its contract claims in the prior arbitration, the causes of action in both are essentially the same."); <u>Gregg v. U.S. Indus., Inc.</u>, 715 F.2d 1522, 1531 (11th Cir. 1989) ("a fraud action may not be used to recover for breach of an unenforceable oral contract … nor may recovery be had for fraudulent inducement to enter an unenforceable oral contract").

- 13 -

Gillette's fraud counterclaim also fails because it does not allege any cognizable injury. The only injury that Gillette apparently alleges is that it was "entrapped into alleged violations of the Purported Terms." (Am. Counterclaim ¶ 43). In other words, according to Gillette, PIC fraudulently represented that the terms and conditions that had governed the parties' relationship in the past would not apply to future projects, so that PIC could sue Gillette when Gillette elected to use the Spring 2004 photographs in violation of those terms and conditions. Absent Gillette's own breach, and the instant lawsuit, Gillette would have no basis for the counterclaim at all.

Although Plaintiff is aware of no case law squarely on point in this jurisdiction, cases from other states have held that the mere filing of a lawsuit cannot constitute "injury" supporting a fraud claim. For example, in Raymond Corp. v. Coopers & Lybrand, 482 N.Y.S. 2d 377 (N.Y. App. Div. 1984), the court dismissed a counterclaim for fraud that relied on a similar theory for damages: "Here, the $500,000 sought as damages appears to relate solely to the commencement of this lawsuit by plaintiffs. Damages attributable solely to the existence of litigation are clearly insufficient to sustain the necessary element of damages in the first counterclaim." Id. at 379. See also Orix Credit Alliance, Inc. v. Taylor Machine Works, Inc., 1996 WL 164286 (N.D. Ill. 1996) (dismissing defendant's counterclaim for fraud under Rule 12(b)(6) where the only injuries alleged were those said to have resulted from the plaintiff's lawsuit); Chow v. Aegis Mortgage Corp., 185 F. Supp. 2d 914 (N.D. Ill. 2002) (where mortgagor sued mortgagee under Truth In Lending Act, mortgagee's counterclaim for fraud was without merit because having incurred attorneys fees and litigation costs does not satisfy the injury element required for fraud). Gillette's Third Counterclaim for fraud should be dismissed.

### 4.    Chapter 93A

Gillette's counterclaim under Mass. Gen. L. ch. 93A[4] is based on the same unenforceable "agreement to agree" as its contract, estoppel, and fraud claims, and thus must be dismissed for the same reasons.

Just as Gillette cannot transform an unenforceable agreement to agree into a binding contract through a claim for fraud, neither can it seek relief under Chapter 93A. American Tel. & Tel. Co. v. IMR Capital Corp., 888 F. Supp. 221 (D. Mass. 1995) (dismissing 93A claim under Rule 12(b)(6) where claim was, in essence, the same as other dismissed claims); see also Trifiro v. New York Life Ins. Co., 845 F.2d 30, 33 (1st Cir. 1988) (Chapter 93A claim failed as a matter of law where primary claims of promissory estoppel, deceit and negligent misrepresentation failed because reliance could not have been reasonable).

### 5.    Trademark Infringement

Gillette's final counterclaim, for "intent to commit trademark infringement," is easily disposed of.  Quite simply, there is no such cause of action.

Gillette alleges that PIC and Picone have an "intention to make use of [the] photographs in commerce without Gillette's authorization" and that "any" use in commerce by PIC or Picone of the photographs violates the Lanham Act. (Am. Counterclaim ¶¶ 56-59).  Gillette does not allege, however, that PIC or Picone have used the photographs in commerce, a basic pleading requirement of the Lanham Act. Lang v. Pacific Marine and Supply Co., Ltd., 895 F.2d 761, 765-766 (Fed. Cir. 1990) (affirming district court's dismissal of Lanham Act claim where the plaintiff did not allege that the defendant's product had entered into commerce).

---

[4] This counterclaim is mis-numbered as Gillette's "Third," even though it is in fact the fourth.

At a minimum, the plaintiff must allege that the defendant has taken some steps to market an infringing product. For example, in <u>NTN Communications, Inc. v. Interactive Network, Inc.</u>, 37 U.S.P.Q.2d 1475 (N.D. Cal. 1995), the court dismissed claims for trademark infringement and false designation of origin under the Lanham Act where the defendant had allegedly "threatened" to use the plaintiff's mark sometime in the future.  The plaintiff in <u>NTN</u>, a developer of an interactive game played in conjunction with televised football games, alleged that it had an exclusive license to the trademarks of the Canadian Football League ("CFL") for use in interactive games.  Although the defendant *admitted* that it "intended" to offer its competing product in connection with CFL games, the court held that the plaintiff had no cause of action:

> [T]here are no allegations that Interactive has begun to use the CFL marks in commerce, as required for a claim under the Lanham Act or the similar state law claims. The complaint merely states that Interactive's offering "*will* involve the use of CFL MARKS in interstate commerce." (emphasis added). In fact, there are no allegations in the complaint regarding steps already taken by Interactive ... Accordingly, the court dismisses this action [for] failure to state a claim.

<u>Id.</u> at 1477 (emphasis in original).

In a similar situation, the Northern District of Illinois explained:

> The complaint contains only the conclusory allegation that "RPC's marketing to the public for use in commerce of a software program under the name "INvironment Light" … constitutes unfair competition under the Lanham Act, because INvironment Light is *intended for use* in commerce…" Id. at ¶ 80 (emphasis added).  The complaint thus does not contain any allegations that the defendant's product was ever used in commerce as required by the Lanham Act. Having failed to correct this defect in their pleadings, Count II of the plaintiff's Second Amended Complaint is dismissed.

<u>Cognitest Corp. v. Riverside Publishing Co.</u>, 36 U.S.P.Q. 2d 1363, 1366 (N.D. Ill. 1995).

The "intent to commit trademark infringement" claim presented by Gillette is even further removed from those which were dismissed as quoted above.  Gillette has not alleged, nor could it allege, that PIC or Mr. Picone have "already taken steps to begin marketing its infringing product."  There is no infringing product (nor, of course, will there ever be).  Indeed, even given

a second opportunity to plead this Count, Gillette could come no closer to alleging trademark infringement than it did in its original counterclaim.[5]

Gillette alleges only that PIC's and Picone's insistence upon the return of the photographs (as required by the contract between PIC and Gillette) is based upon PIC's and Picone's "intention" to use those photographs in violation of the Lanham Act. Even if true, this would be insufficient to state a claim for trademark infringement as a matter of law. Mere "intention" to use a trademark does not state a claim upon which relief can be granted. NTN, 37 U.S.P.Q.2d 1475; Cognitest, 36 U.S.P.Q. 2d 1363; see also Mueller Co., Mueller Intern., Inc. v. U.S. Pipe and Foundry Co., 71 U.S.P.Q. 2d 1849 (D.N.H. 2004) (dismissing counterclaim for declaratory judgment of trademark infringement for lack of subject matter jurisdiction where claimant failed to allege that it "had engaged in a course of conduct evidencing a 'definite intent and apparent ability to commence use' of the marks on the product").[6]

What is more, contrary to Gillette's allegations, it is simply false that "any" use in commerce by PIC of its own images would violate the Lanham Act. There are many ways in which PIC can use its own images without violating any of Gillette's rights. PIC could, for example, show the images to potential clients as an example of PIC's photographic portfolio. For that matter, it could sell the images as art or as part of a historical retrospective on commercial photography. None of these uses would violate the Lanham Act, as they would not be uses of the mark GILLETTE in connection with the sale of razors or any of the other goods that Gillette sells. See Star Fin. Svcs. v. Aastar Mortgage Corp., 89 F.3d 5, 9 (1st Cir. 1996)

---

[5] Gillette has no good faith basis to allege that Mr. Picone or his company intend to infringe Gillette's trademarks. As discussed in the text below, numerous non-infringing uses for the photographs – which are indisputably owned by PIC – exist.

[6] To the extent that Gillette seeks a declaratory judgment of trademark infringement (Am. Counterclaim ¶ 6), the Court lacks subject matter jurisdiction over such a claim under the Declaratory Judgment Act. Id.

("The purpose of trademark laws is to prevent the use of the same or similar marks in a way that confuses the public about the actual source of the goods or service."). Although obvious, it is worth noting that PIC is in the business of commercial photography, not the manufacture and sale of razors or other household products. PIC is not a competitor to Gillette. Gillette's pleading does not even suggest how PIC's use of its own pictures could possibly infringe Gillette's trademarks.

Aside from the many non-infringing commercial uses that PIC could make of its own images, PIC can also use those images without putting them "in commerce" at all. Perhaps most obviously, had Gillette complied with its obligation to return the images, this would have prevented Gillette from copying those images in further breach of the parties' agreements and in further violation of PIC's copyrights, as has occurred. Returning PIC its pictures as required by the contracts also would have prevented Gillette from giving the images to third-parties for duplication and use, as has also occurred. PIC could also draw upon the images in developing ideas for future projects for other clients without implicating the Lanham Act at all.

As baseless as the notion is that one can improperly retain another's property on the speculative theory that the rightful owner "intended" to put it to ill use, Gillette's position is further undermined by the absence of any allegations supporting the theory that PIC *would* have done anything improper with the images. Moreover, even solid grounds for such speculation would not satisfy the Lanham Act's requirement that such improper use already have occurred to be actionable. It is difficult to conceive of a basis for Gillette's having asserted this counterclaim that is not grounded in the litigation expense to which PIC has now been put in responding to it.

In short, Gillette's attempt to invent a cause of action for "intent" to commit trademark infringement is a transparent effort to circumvent its contractual obligation – which it admits it has breached – to return PIC's photographic materials.

- 18 -

Of primary importance to the present motion, the allegation fails to state a claim for trademark infringement as a matter of law, and must therefore be dismissed.

**III.     CONCLUSION**

For the above reasons, Gillette's counterclaims against PIC and Paul Picone should be dismissed with prejudice.

Respectfully submitted,

PLAINTIFF AND COUNTERCLAIM-DEFENDANT
PHOTOGRAPHIC ILLUSTRATORS CORP.

and

ADDITIONAL COUNTERCLAIM-DEFENDANT
PAUL PICONE

By their counsel,


Dated: November 24, 2004          /s/ Michael A. Albert
                                  Michael A. Albert, BBO #558566
                                  malbert@wolfgreenfield.com
                                  Michael N. Rader, BBO # 646990
                                  mrader@wolfgreenfield.com
                                  WOLF, GREENFIELD & SACKS, P.C.
                                  600 Atlantic Ave.
                                  Boston, MA 02210
                                  Tel: (617) 646-8000