UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHOTOGRAPHIC ILLUSTRATORS CORPORATION,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>THE GILLETTE COMPANY,<br><br>　　　　Defendant. | Civil Action No. 04-10913 WGY |
| THE GILLETTE COMPANY,<br><br>　　　　Counterclaim-Plaintiff,<br><br>　vs.<br><br>PHOTOGRAPHIC ILLUSTRATORS CORPORATION and PAUL PICONE,<br><br>　　　　Counterclaim-Defendants. | |

## THE GILLETTE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO PHOTOGRAPHIC ILLUSTRATORS CORPORATION AND PAUL PICONE'S MOTION TO DISMISS COUNTERCLAIMS

FROSS ZELNICK LEHRMAN & ZISSU, P.C.
　　　Marie V. Driscoll (Admitted *pro hac vice*)
　　　Patrick T. Perkins (Admitted *pro hac vice*)
　　　David Donahue (Admitted *pro hac vice*)
886 United Nations Plaza
New York, New York 10017
Ph: (212) 813-5900
Fax: (212) 813-5901

GELB & GELB LLP
　　　Richard M. Gelb (BBO#188240)
　　　Robert S. Messinger (BBO#651396)
20 Custom House Street
Boston, MA  02110
Tel: (617) 345-0010
Fax: (617) 345-0009

*Attorneys for Defendant/Counterclaim-Plaintiff*
*The Gillette Company*

# TABLE OF CONTENTS

Table of Authorities ......................................................................................................... ii

BACKGROUND .............................................................................................................. 1

ARGUMENT ................................................................................................................... 4

I.    GILLETTE STATES A VALID BREACH OF CONTRACT CLAIM ............................. 5

    A.    Gillette Has Pleaded PIC's Breach of Oral/Implied-in-Fact Contracts. .................. 5

    B.    PIC's "Parol Evidence Rule" Argument Ignores the Facts Alleged by Gillette and is Based on a Legal Principle That the First Circuit Has Overruled. ............. 11

    C.    Gillette Has Alleged That it Was "Ready, Willing and Able" to Perform. ........... 15

II.    GILLETTE STATES A VALID ESTOPPEL COUNTERCLAIM ................................... 16

III.    GILLETTE STATES A VALID FRAUD CLAIM ............................................................ 17

IV.    GILLETTE STATES A VALID CLAIM UNDER CHAPTER 93A ................................ 18

V.    GILLETTE STATES VALID TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION CLAIMS ............................................................................................... 19

CONCLUSION ................................................................................................................ 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alloy Computer Products, Inc. v. Northern Telecom, Inc.*, 683 F. Supp. 12
(D. Mass. 1988).................................................................................................. 12-13

*Coady Corp. v. Toyota Motor Distribs., Inc.*, ___ F. Supp. 2d ___, 2003 WL 23873278
(D. Mass. Apr. 14, 2003) ................................................................................15

*Druker v. Sullivan*, 334 F. Supp. 861 (D. Mass. 1971)....................................................4

*Fontneau v. Town of Sandwich*, 251 F. Supp. 2d 994 (D. Mass. 2003) ................................. 16-17

*Gorski v. New Hampshire Department of Corrections,* 290 F.3d 466 (1st Cir. 2002)....................4

*Hunneman Real Estate Corp. v. Norwood Realty, Inc.*, 54 Mass. Ct. App. 416 (2002)................10

*I.Lan Sys., Inc. v. Netscout Serv. Level Corp.*, 183 F. Supp. 2d 328 (D. Mass. 2002) ............12, 14

*Ionics, Inc. v. Elmwood Sensors, Inc.*, 110 F.3d 184, 188-89 (1st Cir. 1997) .......................... 12-13

*JOM, Inc. v. Adell Plastics, Inc.*, 193 F.3d 47 (1st Cir. 1999).......................................................13

*Lafayette Place Associates v. Boston Redevelopment Authority*, 427 Mass. 509 (1998) .......... 9-10

*Lombardo v. Mauriello*, No. 99039OF, 2002 WL 31492393 (Mass. Super. Oct. 1, 2002)......... 8-9

*Lycos, Inc. v. Internet Venture Works, Inc.*, NO. CIV.A. 02-11383-RWZ, 2003 WL
21146661 (D. Mass. May 19, 2003) ................................................................18

*McEvoy Travel Bureau, Inc. v. Norton Co.*, 408 Mass. 704 (1990) ...............................................18

*Metrowest Med. Group, Inc. v. Mount Auburn Hosp.*, No. 94-4767, 1994 WL 902895
(Mass. Super. Ct. Dec. 14, 1994).....................................................................10

*Novel Iron Works, Inc. v. Wexler Contr. Co.*, 26 Mass. App. Ct. 401 (1988) ...............................8

*Persson v. Scotia Prince Cruises, Ltd.*, 330 F.3d 28 (1st Cir. 2003)..............................................15

*Pittsfield & N. Adams R.R. v. Boston & Albany R.R.*, 260 Mass. 390 (1927) ................................8

*Pro CD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996)..........................................................14

*Quint v. A.E. Staley Manufacturing Co.*, 246 F.3d 11 (1st Cir. 2001)........................................ 6-7

*Rosenfield v. U.S. Trust Co.*, 290 Mass. 210 (1935) ..................................................................... 8-9

*Roto-Lith Ltd. v. F.P. Bartlett & Co.*, 297 F.2d 497 (1st Cir. 1962) ...................................... 12-13

*Singarella v. City of Boston*, 342 Mass. 385 (1961) ..................................................................... 15

*Stein v. Smith*, 270 F. Supp. 2d 157 (D. Mass. 2003) ..................................................................... 5

*Turner v. Johnson & Johnson, Inc.*, 809 F.2d 90 (1st Cir. 1986) .................................................. 18

## FEDERAL STATUTES AND RULES

Fed. R. Civ. P. 12(b)(6) .......................................................................................................... *passim*

## MASSACHUSETTS STATUTES

Mass. Gen. L. ch. 93A ............................................................................................................ *passim*

Mass. Gen. L. ch. 106, § 2-204 ........................................................................................................ 9

Mass. Gen. L. 106, § 2-207 ..................................................................................................... 13-14

## MISCELLANEOUS

Farnsworth, E. Allan, 1 *Farnsworth on Contracts* § 3.8 (3d ed. 2004) ...................................... 8-9

McCarthy, J. Thomas, 5 *McCarthy on Trademarks* § 30:10 (3d ed. 2004) .................................. 19

White, James J. & Summers, Robert S., 1 *Uniform Commercial Code* § 1-3
    (4th ed. & 2004 Supp.) ............................................................................................................ 13

## BACKGROUND

For over a decade, PIC photographed consumer products made by Gillette's various divisions and affiliates and provided such photographs to employees in the Business Communications departments of Gillette's various divisions.  Am. Ans. & Countercls. ("AAC") ¶¶ 12-13.  PIC and Piccone enjoyed a good working relationship with Gillette and profited handsomely from it:  Indeed, by PIC's own estimation, it received approximately $1,000,000 from Gillette during that period for photographing *Gillette's own products*. *Id.* ¶ 12.

The parties' relationship soured in late 2002 when Picone, apparently piqued by his mistaken belief that Gillette no longer intended to use PIC as a vendor of photographic services, announced that he was terminating PIC's relationship with Gillette and demanded that Gillette return *all* photographs of Gillette's products that PIC had provided to Gillette over the past decade.  *See* AAC at 4, 7 (responses to PIC's Second Amended Complaint ("SAC") ¶¶ 17, 29, 30).  To Gillette's surprise, PIC and Picone threatened to enforce purported contract terms (the "Purported Terms") for the first time in the parties' long relationship that, according to them, would cause Gillette to immediately owe PIC hundreds of thousands of dollars.  *See* AAC ¶ 14.

The Purported Terms that PIC now was claiming it would enforce were printed on the back of PIC's Invoices, which, in most if not all cases, PIC sent to Gillette *after* providing the photographs to Gillette and *after* Gillette commenced its use of the photographs with PIC's knowledge, *see, e.g., id.* ¶¶ 14, 25, 27.  It is undisputed that for over a decade, the parties disregarded PIC's Purported Terms.[1]

Based on Picone's announcement that PIC no longer would serve as a vendor for Gillette, Gillette did not use PIC's services in the months following PIC's demand for the return of the photographs in Gillette's possession.  In early March 2004, however, Beth Cooper, a Senior Project Manager in the Business Communications Department of Gillette's Oral-B/Braun division, contacted Picone about a photography project for the International Home &

---

[1] PIC's claim that the Purported Terms are "standard in the industry" (PIC Mem. at 1) is outside the pleadings of this case and is untrue.

1

Housewares Show, *see* AAC ¶ 19, which was scheduled to take place in Chicago, Illinois from March 20-22, 2004 (the "March 2004 Housewares Show").

On March 1, 2004, Picone met with Ms. Cooper and discussed the possibility of PIC providing photographs of Gillette products for Gillette's use in the March 2004 Housewares Show (the "March 2004 Housewares Project"). AAC ¶ 19. However, given PIC's recent post-hoc attempt to impose and enforce its back-of-the-Invoice Purported Terms on the parties' prior business, Ms. Cooper made perfectly clear to Picone that Gillette would not permit PIC to perform work for Gillette if PIC would attempt to impose the Purported Terms on the parties' future dealings. *See* AAC ¶ 21. In reliance on Picone's express oral agreement that PIC would not claim that such Purported Terms applied to the project, Ms. Cooper entered into an agreement with PIC for the March 2004 Housewares Project. *Id.* ¶¶ 21-22, 39, 44.

Under the parties' resulting agreement: (1) Gillette was to provide PIC with Gillette products for PIC to photograph; (2) PIC was to photograph such products and provide such photographs to Gillette for Gillette's use, *inter alia*, in connection with the March 2004 Housewares Show; (3) PIC was to charge Gillette no more than its customary rate; and (4) PIC would not attempt to impose the back-of-the-Invoice Purported Terms on the parties' relationship. *Id.* ¶ 22. The parties also agreed to memorialize their agreement at a later date. *Id.*

Thereafter, as a direct result of the March 1, 2004 meeting, Gillette asked PIC to perform three other projects for it in March and April 2004 (collectively, with the 2004 Housewares Project, the "Spring 2004 Projects"). *Id.* ¶ 23. The parties' agreements for each of the Spring 2004 Projects included the terms the parties had agreed upon at the March 1, 2004 meeting (collectively, the "Spring 2004 Agreements"). *Id.*

In reliance upon Mr. Picone's express and/or implied representations at the March 1, 2004 meeting, and in partial performance of its obligations under the Spring 2004 Agreements, Gillette provided Gillette products to PIC and Picone and permitted PIC and Picone to photograph Gillette products. *Id.* ¶ 24.

2

As set forth in the AAC, in April 2004, after PIC had completed the projects and had delivered the photographs to Gillette, and after Gillette had used the photographs for the March 2004 Housewares Show, Picone offered to withhold invoicing Gillette for the Spring 2004 Projects until Gillette and PIC memorialized terms of the parties' agreement concerning ownership and further use of the photographs.  *Id.* ¶ 25.  Because Ms. Cooper wanted PIC to be paid for the Spring 2004 Projects, however, she instead invited him to send the invoices with the Purported Terms voided.  *Id.*  Ms. Cooper thereby manifested that Gillette was ready, willing and able to complete performance of the parties' Spring 2004 Project Agreements once PIC provided Gillette with invoices conforming to the parties' agreement that, among other things, PIC would not charge Gillette more than PIC's customary rate and that PIC and Picone would not claim that the Purported Terms on the back of PIC's invoices applied to the Spring 2004 projects.  *Id.*  PIC did not submit invoices to Gillette relating to the Spring 2004 Projects at that time.  However, based upon the oral and implied agreement between Gillette and PIC, Gillette used the photographs provided in connection with the remaining Spring 2004 Projects.  *Id.* ¶ 26.

On May 7, 2004, several weeks after PIC and Picone had delivered and Gillette had used the photographs provided in connection with the Spring 2004 Projects, PIC sued Gillette, asserting claims for breach of contract, fraud and copyright infringement, and violations of Mass. Gen. L. ch. 93A.  PIC's first pleading made *no mention* of the Spring 2004 Projects.  Among other things, PIC alleged that the Purported Terms contained on the back of PIC's Invoices governed the parties' relationship from its inception and that Gillette breached the Purported Terms by failing to return the photographs to PIC in a timely manner.  *See* SAC ¶¶ 9, 15, 17. Consistent with the parties' conduct throughout the history of their relationship, Gillette emphatically has denied PIC's claim that the Purported Terms governed the parties' relationship. AAC at 2-3 (responses to SAC ¶¶ 9, 15, 17); *id.* at 8 (3d Aff. Def.).

On May 21, 2004, two weeks *after* PIC commenced this action against it, Gillette finally received invoices from PIC for the Spring 2004 Projects.  AAC ¶ 27.  By this time, Gillette had already made use of the photographs provided in connection therewith in express reliance on the

3

oral and implied Spring 2004 Agreements with PIC. *Id.* ¶ 26. However, contrary to PIC's and Picone's agreement with Ms. Cooper and express and implied promises to her, the invoices contained the Purported Terms that PIC and Picone had acknowledged would not govern the parties' relationship. *Id.* ¶ 27. Moreover, on the invoice for the 2004 Housewares Project, PIC overcharged Gillette by tens of thousands of dollars and included the phrase "Same Day Service Provided" when no such service was provided. *Id*. ¶ 28. Based on PIC's breach of its obligations to Gillette in connection with the Spring 2004 Projects, Gillette has withheld payment to date. *See id.* at 6 (response to SAC ¶ 43).

Based on PIC and Picone's wrongful conduct in connection with the Spring 2004 Projects, Gillette has asserted counterclaims against PIC for breach of contract and estoppel, and against PIC and Picone for fraud and for unfair and deceptive trade practices under Mass. Gen. L. ch. 93A. In addition, based upon PIC and Picone's apparent intention to use in commerce photographs bearing Gillette's products and trademarks, Gillette also has asserted a claim for trademark infringement and unfair competition against PIC and Picone. Gillette's counterclaims are closely related to Gillette's defenses to PIC's claims and do not add substantially, if at all, to the scope of discovery in this case.

## ARGUMENT

"[M]otion[s] to dismiss for failure to state a claim [are] viewed with disfavor and [are] rarely granted." *Druker v. Sullivan*, 334 F. Supp. 861, 864 (D. Mass. 1971), *aff'd*, 458 F.2d 1272 (1st Cir. 1972). Federal Rule of Civil Procedure 12(b)(6) permits dismissal for failure to state a claim upon which relief can be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Gorski v. New Hampshire Dep't of Corr.,* 290 F.3d 466, 473 (1st Cir. 2002) (internal quotation marks and citations omitted). "The factual allegations of [Gillette's counterclaims] are to be accepted as true, and all reasonable inferences that might be drawn from them are indulged in favor of" Gillette. *Id.* (citations omitted). The burden PIC and Picone face in seeking dismissal of Gillette's

counterclaims is indeed "a heavy one." *Stein v. Smith*, 270 F. Supp. 2d 157, 164 (D. Mass. 2003) (citation omitted). They fail to meet it here.

## I.     GILLETTE STATES A VALID BREACH OF CONTRACT CLAIM

Gillette's First Counterclaim for Breach of Contract against PIC is based on the four oral and/or implied in fact Spring 2004 Agreements entered into by Gillette and PIC in March and April 2004. Specifically, Gillette alleges that on March 1, 2004, Gillette employee Beth Cooper and PIC's principal, Paul Picone, entered into a binding contract for PIC to provide services to Gillette in connection with the March 2004 Housewares Show, which was to take place later that month. AAC ¶¶ 19-22. Gillette further alleges that PIC and Gillette entered into additional contracts in March and April 2004 concerning three additional projects. *Id.* ¶ 23.

PIC raises three meritless arguments in an attempt to undermine Gillette's breach of contract counterclaim: First, PIC claims that Gillette has not pleaded an actual agreement between the parties, but only an unenforceable agreement to agree. Second, even though PIC did not send its invoices to Gillette until mid-May 2004—*after* PIC had provided photographs to Gillette under the Spring 2004 Agreements, *after* Gillette used the photographs with PIC's knowledge, and *after* PIC commenced this lawsuit against Gillette—PIC claims that Gillette's allegations concerning the terms of the oral and/or implied in fact Spring 2004 Agreements are barred by the parol evidence rule based on the Purported Terms contained on the backside of PIC's invoices. Finally, PIC argues that Gillette's claim fails because Gillette has failed to allege its own performance under the parties' agreement.

Each of PIC's arguments is based on PIC's distortion or outright denial of the facts alleged by Gillette and on PIC's incomplete or, in some instances, incorrect analysis of the applicable law.

### A.  Gillette Has Pleaded PIC's Breach of Oral/Implied-in-Fact Contracts.

The allegations of Gillette's pleading, which must be accepted as true for purposes of PIC's motion to dismiss, establish that on March 1, 2004, and later in connection with the other

Spring 2004 Projects, PIC and Gillette entered into enforceable agreements under which, *inter alia*, Gillette was to provide its consumer products to PIC, and PIC was to photograph the products, provide the photographs to Gillette for Gillette's use and charge Gillette its customary rate for such services.  AAC ¶¶ 19-22.  These terms standing alone are sufficient to create a binding contract.[2]

In addition to the above-recited terms, Gillette alleges that PIC promised not to claim that the Purported Terms on the back of PIC's invoices applied to the Spring 2004 Projects.  *Id.* ¶¶ 22-23.  Given PIC's post-hoc attempt to apply the Purported Terms to the parties' pre-2002 dealings, this provision was a deal-breaker:  As Gillette has alleged and will prove at trial, Gillette would not have entered into the Spring 2004 Agreements without PIC's promise that it would not claim that the Purported Terms applied.  *See* AAC ¶¶ 21-23, 39.  These allegations must be accepted as true for purposes of PIC's motion.

In an attempt to avoid the basic contract principle that oral agreements of the type PIC and Gillette entered into are enforceable, PIC omits any discussion of the above-recited contract terms in its "Agreement to Agree" section of its brief.  Instead, based on three other allegations of Gillette concerning the parties' intention to "memorialize" terms concerning their relationship, PIC argues that Gillette's pleading establishes as a matter of law that the parties did not enter into a binding agreement, but only an unenforceable "agreement to agree."  PIC is wrong.

At the outset, the word "memorialize" means to put in writing terms on which the parties orally have agreed.  *See, e.g.*, *Quint v. A.E. Staley Mfg. Co.*, 246 F.3d 11, 13 (1st Cir. 2001).  However, to support its argument, PIC attempts to equate "memorialize" with "negotiate."  (PIC Mem. at 4-5, 7-8.)  Any argument by PIC that whenever Gillette alleges the parties' intention to "memorialize" contract terms, Gillette *really* means to allege the parties' intention to "negotiate"

---

[2] Indeed, Gillette will prove in this case that PIC and Gillette *always* transacted business in this informal manner and that PIC's attempt to claim otherwise is nothing but PIC's attempt to recreate history, fueled by Picone's mistaken belief that Gillette no longer wished to employ him as a vendor.

contract terms, is impermissible under Rule 12(b)(6), which requires Gillette's allegations to be construed in a light most favorable to Gillette, not as PIC sees fit.

Moreover, the specific allegations that PIC points to do not support PIC's agreement to agree theory.  First, PIC claims that Gillette's allegation that "[d]uring the March 1, 2004 meeting, Picone and Ms. Cooper discussed, *inter alia*, memorializing terms to cover all *future* work performed by PIC for Gillette" proves that the parties did not come to an agreement.  *See* PIC Mem. at 7.  PIC's argument is a non-sequitur.  Gillette's breach of contract counterclaim is not based on a breach by PIC of any alleged terms regarding "future work" to be "performed by PIC for Gillette."  Rather, Gillette's counterclaim is based on PIC's breach of the terms that the parties agreed to in connection with the Spring 2004 Projects (i.e., that PIC would not claim the back-of-the-invoice Purported Terms applied to such projects, charge Gillette more than its customary rate or include false information on its invoices).  AAC ¶¶ 27-28.  Thus, Gillette's allegation that the parties considered memorializing terms to address "future work" by PIC does not obviate the Spring 2004 Agreements or excuse PIC's breach thereof.

PIC also attempts to support its agreement to agree theory by citing Gillette's allegation that in April 2004, "Picone offered to withhold invoicing Gillette for the Spring 2004 Projects until Gillette and PIC *memorialized* terms concerning ownership and use of the photographs." PIC Mem. at 7 (citing AAC ¶ 25).  This allegation suggests only that PIC and Gillette considered memorializing the terms on which they already had agreed in connection with the 2004 Spring Agreements.  The fact that Gillette and PIC never memorialized the Spring 2004 Agreements— PIC sued Gillette before Gillette could have prepared a draft agreement—does not alter the fact that the parties orally agreed to terms in connection with the Spring 2004 Projects and intended to be bound to such terms.  *Quint*, 246 F.3d at 13 ("[Appellant's] argument, that when the parties to an agreement contemplate a written document will memorialize a contract, there can be no agreement until the document is executed, is a radical and doomed departure from the principles of contract law…. [T]hat is not the law.")

Indeed, in its pleading, Gillette not only alleges that the parties intended to be bound by their oral Spring 2004 Agreements, *see* AAC ¶¶ 22-23, Gillette alleges that *both parties* took action in furtherance of such agreements notwithstanding the lack of a formal writing, *id.* ¶¶ 24-25. Specifically, Gillette has alleged that it provided its products to PIC, PIC photographed such products and *delivered* such photographs to Gillette, and Gillette used the photographs, all in the absence of a formal written agreement. *Id.* As the Massachusetts Court of Appeals noted when it enforced an oral agreement under similar circumstances, "[t]here is no surer way to find out what parties meant, than to see what they have done." *Novel Iron Works, Inc. v. Wexler Contr. Co.*, 26 Mass. App. Ct. 401, 409 (1988) (quoting *Pittsfield & N. Adams R.R. v. Boston & Albany R.R.*, 260 Mass. 390, 398 (1927)). Where, as here, the parties' conduct shows that they intended to be bound even in the absence of a formal writing, their contract must be enforced. *Id.* at 410 (affirming verdict finding oral contract enforceable where "[t]he preliminaries had been completed, the essential terms of the agreement had been reached, and the parties thereafter engaged in activities consistent with their agreement."); *see also Lombardo v. Mauriello*, No. 99039OF, 2002 WL 31492393, at *2 (Mass. Super. Oct. 1, 2002) (denying summary judgment where parties' partial performance, *inter alia*, signaled intention to be bound in absence of more formal writing); 1 *Farnsworth on Contracts* § 3.8, at 228 (3d ed. 2004) ("[A] party's subsequent behavior … may be persuasive … as showing that the [oral] agreement was intended to be binding….").

*Rosenfield v. U.S. Trust Co.*, 290 Mass. 210 (1935), cited in PIC Mem. at 7, is distinguishable. In that case, the Court found, on review of the evidence presented at trial, not in the context of a motion to dismiss, that the parties to a purported lease had not reached agreement on the material terms of the lease and that their actions showed that they "did not intend to be bound until the perfected lease was executed." *Id.* at 217-19. Here, however, PIC and Gillette not only agreed on terms concerning the Spring 2004 Projects, they went forward with the projects in the absence of a written agreement. AAC ¶¶ 22-25. Gillette's allegations concerning the terms of the parties' Spring 2004 Agreements, the actions the parties took in

furtherance of such agreements, and the parties' intention to be bound by the Spring 2004

Agreements must be accepted as true and viewed in a light most favorable to Gillette for

purposes of PIC's motion.  Any argument by PIC that the parties *did not* intend to be bound is

irrelevant on this motion to dismiss:  rather, this determination should be "left to the trier of fact,

based on all the circumstances" as developed in discovery and at trial.  1 *Farnsworth on*

*Contracts* § 3.8, at 227; *see also Lombardo,* 2002 WL 31492393, at *2 ("Whether the parties

intended to be bound before signing the letter agreement, and, if so, the terms of the agreement

are questions of fact to be decided by a jury.").

Moreover, to the extent PIC is claiming that if the parties left out some terms from their

oral agreement and agreed to work them out in writing at a later date, then the parties could not

have had a binding agreement, PIC is wrong.  Indeed, the Supreme Judicial Court of

Massachusetts expressly rejected an argument similar to the one PIC advances here.  In *Lafayette*

*Place Associates v. Boston Redevelopment Authority*, 427 Mass. 509, 517-19 (1998), the

defendant argued that the parties' alleged agreement for the sale of a parcel of land was an

unenforceable "agreement to agree" because the agreement left open certain issues concerning

the sale price and the precise boundaries of the parcel and required that "'the parties shall in

good faith negotiate and enter into an agreement'" with respect to such open terms.  In rejecting

the defendant's argument, the Supreme Judicial Court of Massachusetts cautioned that "[r]ules of

contract must not preclude parties from binding themselves in the face of uncertainty" and that

"it is … important that courts enforce and preserve agreements that were intended as binding,

despite a need for further documentation or further negotiation."  *Id.* at 518 & n.9 (citations

omitted).  The rule is the same under the Uniform Commercial Code as adopted by

Massachusetts.  *See* Mass. Gen. L. ch. 106, § 2-204(3) ("Even though one or more terms are left

open a contract for sale does not fail for indefiniteness if the parties have intended to make a

contract and there is a reasonably certain basis for giving an appropriate remedy.").

Gillette is *not* claiming that PIC breached any  "additional" terms that the parties had

agreed to memorialize.  Rather, Gillette is claiming that PIC breached the specific terms the

9

parties agreed to under the 2004 Spring Agreements.  AAC ¶¶ 22-23, 27-28.  Even if Gillette's pleading could be construed (as PIC suggests) to allege that the parties left some terms open (and on this motion to dismiss, any such construction would be inappropriate), Gillette's allegations concerning (i) the terms on which the parties agreed, (ii) the actions the parties took in furtherance of such projects, and (iii) the parties' intention to be bound in the absence of a formal writing and in the absence of any purported intention to negotiate unspecified "additional terms," provide sufficient grounds for finding that the Spring 2004 Agreements are enforceable. *Hunneman Real Estate Corp. v. Norwood Realty, Inc.*, 54 Mass. Ct. App. 416, 421 (2002) (in determining the enforceability of contracts of this type, courts "place great emphasis on the intention of the parties.").

The cases cited by PIC in which courts have held that the party seeking enforcement of a contract pleaded only an unenforceable agreement to agree are completely inapposite.  For example, in *Metrowest Med. Group, Inc. v. Mount Auburn Hosp.*, No. 94-4767, 1994 WL 902895 (Mass. Super. Ct. Dec. 14, 1994), cited in PIC Mem. at 7-8, a medical provider claimed that it had reached employment agreements with doctors based on the parties' written agreement "to execute written employment contracts with [the provider] substantially identical to those executed with [their former employer]."  The court found an unenforceable agreement to agree, however, based on the fact that in the same agreement the parties "undertook to negotiate in good faith the terms of their employment and other aspects of [their] relationship …."  *Id.* at *5. In other words, the parties had not agreed on *any* specific terms other than that they would negotiate the terms of their employment arrangement in good faith.  *See id.*

That is not what Gillette has alleged here.  Rather, Gillette has alleged that the parties reached oral agreements concerning the Spring 2004 Projects which included specific terms (e.g., that PIC would charge Gillette its standard rate established by the parties' long course of dealing and would not later claim that the Purported Terms on the back of its invoices applied to the Spring 2004 Projects) that PIC breached in May 2004 when it sent its invoices containing the

Purported Terms and overcharging Gillette.  These allegations are sufficient to allege

enforceable agreements between PIC and Gillette, and PIC's breach thereof.

>    **B.  PIC's "Parol Evidence Rule" Argument Ignores the Facts Alleged by Gillette
>         and is Based on a Legal Principle That the First Circuit Has Overruled.**

In direct contradiction to its first argument (i.e., that the parties never consummated an

agreement with respect to the Spring 2004 Projects), PIC also argues that Gillette *accepted* the

Purported Terms that PIC included on the back of its invoices for the Spring 2004 Projects and

that under the parol evidence rule this purported *written* contract bars Gillette's allegations

concerning the parties' oral Spring 2004 Agreements.  PIC Mem. at 9.  PIC is wrong again in

both its recitation of the facts pleaded by Gillette and its analysis of the applicable law.

PIC's argument is based entirely on its claim that "[w]hen Gillette … accepted and used

*the photographs sent by PIC in May 2004 …*, it thereby agreed to the terms and conditions

printed on the invoice *that accompanied the images*."  *Id.* (emphasis added).  There are at least

three factual inaccuracies and two misstatements of law in PIC's argument.

We start with the factual inaccuracies, which by themselves are sufficient to put PIC's

parol evidence rule argument to rest.  First, PIC did not send the photographs to Gillette "in May

2004" as PIC claims; Gillette has pleaded, and possesses indisputable evidence, including emails

from Picone himself, that PIC provided the photographs relating to the Spring 2004 Projects to

Gillette in March and April 2004.  *See* AAC ¶ 25.

Second, Gillette did not commence "use" of the photographs "in May 2004" as PIC

alleges.  Rather, Gillette alleges and possesses indisputable evidence that it used the photographs

with PIC and Picone's knowledge in March and April 2004—including  in connection with the

March 2004 Housewares Show which took place on March 20-22, 2004—prior to receiving

PIC's invoices for the Spring 2004 Projects.  *See* AAC ¶¶ 26-27.

Third, PIC's statement that its "invoices … accompanied the images" (PIC Mem. at 9) is

contrary to Gillette's allegations and, in fact, is false:  PIC did not send the invoices for the

Spring 2004 Projects to Gillette until May 2004, *after* PIC had provided photographs to Gillette

under the Spring 2004 Agreements, *after* Gillette had commenced use of the photographs with

PIC's knowledge, and *after* PIC commenced this lawsuit against Gillette.  *See* AAC ¶¶ 25-27.

Viewed against a timeline that accurately reflects Gillette's allegations, PIC's claim –

that by accepting and using the photographs in March and April of 2004 Gillette accepted the

Purported Terms even though PIC did not send Gillette the invoices containing such terms until

mid-May 2004 – not only is legally untenable, it is highly misleading.

The legal deficiencies of PIC's parol evidence argument are equally devastating to PIC.

First, even if PIC's timeline of events were correct (and as demonstrated above, it is not), PIC's

claim that Gillette would have accepted the Purported Terms by accepting the photographs fails

as a matter of law.  PIC cites three cases for this proposition, but none of them support it.

Although in *Alloy Computer Products, Inc. v. Northern Telecom, Inc.*, 683 F. Supp. 12,

14 (D. Mass. 1988), the court held that the purchaser's acceptance of goods constituted

acceptance of the seller's terms which were enclosed with the shipment of goods even though the

buyer never expressly accepted the terms, the court's decision was based entirely on a rule set

forth in *Roto-Lith Ltd. v. F.P. Bartlett & Co.*, 297 F.2d 497 (1st Cir. 1962), which the First

Circuit expressly has overruled.  *See Ionics, Inc. v. Elmwood Sensors, Inc.*, 110 F.3d 184, 188-89

(1st Cir. 1997); *see also I.Lan Sys., Inc. v. Netscout Serv. Level Corp.*, 183 F. Supp. 2d 328, 336

(D. Mass. 2002) (Young, *Chief J.*) (noting that *Ionics, Inc.* overruled *Roto-Lith Ltd.*).  As the

court explained in *Alloy Computer Products*, the old law in this Circuit under *Roto-Lith* was that:

> whenever an offeree's acceptance contains terms that materially alter the contract by
> burdening the offeror, the offeree has conditioned his participation on the offeror's
> acceptance of such terms. The offeree's response becomes a counteroffer, to be accepted
> or rejected by the offeror, rather than an acknowledgment of the original offer.
> Performance by the offeror may constitute an acceptance.

683 F. Supp. at 14.  Thus, the court held that "[u]nder the teaching of *Roto-Lith,*" the seller's

terms enclosed with the shipment of goods constituted a counteroffer that the buyer was "deemed

to have accepted … when it accepted the [goods]." *Id.* at 15.

Now, however, as a result of the First Circuit's overruling of *Roto-Lith*, where a seller

sends goods to a purchaser with an invoice containing terms that are additional to or different

than the terms of the parties' prior written or oral agreement, the form is *not* considered a counteroffer,[3] and the terms on the form *do not* become part of the parties' agreement if they would materially alter the parties' agreement even if the buyer accepts the goods. *JOM, Inc. v. Adell Plastics, Inc.*, 193 F.3d 47, 59 (1st Cir. 1999) (citing Mass. Gen. L. 106, § 2-207(2)(b)).

The above-stated rule applies not only if there is a so-called "battle of the forms" where the seller and buyer each use their own standard forms with differing terms; it also applies where, as here, the parties reach an oral agreement and the seller later sends a form contract that contains terms that would materially alter the parties' agreement. *See* Mass. Gen. L. ch. 106, § 2-207 cmt. 1 ("This section is intended to deal with …. the written confirmation, where an agreement has been reached either *orally* or *by informal correspondence* between the parties and is followed by *one or both* of the parties sending formal memoranda embodying the terms so far as agreed upon and adding terms not discussed.") (emphasis added); *see also* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 1-3, at 28 (4th ed. & 2004 Supp.) ("When a [written] confirmation states a term different from the original oral or other informal agreement, the different term falls out."). This brings us to the second legal flaw in PIC's analysis: Since Section 2-207 contemplates and endorses oral agreements, PIC's claim that the parol evidence rule bars Gillette's allegations concerning the parties' oral agreements is legally flawed.

Under Section 2-207(1), PIC's invoices containing the Purported Terms merely constitute written confirmations of the 2004 Spring Agreements that proposed additional and/or different terms to such agreements. Although a determination whether PIC's Purported Terms would materially alter the Spring 2004 Agreements is not appropriate on a motion to dismiss, the materiality of the Purported Terms is obvious here: As Gillette has alleged, at the March 1, 2004 meeting, the parties *specifically agreed that such terms would not* apply to the Spring 2004 Projects. Accordingly, the Purported Terms *did not* become part of the parties' agreement.

---

[3] The form may be considered a counteroffer only if the seller conditions its acceptance of the offer on the buyer's express assent to the seller's terms, *see* Mass. Gen. L. ch. 106, § 2-207(1), which is not what PIC alleges occurred here.

*I.Lan Systems* does not support PIC either.  In that case, this Court held that the purchaser explicitly accepted the seller's terms of a "clickwrap" software license by clicking "I agree" to the terms of the license *before* using the software.  183 F. Supp. 2d at 338.  There is no similar allegation here.

Finally, *Pro CD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1448 (7th Cir. 1996), also is inapposite.  In that case, the issue was whether a buyer of computer software was bound by the terms of a software license enclosed inside the package and on a CD-ROM containing the software.  The Court held that § 2-207 did not apply because the packaging on the outside of the box "declare[d] that the software comes with restrictions on the enclosed license."  Thus, the purchaser knew when it purchased the product that there were additional terms set forth inside the box.  Again, nothing like that happened here.  PIC waited until May 2004 to send its invoices to Gillette for the Spring 2004 Projects, *after* PIC had provided photographs to Gillette under the Spring 2004 Agreements, *after* Gillette had commenced use of the photographs with PIC's knowledge, and *after* PIC commenced this lawsuit against Gillette.  *See* AAC ¶¶ 25, 27.

Putting PIC's meritless parol evidence argument aside for the moment, it is important to note what PIC really is trying to do here.  As the Court is aware, one of the major issues to be decided in this case is whether the Purported Terms included on the back of PIC's invoices governed the parties' relationship over a course of dealing that exceeded 10 years:  PIC claims the terms apply; Gillette claims they do not apply.  *See* AAC at 2-3 (responses to SAC ¶¶ 9, 15, 17); *id.* at 8 (3d Aff. Def.).  In seeking dismissal of Gillette's breach of contract claim by arguing that Gillette's acceptance of the photographs equaled Gillette's acceptance of the Purported Terms, PIC is in essence asking the Court to decide the primary and hotly disputed issue raised by PIC's complaint in this action on a motion to dismiss *Gillette's counterclaim*.  PIC's backdoor effort to obtain judgment on the pleadings should be rejected.

14

**C. Gillette Has Alleged That it Was "Ready, Willing and Able" to Perform.**

PIC's claim that Gillette has failed to state a claim for breach of contract because Gillette has pleaded "a refusal to perform, i.e., a refusal to pay PIC's Invoices" rather than its performance of the contract (PIC Mem. at 10) is legally flawed.  In an attempt to support its argument, PIC relies on a First Circuit case interpreting either *Maine* or *federal admiralty law* to supply the pleading standard for Gillette's breach of contract counterclaim under *Massachusetts* law.  (PIC Mem. at 10 (citing *Persson v. Scotia Prince Cruises, Ltd.*, 330 F.3d 28 (1st Cir. 2003), an appeal from a District of Maine decision brought by crew of Nova Scotia, Canada/Yarmouth, Maine ferry service "under the federal court's admiralty jurisdiction.").  "In Massachusetts," however, "a breach of contract is proven by a showing that (1) an agreement was made between the plaintiff and the defendant supported by valid consideration, (2) *the plaintiff was ready, willing and able to perform*, (3) the defendant failed to perform a material obligation under the agreement and (4) the plaintiff suffered damage as a result of defendant's failure to perform." *Coady Corp. v. Toyota Motor Distribs., Inc.*, ___ F. Supp. 2d ___, 2003 WL 23873278 (D. Mass. Apr. 14, 2003) (emphasis added) (citing *Singarella v. City of Boston*, 342 Mass. 385, 387 (1961)).

Gillette's pleading easily meets this standard.  Specifically, Gillette has alleged that:  (1) PIC and Gillette entered into valid contracts (the Spring 2004 Agreements) (AAC ¶¶ 22-23); (2) Gillette performed key obligations under the contracts (i.e., by providing PIC with its products so that PIC could photograph them) and "was ready, willing and able to complete performance" in April 2004 (*id.* ¶¶ 24-25); (3) PIC breached the Spring 2004 Agreements by including the Purported Terms on its invoices and claiming that they apply to the Spring 2004 Agreements, by charging Gillette more than PIC's customary rate, and by including "Same day Service Provided" on one of the invoices when, in fact, no such service was provided (*id.* ¶¶ 32-34); and (4) Gillette was damaged thereby (*id.* ¶ 35).

## II.    GILLETTE STATES A VALID ESTOPPEL COUNTERCLAIM

PIC's two arguments against Gillette's estoppel claim contradict one another and fail for the same reasons as its arguments against Gillette's breach of contract claim.  First, PIC claims that Gillette's estoppel claim is barred because it is based on an unenforceable "agreement to agree" whereby PIC promised the Purported Terms "would not apply under a later contract (one that was never consummated and is not alleged to have been consummated)."  PIC Mem. at 11.  However, what Gillette actually alleged is that:  (1) PIC promised, through its unambiguous express words and/or its actions, to allow Gillette to use the photographs prepared in connection with the Spring 2004 Projects without claiming that such use is subject to the Purported Terms and to charge Gillette no more than its customary rate (AAC ¶ 37); (2) PIC and Picone knew that Gillette would rely on such unambiguous promises (*id.* ¶ 38); (3) Gillette relied on such unambiguous promises to its detriment by permitting PIC to perform the Spring 2004 Projects and by going forward with use of the photographs provided by PIC in connection with the Spring 2004 Projects (*id.* ¶ 39); (4) on May 21, 2004, several weeks after PIC delivered the photographs and Gillette had used them in reliance on PIC 's promises, PIC sent invoices to Gillette that still contained the Purported Terms, which PIC and Picone had acknowledged would not govern the parties' relationship; and (5) "[a]s a result, Gillette has been, and will continue to be, damaged by PIC's actions in an amount to be determined at trial" (*id.* ¶ 40.)

Gillette's counterclaim thus does not arise from any "agreement to agree" on some "later contract" that was "never consummated" as PIC claims.  Rather, the claim arises from PIC's specific promise not to later claim that the Purported Terms apply to the Spring 2004 Projects made in connection with the parties' enforceable Spring 2004 Agreements.

The facts of *Fontneau v. Town of Sandwich*, 251 F. Supp. 2d 994, 1002 (D. Mass. 2003) (Young, *Chief J.*), cited in PIC Mem. at 10-11, are easily distinguished from this case.  In *Fonteneau*, the lessor of a boat slip claimed that a town breached its oral commitment to renew his lease in 2002, but the sole evidence in support of his claim was that:  (1) in 2000 he was told

"You're all set" when the he asked the harbormaster whether he "could stay on in the harbor"; and (2) the town allowed him to renew his lease *for one year* in 2001. *See id.* at 997. This is a far cry from Gillette's allegations here that immediately prior to entering into the Spring 2004 Agreements for the Spring 2004 Projects, PIC promised Gillette that it would not later claim that its Purported Terms applied to such projects.

PIC's second argument against Gillette's estoppel claim directly contradicts its first argument. PIC claims that Gillette's alleged reliance on PIC's promises in March and April 2004 not to later claim that the Purported Terms applied is "directly at odds with the terms and conditions later delivered to and accepted by Gillette." PIC Mem. at 12. As Gillette explained in Section I(B) above, however, PIC's fanciful claim that Gillette somehow accepted its Purported Terms in May 2004 by accepting and using PIC's photographs in March and April 2004 is directly contradicted by the allegations of Gillette's pleading, *see* AAC ¶ 29—which must be accepted as true on this motion—and fails as a matter of law.

## III.    GILLETTE STATES A VALID FRAUD CLAIM

With respect to Gillette's fraud claim, PIC and Picone again distort Gillette's allegations and misapply the law. In a reprise of PIC's failed "parol evidence rule" argument, PIC and Picone claim that "any alleged misrepresentation [by PIC and Picone] could not reasonably have been relied upon by Gillette because it would directly contradict the unambiguous language of the parties' written contract," which, according to PIC and Picone, incorporates the Purported Terms that Gillette alleges PIC and Picone promised would not apply. PIC Mem. at 12. This recycled argument fares no better here. As Gillette has explained in Sections I-III, above, Gillette never accepted PIC's the Purported Terms on PIC's invoices, which PIC sent to Gillette

in May 2004. Thus, the Purported Terms never became part of the contracts between the parties with respect to the 2004 Spring Projects.[4]

PIC and Picone's claim that "Gillette cannot revive an otherwise unenforceable contract claim simply by re-labeling it as a tort claim" is irrelevant because that is not what Gillette has done here. Moreover, at the pleadings stage, one who is fraudulently induced by another to enter into a contract may sue for fraud as well as breach of the resulting contract. *See, e.g., Lycos, Inc. v. Internet Venture Works, Inc.*, NO. CIV.A. 02-11383-RWZ, 2003 WL 21146661 (D. Mass. May 19, 2003) (plaintiff stated claim for breach of contract as well as fraudulent inducement).

Finally, PIC and Picone's claim that Gillette has failed "to allege any cognizable injury" also fails. PIC Mem. at 14. In an attempt to support this theory, PIC and Picone falsely state that "the only injury Gillette apparently alleges is that it was 'entrapped into alleged violations of the Purported Terms.'" *Id.* (quoting AAC ¶ 43.) However, Gillette specifically has alleged that "Gillette relied to its detriment upon Picone's promise that Picone and PIC would not claim that its use of the photographs is subject to the Purported Terms by permitting PIC and Picone to perform the Spring 2004 Projects …." (AAC ¶ 44.) The "injury" requirement is satisfied where, as here, a party claims that it was fraudulently induced into entering into a contract. *See McEvoy Travel Bureau, Inc.*, 408 Mass. at 712-13 ("We continue to believe that parties to contracts, whether experienced in business or not, should deal with each other honestly, and that a party should not be permitted to engage in fraud to induce the contract.").

## IV.    GILLETTE STATES A VALID CLAIM UNDER CHAPTER 93A

PIC and Picone do not advance any new arguments against Gillette's Chapter 93A claim, relying instead on their baseless attacks on Gillette's contract, estoppel and fraud claims. For the

---

[4] In any event, "[i]t is well established that the parol evidence rule does not apply when the complaining party alleges fraud in the inducement." *McEvoy Travel Bureau, Inc. v. Norton Co.*, 408 Mass. 704, 711 n.5 (1990). To the extent PIC believes *Turner v. Johnson & Johnson, Inc.*, 809 F.2d 90 (1st Cir. 1986), cited in PIC Mem. at 12-13, once suggested otherwise, the Massachusetts Supreme Judicial Court's later decision in *McEvoy Travel Bureau* governs.

reasons stated in Sections I-III above, their motion also should be denied with respect to Gillette's Chapter 93A claim.

## V.   GILLETTE STATES VALID TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION CLAIMS

PIC and Picone's defense to Gillette's trademark claim may be summed up as "Gillette has not caught us infringing its trademarks yet, so it cannot stop us from doing so." But as the leading commentator on trademark law has remarked: "Injunctive relief may be obtained before defendant actually opens for business …. One does not have to await consummation of the threatened injury to obtain preventive relief." 5 J. Thomas McCarthy, *McCarthy on Trademarks* § 30:10, at 30:22 (3d ed. 2004).

Here, Gillette asserts a counterclaim for trademark infringement and unfair competition against PIC and Picone on the basis of its belief that "PIC's and Picone's recent insistence upon the return of photographs of Gillette's products bearing Gillette's trademarks is based upon PIC's and Picone's intention to make use of such photographs in commerce without Gillette's authorization." AAC ¶ 56. PIC and Picone's actions and PIC's responses to Gillette's discovery requests since the time Gillette filed its counterclaims are confirming Gillette's fears.

When PIC's counsel alerted Gillette's counsel of PIC's intention to file this motion to dismiss, Gillette's counsel made the following offer to PIC's counsel:

> In the spirit of avoiding unnecessary litigation, Gillette would agree to withdraw Gillette's Fourth Counterclaim for trademark infringement and unfair competition against PIC and Paul Picone if PIC and Mr. Picone would stipulate that they have not used the photographs they prepared for Gillette and will not use such photographs for any purpose in the future without Gillette's written permission.

PIC and Picone's counsel filed the motion anyway without responding to Gillette's offer.

As Gillette soon learned, PIC and Picone's counsel had good reason to avoid discussion of a stipulation that would have obviated the need for Gillette's trademark and unfair competition claim. PIC's discovery responses, which were served the business day after PIC and Picone filed this motion to dismiss, confirm Gillette's fear that PIC and Picone intend to misuse or facilitate the misuse of photographs bearing Gillette's trademarks. In response to an interrogatory

requiring PIC to identify the uses it has made of photographs of Gillette's consumer products, PIC stated that it intends to sell Gillette's photographs to others "for use as stock photos."[5]

Gillette should not have to wait until *after* it catches PIC and Picone in the act to put a stop to their trademark infringement and unfair competition.

## CONCLUSION

For the reasons set forth above and in its moving brief, Gillette respectfully requests that the Court deny PIC's and Picone's Motion in its entirety or, in the alternative, be given the opportunity to amend its counterclaims.

Dated:  December 8, 2004                    FROSS ZELNICK LEHRMAN & ZISSU, P.C.

By:    /s/David Donahue/
      Marie V. Driscoll (Admitted *pro hac vice*)
      Patrick T. Perkins (Admitted *pro hac vice*)
      David Donahue (Admitted *pro hac vice*)
886 United Nations Plaza
New York, New York 10017
Ph: (212) 813-5900
Fax: (212) 813-5901

GELB & GELB LLP

By:     /s/Richard M. Gelb/
      Richard M. Gelb (BBO#188240)
      rgelb@gelbgelb.com
      Robert S. Messinger (BBO# 651396)
      rmessinger@gelbgelb.com

20 Custom House Street
Boston, MA  02110
Tel: (617) 345-0010
Fax: (617) 345-0009

*Attorneys for Defendant/Counterclaim-Plaintiff*
*The Gillette Company*

---

[5] PIC's claim that the photographs "are indisputably owned by PIC" (PIC Mem. at 17 n.5), which is reflected in the tenor of its interrogatory responses, is untrue and is in any event directly contrary to Gillette's pleading and should be disregarded on this motion to dismiss.