IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PHOTOGRAPHIC ILLUSTRATORS
CORPORATION,

       Plaintiff,

v.

THE GILLETTE COMPANY,

       Defendant.

Civil Action No. 04-CV-10913-WGY

**EXPEDITED CONSIDERATION
REQUESTED PURSUANT TO
LOCAL RULE 5.1(c)**

**MEMORANDUM IN SUPPORT OF PIC'S MOTION TO COMPEL
GILLETTE TO PRODUCE DOCUMENTS AND RESPOND TO INTERROGATORIES**

TABLE OF CONTENTS

I.    BACKGROUND .................................................................................................2

     A.    Overview Of The Case.............................................................................2

     B.    Overview Of PIC's Efforts To Obtain Discovery From Gillette ...........3

II.   DISCOVERY THAT SHOULD BE COMPELLED...........................................4

     A.    Catalogs And Related Marketing Materials............................................4

     B.    Trade Show Displays And Related Documents.......................................6

     C.    Product Packaging And Point-Of-Purchase Displays..............................8

     D.    Documents Concerning Gillette's Reproduction Of PIC's Images ......10

     E.    Gillette's Indexes of PIC's Images .......................................................13

     F.    Privilege Log.........................................................................................14

     G.    Electronic Mail And Documents ...........................................................14

     H.    PIC's Invoices.......................................................................................16

     I.    Electronic Copies of Gillette's Web Sites ............................................17

     J.    Revenue And Profit Information ...........................................................19

III.  CONCLUSION................................................................................................20

Plaintiff Photographic Illustrators Corporation ("PIC") requests an order compelling Defendant The Gillette Company ("Gillette") to comply with its discovery obligations.

After stonewalling PIC for a year prior to this case with empty promises that it would "investigate" PIC's claims and report the results of its investigation to PIC, Gillette has continued to pursue the same strategy in litigation, refusing to produce large numbers of highly relevant responsive documents or to answer PIC's interrogatories.

Gillette's stonewalling in this case is particularly striking because PIC's requests are narrowly tailored to documents and information that PIC *knows* exist. In many cases, PIC has independently obtained sample documents of the type that it seeks, and needs the full set from Gillette. Gillette nevertheless claims that such documents do not exist or are not "reasonably" accessible – or simply refuses to produce them with no justification at all.

By its very nature, this is a case in which discovery from Gillette is critical. PIC contends that Gillette systematically misused thousands of PIC's copyrighted images over a period of years. The full extent of that misuse is known only to Gillette. Stonewalling in discovery is a transparent attempt by Gillette to prevent PIC from proving its case at trial.

Gillette has coupled its strategy of stonewalling with a successful request that the Court put this case on a fast track to trial, necessitating adoption of a very limited discovery period. See Transcript of September 23, 2004 Hearing (Exhibit A).[1] At various points during discovery, Gillette has put PIC off with further assurances that Gillette was looking for more documents and/or reconsidering prior refusals to produce. Now, however, with only one month left before the scheduled fact discovery deadline, Gillette continues to fail and/or refuse to produce key documents and information that PIC needs prior to deposing Gillette's witnesses.

---

[1] PIC's counsel, explaining the depth and complexity of discovery needed in this case, recommended a one-year schedule. Gillette's counsel requested, and secured, a schedule totaling just over eight months instead. (Id. at 9). The Court then warned Gillette, however, that it would not tolerate stonewalling. (Id. at 11).

Gillette's conduct has put PIC in an untenable situation, forcing PIC to file this motion to compel and to request expedited consideration under Local Rule 5.1(c).[2]

## I.    BACKGROUND

### A.    <u>Overview Of The Case</u>

This case is about Gillette's systematic wrongful conduct toward its longtime product photographer, PIC. The key facts are undisputed. Notwithstanding a contractual provision (standard in the industry) requiring that Gillette return PIC's original photographic materials within thirty days, Gillette refused to do so. (2d Am. Compl. ¶¶ 14, 17, 18). Gillette admits this. <u>See</u> Am. Answer ¶ 17 ("Defendant admits that it did not return all photographs provided to it by plaintiff.").[3] Gillette wrongfully retained *thousands* of PIC's original images over the years despite PIC's demands that these materials be returned.[4]

After retaining thousands of PIC's original images in breach of its contracts with PIC, Gillette proceeded to bypass PIC in satisfying its copying needs – wrongfully duplicating the images through third-party laboratories instead of through PIC. (2d Am. Compl. ¶¶ 24-26). Gillette admits that it did this too. <u>See</u> Am. Answer ¶ 25 ("Defendant admits that … it purchased from third-party laboratories … duplicate prints of photographs provided by plaintiff.").

Gillette then induced additional infringements by unlawfully disseminating PIC's images, including the duplicates that Gillette had made, to Gillette's resellers, who committed wholesale copyright infringement by using PIC's images in their own marketing and advertising materials.

---

[2] Under the circumstances, PIC further suggests that fact discovery, including the deposition of fact witnesses, should be permitted to take place through the close of discovery on March 31, 2005.

[3] Indeed, Gillette *still* refuses to return to PIC the images that it has in its possession, despite the Court's dismissal of Gillette's counterclaim that PIC "intends" to commit trademark infringement with those images once they are returned.

[4] Given the vast number of images at issue in this case, it will be critical that Gillette cooperate with requests for admission on the fate of those images to avoid addressing each image individually at trial. PIC is serving a comprehensive set of requests for admission today, and hopes that Gillette will cooperate so that further motions of this nature are not needed.

Gillette also infringed PIC's copyrights by using PIC's images outside the scope of any license (i.e., one year) that it purchased. (2d Am. Compl. ¶¶ 20-22). Gillette admits that PIC's images were still posted on its web site even after this suit was filed. (Am. Answer ¶¶ 21-22). Indeed, as discussed in Section II(I) below, PIC's images are *still* posted on Gillette's web site even though PIC brought the infringements to Gillette's attention in briefing four months ago.

In short, although Gillette purchased *limited licenses* to use PIC's images (for one year in the United States only), Gillette systematically treated PIC's images as if they were Gillette's own, refusing to return them as required by the parties' contracts, using them far beyond the geographic and temporal scope of any licenses that it bought, duplicating them without permission, and sending them around the country and the world to third parties for their use.

Now, in an effort to prevent PIC from uncovering the full extent of its misuse of PIC's images, Gillette is refusing to produce documents or answer PIC's interrogatories.

**B.      Overview Of PIC's Efforts To Obtain Discovery From Gillette**

PIC's attempts to find out what happened to its images began long before this suit was filed in May 2004. In June 2003, after various unsuccessful attempts to secure return of its images as required by the parties' contracts, PIC contacted Gillette in writing to request that the images be returned. (Exhibit B). After sending PIC a small box containing a tiny fraction of PIC's images, Gillette declined to cooperate further, necessitating a follow-up letter to Gillette from PIC's counsel. (Exhibit C).

Gillette responded by "apologiz[ing] for the untimely manner in which we have complied with [PIC's] requests" and assuring PIC that it would "continue with our investigation and forward any relevant information to your attention as it becomes available." (Exhibit D).

Despite this assurance, Gillette never got back to PIC with any such information. Notwithstanding additional correspondence from PIC's counsel (Exhibit E), Gillette refused to disclose the results of its investigation.  This action was commenced on May 7, 2004.

After the parties held their Rule 26(f) conference, PIC served a first round of document requests and interrogatories on October 4, 2004 (Exhibits F, G).  This was followed by a second round on November 22, 2004 (Exhibits H, I).

As discussed in detail below, Gillette responded with a miniscule production unresponsive to most of PIC's requests, and refused to answer almost all of PIC's interrogatories. In an effort to resolve the issue, PIC's counsel contacted Gillette's counsel.  In correspondence during November and December 2004, Gillette's counsel assured PIC's counsel that it was consulting its client and working in good faith to locate responsive material.  Those assurances, like Gillette's earlier assurances regarding its pre-lawsuit "investigation," proved empty.

On January 20, 2005, PIC's counsel sent Gillette's counsel a detailed follow-up letter in an effort to obtain the discovery owed by Gillette without requiring the Court's involvement. (Exhibit J).  Gillette's response (Exhibit K) stonewalled once again on almost all of the relevant issues, necessitating the filing of the present motion.

## II.    DISCOVERY THAT SHOULD BE COMPELLED

### A.    <u>Catalogs And Related Marketing Materials</u>

For years, PIC served as Gillette's primary product photographer for numerous lines of products including shavers and shaving products, kitchen appliances, toothbrushes and batteries (to name a few).  PIC's images were used by Gillette in many types of marketing materials, including catalogs, product guides, product sheets (individual pages used to advertise particular products), Internet web site advertising, trade show booths and other media. <u>See</u> Declaration of Paul K. Picone (Exhibit L) ¶ 2.

- 4 -

PIC knows that Gillette used its images outside both the temporal scope (one year) and the geographic scope (U.S. only) of any licenses that Gillette purchased. For example, PIC is in possession of four annual catalogs produced by Gillette's Braun division dating from 1999 through 2002, each of which contains at least fifteen of PIC's images. Many of those uses exceed the one-year license provided to Gillette. (Id. ¶ 3). Likewise, PIC is aware of at least one unauthorized use by Gillette of an image in a catalog outside the United States. (Id. ¶ 4).

Accordingly, PIC requested production of Gillette's catalogs and other marketing materials containing PIC's images. To be sure that all of the relevant catalogs would be produced, PIC's request explained that Gillette should err on the side of including catalogs containing images with uncertain origins. (Exhibit G – Request No. 1).[5]

Gillette responded with the implausible statement that it does not keep copies of its own catalogs in the normal course of business. (Exhibit M at 3). In later correspondence, Gillette backtracked to some degree on this contention and indicated that its "efforts to locate more [catalogs] if any, is ongoing." (Exhibit N at 2).

Yet Gillette's document production to date includes just two copies of a single United States catalog (the 1999 catalog for Gillette's Braun division) and a modest group of what appear to be product sheets. Gillette has not produced a single foreign catalog,[6] nor has Gillette produced even its *current* 2004 and 2005 catalogs from the U.S. market. Similarly, numerous product guides and hundreds of product sheets are missing. Based on PIC's review of the catalogs in its own possession, the missing catalogs, product guides and product sheets are expected to contain hundreds of copyright infringements. (Picone Decl. ¶ 5).

---

[5] PIC also requested "[a]ll documents concerning PIC's images or PIC." (Exhibit G – Request No. 14).

[6] According to Gillette's own document retention policy, marketing materials from the "Latin American Group" are retained for at least three years. (Exhibit O at Bates No. GLTC 50).

In its January 21, 2005 letter preceding the filing of this motion, Gillette's counsel stated that some additional marketing materials had been located, and that with respect to Gillette's current catalogs, "we *will* ask the client to gather them." (Exhibit K at 2) (emphasis added). That Gillette's counsel had not even *asked* Gillette to gather these directly responsive *current* materials, over three months after the document request was served, is improper.

The situation is the same with respect to other marketing materials such as product guides and product sheets. PIC knows these materials exist because PIC obtained some from Gillette over the years. It is implausible that PIC possesses more of Gillette's catalogs, product guides and product sheets than Gillette itself does. Indeed, according to Gillette's own document retention policy, such marketing materials are retained for at least six years. See Exhibit O at Bates No. GLTC 22 ("Print advertising" is retained for at least six years).

Gillette should be compelled to produce all catalogs, product guides, product sheets and other marketing materials containing PIC's images. It should be required forthwith to search every office, division or branch, whether domestic or international, that may contain such materials, as well as to request copies of such materials from its print vendors. If Gillette is uncertain of the origin of any images, due to its failure to implement a system to keep track of which pictures it had obtained from PIC and which it had obtained from another source, the materials containing all such ambiguous images should be produced as requested.

### B.     Trade Show Displays And Related Documents

As already noted above, Gillette has used many of PIC's images in its trade show booths and displays over the years. The total number of these displays is believed to be in the dozens. (Picone Decl. ¶ 6). Naturally, PIC must know when and how its images were used in order to assess the full extent of its copyright infringement claim.

Accordingly, PIC requested production of all trade show booths that include PIC's images and all other documents concerning such displays, such as documents reflecting when and where the displays were used. (Exhibit G – Request Nos. 4, 5). Gillette responded that it would produce only "examples" of its booths and refused to provide supporting documentation. (Exhibit M at 5-6). When PIC's counsel reminded Gillette's counsel that Gillette employs photographers to photograph its trade show booths and maintains an archive of those photographs (Exhibit J at 5), Gillette's counsel stated that it would check on this and "get back to you as soon as possible" (Exhibit K at 3). Yet three months have passed since the document request was served, and fact discovery is set to close in 30 days unless extended by the Court.

PIC knows that Gillette used PIC's images in booths for at least a dozen *recent* trade shows known to one particular Gillette employee, Beth Cooper. In an e-mail dated March 5, 2004 (around the time that PIC was assisting Ms. Cooper by creating images for a housewares trade show booth), that Gillette produced to PIC, Ms. Cooper explained to a trade show booth vendor that "Paul [Picone, the principal of PIC] has provided the images for ***the last dozen*** shows." (Exhibit P) (emphasis added). Notwithstanding the knowledge of Ms. Cooper and others in Gillette that PIC provided images for Gillette's trade show booths, Gillette still has not produced a single such display, let alone all of them as requested.

Trade show booths are expensive to make, and thus are reused. To date, Gillette has provided no reason to believe that the displays are not maintained in accordance with Gillette's own document retention policy, under which marketing materials are retained for at least six years. (Exhibit O at Bates No. GLTC 22). PIC is aware that Gillette employee Linda Mallette maintains an archive, which is believed to include an electronic database, of how advertising images such as PIC's are used. (Picone Decl. ¶ 7). None of this material has been produced. Indeed, not a single piece of paper has been produced from Ms. Mallette's files to date.

- 7 -

Gillette should be compelled to provide all of the trade show booths and displays that incorporate PIC's images, as well as all of the other documents concerning these displays, including documents reflecting when and where the booths were displayed. Again, if Gillette is uncertain of the origin of any images, the displays containing them (and the corresponding supporting documents) should be produced as requested.

**C.     Product Packaging And Point-Of-Purchase Displays**

As one of Gillette's leading product photographers, PIC provided many of the images that Gillette used in its packaging and point-of-purchase displays over the years. Naturally, PIC must have access to these materials to assess the full scope of its copyright infringement claim based on Gillette's use of PIC's images in these media beyond the scope of any license.

Accordingly, PIC requested original or color copies of all Gillette packaging and point-of-purchase displays that included any images created by PIC. (Exhibit G – Request No. 3). PIC also asked in an interrogatory that these same materials be identified. (Exhibit F – Interrogatory No. 4). Once again, PIC instructed that materials containing images of uncertain origin be included. (Id.). Although including its standard objection that the request "seeks information not kept by Gillette in the ordinary course of business," Gillette agreed to provide the requested materials in its possession, custody or control. (Exhibit M at 4).

Nevertheless, Gillette never provided any such materials. PIC raised the issue in its January 20, 2005 letter. (Exhibit J at 5). Although Gillette's counsel responded to the other portions of that letter, it ignored this section. (Exhibit K).

Once again, PIC knows that the requested materials exist. For example, just days ago, PIC's principal Paul Picone purchased, from a CVS store, three samples that *still* – over a year into this litigation – contain PIC's copyrighted images and designs. (Picone Decl. ¶ 8). The following two shaving cream cans feature images of dollops of shaving cream created by PIC.



PIC's Photographs

Likewise, Gillette's Mach 3 razor is still being sold in packaging derived from a PIC design:



(Picone Decl. ¶ 9).

These are but three examples that Mr. Picone was able to identify from a single visit to a CVS store. They undoubtedly represent *millions* of copyright infringements, as these are among Gillette's flagship products. Almost a year into this lawsuit, Gillette is still wrongly profiting from its infringement of PIC's copyrights in selling these (and undoubtedly many other) products. PIC needs discovery from Gillette to identify all of the products that are still being sold with PIC's images. PIC also knows that significant numbers of other products, now discontinued, were also sold with PIC's images. This historical information is known only to Gillette, and must be produced to PIC.

The same is true of point-of-purchase displays. PIC is aware of recent copyright infringements in point-of-purchase displays at stores including Costco. (Picone Decl. ¶ 11). Gillette has refused, however, to produce a single point-of-purchase display in response to PIC's requests.

Gillette should be compelled to provide all of the product packaging and point-of-purchase displays that incorporate PIC's images, as well as the other documents concerning these materials, such as documents reflecting the volume of sales of products packaged with PIC's images and when and where point-of-purchase displays incorporating PIC's images were used.

### D.    Documents Concerning Gillette's Reproduction Of PIC's Images

As explained above, one of the ways in which Gillette misused many of PIC's images was by duplicating them without permission, then using those duplicates outside the scope of its license or even transferring them to third parties such as its resellers for their use. The misuse continues to this day. For example, Gillette's reseller Wal-Mart still displays PIC's copyrighted images on its web site, including this one of the Braun Multiquick Hand Blender:



See http://www.walmart.com/catalog/product.gsp?product_id=2443178.

The infringement is striking because this is one of the images that PIC brought to Gillette's attention in its Second Amended Complaint (on September 28, 2004) with respect to infringement on Gillette's own web site. (2d Am. Compl. ¶ 21). Gillette removed the image from its web site, but the image remains in use by third parties to whom Gillette unlawfully provided it.

Other PIC images on web sites of Gillette resellers abound. For example, the following image of Braun's Gold Screen Filter still appears on the web site of Gillette's reseller Bed, Bath & Beyond:



See http://www.bedbathandbeyond.com/product.asp?order_num=-1&SKU=10335272.

These are but a few examples of what PIC has reason to believe will ultimately number in the thousands of infringements (not only on the Internet, but in print advertising and marketing materials and other media) that resulted from Gillette's unlawful duplication and distribution of PIC's images.

To obtain information about Gillette's duplication activities, PIC requested "[a]ll documents concerning Gillette's duplication of images created by PIC." (Exhibit G – Request No. 16). PIC reiterated its request in its second round of document requests. (Exhibit I – Request No. 18). PIC expected to receive copies of correspondence and invoices reflecting Gillette's duplication activities, especially given that Gillette *admitted* in its Answer to having duplicated PIC's images through third-party laboratories, see Am. Answer ¶ 25 ("Defendant admits that … it purchased from third-party laboratories … duplicate prints of photographs provided by plaintiff."), but not a single such document has been produced.

In its January 21, 2005 letter, Gillette's counsel nevertheless contended that a "reasonable" search had been made and that "all" responsive documents had been produced.

The assertion is flatly untrue, as PIC once again can prove. PIC retrieved from third-party laboratory Advanced Photographics, Inc. ("Advanced") a box filled with hundreds of PIC's images that Gillette had improperly provided to Advanced for unauthorized duplication. (Picone Decl. ¶ 12). Advanced has informed PIC that these images were used to produce hundreds, if not thousands, of duplicates at Gillette's request. (Id. ¶ 13). Although most invoices reflecting Gillette's orders from Advanced would be in Gillette's possession, having been provided to Gillette accompanying the duplicates that Advanced provided, the box did contain some documentation of Gillette's orders. For example, the invoice attached hereto at Exhibit Q reflects a January 7, 2000 order by Gillette for 232 duplicates of PIC's images.

This is but one of many – probably hundreds – of orders placed by Gillette with Advanced.  Gillette has also admitted that it placed orders with other third-party development laboratories in addition to Advanced, yet not a single page of documentation concerning these orders (correspondence, e-mails, invoices, pay stubs, or even the names of the laboratories) has been provided, thereby unfairly blocking PIC's ability to seek third-party discovery that would further buttress its case.

Gillette should be compelled to produce all of the requested documentation of its duplication activities with third-party laboratories.

### E.    Gillette's Indexes Of PIC's Images

Shortly after this suit was filed, Gillette once again represented to PIC that it was conducting an investigation of PIC's claims.  Among other things, Gillette stated that it had created an index of PIC's Photographs that remained in its possession. (Exhibit R – May 18, 2005 Letter Reflecting Conversation).  In a responsive letter, Gillette denied having made the representation, stating that "no representation was made to you regarding an index of photographic materials belonging to [PIC]." (Exhibit S).

PIC requested all documents concerning Gillette's investigation of PIC's claims, including the index.  When Gillette failed to produce responsive documents, PIC followed up in its January 20, 2005 letter. (Exhibit J at 3).  This time, in response, Gillette admitted to having responsive documents, but stated that it intended to withhold these documents on grounds of privilege. (Exhibit K at 2).

Thus, Gillette **first** represented to PIC that it had created an index of PIC's photographs in its possession, **then** contended that no such index was created, **then** (most recently) admitted that the index exists, but that it intends to withhold the index as privileged.  To date, however, no privilege log has been provided (as discussed below).

- 13 -

F.    **Privilege Log**

Gillette has withheld numerous documents citing claims of privilege and work product, and has redacted other documents without explanation.  To date, however, Gillette has not provided a privilege log. (PIC *has* provided its privilege log to Gillette.)  Although Gillette's counsel has promised to provide one on multiple occasions, PIC still awaits receipt of the log. An order should be entered compelling Gillette to provide a full and complete privilege log so that PIC can assess the applicability of any claimed privilege or immunity from production.

G.    **Electronic Mail And Documents**

PIC is entitled to all electronic mail and other electronic documents that are responsive to its document requests.  For example, PIC's Request Nos. 2, 5, 7 and 8 call for all documents – including electronic documents – concerning the use of PIC's images in various media.  Request Nos. 11, 12 and 13 call for all documents – including electronic documents – concerning any communications between Gillette and PIC, between Gillette and any third party, and internal to Gillette, concerning PIC's images or PIC.  PIC's Request Nos. 30 and 31 call for all e-mail communications concerning the subject matter of this case, and No. 36 calls for all e-mails concerning PIC or Mr. Picone. (Exhibit G).

Thus far, Gillette has produced *no* documents in electronic format, and just 34 e-mails in hard copy.[7]  Gillette originally objected to producing any electronic document "not previously printed out."  After PIC took issue with this, Gillette's counsel stated that it was "in the process of discussing these issues with our client" (Exhibit T – November 23, 2004 Letter), and later that it was "looking into" the issue further. (Exhibit U – December 1, 2004 Letter).  In its most recent letter, Gillette's counsel contended that all "non-deleted" e-mails had been produced, and that Gillette would await a "proposal" from PIC with respect to "deleted" e-mails. (Exhibit K at 2).

---

[7] Fully 31 of these e-mails are either to or from Mr. Picone.  Gillette has produced only three other e-mails.

It is unclear from Gillette's responses whether it continues to refuse to produce e-mails that have not previously been printed out, or if it is only refusing to produce e-mails that are stored on backup media.  In either case, it is too late in the discovery period for Gillette to be seeking "proposals" from PIC on how Gillette can comply with its discovery obligations. Documents in electronic form (not just those already printed out) are plainly discoverable. E.g., Cornell Research Found., Inc. v. Hewlett Packard Co., 223 F.R.D. 55, 74 (N.D.N.Y. 2003). These materials should have been produced long ago, and should now be produced forthwith. PIC's only remaining "proposal" would be to extend the discovery deadline so that PIC is not unfairly prejudiced in the follow-up discovery that it will still need once these materials are produced.

Once again, PIC knows that a large volume of responsive e-mail communications (not to mention other electronic documents) has been withheld by Gillette.  For one thing, PIC's own files contain extensive e-mail correspondence with Gillette personnel about the jobs that PIC did for Gillette.  The same e-mails should have been produced by Gillette but were not.  More importantly, Gillette's *internal* e-mails concerning PIC and PIC's images, its e-mails with third-party laboratories (concerning duplication to which Gillette has admitted in its Answer), with its customers (to whom Gillette has indisputably provided PIC's Photographs as discussed above), with its product packaging and point-of-purchase vendors (which have indisputably produced advertising materials bearing PIC's images), with its trade show booth vendors (which have admittedly made booths bearing PIC's images for at least "a dozen" trade shows), all must be produced.  These documents likely contain valuable admissions regarding Gillette's breaches of the parties' agreements, copyright infringements, and efforts to avoid the consequences of its actions.

Gillette should be ordered to produce electronic documents responsive to PIC's requests, regardless of whether they have been previously printed or whether they reside on backup media or on the computers of Gillette employees. Gillette should be ordered to search for e-mail to and from each of the individuals listed in PIC's initial disclosures as likely to have relevant information, namely: Linda Mallette, Karen Mullen, Michele Sager, Joyce Lorden, Beth Cooper, Brenda Tattan, Jill Josephson, Nancy Daly, Pamela _____ (last name unknown but her extension at Gillette is 617-463-4075), Nadine Romano, Trish Moriarty, Barbara Mackin, Anna Madden and Gary Gibson. For most of these individuals, Gillette has produced no e-mail at all.

### H.     PIC's Invoices

Gillette has produced to PIC a partial group of PIC's invoices for photographic services provided to Gillette. In addition to missing quite a number of invoices (including about 253 invoices pre-dating December 1997, and approximately 70 invoices from December 1997 to the present), Gillette's production is missing the reverse side of *every* invoice, which includes PIC's Terms and Conditions.

Gillette should be compelled to search its records for the missing invoices, and to produce the reverse side of all invoices. (If other two-sided documents have likewise been copied on only one side, Gillette should produce the other side of those documents too.)

While Gillette argues that copyright infringement claims based on invoices prior to December 1997 may be barred by the statute of limitations (Exhibit K at 3), that is not a valid reason to withhold production in response to PIC's requests. No statute of limitations has been established in this case, and much doubt remains regarding any such limitation. In any event, if Gillette continues to use an image, no statute of limitations could apply no matter how long ago PIC provided the image to Gillette.

Gillette should be ordered to produce all of the PIC invoices in its possession, including both the front and back sides of the invoices, and any invoices that might be stored in electronic format.

**I.    Electronic Copies of Gillette's Web Sites**

PIC's Request No. 6 (Exhibit G) calls for electronic copies of all of Gillette's websites, annually for the past six years.  These documents will demonstrate that Gillette's Internet uses of PIC's images exceeded the scope of any license it received from PIC.

Such infringing uses, both current and historical, are expected to be located in significant numbers once PIC has access to the electronic copies of Gillette's websites.  Striking examples of continuing infringement are instances of infringement that PIC brought to Gillette's attention on September 22, 2004 (<u>see</u> Docket No. 17 ¶ 10) that *remain on Gillette's web site today*:



See http://www.gillette.com/household/digital_library/iron.htm.



See http://www.gillette.com/household/digital_library/blenders.htm.



See http://www.gillette.com/men/digital_library/flexintegral.htm.

Despite the overwhelming evidence that Gillette has committed – and continues to commit – copyright infringement on the Internet, Gillette flatly refuses to produce any electronic copies of its websites, agreeing only to produce web pages already printed out by happenstance, and insisting that copies of past websites do not exist. (Exhibits K, U).

It is exceedingly unlikely that no copies of past versions of Gillette's websites have been retained (on backup media or otherwise), either by Gillette or the outside vendor(s) that it retains in connection with maintenance of its websites. Gillette should be ordered to produce any and all backup copies it may have of its websites, and to request the same from its vendor. McGuire v. Acufex Microsurgical, Inc., 175 F.R.D. 149 (D. Mass. 1997) (discussing court order to produce material from backup tapes).

With respect to current versions of its websites, Gillette "believe[s] such request is not appropriate" because the "web site is publicly available [for] review." (Exhibit K at 2). While it is true that Gillette's websites are publicly available on the Internet, they are interactive websites and it is not possible to obtain complete data from those websites without receiving them from Gillette in electronic format. For example, certain pages of the websites may only appear after a customer has made a purchase. These materials are under Gillette's control and can be produced to PIC with little effort or expense to Gillette.

**J.     Revenue And Profit Information**

PIC requested a statement of Gillette's gross revenues, costs and profits for products that Gillette advertised or marketed using PIC's images, broken down by year and product (Interrogatory No. 24) as well as related information about Gillette's advertising expenditures and the effectiveness of its advertising (Interrogatory Nos. 25-27), and documents reflecting the same (Request Nos. 39-43). Gillette refused to provide this information.

This information is highly relevant to a number of issues in the case, including PIC's claim to an appropriate percentage of Gillette's profits from the sale of products that Gillette advertised or marketed with infringing images. See 17 U.S.C. § 504 (Copyright owner is entitled to collect "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."); Polar Bear Productions, Inc. v. Timex Corp., 384 F.3d 700 (9th Cir. 2004) ("Profits indirectly gained from infringements used in promotional efforts, as is the case here, fall squarely within the rubric of wrongful profits" recoverable by the copyright owner under 17 U.S.C. § 504).

Gillette's refusal to provide this information is based on an assertion that PIC has provided Ninth Circuit, rather than First Circuit, authority for the proposition that a portion of the infringer's profits are recoverable. This objection plainly does not relieve Gillette of its obligation to respond to the discovery requests. **First,** any legal challenge that Gillette might mount to such recovery (in a summary judgment motion, for example) is not an excuse to refuse to provide requested fact discovery. **Second,** in any event the Copyright Act *itself* provides for recovery of indirect infringement damages in Section 504 (quoted above). **Third,** the First Circuit agrees with the Ninth Circuit on this issue. Data Gen'l Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1173-74 (1st Cir. 1994) ("In addition to actual damages, a copyright plaintiff may also recover the infringer's nonduplicative profits.")

- 19 -

Gillette should be ordered to provide the requested revenue and profit information forthwith.  With the close of fact discovery approaching, and expert reports coming due, Gillette has left PIC and its experts with precious little time to analyze these revenue and profit statements once they are produced.[8]

## III.    CONCLUSION

For the above reasons, Gillette should be ordered to respond fully and forthwith to PIC's document requests and interrogatories as detailed above.  An extension of the discovery schedule is also requested, to prevent unfair prejudice to PIC as a result of Gillette's stonewalling.

Respectfully submitted,

PHOTOGRAPHIC ILLUSTRATORS CORPORATION,

By its counsel,

Dated: January 25, 2005                    /s/ Michael N. Rader
                                           Michael A. Albert, BBO #558566
                                           malbert@wolfgreenfield.com
                                           Michael N. Rader, BBO # 646990
                                           mrader@wolfgreenfield.com
                                           WOLF, GREENFIELD & SACKS, P.C.
                                           600 Atlantic Ave.
                                           Boston, MA 02210
                                           (617) 646-8000

---

[8] PIC has already agreed to stipulate to entry of an appropriate protective order if Gillette should desire to designate the requested financial information as confidential.