UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHOTOGRAPHIC ILLUSTRATORS CORPORATION, | |
| Plaintiff, | |
| vs. | Civil Action No. 04-10913 WGY |
| THE GILLETTE COMPANY, | **DECLARATION OF PATRICK T. PERKINS IN OPPOSITION TO PIC'S MOTION FOR SANCTIONS** |
| Defendant. | |

Patrick T. Perkins hereby declares:

1.      I am a member of the Bar of the State of New York and a shareholder of the law firm of Fross Zelnick Lehrman & Zissu, P.C.  I have been admitted *pro hac vice* to act before this Court as counsel for Defendant The Gillette Company ("Gillette") in this action.  I submit this declaration in opposition to plaintiff's Emergency Motion To Further Compel Gillette's Compliance With The Court's Order, To Hold Gillette In Contempt Of That Order, And For Appropriate Relief And Sanctions.

2.      Attached as Perkins Exhibit 1 is a copy of plaintiff's response to Gillette's Interrogatory No. 7.

3.      Attached as Perkins Exhibit 2 are pages 91-92 and 115-117 from the "rough" transcript of the deposition of Beth Cooper held on February 16, 2005, setting forth some of the things she did to search for documents responsive to PIC discovery requests.

4.      Attached as Perkins Exhibit 3 are pages 160-162 from the transcript of the deposition of Jill Josephson held on February 17, 2005 setting forth some of the things she did to search for documents responsive to PIC's discovery request.

5.     Attached as Perkins Exhibit 4 are pages 116-120 from the "rough" transcript of the deposition of Karen Mullen held on February 24, 2005 setting forth some of the things she did to search for documents responsive to PIC's discovery request.

6.     Attached as Perkins Exhibit 5 are pages 51-52, 128-129 from the "rough" transcript of the deposition of Brenda Tattan held on February 18, 2005 setting forth some of the things she did to search for documents responsive to PIC's discovery request.

7.     Attached as Perkins Exhibit 6 are pages 39-41, 112-114 from the "rough" transcript of the deposition of Linda Mallette held on February 22, 2005 setting forth some of the things she did to search for documents responsive to PIC's discovery request.

8.     Attached as Perkins Exhibit 7 is an e-mail chain reflecting correspondence between the undersigned and counsel for PIC suggesting an extension of the discovery period.

9.     As outlined in the Declaration of Leon Bechet, Gillette's documents were produced on February 11, 14 and 15, 2005.  PIC never requested that the deposition of any Gillette employee be postponed so that PIC could have more time review Gillette's documents. Instead, PIC went forward with the deposition of Beth Cooper on February 16, 2005, which deposition lasted nearly a full seven hours.  PIC also pressed forward with the deposition of Jill Josephson on February 17, 2005 and the depositions of Brenda Tattan and Nancy Dwyer on February 18, 2005.

10.     On February 14, 2005, after the close of business, counsel for PIC sent an e-mail concerning its desire to see the files of Gillette employee Bill Spain.  Neither I nor my colleague David Donahue knew who Bill Spain was.  The next day we were told who Mr. Spain is, that he had been previously asked by Gillette employees to produce documents responsive to PIC's document requests but did not understand his collection of photographs of trade show booths to be responsive.  On that day, Gillette made Mr. Spain's collection of photographs available to PIC for review.

11.     While PIC seeks to condemn Gillette for supplementing its document production two business days after the Court's deadline, PIC itself has engaged in a constant pattern of delay

of its document production.  PIC's response to Gillette's document production was due on November 29, 2004.  On December 1, 2004, I first inquired when we would receive documents. PIC put Gillette off for almost the entire month of December, with the wave of PIC's production not produced until the first week in January 2005.  On January 20, 2005, PIC promised production would be complete no later than January 28, 2005.  That deadline was then changed again to February 4, 2005.  However, since February 4, 2005, PIC has produced thousands of pages of documents and has informed Gillette *today* that it has located another four years worth of responsive documents that are likely to total in the thousands of pages.

12.    Also, by e-mail dated February 17, 2005, we asked PIC what search, if any, PIC conducted of its deleted e-mail and other electronic data.  Attached as Perkins Ex. 8 is a copy of the February 17, 2005 e-mail.  PIC never provided a response to our inquiry.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed at New York, New York this 1st day of March, 2005.


                                                        /s/ Patrick T. Perkins
                                                        Patrick T. Perkins

I:\PPERKINS\GLTC\General\Perkins Decl. Opp Sanctions.doc

**PERKINS EX. 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PHOTOGRAPHIC ILLUSTRATORS
CORPORATION,

        Plaintiff,

v.

THE GILLETTE COMPANY,

        Defendant.

Civil Action No. 04-CV-10913-WGY

## PLAINTIFF'S RESPONSES TO GILLETTE'S FIRST SET OF INTERROGATORIES

Plaintiff Photographic Illustrators Corporation ("PIC") responds to Gillette's First Set of Interrogatories as follows.

PIC's investigations are ongoing and its responses are based on present knowledge and belief. PIC reserves the right to modify or supplement its responses if additional or different information is discovered at a later time.

PIC's responses are not to be construed as a waiver of any right or objection, or as an admission of relevance, materiality, or admissibility of any information or document provided.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

PIC objects to Gillette's definition of "you," "PIC" and "Picone" in Paragraph B to the extent it includes entities not under PIC's control.

PIC objects to Gillette's definition of the term "identify" in Paragraph D to the extent it exceeds the scope provided for that term in D. Mass. Local Rule 26.5(c).

PIC objects to Gillette's request in Paragraph K to the extent it exceeds the requirements of Fed. R. Civ. P. 26(b)(5).

k.    the amount of consideration, including, without limitation, money you received for each such job number;

1.    which, if any, of the photos identified by each job number were returned to you, and if so, when;

m.    each instance, by date, when you expressly requested the return of photos related to a given job number, to whom such request was made and by what means.

n.    each instance, by date, when you became aware of Gillette's use of a photo related to a given job number outside the United States or over one year after the photo was provided to Gillette.

## Response

PIC objects to this interrogatory as unduly burdensome, in that much of the information requested is better suited to discovery at a deposition than through an interrogatory.

See Responses to Interrogatories 1-2, which are incorporated herein by reference. Subject to the foregoing general and specific objections, PIC states as follows:

Without limitation of the foregoing, PIC will produce, pursuant to Fed. R. Civ. P. 33(d), available, non-privileged documents reflecting requested information.

## Interrogatory No. 7

Identify any and all uses you have made of any photo prepared for Gillette, including but not limited to:

a.    the content of the photo used;

b.    the job number associated with such photo;

c.    the date of such use;

d.    in what media such photo was used;

e.    the number of copies distributed;

f.    the geographic scope of distribution;

g.    the identity of each recipient of such photos;

h.    any revenues received in connection with your reproduction and/or distribution of such photos.

**Response**

PIC objects to this interrogatory because it seeks information about "uses" to which PIC has put images that Gillette has wrongfully refused to return to PIC. PIC cannot have "used" images that are in Gillette's possession.

Subject to the foregoing general objections, PIC states as follows:

PIC has many uses for the images it prepared for Gillette. For example, one use is that PIC provided Gillette with limited licenses to use such images. Indeed, by retaining its images, PIC can prevent Gillette from making unauthorized copies or from engaging in unauthorized distribution, thereby infringing PIC's copyrights.

The photos are also included in PIC's portfolio book, which it shows to prospective clients to establish its credentials and obtain business.

PIC has had numerous inquiries by third parties to purchase such images for use as stock photos. PIC has repeatedly been forced to decline these inquiries because Gillette had wrongly obtained the original transparencies of such images such that PIC could not provide them to the third parties who requested them.

PIC personnel also regularly review such images to generate ideas for use in projects for other clients, including to generate ideas for lighting technique, shadow placements, camera angles and the like.

**Interrogatory No. 8**

Identify with specificity each and every agreement entered into between you and Gillette, whether written or otherwise.

**Response**

Subject to the foregoing general objections, PIC states as follows:

**PERKINS EX. 2**

1

1                    VOLUME 1

2                    PAGES 1 -

3                    EXHIBITS 1 -

4        IN THE UNITED STATES DISTRICT COURT

5        FOR THE DISTRICT OF MASSACHUSETTS

6                No. 04-CV-10919-WGY

7    - - - - - - - - - - - - - - - - - - - - - - - -

8  PHOTOGRAPHIC ILLUSTRATORS CORPORATION,

9              Plaintiffs

10        vs.

11  THE GILLETTE COMPANY,

12              Defendants

13   - - - - - - - - - - - - - - - - - - - - - - - -

14        DEPOSITION OF ELIZABETH A. COOPER

15    Wednesday, February 16, 2005 9:20 a.m

16        Wolf, Greenfield & Sacks, P.C.

17      600 Atlantic Avenue, Boston, MA 02210

18

19

20

21    Reporter:  Janet M. Konarski, RMR, CRR

22            LegaLink Boston

23      320 Congress Street, Boston, MA 02210

24            (617)542-0039

7   projects.

8       Q.  Okay.  If you had chosen the best image to

9   use and sent it to the printer, can you explain why you

10  kept the other images that you didn't think were the

11  best?

12          MR. MENDE:  Object as to the form of the

13  question.

14      A.  I wouldn't want to destroy them.  There

15  was really no reason to.  I guess if, in the off chance

16  that the transparency that you selected got lost, then

17  you had backup.  I think there may have been times,

18  too, when we talked about sending the transparencies

19  back to Mr. Picone, if he wanted to keep it on file,

20  but most of the time we just held on to them.

21      Q.  Okay.  Now, how did you discuss sending

22  the transparencies back to Mr. Picone with?

23      A.  Probably him.

24      Q.  Approximately when did that discussion


                        95

1   occur?

2       A.  Specific to this transparency?

3       Q.  Well, did it occur specifically with

4   regard to this one?

5       A.  I don't know.  I'm just speaking

6   generally, in terms of the jobs that we did.  It didn't

7   necessarily happen every single time, but it may have

8   happened.

9       Q.  Okay.  And during approximately what time

10  frame did that type of discussion occur?

11      A.  From the time that I started to work with

12  him.

13      Q.  Do you remember the first time that you

14  had a discussion about potentially returning images to

15  him?

16      A.  No.

17      Q.  Do you remember the approximate time frame

18  in which that occurred?

19      A.  It was somewhere between '99 and, you

20  know, 2000 -- actually, 2003 before I went on maternity

21  leave.

22      Q.  And who initiated that conversation?

23      A.  I don't know.  But, would I guess it would

24  probably be me, because I was holding on to the


                              96

1   transparencies, so I would have asked do you want them

2   back or should I hold onto them, which is what we do

3   with video vendors, also.

4       Q.  Did Mr. Picone express that he wanted the

5   materials returned?

6       A.  No.

7       Q.  Did he express that they should ultimately

8   be returned, although you would hold on to them for

Case 1:04-cv-10913-WGY     Document 52-3     Filed 03/01/2005     Page 12 of 46

4      A.   Certainly.

5      Q.   Do you know whether the Mickey Mouse head

6  brush, what the life of that product was?

7      A.   Yes.  I think we're coming to the end of

8  its life shortly.

9      Q.   About how many years was it on the market?

10     A.   Probably four.

11     Q.   Okay.  So, if you needed a transparency of

12  the Mickey Mouse head brush during that time and

13  couldn't locate the one that you used for the sell

14  sheets, would you turn back to your files?

15         MR. MENDE:  Object as to form.

16     A.   No.

17         MR. MENDE:  Calls for speculation.

18     Q.   Would you turn back to the ones that you

19  had placed in the file?

20     A.   No.

21     Q.   Okay.  Why not?

22     A.   Once the product goes to market, we have

23  images that are in our digital library, and I would use

24  the images from the digital library.


                        120

1      Q.   Okay.  And where do those images come

2  from?

3      A.   I don't know.

4      Q.   Who maintains the digital library?

5      A.  Creative services.

6      Q.  Is there a specific individual, who

7  maintains it?

8      A.  At this time, Marie Scalia, S-C-A-L-I-A.

9      Q.  Do you ever provide images to Ms. Scalia?

10     A.  I do not.

11     Q.  So, do you have any idea where she gets

12  the images for the database?

13     A.  I believe that they use Clements and

14  Howcraft to shoot the images for the digital library,

15  or they receive them from global business management,

16  which is an internal Gillette department.

17     Q.  I thought you said that Gillette doesn't

18  take inhouse photography.  Is that right?

19     A.  I don't believe that we do.

20     Q.  So, how does the blow balance business

21  management division get images?

22     A.  They use outside vendors.

23     Q.  For products that had acceded their shelf

24  life, what did you do with the images in your files

                          121

1  then?

2          MR. MENDE:  Object as to form.

3      A.  Nothing.  I leave them alone.

4      Q.  If the images -- would there ever be a

5  reason to use a photograph of a product again after it

6   had exceeded its shelf life?

7       A.   There may be.

8       Q.   Okay.  What types of things might you use

9   that for?

10      A.  I don't know.  I've never specifically

11  been asked to use a photo beyond a product's shelf

12  life.

13      Q.   During the shelf life of the product, what

14  would you use these photos for?

15          MR. MENDE:  Object as to form.

16      A.  Sell sheets and Power Point presentations.

17      Q.   Did you use the same transparency for the

18  sell sheets and the Power Point presentations?

19          MR. MENDE:  Object as to form.

20      A.  No.  You wouldn't use the transparency for

21  a Power Point presentation.  The resolution is too

22  high.

23      Q.   So, what image would you put into a Power

24  Point presentation?


                        122

1           MR. MENDE:  Are you asking what she did or

2   are you asking her to speculate?  Object as to form.

3       Q.   In general, when you made Power Point

4   presentation abouts products, what images did you put

5   into the Power Point?

6       A.   JPEG images.

**PERKINS EX. 3**

Jill Josephson                                              02/17/2005

1

1                                    Volume:  I

2                                    Pages:  1-166

3                                    Exhibits:  59-80

4               IN THE UNITED STATES DISTRICT COURT

5               FOR THE DISTRICT OF MASSACHUSETTS

6

7       * * * * * * * * * * * * * * * *

8       PHOTOGRAPHIC ILLUSTRATORS CORPORATION,

9

10                       Plaintiff,

11      vs.                         NO. 04-CV-10919-WGY

12      THE GILLETTE COMPANY,

13                       Defendant.

14      * * * * * * * * * * * * * * * *

15

16              DEPOSITION OF JILL JOSEPHSON

17            Wolf, Greenfield & Sacks, P.C.

18                600 Atlantic Avenue

19               Boston, Massachusetts

20                   10:19 a.m.

21            Thursday, February 17, 2005

22       Court Reporter:  Mary C. Soldati CSR, RPR

23

24

160

1    A.    For a couple of years; two or three years,

2    maybe.

3    Q.    Okay.   Have you searched all of your e-mails

4    for materials from or concerning or mentioning Mr.

5    Picone or PI?

6    A.    Yes.

7    Q.    And have you provided all such materials to

8    the lawyers, to the Gillette lawyers?

9    A.    Yes.

10    Q.    Have you searched all of your files for any

11    materials, either from or concerning or mentioning

12    Mr. Picone or PI?

13    A.    Yes.

14    Q.    Have you provided e-mails -- I'm sorry.

15    Strike that.

16          Have you provided catalogs and

17    brochures, including from your personal files, that

18    contain images from Mr. Picone?

19    A.    Yes.

20    Q.    And are there any such materials that you

21    haven't provided?

22    A.    Not to my knowledge, no.

23    Q.    And aside from the e-mail -- actually.   One

24    other question.   I don't know if you testified on

Jill Josephson                                    02/17/2005

161

1    this.  Do you know what GDOS is?

2        A.  Yes.

3        Q.  What is it?

4        A.  It's the Gillette Display Ordering System.

5    It's an electronic on-line system used by Gillette

6    sales reps.

7        Q.  Have you provided -- have you produced any

8    GDOS materials in connection with this case or in

9    connection with Mr. Picone's claim?

10       A.  Previously, we had some pictures on that

11   site, back in 2002, and nothing has been up there

12   since then.

13       Q.  Okay.  And were those materials provided for

14   production, do you know, or were those provided to

15   the lawyers?

16       A.  Yes.

17       Q.  Okay.  And are there any other files that

18   you have or know about with materials from or

19   concerning or mentioning Mr. Picone or PI, other

20   than the ones that you've just described, which you

21   have provided to the attorneys?

22       A.  No.

23       Q.  Where are your files kept?

24       A.  My personal files are kept at home for my

Jill Josephson                                    02/17/2005

162

1    portfolio.

2        Q.  And where are your files relating to

3    Gillette work kept?

4        A.  At Gillette, in my office.

5        Q.  Okay.  And do Gillette's lawyers know that

6    you've produced all of the materials that you have?

7        A.  Yes.

8            MR. MENDE:  That's all I have.

9            MR. RADER:  I just want to ask one or

10   two questions that got prompted.

11                   REDIRECT EXAMINATION

12   BY MR. RADER:

13       Q.  As you sit here today, do you know that

14   Advanced Photographics is the only laboratory that

15   Gillette ever used to duplicate Photographic

16   Illustrators' photographs?

17       A.  From my experience, yes.

18       Q.  Can you speak for everyone else that dealt

19   with those photographs?

20       A.  I can't speak for anybody else.

21       Q.  Mr. Mende asked you about the e-mails.  Did

22   you perform or have performed a search on backup

23   media?

24       A.  Yes.

**PERKINS EX. 4**

cokmul.txt
1    * * * * * * * * * * * * * *

2

3                DEPOSITION OF KAREN MULLEN

4              Wolf, Greenfield & Sacks, P.C.

5                   600 Atlantic Avenue

6                  Boston, Massachusetts

7                       9:11 a.m.

8              Thursday, February 24, 2005

9        Court Reporter:  Mary C. Soldati CSR, RPR

10

11

12   APPEARANCES:

13       WOLF, GREENFIELD & SACKS, P.C.

14       Michael N. Rader, Esquire

15       600 Atlantic Avenue

16       (617) 720-3500

17       On Behalf of the Plaintiff

18

19       FROSS, ZELNICK, LEHRMAN & ZISSU, P.C.

20       By David Donahue, Esquire

21       866 United Nations Plaza

22       New York, New York  10017

23       (212) 813-5990

24       On Behalf of the Defendant

                                             4

1

2

                     Page 3

cokmul.txt

12    handwritten date on the on the fax cover sheet?

13        A.  Yes, I do.

14        Q.  What date do you believe that you sent this

15    document?

16        A.  I sent it on October 25 blg of 2002.

17        Q.  And do you think that the do you think that

18    the dated handwritten date is a was a mistake, an

19    error?

20        A.  I do.  I can't imagine I would have waited a

21    year to respond.

22        Q.  Okay.  That's it for that one.  Now, do you

23    remember before when Mr. Rader asked you whether you

24    performed a search for materials relating to Mr.


116


1    Picone?

2        A.  Yes.

3        Q.  What did you understand him to mean when he

4    asked you whether you conducted a search of

5    materials strike that what materials to you believe

6    he was talking about at that time?

7        A.  The transparencies.

8        Q.  Okay.  Did you ever conduct a subsequent

9    search for other types of materials that could

10    relate to Mr. Picone or to this lawsuit.   Yes?

11        Q.  And did you turn over what did you find any

12    documents?

Page 110

cokmul.txt

13      A.  I did.

14      Q.  And did you turn over those documents to

15  Gillette's counsel?

16      A.  Yes, I did.

17      Q.  Are there any files that you're aware of

18  that you believe may contain materials relating to

19  Mr. Picone or to PIC or to this lawsuit that you

20  have not reviewed?

21      A.  No.

22      Q.  Let me strike that.  It a confusing

23  question.  Have you searched all files of which you

24  are aware that you believe may contain materials

117

1   relating to Mr. Picone or PIC?

2       A.  Yes.

3       Q.  Okay.  And strike that.  I think that's it

4   by Rader sth?

5       Q.  If I could just one or two questions quickly

6   in response to at that?

7   BY MR. RADER:

8       Q.  You just testified that you performed an

9   additional search in addition to your search for

10  answer transparencies is that right?

11      A.  That's right.

12      Q.  Okay.  And when did you do that search?

13      A.  I don't recall the date.

14      Q.  Was it within the last month?

Page 111

cokmul.txt

15      A.  No.

16      Q.  Was it within the last six months?

17      A.  I don't know.

18      Q.  Was it before or after you performed the

19  search for transparencies?

20      A.  After.

21      Q.  It was within the last three months?

22      A.  No.

23      Q.  Okay.  When?

24      Q.  And when you performed that search, did you


                                                118


1   search for e-mails?

2       A.  Yes.

3       Q.  And how did you do that search?

4       A.  I have a folder with anything related

5   anything legal, I have a folder open my computer, so

6   I pulled down all of those.

7       Q.  And how far back in time does that folder

8   go?

9       A.  Oh to when this started, 10/25/02.

10      Q.  And is that folder include e-mails that you

11  both sent and received?

12          MR. DONAHUE:  Objection.  It's vague and

13  the the e-mail that she both sent and received or

14  e-mails that she sent and other e-mails is he

15  received.

Page 112

cokmul.txt

16          Q.  Does that folder include e-mails that you

17   sent?

18          A.  I believe so.

19          Q.  Is it --

20          A.  Yes.

21          Q.  And does it include e-mails that you

22   received?

23          A.  Yes.

24          Q.  Okay.  Have you ever done a search for

119

1    e-mails that were sent or received within the last

2    three months?

3              MR. DONAHUE:  Objection.  It's vague as

4    to form.

5       Q.  The search that you're referring to for

6    e-mails would that have captured e-mails that were

7    sent or received within the last three months?

8       A.  If I had September or received any in the

9    last three months.

10      Q.  I believe you said that search occurred more

11   than three months ago is at that right correct?

12      A.  Yes.

13      Q.  Have you done a subsequent search for e-mail

14   since at that then?

15      A.  There have not been any since then I provide

16   everything I had and there haven't been any

17   additional.

Page 113

cokmul.txt

18        Q.  So in the last three months, you haven't

19    sent any e-mails regarding this case or Mr. Picone?

20        A.  Not that aim aware no.

21        Q.  Okay I have nothing further then.

22            MR. DONAHUE:  Yeah.  I have just are you

23    cop you will quick follow-up questions.

24    BY MR. DONAHUE:


                                                    120


1

2        Q.  You testified before miss Mullen that you

3    never person learn personally hired Mr. Picone to do

4    any work for Gillette is that correct?

5        A.  That's correct.

6        Q.  Would you recognize Mr. Picone's a

7    photograph that had opinion provide by Mr. Picone

8    without being told that it is a photograph provide

9    by Mr. Picone?

10        A.  No.

11        Q.  Would you if you had two pictures next to

12    each other, of the same product, and were told that

13    they were taken by different photographers, would

14    you able to tell whether one had been taken by Mr.

15    Picone and the other had not been taken by Mr.

16    Picone?

17        A.  No.

18            MR. DONAHUE:  No further questions.

Page 114

**PERKINS EX. 5**

1

1              VOLUME 1

2            PAGES 1 -

3           EXHIBITS 1 -

4     IN THE UNITED STATES DISTRICT COURT

5      FOR THE DISTRICT OF MASSACHUSETTS

6            No. 04-CV-10919-WGY

7   - - - - - - - - - - - - - - - - - - - - - - - -

8   PHOTOGRAPHIC ILLUSTRATORS CORPORATION,

9            Plaintiffs

10        vs.

11   THE GILLETTE COMPANY,

12            Defendants

13   - - - - - - - - - - - - - - - - - - - - - - - -

14        DEPOSITION OF BRENDA TATTAN

15    Friday, February 18, 2005      .m

16      Wolf, Greenfield & Sacks, P.C.

17    600 Atlantic Avenue, Boston, MA 02210

18

19

20

21    Reporter:  Janet M. Konarski, RMR, CRR

22         LegaLink Boston

23    320 Congress Street, Boston, MA 02210

24        (617)542-0039

21      A.  Yes.

22      Q.  Okay.  So, when you were doing the search

23   for transparencies a year or two ago, did you have to

24   match up the invoices to the folders?


                         53

1            MR. MENDE:  Object as to form.

2       A.  I did that on my own as a cross reference.

3       Q.  And how did you match up the invoices to

4    the folders?

5       A.  By the product code.  Mr. Picone would

6    reference the product code or a description of the

7    product on the invoice.

8       Q.  So, if Mr. Picone had photographed a

9    product for you and had referenced that product code on

10   the invoice, could you then be sure that the photograph

11   of that product in your folder came from him?

12           MR. MENDE:  Object as to form.

13      A.  Not a hundred percent sure, no.

14      Q.  But, confident enough to return those

15   images to him?

16      A.  Yes.

17      Q.  When you matched up an invoice to a folder

18   based on the product code, did you then have any reason

19   to doubt that those images came from Mr. Picone?

20      A.  No.

21      Q.  Were you surprised at being requested to

22  return the images to Mr. Picone?

23        MR. MENDE:  Object as to form.

24     A.  Yes.


                        54

1      Q.  Why were you surprised?

2      A.  I didn't know the reason why, why he was

3   requesting it.

4      Q.  Did you ask Ms. Mullen why it was being

5   requested?

6      A.  Yes.

7      Q.  What did she say?

8      A.  That she was told that we need to do that.

9      Q.  Did she say anything else?

10     A.  No.

11     Q.  At around that time, did you have occasion

12  to view a letter that Mr. Picone had written to

13  Gillette about his images?

14        MR. MENDE:  Object as to form.

15     A.  No.

16     Q.  Did anyone mention the letter to you?

17        MR. MENDE:  Object as to form.

18     A.  No.

19     Q.  Now, when you processed Mr. Picone's

20  invoices, did you review them?

21        MR. MENDE:  Can I hear the question back?

22        (The pending question was read by the

17    A.  Yes.

18    Q.  Okay.  Who owns them?

19    A.  The Gillette Company.

20    Q.  Okay.  And, as you sit here today, do you

21  have an understanding of who owns the copyrights in

22  those images?

23    A.  I mean I didn't know they were

24  copyrighted.  They were submitted to be copyrighted


                            133

1  trademark.  I know we do that with our logos, but --

2    Q.  And your understanding as to ownership of

3  the transparencies, what is that based on?

4      MR. MENDE:  The physical images?  Is that

5  what the word you used?

6      MR. RADER:  I actually said physical

7  "transparencies," at least that is what the transcript

8  reflects.

9    A.  Gillette would be the owner of the

10  physical transparencies.

11    Q.  And what is your understanding based on?

12    A.  Payment to Mr. Picone, in return for the

13  photographing of each of the products, as well as the

14  transparencies.

15    Q.  Okay.  It was your understanding at the

16  time that Ms. Mullen asked you to gather transparencies

17  for return to Mr. Picone?

Case 1:04-cv-10913-WGY    Document 52-3    Filed 03/01/2005    Page 32 of 46

18      MR. MENDE:  Object as to the form of the

19  question.

20      A.  Yes.

21      Q.  Okay.  Did you convey your understanding

22  to Ms. Mullen?

23      A.  We never talked about it.

24      Q.  So, although your understanding was that

                      134

1   The Gillette Company owned those transparencies, you

2   never conveyed to that to Ms. Mullen when she asked you

3   to gather them for return?

4       MR. MENDE:  I think that's been asked and

5   answered.

6       A.  No.  That was never discussed.

7       Q.  In Mende asked you about a sentence on the

8   back of Exhibit 87, where the word ear appears.  Can

9   you locate that sentence again, please?

10      A.  Yes.  I see it.

11      Q.  Can you read the whole sentence off the

12  page, please?

13      A.  I sure can., "All rights, not expressly

14  granted herein remain the exclusive property of

15  photographic -- the next sentence, excuse me.  Unless

16  otherwise stated on the face of this agreement,

17  duration of the license is one ear from agreement date

18  and limited to use in the United States of America.

**PERKINS EX. 6**

1

1                    VOLUME 1

2                    PAGES 1 -

3                    EXHIBITS 1 -

4       IN THE UNITED STATES DISTRICT COURT

5        FOR THE DISTRICT OF MASSACHUSETTS

6               No. 04-CV-10919-WGY

7   - - - - - - - - - - - - - - - - - - - - - - - -

8   PHOTOGRAPHIC ILLUSTRATORS CORPORATION,

9            Plaintiffs

10        vs.

11   THE GILLETTE COMPANY,

12            Defendants

13   - - - - - - - - - - - - - - - - - - - - - - - -

14         DEPOSITION OF LINDA K. MALLETTE

15      Tuesday, February 22, 2005 10:18 a.m

16        Wolf, Greenfield & Sacks, P.C.

17     600 Atlantic Avenue, Boston, MA 02210

18

19

20

21     Reporter:  Janet M. Konarski, RMR, CRR

22            LegaLink Boston

23      320 Congress Street, Boston, MA 02210

24            (617)542-0039

9        MR. MENDE:  For the record, those were

10   supplied to attorneys, and they have been produced in

11   this case.

12   BY MR. RADER:

13        Q.   Do you recall approximately when you

14   provided those two copies?

15        A.   Within the last couple of weeks.

16        Q.   And prior to that, had you done any review

17   of materials in connection with this case?

18        A.   No.

19        Q.   And other than producing the two copies of

20   the digital library, did you do any review or search of

21   materials that might be relevant for the case?

22        MR. MENDE:  I'm going to caution the

23   witness not to divulge any attorney/client

24   communications or any instructions you might have

41

1   received from your attorneys.  You can testify as to

2   what you actually did, whether you actually searched

3   for something and so forth.

4        A.   I looked for E-mails, but other than

5   that --

6        Q.   And how did you look for E-mails?

7        A.   Just did a search on my own computer for

8   current documents or archived documents.

9        Q.   And when did you do that?

10    A.  Yesterday, actually.

11    Q.  Did you find any?

12    A.  No.

13    Q.  And do you recall what search terms you

14  used?

15    A.  I went to either PIC, I went to Picone,

16  and I went back to Jill Josephson, who I had E-mails

17  back and forth with on that subject.

18    Q.  I guess I'd like to rewind in time again

19  to when you first started using Chapman Studios to do

20  photography.  Do you recall approximately when that

21  was?

22    A.  I was introduced to them by my boss at the

23  time, who would have been the creative services manager

24  back when I was a graphic designer.


                              42

1         MR. MENDE:  Can I hear the question back,

2  please.

3         (The pending question was read by the

4         reporter as requested.)

5  BY MR. RADER:

6    A.  Do you want me to continue?

7    Q.  Yes, please.

8         MR. MENDE:  You can answer that question.

9    A.  It would have been the mid '70s.  That is

10  the answer.

11      Q.   Okay.  And I think you said -- well, let

12   me just ask you:  How did you first meet the folks at

13   Chapman Studios?

14      A.   Through my boss at the time.

15      Q.   Who was that?

16      A.   His name was Ron Gray.

17      Q.   And do you remember how Mr. Gray

18   introduced you to Chapman Studios?

19         MR. MENDE:  Object as to form.  If you

20   understand that question, you can answer.

21      A.   He would have taken me to the studio and

22   taught me how to do a photo shoot.

23      Q.   Okay.  And was it your practice to go to

24   the studio when Chapman Studios was doing a shoot for


                          43

1   you?

2      A.   Yes.

3      Q.   And when you first started using Chapman

4   Studios, did you have any discussion with the folks at

5   the studio about the terms of your relationship?

6         MR. MENDE:  Object as to form.

7      A.   No.

8      Q.   And did you have any agreement about how

9   Gillette could use the images that they generated?

10         MR. MENDE:  Object as to form.

11      A.   No.

Rhonda Fields - 0223.pic.txt
Case 1:04-cv-10913-WGY    Document 52-3    Filed 03/01/2005    Page 38 of 46
Page 112

1   did creative services originally obtain the

2   transparencies in Exhibit 97?

3       A.  I don't know.

4       Q.  And what about the ones in Exhibit 96?

5       A.  I don't know that, either.

6       Q.  Now, I'm going to ask the court reporter

7   to mark the four CDs that you brought with you.

8           (

9                   marked Exhibit 98.)

10          (

11                  marked Exhibit 99.)

12          (

13                  marked Exhibit 100.)

14          (

15                  marked Exhibit 101.)

16      Q.  I'm going to hand you now Exhibits 98, 99,

17  100, 101 and just ask you first to verify that these

18  are the CDs that you brought with you today?

19      A.  Yes, they are.

20      Q.  And just walking through them one by one,

21  what is on these four CDs?

22      A.  Ninety-eight are the power assisted brands

23  at 100 percent EPS, so the full size images.

24  Ninety-nine are manual products, and 100 is also manual


                        117


1   products.  They're enough they were on two CDs at full

2  size DPS, and 101 is listed as a Braun Oral B

3  multi-format, so this is various tooth brushes across

4  the board and flosses.

5      Q.  Now, is there an indication of what size

6  the images are in Exhibit -- in the CD of Exhibit 101?

7      A.  In 101, it says multi-format.

8      Q.  Now, who were these CDs provided to?

9      A.  Typically, we did these sets prior to and

10  at the time of the launch of the digital library

11  online, so that these would be provided to, back to the

12  Bus. Com. folks, who would then make copies and send

13  them off to the sales force.  And on the back of 101 it

14  does tell you the various file formats.

15      Q.  Now, the four CDs that you brought with

16  you, are those all for the year 2000?

17      A.  Yes.

18      Q.  When in 2000 were they produced?

19      A.  I don't know specifically.  I'm making an

20  assumption, because there are two different -- there is

21  a set of high res, then that the 101 says multi-format

22  that they could, could, and I don't know for a fact,

23  have been produced at two times during the year, which

24  is typically what we would do.  When something updated,


                                118


1  we would provide new CDs.

2      Q.  And have these -- were these CDs produced

3   in 2001?

4       A.  Not --

5       Q.  Let me rephrase that.  Not these specific

6   CDs, but was a similar set of CDs produced in 2001, as

7   well as 2000?

8       MR. MENDE:  Object as to form.

9       A.  I don't recall when we went from having

10  CDs to having just digital images.  Often Bus. Com.

11  Would ask for sets, even though the images could be

12  downloaded.

13      Q.  So, even after the library was put up on

14  the internet, creative service would still produce CDs

15  request from business communications?

16      A.  Yes.

17      Q.  And do you still do that?

18      A.  Very rarely.

19      Q.  Did you do that in 2001?

20      A.  I don't recall.

21      Q.  Now, did Gillette provide these types of

22  CDs to third parties, as well?

23      MR. MENDE:  Object as to form.

24      A.  They -- I don't recall.  They could have


                        119

1   been sent off to our agencies, but the purpose of them

2   was to hand them off to the sales force.

3       Q.  What did the sales force do with them?

**PERKINS EX. 7**

**From:**     Patrick Perkins
**To:**     Albert, Michael
**Date:**     2/25/05 10:55AM
**Subject:**     RE: PIC v. Gillette

Dear Michael-

I write in response to your e-mail of Wednesday evening concerning my suggestion that we extend discovery by 30 days. I am somewhat disappointed by your response since it implies, among other things, that Gillette and not PIC has been delinquent in its discovery obligations. Obviously this is far from true. I won't rehearse again what we consider to be PIC's deficiencies.

As for your question about Gillette's plans for additional discovery, we currently have none. However, because PIC still has not completely complied with its discovery obligations, Gillette is, in effect, foreclosed from any follow up discovery. In any event, Gillette is not prepared to agree to a one-sided extension of the discovery period. This is neither fair, nor justified.

As a result, it appears that the only mutually agreeable solution is to "clean up" discovery loose ends in March. In that connection, you have committed to providing PIC's 30(b)(6) witness and Mr. Picone for the completion of their respective depositions in the month of March. We will get you some dates in that regard. As for further depositions of Gillette employees, we need to agree to a date for the remaining two or three topics left on the 30(b)(6) notice that were to be addressed at the deposition on the 23rd but that was postponed at your request. As for re-deposing any Gillette witnesses that have previously been deposed, we will consider any such request once you identify who you wish to re-depose and why. Assuming you wish to depose certain individuals for a very limited time on additional documents that were produced after an individual's deposition, we will do our best to accommodate you. Similarly, non-party witness Anna Madden will be produced out of time since she had to reschedule due to illness.

However, we will not consent to the taking of any other third party depositions out of time. In particular, the deposition of Wal-Mart was noticed extremely late in discovery through no fault of Gillette. Thus, the extenuating circumstances that required the re-scheduling of the depositions of your clients and of Anna Madden, do not exist here.

Regards,

Patrick T. Perkins
Fross Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza
New York, NY 10017
Tel: (212) 813-5900
Fax: (212) 813-5901
e-mail: pperkins@frosszelnick.com

>>> "Albert, Michael" <Michael.Albert@WolfGreenfield.com> 02/23/05 08:23PM >>>
Dear Patrick,

While we appreciate your concern about the position PIC has been put in as a result of the lateness of Gillette's production of responsive materials, we are somewhat apprehensive about the purpose or intent behind Gillette's proposal for a blanket 30-day extension of discovery for all purposes. While PIC should indeed be entitled to some relief, it is far from clear that Gillette should be granted any additional discovery, let alone an open-ended extension of the sort you have proposed. So that we can better understand what Gillette has in mind, could you identify what, if any, specific additional discovery Gillette anticipates taking if an extension of the discovery deadline were to be agreed upon? While we have not yet decided what course would be most appropriate here, one possibility would simply be to agree upon appropriate dates in March for the completion of any discovery events that the parties have already scheduled or attempted to schedule, as well as for such additional follow-up discovery by PIC as may be

necessary to ensure that PIC is not prejudiced. I think that would be a fair approach; but if we were to consider agreeing to something more open ended, we would like to have a better idea of what additional activities Gillette has in mind for the proposed additional discovery period.

Regards,

Michael

---

From: Patrick Perkins [mailto:pperkins@frosszelnick.com]
Sent: Wed 2/23/2005 4:56 PM
To: Albert, Michael
Cc: Craig Mende; David Donahue; Rader, Michael
Subject: PIC v. Gillette

Dear Michael-

I write further to our conversation of yesterday concerning our proposal for the parties to ask the Court for a 30-day extension of the discovery period in the case. As I mentioned to you, because some of Gillette's documents have only relatively recently come to light, and because PIC's production appears not to be complete and because it has not yet provided complete responses to Gillette's interrogatories, it would make sense to ask the Court for a modest extension of the discovery period to be able to "clean up" the loose ends in an orderly fashion. Moreover, my illness has put Gillette behind, particularly with respect to completing discovery of your client and its claims.

As I explained, Gillette has no desire to "sandbag" PIC but wants PIC to have sufficient time with Gillette's documents in order to complete the depositions in the case. Similarly, I am hopeful that PIC will provide Gillette with the information it has been asking for since the beginning of the case and is not trying to "hide the ball" with respect to its claims. Similarly, because you and your firm have been so understanding about my illness, I am certain it is not your intention to take advantage of that event to foreclose Gillette's ability to complete discovery.

In our discussion, you mentioned that you would be interested in extending all of the dates by 30-days since the current trial schedule coincides with the birth of Michael Rader's child and could interfere with your vacation. If it is more convenient for you and Michael, we are of course willing to agree to a 30-day extension of all dates, not just discovery. Obviously, this would be subject to the Court's approval.

If we are going to ask the Court for an extension, we should do so sooner rather than later.

I look forward to your response.

Regards,

Patrick T. Perkins
Fross Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza
New York, NY 10017
Tel:  (212) 813-5900
Fax:  (212) 813-5901
e-mail:  pperkins@frosszelnick.com
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The information contained in this E-mail message may be privileged, confidential, and protected
from disclosure.  Any unauthorized use, printing, copying, disclosure or dissemination of this
communication may be subject to legal restriction or sanction.  If you think that you have received
this E-mail message in error, please reply to the sender.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**CC:**          Donahue, David;  Kessel, Adam;  Mende, Craig;  Rader, Michael

**PERKINS EX. 8**

**From:**      David Donahue
**To:**        Rader, Michael
**Date:**      2/17/05 6:37PM
**Subject:**   RE: PIC v. Gillette

Michael,

Can you please advise what search, if any, of deleted e-mails and other electronic data your client made in response to Gillette's discovery requests, and when such search was made.

Sincerely,

David Donahue
Fross Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza
New York, New York 10017
Phone: (212) 813-5900
Fax: (212) 813-5901


>>> "Rader, Michael" <Michael.Rader@WolfGreenfield.com> 02/17/05 08:58AM >>>
Dear David,

I understand what you are saying, and we will provide updated responses
to both of these interrogatories on Monday.

Michael Rader

-----Original Message-----
From: David Donahue [mailto:ddonahue@frosszelnick.com]
Sent: Wednesday, February 16, 2005 7:19 PM
To: Albert, Michael
Cc: Craig Mende; Marie Driscoll; Patrick Perkins; rgelb@gelbgelb.com;
rmessinger@gelbgelb.com; Kessel, Adam; Rader, Michael
Subject: PIC v. Gillette


Michael,

Gillette's Interrogatory 1 required PIC to identify each alleged
copyright infringement and for each such alleged infringement, provide:
(a) the content of such photo; (b) the date such photo was provided to
Gillette; (c) the particular infringing act or acts alleged; (d) the
date of such alleged infringing acts; (e) the job number assigned to
each photo by PIC; (f) the particular invoice associated with such
photo; (g) any consideration, including, without limitation, the amount
of money received by PIC from Gillette for its use of the photo; (h) the
copyright registration number that covers such photo; (i) the date PIC
first learned of such infringing act.

Gillette's Interrogatory No. 2 required your client to identify each
alleged breach of contract and for each such breach to specify:  (a) the
actual alleged agreement that has been breached; (b) the specific
provision of any alleged agreement that has been breached; (c) the
specific act that allegedly gives rise to a breach; (d) the date of such
alleged breach;