Page 1

```
 1                              Volume:  I
 2                              Pages:  1-166
 3                              Exhibits:  59-80
 4         IN THE UNITED STATES DISTRICT COURT
 5           FOR THE DISTRICT OF MASSACHUSETTS
 6
 7   * * * * * * * * * * * * * * *
 8   PHOTOGRAPHIC ILLUSTRATORS CORPORATION,
 9
10                    Plaintiff,
11   vs.                      NO. 04-CV-10919-WGY
12   THE GILLETTE COMPANY,
13                    Defendant.
14   * * * * * * * * * * * * * * *
15
16          DEPOSITION OF JILL JOSEPHSON
17          Wolf, Greenfield & Sacks, P.C.
18               600 Atlantic Avenue
19              Boston, Massachusetts
20                   10:19 a.m.
21          Thursday, February 17, 2005
22   Court Reporter:  Mary C. Soldati CSR, RPR
23
24
```

```
                                                         Page 2
 1   APPEARANCES:
 2      WOLF, GREENFIELD & SACKS, P.C.
 3      By Michael N. Rader, Esquire
 4      and Adam Kessel, Esquire
 5      600 Atlantic Avenue
 6      Boston, Massachusetts  02110
 7      (617) 720-3500
 8      On Behalf of the Plaintiff
 9
10      FROSS ZELNICK LEHRMAN & ZISSU, P.C.
11      By Craig S. Mende, Esquire
12      866 United Nations Plaza
13      At First Avenue & 48th Street
14      New York, New York  10017
15      (212) 813-5900
16      On Behalf of the Defendant
17
18
19
20
21
22
23
24
```

```
                                                         Page 3
 1
 2                    I N D E X
 3
 4   DEPONENT:         DIRECT CROSS REDIRECT
 5   JILL JOSEPHSON
 6
 7   By Mr. Rader      5          162
 8   By Mr. Mende                 158
 9
10
11                  E X H I B I T S
12
13   NO.        DESCRIPTION                      PAGE
14   59    Invoices                                7
15   60    Document Bates No. Gillette 738        50
16   61    Document Bates No. PIC 10626           56
17   62    Document Bates No. PIC 14280           58
18   63    Document Bates No. PIC 10566           64
19   64    Document Bates No. PIC 14583           67
20   65    Document Bates No. PIC 09004           79
21   66    Document Bates No. PIC 09906           83
22   67    Document Bates No. PIC 01211           85
23   68    Document Bates No. 15709               88
24   69    Invoices                              104
```

```
                                                         Page 4
 1              E X H I B I T S (Continued)
 2   NO.        DESCRIPTION                      PAGE
 3   70    Document Bates No. 14932              120
 4   71    Invoices                              123
 5   72    Document Bates No. JJP-001 to 247     134
 6   73    Document Bates No. JJP-325            137
 7   74    Document Bates No. JJP-326            137
 8   75    Document Bates No. 340                137
 9   76    Document Bates No. JJP-248 to 499     137
10   77    Document Bates No. Gillette 242-1     145
11         and 242-2
12   78    Document Bates No. PIC 12175          148
13   79    Document Bates No. ADV 00046          151
14   80    Multi-page Exhibit                    153
15
16
17
18
19
20   *Exhibits retained by Attorney Rader
21
22
23
24
```

```
                                                         Page 5
 1                    P R O C E E D I N G S
 2
 3             JILL JOSEPHSON,
 4   a witness called for examination by counsel for the
 5   Plaintiff, having been satisfactorily identified and
 6   duly sworn by the Notary Public, was examined and
 7   testified as follows:
 8             DIRECT EXAMINATION
 9   BY MR. RADER:
10       Q.  Good morning, Miss Josephson.  My name is
11   Mike Rader.  I'm one of the attorneys for
12   Photographic Illustrators Corporation and Paul
13   Picone in this case.  I'm going to ask you some
14   questions today.
15             Just a couple of introductory remarks,
16   first of all, thank you very much for coming.  Thank
17   you for your time.  I'm going to ask you a series of
18   questions throughout the day.
19             And I'll just need to ask you, because
20   we have a court reporter taking down your answers,
21   to answer audibly, such that, for example, nodding
22   or shaking your head would not be sufficient.  Do
23   you understand that?
24       A.  Correct.
```

### Page 42

1   Rosenthal, and other various display vendors.
2       Q. Okay. Between 1992, when you first began
3   working at Braun, and 2002, when you stopped using
4   Photographic Illustrators, did you use any
5   photographers other than Photographic Illustrators?
6           MR. MENDE: Object as to form.
7       A. No.
8       Q. Okay. During your time at Braun and
9   Oral-B --
10          MR. MENDE: By the way, if I'm back
11  tomorrow, I'd also like some blueberries because
12  those look good. Thank you. Let the record
13  reflect.
14          MR. RADER: Feel free to share with the
15  witness, too.
16          THE WITNESS: It's okay.
17      Q. Miss Josephson, during your time at Braun
18  and Oral-B, when you hired Photographic Illustrators
19  to do a shoot, did they provide -- did the company
20  provide you with a deliverable?
21      A. Yes.
22      Q. Okay. And what was that?
23      A. Transparencies.
24      Q. And how many transparencies would

### Page 43

1   Photographic Illustrators typically provide?
2       A. Four.
3       Q. Is that four per product?
4       A. Yes.
5       Q. Were there occasions on which more than one
6   product was photographed in a shoot?
7       A. Yes.
8       Q. And on those occasions, how many
9   transparencies were provided?
10      A. Four for each product.
11      Q. Okay. Okay. And then what did you do with
12  the transparencies once you got them?
13      A. Depending on what they were being used for,
14  I would take them and give them to the designer who
15  was producing the sales materials, have them choose
16  which exposure they wanted, and I would take the
17  rest and put them back into a file.
18      Q. Okay. I take it that's similar to the
19  procedure you followed at Sylvania?
20      A. Correct.
21      Q. And why did you put the transparencies into
22  a file?
23      A. For safekeeping.
24      Q. And why did you want to keep them safe?

### Page 44

1       A. In case we wanted to use them again.
2       Q. Were there occasions in which you did use
3   them again?
4       A. Not that I can recall.
5       Q. But you wanted to make sure they were there
6   in case you needed them, correct?
7       A. Correct.
8       Q. And did you ever return those extra
9   transparencies to Mr. Picone?
10      A. No.
11      Q. Did he ask for them back?
12      A. No.
13      Q. Have you ever had a conversation with Mr.
14  Picone in which he told you that he wanted his
15  transparencies back?
16      A. No.
17      Q. When was the last time that you spoke with
18  Mr. Picone?
19      A. Six months ago, perhaps.
20      Q. Okay. Have you spoken to Mr. Picone within
21  the last two weeks?
22      A. No.
23      Q. Within the last two months?
24      A. No.

### Page 45

1       Q. Have you visited Mr. Picone's property
2   within the last two months?
3       A. No.
4       Q. Were you bitten by his dog within the last
5   two months?
6       A. No.
7       Q. Miss Josephson, have you ever seen a letter
8   in which Mr. Picone informed Gillette that he wanted
9   his transparencies back?
10      A. Yes.
11      Q. When did you see that?
12      A. I saw a copy of it this morning. I imagine
13  I saw the original copy when it was mailed to me. I
14  don't remember that date.
15      Q. When you saw the original copy -- when you
16  received the original copy, I should say, did you
17  discuss it with anyone?
18      A. I can't recall.
19      Q. Did you call Mr. Picone?
20      A. I can't recall.
21      Q. Did Mr. Picone's photographs ever include
22  you?
23      A. On occasion.
24      Q. During your time at Braun and Oral-B, did

Jill Josephson                                                                02/17/2005

Page 62

1   Q. Okay. And how about the KFK4?
2        MR. MENDE: Object as to form.
3   A. Possibly.
4   Q. Looking back at Exhibit 61. Is Exhibit 61 a
5   picture of the KF12?
6   A. I don't recall the model number of these.
7   It is possible.
8   Q. Okay. Do you see any differences between
9   the product shown in Exhibit 61 and the product
10  shown in the picture at the top of the second page
11  of Exhibit 62?
12       MR. MENDE: Objection.
13  A. It's hard to tell from these photos.
14  Q. Okay. And -- well, can you identify any
15  differences from looking at these photos?
16       MR. MENDE: Objection.
17  A. I can see that they're two different photos.
18  Q. Okay. I'm not talking about whether the
19  photos are the same. What I'd like to know is
20  whether you can identify a single difference between
21  the two products that are shown in the photos.
22       MR. MENDE: Objection.
23  A. I cannot.
24  Q. I don't know if your attorney speaking went

Page 63

1   over that. So let me just ask it again. And we'll
2   give him an opportunity to object before you answer.
3        Okay. Can you identify a single
4   difference between the product shown in Exhibit 61
5   and the product shown in the picture at the top of
6   Page 2 of Exhibit 62?
7        MR. MENDE: Objection.
8   A. I cannot tell.
9   Q. Ms. Josephson, how many times did you hire
10  Photographic Illustrators to photograph the product
11  shown in Exhibit 61?
12  A. I don't recall.
13  Q. What was your typical -- was it your typical
14  practice to hire Photographic Illustrators to
15  photograph a product more than once?
16       MR. MENDE: Object as to form.
17  A. Sometimes.
18  Q. Do you recall doing that with the product
19  shown in Exhibit 61?
20  A. It's possible. But I don't remember
21  exactly.
22  Q. As you sit here today, do you recall hiring
23  Photographic Illustrators to photograph this product
24  more than once?

Page 64

1   A. I don't.
2   Q. Okay.
3        (Exhibit No. 63 marked for
4   identification.)
5   Q. Okay. This is Exhibit 63. And it bears PIC
6   Bates No. 10566. PIC, by the way, is just an
7   abbreviation for Photographic Illustrators
8   Corporation.
9        And by the way, we're showing it to you
10  on screen, in color, although the black and white
11  version came out pretty clear, I think. Does this
12  photograph look familiar to you?
13  A. Yes, it does.
14  Q. Did you hire Photographic Illustrators to
15  take this photograph?
16  A. Yes, I did.
17  Q. Do you remember, approximately, when you did
18  that?
19  A. I do not.
20  Q. Was it when you were working for Braun or
21  Oral-B?
22  A. It would have been when I was working for
23  Braun, so that would be between '92 and '97.
24  Q. And do you recall what you used this

Page 65

1   photograph for?
2   A. It was probably used for a catalog.
3   Q. Do you recall what year?
4   A. No, I do not.
5   Q. And were you present when this photograph
6   was taken?
7   A. Yes, I was.
8   Q. Did you help arrange the objects on the
9   counter?
10  A. Yes, I did.
11  Q. Was this photograph used for anything other
12  than a catalog?
13  A. I cannot recall.
14  Q. Let's just step back a second. When you
15  were working on catalogs for Braun, were those
16  catalogs produced in-house?
17  A. Define in-house.
18  Q. Did Gillette have the capability to print
19  its own catalogs?
20  A. No, they did not.
21  Q. Do you recall who Gillette hired to print
22  catalogs?
23  A. It was a design agency called Vanauken and
24  Margolis.

17 (Pages 62 to 65)

Jill Josephson                                                                                                         02/17/2005

Page 66

1    Q.  And did you provide transparencies to that
2  company for use in the catalog?
3    A.  Yes.
4    Q.  And how many transparencies of each shot did
5  you provide to them?
6        MR. MENDE:  Object as to form.
7    A.  In most instances, just one.
8    Q.  And what did you do with the other
9  transparencies of that view?
10        MR. MENDE:  Objection as to form.
11    A.  Put them in a file.
12    Q.  And do you recall providing a transparency
13  of the picture in Exhibit 63 to the catalog company?
14    A.  Yes.
15    Q.  And what did you do with the other
16  transparencies of this image?
17    A.  They were put in a file.
18    Q.  Did you ever provide one to anyone besides
19  the catalog company?
20    A.  Not to my recollection.
21    Q.  Did you ever duplicate them?
22        MR. MENDE:  Object as to form.
23    A.  Not that I can recall.
24    Q.  Okay.  Did you ever -- let me start the

Page 67

1  question over.
2        When you were working for Braun, did you
3  ever have occasion to work with individuals in the
4  Gillette Company outside the United States?
5    A.  No.
6    Q.  Have you ever seen a Gillette catalog from
7  outside the United States?
8    A.  No.
9    Q.  Have you ever seen a Gillette marketing
10  piece from outside the U.S.?
11    A.  No.
12    Q.  Okay.  I'm going show you the next exhibit.
13        (Exhibit No. 64 marked for
14  identification.)
15    Q.  Okay.  This is Exhibit 64.  It bears PIC
16  Bates No. 14583.  Does this picture look familiar?
17    A.  Yes, it does.
18    Q.  Is it the same picture that we just looked
19  at in Exhibit 63?
20    A.  Yes, it is.
21    Q.  Is there any writing or?
22        MR. MENDE:  I'm objecting to the
23  question just on the grounds that I think the
24  pictures speak for themselves.  And I can see

Page 68

1  differences in what appears here, but that would
2  speak for itself.
3    Q.  Is there any writing on the picture?
4    A.  Yes, there is.
5    Q.  And is it in English?
6    A.  No, it is not.
7    Q.  Do you know what language it's in?
8    A.  I would suspect it's probably Spanish of
9  some sort.
10    Q.  Do you have a working knowledge of Spanish?
11    A.  No, I do not.
12    Q.  Have you ever seen this version of the
13  picture with the Spanish writing on it before?
14        MR. MENDE:  Object as to form.
15    A.  No, I have not.
16    Q.  Do you have any idea how that writing got on
17  there?
18        MR. MENDE:  Object as to form.
19    A.  No, I do not.
20    Q.  Do you see on the lower right-hand corner of
21  the picture some writing?
22    A.  Yes.
23    Q.  Okay.  What is that?
24    A.  It looks like it's a copyright signature for

Page 69

1  Photographic Illustrators.
2    Q.  Okay.  And have you seen that copyright
3  notice before?
4        MR. MENDE:  Object as to form.
5    A.  No.
6    Q.  You never saw that on any other material
7  that was provided to you by Photographic
8  Illustrators?
9    A.  No.
10    Q.  Are you surprised to see this picture with
11  Spanish writing on it?
12    A.  Yes, I am.
13    Q.  Why are you surprised?
14    A.  Because I had nothing to do with it once I
15  used it in its original form for a catalog.  Then I
16  moved to a different department.  So obviously,
17  somebody has taken this out of the file.
18    Q.  Do you know where the file for this job is
19  stored today?
20    A.  No, I do not.
21    Q.  Did you know where the file for this job was
22  when you switched from Braun to Oral-B in 1997?
23    A.  Yes, I do.
24    Q.  Okay.  At that time, where was the file?

18 (Pages 66 to 69)

Jill Josephson                                                                                              02/17/2005

Page 94

1   Q. As you sit here today, do you have any
2   knowledge that Ms. Burrow contacted Photographic
3   Illustrators to request permission?
4   A. I do not know that.
5   Q. And do you have any knowledge that Advanced
6   Photographics contacted Photographic Illustrators
7   for permission?
8   A. I do not know that.
9   Q. Let's take lunch.
10      (Lunch recess.)
11  Q. Okay. Miss Josephson, we're back from lunch
12  and starting again, right?
13  A. Yes.
14  Q. And do you understand although we've taken a
15  break for lunch, your oath from this morning still
16  applies?
17  A. Yes.
18  Q. You're still under oath to tell the truth;
19  is that correct?
20  A. I would like to go back a statement I made
21  earlier, if I could, regarding my visiting Paul
22  Picone at his house and a dog bite.
23  Q. Okay. Did you --
24  A. I -- actually, I was confused on the timing

Page 95

1   and the actual dog bite thing. I did stop by his
2   house in December, it was probably the second or
3   third week of December, on a social visit.
4       I met with his wife, in the stable. I
5   talked with her. When I came up into the yard, one
6   of his dogs did nip at me. It didn't bite me.
7       And I never saw Paul or talked to him,
8   but I did have a conversation with his wife. So I
9   just want to clarify that.
10  Q. Did you see anyone there besides Mr.
11  Picone's wife?
12  A. His groundskeeper was there.
13  Q. Okay. So just to be clear. Mr. Picone's
14  dog, did its teeth actually make contact with you?
15  A. He nipped at my pants.
16  Q. Did he rip your pants?
17  A. No. Nipped.
18      MR. MENDE: Do you guys do personal
19  injury at all?
20  A. Yeah, I was going to say.
21  Q. It doesn't sound like you have a case for
22  that. Okay. Did you see anyone besides Mr.
23  Picone's wife and his groundskeeper?
24  A. No.

Page 96

1   Q. And why did you stop by?
2   A. Just to say hello. Paul and I are friends.
3   Q. And prior to that occasion, when was the
4   last time that you stopped by?
5   A. Months. I can't even remember the last time
6   I had stopped by prior to that.
7   Q. Okay. Did you call ahead before you stopped
8   by?
9   A. I don't recall.
10  Q. Do you remember what day of the week it was?
11  A. I don't.
12  Q. Do you know what time of day it was?
13  A. It was the morning, I think.
14  Q. Do you work five days a week?
15  A. Yes, I do. Sometimes I have Fridays off.
16  Q. Do you recall taking a day off from work to
17  go over and pay a visit to Mr. Picone?
18  A. No, I don't.
19  Q. Okay. Well, now that you've clarified that,
20  that reminds me of something.
21      I just want to confirm -- I think I
22  asked you about this before, but have you placed a
23  phone call to Mr. Picone in the last two weeks?
24  A. I believe I placed a phone call to him, from

Page 97

1   my own personal phone, to let him know that I was
2   being depositioned.
3   Q. Okay. And when was that?
4   A. I believe about two, three weeks ago.
5   Q. When you say your personal phone, is that
6   your home phone or a cell phone?
7   A. It would be a cell phone.
8   Q. Now, when you testified earlier that you
9   hadn't called Mr. Picone in two months -- do you
10  remember that?
11  A. Yes, I do. And I was a little bit shocked
12  by that, that that question came up.
13  Q. Okay. Was your answer to that question
14  accurate?
15  A. I would say it would not be. Paul had
16  mentioned that he would not say that he and I had
17  spoken. So I was a little bit surprised that that
18  came up.
19  Q. And is that why you said you hadn't spoken
20  when I asked you the question?
21  A. Yes.
22  Q. So when I asked you the question earlier
23  today whether you had spoken or called Mr. Picone in
24  the last two weeks, did you know that the answer was

LegaLink Boston
(800) 822-3376

Jill Josephson                                                                                                                02/17/2005

Page 98

1   yes?
2   A. Yes.
3   Q. But you said no, correct?
4   A. Yes.
5   Q. Do you recall, were you are able to get Mr.
6   Picone on the first try when you called him?
7   A. I don't recall.
8   Q. Did you reach him at his studio or on his
9   cell phone?
10      MR. MENDE: Object as to form.
11  A. It was probably his cell phone.
12  Q. Did you try calling the studio first?
13  A. Probably, if I had tried to call at all,
14  yeah. I mean, I've had conversations with Paul off
15  and on very sporadically, not as often as I used to
16  when I was working with him.
17      Sometimes I call him at the studio,
18  sometimes I call him on his cell phone and sometimes
19  he calls me.
20  Q. On the occasion in question -- first, let's
21  just try to pin it down. I think you said a minute
22  ago it was within the last few weeks; is that
23  accurate?
24  A. Yes.

Page 99

1   Q. Okay. Was it last week?
2   A. It was when I found out I was being
3   depositioned.
4   Q. Okay. Do you recall when you found out?
5   A. I'll find out when that deposition notice
6   came through.
7   Q. Okay. If that refreshes your recollection.
8   A. I believe it was somewhere around 2/4.
9   Q. Meaning, February 4th?
10  A. Yes.
11  Q. Do you remember how many times you called
12  him that day?
13  A. I don't.
14  Q. When you called him, what did you say to
15  him?
16  A. I told him that I was being called up for a
17  deposition.
18  Q. And what did he say to you?
19  A. He said that's fine.
20  Q. About how long would you say the telephone
21  call lasted?
22  A. I don't know. A couple of minutes, five
23  minutes. I don't time my phone calls and record
24  everything, as I know Paul does.

Page 100

1   Q. Would you say it lasted more than ten
2   minutes?
3   A. It could have been.
4   Q. Okay. In that ten minutes, what did you say
5   to him besides the fact that you were going to be
6   deposed?
7       MR. MENDE: Object to the form of the
8   question. You just mischaracterized her testimony.
9   A. I don't remember.
10  Q. What else did Mr. Picone say to you?
11  A. I don't remember.
12  Q. Did you express any concerns during the
13  phone call?
14  A. I'm sure I probably did.
15  Q. Okay. What were those concerns?
16  A. Our personal relationship. Having a
17  friendship and being called to this deposition, I
18  felt it was a conflict of interest.
19  Q. Okay. Why did you feel it was a conflict of
20  interest?
21  A. Because I'm being asked to come here and,
22  you know, make statements about how I did business
23  with him, be it right or wrong.
24  Q. Can you explain in as much detail as you're

Page 101

1   able, why you felt that that would be a conflict of
2   interest?
3   A. We have a personal friendship and we had a
4   working relationship. That, alone, to me makes it
5   feel that it's a conflict of interest.
6   Q. Did you expect to offer testimony that would
7   be damaging to Mr. Picone's case?
8   A. No, I did not.
9   Q. Did you expect to offer testimony that would
10  be favorable to his case?
11  A. No, I did not.
12  Q. Did you have an understanding of the subject
13  matter of the case at the time of that phone call?
14  A. Yes, I did.
15  Q. Okay. What was that understanding?
16  A. That Paul Picone had brought suit against
17  Gillette for misuse of photography.
18  Q. And did you know what the alleged misuse
19  was?
20  A. Yes.
21  Q. Okay. And what was that?
22  A. That we had not returned photographs that
23  were his and that in some instances, the photographs
24  had been used without his permission.

26 (Pages 98 to 101)

Page 102

1  MR. MENDE: Are you asking her to give
2  what the allegations are?
3  A. That's what I think they are. I -- I don't
4  know that is for sure. I have not seen any formal
5  documents stating what those things are. That is
6  information -- hearsay from Mr. Picone.
7  Q. Did you express concern to Mr. Picone that
8  you might be asked at your deposition whether you
9  had recently spoken to him?
10  A. Yes.
11  Q. Why were you concerned about that?
12  A. Because I felt that it would be damaging to
13  the case, for both him and myself.
14  Q. And how did you feel that it would damage
15  you?
16  A. I guess I felt that it probably wouldn't
17  look good for somebody from Gillette, the company
18  that he is suing, to be talking to him, who is the
19  party who is suing.
20  Q. And how did you feel that it could be
21  damaging to Mr. Picone?
22  A. Same thing. I don't think he should be
23  talking to me.
24  Q. And did you intend, before your deposition,

Page 103

1  to testify that you had not spoken with Mr. Picone
2  recently?
3  MR. MENDE: Object to -- I object to the
4  question. There's -- can I have the question back?
5  And I'll object again.
6  (Record read.)
7  MR. MENDE: I object on a number of
8  grounds. First, it assumes that there was some
9  intent formed. Second, it's really at some point
10  just harassing the witness. And I don't think
11  that's appropriate. So I'd ask you to move on to
12  another question.
13  Q. Please answer the question, Ms. Josephson.
14  THE WITNESS: Do I have to answer that
15  question?
16  A. I didn't come in here with any intent to
17  lie. I was surprised that it had come up, because
18  Paul had said to me, I will not let anybody know
19  that we had spoken.
20  So when that came up, it surprised me.
21  And, of course, my reaction was to say no. I think
22  I thought it was a trick question.
23  Q. Do you understand that you're under oath to
24  tell the truth, regardless of what you think of the

Page 104

1  question?
2  MR. MENDE: Objection. Obviously, she
3  understands she's under oath, because you've already
4  asked her and because she went out of her way to
5  correct prior misstatements in her testimony on the
6  very day that she's giving the testimony. So it's
7  clear that she understands --
8  A. I do understand it and I do have a
9  conscience about it. So that's why I felt it was
10  necessary to come back in here and clear the air on
11  that.
12  Q. Did you speak with anyone at Gillette about
13  your visit to Mr. Picone's house?
14  A. No.
15  Q. Did you speak with anyone at Gillette about
16  your phone call with Mr. Picone?
17  A. No. Or should I say, not that I recollect.
18  MR. MENDE: Good.
19  Q. Okay. Let's talk about something else.
20  A. Like the case?
21  Q. I'm going to ask the court reporter to mark
22  the next set of exhibits.
23  (Exhibit No. 69 marked for
24  identification.)

Page 105

1  Q. Okay. This is Exhibit 69. Miss Josephson,
2  this is a multi-page exhibit. If you would be so
3  kind to please have a look through these pages to
4  verify that your signature is found on each of them,
5  please.
6  A. Yes.
7  MR. MENDE: Wait until you go through
8  all of the pages before you answer it.
9  A. Okay.
10  Q. Okay. Does your signature appear on each of
11  these pages?
12  A. Yes.
13  Q. And what are the documents that you just
14  looked at?
15  A. They're invoices.
16  Q. Are they from Photographic Illustrators?
17  A. Yes, they are.
18  Q. And are they for jobs that you ordered?
19  A. Yes, they are.
20  Q. And when you signed each of these invoices,
21  did you review the invoice before you signed it?
22  A. Yes.
23  MR. MENDE: Object as to form. You can
24  answer.