IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PHOTOGRAPHIC ILLUSTRATORS
CORPORATION,

       Plaintiff,

v.

THE GILLETTE COMPANY,

       Defendant.

Civil Action No. 04-CV-10913-WGY

**MEMORANDUM IN SUPPORT OF PIC'S MOTION FOR SUMMARY JUDGMENT
ON ITS CLAIM FOR LIQUIDATED DAMAGES FOR GILLETTE'S FAILURE
TO RETURN PIC'S IMAGES AS REQUIRED BY THE PARTIES' CONTRACTS**

Michael A. Albert, BBO #558566
Michael N. Rader, BBO # 646990
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

COUNSEL FOR PLAINTIFF
PHOTOGRAPHIC ILLUSTRATORS CORP.

## TABLE OF CONTENTS

I.      BACKGROUND .................................................................................................1

      A.    PIC and Its Principal Mr. Paul Picone ...............................................1

      B.    Photography Industry Practices and Standards.....................................2

      C.    PIC's Introduction to Gillette .............................................................4

      D.    PIC's Relationship With Gillette .........................................................8

      E.    Breakdown of the Relationship, and PIC's
             Unsuccessful Efforts to Retrieve Its Film From Gillette .....................11

II.     UNDISPUTED FACTS REGARDING
        GILLETTE'S FAILURE TO RETURN PIC'S FILM ......................................13

      A.    PIC Delivered at Least 9,381 Original Transparencies to Gillette,
             Subject to PIC's Standard Terms and Conditions ...............................13

      B.    Gillette Was Aware of PIC's Terms and Conditions and
             It Reviewed *and Signed* Substantially Every PIC Invoice ...................13

      C.    Gillette Has Failed to Return PIC's Film As Required .........................14

III.    PIC IS ENTITLED TO SUMMARY JUDGMENT
        ON ITS CLAIM FOR LIQUIDATED DAMAGES ..........................................14

      A.    As a Matter of Law, PIC's Invoices Constitute The Parties' Contracts ...............14

      B.    The Liquidated Damages Clause Is Enforceable ..................................17

      C.    PIC Is Entitled to Liquidated Damages for the 9,381
             Transparencies That Gillette Failed to Return As Required..................19

IV.    CONCLUSION...................................................................................................20

Gillette's refusal to return PIC's original, copyrighted photographic materials, despite contractually undertaking to do so – in writing, on hundreds of occasions – entitles PIC to summary judgment on its core claim in this case. PIC's damages for the unreturned film are specified explicitly in every one of the contracts that Gillette reviewed and signed.

The pertinent facts are few and undisputed. Summary judgment for PIC is in order.

## I.     BACKGROUND

### A.     PIC and Its Principal Mr. Paul Picone

PIC, through its principal, Mr. Paul Picone, specializes in high-end photography of consumer products for large corporate clients who desire high quality photography for use in marketing and advertising materials. Although PIC employs a handful of office staff and assistants, it is a single-professional operation. Mr. Picone is the company's sole photographer. In business for almost forty years, Mr. Picone still personally performs all photography and services every client. (Picone Decl. ¶¶ 3-5).

Mr. Picone's artistic and technical abilities, his integrity, and the high level of customer service that he provides, are beyond dispute. The Vice President of Advanced Photographics, Inc. (a photography lab used by both PIC and Gillette), who is familiar with the work of many photographers, testified that Mr. Picone's work is of "excellent" quality. See J. Roopenian Depo. (attached as Ex. 6 to the Declaration of Attorney Michael N. Rader), at 39-40. PIC's expert on the photography industry, Jeff Sedlik, an award-winning photographer and a past president of the Advertising Photographers of America (APA), concluded after reviewing Mr. Picone's portfolio that he "is a highly talented artist and a skilled craftsman, with quality work of the highest technical standards." See Sedlik Report (Ex. 11[1]) at 9.

---

[1] Unless otherwise noted, all referenced Exhibits are attached to the Declaration of Attorney Michael N. Rader.

Mr. Sedlik explains the effort that goes into photographing products like Gillette's:

> Creating effective photographs of such products requires a high level of expertise and experience. Odd shapes, combinations of shiny and dull metal and plastic, adjacent light and dark materials, transparent plastic and glass, and highly reflective surfaces make such products highly challenging subject material for photographers… Subtle techniques employed by a photographer using lighting position, lighting angle, lighting direction, lighting modifiers, reflectors, backgrounds, camera angles, filtration, lens settings, selective focus, lens choice, in-camera perspective control, exposure, digital post production and careful attention to the preparation of the product before shooting can significantly impact the quality of the resulting images.

(Id. at 9-10).

Gillette personnel testified not only to Mr. Picone's skill, but to his reliability and service as well. E.g., Mullen Depo. (Ex. 3) at 69-70 ("My understanding was he was a very good, high quality photographer."); Romano Depo. (Ex. 4) at 6-8 (Mr. Picone is reliable and timely); Ex. 19 (e-mails from Gillette expressing "You rock!" and "GORGEOUS!!!").  As a result of these qualities, Mr. Picone's clients stay with him for years and even decades. (Picone Decl. ¶ 6).

Mr. Picone's daily rate ranges from $2,600 to $8,800, depending on when and where a shoot takes place. (Id. ¶ 5).  Although substantial, his charges are in fact modest for a photographer of Mr. Picone's experience and skill. See Sedlik Report at 10 ("I find Mr. Picone's fees extremely reasonable – and even on the low side – relative to the quality of his work.").

## B.     Photography Industry Practices and Standards

Copyright law is the basis of the photography industry.  Photographers make their living by providing their clients with limited licenses to use and reproduce their images.  Each license is tailored to the particular needs of the client at the time the license is requested.  If a client later wishes to use an image for additional purposes (such as in media not within the scope of the originally licensed media use), or for a longer period of time, or in a different geographic region, the client must return to the photographer to obtain another license for an additional fee.  PIC's and Gillette's experts agree on this. Id. at 7; Adler Depo. (Ex. 8) at 125-126, 139-140.

To police clients' use of their images, photographers generally maintain physical control over their reproducible media such as negatives and transparencies. For example, wedding photographers do not provide such media to their clients, helping ensure that the client will not circumvent the copyright laws, but rather will order prints and albums only from the photographer. See Sedlik Report at 15; Adler Depo. at 74.

In other segments of the industry, practical considerations make it difficult for photographers to maintain such tight control over their film. Advertising photographers' clients, for example, must receive an original, reproducible piece of film in order to incorporate the photograph into another medium such as marketing material. In order to minimize the likelihood that the client will misuse the film outside the scope of the license, advertising photographers typically require that the film be returned. This return requirement is usually embodied in the Terms and Conditions recited on the back of the photographer's invoice. (Sedlik Report at 16).[2]

Failure by a client to return original film can lead to problems for the photographer. For example, as already noted, the client might continue making reproductions outside the scope of the original license granted, rather than having to return to the photographer to purchase an additional license. Such infringement can be difficult for the photographer to detect and police. In addition, if the film is not returned (or is returned with damage) the photographer will be unable to license those images to other clients or to stock photography agencies. Likewise, the photographer will not have the film available for other purposes such as internal reference, use in a portfolio, or bulk sale if an appropriate opportunity arises. (Picone Decl. ¶¶ 8-9).

---

[2] According to a 1999 survey by the APA, 36.9% of respondents "always" use the Terms and Conditions on the APA-recommended invoice, which includes a return requirement. (Ex. 32 at 14). Another 46.5% "always" use a modified version of these Terms and Conditions. (Id.). The survey also found that 27.3% of photographers "always" request return of their film, while another 66.1% "sometimes" do so. (Id. at 10). Gillette's expert on photography practices agreed with the statement in Mr. Sedlik's report that the APA (which commissioned the quoted survey) is "the leading trade association for commercial photographers in the United States." (Adler Depo. at 46-47).

These considerations notwithstanding, it is common practice in the industry for photographers to provide some latitude on the return requirement for regular clients who respect the photographer's copyrights. (Sedlik Report at 19-20).

Because it is difficult to predict the value of particular images, the photography industry has adopted a standard sum to be paid for each original transparency or negative that is damaged or not returned by a photographer's client. The current figure recommended by the APA is $2,500, although PIC's invoices to Gillette all used the earlier, longstanding $1,500 figure. (Id. at 16; Picone Decl. ¶ 10). Gillette's own expert conceded that the $1,500 figure is commonly used and has "been around for a long, long time." (Adler Depo. at 25-26, 80). As Mr. Sedlik explains:

> The value of an original transparency or negative created for commercial use can range up to tens of thousands of dollars if the images is of high quality and is used in a commercially significant fashion (such as to advertise a product that sells well as a result of the advertising). The choice of a $1,500 (or, in the current APA form, $2,500) liquidated damages amount represents a fair and practical estimate of the value of a typical image, although the actual value of a particular image might be worth more or less than $1,500... the photographer agrees not to demand that the client pay more than the stipulated amount for loss, damage or refusal to return a particular photograph, even if a particular photograph is worth more... Likewise, the client agrees to pay the stipulated amount for loss, damage or refusal to return, even if a particular photograph is worth less.

(Sedlik Report at 17).

## C.    PIC's Introduction to Gillette

PIC's first introduction to Gillette[3] came in approximately March 1992, through Nadine Romano, who knew Mr. Picone from having worked with him in her previous job at Sylvania (another PIC client). At the time, Ms. Romano was working as a consultant to Gillette, but she became a full-time employee soon thereafter, in 1994. (Romano Depo. at 19).

---

[3] Mr. Picone's initial contact was with the Braun division of Gillette. Consistent with the parties' practice throughout the case, this brief refers to "Gillette" as encompassing all of The Gillette Company's divisions, which include Braun, Oral-B and Duracell.

Ms. Romano does not recall hiring Mr. Picone in her capacity as a consultant to Gillette. (Id. at 17-18, 24).  Mr. Picone *does* remember being retained by Ms. Romano on Gillette's behalf, and has documentation of the same.[4]  PIC's very first Job for Gillette, which bore PIC's Job Number 3072, occurred in early March 1992.  Ms. Romano contacted Mr. Picone to request that PIC handle a photography project for Gillette on a limited budget, as an introduction to working for Gillette.  Ms. Romano was working with an outside agency called Cartouche on this particular project, and although PIC's bill was to be sent to Cartouche on behalf of Gillette, it was understood that Gillette was PIC's client.  See 3/24/05 Picone Depo. (Ex. 10) at 117-122.

On or about March 2, 1992, PIC put together an estimate for Gillette on its standard estimate/invoice form. (Ex. 20).  The form describes the photography to be done and includes spaces for PIC to indicate the licensed "Media Use" ("Consumer Leaflet") and "Period of Use" if it varies from the default one-year term set forth in the Terms and Conditions on the back of the form. (In this case that space was left blank.)  The form clearly states, "Rights granted only upon full payment of this invoice; subject to terms and conditions on reverse." (Id.).

The top of the reverse side states: "ALL ASSIGNMENTS ARE ACCEPTED SUBJECT TO THESE TERMS AND CONDITIONS AND ALL REPRODUCTION RIGHTS AND LICENSES ARE LIMITED AS FOLLOWS."  Fourteen paragraphs follow in which these Terms and Conditions are recited.  The whole contract is contained on a single page (front and back).

Among other things, the Terms and Conditions specify (in ¶ 9) that "Unless otherwise stated on the face of this Agreement, duration of the License is one year from Agreement date and limited to use in the United States of America."  Accordingly, since nothing contrary was written on the face of the form, PIC's estimate proposed to provide a one-year, U.S.-only license.

---

[4] Mr. Picone's contemporaneous notes state that his contact was "N. Romano / Braun." (Ex. 23; Picone Decl. ¶ 13).

The Terms and Conditions also specify (in ¶ 10) that the client must return all photographic materials to PIC within thirty days of "first publication." This time period is triggered by transmittal of images to a client company for advertising use. See 17 U.S.C. § 101 ("The offering to distribute copies … to a group of persons for purposes of further distribution … constitutes publication."). As Mr. Sedlik explains in his report, "first publication" is a term of art in the photography industry that means – consistent with the Copyright Statute – transmittal of the image by the photographer to the client. (Sedlik Report at 16). This is the way that Mr. Picone uses the phrase. See 2/10/05 Picone Depo. (Ex. 9) at 40.

The Terms and Conditions go on to state that "liquidated damage(s) for loss or damage has been agreed upon between the parties to be $1,500 per original transparency or negative," and that "In the event of failure to return photographs per item #10, Photographer shall be entitled to immediate payment in full of above liquidated damages." (Id. ¶ 11).

At a meeting in Mr. Picone' studio on or about March 2, 1992, Ms. Romano and Cartouche Agency personnel reviewed PIC's estimate, including its Terms and Conditions. Mr. Picone went through the Terms and Conditions with the Cartouche personnel before Ms. Romano arrived at the studio, and the Cartouche personnel in turn reviewed them with Ms. Romano thereafter. (3/24/05 Picone Depo. at 127-129, 134-136). Mr. Picone was within earshot of that discussion and "heard them mention the Terms and Conditions line by line." (Id. at 136).

Following Ms. Romano's review of the March 2, 1992 estimate (Ex. 20), she, the Cartouche personnel and Mr. Picone had a further discussion about the project. Ms. Romano made it clear that she had read and understood PIC's Terms and Conditions, including the one-year limitation; in fact, for that particular Job only, she wanted to specifically negotiate for Gillette to obtain unlimited rights to use the images beyond the default one-year period specified in the Terms and Conditions. (Picone Decl. ¶¶ 14-17).

At the same time, however, she was concerned about keeping the project's budget tight. After some negotiation, it was agreed that the project would be condensed, such that PIC could complete it in one day instead of the originally estimated 1½ to 2 days, and that PIC would provide Gillette with an unlimited license to use the images for the originally-quoted fee of $2,000. Halving the time spent on the project, while maintaining the same $2,000 fee, had the effect of doubling Mr. Picone's day rate as compensation for the unlimited license that Gillette wanted. (3/24/05 Picone Depo. at 123-124, 131-132; Picone Decl. ¶¶ 14-17).

Ms. Romano also read and was aware of the 30-day return requirement. She wanted an extension of this term as well, and requested that Gillette be permitted to maintain custody of PIC's film beyond the 30-day period (1) for Gillette's convenience; and (2) to maintain the security of the film in case it was needed in the future.[5] Mr. Picone reluctantly agreed to that arrangement, with the understanding that the return requirement of PIC's Terms and Conditions was merely being extended (not waived), subject to PIC's discretion. Gillette would still have to return PIC's images upon request. (3/24/05 Picone Depo. at 134-135; Picone Decl. ¶¶ 17-18).

A new estimate reflecting the aforementioned changes was generated on or about March 3, 1992. Under "Media Use," the new estimate stated: "Buy-out. Reproduction rights and film retained by client." (Ex. 21). As with every PIC estimate and invoice, this one too included PIC's Terms and Conditions on the reverse side. (Id.). The revised estimate was accepted and signed, either by Gillette or by Cartouche on behalf of Gillette. (Id.; 3/24/05 Picone Depo. at 127). PIC thereafter completed the Job, transmitted its invoice (again, with its standard Terms and Conditions), and received payment from Cartouche. (Ex. 22, 42).

---

[5] The irony is striking. Gillette failed to maintain any system for tracking PIC's film, and appears to have lost quite a bit of it, while PIC maintains meticulous files as Gillette's own counsel conceded. (2/10/05 Picone Depo. at 78) ("I'll just tell you that these were – you keep meticulous records, Mr. Picone.").

In addition to Ms. Romano, who was then working as a consultant to Gillette (but was soon to become an employee), another future Gillette employee was also involved in PIC's initial Job for Gillette.  Jill Josephson (whose name at that time was Jill Wall) was working at Sylvania at the time, but took a day off to serve as a hand model.  Within a month of the Job, however, she was hired away from Sylvania by Gillette. See Josephson Depo. (Ex. 2) at 28-29.

Ms. Josephson was present during the discussion of PIC's Terms and Conditions, and in any event had reviewed many of PIC's invoices in her previous job at Sylvania. (3/24/05 Picone Depo. at 145-148; Josephson Depo. at 18, 25).

Accordingly, not one but two key Gillette employees were intimately familiar with PIC's Terms and Conditions, including the image return requirement, at the very outset of the parties' relationship.  Ms. Josephson went on to place over 100 orders with PIC for Gillette, reviewing and signing the corresponding invoices, and Ms. Romano went on to run the Gillette department with which PIC worked. (Josephson Depo. at 54, 72).

### D.    PIC's Relationship With Gillette

Following PIC's first Job for Gillette (Job No. 3072, discussed above), Ms. Romano engaged Mr. Picone in a further discussion about Gillette retaining custody of PIC's images, and Mr. Picone agreed to extend the 30-day return period going forward on the same basis that he had for the first Job. (2/10/05 Picone Depo. at 27-28; 3/24/05 Picone Depo. at 137).  Mr. Picone did this as a convenience to Gillette, and explained to Ms. Romano that all images would still have to be returned upon PIC's request. (Picone Decl. ¶ 18).[6]  PIC's extension of the 30-day return requirement for Gillette's convenience is consistent with standard industry practices. (Sedlik Report at 19-20).

---

[6] Ms. Romano has no contrary memory, or indeed any memory, of the conversation. (Romano Depo. at 55).

During a shoot, it is typical for Mr. Picone to take several exposures of each view. These exposures are then developed into 4-by-5 inch pieces of film called "transparencies" or "chromes." Each exposure is different in various respects, including lighting. Most clients request that Mr. Picone provide only the most appropriate exposure, limiting the client's potential liability for losing or damaging the transparency. (Picone Decl. ¶ 22; Sedlik Report at 17). In Gillette's case, notwithstanding Gillette's knowledge of PIC's Terms and Conditions, Gillette regularly requested that multiple exposures be provided.[7] E.g., Cooper Depo. (Ex. 1) at 54-55. Mr. Picone provided the best exposures to Gillette, while retaining, when possible, some reference material (either inferior exposures or Polaroids) in his files. (Picone Decl. ¶ 23).

Over the years, PIC handled over 700 Jobs for Gillette. Each Job has a Job Folder containing all of the relevant paperwork, including the invoice, a page of Photographer's Notes, any leftover images (e.g., transparencies or Polaroids) not provided to Gillette, and invoices from the laboratory (Advanced Photographics) that Mr. Picone used to develop his film. (Id. ¶ 24).

The Photographer's Notes include a notation of the number of pieces of film developed in connection with each Job. By way of example, the Photographer's Notes for Job No. 5338 indicate, on the left hand side of the page, that 94 transparencies were developed. (Picone Decl. ¶ 25 & Ex. 24). The Advanced Photographics invoices also reflect the number of transparencies developed in connection with each Job. In Job Folder No. 5338, the three Advanced Photographics invoices confirm that 94 transparencies were ordered. (Ex. 25) (invoices for development of 30, 46 and 18 transparencies for a total of 94).[8]

---

[7] In a particular Job, PIC might photograph several views of each of several products. As a result, there were Jobs for which PIC provided dozens of transparencies to Gillette.

[8] See Kennedy v. News Am. Publishing, Inc., 161 A.D.2d 445 (N.Y. App. Div. 1990) (granting summary judgment for plaintiff who proved number of transparencies transmitted based on developing lab receipts; defendant could raise no fact issue regarding the number of transparencies it received).

For each Job, the number of transparencies provided by PIC to Gillette is calculated by subtracting the number remaining in the Job Folder from the number developed in the first instance.  For example, for Job No. 5338, PIC retained 26 transparencies, establishing that 68 transparencies were provided to Gillette. (Picone Decl. ¶ 26).  Performing this calculation for each Job Folder,[9] the total number of transparencies provided by PIC to Gillette is at least 9,381.[10]  See Declaration of Ryan McManus ¶¶ 2-7; Picone Decl. ¶¶ 27-28.

For each Job, PIC retained a copy of its invoice in its Job Folder.  PIC's invoice forms did not change materially over the years.  The return requirement and liquidated damages clause remained the same.  PIC's file copies of invoices to Gillette are attached as Exhibit 13.

As a matter of policy, Gillette personnel reviewed *and signed* every PIC invoice.

- Cooper Depo. at 80-81, 84, 250-251 & Ex 13 (PIC Depo. Ex. 57).
- Josephson Depo. at 54, 105-106 & Ex. 14 (PIC Depo. Ex. 69).
- Mullen Depo. at 28-29, 38-39 & Ex. 15 (PIC Depo. Ex. 109).
- Tattan Depo. (Ex. 5) at 65-67, 70-74 & Ex. 16 (PIC Depo. Ex. 81).

In discovery, Gillette refused to produce PIC invoices pre-dating December 1997.  Gillette did produce, however, 285 signed copies out of the 415 invoices that PIC sent to Gillette after December 1997. (Ex. 14).  In other words, for the period during which Gillette provided documents, its own (incomplete) records show that it signed over 80% of PIC's invoices.  Coupled with Gillette's testimony that its personnel signed the invoices as a matter of policy, Gillette's records preclude any dispute that it signed all or substantially all of PIC's invoices.[11]

---

[9] In some of the older Job Folders, some documentation such as Photographer's Notes either was missing or was not legible.  PIC took a conservative approach and only tallied figures for those Jobs where there was no question. (Id.).

[10] PIC produced its documents electronically, organized by Job Number, with each of the Job-related documents associated with the Job in a "folder" format on CD.  Gillette thus can double-check PIC's math if it wishes to do so.

[11] Gillette has not produced unsigned invoices.  Even if invoices occasionally went unsigned, although there is no evidence that this happened, the Terms and Conditions still applied.  See Rational Software v. Sterling, 393 F.3d 276, 279 (1st Cir. 2005) (cited at p. 17 infra); I. Lan Sys., Inc. v. Netscout Service Level Corp., 183 F. Supp. 2d 328 (D. Mass. 2002) (Young, C.J.) (enforcing shrinkwrap license provision where licensee accepted and used the software).

**E.    Breakdown of the Relationship, and PIC's**
<u>**Unsuccessful Efforts to Retrieve Its Film From Gillette**</u>

Over time PIC became a valued and trusted vendor to Gillette.  Unfortunately, PIC's

relationship with Gillette began to break down when PIC discovered, in or about 2002, that

Gillette had been misusing its images.  A full discussion of the scope of that misuse is beyond

the scope of the present motion (but is addressed in other PIC filings).  For present purposes, it is

enough to summarize that, although Gillette purchased *limited licenses* to use PIC's images (for

one year only and for use in the U.S. only), Gillette systematically treated PIC's images as if they

were Gillette's own, using them far beyond the geographic and temporal scope of these licenses.

Mr. Picone initiated discussions about Gillette's misuse in 2002.  In October 2002, after

failing to get satisfaction from Gillette, he decided to terminate the relationship and called

relevant Gillette personnel to demand return of PIC's images. (3/24/05 Picone Depo. at 267).

When PIC's images were not returned, Mr. Picone sent a letter on June 23, 2003

requesting that the images be returned. (Ex. 26).  On August 13, 2003, Gillette responded by

assuring PIC that "we are conducting an internal investigation to determine the extent to which"

any PIC "images have been used by Gillette or any of its subsidiaries," and that "[w]e will

continue with our investigation and forward any relevant information to your attention as it

becomes available." (Ex. 27).  Despite this assurance, it is now apparent that no such

investigation was undertaken, and certainly not one from which any results were forwarded to

PIC.[12]  Acknowledging its duty to return PIC's transparencies, Gillette sent PIC a box of images,

but the box only contained 191 out of PIC's thousands of missing transparencies. <u>See</u> Picone

Decl. ¶ 31; Declaration of Alene M. Jennette (Ex. 28).

---

[12] The false statement in Gillette's letter that such an investigation was conducted is one ground for PIC's summary
judgment motion on fraud.

This is not a garden-variety case of film loss or damage.  Although it is clear that Gillette lost *some* of PIC's film, what makes this case different is Gillette's *refusal* to return film *that it still possessed*.  It is undisputed that Gillette possesses thousands of PIC's transparencies, negatives and slides that Gillette claimed not to have until very late in the discovery process, following a Court Order on PIC's Motion to Compel. (Picone Decl. ¶ 32; Docket #56-57).  Yet Gillette has refused – without so much as an explanation – to return these items to PIC.

Particularly striking is the fact that The Gillette Company, through two of its Rule 30(b)(6) witnesses, acknowledged that PIC's transparencies had to be returned, or else Gillette would become liable to PIC for the liquidated damages of $1,500 per image:

> Q:  What was your first reaction when you saw this letter?
> A:  ***That it was a justifiable letter that he typed up, requesting this information and wanting the photographs back.***
> Q:  So was it your understanding that he is entitled to get the photographs back?
> A:  ***It is my understanding that he had the right to ask for his photographs back.***
> Q:  And was it your understanding that if he asked, they should be returned?
> A:  ***Yes.***    * * *
> Q:  At the time you read this, did you have an understanding as to why Mr. Picone was claiming he was entitled to $1,500 for each original image?    * * *
> A:  Because he said that he had terms on his contract.    * * *
> Q:  And after you reviewed those terms, did you come to an understanding, your own understanding, as to whether Mr. Picone was correct that he was owed this money?
> A:  Yes.
> Q:  Okay.  And what was your understanding?
> A:  ***That he deserved to have his photographs back.  And if he didn't get them back, he would charge us $1,500 for each one not returned.***

(Gillette Rule 30(b)(6) Depo. by J. Josephson at 117-120) (emphasis added, objections omitted).

> Q:  And did he explain why he thought he was entitled to the return of those images?
> A:  No.  I don't think so.  ***I don't think anyone -- I mean I certainly didn't dispute that he would have the right to get those images back.***

(Gillette Rule 30(b)(6) Depo. by B. Cooper at 191) (emphasis added).

- 12 -

## II.    UNDISPUTED FACTS REGARDING
## GILLETTE'S FAILURE TO RETURN PIC'S FILM

### A.    PIC Delivered at Least 9,381 Original Transparencies to Gillette, Subject to PIC's Standard Terms and Conditions.

As explained in Section I(D) above, PIC delivered at least 9,381 original transparencies to Gillette.  This calculation was performed in a conservative manner by careful review of the relevant materials in each Job Folder. (Picone Decl. ¶¶ 27-28; McManus Decl. ¶¶ 6-7).

In the hope of simplifying proof and eliminating the need for a voluminous record, PIC served on Gillette a series of Requests for Admission (Nos. 37-39 and 49-51) seeking admissions regarding the number of transparencies transmitted to Gillette in each Job, as well as the total number. (Ex. 29).  Gillette responded, to each such Request, that it lacks "sufficient information or knowledge to respond" because it did not maintain any formal record of what it did and did not receive from PIC. (Ex. 30).  Accordingly, Gillette concedes that it has no evidentiary basis on which to dispute PIC's proof of the number of transparencies transmitted.

### B.    Gillette Was Aware of PIC's Terms and Conditions and It Reviewed *and Signed* Substantially Every PIC Invoice.

As explained in Section I(C) above, Ms. Romano reviewed PIC's Terms and Conditions prior to PIC's very first Job for Gillette, and discussed PIC's image return requirement with Mr. Picone at about the same time.  Her inability to recall these events does not raise a genuine issue of fact precluding summary judgment. Benson v. Mass. Gen'l Hosp., 49 Mass. App. Ct. 530, 532 n.3 (2000) (lack of recall is "insufficient to defeat a well-pleaded summary judgment motion").

What is more, as explained in Section I(D) above, Gillette employees reviewed every PIC invoice, then signed it (a procedural requirement at Gillette), and in many cases had their supervisors sign as well.  Taken together with the substantial number of signed invoices that Gillette produced in discovery, this testimony establishes beyond any dispute (let alone a genuine dispute) that Gillette reviewed and signed substantially every PIC invoice.

- 13 -

**C.    Gillette Has Failed to Return PIC's Film As Required.**

As explained in Section I(E) above, Gillette has returned just 191 of the 9,381 transparencies provided to it by PIC – and even those 191 were produced months after PIC's Oct. 2002 demand. (Picone Decl. ¶¶ 30-31).  Mr. Picone's testimony on this point is unrebutted.

PIC served a series of Requests for Admission (Nos. 66-68) seeking an admission regarding the number of transparencies returned by Gillette.  Gillette responded, again, that it lacks "sufficient information or knowledge to respond." (Ex. 30).  Thus, Gillette concedes that it has no evidentiary basis on which to dispute PIC's proof of the number of transparencies returned.  Moreover, Gillette, through its Rule 30(b)(6) witnesses, acknowledged that it was not Gillette's practice to return transparencies. E.g., Gillette 30(b)(6) Depo. by J. Josephson at 44.

**III.    PIC IS ENTITLED TO SUMMARY JUDGMENT
ON ITS CLAIM FOR LIQUIDATED DAMAGES.**

At issue is a straightforward contract action for enforcement of a liquidated damages clause.  Where no material facts are in dispute, summary judgment enforcing such a clause is appropriate. Kelly v. Marx, 705 N.E. 2d 1114 (Mass. 1999) (affirming summary judgment enforcing liquidated damages clause); Kennedy v. News Am. Publishing, Inc., 161 A.D. 2d 445, 446 (N.Y. App. Div. 1990) ("[P]laintiff is entitled to summary judgment … with respect to the 845 transparencies which were not returned to him.").

**A.    As a Matter of Law, PIC's Invoices Constitute The Parties' Contracts.**

It is undisputed that Gillette never issued a purchase order or any other document to PIC purporting to establish a contract between the parties. (Romano Depo. at 115, Tattan Depo. at 68-69).  The parties' only writing is PIC's invoice bearing its Terms and Conditions.  Gillette indisputably knew about – and accepted – these Terms and Conditions in PIC's very first Job.  The Terms and Conditions continued to govern the parties' relationship, with Gillette reviewing, signing, paying, and failing to object to them hundreds of times. (Romano Depo. at 42-43).

- 14 -

Under these circumstances, the Terms and Conditions on PIC's invoices constitute the parties' contracts as a matter of law, as numerous courts have held on essentially identical facts. E.g., Greenfield v. Twin Vision Graphics, Inc., 268 F. Supp. 2d 358, 373-75 (D.N.J. 2003) (granting summary judgment for plaintiff: "[E]ach invoice describes the price, quantity, and type of photograph purchased, and describes the purpose for which each photograph will be used. As such, the invoices contain all the terms necessary to form a contract."); Bair v. Axiom Design, LLC, 20 P.3d 388, 389 n.1 (Utah 2001) (reversing dismissal of breach of contract claim for failure to return transparencies: "The terms of each contract were set forth in a "Delivery Memorandum.""); Wolff v. IEEE, Inc., 768 F. Supp. 66 (S.D.N.Y. 1991) (granting plaintiff's motion for summary judgment on contract claim for violation of terms set forth on "Stock Photo Invoice"); Baker v. Int'l Record Syndicate, Inc., 812 S.W.2d 53 (Tex. App. 1991) (reversing judgment holding liquidated damages clause "printed on Baker's invoice" unenforceable).

Because Gillette has refused to answer PIC's interrogatories inquiring about its affirmative defenses,[13] it is unclear how (if at all) Gillette plans to attack PIC's invoices. The snippets that PIC has seen of Gillette's defense are easily disposed of.

First, Gillette's photography expert Beverly Adler speculated at deposition that Terms and Conditions on the front of an invoice are enforceable, while those on the reverse are not. (Adler Depo. at 50-51). This is wrong as a matter of law. Greenfield, 268 F. Supp. 2d at 362 (Terms and Conditions on "the reverse side" held enforceable); Wolff, 768 F. Supp. at 68 (same). Indeed, the trade organization where Ms. Adler worked for several years recommends that photographers put their Terms and Conditions on the reverse side of the invoice, as she was forced to concede. (Adler Depo. at 140-141).

---

[13] On April 7, 2005 the Court Ordered Gillette to provide answers to these interrogatories.

Second, Gillette witnesses contended at deposition that, notwithstanding their review and signature of PIC's invoices, they never read any of the Terms and Conditions. Even assuming for summary judgment purposes that such statements could be considered credible (notwithstanding the hundreds of Gillette signatures next to the phrase "subject to terms and conditions on reverse"), one cannot avoid being bound by Terms and Conditions merely by not reading them. This is particularly true for a company like Gillette, which is a large and extremely sophisticated entity as Gillette's own expert admitted. (Adler Depo. at 74). "In the absence of fraud, a person who signs a written agreement is bound by its terms whether she reads and understands them or not." DeLuca v. Bear Stearns, 175 F. Supp. 2d 102, 115 (D. Mass. 2001). Greenfield also dealt with this issue in the precise context of photography invoices:

> M & M cites to the depositions of Ken Berch and Roger Mumford, wherein they testified that once they had purchased the photographs from TPI, they believed that they could use them as they saw fit… Defendants also argue that because Greenfield never discussed the terms of the invoices with the[m], Defendants cannot be said to have understood or assented to them… *Even under the facts analyzed in a light most favorable to Defendants, however, Defendants cannot prevail on this issue.* New Jersey contract law clearly binds the signors to the terms of the invoice, absent some fraud or duress, which has not been alleged here.

Greenfield, 268 F. Supp. 2d at 374 (emphasis added).

In sum, the "I didn't read it" defense will not work here. Kimco of New England, Inc. v. Cliftex Corp., 1998 WL 409003 (Mass. Super. July 6, 1998) (granting summary judgment: "[T]hese sophisticated businesses should be held to the terms of the contract, including the mutually agreed-to liquidated damages clause.").

Gillette may also argue that PIC's invoices, which were typically sent a week or two after images were provided to Gillette, arrived "too late" to form binding contracts. This argument too fails as a matter of law. Even in cases (unlike this one) when a contract is already in place between the parties before the invoice is received, the Terms and Conditions on the invoice still control where numerous previous invoices have presented the same Terms and Conditions. E.g.,

Rational Software v. Sterling, 393 F.3d 276, 279 (1st Cir. 2005) ("Prior to the February 2001 move, Rational had engaged Sterling for over 200 jobs.  For each move, Rational received a bill of lading which prominently displayed the liability limitation and referenced Sterling's tariff.").[14]

In this case, as discussed above, Gillette knew about PIC's Terms and Conditions from the very beginning of its relationship with PIC.  Between that knowledge and the vast number of invoices that Gillette reviewed, signed and accepted over the years, there is no room for doubt that the invoices constitute the parties' contracts.

### B.    The Liquidated Damages Clause Is Enforceable.

"Where actual damages are difficult to ascertain and where the sum agreed upon by the parties at the time of execution of the contract represents a reasonable estimate of the actual damages, such a contract will be enforced." Kelly, 705 N.E. 2d at 1116.  The Supreme Judicial Court in Kelly expressly rejected the "second look" approach, holding that the reasonableness of a liquidated damages provision is reviewed based on conditions at the time of contract formation *without* consideration of the actual damages ultimately incurred. Id.

At the time of contract formation, PIC was rightfully concerned that failure by Gillette to return its transparencies on demand could result in damage to PIC.  First, Gillette could misuse the transparencies, depriving PIC of revenue. (2/10/05 Picone Depo. at 52-53).  This concern turned out to be prescient.[15]  Second, PIC would be deprived of the opportunity to use those transparencies – as reference material when shooting similar products, as part of its portfolio, for stock photography, and for other purposes. (Picone Decl. ¶ 9).

---

[14] Any argument that PIC's invoices did not form binding contracts would, if successful, leave Gillette without any license to use PIC's images.  This plainly was not the intent of the parties.

[15] As previously explained, PIC's agreement to extend the 30-day time period for return of images, as a matter of convenience, was based on an understanding that Gillette would act appropriately and not misuse the images.

Product photographs like PIC's are ripe candidates for stock licensing, and can garner $10,000 or more per image per year. See Sedlik Depo. (Ex. 7) at 164-165. Gillette's failure to return PIC's images has prevents Mr. Picone from pursuing stock photography licensing. (Picone Decl. ¶ 9). Moreover, Mr. Picone is nearing retirement and might consider a bulk buyout of his film by a stock agency or other entity for a substantial sum. Having almost 10,000 fewer transparencies in his files will significantly decrease the value of his collection. (Id. ¶ 10).

Each exposure has independent economic value; multiple exposures of the same view are often suited to different uses. (Sedlik Report at 17-18). Indeed, Gillette put PIC's images to different uses, keeping some for printed sales material and sending others to third parties.

Gillette's unauthorized uses (notwithstanding its agreement to store images solely for convenience and security) have deprived PIC of revenue that it should have received from Gillette. PIC is also unable to derive revenue from the images in other ways because it does not have access to them. *Moreover, PIC has been prevented from registering its copyrights in the images, costing PIC infringement damages – including potentially massive statutory damages.*

In short, at the time of contract formation, the value of each transparency was uncertain but potentially high. These are precisely the circumstances under which liquidated damages clauses should be enforced. Kelly, 705 N.E. 2d at 1116. Moreover, as explained above and conceded by Gillette's own expert (Adler Depo. at 25-26, 80), the $1,500 figure is an established standard. This weighs heavily in favor of enforcement. Lynch v. Andrew, 481 N.E. 2d 1383, 1386 (Mass. App. 1985) ("We are disinclined to tamper with a well established solution to the problems of expense and uncertainty in litigating the precise damages in cases of this kind.").[16]

---

[16] Mr. Picone also explained at deposition that $1,500 is a reasonable estimate for the cost re-creating a basic "tabletop shoot." (2/10/05 Picone Depo. at 46). This provides yet another business basis for the $1,500 figure.

For these reasons, the $1,500 liquidated damages figure has repeatedly been upheld in cases involving failure to return film. E.g., Bair, 20 P.3d at 392 (evidence showed that plaintiff was entitled to recover $1,500 liquidated damages as set forth in contract); Baker, 812 S.W.2d at 55 (reversing lower court: "In view of the inherent difficulty in determining the value of a piece of art, the broad ranges of values and long-term earning power of photographs, and the unknown potential for fame of the subject, $1500 is not an unreasonable estimate of Baker's actual damages."); Lowit v. Consol. Edison Co. of New York, 234 A.D. 2d 2 (N.Y. App. Div. 1996) (affirming that "49 slides were lost as a result of the natural gas explosion, and that each had a value of $1,500."); Cook v. Levine, Civil Action No. 89-00660 (D. Haw. Oct. 9, 1991) (unpublished, attached as Ex. 31) (upholding $1,500 per image liquidated damages clause).

Under Massachusetts law, Gillette bears the burden of proving that the liquidated damages clause in the parties' contracts is unenforceable. Honey Dew Assoc., Inc. v. M&K Food Corp., 241 F.3d 23 (1st Cir. 2001). Given the considerations discussed above, Gillette cannot sustain that burden – particularly given that, "[i]f there was any advantage in experience or sophistication, it was on the side of" Gillette. Lynch, 481 N.E. 2d at 1386.

Enforceability of a liquidated damages clause is an issue of law for the court. Manganaro Drywall, Inc. v. Penn-Simon Construction Co., 260 N.E. 2d 182, 184-85 (Mass. 1970). On the record in this case, summary judgment for PIC is in order.

### C.    PIC Is Entitled to Liquidated Damages for the 9,381 Transparencies That Gillette Failed to Return As Required.

Liquidated damages clauses are intended to "eliminate uncertainty and … prevent costly future litigation." Kelly, 705 N.E. 2d at 117.

Because Gillette failed to return PIC's images, and further refused to pay PIC the agreed-upon sum that it owed, PIC has unfairly been forced to "litigate (at great expense and delay) that which [the parties] sought not to litigate" in the first instance. Id.

- 19 -

As set forth above, PIC has straightforwardly proven the number of transparencies not returned. The requirement of the parties' contracts is clear, and PIC should be awarded $1,500 for each unreturned transparency.[17]

## IV.    CONCLUSION

For the above reasons, summary judgment should be entered for PIC on its claim for liquidated damages,[18] in the amount of $1,500 times the number of photographic transparencies (9,381) that Gillette has indisputably failed to return – for a total of $14,071,500.[19]

Respectfully submitted,

PHOTOGRAPHIC ILLUSTRATORS CORP.

By its counsel,

Dated: April 8, 2005                    /s/ Michael A. Albert
                                    Michael A. Albert, BBO #558566
                                    malbert@wolfgreenfield.com
                                    Michael N. Rader, BBO # 646990
                                    mrader@wolfgreenfield.com
                                    WOLF, GREENFIELD & SACKS, P.C.
                                    600 Atlantic Ave.
                                    Boston, MA 02210
                                    (617) 646-8000

---

[17] Gillette's counsel pressed Mr. Picone at his deposition as to whether PIC would still be entitled to liquidated damages if Gillette returned PIC's transparencies after the return period had expired. As a matter of law, the answer to that question is "yes." Even if Gillette elected to return PIC's transparencies now, it would still be liable for liquidated damages – both because it has held PIC's images well beyond the 30-day grace period following PIC's demand, and particularly because PIC has been put to immense trouble and expense enforcing its rights in court, which is precisely what the return requirement and the liquidated damages clause were intended to prevent. If the Court decides, however, that the 191 transparencies returned within 30 days of PIC's June 2003 demand letter (albeit more than 30 days after his earlier October 2002 telephone demands) are not subject to liquidated damages, those should be subtracted from the 9,381 total.

[18] If granted, this motion will resolve the greatest bone of contention between the parties, simplify the case, and undoubtedly encourage settlement discussions.

[19] If the Court decides that the 191 transparencies returned within 30 days of PIC's June 2003 demand letter are not subject to liquidated damages, see supra note 16, then the total damages figure would be $13,785,000.