IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHOTOGRAPHIC ILLUSTRATORS CORPORATION,<br><br>       Plaintiff,<br><br>v.<br><br>THE GILLETTE COMPANY,<br><br>       Defendant. | Civil Action No. 04-CV-10913-WGY |

**DECLARATION OF PAUL K. PICONE**
**IN SUPPORT OF PIC'S SUMMARY JUDGMENT MOTIONS**

Paul K. Picone states as follows:

1. I am the principal of Photographic Illustrators Corp. ("PIC"), the Plaintiff in the above-captioned matter.

2. I make this declaration in support of PIC's summary judgment motions in this case.

3. PIC specializes in high-end photography of consumer products for large corporate clients who desire high quality photography for use in marketing and advertising materials.

4. Although the company employs some office staff and assistants (who help with photography, digital retouching, etc.), I am the company's sole photographer.

5. I have been in business for almost forty years. I still personally perform all photography and service every client myself. My daily rate ranges from $2,600 to $8,800, depending on when and where a shoot takes place.

6. I pride myself not only on my artistic and technical skills, but on PIC's responsiveness to customers, reliability and loyalty. As a result of these qualities, my clients tend to stay with me for the long term. For example, Sylvania has been one of my major clients for over thirty years. Gillette was a client for over a decade.

7. Attached to Attorney Rader's declaration as Exhibit 19 are e-mails that I received from Gillette personnel in which those personnel praised my work. Attached to Attorney Rader's declaration as Exhibit 41 is an e-mail I received from Beth Cooper on or about March 4, 2004.

8. One of the issues in this case concerns the industry-standard requirement that clients return the photographer's film to the photographer. Failure by a client to return original film can lead to problems. For example, as occurred in this case with Gillette, the client might continue making reproductions outside the scope of the original license granted, rather than having to return to the photographer to purchase an additional license. This possibility always concerns me, although over the years I granted Gillette some latitude, allowing Gillette to maintain custody of my images past 30 days, because it was a good client and I was assured that the film was being stored securely and was not being misused.

9. When PIC's relationship with Gillette broke down, I demanded that my film be returned. Because Gillette has not returned my film despite this demand, I have been and remain unable to license those images to other clients or to stock photography agencies. Likewise, I do not have the film available for internal reference, use in my portfolio, or other purposes.

10. Given that I am now approaching retirement age, I am considering the possibility of a bulk sale of my film to a stock agency or other entity. A film collection as large as mine may be worth a considerable sum of money. Having 10,000 fewer transparencies in the collection due to Gillette's failure to return the same will undoubtedly have a major negative impact on the value of the collection.

11. Because it is difficult to predict the value of particular images, the photography industry has adopted a standard sum to be paid for each original transparency or negative that is damaged or not returned by a photographer's client. The current figure recommended by my trade organization (which is the leading organization in the industry), Advertising Photographers of America, is $2,500, although PIC's invoices to Gillette all used the earlier, longstanding $1,500 figure.

12. On or about March 2, 1992, a meeting was held in my studio at which I discussed a possible project for Gillette (Braun) with Nadine Romano and individuals from an agency called Cartouche (with whom Nadine was working on behalf of Gillette).

13. My contemporaneous notes are attached as Exhibit 23 to Attorney Rader's declaration. They show that my contact was contact was "N. Romano / Braun."

14. Ms. Romano was very concerned about keeping the project's budget tight. Following an initial estimate that I provided (which is attached as Exhibit 20 to Attorney Rader's declaration), we had some negotiation about the project.

15. Ms. Romano had reviewed the estimate and made it clear that she had read and understood PIC's Terms and Conditions, including the one-year limitation. For that particular Job only, she wanted to specifically negotiate for Gillette to obtain unlimited rights to use the images beyond the default one-year period specified in the Terms and Conditions.

16. On the other hand, as noted above, Ms. Romano was concerned about cost. After some negotiation we agreed that the project would be condensed, such that PIC could complete it in one day instead of the originally estimated 1½ to 2 days. We further agreed that PIC would provide Gillette with an unlimited license to use the images for the originally-quoted fee of $2,000. Halving the time spent on the project, while maintaining the same $2,000 fee, had the effect of doubling my day rate as compensation for the unlimited license that Gillette wanted.

17. Ms. Romano also read and was aware of the 30-day return requirement. She wanted an extension of this term as well, and requested that Gillette be permitted to maintain custody of PIC's film beyond the 30-day period.

18. Ms. Romano offered two reasons for her request: first, for Gillette's convenience, and second, to maintain the security of the film in case it was needed in the future. I was reluctant but agreed to that arrangement, with the understanding that the return requirement was merely being extended (not waived), subject to PIC's discretion. I explained to Ms. Romano that Gillette would still have to return PIC's images upon request. I also reiterated this statement in subsequent discussions with Ms. Romano in connection with the second or third Job that I did for Gillette. My agreement was also subject to my understanding that Gillette would respect my rights and would not use the retained images in any unauthorized fashion.

19. Following this discussion, a new invoice dated March 3, 1992 was generated. This is attached to Attorney Rader's declaration as Exhibit 21.

20. After the Job was complete, PIC generated a final invoice for the Job, which is attached as Exhibit 22 to Attorney Rader's declaration.

21. Pay stubs from the checks I received from Cartouche in payment of the invoice are attached as Exhibit 42 to Attorney Rader's declaration.

- 4 -

22.     During a shoot, I typically take several exposures of each view.  These exposures are then developed into 4-by-5 inch pieces of film called "transparencies" or "chromes."  Each exposure is different in various respects, including lighting.  Most clients request that I provide only the most appropriate exposure, limiting the client's potential liability for losing or damaging the transparency.

23.     Gillette, however, regularly requested that multiple exposures be provided.  I provided the best exposures to Gillette, while retaining, when possible, some reference material (either inferior exposures or Polaroids) in PIC's files.

24.     Over the years, PIC handled over 700 Jobs for Gillette.  Each Job has a Job Folder containing all of the relevant paperwork, including the invoice, a page of Photographer's Notes, any leftover images (e.g., transparencies or Polaroids) not provided to Gillette, and invoices from the laboratory (Advanced Photographics) that I used to develop his film.

25.     The Photographer's Notes include a notation of the number of pieces of film developed in connection with each Job.  By way of example, the Photographer's Notes for Job No. 5338 (attached as Exhibit 24 to Attorney Rader's declaration) indicate, on the left hand side of the page, that 94 transparencies were developed.

26.     The Advanced Photographics invoices also reflect the number of transparencies developed in connection with each Job.  In Job Folder No. 5338, for example, the three Advanced Photographics invoices (attached as Exhibit 25 to Attorney Rader's declaration) confirm that 94 transparencies were ordered.

27.     For each Job, the number of transparencies provided to Gillette is calculated by subtracting the number remaining in the Job Folder from the number developed in the first instance.  For example, for Job No. 5338, PIC retained 26 transparencies in the Job Folder, establishing that 68 transparencies were provided to Gillette.

28. I explained to Ryan McManus, a paralegal with Wolf Greenfield & Sacks, in how to do this calculation, and instructed him to carry out the calculation for each Job Folder. In some of the older Job Folders, some documentation such as Photographer's Notes either was missing or was not legible. In doing his calculations, Mr. McManus took a conservative approach and only tallied figures for those Jobs where there was no question.

29. For each Job, PIC retained a copy of its invoice in its Job Folder. PIC's invoice forms did not change materially over the years. The return requirement and liquidated damages clause remained the same. PIC's file copies of invoices to Gillette are attached as Exhibit 13 to Attorney Rader's declaration.

30. I initiated discussions about Gillette's misuse of PIC's images in 2002. In October 2002, after failing to get satisfaction from Gillette, I decided to terminate my relationship with Gillette, and called relevant Gillette personnel to demand return of PIC's images. When the images were not returned, I followed up with a letter on June 23, 2003 demanding return. A copy of this letter is attached to Attorney Rader's declaration as Exhibit 26.

31. Following my June 2003 letter, Gillette sent a single FedEx box to me. I did not open it right away, but provided it to my attorneys who had it opened by an independent third party court reporter, who transcribed its contents. In August 2003 Gillette finally sent a responsive letter to my counsel indicating that it was conducting an investigation into my claims. I delayed legal action as a result of Gillette's representation that it was conducting an investigation and would get back to me with its results.

32. Gillette still possesses thousands of PIC's transparencies, negatives and slides. I saw them for the first time in February 2005, when I had the opportunity to inspect a conference room full of materials produced by Gillette in its Prudential Building offices. I reviewed the materials provided, including many files containing transparencies, and determined that virtually all of them were my original transparencies or duplicates thereof. I instructed Mr. McManus to count the number of original and duplicate transparencies.

33. In approximately March 2001, I questioned Gillette employee Anna Madden as to why Gillette had reduced its orders of duplicates from PIC. Ms. Madden responded that Gillette simply had a reduced need for duplicates at that time.

34. On approximately March 1, 2004, Gillette employee Beth Cooper approached me with an "emergency" photography project of significant scope. I was reluctant to take the project, but she came to my office to plead her case and convinced me to help. While at my office, Ms. Cooper provided me with a copy of her notes from a conversation she had with Gillette legal counsel days earlier. A copy of those notes is attached to Attorney Rader's declaration as Exhibit 37.

35. The scope of the project ended up requiring PIC personnel to work night and day for two weeks to complete it.

36. Following this project, Ms. Cooper requested that PIC assist with three additional projects, to which I agreed. Although PIC did the work requested by Gillette in the Spring 2004 time frame, Gillette never paid our invoices. When I tried to find out why, I discovered that no one at Gillette would even take my calls.

37. During my March 1, 2004 meeting with Beth Cooper, the subject of PIC's Terms and Conditions arose. I did *not* agree to remove PIC's Terms and Conditions from my invoices under any circumstances – these are the source of my livelihood.

38. PIC's Terms and Conditions govern every one of the 700-plus Jobs that PIC did for Gillette, as well as the thousands of Jobs that PIC has done and continues to do for its other clients. PIC does not accept engagements except subject to those Terms and Conditions.

39. During the time period of my meeting with Ms. Cooper, I was particularly averse to any deviation from PIC's standard practices in light of the dispute that I already had with Gillette regarding Gillette's failure to respect the Terms and Conditions in the past.

40. I did agree, however, to Ms. Cooper's request that PIC provide Gillette with unlimited usage rights, provided appropriate compensation for that broader license term was provided.

41. PIC charged its ordinary and customary rates for the Spring 2004 Jobs. In fact, I purposely undercharged Gillette, for example on rush fees, as a goodwill gesture.

42. My Photographer's Notes for Job No. 6365, which I understand to be the primary Job about which Gillette has complained, are attached to Mr. Rader's declaration as Exhibit 43.

43. From these notes, I can tell exactly how I arrived at the $43,500 fee reflected on my invoice for Job No. 6365. Specifically, I doubled my $2,600 day rate to $5,200 to account for the expanded usage rights that Gillette had requested. (In fact, I could have and probably should have charged more than an extra 100% for such a broad license.) Next, I multiplied that rate by the number of full days or day-equivalents that were spent on the project (5), yielding a total of $26,000. Next, I added an additional 50% rush charge (once again giving Gillette a discount because same-day service normally results in a 200% rush charge), for a total of $39,000. Next, I added a $3,500 charge for overtime work outside the normal eight-hour workday. Finally, I added a $1,000 charge for travel time. These charges come to a total of $43,500 and represent ordinary and customary charges that I apply in my business. Expenses are charged in addition to fees, as reflected on the invoice.

44. A word of explanation about rush charges is in order. A "same-day service" charge of 200% usually applies, as noted above. Lower amounts apply to other forms of rush service that are less expedited. In any event, "same day service" means that the photographer begins work on the project on the same day that he receives the product, putting it ahead of other clients' projects. "Same-day service" does not mean that the project is completed in a single day; in many cases it is simply impossible to complete a job in one day.

45. I have won several national awards for excellence in catalog photography, awarded by Catalog Age Magazine. I received First Place Gold Awards in 1987, 1988 and 1989 and a Silver Award in 1991. In these competitions I was competing against catalogs such as Sharper Image. I also received a Hatch Award in 1980 for our Corporate Identity Program. I stopped entering these contests in 1992 because PIC's client roster was full.

Sworn to under the pains and penalties of perjury that the foregoing is true to the best of my knowledge and belief.

Dated: April 8, 2005                    /s/ Paul K. Picone
                                        Paul K. Picone