IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHOTOGRAPHIC ILLUSTRATORS CORPORATION,<br><br>    Plaintiff,<br><br>v.<br><br>THE GILLETTE COMPANY,<br><br>    Defendant. | Civil Action No. 04-CV-10913-WGY |

**MEMORANDUM IN SUPPORT OF PIC'S MOTION FOR
SUMMARY JUDGMENT ON GILLETTE'S FRAUD**

 

Michael A. Albert, BBO #558566
Michael N. Rader, BBO # 646990
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

COUNSEL FOR PLAINTIFF
PHOTOGRAPHIC ILLUSTRATORS CORP.

TABLE OF CONTENTS

I.   UNDISPUTED FACTS ENTITLING PIC TO SUMMARY JUDGMENT ....................... 2

    A.   Gillette Falsely Represented That It Was Conducting
        An "Investigation" Into PIC's Claims and Would
        Forward Relevant Information to PIC ................................................................. 2

    B.   Gillette Requested PIC's Services In
        Spring 2004 Without an Intent to Pay ..................................................................... 6

    C.   Gillette Falsely Told PIC That It Had a Reduced Need for
        Duplication Services, When In Fact It Was Obtaining
        Duplicates From Other Sources Without PIC's Permission ................................... 7

II.  PIC IS ENTITLED TO SUMMARY JUDGMENT ON GILLETTE'S FRAUD ............... 8

    A.   Gillette's False Representations That It Was Conducting
        An "Investigation" Into PIC's Claims and Would
        Forward Relevant Information to PIC Constitute Fraud ......................................... 8

    B.   Gillette's Hiring of PIC In Spring 2004
        Without an Intent to Pay PIC Constitutes Fraud ..................................................... 9

    C.   Gillette's False Statement That It Had a Reduced
        Need for Duplication Services Constitutes Fraud ................................................ 11

III. CONCLUSION ........................................................................................................... 11

Gillette's response to PIC's claims, both before and during this case, has been to stonewall, evade and deny. In doing so, Gillette crossed the line, on more than one occasion, into outright fraud – making material misrepresentations to PIC on which it knew that PIC would rely to its detriment.

Three occurrences of fraud are at issue in this summary judgment motion. First, in Summer 2003, after PIC discovered the scope of Gillette's misuse of PIC's images and requested that its film be returned as required by the parties' contracts, Gillette assured PIC that it was conducting an investigation into PIC's claims and would get back to PIC with its results. Gillette never got back to PIC, however, and through discovery PIC has learned that no investigation was being conducted in the first place. Gillette's misrepresentation of an "investigation" was calculated to induce, and did induce, PIC to delay the filing of this lawsuit.

Second, in early Spring 2004, notwithstanding the brewing dispute between the parties (this suit was filed in May 2004), Gillette entreated PIC to take on a series of "emergency" photography projects. Gillette's request that PIC do this work meant that Gillette would pay its bills for these services as it always had in the past. The fact, however, is that Gillette did not pay PIC and never intended to pay PIC. Gillette's retaining PIC's services without an intent to pay constitutes fraud as a matter of law.

Third, after purchasing duplicate transparencies from PIC for a period of time as required, Gillette later began purchasing fewer duplicates from PIC, and instead purchased duplicates directly from third-party laboratories without PIC's permission and in violation of PIC's copyrights. When PIC inquired about Gillette's duplication practices, Gillette falsely told PIC that it had a reduced need for duplication services, when in fact Gillette was obtaining duplicates from other sources without PIC's permission.

**I.    UNDISPUTED FACTS ENTITLING PIC TO SUMMARY JUDGMENT**

A detailed discussion of PIC's various claims against Gillette is covered in other motions. For present purposes, it is enough to summarize that, although Gillette purchased *limited licenses* to use PIC's images (for one year only and for use in the U.S. only), Gillette systematically treated PIC's images as if they were Gillette's own, using them far beyond the geographic and temporal scope of the licenses, and refusing to return them as required by the parties' contracts.

When PIC discovered the scope of Gillette's misuse and demanded that its images be returned, Gillette started to stonewall (a practice that it has engaged in throughout this case).

**A.    Gillette Falsely Represented That It Was Conducting An "Investigation" Into PIC's Claims and Would <u>Forward Relevant Information to PIC</u>.**

Mr. Paul Picone, PIC's principal, initiated discussions with Gillette about Gillette's misuse of PIC's images in 2002. In October 2002, after failing to get any information, clarification or other response from Gillette, Mr. Picone decided to terminate PIC's relationship with Gillette, and telephoned relevant Gillette personnel to demand the return of PIC's film. See 3/24/05 Picone Depo. (Ex. 10 to the Declaration of Michael N. Rader) at 267.[1]

When Gillette did not return PIC's film in response to Mr. Picone's telephone calls, Mr. Picone followed up with a letter, dated June 23, 2003, requesting that the film be returned immediately. (Ex. 26). Mr. Picone addressed his letter to several key individuals at Gillette, including those who had most frequently retained PIC over the years and those with whom PIC had recently been in contact regarding the parties' dispute, i.e., Linda Mallette, Karen Mullen, Joyce Lorden, Tom Burgess and Jill Josephson. (Id.).

---

[1] Unless otherwise noted, all referenced Exhibits are attached to the Declaration of Attorney Michael N. Rader.

Gillette responded by sending PIC a box of PIC's photographic transparencies, but the box only contained 191 out of thousands of missing transparencies. See Picone Decl. ¶ 31; Declaration of Alene M. Jennette (Ex. 28).[2]

Thereafter, Gillette declined to cooperate further, necessitating a follow-up letter to Gillette from PIC's counsel on August 5, 2003. (Ex. 33).

On August 13, 2003, Gillette responded to PIC's counsel's letter, through its Deputy General Counsel John B. Gatlin, stating, "We apologize for the untimely manner in which we have complied with these requests." Gillette's letter went on to assure PIC that "we are conducting an internal investigation to determine the extent to which" any PIC "images have been used by Gillette or any of its subsidiaries," and that "[w]e will continue with our investigation and forward any relevant information to your attention as it becomes available." The letter concluded with the statement, "We hope to maintain open lines of communication with you to resolve any issues associated with this matter." (Ex. 27).

The representations in Gillette's August 13, 2003 letter that it was conducting an "investigation" into PIC's claims and would "forward any relevant information to your attention as it becomes available" were knowingly false at the time they were made.

Through discovery, PIC obtained an e-mail sent by a Gillette Legal Intern the very next day – on August 14, 2003 – forwarding Mr. Gatlin's August 13 letter to every one of the recipients of Mr. Picone's June 23 letter and ***instructing them to do nothing:***

---

[2] To stave off any dispute over what the box contained, PIC had it opened by a court reporter who then itemized its contents and provided her undisputed declaration.

> Ladies and Gentlemen:
>
> I am attaching hereto an electronic copy of a letter that was sent yesterday afternoon by the General Counsels Office to the law firm currently representing Photographic Illustrators Corporation. ***Please note that delivery of a copy of this letter to each of you is simply for your records.  <u>You do not need to do anything</u>***.
>
> Please make an effort not to openly discuss this matter with anyone and please direct all inquiries you may receive from anyone (including Mr. Picone) concerning this matter to John Gatlin.

(Ex. 34) (emphasis added).[3]

This contemporaneous instruction to all of the key Gillette employees (including every individual to whom Mr. Picone had addressed his own correspondence) ***to do nothing*** establishes that Gillette's representations regarding an "investigation" were knowingly false.

The production of this smoking-gun e-mail confirmed what PIC had by then learned in another way.  On May 19, 2004, almost a year after Gillette's representation that it was conducting an "investigation," and following additional oral representations that an investigation had occurred and relevant materials gathered, Gillette sent PIC a new letter alleging that "no representation was made to you regarding an 'investigation' undertaken by Gillette." (Ex. 35). Gillette, having stated in writing that it would conduct an investigation, and having thereafter confirmed orally that such an investigation had been performed, later stated in writing that it had never so stated.

---

[3] Gillette has taken the position that this e-mail is privileged notwithstanding its production to PIC.  This is incorrect.  See Amgen, Inc. v. Hoechst Marion Roussel, Inc., 190 F.R.D. 287 (D. Mass. 2000) (Young, C.J.) (inadvertent production held to result in waiver of privilege).  Moreover, even if the production of the e-mail to PIC did not result in a waiver, the crime-fraud exception clearly applies here, as the purpose of the e-mail was to further Gillette's fraud in telling PIC it would investigate and report back to PIC, while almost simultaneously telling the relevant sources of information within Gillette not to do so.

The discovery process in this case yielded further proof that Gillette's purported "investigation" was a sham. As the Court is well aware at this point, Gillette has not produced many of the documents required by PIC's discovery requests (and two Court Orders) at all. The vast majority of what it did produce was produced belatedly, after initially representing that the materials did not exist. Had Gillette in fact conducted the "investigation" it promised in 2003, these documents would have been located long before the litigation, such that production could timely have been made and no motion practice by PIC would have been necessary.[4]

A striking example is the massive volume of material, including thousands of PIC's photographic transparencies that lie at the heart of this case,[5] that were produced during the week of February 14, 2005, only after PIC had filed a Contempt Motion with the Court. See Docket #56-57. The number of transparencies produced at that late date dwarfed Gillette's previous production. Had any meaningful "investigation" been done in 2003 as represented, this discovery debacle (and the resulting prejudice to PIC) never would have occurred.

Finally, Gillette's own privilege log (Ex. 36) demonstrates that its statements in the August 2003 letter were false. Following the August 13 letter and the August 14 e-mail from the Gillette Legal Intern referenced above, the only other entry in 2003 is labeled "List of PIC materials." A mere "list of materials," which evidently did not contain the vast majority of the relevant materials ultimately produced after PIC filed its Contempt Motion (since these were allegedly discovered at the last moment, see Cooper Depo. (Ex. 1) at 117-118) does not come close to reflecting an "investigation."

---

[4] Indeed, the litigation itself might not have been necessary, as one hopes that Gillette would have met its contractual obligations at that point.

[5] PIC's core claim for liquidated damages stemming from Gillette's failure to return its transparencies as required by the parties' contracts is the subject of a separate motion for summary judgment.

Moreover, if such a list *were* deemed to reflect an investigation, then this would prove that Gillette's related representation to PIC – that it would "forward any relevant information to your attention as it becomes available" – was fraudulent, as Gillette did not produce (indeed refused to produce) this list to PIC.

### B. Gillette Requested PIC's Services In Spring 2004 Without an Intent to Pay.

The second occurrence of fraud on which PIC is entitled to summary judgment concerns Gillette's retaining of PIC, in Spring 2004, to handle a series of "emergency" photography projects, without intending to pay PIC for its services.

The facts underlying the Spring 2004 Jobs are set forth in detail in a separate motion in which PIC seeks summary judgment on Gillette's counterclaims (which all hinge on the Spring 2004 Jobs), as well as on PIC's claim for payment of its Spring 2004 invoices. Only a few key facts need be repeated here to demonstrate Gillette's fraud.

On or about March 1, 2004, Gillette employee Beth Cooper approached PIC with an "emergency" photography project of significant scope. She entreated Mr. Picone to assist with this project, notwithstanding the ongoing dispute between the parties regarding Gillette's infringement and other breaches and violations. Ms. Cooper even traveled to PIC's office to plead her case. (Picone Decl. ¶ 34).

In response to Ms. Cooper's request at their March 1, 2004 meeting, Mr. Picone agreed to assist Gillette as a gesture of good will and in the hope that this would assist in resolving PIC's underlying dispute with Gillette. The scope of the project ended up requiring PIC personnel to work night and day for two weeks to complete it. (Id. ¶¶ 35).

While working on the project, PIC received correspondence from Ms. Cooper conveying satisfaction with the high quality of PIC's work. (Ex. 19) (e-mails from Beth Cooper expressing "You rock!" and "GORGEOUS!!!").

Ms. Cooper's correspondence was also calculated to suggest that PIC's gesture of taking on the emergency project would assist in resolution of PIC's outstanding disputes with Gillette. For instance, on March 4, 2004, Ms. Cooper wrote to Mr. Picone: "FYI … I left a message for legal this AM and am awaiting followup.... glad to have you back!" (Ex. 41 at 2).

Following the project, Gillette requested that PIC handle additional emergency projects. In all, PIC handled four such projects between March and April 2004. (Picone Decl. ¶ 36).

Despite placing these orders, and accepting and using the photographs provided by PIC, Gillette did not pay PIC's invoices (which are provided at Exhibit 38). (Picone Decl. ¶ 36).

### C. Gillette Falsely Told PIC That It Had a Reduced Need for Duplication Services, When In Fact It Was Obtaining Duplicates From Other Sources Without PIC's Permission.

The second occurrence of fraud on which PIC is entitled to summary judgment concerns Gillette's false statement to PIC that it had a reduced need for duplicates, when in fact it was purchasing duplicates directly from third-party laboratories without PIC's permission and in violation of PIC's copyrights.

In or about March 2001, Mr. Picone questioned Gillette employee Anna Madden as to why Gillette had reduced its orders of duplicates from PIC. Ms. Madden responded that Gillette simply had a reduced need for duplicates at that time. (Picone Decl. ¶ 33).

The statement was false, as Gillette was, during that same time period, ordering duplicates directly from a third-party laboratory, Advanced Photographics, Inc., without PIC's permission. See Deposition of J. Roopenian (Ex. 6) (Advanced made duplicates of PIC's images for Gillette from a box of PIC's film that resided at Advanced) and Picone Depo. at 186 (Mr. Picone retrieved the box in 2002). The purpose of Gillette's false statement was to prevent PIC from discovering the truth about Gillette's duplication activities.

## II. PIC IS ENTITLED TO SUMMARY JUDGMENT ON GILLETTE'S FRAUD.

### A. Gillette's False Representations That It Was Conducting An "Investigation" Into PIC's Claims and Would Forward Relevant Information to PIC Constitute Fraud.

All of the evidence of record demonstrates that Gillette's statement to PIC in Gillette's August 13, 2003 letter that it was conducting an "investigation" into PIC's claims was false. First, the very next day, a Gillette Legal Intern forwarded that letter to the key Gillette employees *with instructions that they do <u>nothing</u>*. (Ex. 34). This is the opposite of an investigation.

Second, after the litigation commenced, a different in-house attorney at Gillette represented to PIC, contrary to what PIC had previously been told, that "no representation was made to you regarding an 'investigation' undertaken by Gillette." (Ex. 35).

Third, the fact that Gillette was unaware of the vast majority of its responsive documents throughout most of the discovery period in this case compels the conclusion that no investigation had been performed in or after August 2003 as represented.

Fourth, Gillette's own privilege log shows little or no activity by Gillette in the period of time following the representation that an investigation was being conducted. (Ex. 36).

In short, there is no genuine dispute that Gillette's August 2003 letter to PIC contained manifestly false statements. The letter itself demonstrates that the statements were made for the purpose of inducing reliance, i.e., to induce PIC to delay the filing of a lawsuit as PIC awaited the results of Gillette's "investigation." Specifically, the letter ends with the statement that "We hope to maintain open lines of communication with you to resolve any issues associated with this matter." (Ex. 27). This invitation to PIC not to proceed with legal action in fact induced the desired reliance by PIC. (Picone Decl. ¶ 31).

- 8 -

Gillette's false representations to PIC that it intended to conduct an investigation and get back to PIC, which were calculated to, and did, induce reliance, constitute fraud. E.g., Barrett Assoc., Inc. v. Aronson, 190 N.E. 2d 867, 868 (Mass. 1963) ("The statement of fact as to present intention of the defendant, being susceptible of actual knowledge and being a fact alleged to have been false, may be made the foundation of an action for deceit").

Gillette has no evidentiary basis on which to dispute the record evidence, because it categorically refused to produce documents or answer questions about its "investigation."

In its Rule 30(b)(6) deposition notice, PIC required that Gillette provide a 30(b)(6) witness to testify on "Gillette's internal investigation(s) of PIC's claims." (Ex. 39, Category #24). Gillette responded that it would not do so on grounds of privilege. (Ex. 40 at 4). Likewise, Gillette refused to produce documents related to a possible investigation, including the "List of materials" shown on its privilege log. (Docket #35 at 4) (asserting "attorney work product").

The attorney-client privilege and work product doctrines cannot be used as both a shield and a sword. Having refused to provide any discovery related to its alleged "investigation" into PIC's claims, Gillette cannot now be heard to contest the undisputed facts set forth above. PIC is entitled to summary judgment on this aspect of Gillette's fraud.

### B.   Gillette's Hiring of PIC In Spring 2004 Without an Intent to Pay PIC Constitutes Fraud.

Gillette's hiring of PIC in Spring 2004 without intending to pay PIC for its services unquestionably constitutes fraud. Where one party retains another's services without intended to pay, the inducement and reliance elements of the fraud claim are formalities. Watson v. Silsby, 43 N.E. 1117 (Mass. 1896) ("[O]ne who buys goods with a preconceived intention not to pay for them is guilty of a fraud upon the vendor."). The only question here is whether Gillette intended not to pay PIC. On the record of this case, there can be no genuine dispute on that point.

Gillette does not dispute that PIC performed the work requested in Spring 2004 and invoiced Gillette for that work. Although Gillette claims that PIC's invoices were high (a contention that is rebutted in PIC's summary judgment motion on Gillette's counterclaims), there is no dispute that Gillette never contacted PIC to discuss the charges. See 2d Am. Complaint ¶ 43 and Am. Answer ¶ 43.

In light of this key fact, the excuse that Gillette did not pay PIC's invoices because it thought they were high is manifestly a pretext. Gillette's witnesses testified that if they ever had a question about an invoice, all they had to do was call Mr. Picone. No Gillette witness ever failed to get satisfaction on a billing issue by calling Mr. Picone. E.g., Tattan Depo. at 37-38. Under these circumstances, no reasonable fact-finder could conclude that Gillette's election not to pay Mr. Picone resulted from the invoice that PIC sent. Rather, the intention not to pay can only have been pre-conceived.

On or about February 25, 2004, just days prior to visiting Mr. Picone, Ms. Cooper prepared by meeting with counsel in the Gillette Legal Department. She told Mr. Picone this, and even gave him a copy of her notes from her conversation with counsel. (Ex. 37).

Despite Ms. Cooper's waiver of privilege from that meeting in providing Mr. Picone with her notes, Gillette refused to produce the corresponding notes taken by Gillette's legal counsel. (Item #26 in Ex. 36). The Court declined to compel production of counsel's notes, but held that ***"the assertion of an attorney-client privilege in this context may be grounds for the drawing of an adverse inference."*** (2/10/05 Electronic Order) (emphasis added). Notwithstanding the Court's Order, Gillette's counsel continued to assert the privilege aggressively at Ms. Cooper's deposition, instructing her not to answer any questions about her February 25, 2004 meeting with counsel. (Cooper Depo. at 227-230).

Since Gillette refused to reveal the substance of Ms. Cooper's discussion with counsel immediately prior to her meeting with Mr. Picone, and in the absence of any explanation regarding why PIC's invoices were not paid, PIC is entitled to an inference that counsel instructed Ms. Cooper not to pay those invoices even before she retained PIC – providing a further and independent basis for summary judgment of fraud.

### C. Gillette's False Statement That It Had a Reduced Need for Duplication Services Constitutes Fraud.

Gillette's false statement that it had a reduced need for duplication services, when in fact it was obtaining duplication from other sources without Mr. Picone's permission, provides still another independent ground on which PIC is entitled to summary judgment of fraud.

### III. CONCLUSION

For the above reasons, summary judgment should be entered for PIC that Gillette committed fraud in falsely representing that it was conducting an "investigation" into PIC's claims in Summer 2003, in requesting PIC's services in Spring 2004 without an intent to pay, and in falsely telling PIC that it had a reduced need for duplication services.

Respectfully submitted,

PHOTOGRAPHIC ILLUSTRATORS CORP.

By its counsel,

Dated: April 8, 2005

/s/ Michael A. Albert
Michael A. Albert, BBO #558566
malbert@wolfgreenfield.com
Michael N. Rader, BBO # 646990
mrader@wolfgreenfield.com
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000