IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHOTOGRAPHIC ILLUSTRATORS CORPORATION,<br><br>　　　　Plaintiff,<br><br>v.<br><br>THE GILLETTE COMPANY,<br><br>　　　　Defendant. | Civil Action No. 04-CV-10913-WGY |

**MEMORANDUM IN SUPPORT OF PIC'S AND PAUL PICONE'S
MOTION FOR SUMMARY JUDGMENT ON GILLETTE'S COUNTERCLAIMS
AND ON PIC'S CLAIM FOR PAYMENT OF ITS SPRING 2004 INVOICES**

　　　　　　　　　　　　　　　　Michael A. Albert, BBO #558566
　　　　　　　　　　　　　　　　Michael N. Rader, BBO # 646990
　　　　　　　　　　　　　　　　Adam J. Kessel, BBO # 661211
　　　　　　　　　　　　　　　　WOLF, GREENFIELD & SACKS, P.C.
　　　　　　　　　　　　　　　　600 Atlantic Ave.
　　　　　　　　　　　　　　　　Boston, MA 02210
　　　　　　　　　　　　　　　　(617) 646-8000

　　　　　　　　　　　　　　　　COUNSEL FOR PLAINTIFF AND
　　　　　　　　　　　　　　　　COUNTERCLAIM-DEFENDANT
　　　　　　　　　　　　　　　　PHOTOGRAPHIC ILLUSTRATORS CORP.

　　　　　　　　　　　　　　　　and

　　　　　　　　　　　　　　　　ADDITIONAL COUNTERCLAIM-DEFENDANT
　　　　　　　　　　　　　　　　PAUL PICONE

TABLE OF CONTENTS

I.   BACKGROUND ...................................................................................................................1

    A.   Overview of the Case and Gillette's Pleading ...........................................................1

    B.   Procedural Posture ....................................................................................................4

II.  UNDISPUTED FACTS REGARDING THE SPRING 2004 JOBS .................................6

    A.   PIC Never Agreed to Forego Its Standard Terms and Conditions ...........................6

    B.   PIC Charged Its Ordinary and Customary Rates ......................................................9

    C.   PIC Provided Same-Day Service ............................................................................12

III. PIC IS ENTITLED TO SUMMARY JUDGMENT
    ON GILLETTE'S COUNTERCLAIMS ........................................................................12

    A.   Breach Of Contract .................................................................................................12

    B.   Estoppel ..................................................................................................................13

    C.   Fraud .......................................................................................................................14

    D.   Chapter 93A ............................................................................................................14

IV.  PIC IS ENTITLED TO SUMMARY JUDGMENT ON ITS
    CLAIM FOR PAYMENT OF ITS SPRING 2004 INVOICES .......................................14

V.   CONCLUSION ................................................................................................................16

The lynchpin of Gillette's counterclaims – that PIC agreed not to apply its standard Terms and Conditions to projects performed for Gillette in the Spring of 2004 (on the eve of this litigation) – is admittedly untrue according to Gillette's Rule 30(b)(6) witness, Beth Cooper, who is asserted in Gillette's pleading to have secured that agreement. In light of Ms. Cooper's deposition testimony, summary judgment for PIC on Gillette's counterclaims is in order.

## I.   BACKGROUND

### A.   Overview of the Case and Gillette's Pleading

The factual predicate of PIC's claims against Gillette, including its core claim for liquidated damages for Gillette's failure to return PIC's photographic transparencies as required by the parties' contracts, is set forth in PIC's other motions for summary judgment and will not be repeated in detail here. In broad outline, while Gillette purchased *limited licenses* to use PIC's photographic images (for one year in the United States only), Gillette systematically treated PIC's images as if they were Gillette's own, using them far beyond the scope of those licenses - and then refusing to return them as contractually required.

The dispute over Gillette's failure to adhere to contractually agreed-upon terms and conditions led PIC to terminate its relationship with Gillette, and to demand return of its images, in late 2002. See 3/24/05 Picone Depo. (Ex. 10 to Declaration of Michael N. Rader) at 267.

Gillette's counterclaims against PIC and Mr. Picone are predicated on an alleged oral agreement executed between Gillette employee Beth Cooper and Mr. Picone at a March 1, 2004 meeting. According to Gillette's pleading, a year and a half after the parties' relationship ended, and notwithstanding their dispute over the applicability of PIC's standard Terms and Conditions to previous projects, PIC agreed to take on a new project for Gillette *without* requiring Gillette to abide by those Terms and Conditions. (Am. Counterclaim ¶¶ 19-22).

Specifically, Gillette's pleading asserts that Ms. Cooper and Mr. Picone met on March 1, 2004 "to discuss the possibility of PIC creating photographs of certain of Gillette's consumer products for use in an upcoming housewares show." (Id. ¶ 19).

Gillette's pleading further asserts that Mr. Picone agreed to provide the requested photography services subject to several conditions, including that "PIC and Picone would not claim the Purported Terms [i.e., PIC's standard Terms and Conditions] contained in the past on the reverse of PIC's invoices applied" to the new project. (Id. ¶ 22).

Then, according to Gillette, after PIC had completed the photography, PIC breached its agreement by sending invoices to Gillette that "still contained the Purported Terms that PIC and Picone had acknowledged would not govern the parties' relationship." (Id. ¶ 27).

While Mr. Picone did consent to do an emergency project for Gillette at Ms. Cooper's request in March 2004, he did *not* agree to remove PIC's standard Terms and Conditions from its invoices. These Terms and Conditions are the source of Mr. Picone's livelihood.[1] They govern every one of the 700-plus Jobs that PIC did for Gillette, as well as the thousands of Jobs that PIC has done and continues to do for its other clients. PIC does not accept engagements except subject to those Terms and Conditions. Indeed, during the time period in question, PIC was particularly averse to any deviation from its standard practices in light of the dispute it already had with Gillette regarding Gillette's failure to respect the Terms and Conditions in the past. (Picone Decl. ¶¶ 38-39).

---

[1] Jeff Sedlik, past president of the Advertising Photographers of America, who is PIC's expert on photography industry practices, explains in his Expert Report:

> It is customary … for photographers to provide their clients with a limited license to use and reproduce their images. Photographers make their living by licensing their clients the right to use their copyrighted photographs for a limited time in limited ways. If additional uses (or uses for an additional time) are required, the client must obtain license from the photographer for such use, and pay an additional license fee.

Sedlik Report (Ex. 11 to Rader Decl.) at 7.

- 2 -

As discussed in detail below, Ms. Cooper conceded explicitly at deposition that – contrary to Gillette's allegations in its pleading – Mr. Picone *never agreed to forego PIC's Terms and Conditions for the Spring 2004 Jobs*. Rather, when asked by Ms. Cooper whether he would consider foregoing the Terms and Conditions, Mr. Picone answered that he would have to consult with his lawyers. See Cooper Depo. (Ex. 1) at 235-237.[2] Gillette admitted, through its Rule 30(b)(6) witness, that the "agreement" alleged by Gillette in its pleading never existed.

The remaining allegations of Gillette's breach of contract counterclaim are that PIC overcharged Gillette for the Spring 2004 work in breach of an "oral and/or implied agreement [to] charge no more than its customary rate" and that PIC "falsely" indicated on one of its invoices that "same day service" had been provided. (Id. ¶¶ 33-34).

Once again, these allegations are baseless. In his accompanying declaration, Mr. Picone explains the Spring 2004 charges in detail, including his same day service fees. Jeff Sedlik, a renowned, award-winning photographer and past president of the Advertising Photographers of America (the leading trade association for commercial photography), who is PIC's expert on photography industry practices, carefully reviewed PIC's documentation and concluded that Gillette's allegations about "overcharging" and "same day service" are without merit. Tellingly, Gillette's own expert witness on photography industry practices, Ms. Beverly Adler, *was unable to offer a contrary opinion*. Finally, Gillette's only fact witness on the issue, Ms. Cooper, based her opinion on a series of assumptions that, at deposition, she was forced to admit were wrong.

---

[2] Unless otherwise noted, all referenced Exhibits are attached to the Declaration of Attorney Michael N. Rader.

Finally, Gillette's estoppel, fraud and Chapter 93A counterclaims are centered on the same erroneous assertion discussed above that PIC agreed to send Gillette invoices without any terms and conditions, leading to alleged reliance by Gillette. (Am. Counterclaims ¶¶ 36-51).[3]

It was Gillette, not PIC, that committed breach of contract, fraud and unfair and deceptive trade practices in connection with the Spring 2004 Jobs. After entreating PIC to do a substantial project on an emergency basis (the short time frame and volume of work forced Mr. Picone and his staff worked day and night for two weeks, see Picone Decl. ¶ 35), Gillette admittedly refused – without so much as an explanation – to pay PIC's Spring 2004 invoices. (Am. Answer ¶ 43).

### B. Procedural Posture

Early in the case, PIC and Mr. Picone moved to dismiss Gillette's counterclaims because Gillette had pled, at most, an unenforceable "agreement to agree." This can neither form the basis for a breach of contract, nor create reasonable reliance as required for estoppel, fraud and Chapter 93A. PIC also moved to dismiss Gillette's final count, for "intent to commit trademark infringement," as failing to state a claim under the Lanham Act. (Docket #25-26).

The Court dismissed the "intent to commit trademark infringement" count completely. See Dec. 16, 2004 Hearing Transcript (Docket #30, "Transcript") at 9 ("Lanham Act, it's out.").

The Court expressed skepticism about Gillette's remaining counterclaims, but suggested that the bulk of those counterclaims would be better addressed on summary judgment.

> Some of these claims, and I mean no disrespect, some of these counterclaims are extraordinarily thin at least as I look at it now. But they're motions to dismiss…. why don't I just deny them and then when we've had some discovery you bring a well pleaded motion for summary judgment and we'll do justice.

(Id. at 4).

---

[3] Gillette does not mention the "overcharge" and "same day service" allegations in its estoppel, fraud or Chapter 93A counts. In any event, such allegations would fare no better in those counts than in the breach of contract count.

With respect to Gillette's fraud counterclaim, the Court clarified with Gillette's counsel that this claim is in fact one of "fraud in the inducement," i.e., an alternative defense to PIC's own breach of contract claim for Gillette's failure to pay PIC's invoices.

> MR. DONAHUE: Fraud should remain in as an alternative, as an alternative claim that we can plead in the event that your Honor finds, for example, that we're bound to the contract price, that we would otherwise be bound to the contract price…
>
> THE COURT: So your claim really, just so I follow, and I keep all the transcript thanks to Mr. Womack on a database, so I want to be clear what we're talking about because it helps work through the lawsuit. Your fraud's fraud in the inducement.
>
> MR. DONAHUE: Yes, your Honor.
>
> THE COURT: If there's a contract it was fraudulently induced.
>
> MR. DONAHUE: Yes, your Honor.

(Id. at 7-8).

The Court then dismissed Gillette's Chapter 93A counterclaim except to the extent that it depends upon proof of fraud in the inducement, and otherwise denied PIC's and Mr. Picone's motion to dismiss. (Id. at 8-9)

In summary, what remains of Gillette's counterclaims at this stage is the breach of contract / estoppel counterclaim described in Section I(A) above, and a fraudulent inducement defense to PIC's own breach of contract claim for Gillette's refusal to pay PIC's Spring 2004 invoices. If Gillette's fraudulent inducement defense fails, its Chapter 93A counterclaim necessarily fails as well. (Id.) ("You're not saying breach of contract … if that's all there is is a 93A violation if your fraud claim falls.").

## II.     UNDISPUTED FACTS REGARDING THE SPRING 2004 JOBS

### A.     PIC Never Agreed to Forego Its Standard Terms and Conditions.

As noted above, PIC accepts photography projects only subject to industry-standard Terms and Conditions governing key aspects of its relationship with its clients, including the scope of the license granted, the requirement that PIC's original images be returned, and a well-established $1,500 liquidated damages provision in the event that transparencies are damaged or not returned by the client. (Picone Decl. ¶ 38; Ex. 13-18).

During the Spring 2004 timeframe, when PIC's dispute with Gillette over Gillette's previous failure to respect PIC's Terms and Conditions was coming to a boil, Mr. Picone was more determined than ever not to budge on PIC's Terms and Conditions. (Picone Decl. ¶ 39).

Notwithstanding his dispute with Gillette, Mr. Picone agreed to assist with the Spring 2004 housewares photography as a favor to Ms. Cooper, with whom he had a longstanding professional relationship. (Id. ¶ 34).  During their March 1, 2004 meeting, Ms. Cooper and Mr. Picone discussed the terms under which PIC would do this work.  The subject of PIC's Terms and Conditions was discussed during this meeting. (Am. Counterclaim ¶¶ 20-21).

The four invoices for the Spring 2004 Jobs that PIC did for Gillette (Job Nos. 6365, 6377, 6382 and 6400) are attached as Exhibit 38 to Attorney Rader's declaration.[4]  Like all of PIC's invoices, each one includes a statement at the bottom of the front page, "Rights granted only upon full payment of this Invoice; subject to terms and conditions on reverse."  The reverse side includes several Terms and Conditions, including a default limitation on the license scope to one year only, in the U.S. only (¶ 9).  These scope of the license can be modified on the front of the form, however, in the spaces labeled "Media Use" and "Period of Use." (Ex. 13; 38).

---

[4] In producing Ex. 38, Gillette did not produce the backs of the invoices.  PIC provided fronts and backs in Ex. 13.

As noted above, the basis for Gillette's counterclaims is the assertion that Mr. Picone "expressly or impliedly agreed," in the March 1, 2004 meeting with Ms. Cooper, not to include PIC's standard Terms and Conditions on its invoices for the Spring 2004 Jobs. This is untrue. Although Mr. Picone agreed to grant Gillette "unlimited" usage rights by filling in the same for "Media Use" and "Period of Use" on the front of the invoice form (in exchange for a higher license fee as is standard in the industry, see Sedlik Report (Ex. 11) at 7; Adler Depo. (Ex. 8) at 125-126, 139-140, he never agreed that the Terms and Conditions themselves would be removed. (Picone Decl. ¶¶ 37-40).

Any dispute about this evaporated with Ms. Cooper's deposition, when she conceded that *Mr. Picone never agreed to forego PIC's Terms and Conditions*. To the contrary, she testified that Mr. Picone responded to her queries on the subject by insisting that he would have to speak with his lawyers before considering any modifications to his longstanding business practices.

Ms. Cooper explained that her March 1, 2004 meeting with Mr. Picone was intended not just to secure his services for the Spring 2004 Jobs but also to attempt a resolution of PIC's underlying conflict with Gillette. According to Ms. Cooper, Gillette's legal department was going to prepare a draft agreement for Mr. Picone's review. She further explained that Mr. Picone *had not yet decided whether to entertain the possibility of foregoing his terms and conditions* (at least not without discussing the matter with counsel).

This testimony, by Gillette's only witness on the subject (who is also Gillette's only Rule 30(b)(6) witness on its counterclaims, see Ex. 39-40, Category #17), directly contradicts the central allegation of Gillette's pleading.

| GILLETTE'S PLEADING | BETH COOPER'S TESTIMONY |
|---|---|
| 21. During the March 1, 2004 meeting, PIC and Picone *expressly agreed* that they would not claim that the Purported Terms applied to future work performed by them for Gillette.<br><br>22. PIC and Picone agreed to perform work for Gillette in connection with the March 2004 housewares show … subject to the terms *expressly and/or impliedly agreed to by PIC and Picone* at the March 1, 2004 meeting [including that] PIC and Picone would not claim that the Purported Terms contained in the past on the reverse of PIC's invoices applied to the Spring 2004 Projects.<br><br>(Am. Counterclaim ¶¶ 21-22). | A: I do know that *he told me he was waiting to hear from his legal counsel as to whether or not he would not include the information on the back of the invoice.*<br><br>Q: Okay. And when did he say that?<br><br>A: Either in a telephone conversation or a voice mail between the end of March and May 14th.<br><br>* * *<br><br>A: I was waiting for the draft of the contract from the Gillette Legal Department, and *he was waiting for his attorneys to give him guidance on taking the information off the back of the invoice.*<br><br>* * *<br><br>Q: If he was waiting to get legal advice about whether to remove the information from the back of the invoice, *how did you come to the conclusion that he had already agreed to remove that information?*<br><br>A: *I hadn't come to that conclusion.* I was waiting to hear back from him to see what – to see what instructions he received from his legal counsel.<br><br>Q: Okay. *So, and did he indicate to you when you met for lunch in late February, early March, that he was going to run this by his legal counsel to make a determination about what to do?*<br><br>A: *Yes.*<br><br>Q: *And that he would wait to get that advice as to whether to remove the information on the back of the invoice?*<br><br>A: *Yes.*<br><br>(Cooper Depo. at 235-237) (emphasis added). |

There is no dispute – let alone a genuine dispute – that Mr. Picone never agreed to forego PIC's standard Terms and Conditions for the Spring 2004 Jobs.

### B. PIC Charged Its Ordinary and Customary Rates.

PIC's Photographer's Notes for PIC's Job No. 6365, which is the Job for which Ms. Cooper contended that PIC's invoice was "exhorbitant," (Cooper Depo. at 152), are provided at Exhibit 43. Based on his review of those notes, Mr. Picone was able to determine exactly how he arrived at the $43,500 in fees reflected on the invoice.

First, Mr. Picone doubled his $2,600 day rate to $5,200 to account for the expanded usage rights that Ms. Cooper had requested (which are reflected in the notation "Unlimited" for both "Media Use" and "Period of Use" on the front of the invoice). (Ex. 38 at GTLC 185). Mr. Picone would usually charge more than a 100% surcharge for unlimited temporal, geographic and media use scope, but in this case elected to reduce the surcharge. (Picone Decl. ¶ 43).

Next, Mr. Picone multiplied his day rate by the number of full days or day-equivalents that were spent on the project (5), yielding a total of $26,000. (Id.).

Next, he added an additional 50% rush charge (once again giving Gillette a discount because same-day service normally results in a 200% rush charge), for a total of $39,000. (Id.).

Finally, he added a $3,500 charge for overtime work outside the normal eight-hour workday and a $1,000 charge for travel time. These charges come to a total of $43,500 and represent ordinary and customary charges that Mr. Picone applies in his business. Expenses are charged in addition to fees, as reflected on the invoice. (Id.).

Mr. Sedlik, who is himself an accomplished photographer as well as a past president of the Advertising Photographers of America, and is intimately familiar with photographers' billing practices around the country, reviewed the fees and charges on this invoice in detail and concluded that they are "reasonable and probably low for the work that was done and the licenses received by Gillette." (Sedlik Report at 23-26).

Tellingly, although Gillette secured an expert on photography industry practices, she offered no opinion on the reasonableness of PIC's fees. See Adler Report (Ex. 12) ¶ 20. Indeed, one of the clients that Ms. Adler represents as an Art Buyer paid over $80,000 for a shoot that took only two days and resulted in a narrow one-year license in China, Hong Kong and Taiwan only. (Ex. 77; Adler Depo. at 42-43). By contrast, PIC's Job No. 6365 took two weeks to complete, encompassed over *five* days or day-equivalents, and provided a license that was not limited in geographic or temporal scope, yet it cost considerably less.

At her deposition, Ms. Cooper admitted that she came to her conclusion that the invoice for Job No. 6365 was "exhorbitant" based on a series of incorrect assumptions.

**First,** Ms. Cooper said that she came to her conclusion about the invoice for Job No. 6365 by comparing it to an earlier invoice for similar work. She testified that she was able to tell by looking at the earlier invoice how many products were photographed and how many views of each were shot on that occasion. (Cooper Depo. at 83-84). In fact, she specifically testified that the earlier invoice stated that the job had involved photography of eleven products whereas Job No. 6365 involved only nine products. (Id. at 161).

*Yet when she was later confronted with that earlier invoice, she was forced to concede that it did not indicate anywhere how many products were shot.* (Id. at 176-177) (Q: Can you tell by looking at the invoice how many products were photographed? A: No, I can't."). Ms. Cooper then was forced to admit that she could not remember what she did in performing the alleged comparison of Job No. 6365 to the earlier Job. (Id. at 178).

Ms. Cooper also attempted to justify her conclusion by alleging that the earlier Job to which she was comparing Job No. 6365 was "a much more extensive photography shoot offsite at a model home, and it went way over time." (Id. at 180). Yet once again, when she was confronted with an invoice for the "model home" shoot, she was forced to concede that this was done for a different Job ("right year, wrong trade show") – the Job to which she was comparing Job No. 6365 did *not* occur offsite a model home after all. (Id. at 182-183).

Ms. Cooper also had no way of knowing whether there were any problems with the earlier Job, but was forced to admit that Job No. 6365 was complicated due to Gillette's errors that force PIC to re-shoot several products. (Id. at 157-159, 173).

Ms. Cooper' **second** mistake her confusion about the concept of a "day rate." She thought that Gillette should only have been billed for *two* "day rates" because a photographer charges a "day rate" for *24 hours of work*. (Cooper Depo. at 145, 168-170). That is unsupported and untrue. Mr. Picone's "day rate" applies to an 8-hour day, after which he charges an overtime rate. (Picone Decl. ¶43). A further fatal flaw in her analysis was that, as she was forced to admit, she had no idea how many days the project took to complete. (Id. at 171)

**Third,** Ms. Cooper, who had not worked with Mr. Picone in some time, was mistaken about Mr. Picone's day rate. She thought it was in the vicinity of $1,000 per day, when in fact Mr. Picone's minimum day rate $2,600 per day. Ms. Cooper conceded that his day rate is more than twice what she thought it was. (Cooper Depo. at 81, 209; Picone Decl. ¶¶ 5, 43).

**Fourth,** Ms. Cooper's analysis did not account for any extra charge by PIC for the expanded usage rights that she had recommended. (Id. at 202).

**Fifth,** as discussed below, Ms. Cooper's analysis did not account for PIC's same-day services charges.

- 11 -

In summary, there is no genuine dispute that PIC's charges for the Spring 2004 Jobs were reasonable and customary. Mr. Picone's testimony on the point is unrebutted. PIC's expert agrees, Gillette's expert declined to offer an opinion, and Gillette's Rule 30(6)(6) witness based her analysis on several assumptions, each of which she was forced to admit were wrong.

### C. PIC Provided Same-Day Service.

As Mr. Picone explains in his declaration, he added only a 50% rush charge for same-day service (once again giving Gillette a discount because same-day service normally results in a 200% rush charge). (Picone Decl. ¶ 43).

"Same day service" means that the photographer begins work on the project on the same day that he receives the product, putting it ahead of other clients' projects. "Same-day service" does *not* mean that the project is completed in a single day; in many cases it is simply impossible to complete a job in one day. (Id. ¶ 44). PIC's expert confirms that Mr. Picone's rush fee structure is reasonable and customary in the industry. (Sedlik Report at 10, 26). Once again, Gillette's expert declined to opine on the reasonableness of PIC's fees. (Adler Report ¶ 20).

Ms. Cooper conceded that, in concluding that "same day service" had not been provided, she applied an inconsistent definition requiring that all work be completed in a single day. (Cooper Depo. at 165).

### III. PIC IS ENTITLED TO SUMMARY JUDGMENT ON GILLETTE'S COUNTERCLAIMS.

#### A. Breach of Contract

As explained in Section II(A) above, Gillette admitted, through its Rule 30(b)(6) witness, that the central allegation of its counterclaims – namely, that Mr. Picone agreed not to send Terms and Conditions along with this Spring 2004 invoices – is untrue. According to Gillette, Mr. Picone said he had to check with his legal counsel before agreeing to such an arrangement.

Mr. Picone testifies that he was unwilling to consider foregoing PIC's Terms and Conditions. Accordingly, there is no dispute at all – let alone any genuine dispute – that Mr. Picone did not make the alleged agreement (either "expressly" or "impliedly") on which this counterclaim is based. PIC is entitled to summary judgment.

With regard to Gillette's subsidiary claims that PIC breached an agreement by failing to charge reasonable and customary rates, or by falsely claiming that "same-day service" had been provided, after Ms. Cooper's deposition there can be no dispute that these claims fail too. As explained in detail above, Mr. Picone did apply his normal and customary fee structure (even giving Gillette several discounts). PIC's expert carefully reviewed the charges and concluded they are reasonable, while Gillette's expert declined to do so. Ms. Cooper was forced to concede repeatedly at deposition that her opinion to the contrary was based on incorrect assumptions.

In denying PIC's motion to dismiss, the Court commented, "We'll see what happens on summary judgment." (Transcript at 6). Discovery has proven that Gillette's breach of contract counterclaim was based on a series of concededly incorrect assumptions, including the central assumption that PIC agreed to forego its Terms and Conditions in the first place. Summary judgment for PIC is in order.

### B. Estoppel

A cause of action for promissory estoppel requires both "an unambiguous promise" and "that the party to whom the promise was made reasonably relied on the representation." Fontneau v. Town of Sandwich, 251 F. Supp. 2d 994, 1002 (D. Mass. 2003) (Young, C.J.). Gillette has conceded there was no promise, let alone an "unambiguous promise," by PIC to forego its Terms and Conditions. PIC is entitled to summary judgment on Gillette's estoppel counterclaim.

### C. <u>Fraud</u>

Like estoppel, fraud requires a false statement made for the purpose of inducing reliance. Again, because the allegedly false statement about foregoing Terms and Conditions indisputably was not made, PIC is entitled to summary judgment on the fraud count too.

### D. <u>Chapter 93A</u>

Gillette's Chapter 93A counterclaim is based on the same alleged promise not to send Terms and Conditions that Gillette now admits, through its 30(b)(6) witness, was not made. At the hearing on PIC's motion to dismiss, the Court dismissed Gillette's Chapter 93A claim except to the extent that it depends on Gillette's fraud claim which, as explained above, should now be dismissed on summary judgment. <u>See also</u> <u>American Tel. & Tel. Co. v. IMR Capital Corp.</u>, 888 F. Supp. 221 (D. Mass. 1995) (dismissing 93A claim under Rule 12(b)(6) where claim was, in essence, the same as other dismissed claims); <u>see also</u> <u>Trifiro v. New York Life Ins. Co.</u>, 845 F.2d 30, 33 (1st Cir. 1988) (Chapter 93A claim failed as a matter of law where primary claims of promissory estoppel, deceit and negligent misrepresentation failed because reliance could not have been reasonable).

### IV. PIC IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM FOR PAYMENT OF ITS SPRING 2004 INVOICES.

As explained above, there is no dispute that PIC's charges for the Spring 2004 Jobs were reasonable and customary. Indeed, the first time that Gillette ever complained about these charges was about half a year after the invoices were sent, when it filed its Answer in October 2004. Prior to that time Gillette simply ignored the invoices, and even refused to take Mr. Picone's calls concerning them. (Picone Decl. ¶ 36). This despite the fact that Gillette had never before been bashful about calling Mr. Picone if there was a potential issue with an invoice. A phone call always sufficed to resolve any issues <u>E.g.</u>, Tattan Depo. at 37-38.

Yet Ms. Cooper conceded that she never called Mr. Picone to discuss the allegedly unreasonable invoice (Cooper Depo. at 153) even though she used the images. (Id. at 61).

"It is well established that a professional may obtain a judgment as a matter of law for an Account Stated when the client fails to object to the professional's statement for services within a reasonable amount of time." Patterson, Belknap, Webb & Tyler v. Larosa, 1993 U.S. Dist. Lexis 2835, *11 (D. Md. Feb. 16, 1993); see also John T. Percy & Assocs. v. Collura, 239 A.D. 2d 650, 651 (granting summary judgment for plaintiff on contract claim where "defendant failed to object to the cost of these services within a reasonable time after receiving the invoices").

In this case, PIC's invoices were indisputably reasonable as discussed above,[5] and in any event were unobjected-to within a reasonable time period. PIC is entitled to collect the sum set forth on those invoices as a matter of law.[6]

---

[5] Indeed, Ms. Cooper admitted that the invoice for Job No. 6400 was reasonable. (Cooper Depo. at 202-203). That even this admittedly reasonable invoice was not paid by Gillette further demonstrates Gillette's bad faith. Gillette has repeatedly forced PIC to expend attorney fees on matters that never should have been litigated.

[6] The detailed discussion in this brief is limited to fees for Job No. 6365 because that is the largest of the Spring 2004 Jobs and the primary one that Ms. Cooper complained about. PIC seeks its damages for all of the unpaid Spring 2004 invoices.

## V. CONCLUSION

For the above reasons, PIC and Mr. Picone should be granted summary judgment on Gillette's counterclaims, which should be dismissed with prejudice. In addition, PIC should be granted summary judgment on its claim for payment of its Spring 2004 Invoices for work that it did for Gillette in Spring 2004, in the amount of $79,310.55.

                Respectfully submitted,

                PLAINTIFF AND COUNTERCLAIM-DEFENDANT
                PHOTOGRAPHIC ILLUSTRATORS CORP.

                and

                ADDITIONAL COUNTERCLAIM-DEFENDANT
                PAUL PICONE

                By their counsel,

Dated: <u>April 8, 2005</u>        <u>/s/ Michael A. Albert</u>
                Michael A. Albert, BBO #558566
                malbert@wolfgreenfield.com
                Michael N. Rader, BBO # 646990
                mrader@wolfgreenfield.com
                Adam J. Kessel, BBO # 661211
                akessel@wolfgreenfield.com
                WOLF, GREENFIELD & SACKS, P.C.
                600 Atlantic Ave.
                Boston, MA 02210
                (617) 646-8000