IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PHOTOGRAPHIC ILLUSTRATORS
CORPORATION,

       Plaintiff,

v.

THE GILLETTE COMPANY,

       Defendant.

Civil Action No. 04-CV-10913-WGY

**MEMORANDUM IN SUPPORT OF PIC'S
MOTION FOR SUMMARY JUDGMENT ON COPYRIGHT INFRINGEMENT**

Michael A. Albert, BBO #558566
Michael N. Rader, BBO # 646990
Adam J. Kessel, BBO # 661211
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

COUNSEL FOR PLAINTIFF
PHOTOGRAPHIC ILLUSTRATORS CORP.

TABLE OF CONTENTS

I.    BACKGROUND ..................................................................................................1

    A.    Overview Of The Case ......................................................................2

    B.    The License Agreement ....................................................................3

    C.    Gillette's Employees' Belief That They Owned The Images..................5

II.    REPRESENTATIVE INFRINGEMENTS ..........................................................6

    A.    The Spring 2004 Jobs ......................................................................7

    B.    Electronic Media Infringements ......................................................8

    C.    Infringement As a Result of Use Beyond the Temporal Scope
        of the License..................................................................................9

    D.    Infringement as a Result of Use Beyond the Geographic Scope
        of the License................................................................................10

    E.    Infringement as a Result of Unauthorized Duplication.......................11

III.    LEGAL STANDARDS ....................................................................................13

    A.    Summary Judgment ........................................................................13

    B.    Copyright Infringement ..................................................................13

IV.    ARGUMENT..................................................................................................13

    A.    PIC is Entitled to Summary Judgment on the Established
        Infringements. ................................................................................13

    B.    PIC is Entitled to Summary Judgment on the Basis
        of Gillette's Contributory Infringement.............................................16

    C.    PIC is Entitled to a Presumption of Infringement in Missing Evidence................17

V.    CONCLUSION................................................................................................20

Over a twelve year period, Plaintiff Photographic Illustrators Corporation ("PIC") created photographic transparencies and provided Defendant The Gillette Company ("Gillette") with limited licenses to use those images. The license agreements ("the Agreements") for the photographs were limited to one year and use in the United States only. Each Agreement also granted a limited media use for the licensed images. Gillette ignored the licenses it received and treated PIC's images as if Gillette owned them, a fact admitted by several Gillette employees. Gillette used many images beyond the one year period, outside of the United States, and for uses other than those permitted by the Agreements. Furthermore, Gillette failed to include a proper copyright notice as required by the Agreements. Gillette also refused to pay for PIC's most recent work (four jobs done in the Spring of 2004), thereby failing to meet a condition precedent to obtaining licenses to use those works at all.

As discussed in this motion, PIC has identified thousands of acts of copyright infringement by Gillette. As a result of Gillette's spoliation of evidence and failure to produce other evidence, thousands more examples of such infringement are no longer extant but can and should be found to have occurred. On the facts of record, PIC should be granted summary judgment on its copyright infringement claims.

## I.    BACKGROUND

In a separate motion, PIC is seeking summary judgment under the liquidated damages clauses of its licenses with Gillette for the nonreturn of its copyrighted photographs. That issue is in many ways the core of this case, and its summary resolution may well prove essential to making Gillette comprehend the need to discuss a good-faith resolution with PIC that it has thus far resisted discussing.

While the issues in that motion are undeniably simpler and more straightforward than the copyright issues discussed here, PIC submits that Gillette's clear, ongoing, and massive copyright infringement is also not genuinely disputable, and accordingly warrants summary judgment for the reasons discussed below.

## A.    Overview Of The Case

Notwithstanding a contractual provision (standard in the industry) requiring that Gillette return PIC's original photographic materials within thirty days of first publication, Gillette refused to do so. (2d Am. Compl. ¶¶ 14, 17, 18).  Gillette admits this.  See Am. Answer ¶ 17 ("Defendant admits that it did not return all photographs provided to it by plaintiff.").

After retaining thousands of PIC's original images in breach of its contracts with PIC, Gillette proceeded to bypass PIC in satisfying its copying needs – wrongfully duplicating the images through third-party laboratories instead of through PIC. (2d Am. Compl. ¶ 24-26). Gillette admits that it did this too. See Am. Answer ¶ 25 ("Defendant admits that … it purchased from third-party laboratories … duplicate prints of photographs provided by plaintiff.").

Gillette also infringed PIC's copyrights by using PIC's images outside the scope of the one-year license that it received. (2d Am. Compl. ¶ 20-22).  Indeed, Gillette admits that PIC's images were still posted on its web site even after this suit was filed. (Am. Answer ¶ 21-22).

In short, although Gillette purchased limited licenses to use PIC's images (for one year, in the United States only, and only in certain media), Gillette systematically treated PIC's images as if they were Gillette's own, using them far beyond the geographic, temporal, and media-use scope of these licenses.

Gillette's disregard for PIC and PIC's rights did not end there.  For instance, in Spring 2004, notwithstanding the existence of outstanding disputes between the parties, Gillette

- 2 -

employee Beth Cooper entreated PIC to assist with a series of "emergency" photography projects of significant scope. As a goodwill gesture, PIC agreed to help. (2d Am. Compl. ¶ 34-37).

To complete the projects in the short time available, Mr. Picone and his staff had to work day and night for weeks. During this time, Gillette effusively thanked PIC and conveyed its satisfaction with the high quality of PIC's work. (Id. ¶ 34-38). Nevertheless, upon completion of the projects, Gillette refused to pay PIC's invoices and would not even take Mr. Picone's phone calls. (Id. ¶ 43-44). Once again, Gillette concedes this. (Am. Answer ¶ 43).

**B.     The License Agreement**

PIC's invoices contained the terms of the licenses between the parties. Throughout the parties' twelve year relationship, PIC granted the same geographic and temporal license terms, with two exceptions discussed infra. Those terms appeared in Paragraph 9 of the Agreement:[6]

> 9.     REPRODUCTION RIGHTS: Reproduction rights are conditioned on Photographer's receipt of payment in full and Client's proper use of the copyright notice. All rights not expressly granted herein remain the exclusive property of Photographer. Unless otherwise stated on the face of the Agreement, duration of the License is one year from Agreement date and limited to use in the United States of America. Client may not sell, assign or otherwise transfer this License, or any rights or obligations under this License without Photographer's prior written consent.

In return for paying PIC the amount invoiced, Gillette thus obtained a narrow set of rights. For one year (and no more), Gillette (and Gillette only) was entitled to reproduce the licensed photographs for domestic use (not abroad), solely in the media identified on the front of the invoice.

---

[6] Early versions of the Agreement included a typo where the word "ear" appears instead of "year." Although Gillette's counsel attempted at one point to put the typo at issue, see Dep. of Brenda Tattan (Ex. 5) at 130, Gillette's employee admitted that it was obvious that the word meant "year." Id. at 134-35. See also Ex. 11 (Expert Report of Jeff Sedlik) at 8 n.7.

Furthermore, this right did not extend to all "copying" as a layman might understand the term. There is an important distinction in commercial photography between reproducing an image and "duplicating" it. See Ex. 11[7] (Expert Report of Jeff Sedlik) at 11. After a photographer supplies a high-quality image to a client (typically in the form of a negative or transparency), the client makes a "reproduction" when it uses the image to create a copy in some other medium, like a product catalog. (Id.). Duplication, however, is something else entirely. It entails making a *second* high-quality transparency from the first, thereby enabling the client (or a third party to whom it provides the duplicate) to continue reproducing an image even after returning the high-quality original to the photographer. (Id.).

Only twice did Gillette seek a more extensive license. First, it successfully negotiated for a "buyout" of the images associated with the very first job that PIC did for the company, thereby giving Gillette the right to use the photographs for however long and for whatever purpose it desired to. See Paul Picone Dep. (Ex. 10) at 150-51; see also Ex. 75 at 21. Gillette also sought an analogous unlimited license for the images that PIC prepared in the course of the Spring 2004 jobs. See Picone Declaration, ¶ 40.[8] Gillette was well aware of how to negotiate a "buyout" of such unrestricted usage rights when it wanted to. But instead, the vast majority of the time, it arrogated to itself the right to such usages without having bought them.

---

[7] Except where otherwise identified (e.g. by Docket No.), references herein to Ex. __ refer to the Exhibits to the Declaration of Michael N. Rader in Support of PIC's Summary Judgment Motions.

[8] Prior to the Spring 2004 projects, Gillette had almost never requested unlimited temporal, geographic or media use, as such broader licenses cost considerably more than standard one-year U.S. only licenses. See Adler Dep. (Ex. 8) at 136 (acknowledgment by Gillette's expert that, as stated in industry publication, "from the standpoint of the client, it is rarely efficient to buy out all of the rights to a photograph."). At the March 1, 2004 meeting, however, Ms. Cooper requested, *for the first time in the parties' relationship* other than that one buyout over ten years earlier, a license of unlimited temporal and geographic scope for use of the images by Gillette's Business Communications Group. (Picone Decl. ¶¶ 34-40.)

### C.    Gillette Employees' Belief That They Owned The Images

The fact that Gillette ignored the license it received and treated the images as if it owned them is established by the testimony of several Gillette employees. For example, Anna Madden, a former project manager in business communications for Gillette, testified at her deposition:

> Q.  Now, did you ever discuss with Mr. Picone how long Gillette could hold onto the transparencies?
>
> MR. DONAHUE:  Objection.  Misleading and assumes facts not in evidence.
>
> A.  Not that I can remember, no.  What I thought when I took photos from him, **I thought they were ours**.  I thought that I was paying for that.
>
> Q.  And what was that understanding based on?
>
> A.  Based on -- How do I put it?  Based on what I thought, what I observed that we had filed.  **We had transparencies on file, so I thought they were on file because they were ours.** So I thought in some way that was included in the pricing of the photo.
>
> Q.  Okay.  Did Mr. Picone or anyone from Photo Illustrators ever tell you that that was the case?
>
> MR. DONAHUE:  Objection as to form.
>
> A.  I can't remember that he did.
>
> Q.  Did anyone at Gillette ever explain it to you that way?
>
> > MR. DONAHUE:  Objection as to form.
>
> A.  Explain that they weren't ours or that we'd have to give them back?
>
> Q.  Did anyone at Gillette ever explain to you that the transparencies belonged to Gillette?
>
> A.  Not that I can remember it ever came up that I asked that question.  I don't remember asking them that question.

Anna Madden Dep. (Ex. 49) at 60-61) (emphasis added).  Other employees testified similarly.

See Brenda Tattan Dep. (Ex. 5 ) at 132-133 ("Q: …Do you have an understanding of who owns

the copyrights in those images? A: I mean I didn't know they were copyrighted. … Q: And your understanding as to ownership of the transparencies, what is that based on? … A: Gillette would be the owner of the physical transparencies."); Karen Mullen Dep. (Ex. 3) at 56 ("I believe my understanding is that when Gillette purchases something from a vendor, that we own what we purchase."); Linda Mallette Dep. (Ex. 50) at 74 ("My understanding was that -- my experience, that Gillette typically would not allow a vendor to have terms and conditions. Whatever services we procured, we owned."); Nadine Romano Dep. (Ex. 4) at 30 ("Q: So, was it your understanding when you reviewed Photo Illustrators' invoices that Gillette owned the transparencies that were provided? A: Yes. That was my assumption.").

In fact, even Gillette's own expert witness testified that her understanding, based on representations from Gillette's counsel was that "Gillette believed that they owned the images." Adler Dep. (Ex. 8) at 22. She had to concede, however, that as a matter of law, no transfer of copyright ownership can occur unless by means of a written transfer (of which there is none).[9]

## II.    REPRESENTATIVE INFRINGEMENTS

Gillette has engaged in at least 8,683 specific instances of copyright infringement that PIC identified in its Second Supplemental Interrogatory Response (Ex. 76 at 57), and thousands more – undoubtedly amounting to several times that figure – as to which its spoliation of evidence over the years has resulted in the unavailability of proof. Summary judgment is warranted at least as to the instances PIC has identified in its interrogatory answers. (Id., supplementing Docket #58, Ex. A).

---

[9] See Adler Dep. (Ex. 8) at 124-125 ("Q: [D]o you see where it says… 'Under federal copyright law, **the photographer is the owner of the photograph unless there is a written transfer of copyright ownership.** Accordingly it is important that the photographer and client agree un usages in advance.' **Would you agree with that? A: Yes.**"). (Emphasis added.)

Due to space limitations, it would be impossible in this memorandum to walk the Court through each of these thousands of infringements. PIC will set forth below a few representative samples.[10]

### A.     The Spring 2004 Jobs

In Spring 2004, notwithstanding the existence of outstanding disputes between the parties, Gillette employee Beth Cooper entreated PIC to assist with a series of "emergency" photography projects of significant scope. As a goodwill gesture, PIC agreed to help. Mr. Picone and his staff worked day and night from late February through early March.

Gillette was quite satisfied with PIC's work, emailing comments to PIC such as "GORGEOUS!!!", "I think it looks terrific!", "You rock! Thanks!", "Thanks for all your help!", and "These look ABSOLUTELY WONDERFUL!!!! Thank you!". (Ex. 45). For each of the jobs, PIC sent Gillette an invoice with its standard Terms and Conditions. (Ex. 44). The total amount due for all four jobs was $79,310.55. (Id.) As detailed in the Expert Report of Jeff Sedlik, these charges were reasonable (and "probably low") based on the number of photographs produced, the rights to be granted by PIC, and the expedited production schedule demanded by Gillette. (Ex. 11 at 23-26). Gillette's expert evidently did not disagree – although her expert report was structured as a challenge to portions of Mr. Sedlik's report, she offered no rebuttal to this section of his report.

---

[10] In a case like this, in which the infringement is on such a massive scale, the practical approach would have been for the parties to exchange information back when the issue arose in 2002-03, review and agree on what the facts show, and reach a reasonable resolution of the value of the infringement. Instead, although it originally agreed to do so, Gillette ultimately stonewalled and refused to participate in this process. (See Motion for Summary Judgment on Fraud.) Gillette adopted a strategy by which it sought to evade responsibility for the wholesale infringement it has engaged in by simply making it virtually impossible for PIC to prove the full scope of Gillette's actions. By pressing for short discovery and trial deadlines, withholding or denying the existence of information accessible only to Gillette, failing to maintain the evidence of the facts underlying the dispute, and refusing even to produce Rule 30(b)(6) witnesses to answer questions about Gillette's conduct with regard to the images (beyond the limited testimony that the individual Gillette witnesses deposed by PIC were prepared to address), Gillette effectively hoped to render the legal process ineffective at policing the kind of massive infringement Gillette has engaged in. PIC trusts that the legal system has greater capacity to remedy large-scale wrongs than Gillette seems to hope.

Gillette admits that it never paid PIC <u>anything</u> for the Spring 2004 Jobs; that it used the images from those jobs; and that it retained the original images from those jobs.  Am. Answer ¶¶ 43, 45, 46; Beth Cooper Dep. (Ex. 1) at 61.  Gillette's license to use PIC's images was expressly conditioned on payment.  Every one of the hundreds of invoices Gillette received stated "Rights granted only upon full payment of this invoice; subject to terms and conditions on reverse."  Because Gillette never paid for the images, it never received any license, and its admitted use of those images infringes PIC's copyrights.  PIC's group copyright registration for the images from the Spring 2004 Jobs is attached as Exhibit 46.

### B.    <u>Electronic Media Infringements</u>

Another category of infringement Gillette has engaged in (on a massive scale) is use of PIC's images in media other than those authorized by the "media use" limitations in the licenses.  Indeed, Gillette admits to having placed all of PIC's images on an electronic database – a use not countenanced in the "media use" section of the licenses.  Mallette Dep. (Ex. 50) at 28.

By way of example, PIC did Job 5613 for Gillette in the Spring of 2001.  <u>See</u> Ex. 47 (Job Folder for Job 5613).  The job folder was started in late March 2001 (Ex. 47, PIC03814), and the invoice was sent to Gillette on May 3, 2001 (Ex. 47, PIC03819).  Gillette employee Joyce Lorden signed this invoice on May 7, 2001.  Ex. 48 (Ex. 55, GLTC0648).  The invoice indicates that this job was a "file retrieval," in which PIC would relicense images it had *previously* created and licensed for a different purpose. In this case, the new terms allowed Gillette to use the associated image solely for purposes of a "powerpoint presentation."  That was the "media use" limitation expressly stated on the face of the license.  Nevertheless, the image later appeared on Gillette's on-line store, located at www.theessentials.com, a web site owned and run by Gillette.  <u>See</u> Ex. 78 (hand-mixer).

**C.      Infringement As a Result of Use Beyond the Temporal Scope of the License**

One of the single largest categories of infringement consists of Gillette's use of PIC's images far beyond the temporal scope of the one-year license granted by PIC. Gillette concedes that it kept no records from which it could even determine when its licenses from PIC terminated, and thus made no effort to comply with the one-year limitation. As its witnesses testified, it simply treated PIC's images as its own. The simplest proof of this fact is that the same PIC images recur, in successive years, in Gillette's catalogs, sell sheets, and other marketing materials. Obviously, use of the same image in more than one year's catalog is use of the image for more than the licensed one-year period. See Tattan Dep. (Ex. 5) at 96 (catalogs come out at about the same time every year).

By way of example, PIC did Job 5595 for Gillette in the Spring of 2001. (Ex. 51, Job Folder for Job 5595 PIC 03964). The invoice was sent to Gillette on May 4, 2001 and included the standard Terms and Conditions, including the provision that gave Gillette the right to reproduce the associated images for one year. (Ex. 52, PIC 16809-16810). One of the images included in the job was of a Braun electric toothbrush, model No. D0813. (Ex. 54, PIC 0969). Gillette used this image in its 2001 Braun catalog. (Ex. 53 (PIC14357)) and again in its 2002 Braun catalog. (Ex. 65 (PIC17235)). The group copyright registration including the photograph attached as Ex. 55.     PIC did Job 4311 for Gillette in the Fall of 1997. (Ex. 56 (Job Folder for Job 4311)). The invoice was sent to Gillette on 11/6/97 and included the standard Terms and Conditions, including the provision that gave Gillette the right to reproduce the associated images for one year. (Ex. 57). One of the images, a photograph of the Braun Model 6520 Rechargeable Shaver (Ex. 58, PIC 10525), subsequently appeared in both the 1999 Braun Catalog ("Feel the Power") (Ex. 59, PIC14458) and the 2000 Braun Catalog for Personal

- 9 -

Products ("Moving in a New Direction") (Ex. 60, PIC14289). The associated group copyright registration is attached as Ex. 67.

PIC did Job 3695 for Gillette in the Fall of 1995 (Ex. 61 (Job Folder for Job 3695)). The invoice was sent to Gillette on January 12, 1996 and included the standard Terms and Conditions, including the provision that gave Gillette the right to reproduce the associated images for one year. (Ex. 62). One of the images, a photograph of the Braun Model MR500 hand blender (Ex. 63, PIC 13156), subsequently appeared in both the 1996 Braun Catalog ("A Blueprint For Success") (Ex. 64, PIC14493 and 14525) and the 1997 Braun Catalog ("Designing Products to Live By") (Ex. 66, PIC14379 and 14405).

These are merely three examples of a much broader pattern of infringement. A Gillette project manager admitted that she was "sure" that the company had incorporated particular PIC images into two annual catalogs for two years in a row. See Tattan Dep. (Ex. 5) at 97.

**D.      Infringement as a Result of Use Beyond the Geographic Scope of the License**

Gillette also sent copies of PIC images all around the world. As discussed below, this constituted infringement under U.S. copyright law because the predicate acts occurred in the United States.

As part of the above-mentioned Job 5595 (Ex. 51, PIC 03964), for example, PIC prepared a digital image of a Braun blender, model No. MX2050 (Ex. 68, PIC 04017). PIC sent the invoice to Gillette on May 4, 2001 and included the standard Terms and Conditions on the reverse side, including the provision giving Gillette a license to use the associated images in the

United States alone (Ex. 52 (PIC 16809-16810)).  Despite this limitation, Gillette used the

blender image in a Canadian catalog the following year (Ex. 69 (GLT 6638-39 and 6764)).[11]

### E.    Infringement as a Result of Unauthorized Duplication

In recent years, Gillette has duplicated thousands of PIC's images without authorization

and thereby infringed PIC's exclusive right to make reproduction-quality copies of the

photographs.  Gillette itself admits to have "purchased from third-party laboratories … duplicate

prints of photographs provided by plaintiff." Am. Answer ¶ 25.  In many cases, Gillette utilized

the services of Advanced Photographics, Inc. ("Advanced") in Danvers, Massachusetts to

duplicate PIC photographs.  Advanced indeed retained a box of PIC's transparencies and other

photographic materials from which Gillette placed a series of duplication orders until Mr. Picone

learned of the box's existence and removed it. Jason Roopenian Dep. (Ex. 6) at 10-11.  All told,

Gillette arranged for the production of more than 2,000 duplicate transparencies, 4,500 duplicate

slides, and 17 duplicate digital images.

When reviewing the film files that Gillette produced, PIC also discovered literally

thousands of duplicate transparencies (1,263) and slides (3,266) containing PIC images.  These

4,529 instances of infringement are nevertheless only a fraction of the PIC images that Gillette

duplicated without authorization; the very purpose of the activity was to procure materials

capable of further reproduction and in turn send them around the globe.  See, e.g., Madden Dep.

(Ex. 49) at 79, 103; Cooper Dep. (Ex. 1) at 121; Mallette Dep. (Ex. 50) at 24-25, 27, 29, 34-37,

41, 84-85, 124.

---

[11] Although the origin of the catalog is not clear from the face of the catalog pages alone, Gillette produced the documents to PIC in a redwell with the note "CANADA Grooming" on the front (Id.)  The fact that the text accompanying the image on the page first lists the capacity of the blender in liters makes it even more clear that Gillette intended this catalog for foreign use.  When using the very same blender image in the domestic 2002 Braun catalog (Ex. 65 (PIC17296), Gillette put the capacity first in ounces and only subsequently in liters.

Gillette has also infringed PIC's exclusive rights through the incorporation of PIC's photographs into what one Gillette employee called an "electronic library" of files available to Gillette's entire sales force. Mallette Dep. (Ex. 50) at 28. This library allowed Gillette to make and send perfect electronic copies of PIC's images to various third-party merchants for subsequent reproduction and use in promotional campaigns.

For example, Gillette provided the retailer ShopKo with compact disks entitled "Recommended Retailer Ads January 2003." These CDs (Ex. No. 70 (Bates Nos. SK0017 and SK0018) PIC, contain at least 63 digital copies of PIC photographs. By transferring the files in a form suitable for subsequent reproduction, Gillette duplicated them and thereby copied the materials in a manner beyond the scope of the license granted under PIC's standard Terms and Conditions.

Likewise, Gillette provided Walmart.com with PIC digital images, such as the image of a Braun Multi-Mix hand blender. See Sabina Chang Dep. (Ex. 71) at 35. With the exception of the deletion of a power cord and a change in background color, the image that Wal-Mart obtained (Ex. 72 ( Bates No. No. WM179623C000011) is identical to the image that PIC provided to Gillette (Ex. 73). Both of these changes amount to nothing more than trivial touch-ups. Indeed, the Wal-Mart employee testified at two different points during her deposition that the two photographs were the same. Chang Dep. (Ex. 71) at 46, 59-60. She answered negatively when counsel for Gillette asked if she could see "*any* differences" between the images. Id. at 59-60. Only after two leading questions did the employee note these two minor touch-ups. There can be no serious contention that these minor adjustments render the images anything less than "substantially similar," the test for infringement under copyright law, as discussed below.

## III. LEGAL STANDARDS

### A. <u>Summary Judgment</u>

Under Rule 56(a) of the Federal Rules of Civil Procedure, a court should render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

### B. <u>Copyright Infringement</u>

To establish a cause of action for copyright infringement, a copyright owner must prove ownership of a valid copyright, and show that someone else copied the original work, or created one "substantially similar" to the original, or created a derivative work from the original. <u>See</u>, <u>e.g.</u>, <u>Feist Publications, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361 (1991).

Under 17 U.S.C § 410(c), a copyright registration certificate is prima facie evidence of the validity of the copyright and of the facts stated in the certificate, including the statement of ownership. <u>See Lotus Dev. Corp. v. Borland Intern., Inc. Lotus Dev. Corp. v. Borland Intern., Inc.</u>, 49 F.3d 807, 813 (1st Cir. 1995).

## IV. ARGUMENT

### A. <u>PIC is Entitled to Summary Judgment on the Established Infringements.</u>

PIC is entitled to summary judgment with respect to the infringements identified in Part II above (and in PIC's interrogatory responses) because there is no genuine issue of material issue of fact that (a) PIC owns the copyrights to the photographs at issue, and (b) Gillette has copied PIC's images without a license to do so, thereby violating PIC's exclusive rights under 17

- 13 -

U.S.C. § 106.  (In many instances, Gillette also *distributed* these works, which is also a violation of § 106; and made *derivative works* from them, a further violation.  This brief focuses primarily on copying.)  The copyright registrations themselves are prima facie evidence of PIC's ownership since they list PIC as the copyright claimant.  See Lotus Dev. Corp. 49 F.3d at 813 (1st Cir. 1995).[12]

By duplicating thousands of PIC's photographs, Gillette "reproduce[e]d" them within the meaning of 16 U.S.C. § 106(1).  See Micro-Sparc, Inc. v. Amtype Corp., 592 F. Supp. 33, 34 (D. Mass. 1984)  ("As owner of the copyright, plaintiff has the exclusive right . . . to copy or sell copies of the programs. . . .  [T]he duplication of plaintiff's copyrighted programs is an infringement of its rights.") (citations and internal quotations omitted); H. Rep. No. 94-1476 (1976) ("[T]he right to reproduce the copyrighted work in copies . . . means the right to produce a material object in which the work is duplicated.").  This type of high-quality copying was not within the scope of "reproduction rights" covered within the scope of Gillette's licenses.  See Ex. 11 (Expert Report of Jeff Sedlik at 11).  By duplicating the images without authorization, therefore, Gillette infringed PIC's rights within the meaning of 17 U.S.C. § 501.  *See* S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1087-88 (9th Cir. 1989) ("The critical question is not the existence but the scope of the license.").

Gillette's licenses likewise did not permit the company to copy a particular image at all once one year had passed from the date of the associated agreement.  Gillette therefore lacked authorization to reproduce images in catalogs that were printed more than a year after the company originally obtained the pictures.  In doing so, Gillette practiced one of PIC's exclusive

---

[12] As to images kept by Gillette and never returned to PIC, of course, it was not possible to obtain copyright registrations (unless the image was sufficiently similar to an image PIC still had so that registration of one would cover use of the other).  The issue of non-returned images is discussed in PIC's pending motion for summary judgment on the liquidated damages clause.

rights and therefore infringed the copyrights. See Kamakazi Music Corp. v. Robbins Music Corp. 534 F. Supp. 69, 78 (S.D.N.Y. 1982), aff'd, 684 F.2d 228 (2d Cir. 1982) (holding that continued use of a work after the license expired constitutes infringement).

The same is true of uses beyond those specified in the Terms and Conditions included either on the front (e.g. media use limitations) or on the back of the invoices that Gillette received. Since the licenses authorized the company to reproduce the associated PIC images only for certain delineated purposes (in one case, for example, in a PowerPoint presentation), Gillette lacked permission to copy the photographs for any other use (e.g. on Gillette's e-commerce web site). Doing so constituted infringement. See AccuSoft Corp. v. Mattel, Inc., 117 F. Supp. 2d 99, 101-02 (D. Mass. 2000) (noting that since a software license only permitted the purported assignor to incorporate the technology into two specific programs, the supposed assignee violated the plaintiff's copyright by using the "toolkit" in two other applications).

Gillette also infringed PIC's copyrights as a result of copying images in the United States for subsequent use abroad. The Terms and Conditions on the reverse of PIC's invoices clearly state that the associated authorization is "limited to use in the United States of America." When duplicating or otherwise copying PIC images in the United States and then sending them across the border for use in other countries, Gillette therefore exceeded the scope of its licenses. While the actual use of the images occurred in other countries, the defendant has nevertheless infringed PIC's copyrights in the U.S. by initially reproducing the photographs within the United States for an unlicensed purpose (i.e., foreign use). See Update Art, Inc. v. Modiin Pub., 843 F.2d 67, 73 (2d Cir. 1988) (upholding a damage award that accrued in large part from the sale of Israeli newspapers) ("It is generally well established that copyright laws do not have extraterritorial application. There is an important exception – when the type of infringement permits further reproduction abroad – such as the unauthorized manufacture of copyrighted materials in the

- 15 -

United States."); <u>L.A. News Serv. v. Reuters TV Int't</u>, 149 F.3d 987, 990-91 (9th Cir. 1998) (endorsing the Second Circuit's line of cases and holding that a copyright holder could recover damages for international distribution of a work based on the theory that an act of direct infringement occurred in the United States).

In most instances here, the predicate act of direct infringement in the United States consisted of copying PIC images for use in the "electronic library" discussed above. Those acts exceeded the terms of Gillette's licenses for two distinct reasons and thereby infringed PIC's copyrights. First, making a high-quality digital copy suitable for subsequent reproduction is an act of duplication, which the Terms and Conditions do not authorize. In addition, making *any* sort of copy intended for use abroad does not constitute reproducing an image for "use in the United States of America." Such activities are therefore beyond the scope of the license as well.

Finally, Gillette infringed PIC's copyrights by reproducing the images associated with the Spring 2004 jobs without paying PIC the amount due on the invoice. PIC's Terms and Conditions make clear that "Reproduction rights are conditioned on Photographer's receipt of payment in full." As with any condition precedent to a license, Gillette's failure to satisfy the terms deprived it of permission to use the images for *any purpose at all* covered by 17 U.S.C. § 106. <u>See</u> 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.15 ("If the nature of a licensee's violation consists of a failure to satisfy a condition to the license…, it follows that the rights dependent upon satisfaction of such condition have not been effectively licensed, and therefore, any use by the licensee is without authority from the licensor and may therefore, constitute an infringement of copyright").

**B.    PIC is Entitled to Summary Judgment on the Basis**
**of Gillette's Contributory Infringement.**

PIC is also entitled to summary judgment on the basis of Gillette's activities in inducing third-party retailers to infringe PIC's copyrights and contributing the very images that allowed

those merchants to do so. A party is liable as a "contributory infringer" if it "induces, causes or materially contributes to the infringing conduct of another" while having knowledge of the infringement. Polygram Int'l Publishing v. Nevada/TIG, Inc., 855 F. Supp. 1314, 1333 (D. Mass. 1994) (quoting Gershwin Publishing Corp. v. Columbia Artists Management, Inc., 443 F.2d 1159 (2d Cir. 1971)). This can occur, for example, when a party furnishes a work to another and the recipient in turn engages in infringing acts. See 3 Nimmer on Copyright § 12.04 (citing Mount v. Book-of-the-Month Club, Inc., 555 F.2d 1108 (2d Cir. 1977).

Here, Gillette furnished transparencies or digital duplicates of PIC images to retailers (such as Wal-Mart or ShopKo) for the *express purpose* of providing high quality photographs that those retailers could in turn reproduce in fliers, newspaper circulars, web site pages, and countless other forms of advertising for Gillette products. See Mallette Dep. (Ex. 50) at 74 ("The original intent was to provide the sale force with images that they could provide to accounts for account ads, so when CVS runs a Sunday circular, and you see a Mach III razor, it is an image we provide them…so that we could control the quality."). The labels on the CDs provided to ShopKo – "*Recommended* Retailer Ads January 2003" (emphasis added) – are a case in point. Likewise, a Wal-Mart.com employee testified that the image of the hand mixer discussed above remained on the Wal-Mart.com web site even as of the date of her deposition. Chang Dep. (Ex. 71) at 36. She later identified it as such (id. at 41), when offered a screen shot of the relevant web page (Ex. 74). Placing a copy of PIC's image on the company's site was an act of direct copyright infringement that Gillette "induced, caused, or materially contributed to" by providing Wal-Mart with a high-quality digital file meant for that very purpose.

### C.    PIC is Entitled to a Presumption of Infringement in Missing Evidence.

Finally, having established the above instances of infringement, numerous as they are, the fact is that thousands of other instances – likely several times the 8,683 already identified in

PIC's interrogatory responses – occurred.  Gillette's discovery abuses and spoliation of relevant evidence have made discovery of the full scope of the infringement impossible.  This fact does not, however, leave the Court without power to remedy the wrong.  When a party fails to comply with a discovery order, courts have the power under Federal Rule of Civil Procedure 37(b)(2)(A) to treat matters that were the subject of the order as if they had been established.  See Smith v. Kmart Corp., 177 F.3d 19, 30 (1st Cir. 1999).[13]  The fact that a sanction may cut to the very heart of a case is no reason to deny it.  See, e.g., Jorgensen v. Cassiday, 320 F.3d 906 (9th Cir. 2003) (upholding the decision to sanction a defendant in a claim concerning breach of a joint venture agreement by instructing the jury to take as established the fact that (a) a joint venture existed and (b) the defendant had breached it, thereby leaving jurors to decide only the question of damages).

Particularly troublesome here is the fact that Gillette has been on notice at least since 2002 of a dispute, and indeed promised on more than one occasion to investigate, thereby lulling PIC into a belief that the situation was being addressed.  Gillette then stonewalled and failed to make any attempt whatsoever to address the issue, provide the promised information, or offer any redress for the wrongs done to PIC, and PIC was forced to file suit.  Against that background, to learn in discovery that Gillette has lost (quite possibly since the dispute began) a vast quantity of the relevant evidence leaves it well within the Court's discretion to make substantive findings adverse to Gillette on the issues.  Gillette's own document retention policy from the 1990s (Docket No. 33, Ex. O) – during much of the time PIC was providing licenses to

---

[13] Courts in the First Circuit consider a variety of factors when determining whether or not sanction a party for violating discovery orders.  These include the extent to which (a) the party's conduct was willful, (b) the party has a history of "protracted inaction or deliberate delay," (c) the party has received and ignored earlier warnings about the conduct and possible sanctions, (d) there has been prejudice to the opposing party, and (e) sanctions would serve to deter violations by *other* parties in the future.  Velazquex-Riveria v. Sea-Land Sevices, Inc., 920 F.2d 1072, 1076-79 (1st Cir. 1990).

Gillette and Gillette was violating its obligations – establishes that Gillette was supposed to keep relevant documents for at least three years.[14]  Courts have broad power to sanction conduct that results in the destruction of evidence relevant to the case, even in the event that the destruction occurs as a result of negligence rather than bad faith.  See Sacramona v. Bridgestone/Firestone, Inc., 106 F.3d 444, 447 (1st Cir. 1997) ("[B]ad faith is not essential. If such evidence is mishandled through carelessness, and the other side is prejudiced, we think that the district court is entitled to consider imposing sanctions, including exclusion of the evidence.").  The duty to preserve evidence begins at the very moment that a party gains notice of possible litigation for which the materials at issue would be relevant. See Trull v. Volkswagen of Am., Inc., 187 F.3d 88, 95 (1st Cir. 1999); Silvestri v. General Motors Corp., 271 F.3d 583 (4th Cir. 2001) (dismissing case as sanction for plaintiff's failure to preserve evidence) ("The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation.")

Here, of course, there is no reason to believe – and indeed it would be astoundingly unlikely – that the particular uses, documents, catalogs, sell sheets, and other marketing materials that Gillette has destroyed, discarded, or simply failed to produce would happen to have fewer instances of infringement than those that it did produce.  If anything, the contrary is more plausible.  At a minimum, the ratio of infringements in those materials should be deemed to be the same.

---

[14] Gillette now claims it has no "active" document retention policy.  One wonders which is worse – its violation of the original policy, or its convenient assertion that a company of its size and stature currently has no document retention policy at all.  Presumably most companies of Gillette's magnitude would, while in the process of adopting a new policy, at least retain the old one until a new one is in place.

In short, summary judgment should run not merely to the identified infringements but to those Gillette should be deemed to have engaged in as a result of spoliated evidence.

## IV.    CONCLUSION

PIC granted *limited* licenses, priced accordingly.  Gillette could have come back to PIC and sought license extensions.  Instead, it cavalierly treated PIC's images as its own, and used the images far beyond the scope of the licenses.  For the above reasons, PIC should be granted summary judgment on its claim for copyright infringement, .

Respectfully submitted,

PLAINTIFF
PHOTOGRAPHIC ILLUSTRATORS CORP.

By its counsel,

Dated: <u>April 8, 2005</u>          <u>      /s/ Michael A. Albert             </u>
                                Michael A. Albert, BBO #558566
                                malbert@wolfgreenfield.com
                                Michael N. Rader, BBO # 646990
                                mrader@wolfgreenfield.com
                                Adam J. Kessel, BBO # 661211
                                akessel@wolfgreenfield.com
                                WOLF, GREENFIELD & SACKS, P.C.
                                600 Atlantic Ave.
                                Boston, MA 02210
                                (617) 646-8000