UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHOTOGRAPHIC ILLUSTRATORS CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>THE GILLETTE COMPANY,<br><br>Defendant. | Civil Action No. 04-10913 WGY |
| THE GILLETTE COMPANY,<br><br>Counterclaim-Plaintiff,<br><br>vs.<br><br>PHOTOGRAPHIC ILLUSTRATORS CORPORATION and PAUL PICONE,<br><br>Counterclaim-Defendants. | |

**THE GILLETTE COMPANY'S STATEMENT OF UNDISPUTED FACTS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56 AND DISTRICT OF MASSACHUSETTS LOCAL RULE 56.1 IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

FROSS ZELNICK LEHRMAN & ZISSU, P.C.
    Patrick T. Perkins (Admitted *pro hac vice*)
    David Donahue (Admitted *pro hac vice*)
886 United Nations Plaza
New York, New York 10017
Ph: (212) 813-5900
Fax: (212) 813-5901

GELB & GELB LLP
    Richard M. Gelb (BBO#188240)
    Robert S. Messinger (BBO#651396)
20 Custom House Street
Boston, MA  02110
Tel: (617) 345-0010
Fax: (617) 345-0009
*Attorneys for Defendant/Counterclaim-Plaintiff*
*The Gillette Company*

Defendant The Gillette Company ("Gillette") respectfully submits this Statement of Undisputed Facts pursuant to Federal Rule of Civil Procedure 56 and District of Massachusetts Local Rule 56.1.

| Undisputed Facts | Evidentiary Support |
|---|---|
| 1. PIC began providing photographs of Gillette products to Gillette in 1992, and did so regularly through 2003. | Ex. 7 at 75-199. |
| 2. During the entirety of its relationship with Gillette, PIC performed in excess of 640 separate jobs for Gillette. | Ex. 7 at 67-73. |
| 3. In connection with the first job PIC performed for Gillette, the parties agreed before any work was performed, that Gillette would own unlimited rights in any photographs produced, and that Gillette would keep the original transparencies and negatives provided by PIC. | Ex. 2 at 16-17, 131. |
| 4. The first job performed by PIC for Gillette was in March 1992 and was identified by PIC's internal Job Number 3072. | Ex. 2 at 117. |
| 5. The job was considered an "audition" for PIC. | Ex. 2 at 15. |
| 6. In connection with this job, PIC provided a written estimate prior to performing the work. | Ex. 13. |
| 7. The reverse of the written estimate | Ex. 15 ¶¶ 10-11. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| contained purported "Terms and Conditions" (hereinafter the "Boilerplate") including, inter alia, a limitation to use of photographs to one year in the United States, and a purported requirement that the recipient of the invoice return all original transparencies and negatives within 30 days, failing which, the recipient was required to pay $1,500 per transparency and negative. | |
| 8.   That estimate was revised and the parties agreed that Gillette would "buy-out" all of PIC's reproduction rights, meaning that Gillette would have "unlimited time and unlimited usage rights" in the photos. | Ex. 2 at 131. |
| 9.   Gillette's representative signed the revised estimate. | Ex. 14. |
| 10.   After PIC performed the job, it sent an invoice to Gillette, which contained the Boilerplate on the reverse side of the invoice. | Ex. 5. |
| 11.   The words "buyout" or "unlimited usage" do not appear on the face of the invoice. | Ex. 5. |
| 12.   Next to the terms "period of use" on the face of the invoice are the letters "N/A," | Exs. 5; 2 at 138. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| which means "not applicable." | |
| 13.  Although the one-year restriction language was in the Boilerplate on the invoice for this job, such restriction did not apply to the job. | Ex. 2 at 138-39. |
| 14.  The provisions in paragraph 10 and 11 of the Boilerplate did not apply to the first job performed. | Ex. 2 at 16-17, 131. |
| 15.  On the next job PIC performed for Gillette in April 1992, identified by Job Number 3088, PIC did not verbally express to Gillette any limitation on the usage of the photograph. | Ex. 2 at 140, 142. |
| 16.  On the face of the invoice for the second job PIC performed for Gillette, the "period of use" is again identified as "N/A." | Ex. 15. |
| 17.  On virtually every job performed in 1992, 1993, and through part of 1994, the "period of use" was similarly identified as "N/A." | Ex. 6. |
| 18.  PIC never told Gillette that "N/A" did not mean Gillette could use the photographs for an unlimited period of time. | Ex. 2 at 155. |
| 19.  In 1994, PIC replaced "N/A" with the letters "T&C." | Ex. 16. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| 20. When PIC replaced "N/A" with the letters "T&C," there was no prior discussion with Gillette limiting the use of photographs to one year. | Tattan Decl. ¶ 6. |
| 21. No PIC employee or representative ever told Gillette prior to any given job, that its use of photographs could be used for only one year. | Tattan Decl. ¶ 6. |
| 22. Before the second job it performed for Gillette, PIC did not tell Gillette that the Boilerplate provisions relating to the return of photographs within 30 days or the purported $1,500 penalty for loss of photographs would apply. | Ex. 2 at 142. |
| 23. Paul Picone never discussed paragraph 10 of the Boilerplate with any Gillette employee. | Ex. 1 at 42. |
| 24. On every job PIC performed for Gillette, PIC would first perform the work and provide original transparencies, negatives and/or digital photographic materials to Gillette and some time thereafter, would forward an invoice to Gillette for payment. | Ex. 2 at 110:3-9. |
| 25. PIC claims that the Boilerplate located on | Dkt. No. 18 (2d Am. Compl., hereinafter, |

| Undisputed Facts | Evidentiary Support |
|---|---|
| the reverse of its invoices represents the contracts between PIC and Gillette governing the use and disposition of PIC's photographs. | "SAC") ¶ 9. |
| 26.  PIC further alleges that on each occasion that PIC provided photographs to Gillette, it did so pursuant to the Boilerplate and that each occasion represented a separate agreement between PIC and Gillette, "such that Gillette and PIC entered into hundreds of Agreements over the years." | SAC ¶ 9 |
| 27.  According to PIC, the Boilerplate places a number of conditions upon Gillette's use of the photographs provided by PIC, including but not limited to: (1) duration of the license to the photograph is limited to one year and territory is limited to the United States, unless stated otherwise on the face of the invoice; (2) photographs must be returned within thirty (30) days of first publication (if no other return date appears on the face of the invoice); and (3) Gillette's failure to return the Photographs within thirty (30) days of first publication "entitles PIC to liquidated damages of | SAC ¶¶ 9, 14, 15; Ex. 5 ¶¶ 10, 11. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| $1,500 per photograph." | |
| 28. On September 23, 2004, the Court held that PIC's "breach of contract claim is preempted by the Copyright Act, but only to the extent that it is premised on Gillette's use of [PIC's] photos outside the temporal and geographic scope of the licenses and without the required copyright notices." | 9/23/04 Tr. at 9. |
| 29. The only remaining portion of PIC's breach of contract claim arises from Gillette's alleged failure to return original negatives and transparencies within 30 days of first publication. | 9/23/04 Tr. at 9. |
| 30. From 1992 to 2002, PIC never enforced the purported Boilerplate condition that Gillette return photographic materials in 30 days. | Ex. 1 at 29-31. |
| 31. From 1992 to 2002, PIC never charged Gillette $1,500 for each negative or transparency not returned in 30 days. | Ex. 1 at 29-31. |
| 32. PIC made a decision not to require return of photographic materials within 30 days because it wanted to continue the relationship with Gillette. | Ex. 1 at 40; Ex. 2 at 133-34. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| 33.  Notwithstanding the fact that Gillette did not return any of PIC's photographic materials within 30 days of first publication, PIC continued to provide photographs to Gillette for years. | Ex. 1 at 40; Ex. 2 at 133-34. |
| 34.  On at least one occasion, PIC requested the return of a photograph from Gillette. Gillette did not return the photograph but PIC took no action. | Ex. 2 at 20-22. |
| 35.  PIC did not provide Gillette any written inventory of materials upon their delivery to Gillette. | Tattan Decl. ¶ 4. |
| 36.  PIC did not alert Gillette with any writing on the packages containing its photographic materials that Gillette's failure to return the materials within 30 days would require Gillette to pay PIC $1,500 per image. | Tattan Decl. ¶ 4. |
| 37.  PIC did not keep a contemporaneous log of what was provided to Gillette. | Ex. 7 at 199. |
| 38.  For purposes of this litigation, PIC has attempted to reconstruct what photographic materials it provided to Gillette. | Ex. 7 at 199. |
| 39.  PIC alleges in its complaint that the | SAC ¶¶ 10, 23, 49. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| copyright license granted to Gillette was limited to one-year. | |
| 40. Gillette provided copies of its 1995, 1996, 1997, 1998, 1999, 2000, 2001 and 2002 yearly Braun catalogs to PIC within one year of each catalog's respective production date. | Ex. 2 at 80-109; Exs. 17, 22; Ex. 19 at 107-109. |
| 41. PIC claims that such catalogs contained numerous PIC photographs used outside PIC's one-year limit. | Ex. 7 at 35-44; Exs. 17, 22. |
| 42. PIC personnel reviewed Gillette's catalogs provided to PIC by Gillette. | Ex. 22; Ex. 2 at 87, 92. |
| 43. PIC did not object to Gillette concerning the use of its photographs in the catalogs outside PIC's one-year license. | Ex. 2 at 73-74, 77, 87, 92; Ex. 19 at 107-09, 113-14. |
| 44. PIC alleges in its complaint that the copyright license granted to Gillette was limited to use in the United States. | SAC ¶¶ 10, 23, 49. |
| 45. Braun's 1995, 1996, 1997, 1998 and 1999 catalogs that PIC produced from its files each prominently contained the address of Braun Canada on the back cover. | Ex. 17. |
| 46. Without objecting or increasing its purported licensing fees, PIC knew that Gillette was sending photographic | Exs. 17, 18; Ex. 19 at 113-14, 123. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| transparencies to a Braun project manager and to a Gillette vendor, both located in Canada. | |
| 47.  Without objecting or increasing its purported licensing fees, PIC sent transparencies to Gillette's offices in the Dominican Republic. | Ex. 20. |
| 48.  Without objecting or increasing its purported licensing fees, PIC was aware of Gillette's alleged use of one of its images in Spanish-language marketing material as early as 1998. | Ex. 2 at 200-02. |
| 49.  PIC claims that its licenses were limited to Gillette and that use by third parties of photographs provided to Gillette constitutes copyright infringement by Gillette. | Ex. 7 at 4, 45-54. |
| 50.  On numerous occasions throughout 1992-2002, PIC either provided photographs to Gillette that PIC knew were to be used by third party sellers of Gillette's products or directly provided photographs to Gillette's vendors for their use without any increase in fees. | Ex. 19 at 110-12, 118, 127; Ex. 21. |
| 51.  Such third-party vendors of Gillette's | Ex. 21. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| products include, Bloomingdale's, Costco, CVS, Dillard's, Duane Reade, Eckerd, Filene's, Fortunoff, Hecht's, K-Mart, Lowe's, QVC, Staples, and Wal-Mart. | |
| 52. PIC never enforced the alleged prohibition on third party use nor made any written alteration to the Boilerplate to indicate any change in any agreement between the parties to accommodate third party use. | Ex. 19 at 110-14, 118, 127; Ex. 21. |
| 53. PIC alleges in its complaint that the copyright license granted to Gillette required Gillette to acknowledge PIC's ownership of copyright with "proper copyright notices." | SAC ¶ 10. |
| 54. Prior to performing work for Gillette, PIC was told that "it would be difficult" to place an acknowledgement of PIC's copyright on Gillette's selling materials. | Ex. 1 at 58. |
| 55. PIC never told Gillette it would not do further work for it unless credited, even after PIC was aware that Gillette was not providing such credit. | Ex. 1 at 59; Ex. 2 at 86. |
| 56. PIC kept in its files copies of Gillette Catalogs from 1995 – 2002, that it received from Gillette within one year of | Ex. 2 at 73-74, 77, 87 92; Exs. 17, 22. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| production and that it reviewed when received. | |
| 57.  None of these catalogs contain any copyright notice acknowledging PIC's copyright ownership. | Exs. 17, 22. |
| 58.  PIC never took any action against Gillette to enforce the purported notice requirement. | Ex. 1 at 59; Ex. 2 at 86-87. |
| 59.  PIC claims that paragraph 11 of the Boilerplate requires payment of $1,500 for each "original transparency or negative" not returned within 30 days of first publication. | Ex. 5 ¶¶ 10-11. |
| 60.  The amount never had any relationship to any actual loss suffered by PIC. | Ex. 1 at 45. |
| 61.  PIC's corporate designee testified that he had "no idea" what the basis was for the $1,500 set as the damages amount. | Ex. 1 at 45. |
| 62.  At deposition, PIC's corporate designee referred to the $1500.00 amount as "boilerplate." | Ex. 1 at 46. |
| 63.  At deposition, PIC's corporate designee conceded the liquidated damages amount was not intended to replace a negative or transparency that has been lost. | Ex. 1 at 46. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| 64. PIC testified that the amount reflects a "license fee" to Gillette. | Ex. 1 at 50. |
| 65. A "license fee" to Gillette has no connection whatever to any loss suffered by PIC by virtue of any loss of original negatives or transparencies or delay in returning them. | Ex. 1 at 52. |
| 66. When asked for the "business basis" for charging $1,500 per lost transparency or negative, PIC referred only to the Boilerplate found on the reverse of its invoices. | Ex. 1 at 52. |
| 67. PIC testified that it kept a "duplicate copy" of "every view that was taken during [a] particular project" and that it "maintained an original copy for duplicating." | Ex. 1 at 28-29, 47-48. |
| 68. PIC further conceded that it maintained an original copy of every job it performed for Gillette. | Ex. 1 at 28-29. |
| 69. PIC testified that it kept "an original" of every shot provided to Gillette, and did not object to Gillette's counsel's statement in a question that PIC "kept one original of everything." | Ex. 1 at 47-48. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| 70.  Beginning in 1997, PIC kept a high resolution, digital copy of everything PIC ever shot for Gillette. | Ex. 2 at 218-19. |
| 71.  PIC began to creating digital copies because "clients started asking for scanned images rather than ektachrome [transparencies]." | Ex. 2 at 218. |
| 72.  PIC considers these digital images to be "original" and "reproducible" just as any transparency or negative. | Ex. 1 at 82. |
| 73.  In correspondence with Gillette, PIC explained that its digital scans were suitable for any form of duplication Gillette might wish to make, with the exception of large format trade show displays. | Ex. 23. |
| 74.  For any image provided to Gillette beginning in 1997, PIC has suffered no loss since it retained a high resolution digital copy that PIC deems to be "original and "reproducible." | Ex. 1 at 82. |
| 75.  PIC concedes that during a ten-year period from 1992-2002, it never insisted upon the return of any original negative or transparency. | Ex. 1 at 29-31. |

13

| Undisputed Facts | Evidentiary Support |
|---|---|
| 76. In 2000, PIC ceased maintaining the high resolution digital scans of all of the work performed for Gillette because, according to PIC's corporate representative, "[n]o one was requesting them.  I wasn't being called and I wasn't doing a lot of business with Gillette, so I just let them fall by the waist [sic] side." | Ex. 2 at 200-21. |
| 77. PIC further testified that the disks containing the high resolution digital scans are "[p]robably [in] total degradation by this time." | Ex. 2 at 220. |
| 78. In discovery in this action, PIC did not produce copies of the "I OMEGA disks" containing the high resolution scans of PIC images of Gillette products. | Ex. 2 at 219-220. |
| 79. PIC claims it is entitled to $1,500 for each of the 191 original negatives and transparencies returned to PIC on June 27, 2003, because they were not returned within 30 days of PIC's purported demand. | Ex. 7 at 64-66. |
| 80. PIC testified that it is not making use of the photographs referenced in the paragraph above and that "[t]hey're in | Ex. 2 at 261. |

| **Undisputed Facts** | **Evidentiary Support** |
|---|---|
| storage somewhere." | |
| 81.  PIC could not point to any actual damage it suffered from Gillette not having returned the original transparencies and negatives within 30 days of its request, stating only "they didn't live up to the terms and conditions of their agreement. They were supposed to return them immediately and they waited quite a while before they were returned." | Ex. 2 at 260-61. |
| 82.  PIC did not have occasion to utilize the 191 original negatives and transparencies between the purported 2002 demand and their return in June 2003.  Instead, PIC testified that Gillette might have "duplicated everything that they sent back" and that "they didn't live up to the terms and conditions of our agreement. . . . They broke contractual law." | Ex. 2 at 261-62. |
| 83.  In Interrogatory No. 7, Gillette requested PIC to "[i]dentify any and all uses [PIC has] made of any photo prepared for Gillette, including but not limited to: (a) the content of the photo used; (b) the job number associated with such photo; (c) the | Ex. 25 at 15. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| date of such use; (d) in what media such photo was used; (e) the number of copies distributed; (f) the geographic scope of distribution; (g) the identify of each recipient of such photo; (h) any revenues received in connection with [PIC's] reproduction and/or distribution of such photos." | |
| 84.  In response to Interrogatory 7, PIC did not identify a single photograph provided to Gillette that it has itself used. | Ex. 25 at 16. |
| 85.  In its response to Interrogatory 7, PIC claims it "cannot have 'used' images that are in Gillette's possession." | Ex. 25 at 16. |
| 86.  In its response to Interrogatory 7, PIC claims that by "retaining its images, PIC can prevent Gillette from making unauthorized copies or from engaging in unauthorized distribution, thereby infringing PIC's copyrights." | Ex. 25 at 16. |
| 87.  In response to Interrogatory 7, PIC claims that "photos are included in PIC's portfolio book, which it shows to prospective clients to establish its credentials and obtain business." | Ex. 25 at 16. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| 88. PIC further conceded that it does not have a standing portfolio book but makes one up as needed. | Ex. 2 at 102-03. |
| 89. At deposition, PIC admitted that it only includes the "final printed piece" in its portfolio that it "wouldn't put a transparency in [its] portfolio." | Ex. 2 at 32. |
| 90. PIC's portfolio needs have nothing to do with its purported requirement that Gillette return negatives and transparencies in 30 days. | |
| 91. In response to Interrogatory 7, PIC claims that it "has had numerous inquiries by third parties to purchase such images for use as stock photos. PIC has repeatedly been forced to decline these inquiries" because of Gillette's purported refusal to return the transparencies. | Ex. 25 at 16. |
| 92. At deposition, PIC testified that it could recall no stock requests that it received since 1992. | Ex. 2 at 28. |
| 93. In response to Interrogatory 7, PIC claims that it reviews images to generate ideas for use in projects for other clients. | Ex. 25 at 16. |
| 94. By order dated March 3, 2005, the Court | March 3. 2005 Order Re: Gillette Motion to |

| Undisputed Facts | Evidentiary Support |
|---|---|
| ordered PIC to produce all documents referred to in its responses to Gillette's Interrogatories Nos. 1 and 2 and to supplement its responses to "state the basis for" each of its copyright and contract claims. | Compel. |
| 95. The Court also has held that "[t]he Order is clear that, unless promptly supplemented with express and detailed factual claims, the plaintiff will be limited at trial to the production of the documents specifically identified" in answer to Gillette's interrogatories concerning its copyright and contract claims. | March 8, 2005 Order Re: Motion for Clarification. |
| 96. PIC's Supplemental Response to Interrogatory 1, its copyright infringement claims are organized as follows: (1) Gillette's alleged unauthorized creation of duplicate transparencies and slides; (2) Gillette's alleged unauthorized duplication of digital images; (3) Gillette's alleged unauthorized reproduction of PIC images in catalogs beyond the scope of PIC's license; (4) use by Gillette or by a third party of PIC's images on the Internet; (5) | Ex. 7 at 3-59. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| Gillette's alleged supply of PIC images to third parties; (6) Gillette's alleged use of PIC images on foreign web sites; (7) Gillette's alleged Latin American use; (8) Gillette's alleged use of PIC images in foreign catalogs; (9) Gillette's use of images provided to Gillette in Spring 2004; and (10) Gillette's alleged use of PIC images on product packaging. | |
| 97. PIC claims copyright infringement based upon alleged duplicates of PIC images made for Gillette by PIC's preferred photo lab, Advanced Photographics, between January 1998 and March 2000. | Ex. 7 at 16-29. |
| 98. PIC knew no later than 2000 that Advanced Photographics was allegedly making unauthorized duplicates of PIC's images for Gillette. | Ex. 3 at 11-12; Ex. 4 at 5-6, 10-16; Ex. 2 at 186-87. |
| 99. Jason Roopenian, the Vice President of Advanced Photographics testified at his deposition that when he was made aware that Gillette was making duplicates of PIC's images he informed PIC's president, Paul Picone. | Ex. 3 at 11-12 |
| 100. Joseph Gannuscio, a managerial employee | Ex. 4 at 5-6, 10-16. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| at Advanced Photographics between 1994 and 2001, similarly testified that he had alerted Paul Picone that Gillette was ordering duplicates of PIC's images directly. | |
| 101. PIC testified at deposition that Mr. Gannuscio had contacted him "several times over duplicating of images from – actually not only Gillette but Sylvania, also." | Ex. 2 at 186-87. |
| 102. No duplicates of any PIC images were made for Gillette by Advanced Photographics after March 2000. | Ex. 7 at 16-29; Ex. 3 at 91. |
| 103. PIC alleges copyright infringement based upon Gillette's use of PIC's photographs in catalogs dated 1996-2002. | Ex. 7 at 33-44. |
| 104. Each of the catalogs for which PIC claims copyright infringement was produced from PIC's own files. | Ex. 7 at 33-44; Exs. 17 & 22. |
| 105. PIC testified at deposition that it received catalogs "within a year" of production and that he would "thumb through them" upon receipt. | Ex. 2 at 73-74, 87. |
| 106. PIC claims copyright infringement based upon alleged use of one of its photographs | Ex. 7 at 55-56. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| in a Spanish-language publication. | |
| 107. PIC has possessed the allegedly infringing publication since 1998. | Ex. 2 at 200-02. |
| 108. PIC does not own copyright registrations for the images that form the basis for its copyright infringement claims based on the transparencies and slides from Gillette's files that were produced to PIC for review as early as February 15, 2005 and which are listed on the chart on pages 5-15 of PIC's Supplemental Response to Interrogatory No. 1. | Ex. 7 at 5-15 |
| 109. PIC does not own copyright registrations for the images that form the basis for its copyright infringement claims based on the alleged creation of unauthorized duplicates for Gillette by Advanced Photographics. | Ex. 7 at 16-29. |
| 110. PIC does not own copyright registrations for the images that form the basis for its copyright infringement claims based on the so-called "digital images." | Ex. 7 at 29-33. |
| 111. PIC does not own copyright registrations for the images that form the basis for its copyright infringement claims based on a | Ex. 7 at 35-44. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| number of the alleged infringements in catalogs. | |
| 112. PIC does not own copyright registrations for the images that form the basis for its copyright infringement claims based on a number of the alleged Internet infringements. | Ex. 7 at 49-51. |
| 113. PIC does not own copyright registrations for the images that form the basis for its copyright infringement claims based on the alleged third party infringements. | Ex. 7 at 51-53. |
| 114. PIC does not own copyright registrations for the images that form the basis for its copyright infringement claims based on the alleged foreign web site uses. | Ex. 7 at 54. |
| 115. PIC does not own copyright registrations for the images that form the basis for its copyright infringement claims based on the alleged product packaging infringements. | Ex. 7 at 58-59. |
| 116. In stating the basis of its copyright infringement claims relating to the creation of duplicates, PIC did not provide proof that duplicates were created by Gillette beyond the alleged one-year | Ex. 7 at 5-23. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| license period. | |
| 117.  PIC's copyright infringement claims based upon alleged unauthorized duplication do not identify the job number of any of the photographs allegedly copied. | Ex. 7 at 5-23. |
| 118.  PIC's copyright infringement claims based upon alleged unauthorized duplication do not provide any documentation demonstrating that PIC actually authored the images at issue. | Ex. 7 at 5-23. |
| 119.  PIC's copyright infringement claims based upon alleged unauthorized duplication of digital images do not identify the job number of any of the photographs allegedly copied. | Ex. 7 at 30-32. |
| 120.  PIC's copyright infringement claims based upon alleged unauthorized duplication of digital images do not provide any documentation demonstrating that PIC actually authored the images at issue. | Ex. 7 at 30-32. |
| 121.  PIC's copyright infringement claims based upon alleged third party uses do not identify the job number of any of the photographs allegedly copied. | Ex. 7 at 52-53. |
| 122.  PIC's copyright infringement claims based | Ex. 7 at 52-53. |

| Undisputed Facts | Evidentiary Support |
| --- | --- |
| upon alleged third party uses do not provide any documentation demonstrating that PIC actually authored the images at issue. | |
| 123.  PIC's copyright infringement claims based upon alleged foreign web site use do not identify the job number of any of the photographs allegedly copied. | Ex. 7 at 54. |
| 124.  PIC's copyright infringement claims based upon alleged foreign web site use do not provide any documentation demonstrating that PIC actually authored the images at issue. | Ex. 7 at 54. |
| 125.  When questioned at deposition about the alleged third party infringements listed in its Supplemental Interrogatory Responses, PIC's corporate designee testified that the only way to determine whether the images listed were actually PIC images was for him to "match it up with a visual" but that he had not done so. | Ex. 2 at 240-41. |
| 126.  When questioned at deposition about the alleged third party infringements listed in its Supplemental Interrogatory Responses, PIC's corporate designee testified that he | Ex. 2 at 241. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| had made no effort to match the images to any of PIC's job numbers. | |
| 127. Many of PIC's copyright infringement claims relating to catalogs do not identify the job number of any of the photographs allegedly copied. | Ex. 7 at 35-44. |
| 128. Many of PIC's copyright infringement claims relating to catalogs do not provide any documentation demonstrating that PIC actually authored the images at issue. | Ex. 7 at 35-44. |
| 129. Many of PIC's copyright infringement claims relating to web sites do not identify the job number of any of the photographs allegedly copied. | Ex. 7 at 49-51. |
| 130. Many of PIC's copyright infringement claims relating to web sites do not provide any documentation demonstrating that PIC actually authored the images at issue. | Ex. 7 at 49-51. |
| 131. PIC has presented no evidence of what photographs are the subject of Copyright Registration VA1-256-101 | Exs. 26. |
| 132. PIC has presented no evidence of what photographs are the subject of Copyright Registration VA1-256-146. | Exs. 27. |
| 133. PIC has presented no evidence of what | Exs. 28. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| photographs are the subject of Copyright Registration VA1-256-147. | |
| 134. PIC's corporate designee testified that by just by looking at these above-referenced Copyright Registrations he could not tell what job number any of the photographs came from or whether PIC ever provided the photographs purportedly registered to Gillette. | Ex. 2 at 48-56. |
| 135. In connection with job number 5478, PIC claims to have photographed the dollop of shaving cream that appears on Gillette's FOAMY shaving cream can. | Ex. 7 at 58, left-hand photo. |
| 136. In an e-mail dated November 17, 2000, Gillette requested PIC to photograph its new FOAMY shaving cream can and provided PIC with a sample brochure picturing the can as well as product samples for the photo shoot. | Ex. 29 at PIC 7888-93. |
| 137. On November 27, 2000, after PIC had taken photographs of Gillette's FOAMY shaving cream can and had provided the photographic transparencies to PIC, Gillette requested PIC to take photographs of dollops of shaving cream that looked | Ex. 29 at PIC 7889. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| like the dollop of shaving cream on the FOAMY shaving cream can. | |
| 138. The dollop of shaving cream on the FOAMY shaving cream can pictured in Gillette's Supplemental Response to Interrogatory No. 2 was not created by PIC. | Ex. 7 at 58, left-hand photo; Ex. 29 at 7888-94. |
| 139. In connection with job number 5478, PIC claims to have photographed the dollop of shaving cream that appears on the GILLETTE SERIES shaving cream can. | Ex. 7 at 58, right-hand photo. |
| 140. The "dollop" of shaving cream on the GILLETTE SERIES shaving cream can pictured in PIC's Supplemental Interrogatory is identical to the dollop of shaving cream pictured on Gillette's old FOAMY shaving cream can. | *Compare* Ex. 7 at 58, right-hand photo, *with* Ex. 30 at PIC 7031. |
| 141. Gillette provided the old FOAMY shaving cream can (containing the dollop of shaving cream on the can) to PIC in connection with job number 5367, which PIC performed in August 2000, over two months before Gillette asked PIC to photograph dollops of shaving cream. | Ex. 30; Ex. 29 at PIC 7895. |
| 142. The dollop of shaving cream on the | *Compare* Ex. 7 at 58, right-hand photo, *with* Ex. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| GILLETTE SERIES shaving cream can pictured in Gillette's Supplemental Response to Interrogatory No. 2 was not provided by PIC. | 30 at PIC 7031. |
| 143. PIC claims that Gillette's current MACH III product packaging is based on packaging that PIC alleges to have helped design for Gillette's MACH III COOL BLUE packaging in connection with job number 5219, which PIC performed in September 2000. | *See* Ex. 7 at 59; Ex. 33. |
| 144. In April 2000, Gillette provided its MACH III product in its packaging to PIC in connection with another project. | Ex. 32. |
| 145. The MACH III packaging that Gillette provided to PIC in April 2000 is substantively identical to its current MACH III packaging. | *Compare* Ex. 32 at PIC 5460 *with* Ex. 31 ¶ 9. |
| 146. Gillette's current MACH III packaging is not based on any packaging designed by PIC. | Exs. 31-33. |
| 147. PIC claims that in March 2001, Gillette employee Anna Madden told Paul Picone that Gillette was "experiencing a reduced need for duplicates" while, in fact, Gillette | SAC ¶¶ 59-62; Ex. 25 at 10-11. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| was allegedly obtaining duplicates of PIC images directly from sources such as Advanced Photographics. | |
| 148. The date of the last Advanced Photographics invoice alleged by PIC to establish Gillette's improper duplication or photographs is February 16, 2000 – more than one year prior to Ms. Madden's alleged misstatements to Mr. Picone. | Ex. 7 at 16-29; Ex. 3 at 91. |
| 149. PIC was aware of Gillette's duplication of PIC images no later than February 2000. | Ex. 2 at 186-87; Ex. 4 at 10-16; Ex. 3 at 11-12. |
| 150. PIC claims that Gillette's in-house attorneys made false statements to PIC concerning PIC's claims and that PIC relied upon such statements in delaying the filing of the instant suit. | SAC ¶¶ 66-68. |
| 151. In the fall of 2002, PIC was under the impression that it would no longer be given work by Gillette. | Ex. 2 at 266. |
| 152. After perceiving that it would no longer be given work by Gillette, PIC in 2002 claimed for the first time that the Boilerplate governed the parties' dealings. | Ex. 1 at 29-30. |
| 153. After perceiving that it would no longer be given work by Gillette, PIC in 2002 that | Ex. 1 at 29-30. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| the Boilerplate's requirement that Gillette return PIC's transparencies and negatives within 30 days of first publication was in fact in effect. | |
| 154. PIC did not make a formal written demand to Gillette until June 23, 2003, when it sent a letter to various Gillette employees alleging use of PIC photographs in ways "inconsistent" with the terms of a purported agreement. | Ex. 8. |
| 155. PIC alleged in the June 23, 2003, letter that Gillette was required to return photographic materials within 30 days and that, failing the return of its photographs, PIC was entitled to $1,500 for each original image. | Ex. 8. |
| 156. On June 26, 2003, Gillette returned to PIC the photographic materials it could find. | Ex. 9. |
| 157. On August 5, 2003, PIC's attorney, Michael Albert, sent a letter to Gillette's in-house counsel stating that PIC had not opened the box of photographs provided by Gillette and asking for an "index" of items included in the June 26, 2003 package to PIC, asking Gillette to check | Ex. 10. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| such index against PIC's list of job numbers, requesting a second shipment of photographic materials, and reiterating PIC's claims that there were "numerous instances in which Gillette used PIC's photographs outside of the limitations imposed by the contracts." | |
| 158. In response, on August 13, 2003, John B. Gatlin, a Gillette in-house attorney, explained that Gillette was having difficulty gathering PIC's photographs and requested that PIC provide more specificity so that Gillette could more easily gather the requested materials. | Ex. 11. |
| 159. In the August 13, 2003 letter, Mr. Gatlin also stated that Gillette was conducting an internal investigation and had been unable to find any instance of any misuse of PIC's photographs but would continue to investigate and would forward any "relevant information" as it became available. | Ex. 11. |
| 160. More than one month later, on September 29, 2003, Mr. Albert responded to Mr. Gatlin's August 13, 2003 letter claiming | Ex. 12. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| to be "puzzled" by Gillette's intentions since PIC's counsel had heard nothing further from Gillette since the August 13 letter.  Mr. Albert also refused to provide Gillette with the information requested by Mr. Gatlin in the August 13 letter. | |
| 161.  There was no written correspondence between PIC's counsel and Gillette counsel from September 30, 2003 through May 7, 2004. | Exs. 8-12. |
| 162.  On May 18, 2004, eleven days after PIC commenced this action against Gillette, Mr. Albert sent a letter to Mr. Bechet purporting to confirm the content of their conversation on that day.  Among other things, Mr. Albert claimed that, during their telephone conversation, Mr. Bechet had "confirmed Michelle Bratton's previous representation to [PIC] that an *index* has been prepared within Gillette of the photographic materials belonging to our client that Gillette has located and gathered during its *investigation*…. You were not willing, however, to provide that *index* to us at this time." | Ex. 34 |

| Undisputed Facts | Evidentiary Support |
|---|---|
| 163. On May 19, 2004, in response to Mr. Albert's letter, Mr. Bechet wrote: "I enjoyed our conversation. In reply to yours of the 18th, please be advised that no representation was made to you regarding an 'investigation' undertaken by Gillette. Also, no representation was made to you regarding an index of photographic materials belonging to your client." | Ex. 35 |
| 164. Mr. Bechet was *not* referring to any prior statement made by Mr. Gatlin concerning Gillette's investigation, but was disputing PIC's counsel's purported record of the parties' telephone conversation. | Ex. 35. |
| 165. Mr. Albert did not respond to Mr. Bechet's letter. | |
| 166. At his deposition, Mr. Picone testified that the correspondence he and his counsel sent to Gillette was intended to bring about an amicable resolution of the dispute. | Ex. 2 at 269-273; Exs. 8-12, 34-35. |
| 167. In the Spring of 2004, PIC agreed to perform a series of additional jobs for Gillette as a gesture of goodwill (the | SAC ¶¶ 34-37. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| "Spring 2004 Jobs"). | |
| 168. The jobs were completed by March 2, 17, 22, and April 20, 2004, respectively. | SAC ¶ 42. |
| 169. After filing its complaint, PIC forwarded to Gillette the invoices for the Spring 2004 Jobs. Because the Invoices appeared to overcharge Gillette, and because PIC and Gillette were in litigation, Gillette has not paid the invoices. | Dkt. No. 24 ¶¶ 27. |
| 170. PIC's Second Amended Complaint alleges, inter alia, the following claims for breach of contract: (1) Gillette has failed to return PIC's original negatives and transparencies within 30 days of publication and, as a result, Gillette is required to pay $1,500 for each such original negative or transparency; (2) Gillette has breached its agreements with PIC by using PIC's images outside the temporal and geographic scope of the copyright license; and (3) Gillette did not include a copyright notice on the photographs acknowledging PIC's ownership of copyrights. | SAC ¶¶ 14-15, 19-27; 53-54, 56. |
| 171. PIC originally based its chapter 93A claim | SAC ¶¶ 70-75. |

| Undisputed Facts | Evidentiary Support |
|---|---|
| on the same conduct that formed the basis for its copyright, breach of contract and fraud claims. | |
| 172.  The Court dismissed plaintiff's Chapter 93A claim as preempted by the Copyright Act "to the extent it is based upon Gillette's reproduction and continued use of the copyrighted photos without [PIC's] permission." | 9/23/04 Tr. at 8:7-10. |
| 173.  PIC's remaining Chapter 93A claim, which is based on Gillette's alleged failure to return PIC's photographs and alleged misrepresentations to PIC by Anna Madden, by Gillette's in-house counsel, and in connection with the Spring 2004 Projects. | SAC ¶¶ 70; 9/23/04 Tr. at 8 |

Dated:  April 8, 2005

FROSS ZELNICK LEHRMAN & ZISSU, P.C.

By:__/s/Patrick T. Perkins/_____
    Patrick T. Perkins (Admitted *pro hac vice*)
    David Donahue (Admitted *pro hac vice*)
886 United Nations Plaza
New York, New York 10017
Ph: (212) 813-5900
Fax: (212) 813-5901

GELB & GELB LLP

By:___/s/Richard M. Gelb/_____
    Richard M. Gelb (BBO#188240)
    rgelb@gelbgelb.com

Robert S. Messinger (BBO# 651396)
rmessinger@gelbgelb.com

20 Custom House Street
Boston, MA  02110
Tel: (617) 345-0010
Fax: (617) 345-0009

*Attorneys for Defendant/Counterclaim-Plaintiff*
*The Gillette Company*

I:\ddonahue\GLTC\COURT DOCS\050407-0420298-pld-56.1 Statement-dd.doc