UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHOTOGRAPHIC ILLUSTRATORS CORPORATION,<br><br>      Plaintiff,<br><br>  vs.<br><br>THE GILLETTE COMPANY,<br><br>      Defendant. | Civil Action No. 04-10913 WGY |
| THE GILLETTE COMPANY,<br><br>      Counterclaim-Plaintiff,<br><br>  vs.<br><br>PHOTOGRAPHIC ILLUSTRATORS CORPORATION and PAUL PICONE,<br><br>      Counterclaim-Defendants. | |

**THE GILLETTE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

FROSS ZELNICK LEHRMAN & ZISSU, P.C.
    Patrick T. Perkins (Admitted *pro hac vice*)
    David Donahue (Admitted *pro hac vice*)
886 United Nations Plaza
New York, New York 10017
Ph: (212) 813-5900
Fax: (212) 813-5901

GELB & GELB LLP
    Richard M. Gelb (BBO#188240)
    Robert S. Messinger (BBO#651396)
20 Custom House Street
Boston, MA  02110
Tel: (617) 345-0010
Fax: (617) 345-0009
*Attorneys for Defendant/Counterclaim-Plaintiff*
*The Gillette Company*

**Preliminary Statement**

For more than 10 years, plaintiff Photographic Illustrators Corporation ("PIC") provided photographs of Gillette's own products to Gillette. During that period, PIC claims to have performed 648 separate jobs for Gillette. Well after PIC completed each individual job Gillette, it submitted invoices for payment that contained supposed boilerplate terms and conditions on the reverse. PIC claims that each of the 648 invoices constitutes a separate, binding contract entered into between Gillette and PIC. Among the purported terms and conditions is a requirement that the recipient return original transparencies and negatives within 30 days, failing which, PIC was entitled to $1,500 per transparency or negative. For over a decade, PIC *never* enforced this provision. Yet PIC now believes it is entitled to more than $15 million for Gillette's failure to return photographs within 30 days provided since 1992. PIC similarly failed to enforce the other conditions upon which it now seeks to rely in this lawsuit, yet would have the Court and a jury sit through days of testimony concerning its 648 separate alleged agreements. Because plaintiff waived the conditions it now seeks to resurrect and because its claims are deficient as a matter of law, the Court, a jury, and Gillette should not be subjected to a lengthy trial concerning boilerplate language that never governed the parties' actions.

**UNDISPUTED FACTS**

PIC regularly provided photographs of Gillette products to Gillette in 1992 through 2003. (Ex. 7 at 75-199.) Throughout its relationship with Gillette, PIC performed over 640 separate jobs. (*Id*. at 67-73.) In connection with the first job PIC performed for Gillette, the parties agreed *before* any work was performed that Gillette would own unlimited rights in any photographs produced, and that Gillette would keep the original transparencies and negatives provided by PIC. (Ex. 2 at 16-17, 131.) After the parties so agreed, and after PIC provided the photographs, PIC submitted an invoice for payment. (Ex. 5.) The reverse of the invoice contained purported "Terms and Conditions" (the "Boilerplate") including, *inter alia*, a limitation on use of photographs to one year in the United States, and a requirement that the recipient of the invoice return all original transparencies and negatives within 30 days (the "Purported 30-day Return Requirement"), failing which, the recipient was required to pay $1,500

per transparency and negative (the "Late Penalty"). (*Id.* ¶¶ 10-11.) It is undisputed that the above provisions *did not apply* to the first job. (Ex. 2 at 16-17, 131.)

Before the second job, PIC did not tell Gillette that the Purported 30-day Return Requirement or the Late Penalty would apply. (*Id.* at 142.) In fact, PIC's president, Paul Picone, testified that he *never* discussed paragraph 10 of the Boilerplate (the paragraph containing the purported return requirement) with any Gillette employee. (Ex. 1 at 42.) Similarly, on virtually every job PIC performed for Gillette between 1992 and mid-1994, PIC wrote "N/A" next to "Period of Use" on the front of its invoices. (Ex. 6.) For the first job and every job thereafter, PIC would first perform the work and provide original transparencies and negatives to Gillette and, some time thereafter, would forward an invoice to Gillette for payment. (Ex. 2 at 110.)

For more than 10 years PIC *never* enforced the Purported 30-day Return Requirement and *never* charged the Late Penalty for negatives or transparencies not returned in 30 days. (Ex. 1 at 29-31.) Similarly, PIC was aware of numerous instances of use of PIC photographs beyond one year, outside the United States, and by third parties, but never objected. (Ex. 7 at 33-34; Ex. 2 at 80-109; Exs. 17-18; Ex. 19 at 107-14, 123; Exs. 20-22.)

In Fall 2002, PIC believed it would no longer be given work by Gillette and thereafter, *for the first time*, claimed that the Purported 30-day Return Requirement and the Late Penalty applied to each of PIC's jobs for Gillette. (Ex. 1 at 29-30; Ex. 2 at 266.) PIC did not make a formal written demand, however, until it sent a June 23, 2003 letter to various Gillette employees alleging that Gillette had used PIC photographs in ways "inconsistent" with the Boilerplate and invoking the Purported 30-day Return Requirement and the Late Penalty. (Ex. 8.)

On June 26, 2003, Gillette returned to PIC the materials it could find. (Ex. 9; Ex. 7 at 64-66.) Apparently dissatisfied with what it deemed a low volume of photographs returned, PIC's counsel sent a letter to Gillette's in-house counsel on August 5, 2003 requesting, *inter alia*, a further shipment of photographic materials, and reiterating PIC's purported claims that there were "numerous instances in which Gillette used PIC's photographs outside of the limitations imposed by the contracts." (Ex. 10.) In response, on August 13, 2003, a Gillette attorney explained that Gillette was having difficulty gathering PIC's photographs and requested PIC to

provide more specificity so that Gillette could more easily gather the requested materials.  (Ex. 11.)  Gillette counsel further explained that Gillette was conducting an internal investigation and had been unable to find any instance of any misuse of PIC's photographs but would continue to investigate and would forward any "relevant information" as it became available.  (*Id.*)

More than six weeks later, on September 29, 2003, PIC's counsel wrote back claiming to be "puzzled" by Gillette's intentions because PIC's counsel had heard nothing further from Gillette since the August 13 letter.  (Ex. 12.)  PIC's counsel also refused to provide Gillette with the information Gillette had requested.  (*Id.*)  Thereafter, there was no written correspondence between PIC's counsel and Gillette counsel until after PIC filed its complaint.  (Exs. 10-12.)  Nevertheless, PIC waited almost eight more months before filing its complaint on May 7, 2004.

Meanwhile, in the Spring of 2004, PIC agreed to perform a series of additional jobs for Gillette as a gesture of goodwill (the "Spring 2004 Jobs").  (Dkt. No. 18, 2d Am. Compl. ("SAC"), ¶¶ 34-37.)  PIC completed the jobs by March 2, 17, 22, and April 20, 2004, respectively.  (*Id.* ¶ 42.)  On May 21, 2004, two weeks after filing its complaint and more than two months after completion of the Spring 2004 Job, PIC forwarded to Gillette the invoices for the Spring 2004 Jobs.  Because PIC and Gillette were in litigation and there was a dispute over the invoices, Gillette has not paid the invoices.  (Dkt. No. 24, Countercl. ¶¶ 27-28.)

## ARGUMENT

Summary judgment is warranted if, after reviewing the facts in the light most favorable to the nonmoving party, no genuine issues of material fact remain.  *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (Young, *Chief J.*).  It "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986).

## I.    PIC'S CONTRACT CLAIMS SHOULD BE DISMISSED

PIC's Second Amended Complaint alleges, *inter alia*, the following breach of contract claims:  (1) as a result of Gillette's failure to return PIC's original negatives and transparencies within 30 days of publication, Gillette is required to pay $1,500 for each such original negative

or transparency (SAC ¶¶ 14-15, 53); (2) Gillette breached its agreements with PIC by using
PIC's images outside the temporal and geographic scope of the copyright license (*id*. ¶¶ 20-27,
54); and (3) Gillette did not include a copyright notice on its sales materials incorporating the
photographs acknowledging PIC's ownership of copyrights (*id*. ¶¶ 19, 56.)

On September 23, 2004, the Court dismissed PIC's breach of contract claim as preempted
by the Copyright Act "to the extent that it is premised on Gillette's use of [PIC's] photos outside
the temporal and geographic scope of the licenses and without the required copyright notices."
(9/23/04 Tr. at 9.)  This motion is targeted at PIC's remaining breach of contract claim based on
Gillette's alleged failure to return original negatives and transparencies within 30 days.[1]

**A.    The Boilerplate Is Not The Contract Between The Parties**

PIC's contract claims rely entirely upon its mistaken assertion that the back-of-the-
invoice Boilerplate was binding on Gillette on each of the more than 640 jobs PIC performed for
Gillette.  However, the undisputed facts establish that PIC is incorrect as a matter of law.

Massachusetts law prohibits the addition of new or different terms on an invoice *after* the
formation of an oral or written contract.  *Commonwealth v. Hull*, 296 Mass. 327, 333 (1937)
("the document or letter containing the qualifying provisions must be accepted by the offeree at
or prior to formation of the contract."); *Agoos Kid Co. v. Blumenthal Import Corp.*,  282 Mass. 1,
14 (1932) (citations omitted) ("[S]tatements printed on the defendant's bill heads are no part of
the contracts between the parties."); *Lalime & Partridge, Inc. v. Hobbs*, 255 Mass. 189, 192
(Mass. 1926) (citations omitted).  The rule is similar under the Massachusetts U.C.C.:  Where a
seller sends goods to a purchaser with an invoice containing terms that are additional to or
different than the terms of the parties' prior written or oral agreement, the form is *not* considered
a counteroffer, and the terms on the form do *not* become part of the parties' agreement if they
would materially alter the parties' agreement, even if the buyer accepts the goods.  *JOM, Inc. v.
Adell Plastics, Inc.*, 193 F.3d 47, 59 (1st Cir. 1999) (citing Mass. Gen. L. 106, § 2-207(2)(b));
*Glyptal, Inc. v. Engelhard Corp.*, 801 F. Supp. 887, 893 (D. Mass. 1992) ("seller's
acknowledgement [that] arrives after the seller ships the goods" is "a mere proposal for

---

[1] Gillette does not address in this motion PIC's only other remaining claim for breach of contract, which
is based upon Gillette's non-payment of PIC invoices in 2004.  *See* SAC ¶ 56.

additional terms, which either would be excluded from or incorporated into the parties' agreement depending upon" analysis under Section 2-207(2)).

PIC claims that the Boilerplate on the reverse of each job invoice represents a separate contract between PIC and Gillette. (SAC ¶ 9.) The Boilerplate purports to place a number of conditions upon Gillette's use of the photographs provided by PIC, including but not limited to: (1) duration of the license to use the photograph is limited to one year and territory is limited to the United States (*id.*); (2) the Purported 30-day Return Requirement (*id.* ¶ 14; Ex. 5 ¶ 10); and (3) the Late Penalty. (SAC ¶ 15; Ex. 5 ¶ 11).

The facts are undisputed that none of the above terms were agreed to between the parties prior to any of the more than 640 jobs PIC performed for Gillette and that, moreover, none of these was ever enforced in the course of the parties' dealings.

### 1.     The Purported 30-day Return Requirement And Late Penalty

PIC concedes that the Purported 30-day Return Requirement and the Late Penalty did not apply to the first job PIC performed in March 1992. Paul Picone testified that Gillette had "bought those images outright. They purchased them, *so I'd have no reason to ask for them back*." (Ex. 2 at 16-17, (emphasis added); Ex. 7 at 67.) Before its second job for Gillette, PIC did not tell Gillette it would have to return the photographs within 30 days, and did not discuss the Late Penalty. (Ex. 2 at 142.) Moreover, Paul Picone, conceded at deposition that he *never* discussed paragraph 10 of the Boilerplate (the paragraph concerning the Purported 30-day Return Requirement and triggering the Late Penalty) with any Gillette employee. (Ex. 1 at 42.) Thus, it is undisputed that the Boilerplate's Purported 30-day Return Requirement and its attendant Late Penalty were not agreed to by the parties at the formation of any of the contracts between them.

### 2.     The Purported One-Year License

PIC's first job for Gillette was in March 1992 and considered an "audition" for PIC. (Ex. 2 at 15, 117.) Prior to performing work on this job, PIC provided a written estimate, which contained the Boilerplate terms on its reverse side. (Ex. 13.) The estimate was then revised to reflect the parties' agreement that Gillette would "buy-out" PIC's reproduction rights, such that Gillette would have "unlimited time and unlimited usage rights" in the photos. (Ex. 2 at 131; Ex. 14.) After performing the job, PIC sent an invoice to Gillette that contained the Boilerplate on

5

the reverse side.  (Ex. 5.)  "Buyout" and "unlimited usage" do not appear on the face of the invoice;  instead, next to "Period of Use" on the face of the invoice, PIC typed "N/A," which PIC concedes means "Not Applicable." (Exs. 5; 2 at 138.)  Although the Boilerplate one-year license language appears on the back of the job invoice, the restriction did not apply. (Ex. 2 at 138-39.)

On the very next job in April 1992, PIC did not verbally express to Gillette any limitation on the usage of the photographs. (Ex. 2 at 140, 142.)  And indeed, on the face of the invoice, "Period of Use" is again identified as "N/A." (Ex. 15.)  In fact, on virtually every job performed in 1992, 1993, through mid-1994, PIC similarly identified the "Period of Use" as "N/A." (Ex. 6.)  PIC never told Gillette that "N/A" did not mean Gillette could use the photographs for an unlimited period of time. (Ex. 2 at 155.)  When, in 1994, PIC replaced "N/A" with the letters "T&C" (Ex. 16), there was no prior discussion with Gillette limiting the use of photographs to one year.  (Tattan Decl. ¶ 6.)  Moreover, no PIC employee or representative ever told Gillette prior to any given job, that its use of photographs could be for only one year.  (*Id.*)

**B.      PIC Has Waived The Conditions It Seeks To Enforce By This Action**

"If [a party] intentionally relinquished a known right, either expressly or by conduct inconsistent with an intent to enforce that right, he has waived it and may not thereafter seek judicial enforcement." *Gooley v. Mobil Oil Corp.*, 678 F. Supp. 939, 941 (D. Mass. 1987), *aff'd* 851 F.2d 513 (1ˢᵗ Cir. 1988) (citation omitted and alterations in original).  Waiver is a question of law to be resolved by the Court where the facts are undisputed. *Cumberland Farms, Inc. v. Marchese*, No. 9702497, 2000 WL 33171003, at *3 (Mass. Super. Mar. 14, 2000) (granting summary judgment against plaintiff) (citing *McCarthy v. Tobin*, 429 Mass. 84, 88 n.5 (1999)).

Waiver is established where "'clear, decisive and unequivocal conduct'" indicates that the party to a contract would not insist that the contractual provision at issue be performed. *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 893 (1st Cir. 1988) (quoting *Glynn v. City of Gloucester*, 9 Mass. App. Ct. 454, 462 (1980)).  Here, PIC demonstrated clear, unequivocal, and undisputed conduct that it would not enforce the provisions it now seeks to enforce.

**1.      PIC Has Waived The Purported 30-day Return Requirement And Its Attendant Late Penalty**

It is undisputed that from 1992 until 2002, PIC did not enforce the Purported 30-day

Return Requirement or the Late Penalty because it wanted to continue its relationship with Gillette.  (Ex. 1 at 29-31, 40; Ex. 2 at 133-34.)  It is further undisputed that PIC did not provide any written inventory of materials it provide to Gillette, nor did it alert Gillette with any writing on the packages containing its materials that Gillette's failure to return the materials within 30 days would require Gillette to pay PIC $1,500 per image.  (Tattan Decl. 4.)  It is further undisputed that PIC did not keep a contemporaneous log of what it provided to Gillette.  (Ex. 7 at 199.)[2]  PIC's waiver of the Purported 30-day Return Requirement and its attendant Late Penalty could not be more clear, decisive, or unequivocal.

### 2.    PIC Has Waived Its Purported Limitations On The Copyright Licenses Granted To Gillette.

PIC alleges that the license granted to Gillette: (1) was limited to one-year and to use in the United States (SAC ¶¶ 10, 23, 49); and (2) required Gillette to acknowledge PIC's copyright ownership with "proper copyright notices" (*Id*. ¶ 10, 49, 55).  PIC also waived these conditions.

Between 1992 and 2002, PIC was on notice that its photographs were regularly used beyond the purported one-year limit, outside the United States and by third parties who sold Gillette products.  With respect to use beyond one year, PIC does not dispute that Gillette provided copies of its 1995 through 2002 yearly Braun catalogs to PIC within the year of each catalog's respective production date, that such catalogs contained numerous PIC photographs outside the purported one-year limit, and that such catalogs were reviewed by PIC personnel. (Ex. 2, at 80-109; Ex. 7 at 33-34; Exs. 17, 22; Ex. 19 at 107-09.)  With respect to PIC's knowledge of Gillette's foreign uses, Braun's 1995, 1996, 1997, 1998 and 1999 catalogs produced from PIC's files each prominently displayed the address of "Braun Canada Ltd." on the back cover.  (Ex. 17.)  Moreover, without objecting or increasing its purported licensing fees, PIC:  (1) knew that Gillette was sending photographic transparencies to a Braun project manager and to a Gillette vendor, both located in Canada (Exs. 17, 18; Ex. 19 at 123:1-11); (2) sent transparencies to Gillette's offices in the Dominican Republic (Ex. 20); and (3) as early as 1998 was aware of Gillette's use of one of its images in Spanish-language marketing material.  (Ex. 2

---

[2] Rather, for purposes of this litigation, PIC has attempted to reconstruct what was actually provided to Gillette.

at 200-02.)  With respect to third-party use, on numerous occasions throughout 1992-2002, PIC either provided photographs to Gillette that PIC knew were to be used by third party sellers of Gillette's products or itself provided photographs to Gillette's vendors for their use without any increase in fees, including Bloomingdale's, Costco, CVS, Dillard's, Duane Reade, Eckerd, Filene's, Fortunoff, Hecht's, K-Mart, Lowe's, QVC, Staples, and Wal-Mart.  (Ex. 21.)

PIC also expressly waived the purported copyright notice requirement.  Indeed, prior to performing work for Gillette, PIC was told that "it would be difficult" to place an acknowledgement of PIC's copyright on Gillette's selling materials.  (Ex. 1 at 58.)  Nevertheless, PIC never told Gillette it would not do further work for it unless credited, even after PIC was aware that Gillette was not providing such credit.  (*Id*. at 59.)  Moreover, PIC kept in its files copies of Gillette Catalogs from 1995 – 2002, that it received from Gillette within one year of production and that it reviewed when received.  (*Id.* at 73-74, 77, 87; Exs. 17, 22.)  None of these catalogs contain any copyright notice acknowledging PIC's copyright ownership.  (*Id*.)

### C.    The Late Penalty Is Unenforceable.

The Late Penalty found in paragraph 11 of PIC's Boilerplate (Ex. 5 ¶¶ 10-11) is unenforceable because it is a penalty.

"Liquidated damages must compensate for loss rather than punish for breach: '[A]n exaction of punishment for a breach which could produce no possible damage has long been deemed oppressive and unjust.'"  *Space Master Int'l, Inc. v. City of Worcester*, 940 F.2d 16, 18 (1st Cir. 1991) (quoting *Priebe & Sons, Inc. v. U.S.*, 332 U.S. 407, 413 (1947)); *see Colonial at Lynnfield, Inc. v. Sloan*, 870 F.2d 761, 764 (1st Cir. 1989) ("unreasonably large liquidated damages amount is unenforceable on public policy grounds as a penalty") (citations omitted).

As a matter of law, there is no question that the Late Penalty, which requires payment of $1,500 per original transparency or negative not returned within 30 days is an unenforceable penalty.  No reasonable juror could find that the parties believed that if Gillette returned the materials on the 31st day after publication, PIC would suffer damage in the amount of $1,500 per negative and transparency.  The objective punitive nature of this provision renders the entire Late Penalty unenforceable as a matter of law.  *See, e.g., Comm'r of Ins. v. Mass. Acc. Co.*, 310 Mass.

769, 771 (1942) (where the same liquidated damages clause applies to various breaches of a contract, if it is a penalty as to one type of breach, it is unenforceable as a penalty as to all breaches).

The Late Penalty is unenforceable since it has no relationship to any loss the parties agreed PIC would suffer due to Gillette's failure to return photographs within 30 days of publication.  Indeed, PIC conceded that the amount never had any relationship to any loss PIC might suffer if its negatives and transparencies were not returned within 30 days, and that PIC had "no idea" what the basis was for the $1,500 set as the damages amount.  (Ex. 1 at 45.)  Moreover, PIC viewed the amount as "boilerplate" and conceded the Late Penalty was *not* intended to replace a negative or transparency that might be lost.  (*Id*. at 46.)  PIC could articulate no "business basis" for the arbitrary $1,500 amount, referring only to the Boilerplate.  (*Id*. at 52.)  Moreover, PIC testified that the amount reflects a "license fee" to Gillette.  (*Id*. at 50.)  A "license fee" to Gillette has no connection whatever to any loss suffered by PIC by virtue of any loss of original negatives or transparencies.

PIC's claim that $1,500 accurately reflected any loss the parties believed PIC might suffer is further contradicted by the fact that PIC retained a "duplicate copy" of "every view that was taken [for Gillette] during [a] particular project" and that it "maintained an original copy for duplicating."  (*Id*. at 28-29.)  PIC later testified that it kept "an original" of every shot provided to Gillette, and did not object to Gillette's counsel's statement in a question that PIC "kept one original of everything."  (*Id*. at 47-48.)[3]  Clearly, because PIC kept an "original copy for duplicating" of "every view" on every job it performed for Gillette, it knew *at the outset of each job* that it could suffer no loss as a result of Gillette's failure to return original negatives and transparencies within 30 days.

Moreover, beginning in 1997, PIC kept a high resolution, digital copy of every

---

[3] Conceding the case dispositive nature of PIC's admission under oath that it kept a "duplicate original" transparency of every shot it provided to Gillette, on March 28, 2005, more than six weeks after the deposition, PIC provided what it called an "errata sheet" in which it attempts to completely revise its prior testimony.  (Ex. 24.)  Ignoring the questionable nature of this action, it should be noted that while PIC attempted to recant only one of its admissions that it kept a duplicate original of every view, the other two, at pages 47 and 48, remain unchanged.

photograph taken by PIC for Gillette. (Ex. 2 at 218-19.)[4]  PIC considers these digital images to be "original" and "reproducible" just as any transparency or negative. (Ex. 1 at 82.)  Indeed, in correspondence with Gillette, PIC explained that its digital scans were suitable for any form of duplication Gillette might wish to make, with the exception of large format trade show displays. (Ex. 23.)  Thus, beginning in 1997, PIC knew it could suffer no loss from Gillette's failure to return photographic materials within 30 days. (Ex. 1 at 82; ex. 2 at 218-19.)

PIC's own actions are admissions that the original transparencies and negatives provided to Gillette were of no value to anyone but Gillette.  For example, PIC concedes that during a ten-year period, it never insisted upon the return of any original negative or transparency. (Ex. 1 at 29-31.)  PIC concedes that in 2000 it ceased maintaining the high resolution digital scans of all of the work performed for Gillette because "[n]o one was requesting them.  I wasn't being called and I wasn't doing a lot of business with Gillette, so I just let them fall by the waist [sic] side." (Ex. 2 at 200-21.)  PIC further testified that its disks containing the high resolution digital scans are "[p]robably [in] total degradation by this time." (*Id*. at 220.)  If these "original" and "reproducible" images of Gillette product had any value to PIC, it would have maintained them.

Perhaps most emblematic of the entirely punitive nature of the Late Return Penalty is PIC's continued claim that it is entitled to $1,500 for each of the 191 original negatives and transparencies returned to PIC on June 27, 2003, because they were not returned within 30 days of PIC's purported demand. (Ex. 7 at 64-66.)  PIC could not point to any actual damage it suffered from Gillette not having returned the original transparencies and negatives within 30 days of its request, stating only "they didn't live up to the terms and conditions of their agreement.  They were supposed to return them immediately and they waited quite a while before they were returned." (Ex. 2 at 260-61.)  PIC conceded that it did not have occasion to utilize the 191 original negatives and transparencies between the purported 2002 demand and their return in June 2003.[5]  (*Id*. at 261-62.)  Indeed, it is clear that PIC does not want the

---

[4] PIC began creating digital copies because "clients started asking for scanned images rather than ektachrome [transparencies]." (Ex. 2at 218.)

[5] PIC further concedes that it is not making use of them now and that "[t]hey're in storage somewhere." (Ex. 2 at 261.)

photographs at issue returned and has suffered no loss – it just wants the money.

PIC has sought to concoct some claim of damage in its responses Gillette's Interrogatories. (Ex. 25 at 15.) In response to Interrogatory No. 7, which required PIC to "[i]dentify any and all uses [PIC has] made of any photo prepared for Gillette," PIC did not identify a single photograph provided to Gillette that PIC has itself used. (Ex. 25 at 15-16.) Instead, PIC provides a list of generalizations, all of which are either irrelevant or untrue. First, PIC claims it "cannot have 'used' images that are in Gillette's possession." (*Id.*) This is undisputedly false as PIC conceded at deposition that it kept a duplicate original of every shot it provided to Gillette and, beginning in 1997, kept high resolution scans of everything it provided to Gillette. (Ex. 1 at 28-29, 47-48; Ex. 2 at 218-19.)

PIC also claims that by "retaining its images, PIC can prevent Gillette from making unauthorized copies or from engaging in unauthorized distribution, thereby infringing PIC's copyrights." (Ex. 25 at 16.) Here, PIC concedes that the Purported 30-day Return Requirement does not relate to any actual loss anticipated by PIC. Moreover, PIC clearly had no such concern: It *never* enforced the Purported 30 day Return Requirement. (Ex. 1 at 29-31.)

PIC next claims that "photos are included in PIC's portfolio book, which it shows to prospective clients to establish its credentials and obtain business." (Ex. 25 at 16.) However, at deposition, PIC admitted that it only includes the "final printed piece" in its portfolio that it "wouldn't put a transparency in [its] portfolio." (Ex. 2 at 32.) Thus, PIC's portfolio needs have nothing to do with the Purported 30-day Return Requirement.

PIC then claims that it "has had numerous inquiries by third parties to purchase such images for use as stock photos [and] … has repeatedly been forced to decline these inquiries" because of Gillette's purported refusal to return the transparencies. (Ex. 25 at 16.) This too is demonstrably false. At deposition, PIC conceded that it could recall *no* stock requests received since 1992. (Ex. 2 at 28.)

Finally, PIC claims that it reviews images to generate ideas for use in projects for other clients. Given that PIC keeps an original duplicate of every shot provided to Gillette (Ex. 1 at 28-29, 47-48), and since 1997 has kept a digital scan of everything provided to Gillette (Ex. 2 at

11

218-19), Gillette's alleged non-compliance with the Purported 30 day Return Requirement is irrelevant.

    **D.    Any Contract Claims PIC May Have That Accrued Prior To May 7, 1998 Are Barred By The Statute Of Limitations**

The statute of limitations for breach of contract claims is six years from the date of accrual. *Saenger Org. v. Nationwide Ins. Licensing Assoc., Inc.*, 119 F.3d 55, 64 (1st Cir. 1997). "[A]n action for breach of contract generally accrues at the time of breach, thereby triggering the statute of limitations for purposes of determining whether a claim is time-barred." *Id.* (citations omitted). Because PIC instituted this action on May 7, 2004, its breach of contract claims arising out of Gillette's failure to return photographs to PIC prior to May 7, 1998 are time-barred.

**II.    PIC'S COPYRIGHT CLAIMS SHOULD BE DISMISSED**

The purported copyright infringement claims in PIC's response to Interrogatory No. 1 are organized by PIC as follows: (1) Gillette's alleged unauthorized creation of duplicate transparencies and slides (Ex. 7 at 3-28); (2) Gillette's alleged unauthorized duplication of digital images (*Id.* at 29-33); (3) Gillette's alleged unauthorized reproduction of PIC images in catalogs beyond the scope of PIC's license (*Id.* at 35-44); (4) use by Gillette or by a third party of PIC's images on the Internet (*Id.* at 45-51); (5) Gillette's alleged supply of PIC images to third parties (*Id.* at 51-54); (6) Gillette's alleged use of PIC images on foreign web sites (*Id.* at 54-55); (7) Gillette's alleged Latin American use (*Id.* at 55-56); (8) Gillette's alleged use of PIC images in foreign catalogs (*Id.* at 56-57); (9) Gillette's use of images provided to Gillette in Spring 2004 (*Id.* at 57-58); and (10) Gillette's use of PIC images on product packaging. (*Id.* at 58-59.)[6]

All of the copyright claims are deficient as a matter of law because, as set forth in Section I *supra*, the purported limitations on use of photographs, as well as the purported requirement for acknowledgement of authorship, have been waived. Separate bases for dismissal of the

---

[6] On March 3, 2005, the Court ordered PIC to produce all documents referred to in its responses to Gillette's Interrogatory Nos. 1 and 2 and to supplement its responses to "state the basis for" each of its copyright and contract claims. (3/3/05 Order Re: Gillette Mot. to Compel.) The Court further stated that "unless promptly supplemented with express and detailed factual claims, the plaintiff will be limited at trial to the production of the documents specifically identified" in answer to Interrogatory Nos. 1 and 2. (3/8/05 Order Re: Mot. for Clarification.)

copyright claims are set forth below.

### A.    The Copyright Statute Of Limitations

The statute of limitations for a claim brought under the Copyright Act is three years from the time when the claim accrues.  17 U.S.C. § 507 (b).  "A claim for copyright infringement is generally considered to have accrued when 'one has knowledge of a violation or is chargeable with such knowledge.'"  *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 186 F. Supp. 2d 1, 24 (D. Mass. 2002) (Young, Chief J.) (citations omitted).  "A plaintiff is 'chargeable with knowledge' when a reasonably diligent person in the plaintiff's position would have become aware of the infringement."  *Id.*  A statute of limitations is delayed only where the facts giving rise to a claim are "'inherently unknowable.'"  *Saenger*, 119 F.3d at 65 (emphasis in original) (quoting *Catrone v. Thoroughbread Racing Ass'ns of N. Am., Inc.*, 929 F.2d 881, 885 (1st Cir. 1991)).  As this Court recently reiterated in *Rakes v. United States*, 352 F. Supp. 2d 47, 70 (D. Mass. 2005), "'[t]he test for whether a plaintiff should have discovered necessary facts [to bring a claim] is an *objective* one.'" (emphasis in original) (quoting *McIntyre v. United States*, 367 F.3d 38, 52 (1st Cir. 2004))[7].  "[T]he plaintiff bears the burden of proving facts taking his case outside the statute of limitations."  *Franklin v. Albert*, 381 Mass. 611, 619, 411 N.E.2d 458, 463 (1980) (citation omitted).

### 1.    Duplicate Transparencies Made At Advanced Photographics

PIC claims copyright infringement based upon alleged duplicates of PIC images made for Gillette by Advanced Photographics between January 1998 and March 2000.  (Ex. 7 at 16-29.) This allegation of more than 6,700 separate infringements all took place before well before May 7, 2001, the cut off date for any copyright claim in this case.  The undisputed facts demonstrate that PIC knew no later than 2000 that Advanced Photographics was allegedly making unauthorized duplicates of PIC's images for Gillette.

Jason Roopenian, the Vice President of Advanced Photographics testified that when he

---

[7] When a person "'has a mere hunch, hint, suspicion, or rumor of a claim . . . such suspicions do give rise to a *duty to inquire* into the possible existence of a claim in the exercise of due diligence.'  Once a duty to inquire is established, the plaintiff is charged with the knowledge of what he or she would have uncovered through a reasonably diligent investigation."  *Rakes*, 352 F. Supp.2d at 70 (emphasis in original) (citations omitted).

was made aware that Gillette was making duplicates of PIC's images he informed PIC's president, Paul Picone.  (Ex. 3 at 11-12.)  Advanced Photographics' former employee Joe Gannuscio, who worked there between 1994 and 2001, similarly testified that he had alerted Paul Picone that Gillette was ordering duplicates of PIC's images directly.  (Ex. 4 at 5-6, 10-16.)  Mr. Picone conceded at his deposition that Mr. Gannuscio had contacted him "several times over duplicating of images from – actually not only Gillette but Sylvania, also."  (Ex. 2 at 186-87.)  Because PIC was told of alleged unauthorized duplication of images by Gillette while it was allegedly taking place, and because it is undisputed that no duplicates of any images were made for Gillette by Advanced Photographics after March 2000 (Ex. 7 at 16-29), PIC was on actual notice, and certainly on inquiry notice, of the purported unauthorized duplication well before the statute of limitations cut off.

### 2.    Gillette's Catalogs

PIC alleges copyright infringement based upon Gillette's use of PIC's photographs in catalogs dated 1996-2002.  (Ex. 7 at 33-44.)  PIC concedes that each of the catalogs for which PIC claims copyright infringement were produced from PIC's own files.  (*Id*.; Exs. 17 & 22.)  PIC received the catalogs "within a year" of production.  (Ex. 2 at 73-74.)  Because the catalogs came from its own files, PIC cannot claim it was not on actual or even inquiry notice.  As a result, any copyright claims relating to the catalogs for 1996-2001 are time barred.

### 3.    The Latin American Photo

PIC claims copyright infringement based upon alleged use of one of its photographs in a Spanish-language publication.  (Ex. 7 at 55-56.)  However, at deposition, PIC conceded that it had the allegedly infringing photograph in its possession as early as 1998.  (Ex.2 at 200-02.)  Thus, any copyright claim based upon this photograph is also time barred.

### B.    The Requirement For Copyright Registrations

Section 411 (a) of the Copyright Act provides that "no action for infringement of copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title."  *Quincy Cablesystems, Inc. v. Sully's Bar, Inc.*, 650 F. Supp. 838, 850, n.7 (D. Mass. 1986) ("[c]opyright registration under § 411 (a) is a condition precedent to filing an infringement action.") (citations omitted).

In its own Interrogatory responses, PIC concedes that it does not own copyright registrations for the following of its claims, which claims should therefore be dismissed: (1) the almost 4,500 transparencies and slides in Gillette's files, produced to PIC for review as early as February 15, 2005 (Ex. 7 at 5-15); (2) the alleged creation of unauthorized duplicates for Gillette by Advanced Photographics (*Id*. at 16-29); (3) the so-called "digital images" (*Id*. at 29-33); (4) a number of the alleged infringements in catalogs (*Id*. at 35-44); (5) a number of the alleged Internet infringements (*Id*. at 49-51); (6) the alleged third party infringements (*Id*. 51-53); (7) the alleged foreign web site uses (*Id*. at 54); and (8) the alleged product packaging infringements (*Id*. at 58-59).

**C.    No Evidence That Allegedly Unauthorized Duplicates Were Made Outside The One-Year License PIC Claims Is In Place.**

PIC alleges that it granted licenses to Gillette to reproduce images for a period of one year. (SAC ¶ 10.) In stating the basis of its copyright infringement claims relating to the creation of duplicates (Ex. 7 at 5-23), PIC fails to provide proof or even allege that the duplicates were created beyond the alleged one-year license period. (*Id*.) Thus, these claims must be dismissed on this separate basis.

**D.    PIC Is Bound By Its Interrogatory Responses, Which Demonstrate That Many of PIC's Copyright Claims Are Deficient On Their Face.**

Pursuant to the Court's March 1 and March 8 Orders, PIC's failure to allege copyright registrations as detailed above doom its copyright claims. However, PIC's failure to completely respond to Interrogatories 1 and 2 serve as a further and separate basis to dismiss PIC's copyright claims.

PIC's claims based upon alleged unauthorized duplication fail to identify the job number of any of the photographs allegedly copied and fail to provide any documentation demonstrating that PIC actually authored the images duplicated. (Ex. 7 at 5-23.) PIC's claims based upon: (1) alleged unauthorized duplication of digital images (*Id*. at 30-32); (2) alleged third party uses (*Id*. at 52-53); (3) alleged foreign web site use (*Id*. at 54), all suffer from these same deficiencies. Moreover, when questioned at deposition about the alleged third party infringements listed in its Supplemental Interrogatory Responses, PIC's corporate designee admitted that the only way to

determine whether the images listed were actually PIC images was for him to "match it up with a visual." (Ex. 2 at 240-41.)  The witness conceded that he had not done so and further admitted that he had made no effort to match the images to any of PIC's job numbers. (*Id*. at 241.) Similarly, many of the alleged infringement claims relating to catalogs (Ex. 7 at 35-44) and web sites (*Id*. at 49-51) suffer from the same deficiencies.  Pursuant to the Court's Orders, PIC can only rely upon the allegations and documents set forth in its Supplemental Interrogatory Responses.

Moreover, any of PIC's copyright claims that rely upon Copyright Registrations VA1-256-101, VA1-256-146, VA1-256-147 (Exs. 26-28), also must fail because PIC has failed to produce or identify any of the photographs identified with these registrations.  At deposition, PIC's corporate designee admitted that by just by looking at these Copyright Registrations he could not tell what job number any of the photographs came from or whether PIC ever provided the photographs purportedly registered to Gillette. (Ex. 2 at 48-56.)  If PIC's corporate designee cannot tell from looking at the face of the registrations what images are covered, neither Gillette nor any reasonable juror will be able to do so either.  Because PIC has presented no evidence of what photographs are the subject of VA1-256-101, VA1-256-146, and VA1-256-147, any claims based thereon should be rejected.

E.     **PIC's Claims As To Product Packaging Are Defective As A Matter Of Law.**

PIC raises three copyright infringement claims based on Gillette's alleged use of PIC images or designs on product packaging, each of which must be dismissed.  First, correspondence between the parties from PIC's files conclusively establishes that the dollop of shaving cream PIC now claims to have photographed (Ex. 7 at 58, left photo) appeared on an image of Gillette's new FOAMY packaging and on the package itself provided by Gillette to PIC on November 17, 2000, *ten days before* Gillette first requested PIC to photograph dollops of shaving cream on November 27, 2000. (*See* Ex. 29 at PIC 7888-93.)  Second, photographic transparencies and documentation produced from PIC's files conclusively establish that the "dollop" of shaving cream on the GILLETTE SERIES shaving cream can pictured in PIC's Supplemental Interrogatory ( Ex. 7 at 58, right photo) is identical to the dollop of shaving cream pictured on Gillette's old FOAMY shaving cream can, which Gillette provided to PIC in

16

connection with another project in August 2000 over *two months before* Gillette asked PIC to photograph dollops of shaving cream. (Ex. 30; Ex. 29 at PIC 7895) Finally, photographic transparencies and documentation produced from PIC's files establish that the Gillette MACH III product packaging PIC now claims is based on PIC's alleged design for Gillette's MACH III COOL BLUE packaging is identical to the MACH III packaging that Gillette provided to PIC in connection with another project in April 2000 *several months* before PIC worked on the COOL BLUE project in September 2000. (Ex. 7 at 59; Ex. 32 at PIC 5460; Ex. 31 ¶ 9; Ex. 33.)

## III.    PIC'S FRAUD CLAIMS ARE DEFECTIVE AS A MATTER OF LAW

PIC claims three separate instances of fraud by Gillette. (SAC ¶¶ 27, 59-69.) First, it claims that in March 2001, Gillette employee Anna Madden told Paul Picone that Gillette was "experiencing a reduced need for duplicates" while, in fact, Gillette was allegedly obtaining duplicates of PIC images directly from sources such as Advanced Photographics. (SAC ¶¶ 59-62; Interrog. Resp. 4 at 10-11.) Second, PIC claims that Gillette hired PIC to perform some work in the spring of 2004 and falsely implied that it would pay for the work. (SAC ¶¶ 35-43, 63-65.) Third, PIC claims that Gillette's in-house attorneys made false statements to PIC concerning PIC's claims and that PIC relied upon such statements in delaying the filing of the instant suit. (*Id*. ¶¶ 66-68.)

To establish a claim for fraud "a plaintiff must prove 'that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage.'" *Sands v. Ridefilm Corp.*, 212 F.3d 657, 663 (1st Cir. 2000). Here, each of PIC's fraud claims fail as a matter of law.

***Statements Attributed to Anna Madden***: As explained more fully in Section II above, PIC cannot support its claim that Gillette engaged in duplication of photographs in a manner inconsistent with Gillette's license to do so. Accordingly, even if Ms. Madden made the statements attributed to her, plaintiff could not have relied to its detriment on such statements. Moreover, the date of the last Advanced Photographics invoice alleged by PIC to establish Gillette's improper duplication or photographs is February 16, 2000 (Ex. 7 at 6-15) – more than

one year prior to Ms. Madden's alleged misstatements to Mr. Picone. Thus, there can be no detrimental reliance by PIC on Ms. Madden's statements, nor can there be any claim that Ms. Madden's statements induced PIC not to take action that led to any improper duplication by Gillette.

Finally, this claim also is time-barred. The statute of limitations for fraud claims under Massachusetts law is three years from the date of accrual. Mass. Gen. Law Ch. 260, § 2A. The limitations period begins to run on the date the plaintiff learns or reasonably should have learned of the misrepresentation. *See Kozikowski v. Toll Bros., Inc.*, 246 F. Supp. 2d 93, 99 (D. Mass.) (Young, *Chief J.*), *aff'd*, 354 F.3d 16 (1st Cir. 2003). Here, it is undisputed that PIC was aware of Gillette's duplication of PIC images no later than February 2000. (Ex. 2 at 186-87; Ex. 4 at 10-16; Ex. 3 at 11-12.) Because, PIC knew or should have known that Ms. Madden's alleged misstatements were false as soon as such statements were made in March 2001, and its cause of action for fraud accrued at that time, more than three years before PIC commenced this action.

***Alleged Fraudulent Inducement Relating to the Spring 2004 Projects***: PIC claims that Gillette fraudulently induced it to perform work relating to the Spring 2004 Projects because Gillette allegedly had no intention of paying PIC for the work it performed. The undisputed facts establish, however, that PIC did not provide Gillette with an invoice for its services relating to the Spring 2004 projects until May 21, 2004, two weeks after PIC commenced this action against Gillette and there was a legitimate dispute over the amount of the invoices. (Counterclaim ¶¶27-28.)[8]

## IV.   PIC'S CHAPTER 93A CLAIMS ARE DEFECTIVE AS A MATTER OF LAW

This motion targets at PIC's remaining Chapter 93A claim, which is based on Gillette's alleged failure to return PIC's photographs and alleged misrepresentations to PIC by Anna

---

[8] PIC's fraud claim based on alleged misrepresentations by Gillette's in-house counsel fails as well. PIC alleges that it relied on an alleged misrepresentation by Gillette's in-house counsel John B. Gatlin in a letter dated August 13, 2003, in which PIC claims he "assured PIC" that Gillette was investigating PIC's claims and "would report back to PIC the results of its investigation." (SAC ¶¶ 13, 31, 33.) However, as demonstrated by PIC's letters of June 23 and August 5, 2003, it already knew the alleged facts that were ultimately included in its complaint. (*Compare* Exs. 8, 10 *with* SAC.)

Madden, by Gillette's in-house counsel, and in connection with the Spring 2004 Projects.[9]

"[T]he boundaries of what may qualify for consideration as a [ch.] 93A violation is a question of law." *Saint-Groban Indus. Ceramics, Inc. v. Wellons, Inc.*, 246 F.3d 64, 73 (1st Cir. 2001) (citations omitted). To plead a claim for unfair trade practices under Mass. Gen. L. ch. 93A, PIC is required to show that the unfair practices reach "'a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce,' and be 'unscrupulous, intolerable, and unethical.'" *Henry v. Nat'l Geographic Soc'y*, 147 F. Supp. 2d 16, 21 (D. Mass. 2001) (citations omitted).

At the outset, Gillette notes that to the extent the Court grants Gillette's motion to dismiss PIC's breach of contract and fraud claims, it should dismiss PIC's Chapter 93A claim based on such claims as well. Moreover, viewing the facts in a light most favorable to PIC, the conduct PIC attributes to Gillette simply does not rise to the level of "rascality" for Chapter 93A claims. With respect to Gillette's failure to return PIC's photographs within 30 days, the undisputed facts show that from 1992 through 2002, Gillette never returned photographs to PIC and PIC never objected or requested Gillette to return photographs it had provided, yet PIC continued to provide photographic services to Gillette. Even if, under these circumstances, Gillette's failure to return some of the photographs upon PIC's demand, for the first time, in 2002, amounts to a breach of contract not barred by PIC's waiver, the circumstances simply cannot provide the basis for a Chapter 93A claim. *See Sunoco, Inc. v. Makol*, No. Civ. A. 01-30053-MAP, 2002 WL 991703, at *7 (D. Mass. May 10, 2002) ("[A] mere breach of contract does not constitute an unfair or deceptive trade practice under [ch.] 93A unless it rises to the level of 'commercial extortion' or a similar degree of culpable conduct.") (citations omitted); *John T. Callahan & Sons, Inc. v. Dykeman Elec. Co.*, 266 F. Supp. 2d 208, 220 n.25 (D. Mass. 2003).

PIC's Chapter 93A claims also fail to the extent they are based on Gillette's alleged misrepresentations. In this regard, PIC particularly focuses its claim on alleged "stonewalling"

---

[9] PIC originally based its chapter 93A claim on the same conduct that formed the basis for its copyright, breach of contract and fraud claims. (SAC ¶¶ 70-75.) However, the Court dismissed plaintiff's Chapter 93A claim as preempted by the Copyright Act "to the extent it is based upon Gillette's reproduction and continued use of the copyrighted photos without [PIC's] permission." (9/23/04 Tr. at 8:7-10.)

by Gillette's in-house counsel in response to inquiries by PIC relating to its claims. As explained above, the undisputed facts establish that Mr. Gatlin and Mr. Bechet did not make any false statements to PIC. Moreover, it is undisputed that the fraudulent statements attributed to Mr. Bechet and Mr. Gatlin were made in the process of settlement negotiations between the parties.[10] As a matter of law, such statements cannot form the basis for a Chapter 93A claim. *Deisenroth v. Numonics Corp.*, 997 F. Supp. 153, 157 (D. Mass. 1998) ("Exposing a party to Chapter 93A liability for statements made in failed settlement discussions would hardly further the public policy in favor of compromise and settlement of disputes.").

## CONCLUSION

For the foregoing reasons, Gillette's motion should be granted in its entirety.

Dated:  April 8, 2005

GELB & GELB LLP

By:____/s/Richard M. Gelb/_____
        Richard M. Gelb (BBO#188240)
        rgelb@gelbgelb.com
        Robert S. Messinger (BBO# 651396)
        rmessinger@gelbgelb.com

20 Custom House Street
Boston, MA  02110
Tel: (617) 345-0010
Fax: (617) 345-0009

FROSS ZELNICK LEHRMAN & ZISSU, P.C.

By:___/s/Patrick T. Perkins/_____
        Patrick T. Perkins (Admitted *pro hac vice*)
        David Donahue (Admitted *pro hac vice*)
886 United Nations Plaza
New York, New York 10017
Ph: (212) 813-5900
Fax: (212) 813-5901

*Attorneys for Defendant/Counterclaim-Plaintiff
The Gillette Company*

I:\PPERKINS\GLTC\General\Memo in support - Summary Judgment.doc

---

[10] At his deposition, Mr. Picone testified that the correspondence sent to Gillette was intended to bring about an amicable resolution of the dispute.  (Ex. 2 at 269-273.)