UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHOTOGRAPHIC ILLUSTRATORS CORPORATION, <br><br> Plaintiff, <br><br> vs. <br><br> THE GILLETTE COMPANY, <br><br><br> Defendant. | Civil Action No. 04-10913 WGY |
| THE GILLETTE COMPANY, <br><br> Counterclaim-Plaintiff, <br><br> vs. <br><br> PHOTOGRAPHIC ILLUSTRATORS CORPORATION and PAUL PICONE, <br><br> Counterclaim-Defendants. | |

**THE GILLETTE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO PIC'S MOTION FOR SUMMARY JUDGMENT ON GILLETTE'S FRAUD**

FROSS ZELNICK LEHRMAN & ZISSU, P.C.
Patrick T. Perkins (Admitted *pro hac vice*)
David Donahue (Admitted *pro hac vice*)
886 United Nations Plaza
New York, New York 10017
Ph: (212) 813-5900
Fax: (212) 813-5901

GELB & GELB LLP
Richard M. Gelb (BBO#188240)
Daniel C. Hohler (BBO#633065)
20 Custom House Street
Boston, MA 02110
Tel: (617) 345-0010
Fax: (617) 345-0009
*Attorneys for Defendant/Counterclaim-Plaintiff
The Gillette Company*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

FACTS ....................................................................................................................2

    I.     FACTS RELATING TO PIC'S "INVESTIGATION" CLAIM ....................... 2

    II.    FACTS RELATING TO PIC'S SPRING 2004 WORK FOR GILLETTE ...... 3

    III.   FACTS RELATING TO PIC'S "DUPLICATION SERVICES" CLAIM ....... 4

ARGUMENT ...........................................................................................................5

    I.     The Standard For Summary Judgment ............................................................ 5

    II.    Gillette's Internal Investigation Into PIC's Claims Cannot Give Rise
         To A Fraud Claim ........................................................................................... 5

        A.    As A Matter Of Law, PIC Could Not Have Reasonably Relied
              Upon The Statement In The August 13, 2003 Letter From Gillette ........... 6

        B.    As A Matter Of Law, PIC Has Experienced No Damage
              As A Result Of The August 13, 2003 Letter From Gillette ........................ 8

        C.    Issues Of Fact Remain About The Existence Of A Knowingly
              False Statement ...................................................................................... 10

    III.   Gillette Intended To Pay PIC For The Spring 2004 Jobs At The Time
         PIC Was Hired, And PIC's Fraud Claim Fails ............................................... 14

    IV.   PIC Could Not Have Relied Upon Any Alleged Statement Made By Gillette
         Employee Anna Madden, Fails To Demonstrate The Existence Of A False
         Statement, And Offers No Evidence Of Ms. Madden's Intent ....................... 17

CONCLUSION .......................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.*,
190 F.R.D. 287 (D. Mass. 2000) ................................................................. 12

*Armstrong v. Rohm & Haas Co., Inc.*,
349 F. Supp. 2d 71, 81 (D. Mass. 2004) ..................................................... 7

*Banafato v. Conductron Corp.*,
No. CA931319F, 1993 WL 818568, at *3 (Mass. Super. Nov. 12, 1993) ...... 14, 19, 20

*Bertera Chrysler Plymouth, Inc. v. Chrysler Corp.*,
992 F. Supp. 64, 74 (D. Mass. 1998) ........................................................ 18

*Carroll v. Barberry Homes, Inc.*,
No. 976418, 1999 WL 1204020, at *4 (Mass. Super. Oct. 22, 1999) .......................... 17

*Coady v. Marvin Lumber & Cedar Co.*,
167 F. Supp. 2d 166, 171 (D. Mass. 2001) ................................................ 9

*Deisenroth v. Numonics Corp.*,
997 F. Supp. 153 (D. Mass. 1998) ............................................................ 10

*Flesner v. Technical Communications Corp.*,
410 Mass. 805, 809 (1991) ....................................................................... 14

*Galotti v. United States Trust Co.*,
335 Mass. 496, 501 (1957) ....................................................................... 17

*Gerli v. G.K. Hall & Co.*,
851 F.2d 452, 455 (1st Cir. 1988) ............................................................. 17

*Kendall v. Atkins*,
374 Mass. 320 (1978) .............................................................................. 15

*Kozikowski v. Toll Bros., Inc.*,
354 F.3d 16, 24 (1st Cir. 2003) ............................................................. 9, 10

*Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc.*,
62 F. Supp. 2d 236, 241-42 (D. Mass. 1999) ............................................ 6

*Rakes v. United States*,
352 F. Supp. 2d 47, 52 (D. Mass. 2005) ................................................... 5

*Sands v. Ridefilm Corp.*,
   212 F.3d 657 (1st Cir. 2000) .................................................................................. 5, 19

*Saxon Theatre Corp. v. Sage*,
   347 Mass. 662 (1964) .............................................................................................. 7

*Thornton v. Harvard Univ.*,
   2 F. Supp. 2d 89 (D. Mass. 1998) .......................................................................... 14

*Town of Framingham v. Shoppers World Community Ctr. L.P.*,
   No. 00-P-756, 2002 WL 1766604 (Mass. App. Jul. 31, 2002) ................................... 17

*Trifiro v. N.Y. Life Ins. Co.*,
   845 F.2d 30 (1st Cir. 1988) ................................................................................... 7, 8

*VLT Corp. v. Unitrode Corp.*,
   194 F.R.D. 8 (D. Mass. 2000) ................................................................................ 12

*Warren H. Bennett, Inc. v. Charlestown Sav. Bank*,
   328 N.E.2d 527 (Mass. App. 1975) ........................................................................... 7

*Zhang v. Mass. Inst. of Technology*,
   708 N.E.2d 128 (Mass. App. 1999) .......................................................................... 17

Defendant The Gillette Company ("Gillette") respectfully submits this Memorandum of Law in Support of its Opposition to PIC's Motion for Summary Judgment on Gillette's Fraud.

## PRELIMINARY STATEMENT

PIC presents this Court with three outlandish claims for fraud that are both factually inaccurate and defy common sense. In its first claim, PIC alleges that it was lulled into a false sense of security by an August 2003 letter from Gillette regarding an internal investigation the company was performing, and consequently PIC refrained from filing suit for *nine additional months*. Though PIC would like this Court to characterize Gillette's statements as fraudulent in order to excuse its delay in filing suit – and recapture claims that were rendered time-barred in this nine month period – PIC's claim fails as a matter of law and is riddled with disputed facts.

Second, PIC argues that in spring 2004, Gillette hired the company for jobs without any present intention to pay for PIC's services. Against clear testimony and affidavits confirming that Gillette had no such intent, PIC simply weaves unsupported theories and asks the Court to make favorable inferences on its behalf as to essential elements of its fraud claim. This is inappropriate. Though Gillette intended to pay PIC for its services at the time PIC agreed to the spring 2004 jobs – as Gillette had, consistently, in the ten years the companies worked together – subsequent events compelled Gillette to decide, months later, to withhold payment for PIC's services. In particular, (1) between the time PIC performed the spring 2004 work and the time it sent invoices to Gillette, PIC chose to file the complaint in this action; and (2) these invoices, now from an adversary, were grossly inflated and bore no resemblance to any work PIC had done for Gillette in their long course of dealing.

Third, PIC claims it was deceived by a Gillette employee who told the company that Gillette had a reduced need for duplication services, while *at the same time* it was placing duplication orders from a third-party laboratory. PIC attempts to deceive the Court as to the underlying facts of this claim. The undisputed documentary evidence *obtained by PIC from third party laboratory Advanced Photographics* demonstrates conclusively that Gillette had ceased obtaining duplicate transparencies for more than a year before the alleged discussion with a Gillette employee. Moreover, it is undisputed that PIC knew about the purportedly

unauthorized duplicates as early as 2000 because employees of the laboratory informed PIC directly. Not only do the basic dates make impossible any detrimental reliance upon Gillette's alleged false statement, but it is unclear whether the disputed statement was even made in 2001.

On all three claims, PIC fails to prove any fraud, and Gillette is entitled to summary judgment on each.

## FACTS

## I.    FACTS RELATING TO PIC'S "INVESTIGATION" CLAIM

In the fall of 2002, PIC believed it would no longer be given work by Gillette, and in reaction it asked for the return of photographic images in Gillette's possession. (Ex. 2 at 266.)[1] After making phone calls to this effect, PIC allowed eight months to elapse before making a written demand for the return of PIC images on June 23, 2003, addressed to a group of Gillette employees with whom Paul Picone, principal of PIC, had worked. (Ex. 8.)

Four days after PIC's written request, on June 27, 2003, Gillette returned almost 200 images to PIC. (Declaration of Michael Rader in Support of PIC's Summary Judgment Motions ("Dkt. No. 77"), Ex. 28 at 1-25.) Several weeks later, on August 5, 2003, Michael A. Albert, counsel for PIC, sent a letter to Gillette Deputy General Counsel John B. Gatlin requesting additional PIC images in Gillette's possession and alleging, *inter alia*, acts of copyright infringement by Gillette. (Ex. 10.) A week later, on August 13, 2003, Mr. Gatlin replied via letter explaining the difficulties involved with tracking down images across a large company and requesting more information about the images PIC sought. (Ex.11.) The letter also stated that Gillette was "conducting an internal investigation to determine the extent to which any of your client's images have been used by Gillette or any of its subsidiaries," that Gillette had not yet found any improper uses of PIC's images, and that Gillette would "continue with our investigation and forward any relevant information to your attention as it becomes available." (*Id.*)

The next day, a Gillette legal intern sent an e-mail, with a copy of Mr. Gatlin's letter

---

[1] Unless otherwise indicated, all exhibits refer to those attached to the Declaration of David Donahue in Support of Defendant The Gillette Company's Motion for Summary Judgment. (Dkt. No. 93.)

attached, to the recipients of Mr. Picone's June 23, 2003 letter. (Dkt. No. 77, Ex. 34.) The e-mail noted that the attached letter "is simply for your reference and for your records. You do not need to do anything." (*Id.*) The e-mail and attachment served to keep Gillette employees (who had been contacted by Mr. Picone) informed but assure them that the Gillette legal department was handling the investigation referenced in the letter and that, consequently, the employees did not need to take any steps on their own before being contacted by a representative from the department.

More than six weeks elapsed, and then on September 29, 2003, Mr. Albert responded to Mr. Gatlin's August 13, 2003 letter. (Ex. 12.) Though Mr. Gatlin had sought more information on the images PIC requested to assist Gillette in its efforts to locate them, Mr. Albert refused to provide any of the requested information. (*Id.*) Mr. Albert stated he was "puzzled as to Gillette's intentions" and wondered why he had not heard from Gillette since its August letter – despite the fact that PIC had failed to provide any additional information to assist Gillette in the efforts PIC had requested. (*Id.*) Notwithstanding its express dissatisfaction with Gillette's response to its claims, inexplicably, PIC waited another eight months to file suit.

Finally, after eight additional months had elapsed, Mr. Albert sent a letter to Assistant Trademark Counsel Leon Bechet purporting to confirm a telephone conversation they had that day, May 18, 2004. (Ex. 34.) In this letter, Mr. Albert claimed that Mr. Bechet had confirmed the existence of an index of photographic materials gathered during Gillette's investigation. (*Id.*) Mr. Bechet responded the next day, May 19, 2004, and corrected Mr. Albert's inaccurate recollection of their telephone conversation, writing that "no representation was made to you regarding an 'investigation' undertaken by Gillette" or "regarding an index of photographic materials belonging to your client." (Ex. 35.)

## II.    FACTS RELATING TO PIC'S SPRING 2004 WORK FOR GILLETTE

In February and March 2004, Gillette employee Elizabeth Cooper had two telephone conversations and a lunch meeting with Mr. Paul Picone, in which he agreed that PIC would photograph several Gillette products (the "Spring 2004 Jobs"). PIC performed this work in March and April 2004. (Cooper Decl. ¶ 6.) Based upon prior jobs PIC performed for Gillette,

Ms. Cooper estimated this work took approximately two days. (Dkt. No. 77, Ex. 1 at 143-44.)

Ms. Cooper was aware that the companies were involved in a dispute, and prior to meeting with Mr. Picone, she met with Gillette's Deputy General Counsel John Gatlin to discuss potential future projects with PIC. (*Id.* at 224-30.) As a courtesy to Mr. Picone, Ms. Cooper provided him with a copy of her notes from her meeting with Mr. Gatlin. (*Id.* at 224.) Ms. Cooper was never instructed by anyone, at any time, not to pay Mr. Picone for the Spring 2004 Jobs. (Cooper Decl. ¶ 9; Dkt. No. 77, Ex. 1 at 258.)

However, Ms. Cooper did not receive invoices for the Spring 2004 Jobs, completed in March and April 2004, for another month. Only after PIC filed the complaint in this action on May 7, 2004 (Dkt. No. 1), did the company send the invoices for the Spring 2004 Jobs in an envelope postmarked May 14, 2004 (Perkins Decl., Ex. 2.), which Ms. Cooper received on May 15, 2004. (Dkt. No. 77, Ex. 1 at 160.) One of the invoices totaled $43,500 for photographic services and, incorporating miscellaneous expenses, totaled over $63,000. (Cooper Decl. ¶ 8.) Ms. Cooper considered this a gross overcharge based upon her years of doing business with PIC. (*Id.*) Indeed, in over four years of dealing with PIC, Ms. Cooper had never received an invoice approaching the amount PIC charged for the Spring 2004 Jobs. (*Id.*) As part of Ms. Cooper's responsibilities in approving vendor invoices, she could not routinely approve an invoice for such an unusually high amount. (*Id.*) Gillette has not paid PIC for the Spring 2004 Jobs.

## III.    FACTS RELATING TO PIC'S "DUPLICATION SERVICES" CLAIM

In the past, Gillette has ordered duplicates of images shot by PIC from a third-party laboratory, Advanced Photographics, Inc. ("Advanced Photographics"). It is undisputed, however, that no duplicates of any images were made for Gillette by Advanced Photographics after March 2000. (Ex. 7 at 16-29.) Moreover, at a point no later than March 2000, employees of Advanced Photographics informed PIC that Gillette was ordering duplicates of such images. (Ex. 4 at 10-16; Ex. 3 at 11-12, 91; Ex. 2 at 186-87.)

Over a year later, in March 2001, Mr. Picone claims to have had a conversation with Gillette employee Anna Madden. Ms. Madden does not recall whether Mr. Picone asked her why PIC was not receiving orders for duplicates from Gillette, does not recall discussing where

4

Gillette was getting duplicates made, and generally did not recall discussing duplication at all with Mr. Picone in that conversation. (Dkt. No. 77, Ex. 49 at 98-101.) Even Mr. Picone's own deposition testimony does not match the allegation in PIC's pleading. (Dkt. No. 77, Ex. 10 at 273-78.)

**ARGUMENT**

PIC's claims for fraud share two qualities: they are littered with unresolved issues of material fact, and, even assuming all facts in PIC's favor, it is Gillette that is entitled to summary judgment on all three claims.

## I.  THE STANDARD FOR SUMMARY JUDGMENT

Summary judgment is warranted if, after reviewing the facts in the light most favorable to the nonmoving party, no genuine issues of material fact remain. *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (Young, *Chief J.*).

To establish a claim for fraud, a plaintiff must prove that the "defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage." *Sands v. Ridefilm Corp.*, 212 F.3d 657, 663 (1st Cir. 2000) (internal quotation marks and citation omitted).

## II.  GILLETTE'S INTERNAL INVESTIGATION INTO PIC'S CLAIMS CANNOT GIVE RISE TO A FRAUD CLAIM.

PIC's first fraud claim is an attempt to justify and excuse its long delay in filing suit in this action. Though PIC casts itself as "lulled" or "duped" by correspondence from Gillette in 2003, that correspondence reveals the opposite – a deeply suspicious and uncooperative complainant represented by sophisticated counsel that simply sat (or was advised to sit) on its purported copyright and contract claims and now has regrets. As discussed in greater detail below, PIC terminated its relationship with Gillette in October 2002, out of frustration with the company, and orally requested its images back. Yet it took PIC eight months to send Gillette a written request for the return of its images. Four days after receiving this request, Gillette

returned almost 200 images to PIC.[2]

Over a month later, counsel for PIC wrote Gillette counsel requesting additional images. Gillette responded that it was conducting an internal investigation and requested more information from PIC to assist in identifying the requested images. More than a month later, PIC's counsel wrote back and refused to provide any of the information that would have assisted Gillette in its task. Rather, PIC questioned Gillette's motives – far from the spirit of a company lulled into a false sense of security by Gillette. Then PIC waited *eight additional months*, from September 2003 to May 2004, to file suit. It now seeks to justify its delay by inventing a fraud claim out of Gillette's last correspondence with PIC. Gillette is entitled to summary judgment on this transparent motion.

PIC claims that, in an August 13, 2003 letter, Gillette falsely represented that it would "conduct an investigation and get back to PIC, which [was] calculated to, and did, induce reliance." (Memorandum in Support of PIC's Motion for Summary Judgment on Gillette's Fraud ("Dkt. No. 81") at 9.) Specifically, PIC asserts that the letter, which ended with the statement "'[w]e hope to maintain open lines of communication with you to resolve any issues associated with this matter'" constituted an "invitation to PIC not to proceed with legal action." (*Id.* at 8.) Presumably, the damage PIC suffered – though not clearly articulated in its motion – was the loss of legal claims which were rendered time-barred in the period of PIC's "reliance," from August 13, 2003 to the date it filed suit on May 7, 2004. Summary judgment is inappropriate for several reasons.

## A. As A Matter Of Law, PIC Could Not Have Reasonably Relied Upon The Statement In the August 13, 2003 Letter From Gillette.

To prevail on its fraud claim, PIC must prove it reasonably relied upon Gillette's statement in the August 13, 2003 letter. *Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 62 F. Supp. 2d 236, 241-42 (D. Mass. 1999) (dismissing fraud claim for lack of

---

[2] Though PIC protests repeatedly that Gillette "stonewalled," it is important to bear in mind that PIC's request was unprecedented in the parties' relationship. In the ten years PIC had worked for Gillette, it had never requested the return of images, much less the wholesale return of a decades-worth of product photographs for a large consumer products corporation.

reasonable reliance). Assuming all facts alleged by PIC to be true, PIC cannot demonstrate reasonable reliance for two reasons.

First, "reliance is not reasonable where the alleged representations are vague or indefinite." *Armstrong v. Rohm & Haas Co., Inc.*, 349 F. Supp. 2d 71, 81 (D. Mass. 2004) (dismissing fraud claim). *See also Saxon Theatre Corp. v. Sage*, 347 Mass. 662, 666-67 (1964) (same); *Warren H. Bennett, Inc. v. Charlestown Sav. Bank*, 328 N.E.2d 527, 528 (Mass. App. 1975) (dismissing deceit claim where the "representation allegedly relied upon was so indefinite and imprecise as to render such reliance unreasonable as a matter of law").

PIC claims reliance upon two short sentences in the August 13, 2003 letter from Gillette. The first states "we are conducting an internal investigation to determine the extent to which any of your client's images have been used by Gillette," while the second states, "[w]e will continue with our investigation and forward any relevant information to your attention as it becomes available." (Ex. 11.) These sentences are classic examples of an "imprecise" or "indefinite" representation. As a courtesy to Mr. Picone, Gillette wrote and informed him of a purely voluntary step Gillette had chosen to take, after a decade of undisturbed business practice between the parties. There is nothing promissory or contractual in this language. The two sentences do not specify a time period in which Gillette would conclude its investigative activities, and as a matter of basic syntax, the letter suggests Gillette would forward materials to PIC *only if* it found any relevant materials. Notably, in the cases cited above, there is at least arguably an oral or written contract between the parties, which is clearly lacking in the August 13, 2003 letter. *See, e.g., Armstrong*, 349 F. Supp. 2d at 81-82; *Saxon*, 347 Mass. at 667. As a matter of law, PIC cannot prove reasonable reliance.

Second, PIC further fails to prove this essential element because "when a person acts in a way contrary to his own acknowledged understanding of the facts, his acts must be deemed unreasonable as a matter of law." *Trifiro v. N.Y. Life Ins. Co.*, 845 F.2d 30, 33 (1st Cir. 1988) (dismissing deceit claim). Mr. Picone acknowledged that his concerns about Gillette's "misuse" of his images emerged long before the August 13, 2003 letter, in 2002. "[A]fter failing to get satisfaction from Gillette" in October 2002, Mr. Picone felt burned enough to terminate his

relationship with Gillette and demand all of his images back. (Declaration of Paul K. Picone in Support of PIC's Summary Judgment Motions ("Dkt. No. 75") ¶ 30.) Still failing to receive satisfaction after eight additional months, Mr. Picone sent a letter to Gillette on June 23, 2003 again demanding the return of his images. (Ex. 8.) When Mr. Picone received an insufficient quantity of images back, he sent a second letter, via legal counsel, to Gillette demanding the remaining images. (Ex. 10.)

PIC cannot in good faith argue, in this context and with this set of facts, that it reasonably relied upon Gillette's August 13, 2003 letter and interpreted such letter as a sensible "invitation" not to take further action. The parties had already been in dispute for ten months and were corresponding through attorneys at the time Gillette's Deputy General Counsel authored the August 13, 2003 letter. Further, in its September 29, 2003 letter to Gillette, PIC's counsel clearly revealed its suspicions about Gillette and the company's efforts, stating that "we are puzzled as to Gillette's intentions." (Ex. 12.) In rejecting a claim for deceit, the First Circuit noted aptly that "'[t]he maker of a fraudulent misrepresentation is not liable to one who does not rely upon its truth but upon the expectation that the maker will be held liable in damages for its falsity.'" *Trifiro*, 845 F.2d at 34 (quoting Restatement, Second, Torts § 548). In two respects, PIC cannot show reasonable reliance as a matter of law, and its motion should be denied.

**B.      As A Matter Of Law, PIC Has Experienced No Damage As A Result Of The August 13, 2003 Letter From Gillette.**

PIC's motion fails to specify the damage suffered from Gillette's alleged fraud, an essential element of its claim. It does characterize Gillette's August 2003 letter as an "invitation to PIC not to proceed with legal action," suggesting that PIC lost certain legal claims which were rendered time-barred during the period of PIC's "reliance," from August 13, 2003 to the date it filed suit on May 7, 2004.

In effect, PIC's fraud claim amounts to a tolling argument which, if successful, would equitably estop Gillette from seeking dismissal of claims that were rendered time-barred in the nine months between August 13, 2003 (the date of the alleged misrepresentation) and May 7, 2004 (date of complaint). The doctrine of equitable estoppel allows a plaintiff to "escape the

8

consequences of his lack of diligence in bringing his action ... by way of proof that the defendant lulled the plaintiff into the delay." *Coady v. Marvin Lumber & Cedar Co.*, 167 F. Supp. 2d 166, 171 (D. Mass. 2001) (holding defendant not equitably estopped from asserting statute of limitations defense and dismissing all claims). However, should PIC fail to make the required showing for application of this doctrine, then the claims that were rendered time-barred in the relevant period remain barred. In that case, PIC fails to allege any damage resulting from Gillette's alleged misrepresentation in August 2003, or its purported reliance thereon.

To apply this doctrine – and prove any actual damage on its fraud claim – PIC must show that (1) Gillette made representations it knew or should have known would induce PIC to postpone bringing suit; (2) PIC delayed bringing suit in reliance on those representations; and (3) its reliance was reasonable. *Kozikowski v. Toll Bros., Inc.*, 354 F.3d 16, 24 (1st Cir. 2003). The *Kozikowski* opinion is instructive, with facts similar to the instant action, and demonstrates PIC's failure to meet all three prongs of this test. Indeed, in that case, the plaintiffs sought to rely upon similarly vague statements, made in letters, that the defendant was "considering the building code violations" identified in an engineer's report and that defendant's "representatives would be available to the [plaintiffs] to discuss their problems." *Id.* at 24.

On the first prong, PIC fails to prove Gillette made the requisite misrepresentation because "[p]romises or assurances in such communications must be specific in order to constitute 'representations.'" *Id.* at 24. As noted in Section II.A., *supra*, Gillette's language in the August 13, 2003 letter fails to rise to the level of a "promise" and is clearly an imprecise and indefinite statement. As in *Kozikowski*, Gillette's statements were "very general in nature and did not specifically assure" PIC that it would get exactly what it wanted at a definite time. *Id.*

On the second prong, the First Circuit reiterated the finding of the district court that "'given the long and rocky course of the relationship' between the two parties, the notion that the [plaintiffs] 'truly *believed*' [defendant] and 'were thus lulled into inaction ... strains credulity.'" *Id.* (quoting *Kozikowski v. Toll Bros., Inc.*, 246 F. Supp. 2d 93, 101 (D. Mass. 2003) (Young, Chief J.)). Again, as noted in Section II.A., *supra*, the parties here had a similarly rocky relationship at the time Gillette sent its August 13, 2003 letter. After Mr. Picone had terminated

9

his relationship with Gillette out of frustration, spent ten months seeking the return of his materials, and retained counsel, the idea that Gillette "lulled" PIC into deferring legal action "strains credulity."

Finally, on the third prong, assuming all facts in a light most favorable to PIC, its reliance upon Gillette's August 2003 letter was unreasonable. Where a defendant has continuously failed to satisfy a plaintiff's demands over a significant period of time, reliance upon correspondence from that defendant is unreasonable. *Kozikowski*, 354 F.3d at 25. These are precisely the facts in the instant action.

Because PIC fails to prove that Gillette "lulled" it into refraining from filing suit, thus warranting application of equitable estoppel, PIC has no recourse for those claims that were rendered time-barred between August 13, 2003 and May 7, 2004.[3] Consequently, PIC cannot show any damage caused by any statement made by Gillette in its August 2003 letter. Summary judgment should be denied.

**C.    Issues Of Fact Remain About The Existence Of A Knowingly False Statement.**

PIC's paper-thin evidence of a false statement by Gillette cannot withstand scrutiny. In its motion, PIC consistently misinterprets documents or juxtaposes evidence from widely different time periods to create the illusion of Gillette's fraudulent intent. A brief review of the cited evidence reveals PIC's failure to identify a false statement. None of these issues of material fact precludes summary judgment in favor of Gillette, however, for the reasons stated in Sections II.A. and B., *supra*.

First, the alleged false statement is itself uncontroversial. Gillette wrote that in response

---

[3] *Cf. Deisenroth v. Numonics Corp.*, 997 F. Supp. 153 (D. Mass. 1998). In *Deisenroth*, the plaintiff argued its tort claims were not time-barred because the defendants lulled him into believing there was no need to file suit. *Id.* at 156-57. Specifically, the plaintiff interpreted sporadic discussions with defendants' representatives, regarding "ways in which he might be repaid for the value of his eliminated stock" and "promises to bring the matter to the Board of Directors," as indications that plaintiff need not file suit. *Id.* at 155. Dismissing the plaintiff's tort claims as time-barred, the court held that a "defendant waives the statute of limitations defense only where it gulls the plaintiff by making such representations throughout the *entire statutory period*." *Id.* at 157 (emphasis added). PIC's fraud claim has the same ring to it: PIC requests the Court hold it was "gulled" by a single, general statement made by Gillette *nine months* before PIC filed suit. This authority further suggests the Court grant summary judgment for Gillette on this claim.

to PIC's June 23, 2003 request for the return of materials, Gillette was "conducting an internal investigation to determine the extent to which any of [PIC's] images have been used by Gillette or any of its subsidiaries." (Ex. 11.) PIC acknowledges, but soft-pedals, the fact that, at the time of this statement, Gillette *had* begun an investigation in response to PIC's written request and, within four days of Mr. Picone's June 2003 letter, had already returned hundreds of images to PIC. (Dkt. No. 75 ¶ 31; Dkt. No. 77, Ex. 28 at 1-25.) On this basis alone, Gillette's statement cannot be considered false.

Second, attempting to confuse the issue, PIC refers to an August 14, 2003 "smoking gun e-mail" from a Gillette legal intern as irrefutable proof of Gillette's false statement and fraudulent intent. The e-mail, sent to the original addressees of Mr. Picone's June 2003 letter and two other individuals, reads:

> I am attaching hereto an electronic copy of a letter that was sent yesterday afternoon by the General Counsels [sic] Office to the law firm currently representing Photographic Illustrators Corporation. Please note that delivery of a copy of this letter to you is simply for your reference and for your records. You do not need to do anything. Please make an effort not to openly discuss this matter with anyone and please direct any inquiries you may receive from anyone (including Mr. Picone) concerning this matter to John Gatlin.

(Dkt. No. 77, Ex. 34.) PIC would have the Court believe that, by this e-mail, Gillette Legal was "pulling the plug" on an investigation it had only just promised Mr. Picone it would perform. (Dkt. No. 81 at 4.) The document cannot bear the weight of PIC's interpretation.

On its face, the e-mail carries none of the nefarious intent PIC ascribes to it. The Gillette Legal Department is, logically, the department responsible for internal investigation of potential legal claims made against the company. Aware that several Gillette employees had received Mr. Picone's June 2003 letter, the department provided them a copy of Gillette's response. At the same time, the department clearly sought to alleviate any concern that it was the employees' responsibility to take unsolicited work upon themselves as part of the "investigation" referenced in the letter. The statement "you do not need to do anything" is obviously an assurance that the non-legal employees did not need to take any action unless they were contacted by the legal

11

department in the course of its investigation.[4]  While PIC hopes, through added emphasis, to

convert this statement into "do not do anything, there is no investigation," the document simply

does not say this.  Furthermore, PIC's reliance upon this privileged document is improper and

violates the express terms of the Confidentiality Stipulation between the parties, which PIC

originally proposed.[5]

Third, perhaps PIC's most egregious mischaracterization of evidence comes with its

allegation that *a year later*, in May 2004, another Gillette attorney, Leon Bechet, reversed course

and stated in a new letter to PIC counsel Michael Albert that "no representation was made to you

regarding an 'investigation' undertaken by Gillette." (Dkt. No. 81 at 4; Ex. 35.) PIC has

deliberately taken Mr. Bechet's statement out of context to create a false and misleading

impression.

Here is what really happened:  after a telephone conversation with Mr. Bechet on May

18, 2004, Mr. Albert sent a letter to Mr. Bechet purporting to confirm the content of their

conversation on *that day*.  (Ex. 34.)  Among other things, Mr. Albert claimed that, *during their*

*telephone conversation*, Mr. Bechet had "confirmed Michelle Bratton's previous representation

---

[4] Indeed, one Gillette employee who received the e-mail, Elizabeth Cooper, validated this clear intent of the e-mail in her testimony about subsequent communications with Gillette employees in September 2003. (Dkt. No. 77, Ex. 1 at 247.)

[5] PIC proposed the parties enter a confidentiality stipulation (*see* Perkins Decl., Ex. 5), to which the parties stipulated on February 4, 2005. (Perkins Decl., Ex. 6.) Paragraph 12 of the final stipulation states that if a producing party discovers that privileged materials have been produced, counsel for the producing party shall give prompt written notice to the receiving party, who shall take prompt steps to ensure that all copies of the material are returned. (*Id.* ¶ 12.) It also states that "the Receiving Party may afterward contest such claims of privilege or work product as if the materials had not been produced, but *shall not assert that a waiver occurred as a result of the production.*" (*Id.* (emphasis added)) In its original proposal, PIC's counsel called its draft stipulation, which contained this language on inadvertent production, a "standard protective order that we often use in IP cases." (Perkins Decl., Ex. 5.) Blatantly ignoring the contract that it proposed and the parties assented to, PIC now includes an inadvertently produced privileged document as a centerpiece of its motion for summary judgment. PIC justifies its behavior by a brief citation to *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 190 F.R.D. 287 (D. Mass. 2000) (Young, *Chief J.*), and a claim that inadvertent production waives privilege. (Dkt. No. 81 at 4, n.3.) Although this Court analyzed inadvertent production in *Amgen*, the case did not address the effect of a confidentiality stipulation between the parties. Indeed, as courts in this district have recognized, "[u]nlike the situation in *Amgen*, the parties here have chosen to have the issue of inadvertent disclosure governed by the stipulated protective order .... [a]ccordingly, the parties have stipulated to a rule that is close to the 'no waiver' rule. This is not an uncommon occurrence." *VLT Corp. v. Unitrode Corp.*, 194 F.R.D. 8, 11 (D. Mass. 2000) (enforcing stipulation and holding no waiver of privilege). The production of a single document from the Gillette legal department to Gillette employees does not reflect gross negligence, but rather simple "inattention, i.e., inadvertence." *Id.* at 12. Gillette also promptly contacted PIC and requested return of the document as soon as Gillette became aware of the inadvertent production. (Perkins Decl., Ex. 7.) The Court should not sanction PIC's behavior here.

12

to [PIC] that an *index* has been prepared within Gillette of the photographic materials belonging to our client that Gillette has located and gathered during its *investigation*.... You were not willing, however, to provide that *index* to us at this time." (*Id.*) (emphasis added.) The next day, on May 19, 2004, in response to Mr. Albert's letter, and specifically in reply to Mr. Albert's faulty recollection of their March 18 telephone conference, Mr. Bechet wrote: "I enjoyed our conversation. In reply to yours of the 18th, please be advised that no representation was made to you regarding an 'investigation' undertaken by Gillette. Also, no representation was made to you regarding an index of photographic materials belonging to your client." (Ex. 35.) Mr. Albert did not respond to Mr. Bechet's letter.

Insofar as Mr. Albert participated in the May 18 telephone conference and wrote the May 18 letter that elicited Mr. Bechet's May 19 response, there can be no doubt that Mr. Albert has always known perfectly well that Mr. Bechet was *not* referring to any prior statement made by Mr. Gatlin, but was correcting PIC's counsel's erroneous record of the parties' telephone conversation of the previous day. Moreover, no reasonable reading of Mr. Bechet's letter can lead to PIC's claim that Gillette conducted no internal investigation. PIC's attempt to suggest the contrary deliberately mischaracterizes the evidence.

Fourth, PIC makes several observations about the discovery process in this case to prop up its allegation that Gillette did not conduct an internal investigation and, thus, made a knowingly false statement in its August 2003 letter. Chiefly, PIC argues that Gillette's production of large numbers of documents "late" demonstrates that no "meaningful" investigation could have occurred in 2003. (Dkt. No. 81 at 5.) PIC's allegation – and, devoid of any fact, it is nothing more – rests on the groundless assumption that Gillette had agreed to a particular type of investigation, or timeframe for it, in its August 2003 letter. Gillette did not give an end-date for the investigation, made no promises as to what would be found, and gave PIC no assurances about the efficiency of its legal department. Again, Gillette made a general statement to Mr. Picone and nothing more. The discovery process in this action has no bearing

13

on the truth or falsity of any statements in Gillette's August 2003 letter.[6]

Despite PIC's efforts to bend the facts in its favor, the record provides no evidence that Gillette made any false statement in its August 2003 letter. The Court should deny PIC's motion on this ground.

## III.    GILLETTE INTENDED TO PAY PIC FOR THE SPRING 2004 JOBS AT THE TIME PIC WAS HIRED, AND PIC'S FRAUD CLAIM FAILS.

PIC correctly argues that "[s]tatements that are promissory in nature are not actionable as fraud or misrepresentation unless it is shown that the promisor had no intention of fulfilling the promise when it was made, so there was a false representation of present intention." *Thornton v. Harvard Univ.*, 2 F. Supp. 2d 89, 95 (D. Mass. 1998) (rejecting fraud claim). PIC further narrows its analysis to the issue of whether Gillette intended to pay PIC at the time the parties agreed PIC would perform the Spring 2004 Projects. (Dkt. No. 81 at 9.)

As an initial matter, "[s]ummary judgment is disfavored where a party's state of mind or motive constitutes an essential element of the cause of action." *Banafato v. Conductron Corp.*, No. CA931319F, 1993 WL 818568, at *3 (Mass. Super. Nov. 12, 1993) (denying summary judgment on promissory fraud claim where genuine issue of fact arose as to intent of promisor) (citing *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 809 (1991)). On this basis alone, the Court should deny PIC's motion. Regardless, clear issues of material fact exist as to (i) Gillette's intent to pay PIC at the time the parties agreed on the Spring 2004 Projects, and (ii) events subsequent to the parties' agreement that caused Gillette to withhold payment for PIC's work on those projects. Summary judgment is inappropriate for two reasons.

First, Gillette intended to pay PIC at the time the parties agreed on the Spring 2004 Projects. PIC's suggestion otherwise lacks any support and is contrary to the record. The

---

[6] PIC also argues that Gillette's privilege log proves that Gillette did not conduct an investigation in 2003 because the only other entry in 2003, a "mere 'list of materials' which evidently did not contain the vast majority of the relevant materials ultimately produced after PIC filed its Contempt Motion ... does not come close to reflecting an 'investigation.'" (Dkt. No. 81 at 5.) Again, PIC's argument is nonsensical and inconclusive. Whether an ongoing investigation of a large company turned up results in its first few weeks or second year does not answer the question – clearly answered in the affirmative by the record before this Court – whether the investigation *ever existed*. PIC's theories about Gillette's investigation ask the Court to rule on the basis of inferences and suggestions unsupported by the evidence.

Gillette employee who hired PIC to perform the Spring 2004 Jobs, Elizabeth Cooper, confirms that Gillette intended to pay PIC at the time of hire. (Cooper Decl. ¶ 9.) In her deposition, Ms. Cooper stated that she and other Gillette employees agreed that undoubtedly there "was not any intent ... not to pay [PIC]." (Dkt. No. 77, Ex. 1 at 258.)

Against this clear evidence, PIC lobs a series of unsupported allegations that, immediately before her meeting with PIC, Ms. Cooper was "instructed" by Gillette counsel not to pay PIC for the Spring 2004 Jobs. Ms. Cooper has dispelled this baseless allegation and confirmed that she was *never* instructed not to pay PIC by anyone at Gillette. (Cooper Decl. ¶ 9.) Notably, in its deposition of Ms. Cooper, PIC chose not ask her whether she was instructed not to pay PIC for its work. Aware that she was never given any such instruction, PIC avoided making a record on this issue and chose instead to rely upon indirect and unsupported allegations.

In the absence of any evidence of a knowingly false statement, PIC clings to a brief order of the Court concerning an "adverse inference" to fill in the gaps. As noted above, Ms. Cooper met with Gillette counsel John Gatlin, prior to her meeting with Mr. Picone, to discuss potential future projects with PIC. (Dkt. No. 77, Ex. 1 at 224-30.) At her meeting with Mr. Picone, Ms. Cooper provided him with her notes of the prior meeting with Mr. Gatlin. (*Id.*) In February 2005, PIC moved to compel the clearly privileged notes of Mr. Gatlin and of a Gillette Legal Intern from two subsequent meetings in late February and April 2005. (Dkt. No. 38.) The Court properly denied PIC's motion and noted that "the assertion of an attorney-client privilege in this context may be grounds for the drawing of an adverse inference" and referred the parties to *Kendall v. Atkins*, 374 Mass. 320 (1978). (2/10/05 Electronic Order.)

The *Kendall* case makes no mention of such an inference or when drawing one is appropriate but involves the clearly distinguishable case of one party's counsel calling another party's counsel as a witness at trial. *See Kendall*, 374 Mass. at 323-25. PIC's argument should be rejected for two additional reasons. First, PIC misses the mark in arguing that "in the absence of any explanation regarding why PIC's invoices were not paid, PIC is entitled to an inference that counsel instructed Ms. Cooper not to pay those invoices even before she retained PIC."

15

(Dkt. No. 81 at 11.)  In fact, Gillette has provided, *infra*, the two actual, compelling reasons why it did not pay the invoices for the Spring 2004 Jobs, which PIC has known about since May of 2004.  Second, such an inference is inappropriate where the notes Ms. Cooper provided to Mr. Picone give absolutely no indication that anyone instructed Ms. Cooper not to pay PIC.  As the Court can examine for itself (Dkt. No. 77, Ex. 37), the notes from Ms. Cooper's meeting with Mr. Gatlin cover prospective terms for the PIC-Gillette relationship on a going-forward basis in 2004 and give *no suggestion whatsoever* that Gillette did not intend to pay PIC for its services.  Ultimately, without any evidence of a false statement or Gillette's intent, PIC asks the Court to "infer" essential elements of its fraud claim without any basis.  The Court should reject PIC's claim.

Second, the actual reasons Gillette withheld payment for the Spring 2004 Jobs are subsequent events that occurred over two months after the parties reached agreement in February or March 2004.  Months after PIC completed the majority of the Spring 2004 Jobs (and several weeks after completion of the final job), it chose to file the complaint in this action on May 7, 2004.  (Dkt. No. 1.)  Only then, after another week had elapsed, did PIC send the invoices for the Spring 2004 Jobs on May 14, 2004.  (Perkins Decl., Ex. 2.)  Although Gillette had naturally intended to pay PIC for the Spring 2004 Jobs when it hired him – as it had done throughout the ten years of their relationship – PIC's later decision to initiate litigation in May 2004 caused Gillette to decide *at that time* to withhold payment.

Furthermore, Gillette decided to withhold payment in May 2004 because the invoices for the Spring 2004 Jobs – sent after PIC initiated litigation – were exorbitantly high and far beyond any amount PIC had charged Gillette in the past.  (Cooper Decl. ¶ 8; Dkt. No. 77, Ex. 1 at 83, 152.)  The inexplicable and gross overcharges were the second reason Gillette chose, in May 2004, to withhold payment for the Spring 2004 Jobs.[7]

---

[7] PIC also argues that the exorbitant amounts of the invoices are a "pretext," demonstrated by the fact that no one from Gillette called PIC to "get satisfaction" on a billing issue, thus compelling the conclusion that the intention not to pay was "preconceived."  (Dkt. No. 81 at 10.)  Gillette did not receive the disputed invoices until after PIC filed suit, and PIC's argument that Gillette should have called to "work out" the billing issue while the parties were in litigation is nonsensical.

Where there is unchallenged testimony that a party intended to perform at the time of contract, but subsequent events caused the party to choose not to perform, a fraud action cannot stand. *See Gerli v. G.K. Hall & Co.*, 851 F.2d 452, 455 (1st Cir. 1988) (affirming Chief Judge Young's directed verdict in favor of defendant on fraud claim); *Carroll v. Barberry Homes, Inc.*, No. 976418, 1999 WL 1204020, at *4 (Mass. Super. Oct. 22, 1999) (dismissing fraud claim where affidavit stated intent to perform at time of contract).

Further, though PIC asserts that Gillette's "intention not to pay can only have been pre-conceived," (Dkt. No. 81 at 10), the simple fact of non-performance is insufficient to show a party's intent at the time of contract. *See Galotti v. United States Trust Co.*, 335 Mass. 496, 501 (1957) (rejecting deceit claim); *Zhang v. Mass. Inst. of Technology*, 708 N.E.2d 128, 135 (Mass. App. 1999) (rejecting fraud claim and further noting that "nor does [a promisor's] failure to perform the agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into"); *Town of Framingham v. Shoppers World Community Ctr. L.P.*, No. 00-P-756, 2002 WL 1766604, at *3 (Mass. App. Jul. 31, 2002) (same). PIC has failed to meet its burden, material issues of fact exist, and summary judgment is inappropriate.

## IV. PIC COULD NOT HAVE RELIED UPON ANY ALLEGED STATEMENT MADE BY GILLETTE EMPLOYEE ANNA MADDEN, FAILS TO DEMONSTRATE THE EXISTENCE OF A FALSE STATEMENT, AND OFFERS NO EVIDENCE OF MS. MADDEN'S INTENT.

PIC devotes a single sentence to its argument that a statement allegedly made by Gillette employee Anna Madden constitutes fraud. (Dkt. No. 81 at 11.) PIC alleges that in a March 2001 conversation with Ms. Madden, Mr. Picone asked why Gillette had reduced duplication orders to PIC, to which Ms. Madden responded that Gillette had a reduced need at that time. (*Id.* at 7.) This statement was allegedly false, as Gillette was "during that same period" ordering duplicates directly from third party Advanced Photographics. (*Id.*) PIC deliberately seeks to deceive this Court with this argument, which it knows to be contrary to the facts.

Even assuming Ms. Madden made the alleged statement, Gillette is entitled to summary

17

judgment on PIC's fraud claim for several reasons.[8] First, the dates of the Advanced Photographics invoices – not disputed by the parties – demonstrate that PIC could not have relied to its detriment upon any statement by Ms. Madden. The date of the last Advanced Photographics invoice alleged by PIC to establish Gillette's improper duplication of photographs is March 31, 2000, *one year prior* to Ms. Madden's alleged statement to Mr. Picone. (Ex. 7 at 22.) PIC is simply wrong on the facts and deliberately obscures them in its allegation that "during the same time period" of Ms. Madden's alleged statement, Gillette was ordering duplicates from Advanced Photographics. (Dkt. No. 81 at 7.) Assuming the alleged statement to be true, it is impossible that Ms. Madden's statement in 2001 induced PIC not to take action that resulted in improper duplication by Gillette *a year earlier* in 2000. PIC knows the facts and dates make its fraud claim impossible yet chose to include this claim in its motion.

Second, PIC could not have reasonably relied upon any statement by Ms. Madden regarding a reduced need for duplication services because PIC was already aware, *a year before*, that Gillette had ordered duplicates directly from Advanced Photographics. Two representatives from Advanced Photographics, Joe Gannuscio and Jason Roopenian, and Mr. Picone testified that Advanced Photographics had informed PIC of Gillette's duplication orders at the time the orders were placed. (Ex. 4 at 10-16; Ex. 3 at 11-12, 91; Ex. 2 at 186-87.) It is undisputed that Gillette did not place any orders for duplications after March 31, 2000. (Ex. 7 at 16-22.) PIC's claim that it relied to its detriment upon Ms. Madden's (allegedly contrary) statement a year later in 2001 is nonsensical, and at best an unreasonable instance of willful blindness. Such "willful blindness is insufficient to support a cognizable claim of reasonable reliance." *Bertera Chrysler Plymouth, Inc. v. Chrysler Corp.*, 992 F. Supp. 64, 74 (D. Mass. 1998) (granting summary judgment and dismissing fraud claim). Even with all inferences drawn in PIC's favor, it cannot establish reasonable reliance, essential to its fraud claim, and Gillette is entitled to summary judgment.[9]

---

[8] This argument is also addressed in The Gillette Company's Memorandum of Law In Support of Its Motion for Summary Judgment ("Gillette Mot. S.J.") at pp. 15, 17-18.
[9] Another reason Gillette is entitled to summary judgment is that PIC's fraud claim is time-barred. As noted in Gillette's motion for summary judgment, assuming all facts alleged in PIC's motion are true, the three-year statute

Third, PIC has already conceded that it could not have detrimentally relied upon Ms. Madden's statement. From PIC's brief statement that the "purpose of Gillette's false statement was to prevent PIC from discovering the truth about Gillette's duplication activities," one is left to infer that the damage done to PIC was the secret and *unauthorized* duplication of images by Gillette. However, PIC has failed to allege any unauthorized duplications by Gillette. PIC alleges that it granted licenses to Gillette to reproduce images for a period of one year. (Second Amend. Compl. ("Dkt. No. 18") ¶ 10.) In stating the basis of its copyright infringement claims relating to the creation of duplicates, PIC failed to provide proof or even allege that duplicates were created beyond the alleged one-year license period. (Ex. 7 at 5-23.) In the absence of any unauthorized duplication, Ms. Madden's alleged statement, whether true or false, neither induced detrimental reliance nor caused any damage to PIC.

If the Court chooses not to rule for summary judgment in Gillette's favor, an issue of material fact exists as to whether Ms. Madden even made this allegedly false statement. PIC specifically addressed the conversation between Mr. Picone and Ms. Madden in her deposition. Ms. Madden stated she could not recall whether Mr. Picone asked here why he was not receiving orders for duplicates from Gillette. (Dkt. No. 49, Ex. 3 at 98.) Twice more, PIC counsel asked whether she discussed duplication with Mr. Picone, and twice Ms. Madden stated she did not "remember there being anything brought up about duplications" and did not discuss with Mr. Picone where Gillette was getting duplicates made. (*Id.* at 100-101.) On this basis alone, an issue of fact arises as to an essential element of PIC's fraud claim. The directly conflicting accounts of Mr. Picone and Ms. Madden boil down to a credibility issue that is clearly inappropriate for disposition on summary judgment.

Furthermore, even assuming Ms. Madden made such a statement, PIC's motion is completely devoid of any evidence concerning Ms. Madden's intent – another essential element of its fraud claim. *See Sands*, 212 F.3d at 663. Because PIC has offered no evidence of this element and, in any case, summary judgment "is disfavored where a party's state of mind or

---

of limitations for fraud began to run in March 2001, the time at which PIC alleges Ms. Madden made her false statement. More than three years elapsed between that event and PIC's filing of its complaint in May 2004. *See* Gillette Mot. S.J. at 18.

19

Case 1:04-cv-10913-WGY     Document 100     Filed 04/22/2005     Page 24 of 24

motive constitutes an essential element of the cause of action," PIC's motion should be denied. *Banafato*, 1993 WL 818568 at *3. Again, though PIC fails to make a proper showing for a fraud claim, none of the disputed factual issues preclude summary judgment in Gillette's favor, as discussed above.

**CONCLUSION**

For the reasons set forth above, Gillette respectfully requests that the Court deny PIC's Motion for Summary Judgment on Gillette's Fraud.


April 22, 2005                                    FROSS ZELNICK LEHRMAN & ZISSU, P.C.



                                                  By:   /Patrick T. Perkins
                                                        Patrick T. Perkins (Admitted *pro hac vice*)
                                                        David Donahue (Admitted *pro hac vice*)
                                                  886 United Nations Plaza
                                                  New York, New York 10017
                                                  Ph: (212) 813-5900
                                                  Fax: (212) 813-5901

                                                  GELB & GELB LLP

                                                  By:    /Richard M. Gelb/
                                                        Richard M. Gelb (BBO#188240)
                                                        rgelb@gelbgelb.com
                                                        Robert S. Messinger (BBO#651396)
                                                        rmessinger@gelbgelb.com

                                                  20 Custom House Street
                                                  Boston, MA  02110
                                                  Tel: (617) 345-0010
                                                  Fax: (617) 345-0009

                                                  *Attorneys for Defendant The Gillette Company*


I:\jdeabler\Gillette\Opposition to PIC's SJ Mot. re Fraud.doc