UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHOTOGRAPHIC ILLUSTRATORS CORPORATION, <br><br> Plaintiff, <br><br> vs. <br><br> THE GILLETTE COMPANY, <br><br> Defendant. | Civil Action No. 04-10913 WGY |
| THE GILLETTE COMPANY, <br><br> Counterclaim-Plaintiff, <br><br> vs. <br><br> PHOTOGRAPHIC ILLUSTRATORS CORPORATION and PAUL PICONE, <br><br> Counterclaim-Defendants. | |

**THE GILLETTE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO PIC'S MOTION FOR SUMMARY JUDGMENT ON ITS CLAIM FOR LIQUIDATED DAMAGES FOR GILLETTE'S ALLEGED FAILURE TO RETURN PIC'S IMAGES**

FROSS ZELNICK LEHRMAN & ZISSU, P.C.
    Patrick T. Perkins (Admitted *pro hac vice*)
    David Donahue (Admitted *pro hac vice*)
886 United Nations Plaza
New York, New York 10017
Ph: (212) 813-5900
Fax: (212) 813-5901

GELB & GELB LLP
    Richard M. Gelb (BBO#188240)
    Robert S. Messinger (BBO#651396)
20 Custom House Street
Boston, MA  02110
Tel: (617) 345-0010
Fax: (617) 345-0009
*Attorneys for Defendant/Counterclaim-Plaintiff*
*The Gillette Company*

TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT ...........................................................................................................1

I.    PIC'S CLAIM FOR LIQUIDATED DAMAGES CLAIM IS BARRED UNDER
THE DOCTRINES OF WAIVER, LACHES AND ESTOPPEL...........................................1

    A.    PIC's Newly Minted Version Of The Purported Agreement Between The
Parties Cannot Be Considered ...............................................................2

        I.  PIC Is Bound By The Judicial Admissions In Its Pleading..................2

        2. PIC's Purported Discussions With A Gillette Consultant In 1992 Are
Barred By The Parol Evidence Rule..................................................3

    B.    By Its More Than 10-Year Inaction As To The Purported 30 Day Return
Requirement And Its Attendant Late Penalty, PIC Has Waived Its Claim ...............4

    C.    PIC's Claim Also Is Barred Under The Doctrine Of Laches and Estoppel...............5

II.   THE BOILERPLATE IS NOT THE CONTRACT BETWEEN THE PARTIES.................7

    A.    The Parties Did Not Agree To The Back Of The Invoice Boilerplate........................7

    B.    Even if Summary Judgment Were Not Warranted for Gillette There Are
Genuine Issues Of Material Fact As To The Terms Relating To Return Of
The Photographs Which Preclude Summary Judgment for PIC..............................11

III.  THE LATE PENALTY IS UNENFORCEABLE AS A MATTER OF LAW....................12

    A.    Paragraph 11 Of The Boilerplate Is A Penalty .........................................12

    B.    PIC's Reliance On A Purported "Industry Standard" In This Case Is
Misplaced Since PIC Concedes That It Did Not Enforce The Boilerplate As
Written ...........................................................................................16

IV.  EVEN IF GILLETTE WERE NOT ENTITLED TO SUMMARY JUDGMENT ON
PIC'S LIQUIDATED DAMAGES CLAIM, THE LIABILITY ASSIGNED BY PIC
TO PURPORTEDLY UNRETURNED TRANSPARENCIES IS VASTLY
OVERSTATED AND, IN ANY EVENT, THERE ARE ISSUES OF FACT THAT
PRECLUDE SUMMARY JUDGMENT FOR PIC............................................................17

    A.    PIC's Breach of Contract Claims That Accrued Prior To May 7, 1998 Are
Barred By The Statute Of Limitations......................................................17

B.   PIC Is Precluded From Claiming Any Breach Of Contract Claim Between December 31, 1990 And August 19, 1998 Because In That Period PIC Did Not Exist ........................................................................................................................18

C.   Genuine Issues Of Material Fact Exist As To PIC's Reconstructed "Calculation" Of Original Transparencies Purportedly Delivered To Gillette..........................................................................................................................18

D.   PIC's Calculation Fails To Subtract Transparencies It Has Recovered And Those That It Will Recover At The Conclusion Of The Litigation...........................................................................................................................19

CONCLUSION...........................................................................................................................20

I:\PPERKINS\GLTC\General\TOC-Liq. Dam-Final.doc

**Preliminary Statement**

For more than 10 years, plaintiff Photographic Illustrators Corporation ("PIC") provided photographs of Gillette's own products to Gillette. PIC claims that its back of the invoice "terms and conditions" (the "Boilerplate") required Gillette to return PIC's original transparencies and negatives within 30 days of first publication (the "Purported 30-day Return Requirement") or pay $1,500 per transparency or negative not returned within 30 days (the "Late Penalty"). For over a decade PIC *never* enforced the Purported 30-day Return Requirement and *never* once charged Gillette a penny for a single unreturned negative or transparency. As set forth in Gillette's motion for summary judgment (Dkt. No. 89), these circumstances warrant a finding that PIC waived the "liquidated damages" provision PIC seeks to invoke in this case.

In the face of PIC's obvious and unambiguous waiver, PIC has resorted to changing its story. Despite the unambiguous allegations of its three pleadings, PIC now claims that PIC and Gillette entered into a different agreement under which PIC had "extended" the Purported 30-day Return Requirement for an unspecified period of time. This transparent lawyer's argument is legally inadmissible and, in any event, does not overcome PIC's waiver or the fact that the Boilerplate clauses are unenforceable as a matter of law. The Court should not be fooled— Gillette's motion for summary judgment should be granted and PIC's denied.

## ARGUMENT

### I.    PIC'S CLAIM FOR LIQUIDATED DAMAGES CLAIM IS BARRED UNDER THE DOCTRINES OF WAIVER, LACHES AND ESTOPPEL

In all three versions of its Complaint, PIC's breach of contract claim for liquidated damages has been limited to a claimed breach of paragraphs 10 and 11 of the Boilerplate. (SAC ¶¶ 14, 15, 53.) Under the terms of the Boilerplate upon which PIC relies in its Complaint (and assuming only *arguendo* that the Boilerplate constitutes an enforceable agreement, *see* Section II, *infra*; *see also* Dkt. No. 89, Mem. at 4-6), Gillette purportedly was required to return "photographic material(s)" to PIC *within 30 days* and its failure to return such materials *within 30 days* "per item #10"—i.e., the Purported 30-day Return Requirement—triggered an obligation to pay $1500 per original transparency or negative. (*Id.*) PIC's pleaded breach of contract claim against Gillette throughout this case thus has been based on its allegations that "Gillette failed to

return PIC's copyrighted Photographs as required by *Paragraph 10 of the [Boilerplate] Agreements*" and that "Gillette has breached its [Boilerplate] *Agreements* with PIC by failing to return PIC's Photographs as required by the [Boilerplate] *Agreements*." (SAC ¶¶ 17, 53.)

In an effort to obtain (and to avoid) summary judgment, PIC has changed its story. PIC now claims that in 1992 it entered into a *different* arrangement with Gillette than that stated in the Boilerplate and pleaded in every iteration of its Complaint and that under such different arrangement, Gillette was required to return the negatives and transparencies "upon request" and *not* within 30 days of first publication. (PIC Br. (Dkt. No. 74) at 7.)

The reason for PIC's about-face is obvious—it is undisputed that for more than 10 years and in connection with more than 600 separate jobs, PIC *never* asked for the return of a single negative or transparency and *never* charged Gillette for its failure to return such materials within 30 days. (Dkt. No. 99, Ex. 1 at 29-31. ) As explained below, PIC's new story cannot be considered, and even if it is, the doctrines of waiver, estoppel and laches bar its current attempt to extract in excess of $14 million from Gillette.

**A.    PIC's Newly Minted Version Of The Purported Agreement Between The Parties Cannot Be Considered.**

PIC has come forward at this late hour with a new, different version of the purported "agreement" between the parties in a transparent effort to excuse its *ten-year* delay in attempting to "enforce" the Purported 30-day Return Requirement. (*See, e.g.*, Dkt. No. 75 ¶ 18 ("the return requirement was merely being extended (not waived)".) However, PIC's own judicial admissions, the language of the very Boilerplate on which PIC relies, and the Parol Evidence Rule bar PIC from engaging in this cynical tactic.

**1.    PIC Is Bound By The Judicial Admissions In Its Pleading**

"A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding." *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., Inc.*, 976 F.2d 58, 61 (1st Cir. 1992) (citation omitted). In *Schott*, the district court rejected a plaintiff's attempt to thwart summary judgment by relying upon the existence of a purported oral agreement not pleaded in the Complaint. *Id.* at 60-61. Instead, the Court held that the plaintiff was bound to its own pleading. *Id.* As the Court of Appeals for the First Circuit

2

explained in affirming the district court:

> The judicial admission found by the lower court rested on plaintiff's clear and express statement in its original and amended complaints that "a contract did, in fact, exist between the parties," fortified by an attached copy of the 1985 Agreement. No other agreement was mentioned *nor was it suggested the Agreement was nullified, altered, or when or how that occurred.*"

*Id.* at 61 (emphasis added). The First Circuit further held that it had "scoured the complaint and [could] find no indication that plaintiff was pleading a termination and novation of the Agreement. . . . The complaint contains no mention of any contract other than the 1985 Agreement . . . ." *Id.* at 62.

The same is true here. PIC's operative Complaint—its third in the case—references and relies *solely* upon paragraph 10 of the Boilerplate "Agreements," which requires return of photographs in 30 days, and paragraph 11 of the Boilerplate "Agreements," which requires payment of $1,500 for failure to return photographs within 30 days in accordance with Paragraph 10. (SAC ¶¶ 14-15, 17, 53.) Nowhere in its pleading does PIC allege, rely upon, or even mention, any alteration of the Boilerplate, such as the "extension" of the 30-day period which PIC now claims. PIC should be held to its judicial admission in its pleadings.[1]

### 2. PIC's Purported Discussions With A Gillette Consultant In 1992 Are Barred By The Parol Evidence Rule.

PIC's attempt to change its story fails for another reason. "'Evidence of prior or contemporaneous oral agreements cannot be admitted to *vary* or *modify* the terms of an unambiguous written contract.'" *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1122-23 (1st Cir. 1995) (citations omitted). Moreover, "parol evidence may not be used to create ambiguity where none otherwise exists." *Id.* (citations and internal quotation marks omitted).

PIC's new story of an "extension" of the Purported 30-day Return Requirement is based upon alleged discussions that took place prior to PIC performing the first job for Gillette and thereafter in connection with the "second or third job." (Dkt. No. 75 ¶ 18.) This story contradicts PIC's Complaint in which PIC has alleged the existence of "hundreds" of integrated

---

[1] Moreover, the fact that the Boilerplate on which PIC relies contains a no oral modification clause, (*See* Dkt. No. 99, Ex. 5 at PIC 17349, ¶ 14), also bolsters a finding that PIC is bound by its judicial admission. *See Schlott*, 976 F.2d at 61 (holding that district court's finding of judicial admission was strengthened by fact that "[t]he Agreement provided that it could not be modified except by written instrument signed by an authorized Honda officer").

agreements between PIC and Gillette entered into over the years that all were subject to "PIC's standard terms and conditions." (SAC ¶ 9.) PIC cannot have it both ways—on the one hand claiming violation of hundreds of integrated written "Agreements" by Gillette while on the other hand purporting to modify the terms of such agreements through "prior or contemporaneous" alleged oral discussions. Assuming the allegations of PIC's own Complaint to be true, these alleged discussions clearly are inadmissible under the parol evidence rule. Indeed, as *PIC itself* vigorously argued in *its* motion to dismiss Gillette's counterclaims, an attempt to rely upon oral statements of the kind PIC presents here,

> violates the parol evidence rule, which prohibits a party to a written contract from contradicting the plain terms of that contract with prior statements. *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1122 (1st Cir. 1995). "The rule that written agreements may not be varied or added to by parol evidence of antecedent or contemporaneous negotiations is not one merely of evidence, but is a rule of substantive law." *Sound Techniques, Inc. v. Hoffman*, 737 N.E. 2d 920, 923 (Mass. App. Ct. 2000).

(Dkt. No. 26 at 9.)

Based on the foregoing, PIC's breach of contract claims on this motion must be limited to the contract PIC pleaded in its three complaints—not the new contract that PIC has conjured up to avoid summary judgment.

### B.    By Its More Than 10-Year Inaction As To The Purported 30 Day Return Requirement And Its Attendant Late Penalty, PIC Has Waived Its Claim

Whether or not PIC is permitted to contradict its pleading in this case, the undisputed facts demonstrate that PIC waived any return requirement as a matter of law.

"If [a party] intentionally relinquished a known right, either expressly or by conduct inconsistent with an intent to enforce that right, he has waived it and may not thereafter seek judicial enforcement." *Gooley v. Mobil Oil Corp.*, 678 F. Supp. 939, 941 (D. Mass. 1987), *aff'd* 851 F.2d 513 (1st Cir. 1988) (citation omitted and alterations in original). Waiver is a question of law to be resolved by the Court where the facts are undisputed. *Cumberland Farms, Inc. v. Marchese*, No. 9702497, 2000 WL 33171003, at *3 (Mass. Super. Mar. 14, 2000) (granting summary judgment against plaintiff) (citing *McCarthy v. Tobin*, 429 Mass. 84, 88 n.5 (1999)). Waiver is established where "clear, decisive and unequivocal conduct" indicates that the party to a contract would not insist that the contractual provision at issue be performed. *Aoude v. Mobil*

4

*Oil Corp.*, 862 F.2d 890, 893 (1st Cir. 1988) (*citation omitted*). *See also Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 992-93 (1st Cir. 1988) ("plaintiff's admitted failure to abide by the terms of the dual notice provision barred the subsequent prosecution of a breach of contract claim against Mass. Electric"). Here, for *ten years* PIC demonstrated clear, unequivocal, and undisputed conduct that it would not enforce the provisions it now seeks to enforce.

It is undisputed that from 1992 until 2002, PIC did not enforce the Purported 30-day Return Requirement or the Late Penalty, never once asking for the return of photographs and never once charging Gillette $1,500 for any transparency it failed to return within 30 days. (Dkt. No. 99, Ex. 1 at 29-31.) PIC failed to enforce these provisions because it wanted to continue its relationship with Gillette. (*Id.*, Ex. 1 at 29-31, Ex.2 at 133-34.) It is further undisputed that PIC did not provide any written inventory of materials it provided to Gillette, nor did it alert Gillette with any writing on the packages containing its materials that Gillette's failure to return the materials within 30 days would require Gillette to pay PIC $1,500 per image. (Dkt. No. 91 ¶ 4.) These actions (or inactions) on the part of PIC clearly establish a waiver of the Purported 30-day Return Requirement and its attendant Late Penalty as a matter of law. PIC's actions here could not be more clear, decisive, or unequivocal.

Moreover, even if PIC's new story is considered, the undisputed facts establish PIC's waiver of that purported agreement too. PIC relies on two purported conversations that allegedly took place in *1992* to support this new "agreement" that Gillette would return of the photographs at some unspecified time in the future. (Dkt. No. 74 at 7-8.) PIC's decision to *never* request the return of its photographs for *10 years*, and to *never* charge $1,500 for a single unreturned transparency or negative during that period (*see* Dkt. No. 99, Ex. 1 at 29-31) mean only one thing: that it never intended to enforce the purported condition.

### C.    PIC's Claim Also Is Barred Under The Doctrine Of Laches and Estoppel.

"The doctrine of laches applies when one party has unreasonably and inexcusably delayed bringing suit and the other party is prejudiced as a result of that delay." *Penn Cent. Corp. v. Union Pacific R. Co.*, 1993 WL 370827, at *4 (D. Mass. 1993) (citing *Galliher v. Cadwell,* 145 U.S. 368 (1892) and *Calkins v. Wire Hardware Co.,* 165 N.E. 889 (1929)).

"Laches commences from the time plaintiff had knowledge that its rights have been infringed." *Id.* Moreover, "'[a] person is estopped from denying the consequences of his conduct where that conduct has been such as to induce another to change his position in good faith or such that a reasonable man would rely upon the representations made.'" *Precious Metals Assocs., Inc. v. Commodity Futures Trading Comm'n,* 620 F.2d 900, 908 (1st Cir. 1980) (quoting *Bergeron v. Mansour,* 152 F.2d 27, 30 (1st Cir. 1945)).

As set forth above, PIC has unreasonably and inexcusably delayed in bringing suit and in enforcing the Purported 30-Day Return Requirement. For more than 600 separate jobs, PIC was aware that Gillette did not return its transparencies to PIC within 30 days. Yet PIC took no action. In reliance upon PIC's failure for more than 10 years to enforce the purported 30-day Return Requirement and the Late Penalty, Gillette had no reason to believe that it would be required at some unspecified future date to return original transparencies and negatives or be charged $1500 for each transparency or negative not returned. (Declaration of Beth Cooper, ("Cooper Decl."), ¶¶ 3-4; Declaration of Jill Josephson ("Josephson Decl."), ¶¶ 4-5; Declaration of Anna Madden ("Madden Decl."), ¶¶ 3-4; Declaration of Brenda Tattan, dated April 22, 2005 ("2d Tattan Decl."), ¶¶ 3-4.) PIC's new version of the "agreement" between the parties cannot overcome a finding of either laches or estoppel. First, PIC's failure for 10 years to request the return of a single transparency or negative and its failure to charge $1,500 for a single unreturned transparency or negative, can only be interpreted in one way—PIC did not want the transparencies and negatives back. Gillette had a right to rely upon PIC's failure for 10 years to ask for the return of any negatives or transparencies. This reliance by Gillette was all the more reasonable based upon PIC's failure to include any written inventory of materials it provided to Gillette and its failure to alert Gillette with any writing on the packages containing its materials that Gillette's failure to return the materials within 30 days would require Gillette to pay PIC $1,500 per image. (Dkt. No. 91 ¶ 4.)

Gillette's reliance on PIC's inaction is further justified by the undisputed fact that, since 1997, PIC kept high resolution digital copies of everything it provided to Gillette. (Dkt. No. 99, Ex. 2 at 218-19.) These high resolution scans are considered by PIC to be "original,"

6

"reproducible," and "equal in quality to originals."   (*Id.* Ex. 1 at 82; Dkt. No. 77 Ex. 7 at 166.) PIC repeatedly made Gillette employees aware that PIC was creating and storing duplicate, high resolution digital scans of its images of Gillette products. (*See, e.g.,* Cooper Decl. ¶ 3; Josephson Decl. ¶ 4; Madden Decl. ¶ 3; 2d Tattan Decl. ¶ 3; Dkt. No. 99, Ex. 23 at PIC 5875; Perkins Decl. Exs. 1 & 4.)  Thus, at least as early as 1997, Gillette had no reason to believe PIC would require the return of its transparencies and negatives since PIC retained a high resolution digital scan of "everything" that was provided to Gillette. (Dkt. No. 99, Ex. 2 at 218-19; Cooper Decl. ¶ 3; Josephson Decl. ¶ 5; Madden Decl. ¶ 4; 2d Tattan Decl. ¶ 4.)

Based upon the above undisputed facts, Gillette rightly relied upon PIC's extreme delay in enforcing a purported return requirement.  The doctrines of laches and estoppel thereby preclude any attempt by PIC now to enforce the Purported 30-day Return Requirement and its attendant Late Penalty.

## II.    THE BOILERPLATE IS NOT THE CONTRACT BETWEEN THE PARTIES

### A.    The Parties Did Not Agree To The Back Of The Invoice Boilerplate

PIC's summary judgment motion must be denied—and summary judgment *for Gillette* must be granted—for another independent reason.  PIC's contract claims rely entirely upon its mistaken assertion that the back-of-the-invoice Boilerplate was binding on Gillette on each of the more than 640 jobs PIC performed for Gillette.  However, the undisputed facts establish that PIC is incorrect as a matter of law.

Massachusetts law prohibits the addition of new or different terms on an invoice *after* the formation of an oral or written contract. *Commonwealth v. Hull*, 296 Mass. 327, 333 (1937) ("the document or letter containing the qualifying provisions must be accepted by the offeree at or prior to formation of the contract."); *Agoos Kid Co. v. Blumenthal Import Corp.*, 282 Mass. 1, 14 (1932) (citations omitted) ("[S]tatements printed on the defendant's bill heads are no part of the contracts between the parties."); *Lalime & Partridge, Inc. v. Hobbs*, 255 Mass. 189, 192 (Mass. 1926) (citations omitted).  *See also* 1 *Farnsworth on Contracts* § 4:26, at 567 (3d ed. 2004) (citing out-of-state authority) ("[T]erms may come too late if they are communicated only after a contract has been made …. Courts have held that terms on an invoice received after a

contract has been made are ineffective.").[2]

The rule is similar under the Massachusetts U.C.C.:  Where a seller sends goods to a purchaser with an invoice containing terms that are additional to or different than the terms of the parties' prior written or oral agreement, the form is *not* considered a counteroffer, and the terms on the form do *not* become part of the parties' agreement if they would materially alter the parties' agreement, even if the buyer accepts the goods. *JOM, Inc. v. Adell Plastics, Inc.*, 193 F.3d 47, 59 (1st Cir. 1999) (citing Mass. Gen. L. 106, § 2-207(2)(b)); *Glyptal, Inc. v. Engelhard Corp.*, 801 F. Supp. 887, 893 (D. Mass. 1992) ("seller's acknowledgement [that] arrives after the seller ships the goods" is "a mere proposal for additional terms, which either would be excluded from or incorporated into the parties' agreement depending upon" analysis under Section 2-207(2)).

PIC claims that the Boilerplate on the reverse of each job invoice represents a separate contract between PIC and Gillette.  (SAC ¶ 9.)  Yet PIC concedes that the Purported 30-day Return Requirement and the Late Penalty did not apply to the first job PIC performed in March 1992.  Paul Picone testified that Gillette had "bought those images outright.  They purchased them, *so I'd have no reason to ask for them back.*"  (Dkt. No. 99, Ex.2 at 16-17) (emphasis added).[3]  (*See also* Dkt. No. 99, Ex.7 at 67; Dkt. No. 77, Ex. 7 at 116-17, 136.)  Before its second job for Gillette, PIC did not tell Gillette it would have to return the photographs within 30 days, and did not discuss the Late Penalty.  (Dkt. No. 99, Ex.2 at 142.)  Paul Picone conceded that he *never* discussed paragraph 10 of the Boilerplate (the paragraph concerning the Purported 30-day Return Requirement and triggering the Late Penalty) with any Gillette employee.  (*Id.*, Ex.1 at 42.)  He further conceded that he never told Nadine Romano (the consultant to Gillette

---

[2] As explained in the *Restatement 2nd of Contracts*, where "non-contractual documents" such as invoices are "delivered after a contract is made" and contain purported contract terms, "a party without knowledge or reason to know that the [document] purports to be a contract is then not bound by terms printed on the [document]." *Restatement Second of Contracts* § 211, cmt. d & Illus. 3.

[3] PIC excluded the Job Number for the first job, 3072, from the list of jobs identified in its response to the Interrogatory requiring PIC to "state the basis of its breach of contract claim.  (*Id.*, Ex.7 at 67.)  Now, in an attempt to disavow its sworn testimony, PIC appears to suggest in a declaration that in connection with the first job Gillette *was* required to return negatives and transparencies at PIC's request.  (Dkt. No. 75 ¶¶ 14-17.)  PIC cannot contradict its deposition testimony with a subsequent declaration.  *Murphy v. Ford Motor Co.*, 170 F.R.D. 82, 85 (D. Mass. 1997).  Accordingly, Paragraphs 14-17 of the Picone declaration "must be stricken." *See id.*

organizing the first job) that if she lost PIC's photographs, Gillette would be required to pay $1,500 per image. (Dkt. No. 77, Ex. 10 at 135-36.) Although Picone insisted at his deposition that Ms. Romano had read the "Terms and Conditions" prior to the first job performed by PIC and thus had to be aware of the $1,500 penalty (*id.*), this insistence is a *non-sequitur* since it is undisputed that the $1,500 penalty *did not* and *does not* apply to the first job. (Dkt. No. 99, Ex.2 at 16-17; *Id.*, Ex.7 at 67.) Moreover, PIC conceded at deposition that at the time of the first job PIC performed for Gillette, there was *no* understanding in place as to the return of transparencies and negatives for all jobs with Gillette going forward. (Dkt. No. 77, Ex. 10 at 137.)

PIC's current story—that Gillette would be required to return PIC's images "on request" (Dkt. No. 75 ¶ 18)—is a startling admission by PIC that the Purported 30-day Return Requirement in the Boilerplate is *not* the agreement between the parties. Moreover, PIC concedes (both expressly and by its silence) that it *never* discussed with Gillette that failure to return photographic materials to PIC "on request" would result in Gillette being charged a $1,500 penalty for each lost transparency or negative. (Dkt. No. 77, Ex. 10 at 135-36.) In other words, the two provisions that PIC seeks to enforce on summary judgment *never* were discussed or expressly agreed to by the parties prior to any job. Moreover, because the Late Penalty is expressly triggered in the Boilerplate by a failure to return transparencies and negatives within 30 days "per item #10" (Dkt. No. 99, Ex. 6 ¶ 11) and because PIC concedes that "item #10" does not apply, the Late Penalty does not reflect the agreement between the parties either. There is simply no evidence that the parties agreed *prior to the photographs being taken and prior to the invoices being sent* that Gillette was required to return PIC's transparencies and negatives within 30 days and, if it failed to do so, that it would be required to pay $1,500 per lost transparency or negative.

PIC's citation to out of circuit authority does not save it here. (Dkt. No. 74 at 14-17.) For example, PIC cites to *Greenfield v. Twin Vision Graphics, Inc.*. 268 F. Supp. 2d 358, 373-75 (D.N.J. 2003), a case applying New Jersey law that is in direct conflict with Massachusetts law. *Compare Greenfield*, 268 F. Supp. 2d at 374 ("New Jersey contract law clearly binds the signors to the terms of the invoice") *with Agoos Kid Co.*, 282 Mass. at 14 (1932) ("[S]tatements printed

on the defendant's bill heads are no part of the contracts between the parties.")  In addition, the Court in *Greenfield* recognized that the course of dealing between parties can trump any purported invoice "terms."  *Greenfield*, 268 F. Supp.2d at 376.  This principle clearly favors Gillette since for more than a decade PIC *never once* enforced the Purported 30-day Return Requirement and *never once* charged Gillette for failure to return transparencies or negatives.  (Dkt. No. 99, Ex. 1 at 29-31.)

PIC's reliance upon *Bair v. Axiom Design, LLC*, 20 P.3d 388 (Utah 2001) is similarly misplaced.  (Dkt. No. 74 at 15.)  In that case, the Supreme Court of Utah remanded the matter for trial because the lower court had, *inter alia*, applied the wrong burden of proof on the liquidated damages issue.  *Bair*, 20 P.3d at 394.  The case is factually inapposite because, as PIC itself concedes, unlike PIC, the photographer in *Bair* set forth the terms of use (of return of photographs) on a "Delivery Memorandum" provided *with* the photographs (*Id.* at 389 n.1; *see also* Dkt. No. 74 at 15.)—not on invoices provided several weeks after the photographs as PIC did here (Dkt. No. 91 ¶ 5; Dkt. No. 99, Ex. 2 at 110.).

PIC's citation to *Wolff v. IEEE, Inc.*, 768 F. Supp. 66, 69 (S.D.N.Y. 1991), is equally inapposite since there (unlike here), the parties conceded that the terms on an invoice actually reflected the parties' understanding.  PIC fares no better with *Baker v. Int'l Record Syndicate, Inc.*, 812 S.W.2d 53 (Tex. 1991).  (Dkt. No. 74 at 15.)  The Court of Appeals of Texas' decision is limited to whether, under the facts of that case and under Texas law, the liquidated damages *amount* with respect to the particular photographs in that case was enforceable.  Again, unlike here, there was no dispute that the invoice represented the parties' agreement and there was no evidence that the parties' course of dealing and course of performance was directly in conflict with the purported terms on the invoice.

PIC's reliance upon *Rational Software Corp. v. Sterling Corp.*, 393 F.3d 276 (1st Cir. 2005) is particularly astonishing.  The result there favors Gillette.  In that case, the defendant sought to rely upon a limitation of liability provision on its bill of lading.  However, there, unlike here (1) the defendant had orally advised its customers of the limitation of liability provision; (2) the specific limitation of liability provision was initialed by the plaintiff's employee; and (3) the

plaintiff acknowledged that the provision governed the parties' relationships. *Id.* at 277. The Court of Appeals for the First Circuit held that the "prior course of dealing" of the parties established that the defendant "understood and agreed" that the limitation of liability provision would apply. *Id.* at 279. In the case at bar, the parties' undisputed "prior course of dealing" conclusively establishes that the Purported 30-day Return Requirement and the Late Penalty *did not* apply.

PIC seeks to make much of the fact that Gillette employees signed the front of many of PIC's invoices. (Dkt. No. 74 at 1, 7, 10, 13, 17.) In so doing, PIC takes Gillette deposition testimony out of context—to a person, the Gillette witnesses testified that the signature had the purpose solely of approving payment for internal purposes: the invoices were not returned to PIC. (Dkt. No. 77, Ex. 1 at 80-81, 84-85; *id.* Ex. 2 at 51-55, 105-106; *id.* Ex. 3 at 26-28, 40-41; *id.* Ex. 5 at 65-66, 69-71. *See generally* Dkt. No. 77, Ex. 14.) More to the point, the fact that Gillette employees signed off on the invoices for payment by Gillette's accounting department does not "convert" the invoices into contracts between the parties. Indeed, the Restatement Second of Contracts illustrates Gillette's point with the following example: "A sells plant bulbs to B. Later, A delivers the bulbs with an invoice containing contractual language. B writes on the invoice 'picked up on October 27th' and signs his name. *The invoice terms are not part of the contract.*" *Restatement Second of Contracts* § 211, cmt. d, illus. 3 (emphasis added).

Thus, on the undisputed facts of this case, the Purported 30-day Return Requirement in the Boilerplate did not apply as a matter of law.

**B.      Even if Summary Judgment Were Not Warranted for Gillette There Are Genuine Issues Of Material Fact As To The Terms Relating To Return Of The Photographs Which Preclude Summary Judgment for PIC.**

PIC seeks to base its claim that the Purported 30-day Return Requirement and the attendant Late Penalty were agreed to by Gillette by alleging that on March 2, 1992: (1) Paul Picone discussed the Boilerplate with personnel from the "Cartouche Agency" (Dkt. No. 74 at 6); (2) personnel from the Cartouche Agency reviewed the Boilerplate with Nadine Romano, an outside consultant to Gillette (*id.*); and (3) future Gillette employee Jill Josephson, who was serving as a hand model on the first job PIC performed for Gillette, was present during the

alleged discussion of the Boilerplate.  *Id.* at 8.

As it turns out, this story offered by PIC is a fabrication.  Jill Josephson testified that the alleged discussion did not take place in her presence, contrary to PIC's claim.  (Josephson Decl. ¶ 2.)  Moreover, former Gillette employee, Donna Sowder, the individual who supervised Nadine Romano's consulting work for Gillette, testifies that Ms. Romano would not have had the authority to make such a commitment and would reported such a discussion as that alleged by PIC with her.  (Declaration of Donna Sowder, ¶ 4.)  Ms. Sowder further explains that in 1992, Gillette never would have entered into an agreement as described in the Boilerplate because, at the time, Gillette's policy with other photographers it used was for Gillette to own all rights in the photographs and to retain the transparencies and negatives for future use.  (*Id.*)

## III.    THE LATE PENALTY IS UNENFORCEABLE AS A MATTER OF LAW.

### A.    Paragraph 11 Of The Boilerplate Is A Penalty.

"Liquidated damages must compensate for loss rather than punish for breach: '[A]n exaction of punishment for a breach which could produce no possible damage has long been deemed oppressive and unjust.'"  *Space Master Int'l, Inc. v. City of Worcester*, 940 F.2d 16, 18 (1st Cir. 1991) (quoting *Priebe & Sons, Inc. v. U.S.*, 332 U.S. 407, 413 (1947)); *see Colonial at Lynnfield, Inc. v. Sloan*, 870 F.2d 761, 764 (1st Cir. 1989) ("unreasonably large liquidated damages amount is unenforceable on public policy grounds as a penalty") (citations omitted). None of the cases cited by PIC on its motion contradicts or even questions this bedrock principle.

PIC definitively conceded at deposition that the purpose of the Late Penalty was *not* intended to compensate for loss of negatives or transparencies.

> Q:    Wouldn't the purpose of something like this [the Late Penalty] be to replace a negative or transparency that's been lost?…
>
> A:    *No*.

(Dkt. No. 77, Ex. 9 at 46 (emphasis added).)  PIC further admitted that the $1,500 amount in the Boilerplate was *not* intended to reimburse *PIC* for any loss, but rather that the amount represented "the fee price for most photographic assignments." (*Id.*)  The "fee price" charged for a photographic assignment has nothing to do with reimbursing PIC for loss of a transparency or negative.  PIC also conceded that the amount never had any relationship to any loss PIC might

suffer if its negatives and transparencies were not returned within 30 days as it had "no idea" what the basis was for the $1,500 set as the damages amount, which amount PIC viewed as "boilerplate." (*Id.* at 45-46, 52.)[4]

PIC attempts to overcome the punitive nature of the Late Penalty by relying upon the unsworn and inadmissible report of its paid "expert," and by citing general propositions from cases to the effect that where the value for loss is uncertain, a liquidated damages clause is enforceable. (Dkt. No. 74 at 18.) This tactic is to no avail. As set forth above, PIC has already conceded that the Late Penalty was not intended to compensate PIC for loss of negatives or transparencies. (Dkt. No. 77, Ex. 9 at 46.) In any event, as a matter of law, PIC cannot claim that, at the time it entered into its purported contracts with Gillette, it anticipated *any* damage in the event Gillette did not return original transparencies and negatives within 30 days. That is because PIC retained a "duplicate copy" of "every view that was taken [for Gillette] during [a] particular project" and that it "maintained an original copy for duplicating." (*Id.* at 28-29, 47-48.) PIC later testified that it kept "an original" of every shot provided to Gillette, and did not object to Gillette's counsel's statement in a question that PIC "kept one original of everything." (*Id.* at 47-48.)[5]

Moreover, beginning in 1997, PIC kept a high resolution, digital copy of every photograph taken by PIC for Gillette. (Dkt. No. 77, Ex. 10 at 218-19.) PIC considers these digital images to be "original" and "reproducible" just as any transparency or negative. (Dkt.

---

[4] Moreover, read strictly, Gillette's return of negatives or transparencies 31 days after publication would subject Gillette to a fee of $1,500 per transparency or negative. (Dkt. No. 99, Ex.6 ¶¶ 10-11.) No reasonable juror could find that the parties believed that if Gillette returned the materials on the 31st day after "publication," PIC would suffer damage in the amount of $1,500 per negative and transparency. The objective punitive nature of this provision renders the entire Late Penalty unenforceable as a matter of law. *See, e.g., Comm'r of Ins. v. Mass. Acc. Co.*, 310 Mass. 769, 771 (1942) (where the same liquidated damages clause applies to various breaches of a contract, if it is a penalty as to one type of breach, it is unenforceable as a penalty as to all breaches).

[5] Conceding the case dispositive nature of PIC's admission under oath that it kept a "duplicate original" transparency of every shot it provided to Gillette, on March 28, 2005, more than six weeks after the deposition, PIC provided what it called an "errata sheet" in which it attempts to completely revise its prior testimony. (Dkt. No. 99, Ex. 24.) Ignoring the questionable nature of this action, it should be noted that while PIC attempted to recant only one of its admissions that it kept a duplicate original of every view, the other two remain unchanged (*Compare* Ex. 24 *with* Dkt. No. 77, Ex. 9 at 47-48).

No. 77, Ex. 9 at 82.)[6] Thus, at the outset of each job it performed for Gillette, PIC *knew* it could suffer no loss from Gillette's failure to return photographic materials within 30 days because it maintained a high quality copy of everything provided to Gillette. (*Id.* Ex. 9 at 82; Ex. 10 at 218-19.)

PIC's own actions are admissions that the set of original transparencies and negatives provided to Gillette were of no value to anyone but Gillette. For example, PIC concedes that during a ten-year period, it never insisted that Gillette return of any original negative or transparency. (*Id.*, Ex. 9 at 29-31.) Moreover, PIC concedes that in 2000 it ceased maintaining the high resolution digital scans of all of the work performed for Gillette because "[n]o one was requesting them. I wasn't being called and I wasn't doing a lot of business with Gillette, so I just let them fall by the waist [sic] side." (Dkt. No. 77, Ex.10 at 200-21.) If these "original" and "reproducible" images of Gillette product had any value to PIC, it would have maintained them.

Perhaps most emblematic of the entirely punitive nature of the Late Return Penalty is PIC's continued claim that it is entitled to $1,500 for each of the 191 original negatives and transparencies returned to PIC on June 27, 2003, because they were not returned within 30 days of PIC's purported demand. (Dkt. No. 99, Ex.7 at 64-66.) PIC could not point to any actual damage it suffered from Gillette not having returned the original transparencies and negatives within 30 days of its request, stating only "they didn't live up to the terms and conditions of their agreement. They were supposed to return them immediately and they waited quite a while before they were returned." (Dkt. No. 77, Ex.10 at 260-61.) PIC conceded that it did not have occasion to utilize the 191 original negatives and transparencies between the purported 2002 demand and their return in June 2003.[7] (*Id.* at 261-62.) Indeed, it is clear that PIC does not want the photographs at issue returned and has suffered no loss – it just wants the money.

---

[6] PIC began creating digital copies because "clients started asking for scanned images rather than ektachrome [transparencies]." (Dkt. No. 77, Ex. 10 at 218.) Indeed, in correspondence with Gillette, PIC explained that its digital scans were suitable for any form of duplication Gillette might wish to make, with the exception of large format trade show displays. (Dkt. No. 99, Ex.23.) Even PIC's paid "expert" conceded at deposition that high resolution digital scans such as those PIC kept of Gillette's images are equal in quality to original transparencies and are accepted by stock photo agencies. (Dkt. No. 77, Ex. 11 at 166.)

[7] PIC further concedes that it is not making use of them now and that "[t]hey're in storage somewhere." (Dkt. No. 77, Ex.10 at 261.)

PIC makes the disingenuous claims that, at the time it entered into contracts with Gillette it was concerned about the following potential damages in the event Gillette failed to return negatives and transparencies: (1) Gillette would misuse PIC's images; and (2) PIC would be deprived of using the transparencies as reference materials, as part of a portfolio, for stock photography and other unnamed purposes. (Dkt. No. 74 at 17.) These arguments are meritless. When it entered into the purported contracts with Gillette, according to its own newly minted story, PIC knew that Gillette would be holding onto the negatives and transparencies for an undefined period of time. (Dkt. No. 75 ¶ 18.) Had PIC really had the above concerns at the time it entered into contracts with Gillette, it would have insisted upon return of negatives and transparencies within 30 days instead of failing to enforce the Purported 30-day Return Requirement for 10 years.

Moreover, PIC's awkward attempt to equate its claim for liquidated damages with purported unauthorized copying by Gillette (Dkt. No. 74 at 17) is impermissible under the Copyright Act's pre-emption provision. 17 U.S.C. § 301; *see also Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1164 (1st Cir. 1994).

PIC's remaining concocted "damages" are similarly without merit. For example, PIC's claim that it was deprived of reference materials is demonstrably false. Given that PIC keeps an original duplicate of every shot provided to Gillette (Dkt. No. 77, Ex. 9 at 28-29, 47-48), and since 1997 has kept a digital scan of everything provided to Gillette (*Id.* Ex.10 at 218-19), PIC knew when it formed the purported contracts with Gillette that, in this regard, regardless of whether or not Gillette returned negatives and transparencies, PIC would be deprived of nothing. PIC's "portfolio" claim (Dkt. No. 74 at 17), is similarly without merit. At deposition, PIC admitted that it only includes the "final printed piece" in its portfolio that it "wouldn't put a transparency in [its] portfolio." (Dkt. No. 77, Ex. 10 at 32.)

PIC's latest attempt to establish "damage" for non-return of transparencies is its claim that PIC principal Paul Picone is nearing retirement and may try to sell its transparencies "for a substantial sum" and that the fact that PIC is missing almost 10,000 transparencies from Gillette will lower the value of such sale. (Dkt. No. 74 at 18.) There is no allegation that PIC had this

concern when it formed its purported contracts with Gillette; thus the argument is irrelevant. *Kelly v. Marx*, 705 N.E. 2d 1114, 1116 (Mass. 1999).

PIC's attempt to rely upon the hypothetical discussion of its paid "expert" regarding stock photography is similarly without merit. Regardless of whether or not photography such as that provided by PIC to Gillette had any value for stock licensing, it is undisputed that in this case, according to its own "version" of events, PIC chose to forego any stock licensing revenues, deciding instead to permit Gillette to retain the negatives and transparencies. Moreover, at deposition, PIC conceded that it could recall *no* stock requests received since 1992. (Dkt. No. 77, Ex. 10 at 28.)

### B.    PIC's Reliance On A Purported "Industry Standard" In This Case Is Misplaced Since PIC Concedes That It Did Not Enforce The Boilerplate As Written

PIC makes much of the fact that the Boilerplate located on the reverse of its invoices comes from a form prepared by the Advertising Photographers Association ("APA"), a trade association for commercial photographers. (Dkt. No. 74 at 2, 4.) PIC attempts to parlay the allegedly broad use of the APA form and the $1,500 liquidated damage amount, as well as a list of out of circuit cases enforcing the $1,500 clause, into a conclusion that the Boilerplate here should be enforced. However, in this case it is undisputed that PIC *did not* abide by the Boilerplate *as written.*

PIC concedes that, notwithstanding the Boilerplate's requirement that negatives and transparencies be returned in 30 days, PIC consciously decided not to enforce the Purported 30-day Return Requirement. (Dkt. No. 75 ¶ 18; Dkt. No. 77, Ex. 9 at 29-31.) This conduct voids any "industry standard" argument PIC may wish to make now. *See Davis v. Dawson, Inc.*, 15 F. Supp. 2d 64, 108 (D. Mass. 1998) (course of performance and course of dealing trump industry standard in determining terms of parties' contract); *see also Keating v. Stadium Mgt. Corp.*, 24 Mass. App. Ct. 246, 251 (1987) ("There is no surer way to find out what the parties meant, than to see what they have done.") (quoting *Martino v. First Nat'l Bank,* 361 Mass. 325, 332 (1972) (internal quotation and citation omitted).) Very simply, the APA form boilerplate *is not* the "agreement" PIC seeks to enforce here. Indeed, the strict terms of the Boilerplate inextricably

link the time period for returning negatives and transparencies—30 days—with the $1,500 amount and it is the purported failure to abide by the Purported 30-day Return Requirement that triggers a payment. PIC's failure to enforce the Purported 30-day Return Requirement is a material change to the APA form boilerplate that must render the $1,500 damage estimate a meaningless number. No reasonable juror could find that the $1,500 damage estimate would be a reasonable forecast of damage where negatives and transparencies were not requested to be returned for 10 years, when the actual Boilerplate ties the estimate to a 30-day return period.

PIC's paid "expert" admitted as much, explaining that photographers are willing to part with their transparencies and negatives "many years after the job is done . . . ." (Dkt. No. 77, Ex. 11 at 15.) Clearly, the "damage" suffered by a photographer for loss of transparencies and negatives diminishes over time. The $1,500 figure in the APA form boilerplate is calibrated based upon the Purported 30-day Return Requirement and cannot apply where the photographer does not seek to re-gain negatives and transparencies for 10 years.

## IV.  EVEN IF GILLETTE WERE NOT ENTITLED TO SUMMARY JUDGMENT ON PIC'S LIQUIDATED DAMAGES CLAIM, THE LIABILITY ASSIGNED BY PIC TO PURPORTEDLY UNRETURNED TRANSPARENCIES IS VASTLY OVERSTATED AND, IN ANY EVENT, THERE ARE ISSUES OF FACT THAT PRECLUDE SUMMARY JUDGMENT FOR PIC

PIC claims that Gillette has failed to return 9,381 original transparencies and, as a result, Gillette is required to pay $14,071,500. As set forth above, the Late Penalty PIC seeks to enforce here has been waived and is unenforceable. Thus, summary judgment must be granted *for Gillette* on these claims. Even if, however, the Court were not inclined to grant summary judgment for Gillette, the number of unreturned transparencies for which PIC claims it is entitled to payment is vastly overstated.

### A.  PIC's Breach of Contract Claims That Accrued Prior To May 7, 1998 Are Barred By The Statute Of Limitations

The statute of limitations for breach of contract claims is six years from the date of accrual. *Saenger Org. v. Nationwide Ins. Licensing Assoc., Inc.*, 119 F.3d 55, 64 (1st Cir. 1997). "[A]n action for breach of contract generally accrues at the time of breach, thereby triggering the statute of limitations for purposes of determining whether a claim is time-barred." *Id.* (citations

omitted).  Because PIC instituted this action on May 7, 2004, its breach of contract claims arising out of Gillette's failure to return photographs to PIC prior to May 7, 1998 are time-barred.

**B.    PIC Is Precluded From Claiming Any Breach Of Contract Claim Between December 31, 1990 And August 19, 1998 Because In That Period PIC Did Not Exist.**

It is self-evident that in order to make a breach of contract claim, a party to an agreement must have existed at the time the disputed contract was made.  According to the official records of the Commonwealth of Massachusetts, PIC was involuntarily dissolved on December 31, 1990 and was not revived until August 19, 1998.  (Perkins Decl. Ex. 12.)  During the period of its dissolution, PIC could not make any contracts with Gillette or anyone else because it did not exist.  Thus, all jobs invoiced prior to August 19, 1998 cannot give rise to any breach of contract claim.

**C.    Genuine Issues Of Material Fact Exist As To PIC's Reconstructed "Calculation" Of Original Transparencies Purportedly Delivered To Gillette.**

PIC purports to have definitively calculated the number of original transparencies it delivered to Gillette over the more than 10-year working relationship between the parties.  (Dkt. No. 74 at 9-10; *see also* Dkt. No. 99, Ex. 7 at 199-211.)  However, PIC's *post-hoc* reconstruction, which would be inadmissible at trial because it was prepared solely for purposes of litigation and thus is not a business record, *see* Fed. R. Evid. 803(6), also appears to have gross inaccuracies.  PIC should not be given an evidentiary "pass" based upon its facile and unsubstantiated attempted reconstruction of events.

It is undisputed that, even if the Boilerplate applies (which it does not), PIC is entitled to payment only for unreturned *original* transparencies and negatives.  (Dkt. No. 99, Ex.6 at ¶ 11.)  The glaring problem with PIC's "calculation" is that nowhere in any of its job folders is there any distinction between *original* transparencies and *duplicate* transparencies.  (*See, e.g.*, Dkt. No. 77, Ex. 24.)  PIC concedes that it provided duplicate transparencies to Gillette over the years.  (Dkt. No. 99, Ex. 10 at 144, 174-75.)  Thus, there is a genuine issue of material fact as to the number of *original* transparencies that PIC actually provided to Gillette.

Moreover, even a cursory review of PIC's actual job folders, compared to PIC's claimed numbers, raise many questions.  For example, in connection with Job No. 4717, PIC claims to

have supplied 101 original transparencies to Gillette. (Dkt. No. 99, Ex. 7 at 204.) However a review of the actual job folder (*see* Perkins Decl. Ex. 8) demonstrates that there appears to be no basis for the number. For example, the only invoice from Advanced Photographics (PIC's vendor that provided the actual film) indicates that only *22* transparencies were prepared (with no identification anywhere as to whether any of the transparencies are duplicates). (*See id.* at PIC 9220.) Moreover, the job folder contains eight transparencies that PIC retained. (*See id.* at PIC 9216-19, 9222-23, 9242-43.) Thus, how PIC came up with a total of 101 transparencies remains a mystery.

Similarly, in connection with Job No. 4816, PIC claims to have supplied 85 original transparencies to Gillette. (Dkt. No. 99, Ex.7 at 204.) However, the invoice from Advanced Photographics indicates that only *78* transparencies were prepared (again with no identification of as to whether any were duplicates). (Perkins Decl. Ex. 9 at PIC 9009.) Moreover, PIC appears to have retained five transparencies in its file. (*Id.* at PIC 8978-82.) Again, how PIC came up with a total of 85 original transparencies is simply indecipherable.[8]

Even the example cited by PIC in its brief is incorrectly calculated. PIC claims to have retained only 26 transparencies in the folder for Job No. 5338. (Dkt. No. 74 at 10.) However, there are actually *38* transparencies in the folder. (Perkins Decl. Ex. 10 at PIC 6053-65, 6087-88, 6096-103, 6106-15, 6117-22.)

If the Court decides that the Purported 30-day Return Requirement and the Late Penalty apply to Gillette, which Gillette respectfully suggests it should not, then PIC should be put to its proof for each of the more than 600 jobs it claims to have performed for Gillette, with Gillette permitted to cross-examine PIC on each such job so that the jury can decide how many original transparencies were in fact provided to Gillette.

### D.    PIC's Calculation Fails To Subtract Transparencies It Has Recovered And Those That It Will Recover At The Conclusion Of The Litigation

If the Late Penalty really is intended to recompense PIC for actual loss of original transparencies and negatives, it stands to reason that it should not receive money for materials

---

[8] Page constraints prevent Gillette from setting forth all of the apparent errors and inconsistencies in PIC's calculations.

that have been returned.  Otherwise, as set forth above, the provision is merely a penalty.

PIC concedes that in June 2003 (only days after PIC's formal written demand) Gillette returned 191 original transparencies.  (Dkt. No. 77, Ex. 28.)  There is simply no loss to PIC with respect to those transparencies.[9]  Similarly, PIC has failed to deduct from its number of purportedly unreturned transparencies an additional *559* it recovered from Advanced Photographics in or around 2002.  (Dkt. No. 99, Ex. 7 at 24.)

Finally, PIC concedes that an additional 1,978 original duplicates were produced to it in discovery.  (*Id.* at 6-15.)  Upon completion of the case, those materials can also be returned to PIC, should it desire to receive them.[10]

## CONCLUSION

For the foregoing reasons, PIC's motion should be denied in its entirety.

Dated:  April 22, 2005

GELB & GELB LLP


By:___/s/Richard M. Gelb/_____
     Richard M. Gelb (BBO#188240)
     rgelb@gelbgelb.com
     Robert S. Messinger (BBO# 651396)
     rmessinger@gelbgelb.com

20 Custom House Street
Boston, MA  02110
Tel: (617) 345-0010
Fax: (617) 345-0009

FROSS ZELNICK LEHRMAN & ZISSU, P.C.

By:__/s/Patrick T. Perkins/_____
     Patrick T. Perkins (Admitted *pro hac vice*)
     David Donahue (Admitted *pro hac vice*)
886 United Nations Plaza
New York, New York 10017
Ph: (212) 813-5900
Fax: (212) 813-5901


*Attorneys for Defendant/Counterclaim-Plaintiff
The Gillette Company*

I:\PPERKINS\GLTC\General\Opp. PIC  SJ - Liq.Dam-Final.doc

---

[9] Indeed, those transparencies are sitting in a box in storage somewhere, completely unused. (Dkt. No. 77, Ex. 10 at 261.)

[10] Gillette has no use for the transparencies and thus would be willing to give them to PIC as a courtesy, though it cannot imagine why PIC would want them.  Gillette has not offered to return them before because PIC has heretofore taken the position that even if Gillette returned transparencies now, it is nonetheless required to pay $1,500 per transparency.