UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHOTOGRAPHIC ILLUSTRATORS CORPORATION,<br><br>    Plaintiff,<br><br>vs.<br><br>THE GILLETTE COMPANY,<br><br>    Defendant. | Civil Action No. 04-10913 WGY |
| THE GILLETTE COMPANY,<br><br>    Counterclaim-Plaintiff,<br><br>vs.<br><br>PHOTOGRAPHIC ILLUSTRATORS CORPORATION and PAUL PICONE,<br><br>    Counterclaim-Defendants. | |

**THE GILLETTE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO PIC'S MOTION FOR SUMMARY JUDGMENT ON GILLETTE'S COUNTERCLAIMS AND ON PIC'S CLAIM FOR PAYMENT OF ITS SPRING 2004 INVOICES**

FROSS ZELNICK LEHRMAN & ZISSU, P.C.
    Patrick T. Perkins (Admitted *pro hac vice*)
    David Donahue (Admitted *pro hac vice*)
886 United Nations Plaza
New York, New York 10017
Ph: (212) 813-5900
Fax: (212) 813-5901

GELB & GELB LLP
    Richard M. Gelb (BBO#188240)
    Robert S. Messinger (BBO#651396)
20 Custom House Street
Boston, MA  02110
Tel: (617) 345-0010
Fax: (617) 345-0009
*Attorneys for Defendant/Counterclaim-Plaintiff*
*The Gillette Company*

## PRELIMINARY STATEMENT

In early 2004, after a 1½ year deep freeze in the parties' relations, a Gillette employee asked plaintiff Paul Picone ("Picone"), about working on a new photography project for Gillette, hoping to start the thawing process. Instead, Picone and his company, plaintiff Photographic Illustrators Corporation (collectively, "PIC"), who were preparing to sue Gillette at the time, seized this as an opportunity to bilk the enemy and create new claims for their lawsuit against Gillette. PIC duped Gillette into retaining PIC for four more photo shoots in Spring 2004 (the "2004 Projects"), only to unilaterally impose, after the fact, a new and exorbitant pricing scheme that was never agreed to by the parties or even provided to Gillette. PIC also sought to impose, after the fact, boilerplate "terms and conditions" (the "Boilerplate") printed on the back of its prior invoices and expressly rejected by Gillette -- including an obligation to pay $1,500 as "liquidated damages" for each photo Gillette did not return within 30 days -- in order to bolster the baseless lawsuit they planned to bring all along.

PIC not only seeks summary dismissal of PIC's claims for breach of contract, promissory estoppel, fraud and unfair and deceptive trade practices arising from the 2004 Projects, but also seeks a ruling on summary judgment that Gillette must pay the amounts listed on the invoices PIC issued after the fact. PIC's motion is supported neither by the facts, key elements of which are in dispute, nor by the law.

## FACTS IN THE RECORD

During the Spring of 2004, Beth Cooper, Senior Project Manager in Gillette's Oral-B/Braun group, contacted plaintiff Picone to discuss the possibility of retaining him to photograph Gillette products in connection with the upcoming 2004 Housewares trade show.

(Tr. 46, 186-87; Cooper Decl. ¶ 1)[1]  Ms. Cooper had had a longstanding and "excellent working relationship" with Picone, liked working with him, and thought a reconciliation was possible. (Tr. 183)

Gillette has alleged, and PIC does not dispute, that Ms. Cooper met with Picone at the beginning of March 2004, that Picone agreed to work on the 2004 Housewares Show project and three other projects, and that both parties proceeded with these projects, which were completed before the end of April 2004.  (Dkt. No. 18, 2d Am. Compl. ("SAC"), ¶ 42; Picone Decl. at ¶¶ 33-34, 36)  Gillette has alleged, and PIC does not dispute, that the parties agreed PIC would charge "customary" rates for the work.  Nor does PIC dispute that it did not send Gillette invoices for these jobs, all completed by April 20 of that year, until *after* PIC sued Gillette in May 2004.[2]

The parties do, however, have a dispute concerning two matters:  (1) the pricing for the Spring 2004 Projects, and (2) the applicability of the terms in the Boilerplate on the backs of PIC's after-the-fact invoices for these projects.

**1.      Dispute On PIC's After-the-Fact Pricing of Spring 2004 Projects**

Ms. Cooper testified that PIC never even proposed a new fee terms for the 2004 Projects; the understanding was that the customary terms from the parties' prior dealings would apply (Tr. 216-19, 223-24; *accord* Countercl. ¶ 22).  Nonetheless, well after the projects were completed, and after PIC filed suit, PIC issued invoices for the 2004 Projects that bore no relation to the

---

[1] Citations to "Tr. __" are to pages of the Cooper deposition transcript annexed as Exhibit 1 to the Declaration of Michael N. Rader in Support of PIC's Summary Judgment Motions (Dkt. No. 77, Exh. 1).  Citations to "Cooper Decl." are to the April 22, 2005 declaration of Beth A. Cooper.

[2] Because PIC had just sued Gillette and there was an obviously-related dispute over the four 2004 invoices, Gillette has not paid these invoices.  (Dkt. No. 24, Countercl. ¶¶ 27-28.)

2

amounts it customarily charged Gillette for similar work over the years. In fact, she testified that the charge for the 2004 Housewares Show project -- $63,000 -- was *three times* the highest invoice PIC had ever sent her before. (Tr. 175)

At her deposition, Ms. Cooper testified that, based on several years of experience working with PIC, including well over 100 separate projects for which she engaged PIC on behalf of Gillette, almost nothing about the charges on the 2004 invoices was in keeping with PIC's customary charges to Gillette. Specifically, she testified that:

\*     PIC had done similar jobs for her, and based on that and her analysis of the components of the total bill, Ms. Cooper's expectation was that charges for the 2004 Housewares project "would have been nowhere in the vicinity of $63,000" that PIC charged (Tr. 170)-- which she determined was "[e]xorbitantly high" (Tr. 152, 162, 170), as were other of the 2004 invoices (Tr. 211-214).

\*     The $43,000 in "day rate" charges for the 2004 Housewares Project represented 30-40 days of work, which was not done for this project (Tr. 207).

\*     Mr. Picone historically worked within Gillette's budgets, and before incurring expenses out of the norm he would need to first advise Gillette and obtain approval (Tr. 170, 215).

\*     PIC did not impose "rush" charges for a similar job 2 years earlier, let alone double the rates as PIC did in the invoices for the 2004 Projects (Tr. 171, 179, 217).

\*     PIC never charged extra for the right to use its photographs for an unlimited period (Tr. 201-02).

\*     PIC did not complete the 2004 Housewares Project the same day it was ordered, and PIC never before increased its charges merely to *commence* a job the same day it was ordered -- which PIC now calls "same day" service -- or even consulted Ms. Cooper about such a service. (Tr. 164-67)

PIC, for its part, has asserted that the higher charges were justified because (a) the project required more work than anticipated, and (b) the higher hourly rates and other added charges (e.g., for jobs commenced the "same day" as ordered) were comparable to industry norms and rates PIC allegedly charges other clients. (Pl. Mem. 9-12)

3

**2.     Dispute On Applicability of Boilerplate to 2004 Projects**

The parties also disagree about whether the terms set forth in the Boilerplate on the back of the invoices PIC issued in May 2004, after PIC filed suit, governed the four projects completed as much as two months earlier.

Terms Governing the 2004 Projects

It is uncontested that the parties did not enter into any written agreement, or even exchange correspondence, concerning the terms governing the 2004 Projects at the time PIC secured the jobs or at any other point prior to their completion. However, there is ample evidence in the record, including extensive testimony by Ms. Cooper, that clear understandings were reached based on contemporaneous oral discussions between the parties, the conduct of the parties, and the lengthy course of prior dealings between them. Specifically, evidence in the record shows that: (1) Gillette made PIC aware from the outset of the 2004 Projects that Gillette would not engage PIC under the terms set forth in the Boilerplate; (2) PIC, knowing this, accepted the engagement and went ahead with the 2004 Projects; and (3) the parties agreed that, at least until they executed a stand-alone contract governing their overall relationship, issues not covered by express oral agreements concerning the 2004 Projects,[3] would be governed by the parties' longstanding course of dealings -- "business as usual." (Tr. 194-95, 218-20, 231, 233 )[4] On the last point, Ms. Cooper testified specifically about the agreement reached with Picone at their March 1, 2004 meeting:

> Q.     So, did you come to any agreement in that meeting as to any of the terms that would be in that -- in that document?

---

[3] *Compare, e.g.,* Tr. 221 (parties expressly agreed that the photographs would be only for use by Ms. Cooper's sales planning and business communications group).

[4] *See also* Tr. 198 (written terms on front of invoices were understood in light of "[o]ur ongoing, established relationship with Mr. Picone").

4

  A. Yes.  **Business as usual until we had the new agreement in place.**

  Q. Did you have any disagreement about what "business as usual" was?

  A. No. I don't even think -- I don't even recall if we had discussion about that. (Tr. 219, emphasis added)

<u>Removal of the Boilerplate Language From Invoices</u>

In addition, Ms. Cooper testified that she specifically asked that the language be removed from the back of the invoices to be issued for the 2004 Projects, and that Picone specifically indicated that he was "agreeable" to this:

> Q. ... And did you ask [Picone] to alter his standard form, his standard invoice or [Boilerplate] terms and conditions form at the meeting?
>
> A. Yes. I asked based on a conversation with our Legal Department that there be changes made to the invoice, in that there would not be any more copy included on the back of the invoice, but that in its place, we would develop a contract that would be agreeable to both parties that would clearly lay out what the terms and conditions were so that there would not be any more ambiguity related to that issue. **And he was agreeable to that.** (Tr. 194-95, emphasis added.)

Ms. Cooper testified that, at the same time, Picone tried to give himself wiggle room by saying during the course of their Spring 2004 conversations that he needed to hear back from his attorneys before committing to remove the objectionable Boilerplate language from future invoices. (Tr. 234-36) But Ms. Cooper was steadfast in the face of painfully repetitive and misleading deposition questioning that, regardless of whether Boilerplate language appeared on the back of a PIC invoice, she *never* discussed, let alone agreed to, those terms and conditions with Picone, and those terms *never* governed the relationship:

> Q. ... Did you discuss these [Boilerplate] terms and conditions with Mr. Picone in your February or March, 2004, meeting?
>
> A. No. We didn't discuss this. We didn't discuss the specifics of what was included in the document. What we discussed was him removing all of this information [Boilerplate] from the back of his invoices, and signing an agreement that would be agreeable to him and to the Gillette company that clearly set out what the terms and conditions were of using his photography services. (Tr. 218-19)

5

            \*   \*   \*

 Q. ... I think you said that Gillette was going to prepare a draft of something new?

 A. Right. Yes.

 Q. And that instead of these [Boilerplate] terms and conditions in Exhibit 53, you were going to use what was prepared by Gillette in the new draft. Is that correct.

 [Objection to form. Assumes facts not in evidence.]

 A. No. That's not correct. It is not in place of what was on the back here. What we asked is that he remove what is on the back of the invoice and that we would have a separate agreement that would clearly lay out what the terms and conditions were of his services. (Tr. 220)

            \*   \*   \*

 Q. ... I believe you testified that you and Mr. Picone discussed not using Mr. Picone's [Boilerplate] terms and conditions in the future. Is that correct?

 [Object as to form.]

 A. No. I didn't testify to that. I was not aware of any terms and conditions put forward by Mr. Picone. What we asked him or what I asked him to do was to remove the information that was on the back of his invoice. (Tr. 231)

<u>PIC's Inconsistent Accounts</u>

 PIC, however, tells a different story -- a few different stories, in fact. First, at Ms. Cooper's deposition, PIC's counsel represented that Picone's "recollection" of the March 2004 discussions was that they were "only about the media use and period of use on the front side of the invoice and not about removing the [Boilerplate] language on the back ...." (Tr. 232)

 Confronted with Ms. Cooper's convincing rejection of that account (Tr. 232), Picone now concedes in his declaration that the two did discuss removal of the Boilerplate -- but asserts that he stood firm against the proposed removal. (Picone Decl. ¶¶ 37, 39) Ignoring the 10 year course of dealings with Gillette, and PIC's failure *ever* to enforce the main Boilerplate terms (*e.g.*, the liquidated damages provision) against Gillette (Dkt No. 77, Ex 9 at 29-31), Picone asserts that this must be so because PIC *only* accepts photography projects subject to the Boilerplate terms and conditions, and that he was particularly averse to deviating from these

6

terms in Spring 2004 in view of the ongoing dispute with Gillette. (Picone Decl. ¶¶ 38-39) This account, too, is at odds with the detailed testimony of Ms. Cooper.

Changing course one more time, however, in their memorandum of law PIC selectively *adopts* Ms. Cooper's testimony, or PIC's interpretation of it. PIC seizes on the mention that Picone said he needed to hear from his attorneys before fully committing to remove the Boilerplate from the back of new invoices (Tr. 234). Based on that, PIC asserts in its statement of "Undisputed Facts Regarding the Spring 2004 Jobs" that Picone "never agreed to forego" the Boilerplate terms themselves. (Pl. Mem. 8)

## **ARGUMENT**

The factual record, including Ms. Cooper's sworn deposition testimony, reveals a scheme by PIC to entrap Gillette into retaining PIC on false pretenses for the 2004 Projects -- a scheme intended to impose on Gillette, after the fact, exorbitant fees out of line with any pricing Gillette ever agreed to, and intended to bolster the baseless lawsuit PIC had already decided to bring before undertaking the 2004 Projects. This scheme forms the factual basis of Gillette's counterclaims for breach of contract, estoppel, fraud and unfair and deceptive trade practices. (*See* Countercl. ¶¶ 11-51)

PIC, relying on (1) Picone's self-serving summary denials of Ms. Cooper's account, and (2) distortions of Gillette's allegations and Ms. Cooper's testimony, disputes the key facts on which Gillette bases its counterclaims. But the counterclaims cannot be dismissed on summary judgment where, as here, the central facts -- including the most basic terms on which the 2004 Projects were commissioned (*e.g.*, pricing) -- are plainly in dispute. *See* Fed. R. Civ. P. 56;

7

*Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (Young, *Chief J.*) (facts must be construed in light most favorable to non-moving party).

## I.  GILLETTE'S BREACH OF CONTRACT CLAIMS CANNOT BE DISMISSED ON SUMMARY JUDGMENT

The record shows there is a fact dispute on each of the two key issues with respect to the parties' agreement on the 2004 Projects: the pricing terms and the applicability of the Boilerplate terms. Accordingly, Gillette's claims cannot be dismissed on summary judgment.

### A.  Dispute on Pricing Scheme for the 2004 Projects

It is undisputed that there was no written agreement as to pricing for the 2004 Projects at the time they were undertaken -- or at any other time. In the absence of a writing, PIC seeks to justify its unilateral, *post hoc* imposition of a new and exorbitant fee scheme by pointing to everything but the one thing that controls: the parties' longstanding course of dealings. As the Massachusetts courts have held over and over: "There is no surer way to find out what the parties meant, than to see what they have done." *Keating v. Stadium Mgt. Corp.*, 24 Mass. App. Ct. 246, 251, 508 N.E.2d 121, 124 (quoting *Martino v. First Nat'l Bank,* 361 Mass. 325, 332, 280 N.E.2d 174 (1972) (internal quotation and citation omitted).)

There is extensive testimony and other evidence that PIC's pricing for the 2004 projects -- including an inflated "day rate" more than twice anything previously charged to Gillette; one invoice three times the highest prior invoice PIC *ever* issued to Ms. Cooper; "same day" charges for projects merely alleged to have been *commenced* (but not completed) on the same day they were commissioned -- was both "exorbitant" and "out of line" with the past course of dealings between the parties over many years, and anything but the customary rates PIC charged Gillette. There is also evidence that PIC was to seek approval before incurring costs disproportionate to prior jobs for Ms. Cooper, and that PIC did not do so with respect to the 2004:

8

> Q. How would [Picone] know what to clear with you then?
>
> A. He would have known that a charge of $63,000 [for the 2004 Housewares project] was way over and above anything that I would have expected to receive. . . . [H]e knows that we're very budget conscious, and he always worked well within our budgets. . . . This would have been nowhere within any budget that I ever would have signed off on. (Tr. 170-71)

PIC tries to attack Ms. Cooper by myopically focusing on just one of the many grounds for her conclusion: a comparison of PIC fees for the 2004 Housewares shoot to a similar shoot two years earlier, which PIC says was based on "incorrect assumptions" (Pl. Mem. 10). At her deposition, Ms. Cooper indicated that the cost PIC charged for the 2004 Housewares shoot was three times the charges for the similar shoot two years earlier. (Tr. 175) PIC, however, points to an aside Ms. Cooper made that the 2002 shoot should have been the more expensive one since it was offsite -- which she corrected upon realizing that the shoot at issue was not offsite. (Tr. 180) But PIC ignores that the 2004 shoot was still three times as expensive as the comparable shoot in 2002, *or any other project PIC ever performed for Ms. Cooper*. More importantly, PIC ignores that the 2002 shoot was far from the only basis for Ms. Cooper's determination that the 2004 Project charges were out of line with the invoices she had received from PIC (more than 100 of them) over more than four years. *See, e.g.*, Tr. 162, 177-78, 211.[5]

Faced with its obvious departure from the parties' course of dealings, PIC first points to the alleged rates PIC charges another of its customers, Osram Sylvania, Inc. ("Sylvania"). *See, e.g.,* Pl. Mem. 11. However, as Ms. Cooper explained, she was never given the Sylvania price sheet upon which PIC relied at her deposition, and the terms on that sheet never applied to PIC's work for Gillette. (Tr. 209, 215-17) To the extent PIC argues that the parties' oral agreement to

9

"customary" rates referred to rates PIC customarily charged other customers -- a difficult proposition since Picone never disclosed any such rates to Gillette (*see* Tr. 217) -- this would at most raise a fact issue as to what the parties' oral agreement meant.

Next, PIC points to its paid "expert" on industry custom to assert that its charges for the 2004 Projects were "reasonable." (Pl. Mem. 13) However, the expert had no involvement in the dealings between the two parties at issue -- PIC and Gillette -- or knowledge of what was "customary" in that context. Nor does his Orwellian reading of the term "same day service" -- even if shared by other "expert" photographers -- speak to whether Gillette ever agreed PIC could multiply its rates simply for *commencing* work on a job the same day it was commissioned.[6] Rather, the course of dealings between the parties at issue controls. *See Davis v. Dawson, Inc.*, 15 F. Supp. 2d 64, 108 (D. Mass. 1998) (course of performance and course of dealing trump industry standard in determining terms of parties' contract).

At most, PIC's arguments as to the agreed pricing scheme raise a fact issue. On this record, Gillette's breach of contract claim cannot be dismissed.

  B.     **Dispute on Applicability of Boilerplate**

As elaborated above, Gillette has provided specific evidence -- including the extensive testimony of Ms. Cooper -- that PIC, knowing Gillette would not engage its services in 2004 if the terms in the Boilerplate were to apply, accepted the 2004 Projects. Gillette has also provided

---

[5] PIC also misconstrues Ms. Cooper's testimony concerning her comparison of the number of products in the two shoots. PIC points to her acknowledgment that the number of products was not listed on the 2002 invoice (Pl. Mem. 10), but ignores her testimony that she was able to determine the number by reviewing the 2002 catalog containing those photographs.

[6] Picone also admits that PIC's charges for the 2004 Projects were not consistent with either purported market rates or PIC's own purported rates for other customers. Picone Decl. ¶ 43 (claiming he added a lower than usual rush charge to the 2004 Project invoices).

specific evidence that the parties agreed that, at least until they executed a stand-alone contract governing their overall relationship, issues not covered by express oral agreements concerning the 2004 Projects would be governed by the parties' longstanding course of dealings -- "business as usual" -- and not the Boilerplate terms that never governed.  (Tr. 219)

While PIC seeks to rebut this account -- albeit with three inconsistent versions of events as described above -- there is no dispute that just over two months later it instituted this suit against Gillette based on alleged breach of the Boilerplate terms, and there*after* issued invoices for the 2004 Projects that included the Boilerplate.  And here is the decisive point:  *if* one assumes that Gillette's version of events, based on its witness' testimony, is accurate (which, on summary judgment, must be assumed), so that the parties had an understanding that the Boilerplate terms could not apply to future Gillette projects, *then* PIC necessarily breached this agreement when it insisted after the fact on application of the Boilerplate terms, and Gillette was injured by imposition of these draconian terms *after* PIC had sued Gillette to enforce those very terms with respect to 10 years' worth of invoices.

In the face of this obvious fact dispute with respect to Gillette's breach of contract claim, PIC distorts both Gillette's claim and the factual record to argue that Gillette's witness made an admission fatal to its contract claim.  Deceptively, PIC says Ms. Cooper admitted that "the central allegation of [Gillette's] counterclaims -- namely, that Mr. Picone agreed *not to send* [the Boilerplate] Terms and Conditions along with this [sic] Spring 2004 invoices -- is untrue."  (Pl. Mem. 12, emphasis added)  But Gillette's claim is not that Picone agreed "not to send" a certain invoice form, whose Boilerplate (in Gillette's view) never had effect anyway.  Gillette's claim is that orally and/or impliedly, PIC agreed to allow the Gillette to use the 2004 photographs "without PIC claiming that such use is subject to the [Boilerplate] Purported Terms" (Countercl.

11

¶ 32). Certainly Picone's expression of agreement to remove the printed Boilerplate language from future invoices provides an additional piece of evidence supporting the understanding that the Boilerplate terms would not govern the 2004 Projects. However, Picone's manipulative wavering on his commitment to remove the Boilerplate from the back of his printed forms (saying he needed to hear back from his counsel before making the change) does not undermine Gillette's claim that, by words and/or conduct, the parties agreed that the Boilerplate terms *would not govern* the 2004 Projects.

Moreover, PIC's twisted reading is inconsistent with Ms. Cooper's unequivocal testimony as to the specific understanding that, until there was a new agreement, the parties' prior course of dealings -- "business as usual" -- would govern rather than the Boilerplate.[7]

## II.   PIC HAS NOT ESTABLISHED A BASIS FOR DISMISSING EITHER OF THE PROMISSORY ESTOPPEL CLAIMS

Gillette has alleged that, even apart from the breach of contract, PIC is liable on a promissory estoppel theory for violating its promises both (1) to charge no more than the customary rate, and (2) to allow Gillette to use the 2004 Project photographs without PIC claiming such use is subject to the Boilerplate terms. (Countercl. ¶ 37)

PIC's three-sentence argument for summary dismissal of this count does not even purport to address the allegations on PIC's overcharging Gillette. (Pl. Mem. 13) Thus, this claim survives irrespective of the outcome of PIC's instant motion.

PIC's only argument for dismissal of the promissory estoppel claim, which addresses PIC's improper, *post hoc* imposition of the Boilerplate terms, is that Ms. Cooper "conceded"

---

[7] As set forth in Gillette's summary judgment motion, it is undisputed that "business as usual" during the prior years meant that Gillette, contrary to the Boilerplate terms, was to retain PIC's photographs without paying $1,500 per photo in liquidated damages.

12

there was no promise to "forego its [Boilerplate] Terms and Conditions." (Pl. Mem. 13) Once again, however, PIC's argument is based on a plain misstatement of Gillette's claims and the evidence supporting them: Gillette never claimed PIC agreed to "forego" the Boilerplate terms; Ms. Cooper was adamant that such terms *never applied in the first place*. The claim is that PIC, by unequivocal words and/or deeds, promised not to claim use of the 2004 Project photos was "subject to the Purported Terms" set forth in the Boilerplate (Countercl. ¶ 37) -- which, as shown in detail above, is supported, not contradicted, by Ms. Cooper's testimony.[8]

### III. PIC'S MOTION TO DISMISS THE FRAUD AND CHAPTER 93A CLAIMS IS UNFOUNDED

PIC sets up the same straw man to make the same glib argument for summary dismissal of Gillette's counterclaims for fraud and PIC's violation of unfair and deceptive trade practices under Mass. Gen. L. ch. 93A (Pl. Mem. 14), asserting such claims are "based on the same alleged promise not to send [the Boilerplate] Terms and Conditions that Gillette now admits, through its 30(b)(6) witness, was not made." (Pl. Mem. 14) Again, however, the *actual* promise alleged by Gillette in its fraud and Chapter 93A claims -- that Picone represented he would not claim Gillette's use of the 2004 Project photographs was "subject to" the terms in the Boilerplate (Countercl. ¶ 42; *see also id.* ¶ 49), is supported, not refuted, by Ms. Cooper's testimony.[9]

---

[8] The evidence also shows that Gillette reasonably relied, to its detriment, on the expectation Picone created that he would undertake the 2004 Projects on essentially the same terms he always had: it is plain from Ms. Cooper's testimony that Gillette used Picone rather than a different photographer based on this expectation (*see* Tr. 65).

[9] As with the promissory estoppel count, PIC challenges the Chapter 93A count only with respect to the claim concerning imposition of Boilerplate terms; it does not argue for dismissal of the 93A count as it applies to the price gouging. *See* Pl. Mem. 14; Countercl. ¶¶ 46-51.

IV. **PIC HAS NOT SHOWN THAT GILLETTE WAIVED ITS OBJECTION TO THE 2004 PROJECT INVOICES**

Finally, PIC argues that Gillette should be ordered, on summary judgment, to pay the full amounts stated on PIC's after-the-fact 2004 Project invoices. This is so, PIC urges, because the invoices were "unobjected-to [sic] within a reasonable time period" after receipt (Pl. Mem. 15). PIC complains specifically that Gillette did not take Picone's phone calls to discuss those invoices, although PIC forgets to mention that the parties were in litigation at the time.

In support of its surprising assertion, PIC cites an unreported decision from the District of Maryland finding that the Patterson Belknap law firm established a claim for Account Stated against one of its clients under Maryland law. *Patterson, Belknap, Webb & Tyler v. Larosa*, 1993 U.S. Dist. Lexis 2835 (D. Md. Feb. 16, 1993). The law firm had issued seven successive cumulative fee statements over a two year period, and the client continued to accept the law firm's services without objecting to the statements throughout that period. The firm then sent follow-up demands for payment six months later and again drew no objection, and still did not file suit for another two months after that. *Id.*

Suffice it to say that Gillette never again accepted services from PIC after receiving the 2004 invoices, and that PIC cites no authority suggesting it was unreasonable for Gillette's employees to refrain from communicating with Picone about the invoices while litigation between the parties on the same matter was pending. (*See* Tr. 153-55) Plainly, in any event, PIC is well aware of Gillette's claims.[10]

---

[10] One cannot help noticing the irony of PIC's insistence that Gillette waived all of its claims by waiting a few months to raise them, while PIC earnestly presses its own claims after waiting *a decade* after they purportedly would have arisen.

14

**CONCLUSION**

For the foregoing reasons, PIC's motion should be denied in its entirety.

| | |
|---|---|
| Dated:  April 22, 2005 | FROSS ZELNICK LEHRMAN & ZISSU, P.C. |
| GELB & GELB LLP | By: /s/Patrick T. Perkins/ |
| | Patrick T. Perkins (Admitted *pro hac vice*) |
| By: /s/Richard M. Gelb/ | David Donahue (Admitted *pro hac vice*) |
| Richard M. Gelb (BBO#188240) | 886 United Nations Plaza |
| rgelb@gelbgelb.com | New York, New York 10017 |
| Robert S. Messinger (BBO# 651396) | Ph: (212) 813-5900 |
| rmessinger@gelbgelb.com | Fax: (212) 813-5901 |
| 20 Custom House Street | |
| Boston, MA  02110 | *Attorneys for Defendant/Counterclaim-Plaintiff* |
| Tel: (617) 345-0010 | *The Gillette Company* |
| Fax: (617) 345-0009 | |
| | Of counsel:  Craig S. Mende |

I:\CMENDE\Gltc\PIC\Court Papers\050422-0420298-pld-SjOppCclaim-csm.doc

15