IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PHOTOGRAPHIC ILLUSTRATORS
CORPORATION,

        Plaintiff,

v.

THE GILLETTE COMPANY,

        Defendant.

Civil Action No. 04-CV-10913-WGY

## PIC'S OPPOSITION TO GILLETTE'S MOTION FOR SUMMARY JUDGMENT

Michael A. Albert, BBO # 558566
Michael N. Rader, BBO # 646990
Adam J. Kessel, BBO # 661211
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

COUNSEL FOR PLAINTIFF
PHOTOGRAPHIC ILLUSTRATORS CORP.

## TABLE OF CONTENTS

I.      FACTUAL BACKGROUND..................................................................................2

II.     GILLETTE IS LIABLE TO PIC FOR BREACH OF CONTRACT ..................................6

        A.      As a Matter of Law, PIC's Invoices Constitute the Parties' Contracts ..................6

        B.      The Image Return Requirement and the Liquidated Damages Clause ...................8

                1.      PIC Did Not Waive the Image Return Requirement ...................................8

                2.      The Liquidated Damages Clause Is Enforceable .........................................9

        C.      The One-Year, U.S.-Only Limitation on Gillette's Licenses ...............................15

III.    GILLETTE IS LIABLE TO PIC FOR COPYRIGHT INFRINGEMENT .......................16

IV.     GILLETTE IS LIABLE TO PIC FOR FRAUD
        AND VIOLATION OF CHAPTER 93A .........................................................................19

V.      CONCLUSION.............................................................................................................20

The central argument of Gillette's summary judgment motion – that PIC impliedly "waived" the Terms and Conditions on each of its invoices through inaction – is factually inaccurate and also fails as a matter of black-letter Massachusetts law.

Gillette argues, for example, that PIC waived the requirement that Gillette return PIC's photographic transparencies by not demanding those transparencies back before October 2002. Yet Mr. Picone's undisputed testimony, the only evidence upon which Gillette itself relies, establishes that PIC only granted Gillette *an extension* of the return requirement (which otherwise would have taken effect 30 days after transparencies were delivered to Gillette) – a standard courtesy that photographers extend to their long-term clients.

PIC granted the extension at Gillette's request, for Gillette's convenience and in deference to Gillette's concern about the "security" of PIC's transparencies, with the understanding that those transparencies would not be misused while in Gillette's custody. Mr. Picone indisputably agreed with Gillette that PIC's transparencies would still have to be returned immediately upon request. ***This is the opposite of a waiver***.

Gillette admits that it understood the return requirement had not been waived. Through two of its Rule 30(b)(6) witnesses, Gillette conceded that PIC's transparencies had to be returned, or else Gillette would be charged $1,500 per transparency.

Gillette's waiver-through-inaction argument also fails as a matter of law. Under Massachusetts law, to constitute an implied waiver, a party's conduct (or inaction) "must be unequivocal and must allow for *no other explanation* of the conduct of the person who allegedly is waiving a contractual right." Burton-Goldman v. Brookline Rent Control Bd., 1994 Mass. App. Div. 92, 94 (1994) (emphasis added). Here, not only is there "another" explanation for PIC not demanding return of its transparencies at an earlier time – that explanation (the agreed-upon extension) is undisputed. Gillette's waiver defense fails.

Gillette's remaining arguments also fail as discussed below. These include the notion that PIC insufficiently explained its written Terms and Conditions to Gillette (a far larger and more sophisticated entity with able counsel), despite Gillette's acceptance, review and signature of hundreds of invoices containing those Terms and Conditions, as well as Gillette's *post hoc* claim that the agreed-to liquidated damages figure is unenforceable as a "penalty."

## I.    FACTUAL BACKGROUND

A detailed discussion of relevant background is provided in PIC's summary judgment papers, and particularly in PIC's motion for summary judgment on its core claim for liquidated damages for Gillette's failure to return PIC's transparencies as required by the parties' contracts. (Docket #74). Without repeating that entire discussion here, the following points bear emphasis.

**First,** Gillette reviewed PIC's Terms and Conditions "line by line" in connection with PIC's very first Job for Gillette in 1992. Gillette demonstrated its understanding of the Terms and Conditions when it specifically requested and negotiated, through its representative Nadine Romano, an extension of the 30-day return requirement and the default one-year license term (set forth on the reverse of the invoice) for that Job. (Id. at 4-8). Mr. Picone's testimony about these events, confirmed by contemporaneous documents (PIC Ex. 20-23), is undisputed. Ms. Romano has no contrary memory of the events. See Romano Depo. (PIC Ex. 4) at 17-18, 24.

**Second,** Ms. Romano requested that, for subsequent Jobs, Gillette continue to be permitted to maintain custody of PIC's transparencies beyond 30 days for reasons of convenience and security (although she did *not* request a blanket extension of the one-year license term). Mr. Picone agreed to this condition, but specifically explained that, as required in the contract, all transparencies would still have to be returned upon PIC's request. (PIC Liq. Dam. Br. at 8). Once again, Mr. Picone's testimony is undisputed, as Ms. Romano has no contrary recollection of the discussion. (Romano Depo. at 55-57).

- 2 -

**Third,** over the course of the parties' relationship, Gillette personnel reviewed, signed, paid, and did not raise any objection to *hundreds* of PIC invoices containing the same Terms and Conditions. (PIC Ex. 14; PIC Liq. Dam. Br. at 10).

**Fourth,** Gillette itself <u>conceded</u> at deposition that it understood and was bound by PIC's Terms and Conditions. For example, Gillette conceded, through two of its Rule 30(b)(6) witnesses, that it knew PIC's transparencies had to be returned following PIC's demand, or else Gillette would be liable to PIC for $1,500 per image. <u>See</u> PIC Liq. Dam. Br. at 12 (quoting Rule 30(b)(6) testimony of Gillette personnel Jill Josephson and Beth Cooper).

The factual discussion in Gillette's brief largely confirms this summary of key events. Where Gillette's version differs, an examination of the evidence cited by Gillette reveals no genuine dispute about any fact that would preclude summary judgment for PIC. *A fortiori*, Gillette's summary judgment motion should be denied.

Gillette concedes that, in connection with its first Job for Gillette, PIC provided an estimate that included PIC's Terms and Conditions on the reverse. Gillette further concedes that it specifically negotiated an exception to those Terms and Conditions on that occasion, in exchange for a greater payment to PIC.[1] <u>See</u> Gillette Br. at 5 ("The estimate was then revised to reflect the parties' agreement that Gillette would … have 'unlimited time and unlimited usage rights' in the photos."). Gillette thus cannot dispute that it was aware of PIC's Terms and Conditions from the very outset of its relationship with PIC, and that it knew it would only be allowed to deviate from those Terms and Conditions if a specially-negotiated exception was entered into, accompanied by appropriate additional consideration.

---

[1] The parties agreed to double Mr. Picone's day rate to compensate PIC for the broader license that Gillette purchased to use images beyond one year. (PIC Liq. Dam. Br. at 7).

Likewise, Gillette cannot dispute that when Mr. Picone agreed to Ms Romano's request for an extension of the 30-day return provision,[2] the extension was expressly qualified by the requirement that the transparencies would still have to be returned upon PIC's request. (PIC Liq. Dam. Br. at 7-8) (citing Mr. Picone's deposition and 4/8/05 Picone Decl. ¶¶ 14-18).[3]

The only evidentiary support proffered by Gillette for its claim that PIC "waived" the return requirement entirely is contained in the following sentence from its brief:

> It is undisputed that from 1992 until 2002, PIC did not enforce the Purported 30-day Return Requirement or the late Penalty because it wanted to continue its relationship with Gillette. (Ex. 1 at 29-31, 40; Ex. 2 at 133-34).

(Gillette Br. at 6-7).

The pages of deposition testimony cited by Gillette are consistent with PIC's *extension* of the 30-day return period, and most certainly do not establish a "waiver" of the return requirement. For example, on page 40 of his February 10, 2005 deposition (Gillette Ex. 1), Mr. Picone testified that he permitted Gillette to maintain "custody" of PIC's images beyond the default 30-day period. At pages 29-31 Mr. Picone likewise testified that, of course, he did not demand return of PIC's images during the time when Gillette was authorized to maintain custody of them. The final passage cited by Gillette, pages 133-134 of Mr. Picone's March 24, 2005 deposition (Gillette Ex. 2), provides an even more detailed explanation of Mr. Picone's discussions with Ms. Romano, in which the two agreed that Gillette would receive an extension (and *not* a waiver):

---

[2] Such extensions are a standard courtesy that photographers extend to their long-term clients. See Sedlik Report (PIC Ex. 11) at 19-20.

[3] Gillette misleads in asserting – twice – that "Before its second job for Gillette, PIC did not tell Gillette it would have to return the photographs within 30 days." (Gillette Br. at 5; nearly identical language also appears on page 2). Mr. Picone's did discuss the return requirement with Ms. Romano early on in the parties' relationship. See 2/10/05 Picone Depo. (Gillette Ex. 1) at 27-28. This is undisputed, as Ms. Romano has no contrary recollection. (Romano Depo. at 55-57).

- 4 -

> Q: And film retained by client, did that mean that they could keep it forever?
>
> A: *No*, because it was my understanding that it was my film.  They have the rights to use the imagery.  When you sell a photograph -- I don't sell film.  I'm selling the rights to the image.
>
> *Q: So when you said retained by client, it was your intention that it was retained temporarily?*
>
> *A: Well, until I requested it back.  That was the understanding I had with Nadine Romano.*
>
> Q: When did you have that discussion?
>
> A: During this time of the negotiation, around the 2nd, and 3rd.
>
> Q: What did you say to Nadine Romano about this issue?
>
> A: She asked if she could hang on to the film and store it, store it in one location.
>
> Q: What did you say?
>
> A: I was reluctant.  And she felt at that time that our relationship was going to be continuing because I made concessions to do this job with them, as you can see.  And for budget reasons, I bent over backwards for them on this project. * * *

See 3/24/05 Picone Depo. (Gillette Ex. 2) at 133-134 (emphasis added).[4]

   Mr. Picone's testimony that the return requirement remained in place is further buttressed by his testimony that he inquired into the safety and security of PIC's transparencies when he was informed of possible irregularities during Gillette's movement of its offices to South Boston. See 2/10/05 Picone Depo. (Gillette Ex. 1) at 31-32.  There would have been no reason for Mr. Picone to make such inquiries if he did not expect return of the transparencies to PIC.

   In light of Mr. Picone's undisputed testimony, there can be no question that PIC did not "waive" its return requirement.[5]  For this reason alone, Gillette's summary judgment motion must be denied to the extent it is based on "waiver."

----

[4] See also id. at 17, cited in Gillette Br. at 5 ("Q: [A]t what point did they know that they had to return them to you after the 30 days?  A: Before that first job was even started.").  It is unclear how Gillette could have represented to the Court that PIC's October 2002 demand was "*the first time*" PIC had claimed that the return requirement would apply to its Jobs for Gillette. (Gillette Br. at 2) (emphasis original).

[5] As discussed below in Sections II(C), the same is true of PIC's other Terms and Conditions, including the one-year and U.S.-only limitations on PIC's licenses to Gillette.

## II.     GILLETTE IS LIABLE TO PIC FOR BREACH OF CONTRACT

### A.     As a Matter of Law, PIC's Invoices Constitute the Parties' Contracts.

As explained above, Gillette indisputably knew – and accepted – PIC's Terms and Conditions at the very outset of the parties' relationship.  The Terms and Conditions continued to govern, with Gillette reviewing, signing, paying and failing to object to invoices containing them hundreds of times throughout the ensuing years. (PIC Liq. Dam. Br. at 10, 13-14).

Numerous courts have concluded that the Terms and Conditions on such invoices constitute the contract between the photographer and his or her client. E.g., Greenfield v. Twin Vision Graphics, Inc., 268 F. Supp. 2d 358, 373-75 (D.N.J. 2003) (granting summary judgment for plaintiff: "[E]ach invoice describes the price, quantity, and type of photograph purchased, and describes the purpose for which each photograph will be used.  As such, the invoices contain all the terms necessary to form a contract."); Bair v. Axiom Design, LLC, 20 P.3d 388, 389 n.1 (Utah 2001) (reversing dismissal of breach of contract claim for failure to return transparencies: "The terms of each contract were set forth in a "Delivery Memorandum."); Wolff v. IEEE, Inc., 768 F. Supp. 66 (S.D.N.Y. 1991) (granting plaintiff's motion for summary judgment on contract claim for violation of terms set forth on "Stock Photo Invoice"); Baker v. Int'l Record Syndicate, Inc., 812 S.W.2d 53 (Tex. App. 1991) (liquidated damages clause held enforceable).

For its part, Gillette cited a series of cases for the proposition that "Massachusetts law prohibits the addition of new or different terms on an invoice *after* the formation of an oral or written contract." (Id.) (emphasis original).  These cases are inapposite because PIC and Gillette had no prior contract.  It is undisputed that Gillette never issued a purchase order or any other document purporting to establish a contract between the parties. (PIC Liq. Dam. Br. at 14) (citing deposition testimony).  It is likewise undisputed that Gillette and PIC had no prior oral contract, let alone one contrary to PIC's Terms and Conditions.

- Tattan Depo. (PIC Ex. 5) at 112-113 ("Q: To your knowledge, was there any agreement between Gillette and Mr. Picone as to how long Gillette could use the images for?  A: No. Q: Okay.  To your knowledge, was there any agreement between Gillette and Mr. Picone over time as to whether his images could be used outside the United States?  A: No.").

- Mullen Depo. (PIC Ex. 3) at 56 ("Q. Did Mr. Picone ever tell you that Gillette owned the images that he took?  A: No, he did not.  Q: Did anyone at Photo Illustrators tell you that?  A: I've never talked to anyone else [at] Photographic Illustrators.").

- Madden Depo. (PIC Ex. 49) at 59-60 (no discussion with Mr. Picone about how long Gillette could retain or use PIC's images);

- Tattan Depo. (PIC Ex. 5) at 79-80 (no discussion about Terms and Conditions).

Indeed, although it purports to advance a "prior oral contract" argument, Gillette cites *no* evidence whatsoever that such contracts existed (Gillette Br. at 4-5), let alone evidence that an oral contract was formed for each of PIC's hundreds of Jobs for Gillette.

As previously noted, (PIC Liq. Dam. Br. at 17 n.14) Gillette's contention that PIC's Terms and Conditions are not the contract(s) between the parties is curious because, if successful, it would leave Gillette without *any* licenses to use PIC's images.  This plainly was not the intent of the parties – yet another reason why Gillette's argument should be rejected.

In any event, Gillette's signatures on PIC's invoices are dispositive here.  "In the absence of fraud, a person who signs a written agreement is bound by its terms whether she reads and understands them or not." DeLuca v. Bear Stearns, 175 F. Supp. 2d 102, 115 (D. Mass. 2001). In a long line of photography cases like this one, courts have held that the Terms and Conditions on the photographer's invoice constitute the contract between the parties. See page 6, supra. Gillette cites *no* authority to the contrary.

Gillette's remaining contention, that Mr. Picone insufficiently explained PIC's Terms and Conditions to Gillette (Gillette Br. at 2, 5-7), is both factually untrue (see Section I above) and irrelevant as a matter of law. Greenfield v. Twin Vision Graphics, Inc., 268 F. Supp. 2d 358, 374 (D.N.J. 2003) (rejecting argument that "because Greenfield never discussed the terms of the invoices with the[m], Defendants cannot be said to have understood or assented to them").

**B.** **The Image Return Requirement and the Liquidated Damages Clause**

**1.** **PIC Did Not Waive the Image Return Requirement.**

As explained in detail in Section I above, all of the relevant evidence – including the deposition testimony upon which Gillette itself relies – establishes that PIC granted Gillette an *extension* of the 30-day image return provision, but expressly declined to waive the requirement.

There can be no finding of waiver under these circumstances. "[T]he Massachusetts standard for waiver is an uncompromising one. A finding of waiver must be premised upon 'clear, decisive and *unequivocal* conduct ... indicating that [PIC] would not insist on adherence to the [provision].'" Paterson-Lietch Co., Inc. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 992 (1st Cir. 1988) (emphasis original) (affirming summary judgment of no waiver).

Given that Gillette cannot even allege the existence of an express waiver, it appears to contend that PIC waived the return requirement impliedly through silence. (Gillette Br. at 6-7).[6] The Massachusetts standard for implied waiver is even higher than the "uncompromising" hurdle for proving an express waiver. To amount to an implied waiver, a party's conduct or silence "must be unequivocal and must allow for *no other explanation* of the conduct of the person who allegedly is waiving a contractual right." Burton-Goldman, 1994 Mass. App. Div. at 94 (emphasis added). See also Dunkin' Donuts, Inc. v. Panagakos, 5 F. Supp. 2d 57, 61 (D. Mass. 1998) ("While it is doubtful that mere silence could satisfy Panagakos's burden of establishing 'clear, decisive, and *unequivocal* conduct' … the undisputed facts show affirmative conduct by Dunkin' Donuts inconsistent with any intent to waive its rights.").

---

[6] In advocating its position overzealously, Gillette at times mischaracterizes its argument as one of "express" waiver. E.g., Gillette Br. at 8.

- 8 -

Here, the only cited evidence (Mr. Picone's testimony) establishes that the return requirement of PIC's Terms and Conditions was extended (at Gillette's request) and expressly *not* waived, as Mr. Picone explained to Ms. Romano.  Gillette has already conceded, through two of its Rule 30(b)(6) witnesses, that it knew the return requirement was not waived. (PIC Liq. Dam. Br. at 12).  PIC is entitled to summary judgment on both waiver and implied waiver.  *A fortiori*, Gillette's summary judgment motion should be denied.

## 2.   The Liquidated Damages Clause Is Enforceable.

Gillette's fallback position on PIC's claim for liquidated damages is that the liquidated damages clause in the parties' contracts is unenforceable.  Gillette's argument proceeds based on old law that has been overturned by the Supreme Judicial Court, as well as factual inaccuracies.

Prior to each of PIC's Jobs for Gillette, the following conditions obtained:

- PIC was concerned (as are most photographers, see PIC Liq. Dam. Br. at 2-4) that Gillette might misuse its transparencies if they were not returned.  PIC reluctantly agreed to extend the 30-day return requirement in Gillette's case based on the understanding that Gillette would respect PIC's copyrights and the limited scope of its license from PIC. (Id. at 7-8).  That understanding turned out to be wrong.[7]  After having denied misusing PIC's images throughout this case, Gillette now concedes that PIC's "photographs were regularly used" in the ways that PIC has alleged, such as "beyond the purported one-year limit, outside the United States and by third parties who sold Gillette products." (Gillette Br. at 7).  This scope of misuse has cost PIC considerable sums that it should have received from Gillette in payment for such rights. See Cook v. Levine, Civil Action No. 89-00660 (D. Haw. Oct. 9, 1991) (PIC Ex. 31) ($1,500 liquidated damages awarded per transparency where defendant made unauthorized uses of images without payment).

- PIC needed its transparencies in case it decided to register the copyrights therein with the Copyright Office (as it elected to do in this case for many of the transparencies that it retained in its possession). (PIC Liq. Dam. Br. at 17-18).

- PIC needed its transparencies for use as reference material. (Id.).

---

[7] The fact that PIC waited until 2002 to demand return of its images in no way suggests that it was unconcerned about Gillette's misuse as Gillette appears to suggest (at 11).  Rather, PIC was simply unaware of that misuse until 2002. (3/24/05 Picone Depo. at 186) (misuse issue came to a head in 2002 when PIC learned of illegal duplication).

- PIC needed its transparencies for its portfolio. (<u>Id.</u>).[8]

- PIC needed its transparencies to license for stock photography if it elected to pursue that line of business. (<u>Id.</u>). <u>See</u> <u>Cook</u> ("Because of the nature of the stock photo business, the value of slides is intrinsically difficult to estimate.").

- PIC needed its transparencies to sell in bulk if an appropriate opportunity arose, for example in connection with Mr. Picone's eventual retirement. (<u>Id.</u>).

- $1,500 was a reasonable estimate of the cost of re-creating a basic "tabletop shoot" for purposes of replacing a lost or damaged transparency. (<u>Id.</u> at 18 n.16).

- $1,500 was also an industry standard figure established for the value of lost or damaged transparencies. <u>E.g.</u>, <u>Cook</u> ("$1,500 is a reasonable preestimate of damage. This reasonableness is further evidenced by the identical industry-wide standards of the American Society of Magazine Photographers.").

- However, it would be impossible for PIC to re-shoot many of its images for Gillette because the products and are no longer available. (4/22/05 Picone Decl. ¶ 27).

- Mr. Picone is a talented, sought-after photographer who is able to command significant fees for his work. (PIC Liq. Dam. Br. at 1-2). <u>See</u> <u>Baker v. Int'l Record Syndicate, Inc.</u>, 812 S.W.2d 53, 55 (Tex. App. 1991) ("Baker testified that he had been paid as much as $14,000 for a photo session.").

- While each of PIC's transparencies was potentially worth a great deal, the precise value of each was nevertheless difficult to predict. (PIC Liq. Dam. Br. at 4, 18). <u>See</u> <u>Baker</u>, 812 S.W. 2d at 55 ("Baker demonstrated … that an accurate determination of the damages from the loss of a single photograph is virtually impossible.").

In challenging the enforceability of the liquidated damages provision, Gillette employs a "retrospective" look at PIC's use of the transparencies, in an effort to show that those transparencies did not live up the $1,500 value set in the parties' contracts. As a matter of law, this approach is improper after <u>Kelly v. Marx</u>, 705 N.E. 2d 1114 (Mass. 1999), in which the SJC expressly rejected this approach and held: "we reject the 'second look' approach, and conclude that a liquidated damages clause … will be enforced where, *at the time the agreement was made*, potential damages were difficult to determine and the clause was a reasonable forecast of damages expected to occur in the event of a breach." <u>Id.</u> at 1115 (emphasis added).

---

[8] Gillette overstates its case in arguing that PIC would have no need for transparencies in its portfolio. (Gillette Br. at 11). Although PIC's "normal practice" is to use "final printed pieces" in its portfolio, original transparencies are sometimes requested by clients to evaluate retouching. (3/24/05 Picone Depo. at 32).

Gillette leads off its argument by citing pre-<u>Kelly</u> cases employing the "second look" approach. (Gillette Br. 8).  For example, in <u>Colonial at Lynnfield, Inc. v. Sloan</u>, 870 F.2d 761 (1st Cir. 1989), the court held a liquidated damages clause unenforceable, notwithstanding the fact that it was reasonable at the time of contract formation, because, *ex post*, it could "ascertain that Colonial in fact suffered no damage." <u>Id.</u> at 765.  After <u>Kelly</u>, this approach invites legal error. <u>Kelly</u>, 705 N.E. 2d at 1116 ("[I]n determining the enforceability of a liquidated damages clause, [the court] should examine only the circumstances at contract formation.").

Gillette's other case, <u>Space Master Int'l, Inc. v. City of Worcester</u>, 940 F.2d 16 (1st Cir. 1991), which cites <u>Colonial at Lynnfield</u>, rejected a party's theory that a liquidated damages clause was inapplicable even though the other party had admitted at deposition that the clause was *expressly intended* as a "penalty" (a contention that Gillette does not make here).

Gillette's factual arguments fare no better than its legal posturing.  First, Gillette claims, inaccurately, that Mr. Picone was unable to articulate a "business basis" for the $1,500 figure. (Gillette Br. at 9).  To the contrary, Mr. Picone testified that $1,500 estimates the cost of a typical product shoot to re-create a lost transparency, and also that it accounts for damage if the client misuses images without a license. (2/10/05 Picone Depo. at 46; 3/24/05 Picone Depo. at 265).  Gillette's contention that Mr. Picone had "'no idea' what the basis was for the $1,500 set as the damages amount" (Gillette Br. at 9) is untrue and highly misleading.  As just explained, Mr. Picone had a very specific explanations for the $1,500 figure.  In the testimony quoted by Gillette, Mr. Picone merely conveyed that he was unaware of the specific way in which the Advertising Photographers of America (APA) trade association had settled on the $1,500 figure. <u>See</u> 2/10/05 Picone Depo. at 45 ("I have no idea.  It came from their legal department or legal advisors.").

- 11 -

Gillette next misrepresents Mr. Picone's testimony about what materials PIC retained from its shoots for Gillette, in an effort to suggest that PIC could not have been damaged by Gillette's failure to return transparencies because it kept a duplicate copy of every single one. (Gillette Br. at 9). The misstatement stems from Gillette's apparent confusion regarding industry terminology. Mr. Picone kept a reference copy of each "view." (2/10/05 Picone Depo. at 29). A "view" means a photograph of a product set-up taken from a particular angle.

While several exposures were taken of each "view," PIC often kept only one such exposure; this was not a duplicate of an exposure provided to Gillette, but was rather an original, inferior "left-over" exposure that Gillette did not take. (Id. at 47; 4/8/05 Picone Decl. ¶ 23).

Gillette has taken Mr. Picone's testimony out of context and twisted it to suggest something that was never said and is untrue.[9] The original transparencies provided by PIC to Gillette were each unique, unduplicated and irreplacable. (PIC Liq. Dam. Br. at 9).

Gillette's next argument suffers from the same defect. Mr. Picone testified that, for a limited period of time starting in 1997, he kept digital scans of images provided to Gillette. Once again, Gillette falsely represents Mr. Picone's testimony as being that PIC kept a digital copy of *every* transparency. (Gillette Br. at 10). This is simply wrong. During the period of time when PIC was doing this scanning, it created a scan of a single "left over" exposure that it had retained. This scan was generally used for reference purposes only because it was not even one of the (better-quality) exposures that had been provided to Gillette. (4/22/05 Picone Decl. ¶ 28).[10]

---

[9] Likewise, Gillette's attack on the minor clarification made by Mr. Picone in his errata sheet (Gillette Br. at 9 n.3) can only be intended to obscure the truth. Mr. Picone's errata sheet did not change the substance, but merely clarified the testimony that he had already given so that there would be no misunderstanding.

[10] In any event, a single digital scan, particularly at the resolution that PIC used at the time, cannot be considered a replacement for an original transparency. Id.; see also Sedlik Depo. (PIC Ex. 7) at 166-168. This is one reason why PIC stopped maintaining such digital scans in about 2000. (Gillette Br. at 10). Another reason is that PIC believed it could always obtain return of its original transparencies from Gillette when needed. (4/22/05 Picone Decl. ¶ 29).

Gillette also attempts to sneak in a "second look" by observing (at 11) that PIC has not actively pursued stock photography licensing opportunities to date. This is irrelevant under Kelly. The key question under the controlling Kelly test is whether, at the time of contract formation, PIC knew that it *could* have pursued such opportunities upon return of its images. This is unquestionably true here. (PIC Liq. Dam. Br. at 17-18; 4/22/05 Picone Decl. ¶ 30).

PIC agreed to allow Gillette to retain custody of its transparencies until PIC requested their return – and thus forfeiting potentially lucrative stock photo licensing opportunities during the time that Gillette maintained such custody – as a courtesy to a client with whom he had a longstanding relationship, and only upon receiving assurances that his materials would be carefully maintained (which Gillette now admits they were not). PIC knew that if the parties' relationship ever broke down, it would have the option to pursue stock licensing after receiving its transparencies back from Gillette.

When Gillette refused to return PIC's transparencies at the conclusion of the parties' relationship, PIC was damaged because it could not then pursue the stock photo licensing opportunities what would have and should have been available to it.[11] Under these circumstances, the liquidated damages provision was (and is) a manifestly reasonable and appropriate means of compensating PIC for its loss. Manganaro Drywall, Inc. v. Penn-Simon Construction Co., 260 N.E. 2d 182, 185 (Mass. 1970) ("This was not an unconscionable potential price to be paid by the defendant in return for the concessions made by the plaintiff.").

---

[11] Indeed, although PIC is currently too busy with its core business of original photography to actively pursue stock photography opportunities, Mr. Picone is contemplating entering the stock photography business, particularly by entertaining a bulk license or sale of PIC's may thousands of images when he retires. (4/8/05 Picone Decl. ¶ 10).

Manganaro is quite instructive. In that case, the defendant owed the plaintiff approximately $81,000. The parties entered into an agreement under which the plaintiff reduced its claim to approximately $78,000, granted the defendant additional time to pay, and agreed to forego interest on the amount owed, so long as the defendant made payment in installments by certain deadlines. The agreement provided, however, that if the defendant missed any of its payment deadlines, the plaintiff would be entitled immediately to recover the unpaid portion, plus 6% interest on the *entire* amount of $78,000. Id. at 183-84.

The defendant argued that the clause providing for interest on the entire amount (including sums paid on time) was unenforceable. The court disagreed, id. at 185:

> The defendant sought a reduction in the amount of the claim … and time within which to pay the principal amount due without interest. The plaintiff agreed to all of these requests in return for which the defendant agreed to pay the principal amount in eight monthly installments. If it had made the installment payments as agreed, it would have paid no interest to the plaintiff.

The court then concluded, as noted above, that the interest provision was "not an unconscionable potential price to be paid by the defendant in return for the concessions made by the plaintiff." Id. Similarly here, the liquidated damages provision, standard in the industry to compensate PIC for its loss, is rendered even more reasonable by PIC's concession to extend its 30-day return requirement at Gillette's request and for Gillette's convenience.

Finally, Gillette half-heartedly argues that PIC's liquidated damages claims on some of its contracts with Gillette are beyond the statute of limitations. (Gillette Br. at 12). This is wrong. When PIC delivered transparencies to Gillette subject to the extended return requirement, Gillette became a bailee of PIC's transparencies. See King v. Trustees of Boston Univ., 647 N.E. 2d 1196, 1201 (Mass. 1995) ("A bailment is established by delivery of personalty for some particular purpose … upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it … or kept until he reclaims it.").

- 14 -

Upon termination of the parties' relationship in 2002, PIC demanded return of the transparencies. Gillette's failure or refusal to effect return, and PIC's cause of action therefor, accrued in 2002. PIC thus had until 2008 (six years later) to file suit. <u>Town of Warren v. Ball</u>, 170 N.E. 2d 341, 344-45 (Mass. 1960) (statute of limitations for bailed goods accrues when demand for their return is made).[12]

### C.    The One-Year, U.S.-Only Limitation on Gillette's Licenses

Gillette argues that PIC impliedly waived, through silence, the geographic and temporal limitations on its licenses to Gillette. (Gillette Br. at 7-8, 12). Once again, Gillette's waiver argument fails as a matter of both fact and law.

Gillette points to a handful of isolated instances in which it claims that PIC was "aware" of Gillette's regular use of PIC's photographs outside the scope of the license. (<u>Id.</u> at 7).[13] The examples that Gillette provides do not stand up to scrutiny.

First, Gillette points to the fact that it used PIC's images in multiple yearly catalogs, thus violating the temporal license. (<u>Id.</u>). Although PIC obtained copies of some catalogs, Mr. Picone did not examine them carefully enough to realize they contained such violations until filing suit. (3/24/05 PIC Depo. at 79-80, 87-88). Moreover, even knowledge of a few breaches does not destroy a party's contractual right, when it learns of more massive breaches, to bring suit.

Similarly, Gillette claims that PIC waived the geographic limitation on its licenses because it received from Gillette catalogs including the address "Braun Canada Ltd." Again, however, Mr. Picone indisputably did not know that until his deposition; he understandably had not studied the back covers before. (<u>Id.</u> at 94) ("I never noticed that. I never saw that.").

---

[12] The law in Massachusetts is consistent with that of other jurisdictions. <u>See</u> PIC Aff. Def. Br. (Docket #92) at 6.

[13] Significantly, Gillette expressly admits that PIC's images were "regularly used beyond the purported one-year limit, outside the United States and by third parties who sold Gillette products." (<u>Id.</u>).

Gillette's next argument, that PIC itself sent a handful of images to third party retailers at Gillette's request, is even farther off the mark. As documented in the evidence that Gillette cites (Gillette Ex. 21), each of the Jobs in which PIC provided images to third-party retailers was licensed and paid for by Gillette, subject to the same Terms and Conditions – one year use in the United States only, with additional compensation provided to PIC. This, again, is *the opposite* of a waiver.[14]

The conduct alleged by Gillette falls well short of that required for "waiver" or "implied waiver" as a matter of law in Massachusetts. See cases cited in Section II(B)(1) above. PIC is entitled to summary judgment, and Gillette's motion should be denied.[15]

## III.    GILLETTE IS LIABLE TO PIC FOR COPYRIGHT INFRINGEMENT.

Gillette's primary challenge to PIC's copyright claims is based on the Copyright Act's three-year statute of limitations. (Gillette Br. at 13). Gillette correctly observes that the limitations period only begins running when a plaintiff knew or should have known of the infringement. (Id.). Gillette fails to note, however, that knowledge of one act of infringement does not start the statute running for another, different act of infringement – each act is considered separately. E.g., Lyons Partnership, LP v. Morris Costumes, Inc., 243 F.3d 789, 797 (4th Cir. 2001) (reversing district court's dismissal of claims that accrued within the limitations period based on earlier-accrued claims).

In any event, PIC was not aware of its copyright claims against Gillette more than three years before it filed this lawsuit.

---

[14] The single transmission of an image to a Gillette facility in the Dominican Republic was handled by a PIC employee who was later terminated. Mr. Picone was unaware of it. (3/24/05 Picone Depo. at 205-208).

[15] The same applies to Gillette's failure to include a proper copyright notice when using PIC's images as required by the parties' contracts. (Gillette Br. at 8). Once again, any silence by PIC resulting from its desire to maintain a good working relationship with Gillette, would be insufficient to establish waiver or implied waiver as a matter of law.

With respect to Gillette's systematic unauthorized duplication of PIC's images at Advanced Photographics ("Advanced"), Mr. Picone testified that Advanced's Vice President Jason Roopenian brought this to his attention in early 2002 when he showed Mr. Picone a box of PIC's film from which Gillette had been placing orders. (2/10/05 Picone Depo. at 88-89). Mr. Roopenian could not recall the specific date, but testified consistently with Mr. Picone that the event occurred during a "window" between 2000 and 2003. See J. Roopenian Depo. (PIC Ex. 6) at 89. This testimony establishes that PIC's claims based on this duplication are not barred.

In response, Gillette points to testimony of a former Advanced employee, Joe Gannuscio, that he earlier brought isolated instances of unauthorized duplication to Mr. Picone's attention. Mr. Picone testified that of the few times he spoke with Mr. Gannuscio about such activity, some related to other PIC clients, and he was only informed about Gillette's duplication "on a one or two-dupe basis." (3/24/05 Picone Depo. at 187). Such isolated knowledge did not start the statute of limitations running for the thousands of unauthorized duplications that Gillette had successfully hidden from PIC, and which PIC only discovered after bringing suit (when PIC obtained the Advanced invoices evidencing massive unauthorized duplication by Gillette and obtained discovery of the thousands of unauthorized duplicates in Gillette's files). Lyons, 243 F.3d 789. See also Torres Ramirez v. Bermudez Garcia, 898 F.2d 224, 229 (1st Cir. 1990).[16]

---

[16] At a minimum, summary judgment for Gillette is inappropriate. E.g., John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 186 F. Supp. 2d 1, 5-6 (D. Mass. 2002) (Young, C.J.) (holding that "[a] genuine issue of material fact remained as to whether [the plaintiff] knew or, in the exercise of reasonable diligence should have known that [the defendant] infringed its copyright more than three years before it lodged its complaint."); Snyder v. United States, 717 F.2d 1193, 1195 (8th Cir.1983) ("Issues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case.... When conflicting inferences can be drawn from the facts, summary judgment is inappropriate.").

Gillette's statute of limitations defense with respect to its catalog infringements (Gillette Br. at 14) fares no better. As explained above, it is undisputed that PIC was unaware of those infringements until after this lawsuit was filed. (3/24/05 PIC Depo. at 79-80, 87-88). Moreover, because of the extent to which Gillette had successfully hidden its infringement from PIC, PIC had no reason to suspect or inquire about such voluminous misuse.[17]

Gillette's second challenge to PIC's copyright claims concerns PIC's lack of copyright registrations for some of the images that Gillette misused. The vast majority of the images for which registrations are lacking *cannot* be registered because Gillette failed to return them. It is undisputed that Gillette possesses and refuses to return thousands of original transparencies (which were only produced at the eleventh hour in this litigation, after PIC had already been forced to file a Motion for Contempt). (Docket #56-57).[18] PIC obviously cannot register these.

Similarly, the only evidence of the number of unauthorized duplicates made by Gillette through Advanced is a series of invoices from Advanced; the transparencies themselves are not available to PIC, having been lost by Gillette or stored without any tracking system as Gillette has repeatedly admitted. Once again, PIC cannot register these images.

PIC should not be penalized for Gillette's spoliation of evidence and failure to comply with its discovery obligations. This Court has the power to sanction Gillette in connection with these violations and should do so. See PIC Copyright Inf. Br. (Docket #87) at 17-20.[19]

---

[17] PIC's knowledge of a single Latin American use in 1998 (id.) is *de minimis* and certainly does not start the statute of limitations for Gillette's thousands of other infringements.

[18] The Court later held Gillette in contempt of its discovery Orders. (4/06/05 Order).

[19] In light of its non-compliance in discovery, Gillette's complaints about PIC's 200-plus page interrogatory response (Gillette Br. at 15-16) ring hollow. PIC provided a detailed identification of over 9,000 infringements by Gillette. (Gillette Ex. 7). Gillette's argument that PIC should be barred from asserting infringement of copyright registrations for which the deposits (i.e., the individual copies of the registered photographs) were not copied fares no better. The registrations themselves were produced, the deposits are publicly available documents, and as soon as PIC was made aware of the oversight, copies of the deposits were made, Bates labeled, and forwarded to Gillette.

Finally, Gillette's challenge to PIC's product packaging infringement claims (Gillette Br. at 16-17) is based on a misapprehension of the photography and design that PIC did for Gillette and the material of PIC's that Gillette used. This information is detailed in Mr. Picone's April 22, 2005 declaration, to which the Court's attention is respectfully directed, and will not be repeated in detail here. In essence, Gillette assumed that photographs and designs that were created by PIC were in fact provided to PIC by Gillette. This is demonstrably untrue as Mr. Picone explains in detail in his declaration.

## IV.   GILLETTE IS LIABLE TO PIC FOR FRAUD AND VIOLATION OF CHAPTER 93A.

PIC is entitled to summary judgment on its fraud claims as outlined in its summary judgment brief on fraud. Gillette's challenges in its summary judgment brief each fail.

First, Gillette contends (at 17-18) that Ms. Madden's misrepresentation could not have induced reliance by PIC, and is outside the statute of limitations, because PIC was aware of Gillette's unauthorized duplication in 2000. As explained above, however, that is simply untrue – Mr. Picone did not become aware of Gillette's massive unauthorized duplication until 2002.

Gillette's argument with respect to its false statement that it would pay PIC for work done in Spring 2004 is unclear. Gillette notes (at 18) that PIC sent its invoices after the alleged misrepresentation, but that is irrelevant. The point is that Gillette induced PIC to do the Spring 2004 work without an intent to pay. PIC is entitled to summary judgment on this fraud, and Gillette's motion should be denied.

In a footnote (at 18 n.8), Gillette also makes a confusing argument that Gillette's misrepresentation concerning its alleged "investigation" could not have induced reliance because PIC "already knew the alleged facts that were ultimately included in its complaint." The point, however, is that PIC was deceived into delaying the filing of this action. Again, PIC is entitled to summary judgment and Gillette's motion should be denied.

- 19 -

Finally, Gillette contends that it is entitled to summary judgment on PIC's Chapter 93A claim because PIC has not alleged sufficient "rascality."  PIC respectfully submits that the conduct alleged is more than sufficient to qualify as unfair and deceptive for Chapter 93A purposes, whether or not one invokes the term "rascality" (a description that would certainly apply here anyway). See Mass. Employers Ins. Exchange v. Propac-Mass, Inc., 648 N.E. 2d 435, 438 (Mass. 1995) ("We view as uninstructive phrases such as 'level of rascality.'").

Finally, as previously explained, Gillette's other misrepresentations to PIC were not made in the context of settlement negotiations, but even if they were, they would still be actionable. Wright and Miller § 5314 ("Rule 408 is also inapplicable when the claim is based upon some wrong that was committed in the course of the settlement discussions; e.g., libel, assault, breach of contract, unfair labor practice, and the like.").

PIC respectfully refers the Court to its summary judgment motion on Gillette's fraud.

## V.    CONCLUSION

For the above reasons, Gillette's summary judgment motion should be denied.

Respectfully submitted,

PHOTOGRAPHIC ILLUSTRATORS CORP.

By its counsel,

Dated: April 22, 2005                    /s/ Michael A. Albert
                                         Michael A. Albert, BBO #558566
                                         malbert@wolfgreenfield.com
                                         Michael N. Rader, BBO # 646990
                                         mrader@wolfgreenfield.com
                                         Adam J. Kessel, BBO # 661211
                                         akessel@wolfgreenfield.com
                                         WOLF, GREENFIELD & SACKS, P.C.
                                         600 Atlantic Ave.
                                         Boston, MA 02210
                                         (617) 646-8000