UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHOTOGRAPHIC ILLUSTRATORS CORPORATION<br><br>Plaintiff,<br><br>vs.<br><br>THE GILLETTE COMPANY,<br><br>Defendant.<br><br>THE GILLETTE COMPANY,<br><br>Counterclaim Plaintiff,<br><br>vs.<br><br>PHOTOGRAPHIC ILLUSTRATORS CORPORATION and PAUL PICONE,<br><br>Counterclaim Defendants. | Civil Action No. 04-10913 WGY<br><br>**MOTION IN LIMINE TO EXCLUDE EXPERT REPORT AND TESTIMONY OF ROBERT HANSEN; MEMORANDUM IN SUPPORT OF MOTION** |

The Gillette Company ("Gillette") hereby moves pursuant to Federal Rules of Evidence 104 and 702 to exclude the expert report of Robert Hansen dated March 1, 2005 ("Hansen Report") and to preclude his testimony proffered by plaintiff Photographic Illustrators Corporation ("PIC").

**MEMORANDUM IN SUPPORT OF MOTION**

For more than a decade, PIC supplied Gillette with photographic images of Gillette's products (the "PIC Images") for use in connection with a variety of Gillette trade sales materials (the "Sales Materials"). PIC commenced this case in May 2004, claiming, *inter alia*, that Gillette had infringed its copyrights in certain of its images by using them beyond the scope of the license granted to Gillette. PIC has advanced a speculative theory of damages, claiming

entitlement to Gillette's profits on the theory that such profits were the result Gillette's use of the PIC images in the Sales Materials.

PIC requested discovery of Gillette's profits and advertising expenditures and filed two distinct motions to compel the production of such documents and information. In response to PIC's discovery requests and discovery motions, Gillette asserted, as it does in this Motion in Limine, that PIC cannot establish any causal connection between Gillette's use of the PIC images in the Sales Materials and that any claim of such a causal connection impermissibly would be based on rank speculation. Apparently agreeing with Gillette, the Court denied both of PIC's discovery motions on point.

Nevertheless, in an attempt to revive its speculative profits theory, PIC has submitted the expert report of Robert Hansen ("Hansen") and intends to offer Hansen as an expert witness to testify that PIC is entitled to $13,428,113 of Gillette's profits. Ex. A at 12, ¶ 34.[1] The Hansen Report consists of a purported calculation of Gillette's profits allegedly attributable to the use of the PIC images in Gillette's Sales Materials. In reality, the report is the new height of "speculation." The entire Hansen Report is premised on the unsupported assumption that there even exists a causal connection between an unspecified, unlicensed use of the PIC images by Gillette and Gillette's ultimate profits. Incredibly, however, Hansen made this assumption without reviewing a single allegedly infringing use by Gillette of the PIC images. This failure alone merits exclusion of his report and preclusion of his testimony at trial.

Moreover, having made the fundamental, unsupported assumption that some portion of Gillette's profits are attributable to some unspecified, unlawful use of the PIC images by Gillette, Hansen proceeds to his "calculation" of such profits. However, Hansen does not refer to any profits data, market studies, consumer surveys or *any* other verifiable objective evidence to derive his conclusion. Rather, he purports to extrapolate a calculation of Gillette's profits

---

[1] References to "Ex." are to the Exhibits to the Declaration of David Donahue, dated May 6, 2005, filed concurrently herewith.

2

attributable to the PIC images from a single piece of third party data—an *Ad Age* magazine report of Gillette's U.S. print advertising expenditures for 2001-2004. To do this, Hansen applies a series of baseless assumptions and subjective criteria to the *Ad Age* data, each compounding the speculative nature of his final conclusion. Ex. A at 12-16. Among these assumptions are the following:

- Hansen assumes that the profits Gillette derived from print advertising were at least equal to the amount expended on such advertising. Ex. A at 13, ¶ 38; Ex. D at 47:13 – 47:21. Yet he concedes that, in many cases, such an assumption could well be false and that his assumption in this case was not based on the factors one would ordinary consider in making such an assessment. *Id.* at 48:3 – 48:10; 51:8 – 52:12; 93:3 – 93:17.

- Hansen assumes that 6% of Gillette's print ad expenditures were on advertisements containing PIC images. Ex. A at 13, ¶ 39. Yet, he admits that he had no objective basis for this estimate and that he did not even review a single Gillette print advertisement alleged to contain a PIC image, Ex. D at 54:4 – 54:11. That is because there are none— PIC has not claimed that Gillette used the PIC images in Gillette's newspaper or magazine advertisements. Dkt. No. 99, Ex. 7 (Resp. to Interrogatory No. 1).

- Hansen assumes that the PIC images were responsible for 14% of the effectiveness of Gillette's print advertisements. Ex. A at 14, ¶ 42. Again, although Hansen readily concedes that the effectiveness of a photograph within an advertisement can vary greatly and can even be zero in some circumstances, he made this assumption without consulting a single Gillette print advertisement. Ex. D at 70:1 – 72:1.

- Without explanation, Hansen applied the above assumed calculations to seven other distinct categories of Gillette Sales Materials, again, without reviewing *any* of them. Ex. A at 15, ¶ 43 & Appendix A.

Hansen has never attempted to publish his admittedly unique methodology, and it never has been subject to peer review. Ex. D at 7:2 - 9:10, 93:18 – 94:15, 94:21 – 95:10. Indeed, Gillette's rebuttal expert, Professor Itamar Simonson rejects Hansen's methodology entirely and points out that "the opinions and estimates included in the Hansen Report are completely detached from and inconsistent with the accepted standards of marketing analysis." Ex. C at 6, ¶ 18. Given its mass speculation and lack of *any exposure*, much less acceptance in Hansen's field, the Hansen Report epitomizes unreliability and is nothing more than a haphazard attempt to give color to PIC's outrageous profits theory.

3

## I. RELEVANT LEGAL STANDARDS FOR ADMISSION OF EXPERT TESTIMONY

The standard for determining the admissibility of expert testimony is set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). The key inquiry in evaluating whether expert testimony should be admitted is whether the proposed testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The Supreme Court stated that such an inquiry "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can be applied to the facts in issue." *Daubert*, 509 U.S. at 592. Accordingly, the Supreme Court elaborated several non-exclusive factors for a court to consider when assessing the reliability of a methodology, including whether the challenged theory or methodology (1) can be tested; (2) entails and maintains standards that control the technique's operation; (3) has a known error rate; (4) has been subject to peer review; and (5) has been generally accepted in the relevant professional community. *Daubert*, 509 U.S. at 591-95; *see also Giard v. Darby*, 360 F. Supp. 2d 229, 235 (D. Mass. 2005) (applying the *Daubert* test for reliability); *Sutera v. The Perrier Group of Am., Inc.*, 986 F. Supp. 655, 661 (D. Mass. 1997).

In 2000, F.R.E. 702 was modified to emphasize the reliability requirement identified in *Daubert*. The revised statute reads as follows:

> If scientific, technical or other specialized knowledge that will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert… may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles to the facts of the case.

F.R.E. 702. Courts today still apply the *Daubert* reliability factors in the context of F.R.E. 702 admissibility inquiries, and have expanded the list to include other factors that may impact the reliability of expert testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting

that a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion offered").

## II. THE EXPERT REPORT AND TESTIMONY OF ROBERT HANSEN IS COMPLETELY UNRELIABLE AND SHOULD BE EXCLUDED

Hansen's highly speculative and admittedly subjective methodology falls dramatically short of satisfying the reliability factors set out in *Daubert* and F.R.E. 702. His entire profits calculation is premised on the unsubstantiated and critical assumption that there actually is a causal relationship between some unlawful activity of Gillette and Gillette's profits. The calculation itself entails a series of interdependent and baseless assumptions, the fallacy of which Hansen concedes would dramatically alter the results of his calculation. Further, Hansen's methodology is unpublished, untested and lacks any acceptance in the relevant academic community.

### A. As PIC Has Not Shown and Cannot Show Any Causal Connection Between the PIC Images and Gillette's Profits, Hansen's Report and Testimony Are Irrelevant

PIC attempts to circumvent its impossible showing that Gillette's profits are attributable to any alleged infringement by offering an expert witness who proposes a wildly unreliable calculation of the *amount* of such profits. *See* Section II.B, *infra*. Hansen's calculation jumps the gun by failing to even ask the prerequisite question whether there is a causal connection between a particular alleged infringement and Gillette's ultimate profits, a question this Court has already answered in the negative.

#### 1. The Legal Standard Under The Copyright Act For Recovery Of An Infringer's Profits

Under the Copyright Act, "the copyright owner is entitled to recover… any profits of the infringer that are attributable to the infringement." 17 U.S.C. § 504(b). When a plaintiff seeks a defendant's profits attributable to an infringement under § 504(b), the plaintiff must establish a "causal connection" between the infringement and the profits. *Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004); 17 U.S.C. § 504(b). "When an infringer's profits are only remotely and speculatively attributable to the infringement, courts will deny

recovery to the copyright owner." 4 M. Nimmer et al., *Nimmer on Copyright* § 14.03, at 14-34 (2003); *see also Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525-26 & n.10 (4th Cir. 2003) (denying infringement claims by creator of Baltimore Ravens' logo and finding that "no reasonable trier of fact could find that the sale of a ticket, or of a sponsorship, or of broadcast rights was in any way a consequence of the team's adoption of one logo design rather than another"); *Mackie v. Rieser*, 296 F.3d 909, 916 (9th Cir. 2002) (indirect profit recovery rejected as too speculative); *Rainey v. Wayne State Univ.*, 26 F. Supp. 2d 963, 972 (E.D. Mich. 1998) (same); *Sunset Lamp Corp. v. Alsy Corp.*, 749 F. Supp. 520, 525 (S.D.N.Y. 1990) (copyright plaintiff should be prevented from "achieving a windfall").

      **2.**    **In Denying PIC's Request for Discovery of Gillette's Advertising Expenditures and Profits, The Court Has Already Rejected the Speculative Theory Advanced By Hansen**

By its Second Set of Interrogatories and Document Requests to Gillette served on November 22, 2004, PIC requested that Gillette produce information and documents concerning Gillette's gross revenues, costs and profits for products that Gillette advertised or marketed using the PIC images, as well as information about Gillette's advertising expenditures and the effectiveness of its advertising. Gillette objected to these discovery requests on the grounds that, *inter alia*, such requests are not reasonably calculated to lead to the discovery of admissible evidence because any profit awards would be purely speculative. On January 25, 2005, PIC filed a Motion to Compel such information and documentation. In its Motion to Compel, PIC reasoned that such discovery was justified because it was entitled to recovery of some portion of Gillette's profits. Dkt. No. 33 at 19. Gillette responded that PIC could not possibly make the necessary showing of a causal connection between the use of its photographs and any sales of Gillette product. Dkt. No. 35 at 6-7. By its order of February 1, 2005, the Court denied PIC's motion with respect to this request.

Undaunted, PIC filed what it entitled a "Motion for Clarification," but which the Court treated as a Motion for Reconsideration, in which PIC misleadingly stated that the Court's

February 1, 2005 Order "did not address" PIC's motion to compel Gillette's production of a statement of "gross revenue, cost and profits for every product that Gillette advertised or marketed with images provided by PIC" and all documents relating to the "effectiveness of Gillette's advertising, trade shows, point of sale displays or product packaging." Dkt. No. 36 at 1. In opposition to PIC's motion, Gillette again argued that any profit award on the facts of this case would be hopelessly speculative and that the requested discovery was therefore properly denied. Dkt. No. 43 at 2-4. By its Order of February 10, 2005, the Court denied PIC's motion.

Having denied PIC's Motion to Compel *and* Motion for Reconsideration, the Court twice considered and rejected PIC's contention that there could be a causal connection between Gillette's use of the PIC images and its ultimate profits. One would think that this was the end of this matter. However, PIC now makes yet another attempt to revisit the issue by offering the testimony of Hansen. As in the past, PIC should be prevented from pursuing its far-reaching and meritless profit theory. And this being an issue decided and no longer within the Court's consideration, the Court should not entertain expert testimony on the point. *Ellis v. United States*, 313 F.3d 636, 646-47 (1st Cir. 2002) (under the "law of the case" doctrine, a court is bound to respect and follow its prior decisions barring an intervening change in the law or some exceptional circumstance).

    **3.**    **Hansen Cannot Overcome The Lack Of An Objective Causal Connection Between Gillette's Alleged Infringement and Any Profits of Gillette**

Even if the possibility of a profits award were not already foreclosed by the Court's prior orders, Hansen has presented no survey evidence, market studies or objective data to support his general assumption that the PIC images had an actual impact on Gillette's profits. Ex. A at 11, ¶ 33. Moreover, Hansen does not identify a single instance of alleged copyright infringement on which he bases his fundamental assumption that a causal link exists. It goes without saying that one would need to identify an alleged infringement in order to assess whether the alleged infringement actually contributed to the alleged infringer's profits. Hansen freely admits that he has seen situations in which images do not even contribute to the effectiveness of

7

advertisements. Ex. D at 70:22 – 71:1. It follows that, in order for Hansen to assess whether Gillette's use of a particular PIC image in a particular Sales Material had any impact on Gillette's ultimate profits, he would have needed to evaluate how the image is depicted in the Sales Material and how the Sales Material was used and distributed. As Hansen has not reviewed—much less based his findings on—any particular allegedly infringing work, his entire report is premised on some hypothetical infringement that presumably had some unspecified impact on profits. This baseless assumption is alone fatal to his opinion. *Daubert*, 509 U.S. at 590 (an expert opinion must be based on "more than subjective belief or unsupported speculation"); *Saia v. Sears Roebuck and Co., Inc.*, 47 F. Supp. 2d 141, 146-150 (D. Mass. 1999) (rejecting expert opinion as unreliable because it was based on unverified assumptions).

Indeed, *any* claim of a causal link between the PIC images in the Sales Materials and Gillette's profits would be nothing more than rank speculation. As pointed out by Gillette's rebuttal expert witness Professor Itamar Simonson, "there are many factors that determine the actual sales of a product, such as product features, the manner in which products are evaluated by customers, brand equity, competing products and their marketing activities, prices, sales promotions, distribution and the economic conditions." Ex. C at 8, ¶19. Professor Simonson further pointed out that, while the use of the product image may be convenient and communicative, it is highly unlikely that the Sales Materials would significantly impact the decisions of consumers or retailers in purchasing utilitarian and personal care products such as Gillette's products. Ex. C at 4-5, ¶¶ 13-15. Such decisions are typically dictated by considerations such as price, brand equity and product features. *Id.*

Hansen did not and cannot point to any competent evidence to prove that any of Gillette's profits are attributable to any unauthorized use of the PIC images. Because PIC cannot meet the legal threshold of demonstrating any causal link between Gillette's profits and any unauthorized use of the PIC images, PIC's claim for Gillette's profits allegedly attributable to the PIC images should not be considered at all, and Hansen's calculation should be deemed irrelevant and inadmissible. F.R.E. 702; *Daubert*, 509 U.S. at 589 (the trial judge must assure that proffered

expert testimony is relevant under F.R.E. 401 and F.R.E. 402); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

B.  **Hansen's Profits Calculation Is Based On Numerous Other Baseless Assumptions and Subjective Criteria.**

To satisfy Rule 702 and the *Daubert* reliability test, an expert opinion must be based on verifiable facts and not speculation or subjective opinion. F.R.E. 702 (opinion must be "based on sufficient facts or data"); *Daubert*, 509 U.S. at 590 (an expert opinion must be based on "more than subjective belief or unsupported speculation"); *United States v. Sebaggala*, 256 F.3d 59, 65-66 (1st Cir. 2001) (trial court properly excluded expert testimony that was speculative, anecdotal and not helpful to jury); *Saia v. Sears Roebuck and Co., Inc.*, 47 F. Supp. 2d 141, 146-150 (D. Mass. 1999) (rejecting expert opinion as unreliable because it was based on unverified assumptions); *Anello v. Shaw Indus., Inc.*, 2000 WL 1609831, at *3 (D. Mass. 2000) (rejecting expert opinion as based on "speculation and conjecture"); *see also Elcock v. Kmart Corp.*, 233 F.3d 734, 754-56 (3d Cir. 2000) (expert opinion regarding lost earnings rejected as subjective, based on assumptions and without foundation in the record).

Hansen's "calculation" is built upon a series of interdependent faulty assumptions. Because each step of the calculation is premised on the accuracy of the preceding assumption, the fallacy of any one assumption is fatal to the entire calculation. The result is a "house of cards" that crumbles under even the mildest scrutiny.

*Assumption 1*

Hansen first attempted to determine Gillette's profits derived from the Sales Materials. However, his "calculation" is not based on any data reflecting Gillette's profits, Gillette's marketing strategies, the costs of the Sales Materials or the effectiveness of the Sales Materials. In fact, the *only* data relied on by Hansen in forming his opinions was an *Ad Age* magazine report

9

that Gillette's print advertising expenditures for "shaving products" from 2001 through 2004 were $125,260,000.[2]  Ex. D at 46:25 – 47:4.

As an initial matter, Gillette's expenditures on print advertising—i.e., "newspaper or magazines," *see* Ex. A at 12, ¶ 35—are completely irrelevant to this case because PIC does not allege that Gillette used the PIC images in any of Gillette's newspaper or magazine advertisements.  *See* Dkt. No. 99, Ex. 7 (Resp. to Interrog. No. 1).  Because Gillette's print advertising expenditures are completely irrelevant to the equation, and Hansen's entire calculation is based solely on such expenditures, Hansen's entire calculations fails at the outset.

Armed only with this unverified third party calculation of Gillette's print advertising costs, Hansen made the assumption that the profits Gillette derived from such print advertising were at least equal to the amount expended on it.  Ex. A at 13, ¶ 38; Ex. D at 47:13 – 47:21.  However, Hansen conceded at deposition that he was merely "assuming" that Gillette's profits attributable to its advertising would equal the cost of said advertising.  Ex. D at 47:13 – 47:21.  He admitted that he had never read any academic article or other publication suggesting this to be a reasonable assumption.  Ex. D at 48:11 – 48:16.  He admitted that the actual profits attributable to any given ad campaign would depend on a variety of factors, and that he did not consider such factors as they pertained to any given Gillette ad campaign.  Ex. D at 51:8 – 52:12.  And he admitted that an unsuccessful advertising campaign could just as well result in a financial loss.  Ex. D at 48:3 – 48:10; 93:3 – 93:17.  Indeed, Gillette's rebuttal expert, Professor Itamar Simonson concluded, by reference to several authorities on point, that the cost of advertising can

---

[2] Hansen had no role in collecting data for the *Ad Age* reports; he had no role in preparing the reports; he could not verify the methodology used by *Ad Age*; he could not confirm what Gillette products were included in "shaving products;" he did not know what advertising was included in "print advertising" and; he could not verify the accuracy of the results printed in the *Ad Age* articles.  Ex. D at 37:19 – 38:15; 42:25 – 44:14; 56:6 – 56:14.  Thus, his report should be inadmissible on this basis alone.  *Daubert*, 509 U.S. at 593 (expert testimony must satisfy standard of "evidentiary reliability"); *Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 173 F.R.D. 675, 688 (D. Kan. 1997) (excluding testimony where expert based opinion on unverified information provided to expert by third party).

frequently exceed the profits generated therefrom. Ex. C at 8, ¶ 20 (and authorities cited therein).

*Assumption 2*

Having assumed that $125,260,000 in print ad expenditures equates to $125,260,000 in profits from those print ad expenditures, Hansen next sought to determine what portion of this alleged $125,260,000 in "profits" was attributable to print advertisements containing PIC images. Hansen "made the assumption that slightly more than one-twentieth of these expenditures, or 6% of the expenditures, were on ads that used one or more of the images in question," and concluded that $7,515,600 (6% of $125,260,000) of Gillette's print advertising for blades and razors was attributable to print advertisements containing PIC images. Ex. A at 13, ¶ 39. When asked whether there was any basis for the 6% figure, Hansen admitted he had not consulted with anyone or reviewed any evidence to support his "estimate." Ex. D at 54:7 – 54:11. In fact, he had not even seen *a single* print advertisement with a PIC image—again, there is none. Ex. D at 54:4 – 54:6. Hansen readily admits that, if the PIC images were not used in print advertisements, then this entire category "would go away." Ex. D at 56:15 – 56:22. In other words, his calculation with respect to Gillette's profits attributable to use of the PIC images in print advertising, the calculation on which his entire report hinges (as shown below), is meaningless.

Also absent from this component of Hansen's calculation is any distinction between Gillette's lawful use of the PIC images (PIC concedes that many uses were permitted even under its view of the license agreements) and Gillette's alleged unlawful use. By failing to account for Gillette's undeniably lawful use, Hansen's final calculation of $13,428,113 does not even purport to be profits attributable to alleged infringement by Gillette, but rather, profits attributable to Gillette's (hypothetical) use of the PIC images, whether lawful or unlawful. Such an amount, even if accurate (which it clearly is not), well exceeds the contemplated profits recovery contemplated by the Copyright Act. 17 U.S.C. § 504(b) (limiting recovery of profits to

11

those "attributable to the infringement"). This too illustrates that Hansen's conclusions are off-point and should be discarded entirely.

*Assumption 3*

Hansen's next purported step was to attempt to quantify the effectiveness of the PIC images within the Gillette print advertisements for blades and razors (even though the images were not even used in such ads). Hansen "concluded" that the PIC images were responsible for 14% of the effectiveness of the print advertisements. Ex. A at 14, ¶ 42. Again, however, Hansen did not even review a single print advertisement to make this determination (as none even existed)—he simply pulled this figure out of thin air! Ex. D at 70:1 – 72:1. He readily concedes that the effectiveness of a photograph within an advertisement can vary greatly and can even be *zero* in some circumstances. *Id.* Yet, without even viewing an advertisement with a PIC image, he blindly concluded that, in this case, the PIC images were responsible for 14% of the (non-existent) Gillette print advertisements for blades and razors containing PIC images. *Id.* The law is clear that such an arbitrary evaluation with no foundation in the evidence warrants the rejection of Hansen's report and the conclusions therein. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Saia v. Sears Roebuck & Co., Inc.*, 47 F. Supp. 2d at 146 (rejecting proffered expert where expert's assessment that plaintiff suffered a 10-20% reduction in ability to lead a normal life was arbitrary).

Hansen could only explain that his assessment was based on his years of working with *other* companies and assessing the effectiveness of *their* photographs in *their* advertisements. Ex. D at 71:4 – 71:14. However, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is sufficient basis for the opinion, and how that experience is reliably applied to the facts." F.R.E. 702, Advisory Committee Note; *see also U.S. v. Fredette*, 315 F.3d 1235, 1240

12

(10th Cir. 2003) (rejecting expert testimony because proposed testimony did not rest on a reliable foundation as expert never explained why his personal experience was a sufficient basis for opinion). Here, Hansen has not explained how his experience with *other* advertisements of *other* companies could possibly bear on the effectiveness of the PIC images in Gillette's Sales Materials. Clearly, such an assessment is particular to the specific manner in which the PIC images are presented in the Sales Materials and Hansen's experience with third party advertisements is completely meaningless without a review of the Sales Materials in issue. *Fredette*, 315 F.3d at 1240 (expert's "experience" relating to "other rebate programs" would not assist in assessment of rebate program in issue).

*Assumption 4*

Applying the unfounded 14% figure derived by *Assumption 3* to the unfounded $7,515,600 in alleged profits derived by *Assumptions 1* and *2*, in his report, Hansen concluded that $1,052,184 of Gillette's profits are attributable to use of the PIC images in Gillette's print advertisements for blades and razors (even though they were never so used). Ex. A at 15, ¶ 43. He then designated Gillette's print advertisements for blades and razors from 2001-2004 as "Use Category 1," and formulated nine other arbitrary "Use Categories" of Sales Materials as depicted in Appendix A to his report. *Id.* (He also refers to the use categories as "Damage Categories"). *Id.* Hansen claims in his report, without further explanation, that he then "applied the same basic methodology [as was used for Use Category 1] to estimate the profits attributable to infringement earned by Gillette Company in the remaining use categories in Appendix A."[3] *Id.*

At his deposition, Hansen conceded that he did nothing of the sort. Because Hansen relied solely on the *Ad Age* assessment of Gillette's U.S. print advertising expenditures for shaving products, he was forced to extrapolate the profit calculations for the other Use

---

[3] The Hansen Report fails to provide any insight as to Hansen's methodology with respect to Use Categories 2-10. (Moreover, as discussed below, his claim that he used "the same basic methodology" as he used for Category 1 is not accurate.) The fact that the Hansen Report merely states his conclusions without explaining the "why" provides yet another independent ground for excluding his testimony on Use Categories 2-10.

Categories from his dramatically flawed assessment of Use Category 1 above. Ex. D at 78:16 – 88:2. For each of the remaining Use Categories, Hansen attempted to determine a multiplier that would reflect the relative profits that must have been attributable to Sales Materials in the Use Category as compared to Use Category 1. Id. For example, for Use Category 2—Print advertising in the U.S. for personal care, oral care, portable power and Braun during 2001-2003—Hansen concluded that the ad expenditures in this category (and hence the resulting profits) would be 1.42 times what was expended in Category 1. Ex. D at 78:20 – 82:14. He then multiplied 1.42 times $1,052,184 to arrive at his calculation of profits attributable to any use of the PIC photographs in the Sales Materials identified in Use Category 2. Id. He repeated this process for each of the Use Categories. Ex. D at 84:21 – 84:3.

Fatal to this approach, however, Hansen had *no* objective basis for determining the multipliers for each Use Category. For example, for Use Category 2, Hansen admitted he had no knowledge of what Gillette's print advertising expenditures were for Braun, Personal Care and Portable Power for 2001-2004.[4] Ex. D at 80:24 – 82:14. Likewise, for Use Category 3 – magazine advertising outside the U.S. for all Gillette products for 2001-2004[5] – Hansen "estimated" that these expenditures would be 97% of the ad expenditures in Use Category 1. Ex. D at 82:15 – 84:12. When asked about this calculation, Hansen conceded that this assumption also was not based on any factual data. He testified as follows:

> Q: Can you explain to me how you derived the profits attributable to the infringement for the use category 3?
>
> A: What I did was I thought it would be – not thought it would be. I wanted to go with a – since it's outside the U.S., I wasn't sure what was going on with regard to how much they are spending and how they go to market over there. So I took the amount from category one and said it was – I provided an estimate that would be – turns out to be 97 percent of that.

---

[4] Gillette breaks its business into 5 separate divisions, Blades and Razors, Braun, Personal Care, Oral Care and Portable Power.

[5] Again fatal to Hansen's calculation, there is no evidence of magazine advertisements containing PIC images in the United States, much less abroad. Dkt. No. __ at __.

14

> Q: Where did you get that 97 percent figure?
>
> A: It's just an estimate.
>
> Q: An estimate – an estimate of what?
>
> A: It's just an estimate of what would have been spent in those categories.
>
> …
>
> Q: How do you know that Gillette's magazine advertising expenditures outside the U.S. wasn't a small fraction of what it spent on print advertising for blades and razors in the U.S.?
>
> A: I don't know that.
>
> Q: So the 97 percent figure could just as well be 10%?
>
> A: If it were, I would put it in there and change the calculations based on information that was made available to me.

*Id.* Hansen continued to admit that he did not use actual figures with respect to the other Use Categories and that his calculations would need to be adjusted if the numbers were different than the numbers he assumed. Ex. D at 85:11 – 87:2.

Moreover, by applying these arbitrary multipliers to the calculation derived with respect to Use Category 1, the calculations for the Use Categories all implicitly carry the same assumptions made for Use Category 1, thus compounding *Assumptions 1-3* for each Use Category. In other words, without having reviewed any allegedly infringing Sales Materials, Hansen assumes that profits attributable to the Sales Materials in each use category are at least equal to the amount expended by Gillette on the Sales Materials in the Use Category; he assumes that 6% of the Sales Materials in each Use Category include PIC photographs; and he assumes that the PIC photographs are responsible for 14% of the effectiveness of all of the Sales Materials. There is no basis to permit Hansen to testify at trial.

**C.     Hansen's Methodology Has Not Been Subject to Peer Review and Is Not Generally Accepted in His Field**

Hansen freely admits that he is not aware of *any attempt* by other academics or expert witnesses to determine the amount of profits attributable to an image within promotional materials. Ex. D at 93:18 – 94:15, 94:21 – 95:10. Moreover, Hansen has not even attempted to publish his theories, putting in serious question whether Hansen has any confidence in his own methodology *Id.*, 7:2 - 9:10; *see* Hon. William G. Young, John R. Pollets & Christopher Poreda, 19 *Mass. Prac. Series, Evidence* § 702.7 n.15 (2d ed. 2005) ("Where an opportunity exists to validate the theory through peer review and the expert has not submitted the theory for external scrutiny, Court may become skeptical of the expert's own confidence in the validity of the theory.").

As Gillette's rebuttal witness Professor Simonson states:

> Dr. Hansen's 'methodology' violates, not only accepted standards, principles, and known limits of marketing research, but also simple common sense… [T]he opinions and 'estimates included in the Hansen Report are completely detached from and inconsistent with the accepted standards of marketing analysis... [B]ased on my familiarity with marketing methods and with the marketing literature and textbooks (including many of the textbooks Dr. Hansen listed), I do not believe that any of these sources supports the notion that one can derive a meaningful estimate of the impact of certain pictures embedded in marketing materials on sales and profits, and specifically, the impact of the PIC images on Gillette's sales and profits. Indeed, as explained above, deriving such an estimate is simply not possible.

Ex. C at 6-7, 10, ¶¶ 16, 18, 22. Because Hansen's methodology finds no support in his field, and particularly considering the number of baseless subjective assumptions it entails, it is completely unreliable. *Daubert*, 509 U.S. at 593 (a pertinent consideration concerning the reliability of a methodology "is whether the theory or technique has been subjected to peer review and publication"); *U.S. v. Van Wyk*, 83 F. Supp. 2d 515, 520-23 (D.N.J. 2000), *aff'd.*, 262 F.2d 405 (3d Cir. 2001) (trial court excluded as unreliable expert opinion because expert could identify only one publication addressing the technique and could not demonstrate any meaningful peer review).

**CONCLUSION**

In view of the numerous compounded assumptions inherent in Hansen's purported calculation, his expert opinion violates the core principles of F.R.E. 702 in that it is not based on sufficient facts or data, is not the product of reliable principles and methods and is not applied to or the facts of *this* case.  Likewise, it fails to satisfy the *Daubert* reliability factors.  Because Hansen's methodology is premised on assumption, there is no way it can be tested objectively and there are no objective standards to control the technique's operation.  Moreover, its error rate is completely unknown.  Even Hansen concedes that the actual data is unknown and so the error can be up to 100%.  Further, his methodology finds no support in the academic or professional communities and has not been subjected to peer review.  Thus, Hansen's extreme extrapolation from Gillette's expenditures for U.S. print advertising on the one hand, to Gillette's profits from use of the PIC images in Sales Materials throughout the world on the other hand, should not be considered as evidence in this case.  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting that in some cases a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered").  As such, the Court should exclude Hansen's Report and preclude him from testifying at trial.

Dated:  May 6, 2005

| GELB & GELB LLP | FROSS ZELNICK LEHRMAN & ZISSU, P.C. |
|---|---|
| By:   /s/Richard M. Gelb/<br>     Richard M. Gelb (BBO#188240)<br>     rgelb@gelbgelb.com<br>     Robert S. Messinger (BBO# 651396)<br>     rmessinger@gelbgelb.com<br><br>20 Custom House Street<br>Boston, MA  02110<br>Tel: (617) 345-0010<br>Fax: (617) 345-0009 | By:   /s/Patrick T. Perkins/<br>     Patrick T. Perkins (Admitted *pro hac vice*)<br>     David Donahue (Admitted *pro hac vice*)<br><br>886 United Nations Plaza<br>New York, New York 10017<br>Ph: (212) 813-5900<br>Fax: (212) 813-5901<br><br>*Attorneys for Defendant/Counterclaim-Plaintiff The Gillette Company* |

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(a)(2)

I, Patrick T. Perkins, do hereby certify that on May 5 and 6, 2005, I communicated with Michael Albert, Esq., counsel of record for Plaintiff, in a good faith effort pursuant to Local Rule 7.1(a)(2) to resolve or narrow the issues raised in this motion.

By: /s/Patrick T. Perkins/
Patrick T. Perkins (Admitted *pro hac vice*)

I:\ddonahue\GLTC\COURT DOCS\050506-0420298-PLD-limine-Hansen-dd.doc