# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PHOTOGRAPHIC ILLUSTRATORS
CORPORATION,

      Plaintiff,

v.

THE GILLETTE COMPANY,

      Defendant.

Civil Action No. 04-CV-10913-WGY

## EXPERT REPORT OF ROBERT A. HANSEN

**I.**    **Qualifications**

1.    I earned a Ph.D. in Marketing from the University of Wisconsin, Madison in

1973. I earned an MBA in 1970, also from the University of Wisconsin,

Madison. I have more than 30 years teaching experience at both undergraduate

and graduate level (MBA and Ph.D.). I taught for five years at The Ohio State

University in Columbus, Ohio, and for the past 25 years at The Carlson School of

Management at The University of Minnesota in Minneapolis. I have taught

courses in marketing, marketing management, consumer behavior, marketing

research, retail management, sales management, introduction to business and

international marketing among others. I offer a number of courses in the

Executive Development Center at (EDC) at the University of Minnesota. I have

also been invited to participate in executive education programs sponsored by The

University of Wisconsin and several trade and professional associations.

2.     I have made numerous speeches to various audiences of business people on topics related to marketing strategy, sales strategy, new product development strategy, market segmentation and market targeting, promotion and distribution strategy, branding and brand building and other business and marketing related topics.

3.     I was on the Board of Advisors of PerforMark, and I am currently a member of the Board of Directors of Fastenal Company, a multi-billion dollar company.  I am a member of the Audit Committee and Chair of the Development Committee at Fastenal.

4.     I have developed and delivered custom education programs for more than 50 companies.  The topics covered  include marketing strategy, brand management, sales management and others.  I have also performed consulting engagements for over 100 companies covering a wide range of topics including marketing research, marketing strategy, brand strategy, new product development, sales management and other marketing and business topics.

5.     I have been employed in business management positions by Oscar Mayer and Co., National Cash Register (NCR) and Grant Thornton International.

6.     In the past four years I have testified in one court case, <u>Polar Bear Productions v. Timex Corporation</u>, 384 F.3d 700 (9th Cir. 2004).

7.     In the past ten years I have published one article in a refereed source. It is "The Right Question: Building Meaningful Dialogue in Customer Satisfaction Measurement Projects," <u>Marketing Management</u>  (July August, 2004).

## II.     Working Relationship and Compensation

8.      Throughout my work on behalf of PIC, I have been given access to all of the
        discovery in this case.  I have also relied on other sources to form the opinions
        that I have presented in this report.  Section III, below, contains the complete list
        of documents that I relied upon in forming my opinion.

9.      I personally performed all of the analysis described and summarized in this report.
        All of the opinions are my opinions.  I reserve the right to amend my report if
        additional information is made available to me.

10.     I have been compensated for my work on this project at the rate of $300 per hour.
        To date, I have spent 36 hours on the project.


**III.     Sources Used**


11.     I relied upon the following documents in researching and drafting my report:

        - Second Amended Complaint
        - PIC License Agreement
        - PIC Price List
        - _____ "Megabrands" Advertising Age   7/21/03
        - _____ "Megabrands" Advertising Age   10/13/04
        - _____ "Megabrands" Advertising Age   7/19/04
        - _____ "Megabrands" Advertising Age   10/11/04
        - "Cool Blue" Project Folder
        - Transcript of the deposition of Linda K. Mallette
        - Transcript of the deposition of Elizabeth A. Cooper
        - Gillette Company Annual Report for 2001
        - Gillette Company Annual Report for 2002

3

- Gillette Company Annual Report for 2003
- Kerin, Roger, et al <u>Marketing</u> (seventh edition) McGraw Hill (New York, 2003)
- Kotler, Philip <u>Marketing Management</u> (11th edition) Prentice Hall (Upper Saddle River, New Jersey, 2003)
- Hutt, Michael and Thomas Speh <u>Business Marketing Management</u> (seventh edition) Harcourt, Inc. (Orlando, Florida, 2001)
- Semenik, Richard <u>Promotion and Integrated Marketing Communication</u> Southwestern Publications (Cincinnati, Ohio, 2003)
- Wheeler, Alina <u>Designing Brand Identity</u> Wiley Publishing (Hoboken, New Jersey, 2003)
- Czinkota et al <u>Marketing Best Practices</u> Dryden Press (Orlando, Florida, 2000)
- Dickson, Peter <u>Marketing Management</u> (second edition) Dryden Press (Orlando, Florida, 1997)
- Best, Roger <u>Market Based Management</u> (second edition) Prentice Hall (Upper Saddle River, New Jersey, 2001)
- Dalrumple, Douglas and William Cron <u>Sales Management</u> (sixth edition) Wiley (New York, New York, 1998)
- Heinmann, Jim <u>All American Ads of the 60's</u> Taschen GmbH Hohenzollernring 53, D_50672 Koln (2001)
- Haas, Robert <u>Business marketing Management</u> (fifth edition) PWS-Kent (Boston, Massachusetts, 1992)
- Zaltman, Gerald <u>How Customers Think</u> Harvard Business School Press (Boston, Massachusetts, 2003)
- Keller, Kevin Lane <u>Building, Measuring, and Managing Brand Equity</u> Prentice Hall (Upper Saddle River, New Jersey, 1998)
- Peter, Paul J. and J.H. Donnelly Jr. <u>A Preface to Marketing Management</u> (eighth edition) Irwin McGraw Hill (New York, New York, 2000)
- Guiltinan, Joseph P., Gordon Paul and Thomas Madden <u>Marketing Management</u> (sixth edition) McGraw Hill (New York, New York, 1997)
- Best, Roger J. <u>Market Based Management</u> (second edition) Prentice Hall Publishing (Upper Saddle River, New Jersey, 2000)
- Churchill, Gilbert A. and J. Paul Peter <u>Marketing</u> Austin Press (Burr Ridge, Illinois, 1995)
- Neff, Jack "Gillette Flexes Its Muscle" <u>Advertising Age</u> 8/2/2004
- Neff, Jack "Gillette Amps Up Sponsorships" <u>Advertising Age</u> 9/6/2004

- _____ "Business: Taking It on the Chin" The Economist London: 4/18/1998
- Heckman, James "Razor Sharp: Adding Value, Making Noise with Mach3 Intro" Marketing News Chicago: 3/29/99
- _____ "The Gillette Company: Company Profile" Datamonitor, February 2005.

## IV.    Introduction

12.    I was retained by Photographic Illustrators Corporation (PIC) to review documents pertaining to the litigation and offer expert opinions on a number of marketing related topics. While I do not offer any legal opinions, I assume certain facts from the current litigation. The facts I used as assumptions include the number of original photographs provided to Gillette by PIC, which numbered in the thousands, and the fact that they were used beyond the scope of their license over the course of several years. For the purposes of this report, I focus on the misuse of the images that occurred in the years 2001 through 2004.

13.    I was asked to offer an opinion as to whether and to what extent PIC's product images contribute to Gillette's marketing efforts, sales, and resultant profits. In addition, I was asked to use available secondary data sources and other publicly available information about the Gillette Company's operations to suggest a methodology that could be used to estimate the marketing based value that Gillette derived from the usage of the photos. Marketing based value ultimately translates into profit for Gillette. Based on my above-described assumptions regarding the merits of the lawsuit, I have assumed that these photos were used illegally by Gillette starting at some point in the 1990's and continuing to the

present. PIC was the source of the vast majority of product images supplied to Gillette from 1997 through 2001and Gillette continued to use those images beyond license period and to make unauthorized duplicates of those images. My analysis covers the time period from 2001 through 2004 because those were the years for which I was able to find advertising expenditure data for the Gillette Company. Further, I applied my methodology to available secondary data and public records to calculate an estimate of the marketing based value Gillette obtained by using the images over the years 2001 through 2004.

14.     I understand that there are other types of damages at issue in this case, such as liquidated damages under the contract for failure to return photographic materials, and PIC's direct copyright damages as distinguished from the "infringer's profits" measure of damages. I did not analyze any issues relating to these other forms of damages, and this report does not include any measure of those damages. The damages covered in this report are limited to Gillette's profits attributable to its infringing activity, and do not in any way count these other categories of damages.

15.     This report presents my opinions on these matters.


**V.     The Consumer Product Goods Industry**


16.     There are numerous descriptions of the specific products and the specific companies that make up the Consumer Product Goods ("CPG") industry or CPG business. In the most basic terms, the products are relatively low priced,

6

frequently purchased consumer nondurable goods. This is in contrast to non-frequently purchased consumer durable goods, such as washing machines and televisions.

17.    Most CPG products are sold to consumers through grocery, drug, discount and convenience stores as well as through other retailers. There are many product-based segments of the CPG industry and the major competitors vary by CPG segment. For ready to eat cereals, General Mills, Kellogg and Malt-O-Meal are major competitors. In the shaving blade and razor segment, Gillette and the American Safety Razor Company are major competitors. The annual sales of products in these segments of the CPG business are measured in the tens of billions of dollars.

18.    For example, in 2003 Gillette had sales of more that $9 billion and it spent over $800 million in advertising (both are global figures). The Gillette Company operates 32 manufacturing facilities in 14 countries and it employees approximately 29,000 people worldwide. In major markets, Gillette's products are sold directly to retailers and or to wholesalers for resale through retail stores. In some small geographic markets, products are distributed through local distributors and sales agents.

19.    Worldwide Gillette sells its products in over 200 countries and territories. Gillette's largest customer in 2003 was Wal-Mart which accounted for 13% of net sales.

20.    In 2003, Gillette had a 72.5% share of the worldwide razor and blades market. Gillette's Duracell brand is the global leader in alkaline batteries. It has a

7

worldwide share of the alkaline battery market. The company's Oral-B brand has a 34% share of the global brushing market.

21. Gillette also spends marketing funds to pay for sales promotions and a sales force. The job of the sales force is to sell the product to the trade. The trade includes the retailer who sells the product to the individual customers. It also includes wholesalers and sales agents and distributors. Some of the sales promotion expense goes to retailers in the form of a yearly rebate based on the total retail sales. The sales force is charged with selling the product to the trade so the trade can then sell the product to the consumer market.

22. Advertising is primarily directed at the consumer and it is designed to entice the consumers to prefer and purchase the sponsor's brand within each product category. Sales promotion in the form of coupons, value packs and other price reduction programs are also used by CPG companies as an added incentive to get customers to buy other brands within a product category.

23. Within a particular product category (e.g., blades and razors or personal care items) individual companies compete for a larger share of the market and hence greater sales. As a general rule, companies implement a strategy of "buying share" using lower overall prices for their products or by offering numerous deep discounts to advertised prices through coupons or other short term sales promotion strategies to consumers and by offering price reductions to the trade. An example of a company that employs the "buy share" strategy is Malt-O-Meal in the ready to eat cereal category. They sell what could be called a copycat

8

version of a branded cereal and they sell it at a much lower price to the trade and to the consumer as well.

24.    Companies who seek to "build share" (as opposed to buying share) do so by investing in research and development efforts to design and build superior products. Companies that implement the "build share" strategy by developing superior products are able to fight the trend toward "commoditization" that occurs within CPG product categories. The "commoditization" occurs when all the brands offered by all of the competitors are seen by consumers as being basically the same in terms of the features performance and benefits offered. When this happens, the consumer makes the purchase decision based on price. Companies that implement a "build share" strategy tend to invest more to support their brands as well. This support includes spending more on sales activities and advertising.

25.    Gillette has a long and storied history as an effective competitor in the broadly defined CPG industry. Gillette is referenced in the latest editions of the number one selling Principles of Marketing and number one selling Marketing Management textbooks. The company is repeatedly cited as an example of how to dominate a product category using a combination of investments in product development and marketing support. Gillette's marketing initiatives are used as examples of how to win in a product category.

26.    In the letter to shareholders in the 2003 annual report, James M. Kilts (then Chairman, President and Chief Executive Officer) of Gillette offered a number of comments concerning the results of the three-year turn around program that he initiated in 2000. He noted that Gillette had been overspending in trade and

9

consumer spending (sales promotions) and under-spending in advertising. He also stated that these trends had been reversed and more money was being spent on advertising. In addition, rigorous testing has shown that Gillette is spending money on marketing and advertising programs that are among the very best in persuasion and impact.

27.    The time period in question in this case was a time of increased importance in terms of investing in marketing and advertising activity at Gillette.

**VI.    Opinions Offered**

28.    Based on my experience in studying and working with business people in evaluating the impact of visual images on success in the consumer package goods industry, I make the following conclusions:

29.    Visual marketing materials are a contributing factor to Gillette's profits, whether in the form of print advertisements, coupons, sales presentations, product support literature used to sell Gillette products to retailers or to other members of the trade.

30.    Product images that appear in marketing materials are among the "key success factors" that contribute to the effectiveness of those materials. High quality images cause a marketing campaign to be more successful, while low quality images will reduce the success of a marketing campaign. In my experience I have seen the dramatic impact that specific images can have on the success of an ad

campaign or marketing initiative and as a result generating more profit for the sponsoring company.

31. The design of product packaging can be a major contributing factor to the sales of that product in the consumer packaged goods industry, and thus the profit made from the sale of the product. This is particularly true where the consumer will be choosing between competing products on a store shelf, as is the case with many of Gillette's products. There are instances where the use of new and unique packaging has had a significant impact on the success of a new product launch or other marketing programs and as a result generating more profit for the sponsoring company.

32. "Business to business" marketing materials, such as sell sheets, PowerPoint presentations, sales support literature and product catalogs can be a major contributing factor to product sales and thus profits. These materials are an integral part of Gillette's selling strategy targeted at the trade. If Gillette is not successful in its sales presentations to the trade their products will not be available for consumers to buy. For all of the sorts of products photographed by PIC, Gillette's sales to end consumers require retail chain decision makers to choose the products first. If Gillette could not "sell" the product to retailers, there would be no profits.

33. The product images created by PIC played an important role in Gillette's marketing and advertising efforts company wide. As a result of PIC's work, Gillette sold more products and made more profits from these sales.

34.    I conducted my analysis using the methodology described in this report and I

conclude the damages amount is $13,428,113.00.

## VII.    Evaluation Methodology

35.    The Gillette Company misused PIC's images in a number of different ways. I

have assumed in this report that PIC's images were used in the following ways:

print advertisements (e.g. newspaper or magazine); sales promotions on coupons

and/or point of purchase (POP) materials; and sales presentations made to what is

referred to as "the trade." This includes retailers, wholesalers, distributors and

sales agents. I have also assumed that the images were used in trade shows

targeting the "trade" as well, in catalogs, product description fact sheets and other

materials that would be left with members of the trade following a sales call

and/or picked up by members of the trade attending a trade show. The final use I

have assumed is in the Gillette Company's annual reports.

36.    Each of the use categories presented above (except the annual report category)

can be applied to products in all five of Gillette's business segments. They

include blades and razors, portable power (Duracell batteries), oral care, Braun

and personal care. Further, the photos may have appeared in the ways mentioned

in both the United States and also in worldwide application.

37.    To begin my analysis, I focused on one specific application area, print ads in the

United States for blades and razors. I chose these specific situations as an example

of how to estimate damages. In Appendix A, I have listed 10 separate use or

application areas where the images could have been used by Gillette to profit from its infringing activity.

38.    Table One presents a summary of Gillette spending on print advertising for blades and razor products for 2001 through 2004 in the United States. The total expenditures in Table One are $125,260,000. I made the assumption that the profit earned by Gillette from this print advertising was at least equal to the amount Gillette spent to execute the programs. This is a minimum return on the dollars invested to implement the print ad campaigns.

39.    Over the four year period, Gillette invested $125,260,000 in print advertising for shaving products. I made the assumption that slightly more than one-twentieth of these expenditures or 6% of the expenditures were on ads that used one or more of the images in question. In my experience, print ads are much more likely to contain images of the product in use or some feature or function of the product rather than just a product image. Applying the 6% allocation of product images to the total spent on print ads leads to an estimate of $7,515,600 worth of print advertising incorporating PIC's images.

40.    The next question that must be asked is what percentage of this $7,515,600 of profit is attributable to PIC's product images? I used a basic component attribution process similar to the type I use in business consulting situations where I am asked to value components of print advertisements. I have identified a set of key success factors (KSF) that can be used to evaluate any print advertising campaign. They include market analysis of target audience selection and selection of the campaign's goal or objective. The other KSF involves program

13

design and execution, which includes media selection, creative work and written material and images and pictures.

41.    In my opinion, the percentage attributed to the individual components of these KSF varies depending on the specific situations. I have personally been involved in several projects targeted toward the evaluation of advertising's effectiveness. In one such case, for example, I determined that the inclusion of a particular photograph improved the ad's effectiveness by 67%. In that specific instance, all of the other components of the ad summed up in the previously described KSF only accounted for 33% of the value of that specific magazine advertisement.

42.    While it may be the case that this 67% allocation could likewise reflect the value that PIC's images had in Gillette's ad campaign, I have attempted to identify a conservative percentage allocation that in my opinion could fairly be attributed to PIC's images in the circumstances of this case. It is my opinion that a conservative estimate of the impact of a PIC photographic image in a Gillette print advertisement would be 14%. This estimate is based on my experience with evaluating the impact of visual images as opposed to narrative in print ads. Images are more important in brand building than text because images are usually remembered longer than the paragraphs of text material included in a print advertisement.


VIII.   **Damage Summary**

43.    Applying this 14% measure to the $7,515,600 of print ads using the offending

images yields profits to Gillette attributable to the infringement of $1,052,184. I

next applied the same basic methodology to estimate the profits attributable to

infringement earned by the Gillette Company in the remaining use categories in

Appendix A. This information is summarized in Table 2. These varying amounts

are based on my experiences with assessing the importance of visual images to

the profit generating ability of a particular marketing, sales or advertising

initiative. Images used in sales presentations and in product description and

support literature directed to the trade have more impact than do images used, for

example, in a coupon sent to an individual consumer. I based my estimate of

profit generated for Gillette due to the use of the images in question in each use

category on my experience in evaluating the effectiveness of various promotion

and communication initiatives. I applied this estimation process to seven of the

remaining 11 use categories listed in Appendix A. I did not attempt to estimate

the profit attributable to infringement in the two Web based use categories or the

annual report use category. In my opinion Gillette has profited from its

infringement in each of these use categories but I do not have enough experience

in evaluating Web based uses of photos or the use of images included in annual

reports. As the information in Table 2 indicates, the total profit to Gillette

resulting from eight of the 11 categories of infringing use is $13,428,113.


IX.    **Concluding Comments**

44.    The methodology that I used to calculate damages is a "macro" as opposed to a "micro" or product by product analysis. It should be noted that in my review of the Gillette Company's annual reports there were several specific new product

and brand extension product launches that were significant enough to be mentioned in the letter to stockholders. These product launches included: the Mach III Turbo, the Oral B premium battery product and the Oral B 3D Excel Rechargeable brush. In addition the company launched an ad campaign entitled the "Brush like a dentist" campaign.

45.    Given that Gillette spent $125,260,000 on print advertisement in the United States between 2001 and 2004, and that Gillette's president and CEO had stated that Gillette had previously under-invested on advertising, my conclusion that the infringing use of images from Gillette's primary product photographer added approximately $14 million in value to the company over that time period is consistent with my understanding of the value high-quality commercial photography can add to a CPG company.

46.    In addition I reviewed documents related to the use of PIC images and design services associated with the launch and actual package used for the razor product in the "Cool Blue" product campaign. To the extent that images and design consulting services from PIC were misused in any of these five individual campaigns; the same percent allocation methodology could be used to calculate the profit Gillette received by illegally using PIC images in each of these five individual campaigns.

Respectfully submitted,

Robert A. Hansen, Ph.D.

16

**Appendix A**

Damage Categories

1. Print advertising in the US for blades and razors during 2001 through 2004.

2. Print advertising in the US for personal care, oral care, portable power and Braun during 2001 through 2003.

3. Magazine advertising outside of the US for blades and razors, personal care, oral care, portable power and Braun during 2001 through 2004.

4. Sales promotion materials including coupons and supporting materials for blades and razors, personal care, oral care, portable power, and Braun worldwide during 2001 through 2004.

5. Materials used during sales presentations of blades and razors, personal care, oral care, portable power and Braun product lines to retailers worldwide during 2001 through 2004.

6. Printed materials such as catalogs and product literature left at the conclusion of sales presentations to retailers worldwide during 2001 through 2004.

7. Materials used during sales presentations of blades and razors, personal care, oral care, portable power and Braun products made to wholesalers, distributors and sales agents worldwide during 2001 through 2004.

8. Images included on Gillette Company internet and intranet web sites from 2001 through 2004.

9. Gillette Company "e-coupons" or other "e-based" promotions implemented between 2001 through 2004.

10. Annual reports of the Gillette Company for 2001, 2002 and 2003.

**Table 1**

Print Ad Expenditures
in the
United States
In 2001 through 2004
For Blades and Razors
(In Millions of Dollars)

| Year | | | |
|------|------|------|------|
| 2001 | 2002 | 2003 | 2004 |
| 9.66* | 17.2 | 32.8 | 65.6** |

\* Calculated from information provided in 2002 summary.

\*\* Calculated from information provided from first six months
of 2004 expenditures summary.

**Table 2**

Summary of Profits Attributable to Infringement
for Gillette in
Each Use Category

| Use Category | Profits Attributable to Infringement |
|---|---|
| 1. | 1,052,184.00 |
| 2. | 1,492,932.00 |
| 3. | 1,018,046.00 |
| 4. | 763,535.00 |
| 5. | 3,563,162.00 |
| 6. | 2,229,604.00 |
| 7. | 3,308,650.00 |
| 8. | --------------- |
| 9. | --------------- |
| 10. | --------------- |
| Total | $13,428,113.00 |

20

## CERTIFICATE OF SERVICE

I certify that on March 1, 2005 a copy of the following document was served on the counsel of record below by First Class Mail:

- Expert Report of Professor Robert A. Hansen

David Donahue, Esq.
FROSS, ZELNICK LEHMAN & ZISSU
866 U.N. Plaza
At First Avenue and 48th Street
New York, NY 10017

Michael N. Rader