# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PHOTOGRAPHIC ILLUSTRATORS
CORPORATION,

       Plaintiff,

v.

THE GILLETTE COMPANY,

       Defendant.

Civil Action No. 04-CV-10913-WGY

## EXPERT REPORT OF JEFF SEDLIK

I have been engaged by Plaintiff Photographic Illustrators Corporation ("PIC") in the above captioned matter against Defendant The Gillette Company ("Gillette") to serve as an expert witness, and possibly as a testifying expert witness. Specifically, I have been asked by PIC to provide an expert opinion and possibly give testimony on commercial photography industry practices and procedures, both in general and relative to the business transactions and other related interaction between PIC and Gillette.

Based on my nineteen years of experience as a commercial photographer working with high level clients, observing many other commercial photographers, and my knowledge of the industry, I expect to offer opinions and testimony in this case related to practices and standards within the commercial photography industry. In addition, based on my ten years of experience with copyright and licensing issues, including my involvement in leading industry organizations and standard-setting bodies, I expect to offer opinions and testimony related to copyright and licensing issues that might arise in the case. Specific topics on which I expect to testify are discussed in more detail below.

This preliminary expert report is submitted pursuant to Fed. R. Civ. P. 26(a)(2). Section V outlines my preliminary opinions. My opinions at this time are based in part on an independent examination of documents produced, deposition testimony, interviews and certain third party documents as disclosed.

I understand that discovery is continuing in this case, and that Gillette has yet to produce some documents and materials requested by PIC. I have had the opportunity to briefly review the rough transcripts of several depositions taken recently in the case. To the extent that additional relevant information comes to light, I may amend or supplement my opinions as necessary and permitted by the Court. I may also offer rebuttal expert reports in response to reports filed by any individuals retained by Gillette in this case. Any rebuttal report that I file may address additional topics on which I would expect to testify.

I reserve the right to supplement or amend this report pursuant to Fed. R. Civ. P. 26(e), if additional information affecting my opinion becomes available. If called upon as a witness in this case, I could and would make the following statements of my own personal knowledge and experience.

2

This report has been prepared in connection with the above referenced case. The report is to be used for specific purposes of this litigation, and is not to be used for any other purpose without my express written consent.

## I.    QUALIFICATIONS

I am currently the President and CEO of the PLUS Coalition. "PLUS" is an acronym for "Picture Licensing Universal System." The PLUS Coalition is a non-profit, international standards body and trade association representing the shared business interests of all industries involved in the creation, licensing and use of photography and illustration, including photographers, illustrators, advertisers, advertising agencies, graphic design studios,  publishers artists' representatives and others. PLUS develops, propagates and maintains universal standards for use by licensees and licensors in transactions involving photography and illustration. I also serve as a founding member of the PLUS Board of Directors, and was personally responsible for the initial development of the core concept ultimately resulting in the formation of the PLUS Coalition and its standards.

I am the recent past National President of the Advertising Photographers of America, the leading trade association for commercial photographers in the United States, for which I currently hold the position of Chief National Advisor on Licensing and Copyright. In that position, I advise the APA on current issues related to copyright and photography business practices, represent the organization in discussions with the US Copyright Office on matters related to photography and copyright, and also interact with trade organizations in photography and other industries, discussing industry standards and other matters related to the business of photography. I have also served on the Board of Directors of the Los Angeles chapter of the APA.

I currently serve on the Advisory Board for Workbookstock.com, a leading stock photography agency. In that capacity I have advised Workbookstock on photography pricing models and contractual terms for contributing photographers. I have also served in a similar capacity for other organizations.

I sit on the Intellectual Property Committee of the Art Center College of Design, where I am an active faculty member, holding the title of Adjunct Professor of Photography, and where I teach advanced courses on legal, business and technical issues related to commercial photography.

After 19 years as an award-winning commercial photographer and the President of Jeff Sedlik Photography, I continue to actively operate an advertising photography studio in Los Angeles, California , with clients such as Nike, Federal Express, Farmers Insurance, SBC, GTE, NBC, Sony, AT&T, Blue Cross, Epson, Ikea, MCA, United Airlines, Warner Brothers, Toyota, Nestle', Disney, Bank of America, and others.

I am the President of Mason Editions, a publishing company producing and distributing fine reproductions of photographs.

And finally, I provide consulting services to photographers nationwide on issues related to copyright, licensing, negotiating and business practices and procedures. I have occasionally testified as an expert witness in litigations involving  photography and photography licensing issues. The cases in which I have testified at trial or by deposition in the last four years are:

Frank Hillebrand v Bodionics

Superior Court of the State of California, County of Riverside-Indio District

Case # INC011593

Karen L. Knauer et al v Kaiser Permanente

U.S. District Court, Northern California District

Case # C02-05172 DLJ (EMC)

My publication list is included in my CV, a copy of which is attached to this Report as Appendix A.

4

## II.   COMPENSATION

My work on this case is being billed at my standard rate of $650 per hour. For clients electing to pay my fees in advance or within ten days of my invoice, I offer 20% Net 10 payment terms. My payment is not contingent upon the outcome of this case.

## III.   MATERIALS REVIEWED

Plaintiff and Plaintiff's counsel made available to me any case materials that I requested, including documents, deposition transcripts, and exhibits. In preparation for this report and for the expert testimony that I may be called on to provide, I have reviewed the materials listed in Appendix B. In addition, I have interviewed Plaintiff Paul Picone, President of Photographic Illustrators Corporation.

## IV.   BACKGROUND

Plaintiff Photographic Illustrators Corporation ("PIC") is a commercial photography studio. PIC President and Photographer Paul Picone and staff are actively engaged in authoring and licensing photography for commercial use by the clients of PIC. PIC creates photography of consumer products and other subject matter for catalogues, advertising and other uses. Mr. Picone has over 40 years of experience in photography, having first been a photographer in the U.S. Navy and then entered the profession of commercial photography in the 1960's. After more than 35 years in continuous operation, Mr. Picone and his PIC studio continue to provide photography and photographic services to a variety of clients. PIC currently operates a photography studio in Hamilton, Massachusetts, where Mr. Picone employs several full and part time staff members, including Photographic Assistants, Digital Artists and Administrative personnel.[1]

Defendant The Gillette Company, founded in 1901 as the American Safety Razor Company, is a globally focused consumer products marketer with approximately 29,400 employees worldwide, with  manufacturing facilities in 14 countries, and  products in four business

---

[1]  Source: Telephone interview with Paul Picone, 2/2005

5

units (Blades/Razors, Duracell, Oral Care, Braun and Personal Care) sold in over 200 countries and territories. Gillette's Net Sales and Net Income in 2003 were approximately $9.2 billion and $1.4 billion respectively.[2]

PIC was a vendor to The Gillette Company ("Gillette") for approximately twelve (12) years. During that time, PIC and Mr. Picone authored thousands of photographs of Gillette products at Gillette's request. Direction provided by Gillette to PIC was typically limited to specifying the products for which Gillette needed PIC to produce images and, at least at times, the number of views required or a description for those views.   Gillette typically left artistic considerations beyond these basic factors to Mr. Picone's professional judgment.[3]

With few exceptions, Gillette did not request or require that PIC supply advance estimates or quotes to PIC, and unless requested by Gillette, PIC did not supply advance estimates or quotes to Gillette. Gillette did not request or require that PIC sign a Gillette vendor agreement or other contract. Gillette did not submit purchase orders to PIC. Gillette would typically contact PIC, specify the product photographs needed, and then supply the products to PIC. PIC would author the photographs, prepare the photographs for delivery to Gillette, deliver them to Gillette and then submit an invoice to Gillette for each job.

Each occasion on which Gillette retained PIC to perform photographic services was referred to by PIC as a project or "job," with documentation related to that job stored in a "job folder." Each job (and job folder) was assigned a unique "job number" by PIC. After performing the requested services and providing photographs (typically in the form of 4-inch by 5-inch transparencies, and in some cases in the form of digital image files), PIC sent Gillette an invoice for the job. Each PIC invoice bears the job number corresponding to the job for which the invoiced work was done.[4]

PIC used a standard form invoice for its work for Gillette, which invoice underwent very little variation over the years. The front of the invoice form includes space for filling in basic billing information (name, address, job number, date, etc.), a description of the services

---

[2] Source: The Gillette Company Q3 2004 Investor Fact Sheet. http://media.corporate-ir.net/media_files/irol/10/106746/factsheet/3Q04_factsheet.pdf

[3] Source: Telephone interview with Paul Picone, February 2005.
[4] Source: Telephone interview with Paul Picone, February 2005

and photographic materials provided by PIC to Gillette in a job, and the fees and costs associated with the job. The invoice form also includes space on the front for filling in information about the scope of the license that PIC was to grant to PIC's client Gillette in relation to a particular job. Specifically, the form includes spaces for specifying both the "media use" and the "period of use" for which the client is authorized by PIC to use the images. The "media use" and "period of use" specified on PIC's invoice forms to Gillette varied from job to job.

The front of the form also states that rights are "granted subject to terms and conditions on reverse." The reverse of the form includes several paragraphs describing the terms and conditions that apply, including requirements specifying that that reproduction rights are conditioned upon full payment of the invoice, that the copyright notice is required (Paragraph 9), that unless otherwise stated on the front of the form, the duration of the license is one year (Paragraph 9), that the client may not sell, assign or transfer the license without PIC's written consent (Paragraph 9), that the client must return all photographic materials within 30 days of first publication (Paragraph 10), and that if the client does not comply with the return requirement, PIC is entitled to immediate payment of $1,500 in liquidated damages per original transparency of negative.[5]

It is customary in the photography industry for photographers to provide their clients with a limited license to use and reproduce their images. Photographers make their living by licensing their clients the right to use their copyrighted photographs for a limited time in limited ways. If additional uses (or uses for additional time) are required, the client must obtain license from the photographer for such use, and pay an additional license fee.

On its invoices to Gillette, PIC specified the permitted "media use" in the space allotted. Some examples of "media use" appearing on PIC's invoices to Gillette include "Catalog," "Sales," Display Header," "Sales Promo," Display Prints," "Printed Material," "Trade Show," and "Display."

PIC also specified on its invoices the "period of use," usually as "Terms and Conditions" or "T & C". This is a reference to the terms and conditions on the reverse side of the invoice, which provide (as noted above) that the duration of the license is one year "unless

---

[5] Source: Telephone interview with Paul Picone, February, 2005, and review of PIC invoices to Gillette.

otherwise stated on the face of this Agreement." On occasion, PIC included other stipulations in this field, such as "Unlimited by Sales Planning / Business Communications." [6]

Upon receipt by Gillette, PIC's invoices were reviewed, signed and approved by requisitioning individuals and/or their managers or supervisors, and then Gillette delivered payment to PIC for the amount invoiced. Though PIC rarely provided advance quotes or estimates to Gillette, Gillette regularly paid PIC's invoices without discussion. On the few occasions that any discussion ensued about the services performed or the fees charged, those issues were resolved amicably by telephone conversations between Gillette personnel and Mr. Picone.

A dispute arose between PIC and Gillette when PIC alleged that many of PIC's photographs delivered to Gillette had not been returned to PIC as specified in the terms and conditions ("T&C") stated on the reverse of PIC's invoices to Gillette. PIC contacted Gillette and demanded the return of PIC's photographs, and Gillette returned some, but not all of PIC's photographs.

## V.   DISCUSSION

### A.   *Standard Industry Terms*

The reverse side of PIC's invoices delivered to Gillette contained a version of industry standard terms and conditions authored by the Advertising Photographers of America (APA) and used and accepted by PIC and other photographers and their clients worldwide.[7] Specifically, paragraphs 9, 10, and 11 of PIC's terms, respectively titled "Reproduction Rights," "Return of Photographs," and "Loss or Damage," PIC's terms are substantially similar if not identical to APA's terms, specifying a one year license period, requiring

---

[6] Source: Telephone interview with Paul Picone, February 2005, and review of PICs invoices to Gillette.
[7] The terms and conditions on the reverse of some PIC invoices include a typo in which the word "year" (in the phrase "...duration of the license is one year..." was misspelled "ear." It is clear from context that "ear" was intended to be "year.""

return of photographs, requiring payment of liquidated damages in the event of loss or damage to the photographs, and restricting use to the United States.[8] These paragraphs, indeed all of the terms and conditions on the reverse of PIC's invoices are standard in the commercial photography industry.

I have not yet had the opportunity to review all of the original invoices provided by PIC to Gillette, as Gillette has not produced all such invoices. However, Paul Picone represents that PIC's invoices to Gillette were, without exception issued on pre-printed carbonless duplicate forms, with each of the two copies bearing the APA terms and conditions. My review of the documents and depositions available to me as of this date is consistent with Mr. Picone's representation, and I have observed that PIC's invoice forms include a white and yellow copy, visually identical in all respects except for color. Mr Picone represents that PIC customarily delivered the original white copy to Gillette, and kept the yellow copy as a file copy. My inspection indicates that both copies bear the APA terms on the reverse.

## B.    PIC's Work and Fees

Having reviewed samples of Mr. Picone's photography, including photographs that he took for Gillette, I conclude that Mr. Picone is a highly talented artist and a skilled craftsman, with quality work of the highest technical standards.

Though to a layperson, a photograph of a razor or blender or toaster might seem mundane or simple, the reality is that while such products are very easy to photograph poorly, they are extremely difficult to photograph well. Creating effective photographs of such products requires a high level of expertise and experience. Odd shapes, combinations of shiny and dull metal and plastic, adjacent light and dark materials, transparent plastic and glass, and highly reflective surfaces make such products highly challenging subject material for photographers.

---

[8] APA terms and conditions are updated periodically. For example, in 1998 the APA increased the applicable liquidated damages for lost or damaged photographs from $1500 to $2500, to reflect changes in industry standards.

A poor photograph can cause a beautifully designed product to appear poorly designed and cheaply constructed. In that sense, a photograph can make or break a product. Subtle techniques employed by a photographer using lighting position, lighting angle, lighting direction, lighting modifiers, reflectors, backgrounds, camera angles, filtration, lens settings, selective focus, lens choice, in-camera perspective control, exposure, digital post production and careful attention to the preparation of the product before shooting can significantly impact the quality of the resulting images. An effective photograph can significantly impact sales and profits of a product by maximizing the attractiveness and appeal of the product when viewed in marketing material and on product packaging.

To create high-quality images for advertising use, skilled and talented photographers such as Mr. Picone are in high demand and earn significant fees, consistent with the high level of value that they deliver to their clients. Based on Gillette's decision to return to PIC time and again for photographs of Gillette product's, PIC's photographs evidently served Gillette and its products well.

Mr. Picone's work was also priced quite reasonably. I have reviewed Mr. Picone's current schedule of fees for his client Sylvania which I understand contains essentially the same fees he charged Gillette (allowing for market increases over the years). This schedule includes Mr. Picone's "day rate," his fees for work done in-studio and on location, his rush fee schedule, and a host of other specific fees. I find Mr. Picone's fees extremely reasonable – and even on the low side – relative to the quality of his work. Likewise, Mr. Picone's rush fees are reasonable and customary in the industry.

It is also apparent, from reviewing correspondence produced in the case and statements made by Gillette employees at deposition, that Mr. Picone provides a high level of customer service—working with clients to make sure the end result meets or exceeds their requirements, working to ensure complete satisfaction, and working on a rush basis when requested.

### C.    PIC's Licenses to Gillette

Because PIC never assigned its copyrights to Gillette (and did not create photographs for Gillette as works for hire), PIC retained the copyrights in its images, granting Gillette limited licenses to use the images only to the extent provided in PIC's invoices.

First, each of PIC's invoices limits the scope of the license to "reproduction rights." In the context of commercial photography, there is an important distinction between "reproduction" and "duplication" of images. Images are typically provided to the client in a format that permits high-quality reproduction (such as a transparency or negative). "Reproduction" of such images involves making one or more copies of the image appearing on that transparency or negative in another medium, such as a product catalog, brochure, flier, billboard, etc. "Duplication" means something different. "Duplication" means making secondary copies from which "Reproductions" and/or additional "Duplicates" may be made. An example would be making a duplicate transparency from a first-generation exposure transparency. A good photographic laboratory can create a duplicate transparency that is extremely close in quality to the first-generation exposure transparency, such that the duplicate itself can serve the purpose of reproduction (discussed above). Most commercial photographers (myself included) do not usually grant licenses to their clients allowing them to engage in duplication. Rather, commercial photographers provide an original image (or a digital file of that image) to the client, and license the client the right to "reproduce" that image in a particular medium (such as a product catalog, brochure, flier, billboard, etc.). The client has no need to duplicate the reproducible item (transparency, negative, etc.) unless it wants more than one reproduction vendor to be working with the same image at the same time. If this is the case, advance authorization must be obtained from the photographer, so that the photographer can negotiate and grant a license permitting the desired scope of duplication and/or reproduction.

Under the terms and conditions of PIC's licenses, Gillette received only "reproduction rights." The very top of the Terms and Conditions page states that "all reproduction rights or licenses are limited as follows," and Paragraph 9 (entitled "Reproduction Rights") states that "Reproduction rights are conditioned on Photographer's receipt of payment in full and Client's proper use of the copyright notice. All rights not expressly granted herein remain the exclusive property of Photographer." Duplication rights are not granted. Once again, these terms and conditions are standard in the industry. Accordingly, unless specifically authorized by PIC, Gillette would be outside the scope of its license in creating duplicates of PIC's original images.

Second, each of PIC's invoices limits the scope of the license to one year only. Once again, this is a standard term in commercial photography licenses. It is common in the commercial photography industry to require that a client pay an additional amount for every year that the client wishes to add to the term of the license. A common amount would be 65% to 100% of the original fee price for the shoot for every additional year that the client requests a license to use the image. If a client wishes to use an image indefinitely without temporal limitation, a common charge would be 200% to 300% of the original fee price for the shoot. I understand that Mr. Picone's practice, on those occasions when a client has requested to use an image indefinitely without temporal limitation, is to charge an additional 100% of the fee price for the shoot. I consider this to be not only a reasonable number, but a number that is highly favorable to Mr. Picone's clients, especially considering the quality of Mr. Picone's work. Absent an additional license (accompanied by payment of the requisite fee) a client such as Gillette would be outside the scope of its license in using PIC's images beyond one year from the date of the relevant invoice.

Third, each of PIC's invoices limits the scope of the license to the United States only. This term too is standard in commercial photography licenses. Once again, an additional fee for worldwide rights is common in the industry.

Fourth, each of PIC's invoices prohibits Gillette from selling, assigning or otherwise transferring its license to a third party without PIC's written

12

consent. Transmitting PIC's images to third parties for use in their advertising would not be permitted under PIC's licenses to Gillette.

Fifth, because payment is required to obtain reproduction rights, a client's failure to pay the photographer's invoice results in no license being granted. The license is not activated until the Photographer receives payment in full.

Sixth, the face of each of PIC's invoices includes a statement of the permitted "media use" for particular photographs. Usage for media other than that specified would not be included in the license. For example, if the "media use" indicates "catalog," then use of the photographs in media such as sales fliers, presentations, packaging, trade show displays, packaging, or any other media would not be licensed. I understand that Mr. Picone's practice, on those occasions when a client has requested to use an image in any media without limitation, is to charge an additional 100% of the fee price for the shoot. This number too is not only reasonable, but low for the industry and highly favorable to Mr. Picone's clients, especially considering the quality of Mr. Picone's work.

These license concepts are critical in the commercial photography industry, which is why the terms are set forth so explicitly on photographers' invoices. The initial fee for a shoot is calibrated only to cover the licensed uses -- it does not cover other uses that a client might later decide to make of the images. Photographers' livelihoods depend on their clients respecting these terms and paying for the usage that they desire. The amount charged by the photographer can vary dramatically depending on that usage. For most commercial photographers, when determining an appropriate fee, the time and complexity involved in the creation of a photograph (although an important consideration) is secondary to consideration of the extent of the reproduction rights granted.

Photographers are not always perfect in policing every violation of their license terms. In many cases individual violations do occur but are difficult to detect or, even if detected, are difficult to remedy appropriately. Most photographers, however, work to police their licenses to the best of their

13

abilities and will not tolerate wholesale violation of their license terms. Tolerating a few violations on occasion is not to be considered a waiver of the license terms any more than Microsoft's tolerating some known copying of its software within families and among friends -- it is simply a practical consideration within the industry. In speaking to Mr. Picone, I conclude that he takes a reasonable approach to this issue that is in line with standard practices in the industry. If he finds an occasional violation (often inadvertent) by a client, he does not necessarily create a confrontation or require additional payment. However, if it becomes clear that the client is engaging in wholesale violation of his license terms, or appear intent on taking advantage of Mr. Picone's good will, he will take appropriate action, up to and including enforcing his rights in court.

Several Gillette employees testified at deposition that they did not read or appreciate the terms and conditions on the front and back of PIC's invoices. I find this position less than credible, given the number of invoices that were reviewed and signed (by multiple individuals in many cases) over time. Moreover, an entity of Gillette's size and sophistication with regard to intellectual property rights (as is made evident by Gillette's aggressive enforcement of it's patents) could not reasonably come to the conclusion that it had acquired unlimited rights use and exploit a photographer's intellectual property for the sums that Gillette paid. Upon review of PIC's invoices I conclude that an unlimited license to use PIC's images indefinitely, across the world, and in any way that Gillette desired, would have cost at least 300% of the fee that PIC customarily charged to Gillette (and could have cost considerably more if PIC had decided to charge more). I understand that PIC's practice is to charge an additional 300% of the fee price for the shoot when a client wants an unlimited license to use an image (i.e., unlimited in time, geographic scope and medium). That number is entirely reasonable.

## D.    Image Return Requirement and Liquidated Damages

The detection of infringements of photographs in al media throughout the world is a daunting task, especially for photographers as small business

14

owners. As photographers rely on compensation from licensing of their copyrights for their livelihood, and as most photographers lack sufficient resources to police their copyrights on a global or even a regional scale, photographers generally prefer to maintain tight physical control over their photographs.

Many photographers refuse to part with their reproducible photographic media (e.g., transparencies and negatives), or only do so many years after the job is done, thus reducing the possibility that a client will duplicate or reproduce the images "on the side," without purchasing duplicates from the photographer (who holds the copyrights in the images). For example, most wedding photographers keep the negatives from wedding shoots, at least for a period of several years, and require that the couple and their relations order albums and any desired prints from the photographer. Albums and prints are deliverables that the photographer can readily produce (either in-house or with the assistance of a third-party laboratory) -- but so can the couple. Were the wedding photographer to provide the negatives to the couple, the photographer would likely lose the business of making albums and prints, and it would be difficult to detect the client's infringement in having those items made elsewhere. Accordingly, most wedding photographers have strict policies against providing transparencies or negatives to their clients.

In other segments of the photography industry, however, practical considerations make it virtually impossible to maintain such tight physical control over transparencies and negatives. Specifically, photographers whose clients have needs that the photographer cannot readily fulfill (such as producing catalogs, brochures or billboards with the images) must necessarily make the original film available to the client, who then provides that film to another vendor for production of the desired medium. PIC, which primarily engages in commercial product photography, is a good example of this. For instance, it would be impractical for PIC to format and produce a product catalog for Gillette on its own. For Gillette to format and produce such a catalog, it must obtain transparencies from PIC and provide those (along with a host of other information) to the vendor that produces and prints the catalog.

15

Accordingly, to do business with a client like Gillette, PIC had no choice but to provide original film (primarily transparencies) to Gillette at the conclusion of a shoot.  Nevertheless, concerns similar to those outlined above for wedding photographers are present in the commercial photography industry.  To make a living, commercial photographers, like wedding photographers, must take steps to discourage and prevent their clients from using their images in a manner that is not licensed and paid for.  To that end, commercial product photographers typically require -- as PIC did here -- that their original transparencies and negatives be returned within a set period of time (usually 30 days) after those originals are provided to the client.  This permits the client a reasonable time period within which to use the image in the licensed manner, while significantly decreasing the likelihood that the client will commit copyright infringement by using the image in another (unlicensed) manner down the road.  If it has returned the original image, the client will have to come back to the photographer to request access to that image again if further use is desired.  This policy ameliorates the problem of undetectable infringement, except in the case of a client that duplicates an original transparency before returning it to the photographer (a risk that the photographer must take to do any business at all).

The terms and conditions on PIC's invoices frame this industry-standard return requirement as accruing "within 30 days of first publication."  In this context, "first publication" is a term of art that means publication (i.e., transmittal) of the image by the photographer to the client.

Inclusion of a liquidated damages provision that is triggered when the 30-day return requirement is not met is an industry standard practice to protect the photographer against loss of images, and also against the possibility that the client will retain the images and use them in violation of the license without paying for that additional use.  The industry standard liquidated damages amount in use today (for example by the APA) is $2,500 per original transparency or negative.  The amount of $1500 is included on PIC's terms and conditions.

16

The value of an original transparency or negative created for commercial use can range up to tens of thousands of dollars if the image is of high quality and is used in a commercially significant fashion (such as to advertise a product that sells well as a result of the advertising). The choice of a $1,500 (or, in the current APA form, $2,500) liquidated damages amount represents a fair and practical estimate of the value of a typical image, although the actual value of particular image might be worth more or less than $1,500. Pursuant to the liquidated damages provision, the photographer agrees not to demand that the client pay more than the stipulated amount for loss, damage or refusal to return a particular photograph, even if a particular photograph is worth more than the stipulated amount. Likewise, the client agrees to pay the stipulated amount for loss, damage or refusal to return, even if a particular photograph is worth less than the stipulated amount.

In short, $1,500 is unquestionably a reasonable estimate of the value of an individual transparency or negative provided to a client by a commercial photographer. In view of Mr. Picone's experience and expertise, and the high quality of his work, the $1,500 amount is most certainly reasonable in his case.

In some cases, photographers will provide more than one original transparency or negative to a client. Each original usually represents a different exposure. Typically, the exposures will differ in relatively minor ways such as density (relative brightness or darkness). When more than one exposure is provided, the client will typically choose the one most desirable for the particular application in question. The others would ordinarily be returned to the photographer, even earlier than the one to be used (which would still need to be returned within 30 days if industry-standard terms and conditions apply). I understand that, in this case, Gillette retained multiple exposures provided by PIC rather than returning them to PIC.

Each original transparency or negative, even if it is not the one selected by the client in the first instance for the particular application in question, has independent economic value. Each transparency or negative is fully reproducible and duplicable. Moreover, some types of exposures are better

17

for some applications than others. Although one exposure may be deemed (rightly or wrongly) by the client to be better for a particular application, a later application (perhaps unlicensed by the photographer) might be better served by use of a different exposure. In addition, because the various exposures tend to be only slightly different one from another, they can effectively be used by the client as "duplicates" (even if some exposures are sub-optimal for particular applications from an artistic point of view), permitting the client to make wider use of the image than was permitted by the license granted by the photographer.

Thus, each individual transparency provided by PIC to Gillette, even if it is merely a different exposure of the same product view, has independent economic value. It may be particularly well-suited to a particular use, and it may be used by the client (as I understand was the case here) in ways not authorized by the photographer in the first instance -- in effect magnifying the client's ability to commit copyright infringement by giving the client an additional original from which more reproductions and duplicates can be made.

$1,500 is a reasonable, and in fact modest, estimate of the economic loss to a photographer like PIC from Gillette's failure to return PIC's original images. Gillette had the ability to (and I understand did) use PIC's images beyond the scope of the licenses provided. Indeed, I understand that Gillette engaged in significant duplication of PIC's original transparencies without prior authorization from PIC, bypassing PIC by ordering duplicates of PIC's photographs directly from PIC's duplicate lab.[9] The uses for which Gillette was typically licensed (production of catalogs, sell sheets, brochures and blown-up images for trade show booths) require one transparency only. Gillette would have had no need to duplicate PIC's transparencies if it was operating within the scope of usage outlined on PIC's invoices. The fact that Gillette duplicated PIC's original transparencies is further evidence that the multiple exposures originally provided to Gillette (which can function as "duplicates" as noted above) had significant economic value to Gillette. This necessarily means that they had economic value to PIC, which makes money

---

[9] Source: Telephone interview with Paul Picone, February 2005.

based on the value of its images to its clients (which usually translates, and should translate, into additional licensing fees).

Although PIC often retained some original transparencies in its job folders (i.e. some additional exposures), this does not diminish the value of each transparency provided to Gillette. This is true for the reasons already outlined above, and also because the exposures retained by PIC were generally inferior to those provided to the client -- the client was provided with what were considered the very best exposures – those most likely to be useful.

Finally, while PIC's invoices require return of PIC's original transparencies or negatives within thirty days, it is not uncommon, as a result of business exigencies, for photographers to permit their clients to hold onto images for longer periods of time. For example, a client may desire easier and speedier access to images in the event that an emergency need arises. Of course, if that need is outside the scope of use licensed to the client, the client would still have to receive an additional license from the photographer before moving forward, but having the transparency stored in-house can save time by requiring only a telephone call or fax communication with the photographer to get permission, rather than waiting for the photographer to retrieve and mail the transparency to the client. Unless expressly stated that the photographer does not expect to receive the images back at all, permission for the client to store the photographer's film on-site should not be (and, in my experience, is not) understood to waive the return requirement if and when the photographer does ultimately request that the images be returned. It is relatively common industry practice to grant, in essence, an "extension" of the 30-day return period when requested by clients, particularly those with whom the photographer has an ongoing working relationship. Again, the "extension" is just that, and does not operate as a waiver.

In this case, I understand that Gillette requested permission to maintain files of PIC's transparencies and other photographic materials in-house beyond 30 days for at least two reasons: (1) expediency (as described above) and (2)

19

security (Gillette felt the materials would be more secure at its facility than at PIC's). In granting permission to Gillette to retain custody of the materials beyond 30 days, PIC maintained that the materials would still be subject to return when and if PIC requested it. I note that Paragraph 14 of the terms and conditions on PIC's invoices states explicitly that "Any changes to this agreement must be in writing and signed by the party to be bound by the changes." Accordingly, unless there is a writing in which PIC waived the return requirement, my understanding -- and industry practice is consistent with this -- is that the return requirement is still in place. I would characterize PIC's decision to permit Gillette (temporarily) to maintain custody of the images as a "customer service" decision that is not uncommon in the industry. It is my understanding from Mr. Picone that PIC would have made a different decision if it had known the extent of Gillette's copyright infringement during the period that Gillette maintained custody of the images.

**E.    Gillette's Handling of PIC's photographs.**

Deposition testimony that I reviewed from Gillette employees related to Gillette's handling of PIC's film indicates a lack of appropriate policies and procedures for the handling of PIC's (or any other vendor's) film. Gillette employees indicated that PIC's film was stored in unlocked file cabinets or boxes, unlocked rooms, and hallways, and that multiple parties had access to PIC's film and could remove it, use it, and then file it in their own projects in cabinets or boxes or binders in other areas. In one instance, a Gillette employee stumbled upon a lost box of PIC's film in a storage room.

Gillette did not require that those desiring access to film log it in and out so as to ensure that the film was properly handled and tracked, and also that agreements with vendors were honored, and that all Gillette personnel and others receiving vendor photographs had sufficient access to the license information associated with each photograph so as to avoid infringing on vendor owned copyrights.

20

Indeed, it appears that Gillette maintained no system at all for tracking the source of film, or the terms under which that film was licensed. In my experience with dozens of clients, this is unusual and demonstrates careless disregard for the photographer's rights and Gillette's responsibilities.

Gillette also sent PIC's film and duplicates of PIC's film to third parties, despite the fact that PIC's terms and conditions prohibit sublicensing, and Gillette did so without utilizing a system for tracking such film deliveries so as to ensure the eventual return of the film.

Gillette also posted digital copies of PIC's film in an image library on Gillette's website and allowed Gillette's employees and customers to access PIC's images without notification that Gillette's use of PIC's images was limited to specific media, or that a one year license duration applied, or that the photographs may not be used outside of the United States. Gillette apparently allowed customers and agencies in domestic and foreign countries to access PIC's images, though it could be reasonably expected that as the result of such access provided by Gillette, foreign customers and agencies would then use PIC's images outside of the United States, exceeding the US – only license provided by PIC.

It is my opinion, based on review of the depositions of Gillette's employees, that Gillette handled PIC's film in a haphazard manner and with careless disregard for PIC's property and PIC's copyright ownership in PIC's photographs, contributing to and inducing infringement of PIC's copyrights. Gillette's failure to establish a formal system for film and license storage and tracking was a recipe for infringement of PIC's copyrights and the loss of PIC's film, on a scale that I have never before seen.

**F.    PIC's delivery of invoices to Gillette.**

In the working relationship between PIC and Gillette, PIC would first deliver photographs to Gillette, and soon thereafter deliver an invoice to

21

Gillette for the charges associated with the creation and licensing of the photographs. As a practical matter, photographers are rarely able to submit invoices concurrently with delivery of photographs, as a Client's needs for photographs are often urgent, and as the creation of an invoice requires the tabulation of fees and charges associated with a shoot. That process – reviewing shooting logs and receipts and notes - takes time, especially as due diligence must be exercised so as to ensure the accuracy of each invoice. In addition, subcontractors and vendors to the photographer might be involved, and the photographer must often wait for their invoices before issuing his own invoice to his client. As such, delays of one to three weeks, or sometimes longer, between delivery of a photograph and delivery of an invoice are common.

The terms and conditions of PIC's invoices state that rights are not granted until the invoice is paid in full. In light of the invoicing factors discussed above, PIC allowed Gillette to reproduce PIC's photographs under the licenses granted, in advance of PIC's receipt of payment, provided that once received, PIC's invoices were promptly paid in full. PIC allowed such latitude to Gillette at PIC's sole discretion, as a customer service, in respect for the long term and mutually beneficial business relationship based on trust between PIC and Gillette.

Irrespective of the above, any failure by Gillette to pay an invoice once presented would void the advance license granted to Gillette by PIC. As a result, any use of PIC's photographs by Gillette would constitute infringement of PIC's copyrights in the photographs. Gillette was well aware of the terms of PIC's invoices, as Gillette has received, reviewed, approved and paid hundreds of such invoices during the course of its relationship with PIC.

## G.    Purpose of Group Registration

Group registrations afford full copyright protection to each photograph in the group, as if each photograph were submitted with a separate registration form and fee. The Copyright Office makes a group registration

option available to photographers in an effort to make the copyright registration process more economical and efficient for photographers and the copyright office. The group registration procedure alleviates the expense involved in registering and processing separate registration applications for each photograph. Photographers save money and time by registering multiple images, and the Copyright Office is relieved of the administrative burden of processing a separate registration for each photograph. Though PIC has used the group registration option for convenience and expediency, the protections afforded to PIC's registered works apply to each individual photograph submitted with each group registration.  My opinions are based on my personal knowledge and familiarity with the copyright registration process, copyright office policies and associated regulations, having communicated in the past on this issue directly with the Register of Copyrights, the General Counsel of the Copyright Office, and the Chief of the Visual Arts Examining Division at the Copyright Office in my capacity as APA National President and APA Chief Advisor on Licensing and Copyright.

### H.     The Spring 2004 Housewares Project.

PIC's invoice #6365 to Gillette[10] in the amount of $63,502.80, dated March 2, 2004, with total fees, expenses and taxes set forth in the below illustration, is reasonable based on the number of photographs produced and the rights granted by PIC, with consideration given to the expedited production schedule demanded by Gillette.

| PIC Fees & Production Charges, Job #6365 | |
| --- | --- |
| **Description** | **Amount** |
| Total Fees | $43,500.00 |
| Total Production Charges | $16,978.86 |
| Sub-Total, Fees and Charges | $60,478.86 |
| Sales Tax | $3023.94 |
| **Total , Invoice #6365** | **63,502.80** |

---

[10] GLTC185

For this project, PIC produced 13 photographs during a fourteen day period, including pre-shoot preparation, five days of photography in studio, and six days of digital post production. Gillette demanded delivery on the fastest possible rush basis. Gillette provided PIC with product samples that were incomplete, incorrectly configured and/or in poor condition, requiring that PIC devote significant time and effort to pre-production clean-up and post-production correction to the products.

In several instances on this shoot, after PIC had photographed, processed, scanned, retouched and transmitted PIC's completed photographs to Gillette, Gillette determined that Gillette had provided PIC with incomplete or incorrect versions of Gillette's products, and then asked PIC to re-photograph products in different configurations, or to perform extensive digital retouching to correct problems with the design and condition of Gillette's products.

The total fees listed on PIC's invoice were $43,500. The base fee was calculated as five days at PIC's then standard day rate of $2600 per day, for a total of $13,000. It is my understanding that Gillette earlier has a history of paying PIC a similar day rate.[11] At Gillette's request, PIC provided Gillette with expanded usage rights ("Unlimited by Sales Planning/Business Communications Group Only"). PIC's fee for providing these expanded rights was calculated at 100% of the day rate, or a total of $13,000, bringing the total applicable photography fee to $26,000.

Though the turnaround time necessitated by the deadlines set by Gillette would normally have required payment for PIC's most costly rush service, "Same Day Rush" (a 200% surcharge), PIC provided special consideration to Gillette and added only a 50% rush charge of $13,000, bringing the total fees and rush charges to $39,000. During the course of the 14 day period during which PIC produced these photographs, Gillette incurred $3500 in overtime charges (Mr. Picone charges Gillette and other clients overtime after eight hours). A $1000 charge was added for travel time,

[11] One year earlier, Gillette's employee Beth Cooper approved and paid an invoice from PIC based on a similar day rate. See PIC's Gillette invoice #6084, 1/16/2003, Kid's Manual Oral Care product, GLTC411, PIC day rate billed at 2 days @ $2300, signed and approved by Beth Cooper .

24

applied to Mr. Picone's six trips, each 45 minutes to one hour, between the PIC studio and the film processing lab. As indicated by the illustration below, the base fee plus the expanded license, the rush charges, travel charges and overtime charges totals $43,500, the total fee listed on the invoice.

| PIC Fees  For Gillette Job #6365 | |
|---|---|
| Description | Amount |
| Base Fee (day rate) 5 days @ $2600 ea | $13,000 |
| Expanded License (100% of day rate) | $13,000 |
| Total Fee, Included Expanded License | $26,000 |
| Rush Charges @ 50% of base rate | $13,000 |
| Travel – Picone | $1000 |
| Overtime – Picone | $3500 |
| **Total Fees** | **$43,500** |

PIC could have (and, according to its own policies should have) charged Gillette a fee considerably higher than $43,500 for the very broad license granted on the face of Invoice No. 6365, as requested by Gillette.  PIC's standard rates for removing various limitations on its licenses are discussed above.

The total expenses appearing on the invoice is $16,978. 86. The bulk of the expenses were associated with digital services, at $11,600. The digital scans associated with the production totaled $3000. Extensive digital work required both by the scope of the project and the condition of Gillette's products when delivered involved 6 days of digital work, totaling $4125. Inserting logos on PIC's products at Gillette's request involved an additional $1650 in additional custom digital work. The electronic transmission of 33 digital image files at Gillette's request totaled $825. And rush charges associated with the above digital work totaled $2000. The total for scans, digital work, logos, file transmission, and rush charges was $11,600, as itemized in the illustration below.

Also appearing on the invoice are expenses of $3300 for PIC's crew time devoted the production and delivery of the photographs over the 14 day period. And $1728 for film and processing, comprised of $968 for film/processing (88 sheets of large format film at $11 per sheet, plus $387 for Polaroid Film (42 sheets at $9 ea), plus $373 in rush charges associated with the expedited processing of the film. Lastly, a $350.86 charge for courier expenses brings the expense total to $16,978.86.

| Production Charges/Expenses for For Gillette Job #6365 | | |
|---|---|---|
| **Crew** | | **$3300.00** |
| | | |
| **Film, Processing and Polaroid** | | |
| Film and Processing | $968.00 | |
| Polaroid | $387.00 | |
| Rush Charges on Processing | $373.00 | |
| **Ttl Film, Processing & Polaroid** | | **$1728.00** |
| | | |
| **Digital Services** | | |
| Drum Scans | $3000.00 | |
| Digital Post-Production | $4125.00 | |
| Insert Logos in Displays | $1650.00 | |
| Electronic Transmission 33 files | $825.00 | |
| Sub-Total, Digital Svc Charges | $9600.00 | |
| Rush Charges on Digital Services | $2000.00 | |
| **Total Digital Services** | | **$11,600.00** |
| **Shipping & Delivery** | | **$350.86** |
| **Total Production Charges** | | **$16978.86** |

After reviewing all fees and charges on PIC invoice #6365 in detail with Mr. Picone, I conclude that such fee and charges and the invoice total are reasonable and probably low for the work that was done and the licenses received by Gillette.

Dated: 3/1/05

Jeff Sedlik

26

**APPENDIX A**

**JEFF SEDLIK**
940 East Second Street, Suite 8, Los Angeles, California 90012
p 213 626 3323  fx 213 626 8129

**Curriculum Vitae**

Professional photographer, film-maker, educator, publisher and consultant. Served two years as National President of the Advertising Photographers of America. Currently serves as the APA's Chief Advisor on Licensing and Copyright, and the President & CEO of the Picture Licensing Universal System. Extensive photographic industry contacts with manufacturers, distributors, suppliers and photographers.

Advises clients on photographic business practices, copyright and contract issues, valuation of photography and photographs, photographic history, and both traditional and digital photographic techniques. Provides Expert Witness and Consulting services in matters related to photography. Experienced and accomplished educator, mentoring students and emerging photographers in trade show seminars, workshops, college level courses at the Art Center College of Design.

## Professional Experience

### President & CEO, Sedlik Photography/Sedlik Productions, 1986 – Present

Current President & CEO of leading commercial photography and film production company. Producer, Director, Photographer, and Director of Photography, creating photography, film and video for advertising agencies, graphic design studios, the entertainment industry, and other clients. Launched and managed SedlikStock, a subsidiary dedicated to licensing existing Sedlik images for advertising, editorial and merchandizing usage via affiliates including stock photography agencies and publishers. Maintain relationships with major photography industry manufacturers, testing and demonstrating analog and digital equipment and software.

### Partial Client List

**Clients:** 3m, 20th Century Fox, A&E Television Network, ABR Information Services, Alpo, AmSouth Bank, Andazia, Inc, Arista Records, Association of Tennis Professionals, AT&T, Avery Dennison, Bank of America, Barrington Music Products, BBC, Blue Cross, BMG/RCA Records, Bristol Myers Squibb, Buena Vista Pictures, Bureau of Census, CareAmerica, Chesebrough-Ponds, CBS/Sony Music, Cedars Sinai, Century 21, Cherokee, Columbia Pictures, Computer Associates, Concord Records, Conroy's Florist, Direct TV, Disney, Doubleday, Dreyfus, Epson, Essilor, Farmer's Insurance, Federal Express, Fitzgerald-Hartley Co., Ford, Gannon/Hartley, Geffen Records, Georgia Pacific, Great Performances, Great Western Bank, GRP Records, GTE, Guinness Museum, Hanna-Barbera, Harcourt Publishers, Hopper Papers, Ikea, Infiniti Automobiles, Island Records, Janssen Pharmaceuticals, JVC Musical Industries, Kraft Food Products, Korg, Inc., LaFace Records, Laura Ashley, Levi Strauss,  Mark Taper Forum, Missouri Historical Society, MCA Records, MCA International, Metro Goldwyn Mayer, Microsoft, Motion Picture & TV Fund, Movieland, MSN, MTM Entertainment, MTV Networks, Navisite, NBC Television, Neenah Paper, Nestle', New World Pictures, Nike, Pacific Bell, Palm Press, Paramount Pictures, Phillip Morris, Polygram Records, Pomegranate Books, Potlatch, Prentice-Hall, San Diego Zoo, Schering Plough, SBC, Signature

2

Eyewear, Smithsonian Institution, Sony Inc., Southern Natural Gas, Spanish Tourism Office, Sugar Hill Records, Taco Bell, Telarc International, Toyota, Turner Broadcasting, U. C. Press, United Airlines, United Way, Universal Studios, VH-1, Warner Brothers Records, Web TV, Windham Hill Records, Word Records, World Savings, Yamaha, Zellerbach, Ziff-Davis, Zildjian

**Advertising Agencies & Design Firms:** Alan Sekuler & Associates, Asher Gould, BBDO, Bozell, Brierley & Partners, Brooks-Gruman Advertising, Campbell, Mithun, Esty, Cline, Davis, & Mann, Cross & Associates Design, Dailey & Associates, Davis, Elen, Daymark, DDB Needham, Worldwide, Deutsch, Douglas Oliver Design, DVC Marketing, DZN, The Design Group, East/West Network, Fitzgerald & Associates, FKQ Advertising, FP Horak Advertising, Foote, Cone, & Belding, GBF Ayer, Goodby Silverstein, Grey Advertising, Hill & Knowlton, Huerta Design, Ikkanda Design, Interbrand, J. Walter Thompson, Kang & Lee, Kaufman/Stewart, Ketchum Advertising, Klemtner Advertising, Kovel Kresser, Kuester Group, Lehman Millet, Inc, Lintas Campbell Ewald, Mangos, Mediatrix, Melia Design Group, Ogilvy & Mather, OZ Advertising, Phillips Ramsey, Poppe-Tyson, Potter Katz & Partners, John Ryan Company, Saatchi & Saatchi, Seineger Advertising, Slaughter Hanson, SmithKlein Beecham, Strike Group, Team One Advertising, Team Creatif, Torre Lazur, Tracy-Locke, Tribe Design, Vrontikis Design, White Rhino Advertising, Young & Rubicam

**Editorial:** American Film, Arts & Entertainment, CD Review, Cosmopolitan, Details, Downbeat, Elle, Entertainment Weekly, Glamour, GuestInformant, Imperial Press, In Focus, Interiors & Sources, Jazziz, Jazz Times, Life, Los Angeles, Los Angeles Times Magazine, Mirabella, Music Connection, Newsweek, Photo District News, People, Premiere, Pulse, Q Magazine, Rolling Stone, Select, Spin, Time-Life

## Other Professional Experience

**President & CEO, Mason Editions**, 1994-Present
Founded Mason Editions in 1994, a publishing company specializing in high quality lithographic reproductions of photographs.

**Consultant**
2000-Present
Consult with artists, attorneys and other interested parties on legal, business and technical matters related to photography.

**Advisory Board Member, WorkbookStock**, 2000-Present
Serve on the advisory board of WorkbookStock, a leading stock photography agency. Consult on the development of a photographer-friendly contract, copyright registration procedures, and web interface.

**Advisory Board Member, Exactly Vertical**, 1998-2000
Served on the advisory board of Exactly Vertical, a company offering interactive business management solutions for photographers. Consulted on issues including web interface, software design, copyright registration, merchandizing, stock licensing, photographers' work flow, and branding.

**Founder, Digital Technology Advisory Council**, 2002
Founded an Advisory Council comprised of high level representatives from each of the leading photography industry manufacturers.

3

## Awards & Recognition

**Mamiya Award of Excellence in Photo Education**, 1999
Recognized as a leading arts educator. Selected from all college-level photography instructors, nationwide.

**Print's Regional Design Annual: Award of Excellence,** 1999

**Ozzie Awards: Silver Ozzie for Best Photography,** 1999

**Art Directors Club: Excellence in Photography,** 1999

**Art Directors Club: Excellence in Photography,** 1999

**The Clio Awards: Silver Clio, Director of Photography, Internet Rich Media Advertising**, 1999

**PDN/Nikon Award of Excellence in Self Promotion,** 1998

**Advertising Photographers of America: Best In Show,** 1998

**Communication Arts Award of Excellence in Editorial Photography,** 1998

**The One Show Award for Excellence in Advertising,** 1997

**Communication Arts Award of Excellence, Unpublished Work,** 1997

**Communication Arts Award of Excellence in Self Promotion,** 1996

**Communication Arts Award of Excellence in Advertising Photography,** 1994

**Communication Arts Award of Excellence, Book Series,** 1993

**Art Direction Magazine Creativity Award,** 1992

**Communication Arts Award of Excellence in Editorial Photography,** 1992

**Communication Arts Award of Excellence in Advertising Photography,** 1991

**Communication Arts Award of Excellence in Editorial Photography,** 1990

**Art Direction Magazine: Creativity Award,** 1990

## Gallery Exhibitions

**Vultus**
New Portrait work
AZ Gallery, Los Angeles, 2002

4

**Miles Davis Retrospective**
Portraits of Miles Davis
Museum of History, St. Louis, Missouri, 2001

**Definitive Images**
The Jazz Gallery, Tribeca, New York, 1999

**The Jazz Image**
Portraits from the Jazz & Blues Masters Series
Kimball's Gallery, San Francisco, 1996

**The Jazz & Blues Masters**
Portraits from the series
Verve Gallery, Los Angeles, 1994

## Articles Authored

**Photo District News,**
Contributor to Photo District News, the photography industry's primary trade publication. Authored the "Ask The Expert" column, writing on subjects of business management, licensing, copyright, and creativity.

**In Focus**
Contributor to In Focus Magazine, the magazine of the Advertising Photographers of America, writing on subjects including business management, industry trends, protecting the value of photography, licensing, copyright, creativity.

**Wraparound**
Regular Contributor to Wraparound Magazine, writing on legal and business topics.

**APA/LA NewsMagazine**
Contributor to the NewsMagazine published by the Advertising Photographers of America, Los Angeles Chapter.

**Photo Media**
"Get Down to Business" Fall, 2000

## Articles on Jeff Sedlik, Sedlik Photography & Mason Editions

**Jazziz Magazine**
"The Jazz Image" January 1993

**Jazziz Magazine**
"Focus on Sedlik" January 1994

5

**Photographic**
"Jeff Sedlik" May 1995

**Computing News**
"Get Your Company on the Internet" June 26, 1998

**Success**
"The Jazz and Blues Masters" September 9, 1998

**PC Computing**
"Set Up Shop on the Internet in 60 Minutes or Less" September 1998

**APA NewsMagazine**
"Jeff Sedlik" December 1998, Volume 20, No. 4

**Entrepreneur's Home Office**
"Jeff Sedlik: Sharp Shooter" December 1998, Volume 1, No. 6

**APA News In Focus**
"An Interview with Photographer Jeff Sedlik" January 1999, Volume 8, No. 1

**Studio Photography and Design**
"Commercial Success: The Conceptual Photography of Jeff Sedlik" April 1999, Volume 2, Issue 4

**PC World**
"The Web and Your Business: Setting Up Shop Online" May 1999, Volume 7, No. 5

**APA NewsMagazine**
"The Life of a Shoot: From First Call to Final Billing" June 1999

**APA NewsMagazine**
"Studio Tour: Jeff Sedlik" September 1999

**Photo District News**
"Focus on Advertising: The Secret of Jeff Sedlik's Success" November 1999

**ASMP/CT News**
"Jeff Sedlik and the Ten Specific Steps Toward Making A Living Now and In the Future in Photography"
September 2002

## Professional Societies

**Picture Licensing Universal System (P.L.U.S.)**
www.useplus.org
President and C.E.O.
Founded trade organization dedicated to the development and implementation of international licensing standards in the photography, illustration, publishing, advertising, and graphic design industries. Directed recruitment of trade organizations and other interested parties worldwide and supervised development and implementation of licensing standards. Ongoing.

**Advertising Photographers of America / National**
www.apanational.org
National President, 2000-2002
Chief Advisor on Licensing & Copyright, 2002- Present
Elected to top position in commercial photography by industry leaders nationwide in June, 2000. Directed and supervised all operations of the largest trade organization representing commercial photographers, leading more than seventy volunteer board members located in all areas of the country. Advised federal and state legislators, and Senior Officials at the Small Business Administration and US Copyright Office.

**Advertising Photographers of America/Los Angeles Chapter**
Board of Directors, APA/Los Angeles Chapter, 1998- 2002
Served as Board Member directing non-profit trade association representing commercial photographers in Los Angeles. Served on legal/legislative committee and events committee.

**Advertising Photographers of America**
Member, 1987-Present

**Photography Instructors Education Association**
Member

## Teaching Experience

**Art Center College of Design,** Pasadena, California
Faculty Member, 1996 – Present

Developed and implemented classes in technique and business. Teach independent study courses and workshops. Mentor graduating students, advise on portfolio development and new business management. Active member of Intellectual Property Committee and Licensing Committee. Consulted with Business Curriculum Committee, reviewing and providing feedback on school's new business curriculum. Named "Great Teacher" by photography students and presented with Great Teacher Award, 1996.

**Other Teaching Experience: Workshops & Seminars**

**1977 – Present**
Invited speaker/panelist at the industry's major trade shows, speaking on topics including copyright, licensing, self promotion, building an advertising photography business, stock photography and technical issues. Lectured on photography at LAUSD Community Adult School. Speak before groups of photographers and creatives nationwide. Wrote and produced the APA "Real World" seminar series on topics ranging from estimating, to licensing, to producing. Participated in the development of Digital Imaging For Photographers, a leading seminar series dedicated to cutting- edge digital techniques and equipment.

**Foundation, Community Service and Charitable Work**

**President, Warren King Foundation,** 2000 - 2002
Created foundation providing endowed photography scholarships to promising photography students. Produced a fundraising event attended by photographers, educators, government officials and media. Lobbied Los Angeles Unified School District to re-launch abandoned arts education programs in local schools. Arranged for a local arts teacher to receive a lifetime achievement award at the Kennedy Center.

**Boy Scouts of America, 1972-1977**
Eagle Scout

**Other Community Service and Charitable Work**

Conduct visiting lectures on the art and history of photography for elementary school students in the Los Angeles Unified and Pasadena Unified School Districts. Judge photography exhibitions at the high school, college, and amateur, and professional levels. Photograph pro-bono or reduced-fee public service campaigns for charitable organizations such as the LA Times "Reading by Nine" program, Jewish Family Services, Motion Picture and Television Fund, United Way, and others. Volunteered time to leadership in the Boy Scouts and public schools. Donated original photographic prints to each of the Focus On Aids annual fundraising auctions 1987-2003, Woodcraft Rangers, Pediatric Aids Foundation and other vital charitable organizations.

**Education**

**Continuing Education**
1986-Present
Attend workshops and seminars on business, legal and technical issues affecting photographers, with an emphasis on intellectual property, business management, stock photography, and digital technology courses. Consult with manufacturers and distributors in testing new equipment to stay abreast of the latest developments in digital imaging technologies.

**Art Center College of Design, Pasadena, California**
BFA, Photography, with strong emphasis in Film1983-1986

**University of California at Santa Barbara**
1980-1983
Liberal Studies major with emphasis in Art, Art History, Economics, Business Management.

8

**Reseda High School**
1977-1980
Studied photography under renowned instructor Warren King in specialized occupational photography program. Awarded High Honors by Los Angeles Unified School District. Named Top Industrial Arts Student in Los Angeles. Selected as one of the top three photography students in the nation, awarded Scholastic/Eastman Kodak Scholarship.

**APPENDIX B**

DOCUMENTS CONSIDERED

- Response email from Linda Mallette to PIC, dated 3/5/2000, 5:17 PM, outlining work to be completed by PIC for Gillette
- Scanned Polaroid photo of the Braun Multiquick 200 product shot
- Product shot of the Braun Multiquick
- Copy of PIC invoice # 4690, dated 1/20/99, for the amount of $18,280.50 billed to Braun, Inc.
- Scan of film positive image, PIC10566, of kitchen counter scene which includes various Braun products.
- Scan of black and white image, PIC 14582, of similar kitchen counter scene including Braun products. This image includes an overlay of type in another language as well as the Braun logo.
- Two copies of the APA Terms and Conditions, each with variation.
- Transcribed copy of the deposition of Elizabeth A. Cooper held on February 16, 2005.
- Copies of completed forms VA & GR/PPh/CON registering the copyright for images of Braun & Gillette products shot from 2002-2004
- Copy of Civil Action No. 04-CV-10913-WGY, PIC vs. The Gillette Company, Second Amended Complaint
- Copy of Civil Action No. 04-CV-10913-WGY Amended Answer and Counterclaims, PIC vs. The Gillette Company and The Gillette Company vs. PIC
- Copy of Civil Action No. 04-CV-10913-WGY, Memorandum In Support of PIC's Motion To Dismiss Gillette's Counterclaims
- Copy of Civil Action No. 04-CV-10913-WGY, Expedited Consideration Requested Pursuant to Local Rule 5.1(c), Memorandum In Support of PIC's Motion To Compell Gillette to Produce Documents and Respond to Interrogatories
- Copy of Civil Action No. 04-CV-10913-WGY, PIC vs. The Gillette Company, Defendant's Responses to Plaintiff's First Set of Interrogatories
- PIC Estimate to Braun Inc. dated 11/11/92 for the amount of $900.00
- PIC Estimate to Braun Inc. dated 5/17/92 for the amount of $1774.00
- PIC Estimate to Braun Inc. dated 5/20/92 for the amount of $1112.00
- PIC Estimate to Braun Inc. dated 7/27/92 for the amount of $2472.80
- PIC Estimate to Braun Inc. dated 8/19/92 for the amount of $2632.00
- Copies of PIC's invoices to Gillette: #'s 6011, 6008, 6016, 5979, 6045, 6053 from August, September and October 2002
- Copies of PIC's invoices to Gillette: #'s 6365, 6377, 6400, 6382, from March and April of 2004

- Copy of letter from PICs to Gillette requesting all film be returned, including a list of job orders and invoice # 6084 dated 1/16/03
- Copy of letter from Jill Josephson to Linda Mallette dated 10/25/02 regarding discussions with Paul of PIC
- Copy of letter from Linda Mallette to Jill Josephson dated 10/25/02 regarding discussions with Paul of PIC.
- Copy of letter from Jim Barch to Jill Josephson, Marty Sullivan, Karen Mullen, Thomas Burgess, Linda Mallette and Debora MacNeills dated 10/25/02 @ 4:20 PM, regarding CSW and renderings
- Copy of letter from Jim Barch to Jill Josephson and Marty Sullivan dated 10/24/02 @ 2:12 PM regarding CSW and renderings.
- Copy of letter from Linda Mallette to Ann O'Neil, Marty Sullivan, Jill Josephson, Jim Barch, Robert Blum, Taryn Schaeneman and Tom Cicale dated 10/24/02 @ 2:01 PM, regarding CSW and renderings
- Copy of letter from Marty Sullivan to Ann O'Neil and Bob @ City Stamp dated 10/24/02 @ 1:02 PM, regarding D4 vinyl GPS
- Copy of letter from Ann O'Neil to Marty Sullivan dated 10/24/02 @ 12:47 PM, regarding D4 vinyl GPS
- Copy of letter from Marty Sullivan to Ann O'Neil and Bob @ City Stamp dated 10/24/02 @ 7:02 AM, regarding D4 vinyl GPS
- Copy of transcription from the deposition of Jill Josephson, taken 2/17/05 @ 10:19 AM
- Copy of transcription from the deposition of Linda Mallette, taken 2/22/05 @ 10:18 AM
- Copy of PIC's Terms and Conditions
- Copy of Civil Action No. 04-CV-10913-WGY, PIC vs. The Gillette Company, PIC's First Requests for Admission to Gillette
- Copy of Civil Action No. 04-CV-10913-WGY, PIC vs. The Gillette Company, PICs Second Requests for Admission to Gillette
- P.I. Corp. Price List
- Copy of Civil Action No. 04-CV-10913-WGY, Defendant's Responses to Plaintiff's Second Set of Interrogatories
- Copy of PIC invoice # 6400, dated 4/20/04, for the amount of $777.00 billed to The Gillette Co.
- Copy of PIC invoice # 6365, dated 3/02/04, for the amount of $63,502.80 billed to The Gillette Co.
- Copy of PIC invoice # 6382, dated 3/22/04, for the amount of $11,539.50 billed to The Gillette Co.
- Copy of PIC invoice # 6377, dated 3/17/04, for the amount of $3791.20 billed to The Gillette Co.

- Photographic Illustrators Corp Spring 2004 Jobs – Invoices, Photography Contracts, Transparencies, Transparency covers, Job Documents, File Folders. Bates Prefix "PIC":

| | | | |
|---|---|---|---|
| 13610_001-F | 13642_023-T | 13674_055-POL | 13706_087-T |
| 13611_002-IN | 13643_024-TC | 13675_056-POL | 13707_088-T |
| 13612_003-P | 13644_025-T | 13676_057-POL | 13708_089-T |
| 13613_004-P | 13645_026-TC | 13677_058-POL | 13709_090-T |
| 13614_005-P | 13646_027-T | 13678_059-POL | 13710_091-T |
| 13615_006-P | 13647_028-TC | 13679_060-POL | 13711_092-T |
| 13616_007-P | 13648_029-T | 13680_061-POL | 13712_093-T |
| 13617_008-P | 13649_030-POL | 13681_062-POL | 13713_094-T |
| 13618_009-P | 13650_031-POL | 13682_063-POL | 13714_095-T |
| 13619_010-P | 13651_032-POL | 13683_064-POL | 13715_096-T |
| 13620_001-F | 13652_033-POL | 13684_065-POL | 13716_097-T |
| 13621_002-TC | 13653_034-POL | 13685_066-POL | 13717_098-T |
| 13622_003-T | 13654_035-POL | 13686_067-POL | 13718_099-T |
| 13623_004-TC | 13655_036-POL | 13687_068-POL | 13719_100-T |
| 13624_005-T | 13656_037-POL | 13688_069-POL | 13720_101-T |
| 13625_006-TC | 13657_038-POL | 13689_070-POL | 13721_102-T |
| 13626_007-T | 13658_039-POL | 13690_071-POL | 13722_103-T |
| 13627_008-TC | 13659_040-POL | 13691_072-POL | 13723_104-T |
| 13628_009-T | 13660_041-POL | 13692_073-POL | 13724_105-T |
| 13629_010-TC | 13661_042-POL | 13693_074-P | 13725_106-T |
| 13630_011-T | 13662_043-POL | 13694_075-E | 13726_107-T |
| 13631_012-TC | 13663_044-POL | 13695_076-T | 13727_108-T |
| 13632_013-T | 13664_045-POL | 13696_077-T | 13728_109-E |
| 13633_014-TC | 13665_046-POL | 13697_078-T | 13729_110-T |
| 13634_015-T | 13666_047-POL | 13698_079-T | 13730_111-T |
| 13635_016-TC | 13667_048-POL | 13699_080-T | 13731_112-T |
| 13636_017-T | 13668_049-POL | 13700_081-T | 13732_113-T |
| 13637_018-TC | 13669_050-POL | 13701_082-T | 13733_114-T |
| 13638_019-T | 13670_051-POL | 13702_083-T | 13734_115-T |
| 13639_020-TC | 13671_052-POL | 13703_084-T | 13735_116-T |
| 13640_021-T | 13672_053-POL | 13704_085-T | 13736_117-T |
| 13641_022-TC | 13673_054-POL | 13705_086-T | 13737_118-T |

| | | | |
|---|---|---|---|
| 13738_119-T | 13770_151-T | 13802_183-P | 13834_215-P |
| 13739_120-T | 13771_152-T | 13803_184-P | 13835_216-P |
| 13740_121-T | 13772_153-T | 13804_185-P | 13836_217-P |
| 13741_122-T | 13773_154-T | 13805_186-P | 13837_218-P |
| 13742_123-T | 13774_155-T | 13806_187-P | 13838_219-P |
| 13743_124-T | 13775_156-T | 13807_188-P | 13839_220-P |
| 13744_125-T | 13776_157-T | 13808_189-P | 13840_221-P |
| 13745_126-T | 13777_158-T | 13809_190-P | 13841_222-P |
| 13746_127-T | 13778_159-T | 13810_191-P | 13842_223-P |
| 13747_128-T | 13779_160-T | 13811_192-P | 13843_224-P |
| 13748_129-P | 13780_161-T | 13812_193-P | 13844_225-P |
| 13749_130-P | 13781_162-T | 13813_194-P | 13845_226-P |
| 13750_131-E | 13782_163-T | 13814_195-P | 13846_227-P |
| 13751_132-T | 13783_164-T | 13815_196-P | 13847_228-P |
| 13752_133-T | 13784_165-T | 13816_197-P | 13848_229-P |
| 13753_134-T | 13785_166-T | 13817_198-P | 13849_230-P |
| 13754_135-T | 13786_167-T | 13818_199-P | 13850_231-P |
| 13755_136-T | 13787_168-P | 13819_200-P | 13851_232-P |
| 13756_137-T | 13788_169-P | 13820_201-P | 13852_233-P |
| 13757_138-T | 13789_170-P | 13821_202-P | 13853_234-P |
| 13758_139-T | 13790_171-P | 13822_203-P | 13854_235-P |
| 13759_140-T | 13791_172-P | 13823_204-P | 13855_236-P |
| 13760_141-T | 13792_173-P | 13824_205-P | 13856_237-P |
| 13761_142-T | 13793_174-P | 13825_206-P | 13857_238-P |
| 13762_143-T | 13794_175-P | 13826_207-P | 13858_239-P |
| 13763_144-T | 13795_176-P | 13827_208-P | 13859_240-P |
| 13764_145-T | 13796_177-P | 13828_209-P | 13860_241-P |
| 13765_146-T | 13797_178-P | 13829_210-P | 13861_242-P |
| 13766_147-T | 13798_179-P | 13830_211-P | 13862_243-P |
| 13767_148-T | 13799_180-P | 13831_212-P | 13863_244-P |
| 13768_149-T | 13800_181-P | 13832_213-P | 13864_245-P |
| 13769_150-T | 13801_182-P | 13833_214-P | 13865_246-P |

13866_247-P
13867_248-IN
13868_249-P
13869_250-P
13870_251-P
13871_252-P
13872_253-P
13873_254-P
13874_255-P
13875_256-P
13876_257-P
13877_258-P
13878_259-P
13879_260-P
13880_261-P
13881_001-F
13882_002-P
13883_003-P
13884_004-P
13885_005-P
13886_006-IN
13887_007-P
13888_008-P
13889_009-P
13890_010-P
13891_011-P
13892_012-P
13893_013-IN
13894_014-IN
13895_015-P
13896_016-P
13897_017-P

13898_018-P
13899_019-P
13900_020-P
13901_021-P
13902_022-P
13903_023-P
13904_024-P
13905_025-P
13906_026-P
13907_027-P
13908_028-P
13909_029-P
13910_030-P
13911_031-P
13912_032-P
13913_033-P
13914_034-P
13915_035-P
13916_036-P
13917_037-P
13918_038-P
13919_039-P
13920_001-F
13921_002-POL
13922_003-POL
13923_004-POL
13924_005-POL
13925_006-P
13926_007-IN
13927_008-IN
13928_009-IN
13929_010-P

13930_011-P
13931_012-P
13932_013-P
13933_014-P
13934_015-E
13935_016-P
13936_017-P
13937_018-P
13938_019-P
13939_020-P
13940_021-P
13941_022-P
13942_023-P
13943_024-P
13944_025-P
13945_026-P
13946_027-P
13947_028-P
13948_029-P
13949_030-P

## AFFIDAVIT OF SERVICE

I hereby state, under penalty of perjury, that on March 1, 2005 a copy of the following document was served on the counsel of record below by First Class Mail:

- Expert Report of Jeff Sedlik


David Donahue, Esq.
FROSS, ZELNICK LEHMAN & ZISSU
866 U.N. Plaza
At First Avenue and 48th Street
New York, NY 10017

_____
Date

_____
Jeff Sedlik