IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHOTOGRAPHIC ILLUSTRATORS CORPORATION,<br><br>            Plaintiff,<br><br>v.<br><br>THE GILLETTE COMPANY,<br><br>            Defendant. | Civil Action No. 04-CV-10913-WGY |

**CONSOLIDATED REPLY IN SUPPORT OF
<u>PIC'S MOTIONS FOR SUMMARY JUDGMENT</u>**

Michael A. Albert, BBO #558566
Michael N. Rader, BBO # 646990
Adam J. Kessel, BBO # 661211
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

COUNSEL FOR PLAINTIFF
PHOTOGRAPHIC ILLUSTRATORS CORP.

TABLE OF CONTENTS

I.   PIC IS ENTITLED TO SUMMARY JUDGMENT
     ON ITS LIQUIDATED DAMAGES CLAIM ....................................................................1

     A.   As a Matter of Law, PIC's Invoices Constitute the Parties' Contracts ...................1

     B.   The Liquidated Damages Clause Is Enforceable ......................................................3

     C.   PIC's Image Count Is Accurate ................................................................................5

     D.   PIC Did Not Waive the Return Requirement
          or the Liquidated Damages Clause ..........................................................................9

          1.   Undisputed Factual Background ................................................................9

          2.   Gillette's Waiver Argument Fails as a Matter of Law .............................11

     E.   Gillette's Remaining Arguments Do Not Prevent Summary
          Judgment for PIC on Its Liquidated Damages Claim ..........................................12

          1.   Statute of Limitations ................................................................................12

          2.   PIC's Corporate Status .............................................................................13

II.  PIC IS ENTITLED TO SUMMARY JUDGMENT ON ITS OTHER CLAIMS .............14

III. CONCLUSION...................................................................................................................16

PIC respectfully requests leave to file this reply brief for the limited purposes of (a) responding to new arguments and (b) correcting misstatements in Gillette's oppositions to PIC's summary judgment motions. In the interest of brevity, PIC limits this brief primarily to its core claim for liquidated damages for Gillette's failure to return PIC's transparencies, and addresses just a few of the most egregious misstatements in Gillette's oppositions to PIC's other motions.

**I.   PIC IS ENTITLED TO SUMMARY JUDGMENT ON ITS LIQUIDATED DAMAGES CLAIM.**

   **A.   As a Matter of Law, PIC's Invoices Constitute the Parties' Contracts.**

Given Gillette's review, signature, payment, and failure to object to PIC's invoices on hundreds of occasions, it is black-letter law that those invoices, which include PIC's industry-standard Terms and Conditions, are the parties' contracts. See PIC Liq. Dam. Br. (Docket #74) at 14-17. Courts have consistently enforced essentially identical Terms and Conditions in a long line of cases concerning failure to return photographic transparencies and negatives. (Id. at 15).

Gillette argues that the Terms and Conditions are not binding because PIC inadequately explained them to Gillette and because the signatures of Gillette personnel were made solely for internal accounting purposes. See Gillette Liq. Dam. Opp. (Docket #104) at 8-11. These arguments fail as a matter of law. Greenfield v. Twin Vision Graphics, Inc., 268 F. Supp. 2d 358, 366, 374 (D.N.J. 2003) (rejecting contention that client's "signature simply confirmed the pricing and receipt of the photographs" and claim that "because Greenfield never discussed the terms of the invoices with the[m], Defendants cannot be said to have understood or assented to them").[1]

---

[1] Gillette contends that Greenfield is "in direct conflict" with Agoos Kid Co. v. Blumenthal Import Corp., 184 N.E. 279 (Mass. 1933), lifting the sentence "statements printed on the defendant's bill heads are no part of the contracts between the parties" out of context from Agoos. Gillette is wrong. First, Agoos, a dispute over implied warranties for "Bagdad goat skins dry salted," is a pre-UCC case concerning sale of goods; no sale of goods is at issue here. Moreover, the parties in Agoos had a prior written contract that was directly contradicted by terms on the seller's bill head. Here it is undisputed that PIC and Gillette had no prior contract, let alone one contrary to PIC's Terms and Conditions. See PIC Opp. to Gillette SJ Mot. (Docket #117) at 6-7.

See also <u>Sharpshooters, Inc. v. McCaffrey</u>, Case No. 88-1102 (S.D. Fla. Mar. 27, 1989) (unpublished, attached hereto as Exhibit 1) (granting judgment for full $1,500 in liquidated damages per transparency where defendant admitted signing delivery memo that was later lost).

Gillette's citation (at 11) to the Restatement (Second) of Contracts on this point is misleading. Gillette cites Illustration 3 in Section 211 of the Restatement for the proposition that when "A *sells* plant bulbs to B," contractual language on the invoice for the bulbs is not part of the contract, even though B signs the invoice. (emphasis added).

Illustration 3 is inapposite because it concerns sale of an item that is completed without the contractual language. Here, it is undisputed that PIC did not *sell* its transparencies.[2] PIC delivered them to Gillette as a bailment for Gillette's temporary custody and use in accordance with the license. Additional language was needed to describe the terms of that custody and use. Illustration 1 of the Restatement § 211, which Gillette did *not* cite, explains this:

> A delivers a fur coat to B *for storage* and receives a warehouse receipt which purports on its face to set forth the terms of the storage contract. By accepting the receipt, whether or not A reads it or understands it, A assents to its terms.

Gillette's final argument (at 9) is that PIC's agreement to extend the 30-day return period somehow means that the return requirement itself, and the liquidated damages clause for failure to return, somehow "do not apply." Gillette cites no authority for the proposition, and the law is to the contrary. In the case of bailments for a specified duration:

> [I]f at the expiration of the appointed time the bailee does not redeliver the property or excuse his or her failure to do so, or deny the bailor's right to possession of it, the bailment does not necessarily end. ***Though the bailor has the right to resume possession, he or she may consider the bailment as continued or renewed.***

8A Am. Jur. 2d Bailments § 202 (emphasis added).

---

[2] Gillette's Rule 30(b)(6) witness conceded that PIC owns its film. See Josephson Depo. at 117-120 (quoted in PIC Liq. Dam. Br. at 12). Moreover, Gillette has now offered to return PIC's film "upon completion of the case." (Gillette Liq. Dam. Opp. at 20). Presumably, Gillette would not offer to return film that Gillette believed it owned.

Accord Bibby's Refrigeration, Heating & Air Conditioning, Inc. v. Salisbury, 603 A.2d 726, 728 (R.I. 1992) ("If at the expiration of the bailment the bailee does not redeliver the property or excuse the failure to do so, the bailor may elect to treat the bailee's retention of the property as a continuation of the original agreement or to treat the contract as ended and pursue a remedy for breach of contract or in tort.").

As a matter of law, extension of the 30-day limit on the return period does not excuse Gillette from returning PIC's property when requested to do so.

### B. The Liquidated Damages Clause Is Enforceable.

Gillette's arguments regarding the enforceability of the industry-standard liquidated damages clause in PIC's Terms and Conditions are addressed more fully in PIC's opposition to Gillette's summary judgment motion (Docket #117 at 9-15), but in a nutshell:

- In a long line of cases going back close to 20 years, court after court has found the industry-standard $1,500 figure enforceable.  PIC cites a number of these cases in its two previous briefs (Docket #74 at 19; Docket #117 at 6).  Yet another is Sharpshooters, Inc. v. McCaffrey, Case No. 88-1102 (S.D. Fla. Mar. 27, 1989) (unpublished), attached hereto as Exhibit 1.

- Gillette has not cited a *single* case in which the $1,500 liquidated damages figure for failure to return photographic transparencies was held unenforceable.

- There are at least eleven (11) independent reasons why, at the time of contract formation, PIC's transparencies were of significant (and difficult to predict) value – a prototypical scenario in which liquidated damages provisions are enforced. (PIC Opp. to Gillette SJ Mot. at 9-10).

- Gillette's attempt to establish that the liquidated damages clause is a "penalty" is premised on a retrospective "second look" at some of those eleven factors, such as PIC's stock photo licensing activity.  This approach is impermissible as a matter of law. Kelly v. Marx, 705 N.E. 2d 1114, 1115 (Mass. 1999) ("[W]e reject the 'second look' approach, and conclude that a liquidated damages clause … will be enforced where, *at the time the agreement was made*, potential damages were difficult to determine and the clause was a reasonable forecast of damages expected to occur in the event of a breach.") (emphasis added).

In a new tactic, Gillette harps on a single statement during Mr. Picone's deposition that the purpose of the liquidated damages is not to "replace a negative or transparency that's been lost." Yet elsewhere in his testimony, as well as in PIC's interrogatory answers, Mr. Picone painstakingly explained that the purpose of the provision is *to compensate for loss resulting from non-returned film*. E.g., 2/10/05 Picone Depo. at 46; 3/24/05 Picone Depo. at 265. This is precisely what makes the liquidated damages clause enforceable. Kelly, 705 N.E. 2d at 1116 (liquidated damages enforceable when "the sum agreed upon by the parties at the execution of the contract *represents a reasonable estimate of the actual damages*") (emphasis added).

Although explained in earlier briefing, it is critical to reiterate the falsity of Gillette's argument that PIC could not have been damaged because it "kept an original of everything" that it provided to Gillette. The undisputed fact is that, on some shoots Gillette personnel walked away with every single exposure – even the non-reproducible Polaroids that PIC ordinarily might have retained as reference material – leaving PIC with *no images whatsoever*:

> Q: Would you have given to Gillette any photograph of a product that had a certain view of a product, the copy of which you did not keep in your file?
> A: It's kind of a – whether I kept it or not is subjective. ***They sometimes just took everything. They would take the film.***
> Q: But what about the Polaroids?
> A: In some cases they took them and sometimes even without asking.

(3/24/05 Picone Depo. at 8) (emphasis added).

See also id. at 20-21 (PIC was forced to turn down a stock photography request because Gillette had taken every single transparency of the desired view; Mr. Picone asked Ms. Josephson to return those images, but she claimed that Gillette did not have them.).

What is more, even when PIC *did* retain images, those were merely inferior, "left-over" exposures that Gillette did not want. (2/10/05 Picone Depo. at 47; 4/8/05 Picone Decl. ¶ 23).

- 4 -

Gillette's contention that Mr. Picone retained exact copies of everything he provided to Gillette is so far from the truth, it is difficult to understand how Gillette made the representation.

Finally, Gillette argues that the liquidated damages clause ought not be enforced because the $1,500 figure is calibrated based on a 30-day return requirement, and "the 'damage' suffered by a photographer for loss of transparencies and negatives diminishes over time." (Gillette Liq. Dam. Opp. at 17). The opposite is true. Many images increase in value over time. This is particularly true for photographs of products like Gillette's, which have relatively short life cycles; if the product is no longer available, the image of it cannot be recreated. The inability to recreate an image has often been recognized by courts in upholding the industry-standard $1,500 liquidated damages figure. E.g., Sharpshooters, supra, at 2 ("Every photograph is unique and therefore each photograph cannot be recreated in the exact same manner.").

The value of a particular image is difficult to predict *ex ante*. While uncertainly often militates against summary judgment, the opposite is true here – liquidated damages clauses are at their most enforceable when damage is "difficult to ascertain." Kelly, 705 N.E. 2d at 1116.

Under Massachusetts law, Gillette bears the burden of proving that the liquidated damages clause is unenforceable. Honey Dew Assoc., Inc. v. M&K Food Corp., 241 F.3d 23 (1st Cir. 2001). Given the considerations discussed above, Gillette cannot sustain that burden – particularly given that, "[i]f there was any advantage in experience or sophistication, it was on the side of" Gillette. Lynch v. Andrew, 481 N.E. 2d 1383, 1386 (Mass. App. 1985).

### C.    PIC's Image Count Is Accurate.

Gillette attempts to manufacture a dispute of fact with respect to PIC's count of the number of transparencies it provided to Gillette. (Gillette Liq. Dam. Opp. at 18-19). Yet in every one of the three Jobs cited by Gillette for an alleged counting error by PIC, *the error was indisputably Gillette's*.

- 5 -

In Job No. 4717 (Ex. 8 to 4/22/05 Perkins Decl.), PIC provided 101 transparencies to Gillette. See 4/8/05 McManus Decl. at 6.

PIC carefully explained, in its Interrogatory Answers (Ex. 7 to 4/8/05 Donahue Decl.), how to calculate the number of transparencies provided to Gillette in connection with a particular Job.  Specifically, one subtracts the number of transparencies remaining in the Job Folder from the number developed in connection with the Job.  The number developed is evidenced by PIC's Photographer's Notes, and can usually be confirmed by the photo lab developing invoices that PIC generally retained in its Job Folders. Id. at 73-74; see also 4/8/05 McManus Decl. ¶¶ 2-5; 4/8/05 Picone Decl. ¶¶ 25-26.

In the case of Job No. 4717, the Photographer's Notes indicate that 105 transparencies were developed. See PIC09245 in Ex. 8 to 4/22/05 Perkins Decl. (notation "105 E6" on left-hand side of the page; "E6" is the code for a 4x5 inch transparency.).  There are only four (4) transparencies remaining in the Job Folder, namely PIC09217, PIC09219, PIC09223 and PIC09243.  PIC also told Gillette this in its Interrogatory Answer, specifying every transparency remaining in its Job Folders by Bates Number. (Ex. 7 to 4/8/05 Donahue Decl. at 138).  Thus, it is readily apparent that a total of 101 transparencies (i.e., 105 – 4) were provided by PIC to Gillette in Job No. 4717.

Gillette mistakenly counted not four remaining transparencies, but eight. See Gillette Liq. Dam. Opp. at 19 ("[T]he job folder contains eight transparencies that PIC retained … PIC 9216-19, 9222-23, 9242-43.").

Gillette mistakenly counted not only the transparencies themselves, but *the sleeves within which the transparencies were stored*.  In producing documents to Gillette, PIC provided a copy of each transparency with – and then without – its sleeve, at least for sleeves bearing stickers and/or writing).

For clarity, the following table sets out the contents of each Bates-Numbered document from Job Folder 4717 that Gillette identified as an alleged transparency. The four that actually *are* transparencies (not sleeves) are bolded in the table.[3]

| Bates Number | Contents | Notes |
|---|---|---|
| PIC9216 | Transparency of silk-epil product *in sleeve* (with stickers on the sleeve) | Same transparency as PIC9217 |
| **PIC9217** | **Transparency of silk-epil product** | |
| PIC9218 | Transparency of silk-epil product *in sleeve* (with sticker on the sleeve) | Same transparency as PIC9219 |
| **PIC9219** | **Transparency of silk-epil product** | |
| PIC9222 | Transparency of packaged cordless styling items *in sleeve* (with sticker on the sleeve) | Same transparency as PIC9223 |
| **PIC9223** | **Transparency of packaged cordless styling items** | |
| PIC9242 | Transparency of packaged shaver replacements *in sleeve* (with sticker on the sleeve) | Same transparency as PIC9243 |
| **PIC9243** | **Transparency of packaged shaver replacements** | |

Had Gillette consulted the detailed Interrogatory Answer that it had demanded from PIC before filing its opposition brief, this error would not have been made.[4]

Gillette is correct in noting that Job Folder 4717 contains only one photo lab developing invoice, for less than the total number of transparencies developed (i.e., another such invoice evidently was misplaced). The point is irrelevant, though, because the number of transparencies developed may be determined conclusively from the Photographer's Notes. See 3/24/05 Picone Depo. at 185 (PIC can "depend on [Photographer's Notes] to give us an accurate count. We're pretty careful about not overcharging the customer, so our accounts are usually right on.").

---

[3] Gillette understood that PIC's transparencies are stored in sleeves. Mr. Picone explained this at his deposition. See 3/24/05 Picone Depo. at 160 ("It's a sleeve … It's a blank sleeve."). It was discussed at other depositions too. E.g., Cooper Depo. at 127 ("Q: Is there a sleeve around it of some sort? A: Yes. There is."). PIC's original Job Folders and their contents were also produced for Gillette's inspection in discovery.

[4] PIC's method was only 'indecipherable' (Gillette Opp. at 19) to one who had not read PIC's Interrogatory Answer.

- 7 -

Gillette made similar errors in reviewing Jobs Nos. 4816 and 5338. For Job No. 4816 (Ex. 9 to 4/22/05 Perkins Decl.), PIC provided Gillette with 85 transparencies. (4/8/05 McManus Decl. at 6). This number is calculated by subtracting the five transparencies remaining in PIC's Job Folder (Gillette does not dispute this) from the 90 that PIC had developed as indicated on the Photographer's Notes (PIC09012). Gillette's only dispute stems from the fact that, in this Job, a photo lab developing invoice appears to be missing from the Job Folder. Once again, the missing page does not create a genuine dispute because the Photographer's Notes are conclusive.

Finally, for Job No. 5338 (Ex. 10 to 4/22/05 Perkins Decl.), PIC provided Gillette with 68 transparencies. (4/8/05 McManus Decl. at 8). This number is calculated by subtracting the 26 transparencies remaining in PIC's Job Folder from the 94 transparencies that PIC had developed in the first instance as indicated on the Photographer's Notes (PIC06129) and confirmed by the photo lab developing invoices (PIC06123-25). Gillette claims that 38 transparencies remain in the folder, but Gillette once again double-counts 12 sleeves (PIC06096, PIC06099, PIC06101, PIC06103, PIC06106, PIC06108, PIC06110, PIC06112, PIC06114, PIC06117, PIC06119, PIC06121). Each of these is unmistakably a sleeve because it includes a sticker with writing, and is followed immediately in the production by an identical transparency *sans* sleeve.

Thus, in the only three cases for which Gillette asserted an error in PIC's math, the error turned out to be Gillette's. There is no genuine dispute about the number of transparencies that PIC provided to Gillette, and summary judgment is in order. <u>Kennedy v. News Am. Publishing, Inc.</u>, 161 A.D.2d 445 (N.Y. App. Div. 1990) (granting summary judgment for plaintiff who proved the number of transparencies based on its contemporaneous notations on its invoices).[5]

---

[5] Gillette also maintains (at 18) that "duplicate" transparencies – occasionally provided by PIC to Gillette – should be excluded from the total. These should not be excluded because they too qualify as "originals" in the sense that they are fully reproducible. In any event, Mr. Picone testified that he provided Gillette with "a lot less" than 100 duplicate transparencies over the years. (3/24/05 Picone Depo. at 183). This number is immaterial and can be subtracted from the total if there is any factual issue regarding whether "duplicates" are subject to the agreement.

**D.    PIC Did Not Waive the Return Requirement
or the Liquidated Damages Clause.**

**1.    Undisputed Factual Background**

In its opening brief, PIC presented Mr. Picone's undisputed testimony, confirmed by contemporaneous documents, that Gillette was aware of PIC's Terms and Conditions – including the image return requirement and the liquidated damages clause – from the very first Job in 1992. (PIC Liq. Dam. Br. at 4-8). The Gillette representative who hired PIC to do that Job (Nadine Romano) testified that she had no contrary recollection of the events in question. (Id.).

Gillette's opposition papers reinforce the absence of any genuine dispute on this point. Rather than submitting a statement from Ms. Romano, Gillette offered a declaration from a different former employee, Donna Sowder, who has no personal knowledge of the events in question. Ms. Sowder could state only that Mr. Picone's testimony "*is likely not true*" because "this is the kind of matter that Ms. Romano *would have* discussed with me." See Sowder Decl. (Docket #106) ¶ 4 (emphasis added).

Gillette's chosen response is important. It did *not* submit a declaration from Ms. Romano, despite the fact that she is available to Gillette, is willing to cooperate, and even claims (belatedly) to recall the 1992 Job: two weeks before Gillette filed its brief, Ms. Romano submitted an errata sheet (Exhibit 2) changing her testimony to reflect a belated recollection of the 1992 Job. Yet Gillette was still unable to secure a declaration from Ms. Romano contradicting Mr. Picone's testimony.[6] Inability to recall events does not raise a genuine issue of fact. Benson v. Mass. Gen'l Hosp., 49 Mass. App. Ct. 530, 532 n.3. *A fortiori*, where a witness *does* recall events, yet cannot offer a contrary account, summary judgment is appropriate.

---

[6] In light of her admission, it is difficult to understand how Gillette could have represented in its brief that the facts concerning the 1992 Job constitute a "fabrication" by PIC. (Gillette Liq. Dam. Opp. at 12).

- 9 -

PIC's opening brief also noted that a second Gillette employee (Jill Josephson) was involved in the initial 1992 Job and was present during the discussion of PIC's Terms and Conditions.  Gillette countered with a declaration from Ms. Josephson that, although she did serve as a hand model on that Job, she was not present during discussion of the Terms and Conditions. See Josephson Decl. (Docket #109) ¶ 2.

Ms. Josephson is an admitted perjurer.  Out of fear that her answers might be "damaging" to her because they "wouldn't look good" (Josephson Depo. at 102), she admitted to lying at her deposition about paying a recent uninvited visit to Mr. Picone's home, to having been bitten by his dog there, and to having called him to discuss her deposition. See id. at 44-45 (answering "no" to series of questions) and 94-98 (admitting that the true answers were "yes" *and that she knew this when she replied "no"*) and 97-98 (Q: So when I asked you whether earlier today whether you had spoken or called Mr. Picone in the last two weeks, did you know that the answer was yes?  A: Yes.  Q:  But you said no, correct?  A: Yes.").

In the telephone call with Mr. Picone that she initially denied having, Ms. Josephson expressed to Mr. Picone a fear that if she told the truth at her deposition, she would be fired by Gillette.  She requested that Mr. Picone pay her $1 million to compensate her for taking this risk. (3/24/05 Picone Depo. at 284-285).  Mr. Picone declined.

Following disclosure of the $1 million request at Mr. Picone's deposition, Gillette purported to "withdraw" Ms. Josephson as a Rule 30(b)(6) witness. (Exhibit 4) ("Ms. Josephson [will] no longer be identified as an individual that speaks for Gillette.").  Now, after having (a) proffered her as a witness, and (b) withdrawn her as a witness, Gillette (c) proffers her again.[7]

---

[7] Even Ms. Josephson's new declaration contains an error – that she engaged PIC "from 1994 through 2002."  In fact, Ms. Josephson first engaged PIC much earlier, in June 1992, for Job No. 3107. (Exhibit 3 – Invoice) (Ms. Josephson's maiden name, Jill Wall, is reflected on the invoice).  This statement, which may have been included in Ms. Josephson's declaration in an effort to minimize her involvement in PIC's early Jobs for Gillette, is incorrect.

In any event, assuming for summary judgment purposes that Ms. Josephson's most recent declaration is truthful, it does not create any issue of fact that Gillette – at least through Ms. Romano – knew PIC's Terms and Conditions in 1992.

### 2. Gillette's Waiver Argument Fails as a Matter of Law.

Gillette's waiver argument is based on the notion – identical to that advanced in its attempt to repudiate the formation of over 600 contracts through review, signature and payment – that PIC's agreement to extend the 30-day limit on the return period somehow constituted a "waiver" of the return requirement itself, as well as the liquidated damages clause. (Gillette Liq. Dam. Opp. at 1-2). As already discussed, this is incorrect as a matter of law because a bailor like PIC may elect to treat the bailee's retention of the property beyond a definite period as a continuation of the original bailment.

Gillette's related argument (at 2-3), that PIC "judicially admitted" that no extension was agreed upon between Mr. Picone and Ms. Romano at the outset of the parties' relationship, is baseless. In the case cited, Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., Inc., 976 F.2d 58 (1st Cir. 1992), the plaintiff alleged an operative contract in its complaint, then argued (in an effort to avoid summary judgment) that the contract had been terminated. Id. at 61-62. Here, PIC has always maintained that its invoices constitute the parties' contracts.

Gillette also maintains (at 3-4) that PIC may not rely upon Mr. Picone's conversation with Ms. Romano to "modify" the parties' contracts because it constitutes "parol evidence." This argument misses the importance of the conversation, which demonstrates that Gillette was aware of PIC's Terms and Conditions from the beginning of the parties' relationship.

Mr. Picone's conversation with Ms. Romano also reflects the parties' intent to extend the 30-day limit on the return period – something that happened anyway when PIC elected to treat Gillette's retention of its property beyond 30 days as an extension of the bailment. See 8A Am. Jur. 2d Bailments §202; Bibby's Refrigeration, 603 A.2d at 728.

Whether the extension of the 30-day limit on the return period was agreed upon by Mr. Picone and Ms. Romano at the outset of the parties' relationship (and there is no *genuine* dispute that it was), or later, at the expiration of each 30-day term, is legally irrelevant. The point is that PIC's extension of the 30-day limit does not work a waiver of the requirement that PIC's property be returned when PIC demanded, per its right as a bailor, that it be given back.[8]

Gillette's final argument (at 4), that PIC waived the return requirement and liquidated damages clause through inaction, is addressed in detail in PIC's opposition to Gillette's summary judgment motion (Docket #117). In the interest of brevity, PIC will not repeat itself here.[9]

### E.  Gillette's Remaining Arguments Do Not Prevent Summary Judgment for PIC on Its Liquidated Damages Claim.

#### 1. Statute of Limitations

As explained in prior briefing, the statute of limitations for a bailment claim begins to run, at the earliest, when demand is made for return of the chattel. Even if Gillette is successful in pressing its argument that the bailment here was for a definite time (i.e., by excluding evidence of Mr. Picone's conversations with Ms. Romano), the result will be the same:

---

[8] Gillette's assertion that, in referring to Mr. Picone's conversation with Ms. Romano, PIC is now "changing its story" (Gillette Liq. Dam. Opp. at 1) and presenting a different version of events "at this late hour" (id. at 2) is wrong. PIC was not required to plead every last detail of its relationship with Gillette in its Complaint. The conversation with Ms. Romano was discussed in detail, *inter alia*, at Mr. Picone's deposition. It certainly was not presented for the first time in summary judgment briefing. In any event, Gillette itself requested the extension over twelve years ago – it cannot claim unfair surprise now that PIC has mentioned it.

[9] Gillette's laches and estoppel defenses fail for at least the same reasons as the waiver defense. It is also worth noting, in view of Gillette's inability to dispute Mr. Picone's testimony about his early conversations with Ms. Romano, that Gillette could not reasonably have relied upon PIC's inaction. Gillette indisputably knew that it would have to return PIC's transparencies when requested to do so.

- 12 -

> A bailment, though for a definite term, is not always determined by the mere expiration of the stipulated time, without a return of the property by the bailee. Accordingly, ***the expiration of the agreed period does not, without more, start the running of the statute of limitations against the bailor***; rather, the bailee must have committed some act of conversion, or set up and asserted some claim adverse to the bailor on which his or her continued possession is based.

8A Am. Jur. 2d Bailments § 215 (emphasis added).

In this case, no such "adverse claim" was set up by Gillette until after PIC demanded its images back and Gillette refused. Accordingly, the statute of limitations began running on PIC's liquidated damages claim in October 2002.

### 2.   PIC's Corporate Status

Finally, Gillette claims, for the first time (and without citation to any authority) that involuntary dissolution of PIC's corporate entity from 1990 to 1998 prevents PIC from recovering against Gillette.

Gillette's position is contradicted by the plain language of the relevant Massachusetts statute and the case law interpreting that statute. When PIC was revived in 1998, "all acts and proceedings of its officers, directors and stockholders, acting or purporting to act as such, which would have been legal and valid but for such dissolution, [stood] ratified and confirmed." Mass. Gen. L. ch. 156B § 108; see also Lockey v. Kanodia, 13 Mass. L. Rptr. 251 (Mass. Super. 2001) ("[T]here is no question, and this Court rules, that SNK was duly revived, and all actions of [SNK's principal] during its period of dissolution stand ratified and confirmed."); Devlin Const. Corp. v. Driftway South Const. Corp., 437 N.E. 2d 1069 (Mass. App. 1982) (allowing corporation to maintain action instituted during period of involuntary dissolution).

In any event, PIC's corporate status is irrelevant in this lawsuit. PIC indisputably existed and did business with Gillette during the period of its involuntary dissolution, regardless of its corporate status. There is no requirement that PIC be formally incorporated to do business, enter into contracts, and enforce the same.

## II.   PIC IS ENTITLED TO SUMMARY JUDGMENT ON ITS OTHER CLAIMS.

In the interest of brevity, PIC will respond to only a small number of the most egregious misstatements in Gillette's oppositions to PIC's remaining motions.

**First,** Gillette argues that PIC has no cause of action for fraud based on Gillette's misrepresentation in 2001 that it had a reduced need for duplicates because, by the time of that statement, Gillette was no longer ordering duplicates from the Advanced Photographics duplication laboratory ("Advanced"). (Docket #100 at 18). The argument ignores the fact that Gillette used multiple laboratories for photographic duplication, *not* just Advanced. Gillette admits this outright in Paragraph 25 of its Answer to the Second Amended Complaint: "Defendant admits that on past occasions it purchased from third-party laboratories, including Advanced Photographics, duplicate prints of photographs provided by plaintiff." Thus, whether or not Gillette was ordering duplicates from Advanced during the time period in question is immaterial – it was unquestionably having its duplicates made *somewhere*, while at the same time representing to PIC that it had a "reduced need" for duplication services. That is fraud.

**Second,** Gillette attempts to distract attention from its unfair and deceptive conduct in connection with the Spring 2004 Jobs by wrongly suggesting that those Jobs represent a "scheme by PIC to entrap Gillette into retaining PIC on false pretenses." (Docket #111 at 7). However, the opposite is plainly the case. It is undisputed that Gillette employee Beth Cooper – not PIC or Mr. Picone – initiated the renewed contact, and entreated PIC to do the Spring 2004 Jobs notwithstanding the dispute brewing between the parties. Gillette admits this in the very first sentence of its brief: "In early 2004, after a 1 ½ year deep freeze in the parties' relations, a Gillette employee asked plaintiff Paul Picone ("Picone") about working on a new photography project for Gillette." (Id. at 1).

What is more, Gillette concedes that Ms. Cooper met with counsel immediately prior to making contact with Mr. Picone, and the Court has ruled that PIC is entitled to an adverse inference about the nature of that meeting. (2/10/05 Electronic Order.)  Gillette cannot pass its own scheming off on PIC.

**Third,** Gillette badly misleads when it accuses PIC of "failure to comply with the Court's Orders of March 3 and 8" concerning updating of PIC's discovery responses, because PIC inadvertently failed to photocopy the deposits associated with three of its copyright registrations. (Docket #102 at 14).  The original documents were made available for inspection as required, but Gillette elected to receive copies rather than to inspect.  PIC provided Gillette with Bates-Numbered copies as soon as the oversight was brought to PIC's attention.  Indeed, Gillette apparently sought to entrap PIC by withholding its own knowledge of the oversight until Mr. Picone's deposition.

**Fourth,** Gillette argues at length that many of PIC's copyright claims should be dismissed because PIC only obtained some 600 or so copyright registrations, which it says cannot cover the thousands of images misused and/or lost by Gillette.  While PIC certainly does not deny the statutory copyright registration requirement, there is nothing improper about the Court quantifying Gillette's infringement in an appropriate way based on an examination of all the evidence (including misconduct and spoliation).  Based on the record before it, the Court may at the very least find that Gillette has infringed the 600+ images that PIC has registered.

It is important to note here that PIC's inability to obtain registrations covering many of Gillette's infringements, due to Gillette's loss of thousands of PIC's transparencies, is yet another factor reinforcing the reasonableness of PIC's liquidated damages claim in this case. Registration of copyrights is an important reason why PIC needed its transparencies back, and the failure by Gillette to return them as required has caused PIC significant damage.

**Fifth,** Gillette's argument that PIC (and not Gillette) is guilty of spoliation (Docket #102 at 18-19) is both factually baseless and wrong as a matter of law.  However, because the same argument is proffered by Gillette in a separate motion for sanctions (Docket #125), PIC refers the Court to its forthcoming opposition to that motion, rather than duplicating its response here.

### III. CONCLUSION

For the foregoing reasons, PIC's motions for summary judgment should be granted.

Respectfully submitted,

PHOTOGRAPHIC ILLUSTRATORS CORP.

By its counsel,

Dated: May 12, 2005                    /s/ Michael A. Albert
Michael A. Albert, BBO #558566
malbert@wolfgreenfield.com
Michael N. Rader, BBO # 646990
mrader@wolfgreenfield.com
Adam J. Kessel, BBO # 661211
akessel@wolfgreenfield.com
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000