UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHOTOGRAPHIC ILLUSTRATORS CORPORATION,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>THE GILLETTE COMPANY,<br><br>　　　　Defendant. | Civil Action No. 04-10913 WGY |
| THE GILLETTE COMPANY,<br><br>　　　　Counterclaim-Plaintiff,<br><br>　vs.<br><br>PHOTOGRAPHIC ILLUSTRATORS CORPORATION and PAUL PICONE,<br><br>　　　　Counterclaim-Defendants. | |

**THE GILLETTE COMPANY'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

FROSS ZELNICK LEHRMAN & ZISSU, P.C.
　　Patrick T. Perkins (Admitted *pro hac vice*)
　　David Donahue (Admitted *pro hac vice*)
886 United Nations Plaza
New York, New York 10017
Ph: (212) 813-5900
Fax: (212) 813-5901

GELB & GELB LLP
　　Richard M. Gelb (BBO#188240)
　　Robert S. Messinger (BBO#651396)
20 Custom House Street
Boston, MA  02110
Tel: (617) 345-0010
Fax: (617) 345-0009
*Attorneys for Defendant/Counterclaim-Plaintiff*
*The Gillette Company*

**Preliminary Statement**

In all three versions of its Complaint, PIC defines the "Agreements" purportedly breached by Gillette as PIC's "standard terms and conditions" which appear on the reverse of PIC's invoices to Gillette. (*See* SAC ¶¶ 9-10.) That document—the sole basis of all of PIC's contractual claims—provides that Gillette purportedly was required to return "photographic material(s)" to PIC *within 30 days* of publication and its failure to return such materials *within 30 days* triggered an obligation to pay $1,500 per unreturned original transparency or negative. (Dkt. No. 77, Exs. 13 & 14 ¶¶ 10-11.) These purported terms (return of photographic materials within 30 days of publication and a penalty of $1,500 for failure to return the materials within that time) are the *sole basis* of PIC's remaining breach of contract claim. (SAC ¶¶ 17, 53.)

PIC's complaint is consistent with its pre-suit statements. In a letter dated June 23, 2003, PIC asserted that "[a]ccording to the terms of my contracts, Gillette had to return to me all the photographs *within 30 days of publication*." (Dkt No. 77, Ex. 26) (emphasis added). On August 5, 2003, PIC's counsel wrote to Gillette "[t]he relevant contracts require Gillette to return all photographic materials (*e.g.*, transparencies, negatives, photos, etc.) *within 30 days of first publication*." (Dkt. No. 77, Ex. 33) (emphasis added). In PIC's counsel's letter of September 29, 2003, he stated that Gillette "failed to timely return the materials *within 30 days of first publication* as required by the parties' contract." (Dkt. No. 99, Ex. 12.) (emphasis added).

In the face of this clear and undisputed record, PIC now attempts to run from its pleading and its pre-suit statements, seeking on summary judgment to allege *a completely different agreement*. PIC now claims that in 1992 it *orally* agreed to allow Gillette to retain photographic materials until PIC requested their return. (PIC Br. at 2.)[1] The question is not whether PIC's tale of a conversation in 1992 is true (in reality, the supposed conversation never happened). Rather, PIC's newly minted story is inadmissible. PIC is bound by its pleading and the purported 1992 oral agreement is also inadmissible under the parol evidence rule.

Once PIC's purported "oral agreement" claim is removed from consideration, which it should be as a matter of law, the result on Gillette's motion is clear. For more than 10 years Paul

---

[1] References to PIC's Opposition to Gillette's Motion for Summary Judgment, Dkt. No. 117, are set forth as "PIC Br. at __."

Picone *never* asked for the return of a single negative or transparency and *never* charged Gillette for its failure to return such materials within 30 days. (Dkt. No. 99, Ex. 1 at 29-31.) Nevertheless, Mr. Picone continued to perform job after job—more than 600 during more than a decade—without insisting upon the return of any photographic materials prior to performing any job. PIC's and Picone's choices in this regard constitute clear waiver and PIC's claims relating to the return of negatives and transparencies should be dismissed. PIC's copyright claims are similarly without merit and should be dismissed.

The standard on a motion for summary judgment is clear: In responding to Gillette's summary judgment motion, PIC "must establish the existence of at least one issue that is both 'genuine' and 'material' . . . ." by "evidence *which would be admissible at trial . . . ." Kelly v. U.S.*, 924 F.2d 355, 357-358 (1st Cir. 1991) (emphasis added) (citations omitted). PIC's defenses to Gillette's motion are rife with purported evidence that would not be admissible at trial. As a result, its attempted reliance on such "evidence" here should not be countenanced.

As articulated by the U.S. Court of Appeals for the Second Circuit, "[c]ourts have an important responsibility . . . to monitor the outer limits within which juries may determine reasonably disputed issues of fact." *Warner Bros. Inc. v. Am. Broad. Cos.,* 720 F.2d 231, 245 (2d Cir. 1983). Gillette respectfully suggests that PIC's claims are outside those "outer limits" and that they should be dismissed.

## I.    PIC CANNOT OVERCOME ITS CLEAR WAIVER OF THE PURPORTED 30-DAY RETURN REQUIREMENT BY CHANGING THE BASIS OF ITS CLAIM

The reason is clear why PIC, on this motion and on its own motion, attempts to allege violation of a different agreement than that pleaded in its complaint—for a period of more than 10 years, neither PIC nor Paul Picone ever once asked for the return of negatives and transparencies which, under the "terms" of the Boilerplate on the reverse of his invoices, were required to be returned within 30 days of publication. Moreover, PIC and Paul Picone never once requested payment of $1,500, or of any other amount, for any unreturned negatives or transparencies. However, during more than a decade, Picone and then PIC performed hundreds of jobs for Gillette, purportedly entering into a new "contract" for each job, without ever enforcing the Purported 30 day Return Requirement. As a result of Picone's and PIC's clear,

2

decisive, and unequivocal action and inaction, PIC has waived the conditions it now seeks to enforce. PIC's attempts to overcome this clear waiver by alleging a different agreement than that pleaded in its complaint is legally impermissible and should be rejected.

### A. PIC's New Version Of Events Is Inadmissible And Thus Cannot Thwart Summary Judgment.

PIC's new story is inadmissible both under the doctrine of judicial admissions and under the parol evidence rule. As a result, PIC's current attempt to circumvent its clear waiver cannot be considered on or defeat summary judgment.

### 1. PIC Is Bound By The Judicial Admissions In Its Pleading

"A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding." *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., Inc.*, 976 F.2d 58, 61 (1st Cir. 1992) (citation omitted). In *Schott*, the district court rejected a plaintiff's attempt to thwart summary judgment by relying upon the existence of a purported oral agreement not pleaded in the Complaint, holding that the plaintiff was bound to its own pleading. *Id.* at 60-61. The Court of Appeals for the First Circuit explained:

> The judicial admission found by the lower court rested on plaintiff's clear and express statement in its original and amended complaints that "a contract did, in fact, exist between the parties," fortified by an attached copy of the 1985 Agreement. No other agreement was mentioned *nor was it suggested the Agreement was nullified, altered, or when or how that occurred.*

*Id.* at 61 (emphasis added). The First Circuit further held that it had "scoured the complaint and [could] find no indication that plaintiff was pleading a termination and novation of the Agreement. . . . The complaint contains no mention of any contract other than the 1985 Agreement . . . ." *Id.* at 62. [2]

As held by another district court in the First Circuit, "[p]laintiffs cannot avoid summary judgment by now arguing, against their own judicial admissions, that the real agreement between the parties was some oral agreement which would happen to contain the provisions not in the Agreement but which the plaintiffs need to avoid summary judgment." *Diaz Rodriguez v. Pep*

---

[2] Moreover, the fact that the Boilerplate on which PIC relies contains a no oral modification clause, (*See* Dkt. No. 99, Ex. 5 at PIC 17349, ¶ 14), also bolsters a finding that PIC is bound by its judicial admission. *See Schott*, 976 F.2d at 61 (holding that district court's finding of judicial admission was strengthened by fact that "[t]he Agreement provided that it could not be modified except by written instrument signed by an authorized Honda officer").

*Boys Corp.*, 2004 WL 329302, *5 (D. Puerto Rico 2004). The same result obtained in *Restaurant Consulting Services, Inc. v. Mountzuris*, 253 F. Supp. 2d 45, 53 (D.Mass. 2003) (citing *Schott supra*) (Young, *Chief J*), where this Court held that a party was bound by its assertion in a pleading concerning the agreement at issue in the case.

It is undisputed that all three versions of PIC's complaint have relied solely upon and have referred exclusively to the Boilerplate. Nowhere in its pleading does PIC allege, rely upon, or even mention, any alteration of the Boilerplate. (SAC ¶¶ 14-15, 17, 53.) That PIC calls the new arrangement an "extension" does not save it here. The "agreements" pleaded by PIC expressly require return of negatives and transparencies within 30 days of first publication. The "extension" is not reflected anywhere in such "agreements." PIC's current story relies upon a different agreement than that pleaded.

In another tacit admission that its contract claim, *as pleaded*, will not survive the waiver defense, on these motions for summary judgment PIC, for the first time, attempts to claim that its rights in the negatives and transparencies provided to Gillette over the years represent a "bailment." (PIC Br. at 14-15.) But PIC never pleaded any claim of bailment or conversion either. Any such argument cannot be advanced now, in response to a motion for summary judgment.

**2.    PIC's Purported Discussions With A Gillette Consultant In 1992 Are Barred By The Parol Evidence Rule.**

PIC's purported oral agreement fails for another reason. "'Evidence of prior or contemporaneous oral agreements cannot be admitted to *vary* or *modify* the terms of an unambiguous written contract.'" *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1122-23 (1st Cir. 1995) (citations omitted). Moreover, "parol evidence may not be used to create ambiguity where none otherwise exists." *Id.* (citations and internal quotation marks omitted).

PIC's new story of an "extension" of the Purported 30-day Return Requirement is based upon alleged discussions that took place prior to PIC performing the first job for Gillette and thereafter in connection with the "second or third job." (Dkt. No. 75 ¶ 18.) This story contradicts PIC's Complaint in which it has alleged the existence of "hundreds" of integrated agreements between PIC and Gillette. (SAC ¶ 9.) PIC cannot have it both ways—on the one

hand claiming violation of hundreds of integrated written "Agreements" by Gillette while on the other hand purporting to swap out terms of such agreements that suit its current needs through alleged "prior or contemporaneous" oral discussions.  Assuming PIC's claim that the parties entered into more than 600 separate, integrated agreements to be true, the alleged 1992 discussions clearly are inadmissible under the parol evidence rule.  Indeed, as *PIC itself* vigorously argued in *its* motion to dismiss Gillette's counterclaims, an attempt to rely upon oral statements of the kind PIC presents here,

> violates the parol evidence rule, which prohibits a party to a written contract from contradicting the plain terms of that contract with prior statements.  *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1122 (1st Cir. 1995).  "The rule that written agreements may not be varied or added to by parol evidence of antecedent or contemporaneous negotiations is not one merely of evidence, but is a rule of substantive law."  *Sound Techniques, Inc. v. Hoffman*, 737 N.E. 2d 920, 923 (Mass. App. Ct. 2000).

(Dkt. No. 26 at 9.)

Based on the foregoing, PIC's breach of contract claims on this motion must be limited to the contract PIC pleaded in its three complaints—not the new contract that PIC has conjured up to avoid summary judgment.[3]

**B.     By More Than 10 Years Of Inaction As To The Purported 30 Day Return Requirement And Its Attendant Late Penalty, And By Continued Performance Of Hundreds Of Jobs For Gillette, PIC Has Waived Its Claim.**

**1.     PIC Has No Admissible Defense To Its Clear Waiver.**

PIC does not dispute that, for more than a decade, either it (or prior to its existence, Paul Picone) performed more than 600 separate jobs for Gillette and never once enforced the Purported 30-day Return Requirement or the Late Penalty.  PIC's *sole defense* to its clear, decisive, and unequivocal conduct is its claim of an "extension" of that requirement.  (PIC Br. at 8.)  As established in Section I A *supra,* PIC's "explanation" is inadmissible.  As a result, there is "no other explanation" for PIC's failure to enforce the Purported 30-day Return Requirement over a period of more than 10 years for more than 600 separate transactions except PIC's clear choice that it "would not insist on adherence to the [provision]."  *Paterson-Lietch Co., Inc. v.*

---

[3] PIC's claim of an oral agreement made in 1992 is similarly defective since it is undisputed that PIC *did not exist* in 1992 and thus could not make any such agreements.  *See, e.g., 1274 Massachusetts Ave. Corp. v. 1280 Massachusetts Ave. Ltd. P'ship,* 1998 WL 1184118, *3 (Mass. Super. 1998).

*Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 992 (1st Cir. 1988) (cited by PIC at page 8 of its Memorandum).

PIC further attempts to overcome its clear waiver of the Purported 30-day Return Requirement and the Late Penalty by misstating the testimony of two Gillette witnesses for the proposition that "the return requirement was not waived." (PIC Br. at 9.)[4] First, PIC relies upon testimony from Gillette witness Jill Josephson for this proposition. However, it is clear from her testimony that she first became aware of PIC's Purported 30-day Return Requirement and the Late Penalty *after* PIC made its formal demand in June 2003. (Dkt. No. 77, Ex. 2 at 119.) Her testimony was based upon her reading of the Boilerplate *after* June 2003. This testimony in no way supports PIC's claim that Gillette "knew the return requirement was not waived." (PIC Br. at 9.) To the contrary, it further confirms Gillette's waiver defense. The fact that, prior to June 2003, Jill Josephson had never viewed the Boilerplate and was unaware of both the Purported 30-day Return Requirement and the Late Penalty in all her years of working directly with PIC merely demonstrates that PIC never enforced the conditions, *never* asked for its transparencies and negatives back, never charged $1,500 for lost materials, and *never* intended to exercise any purported right to reclaim the materials or charge anything if they were lost.

PIC's attempt to rely upon the testimony of Beth Cooper is similarly misplaced. The only thing Ms. Cooper stated was that at the time of her meeting with Paul Picone in 2004, she did not dispute that PIC had the right to get its images back. (Dkt No. 77, Ex. 1 at 191.) This in no way contradicts Gillette's position that PIC waived the Purported 30-day Return Requirement and the Late Penalty as set forth in the Boilerplate.[5]

### 2.    Even Considering PIC's "Extension" Claim, It Has Still Waived The Conditions It Now Seeks To Enforce

Even if PIC's new "extension" story is considered, the undisputed facts establish PIC's waiver of that purported agreement too. PIC's decisions to *never* request the return of its photographs for *10 years* and *never* charge $1,500 for a single unreturned transparency or

---

[4] PIC's choice of words is revealing—PIC attempts to slide by the express language of the Boilerplate that is sole basis of its complaint by converting the Purported *30-day* Return Requirement into just "the return requirement."

[5] Moreover, Beth Cooper's employment at Gillette commenced in August 1999. By that time, over seven years had passed without PIC ever attempting to enforce the Purported 30-day Return Requirement and as such, PIC already had waived it. (Dkt. No. 77, Ex. 1 at 33.)

negative during that period while entering into hundreds of additional transactions with Gillette mean only one thing:  that PIC never intended to enforce the purported condition.  PIC cannot revive the purported condition simply out of a desire for revenge against Gillette upon learning it would no longer receive assignments from Gillette.

Moreover, absent from its story of an oral agreement entered into in 1992 is any mention of an agreement that Gillette would be required to pay $1,500 per lost original negative or transparency in the event PIC exercised its whim to have such materials returned.  To the contrary, PIC *never* discussed with Gillette that failure to return photographic materials to PIC "on request" would result in Gillette being charged a $1,500 penalty for each lost transparency or negative.  (Dkt. No. 77, Ex. 10 at 135-36.)

## II.  EVEN IF ADMISSIBLE, PIC'S PURPORTED ORAL AGREEMENT AS TO THE RETURN OF PHOTOGRAPHS IS UNENFORCEABLE AS A MATTER OF LAW.

An agreement is enforceable only if there is "'agreement on the essential terms of the transaction in order that the nature and extent of the parties' obligations can be determined and ... enforced.'"  *Realty Central LLC v. Re/Max Of New England, Inc.*, 2005 WL 235932 at * 3 (Mass. App. Ct. Feb. 1, 2005) (quoting *Novel Iron Works, Inc. v. Wexler Const. Co.*, 26 Mass. App. Ct. 401, 408 (1988)).  "The duration of the agreement is such an essential term."  *Realty Central*, 2005 WL 235932 at *3 (citing *Held v. Zamparelli*, 13 Mass. App. Ct. 957, 958 (1982)).  In *Realty Central*, the court found that a plaintiff's argument that the parties had agreed orally that the term of a franchise would be "forever" (as opposed to the five years in the written agreement) would prevent enforcement of the contract since there was no agreement on duration—an essential term.  *Id*.

The same logic applies here.  Even were the Court to accept PIC's claim of an oral agreement with Gillette concerning the return of negatives and transparencies, which it should not, the duration of the agreement is undefined and thus unenforceable.  PIC concedes that there is no agreement as to the duration of Gillette's purported obligation to maintain "custody" of negatives and transparencies.  PIC's current claim that Gillette would be required to return the photographs at some undefined future time, completely at PIC's whim (PIC Decl. ¶ 18),

demonstrates as a matter of law that there is no agreement as to a fixed duration of Gillette's purported obligation. Thus, the purported oral agreement is unenforceable.

## III.    THE LATE PENALTY IS UNENFORCEABLE AS A MATTER OF LAW.

### A.    Paragraph 11 Of The Boilerplate Is A Penalty.

PIC does not dispute, because it cannot, that in order to be enforceable, a liquidated damages provision must compensate loss, otherwise it is a penalty. PIC definitively conceded at deposition that the purpose of the Late Penalty was *not* intended to compensate for loss of negatives or transparencies.

> Q:    Wouldn't the purpose of something like this [the Late Penalty] be to replace a negative or transparency that's been lost?…
>
> A:    *No*.

(Dkt. No. 77, Ex. 9 at 46 (emphasis added).) This concession alone is dispositive and should end all debate on the matter. As it turns out, the above concession is only one of many that doom PIC's liquidated damages claim.

PIC further admitted at deposition (and again in its opposition to Gillette's summary judgment motion), that the $1,500 amount in the Boilerplate was *not* intended to reimburse *PIC* for any loss, but rather that the amount represented "the fee price for most photographic assignments." (*Id*.; PIC Br. at 11.) The average "fee price" charged to Gillette for a photographic assignment *has nothing to do* with reimbursing PIC for loss of a transparency or negative.

Moreover, as established by PIC's own testimony—*at the time it entered into each transaction with Gillette*—PIC knew that it would not be damaged in the event Gillette failed to return original negatives or transparencies because as Picone conceded at deposition, PIC retained a "duplicate copy" transparency of "every view that was taken [for Gillette] during [a] particular project," kept "an original" of every shot provided to Gillette. Moreover, Picone confirmed that PIC "kept one original of everything." (Dkt. No. 77, Ex. 9, 28-29, 47-48.) Indeed, at deposition, Gillette's counsel asked that PIC confirm that it kept a "duplicate of every shot that [it] provided for Gillette, correct?" Picone corrected Gillette's counsel, stating "I kept an original, not a duplicate." (*Id.* at 47.) PIC also conceded that, beginning in 1997, it kept a

high resolution, digital copy of every photograph taken by PIC for Gillette. (Dkt. No. 77, Ex. 10 at 218-19.) Thus, PIC knew, at the beginning of each job for Gillette, that even if Gillette lost or otherwise failed to return the negatives or transparencies, PIC would stand to lose nothing. Under those circumstances, the $1,500 Late Penalty is nothing less than an unenforceable penalty.

PIC has attempted to overcome these case-dispositive admissions by trying to change sworn testimony and by offering conflicting affidavits. These maneuvers are to no avail. With respect to the duplicate transparencies PIC previously admitted to keeping, PIC now claims in a newly offered declaration that PIC kept only an "inferior 'left-over' exposure that Gillette did not take." (PIC Br. at 12.) Of course, PIC's attempt to correct its deposition testimony with a declaration is inadmissible. *Murphy v. Ford Motor Co.*, 170 F.R.D. 82, 85 (D. Mass. 1997). Moreover, the new story is demonstrably false. When asked at his deposition why he kept a duplicate original of everything provided to Gillette, Picone testified unequivocally "[t]hat was so that we maintained an original copy for duplicating." (Dkt. No. 77, Ex. 9 at 29.) Obviously, an "inferior 'left-over' exposure" would never be suitable for duplicating. The facts as originally testified to by Picone are confirmed by PIC's own business records. For example, PIC states on one of its internal notations that it keeps Gillette's original transparencies in a binder. (Reply Declaration of David Donahue, dated May 12, 2005 ("Donahue Reply Decl."), Ex. 1.) Moreover, in an e-mail from PIC to Gillette in February 2001, PIC represented to Gillette that PIC kept "a master chrome and digital file here as back-up *in case you need duplicates later.*" (*Id.* Ex. 2) (emphasis added.)

PIC similarly attempts to run from its clear admissions under oath that, beginning in 1997, it kept a high resolution, digital scan of "everything" it provided to Gillette. In response to Gillette's motion for summary judgment, PIC now claims that it kept digital scans only of single "left over" exposures that it had retained, and further claims that the digital scans cannot be considered a replacement for an original transparency. (PIC Br. at 12.) This new story contradicts PIC's prior unambiguous testimony offered under oath. Specifically, Paul Picone testified as follows:

Q;     Now when you started—first of all, do you know when you started doing this for Gillette?

A:     Scanning and saving digital images?

Q:     Yes.

A:     I would say about '97.

Q:     Now, when you started doing that, did you scan in everything that you provided to Gillette?

A:     Yes.  I think the instructions were at that time whenever we shot something and got the film back, we should scan it.

**Q:     So from 1997 forward, anything that Gillette received, you maintained in your electronic directory, correct?**

A:     **Correct.**

(*Id*. at 219) (emphasis added.)

This testimony is consistent with that of Gillette's witnesses, who were told by PIC that it was keeping high resolution digital scans of everything provided to Gillette.  (Cooper, Madden, Josephson, and Tattan Declarations, Dkt. Nos. 107-110.)

PIC's belated claim that the high resolution digital scans were not equivalent to negatives and transparencies is similarly belied by PIC's own witnesses.  For example, Paul Picone testified that PIC considers these digital images to be "original" and "reproducible" just as any transparency or negative.  (Dkt. No. 77, Ex. 9 at 82.)  Mr. Picone further testified that PIC began creating digital copies because "clients started asking for scanned images rather than ektachrome [transparencies]."  (Dkt. No. 77, Ex. 10 at 218.)  Indeed, in correspondence with Gillette, PIC explained that its digital scans were suitable for any form of duplication Gillette might wish to make, with the exception of large format trade show displays.  (Dkt. No. 99, Ex. 23.)  Even PIC's paid "expert" testified at deposition that high resolution digital scans such as those PIC kept of Gillette's images are equal in quality to original transparencies and are accepted by stock photo agencies.  (Dkt. No. 77, Ex. 11 at 166.)

Moreover, contrary to its implication that any scanning of Gillette images ceased in 2000, PIC's own files show that as recently as July 2002, PIC was making active use of its directory of digital Gillette images and, indeed, appeared to charge Gillette for doing so.  (Reply Donahue Decl., Ex. 3.)

The import of the uncontroverted evidence of PIC's practice of maintaining an original transparency of every shot and keeping a high resolution digital scan of "everything" provided to Gillette for the purposes of duplication is obvious:  At the outset of each and every job performed for Gillette, PIC *knew* that it would suffer no loss if Gillette failed to return any of the negatives or transparencies because PIC kept high quality copies of everything.  It is no wonder that PIC is so strenuously attempting to wriggle out of its prior admissions.

PIC's attempt to concoct "damages" for Gillette's purported failure to return transparencies and negatives is also deficient as a matter of law.  For example, PIC claims that it was "damaged because it could not . . . pursue the stock photo licensing opportunities what [sic] would have been and should have been available to it."[6]  (PIC Br. at 13.)  However, this argument is inconsistent with what PIC concedes is the law governing liquidated damages in Massachusetts, namely damages must be evaluated "at the time the agreement was made."  *Kelly v. Marx,* 705 N.E.2d 1114. 1115 (Mass. 1999) (cited at PIC Br. at 10.)  PIC has offered no evidence or testimony to support its claim that, at the time it entered into its purported agreements, PIC contemplated using the photographs it provided to Gillette for stock photography.  Indeed, PIC concedes the opposite in its brief, stating that "although PIC is currently too busy with its core business of original photography to actively pursue stock photography opportunities, Mr. Picone *is contemplating* entering the stock photography business, particularly by entertaining a bulk license or sale of PIC's may [sic] thousands of images when he retires."  (PIC Br. at 13, n.11) (emphasis added).  Since PIC is just now contemplating the stock photography business, it clearly did not factor into the estimation of PIC's anticipated loss *at the time the parties entered into the purported agreements*.

PIC attempts to avoid its admission at deposition that it could recall *no* stock requests received since 1992 (Dkt. No. 77, Ex. 10 at 28), by characterizing this as an impermissible "second look" approach under *Kelly*.  (PIC Br. at 13.)  This is incorrect.  In this case it is

---

[6] This argument represents yet another change in story by PIC.  In response to a Gillette Interrogatory, PIC alleged that it "has had numerous inquiries by third parties to purchase such images for use as stock photos [and] … has repeatedly been forced to decline these inquiries" because of Gillette's purported refusal to return the transparencies. (Dkt. No. 99, Ex. 25 at 16.)  This turned out to be false.  At deposition, PIC conceded that it could recall *no* stock requests received since 1992.  (Dkt. No. 77, Ex. 2 at 28.)

undisputed that the parties had a more than 10-year course of dealing with more than 600 jobs performed.  As a result, with each separate job, PIC and Gillette had as a backdrop PIC's decision not to reclaim the transparencies and negatives and its concurrent decision not to use the photographs for stock photography.  In other words, after a period of time, when PIC agreed to perform new jobs for Gillette, it knew it would not use the photographs provided to Gillette for stock because it had not done so for any of the previous jobs.

PIC's argument that the purported "extended" return requirement was necessary in order to curb misuse of photographs by Gillette is similarly without merit.  (PIC Br. at 9.)  This argument employs the very "retrospective" approach that PIC concedes is not the law.  (PIC Br. at 10-11.)  Indeed, PIC concedes that it did not insist upon return of negatives and transparencies within 30 days at the time it entered into the purported agreements because it believed "Gillette would respect PIC's copyrights."  (*Id*. at 9.)  Clearly, if PIC were concerned that Gillette would misuse its images *at the time* it entered into its purported agreements with Gillette, it would not have waived (or even "extended") the Purported 30-day Return Requirement.[7]

PIC also makes the bizarre claim that, at the time of each job for Gillette, PIC "needed its transparencies in case it decided to register the copyrights therein with the Copyright Office." (PIC Br. at 9.)  Of course, PIC offers no *fact* citation for this outlandish claim, merely referring to another of its briefs.  As is demonstrated by the record, PIC kept copies of everything it provided to Gillette and thus has never been deprived of the ability to seek copyright registrations.  Even PIC concedes that it kept a copy of each view provided to Gillette, which themselves could be registered.  (PIC Br. at 12.)  Indeed, notwithstanding purportedly having been deprived of transparencies by Gillette, PIC was nonetheless able to register in excess of 600 photographs when it decided to bring this action.  (Dkt. No. 99, Ex. 7 at 46-48.)  In any event, nothing prevented PIC from making an extra color copy or print of the photographs it prepared for Gillette and sending such copy or print as a specimen to support a copyright application.

---

[7] As set forth in more detail in Gillette's Motion in Limine To Exclude All Evidence And Testimony In Support Of Plaintiff's Claim That The Purported Liquidated Damages Clause Is Intended To Compensate For Use Of Photographs Without A License (Dkt. No. 123), this argument also fails because it is preempted under Section 301 of the Copyright Act.  17 U.S.C. § 301.

Simply put, PIC's decision not to obtain registrations for the vast majority of its photographs resulted from PIC's own decision, not any alleged malfeasance by Gillette.

PIC's attempt to rely upon the hypothetical and unsworn discussion of its paid "expert" regarding stock photography is similarly without merit. The existence of a supposed "industry standard" in this case is irrelevant because of the particular, undisputed facts here. Regardless of what the purported industry standard may be, *in this case* it is clear that at the time PIC performed each job, neither party believed or even contemplated that Gillette's failure to return negatives and transparencies would cause any damage to PIC. Regardless of whether or not photography such as that provided by PIC to Gillette had any value for stock licensing, it is undisputed that in this case, according to its own "version" of events, PIC chose to forego any stock licensing revenues, deciding instead to permit Gillette to retain the negatives and transparencies.

**B.     PIC Has No Response To The Undisputed Massachusetts Law Holding That If A Liquidated Damages Clause Is A Penalty As To One Breach, It Is Unenforceable As To All.**

In its moving brief, Gillette cited the holding of the Supreme Court of Massachusetts that where the same liquidated damages clause applies to various breaches of a contract, if it is a penalty as to one type of breach, it is unenforceable as a penalty as to all breaches. *Comm'r of Ins. v. Mass. Acc. Co.*, 310 Mass. 769, 771 (1942). By its silence, PIC concedes this is the law of this jurisdiction. PIC argues that the Late Penalty would require payment of $1,500 per original transparency or negative returned on the 31st day after publication. (Dkt. No. 77 at 20 n.17.) The objective punitive nature of this provision as to return of materials on the 31st day from publication renders the entire Late Penalty unenforceable as to any other purported breaches as a matter of Massachusetts law.

**C.     PIC's Reliance On A Purported "Industry Standard" In This Case Is Misplaced Since PIC Concedes That It Did Not Enforce The Boilerplate As Written**

PIC makes much of the fact that the Boilerplate located on the reverse of its invoices comes from a form prepared by the Advertising Photographers Association ("APA"), a trade association for commercial photographers. (Dkt. No. 74 at 2, 4.) PIC attempts to parlay the allegedly broad use of the APA form and the $1,500 liquidated damage amount, as well as a list

of out of circuit cases enforcing the $1,500 clause, into a conclusion that the Boilerplate here should be enforced. However, in this case it is undisputed that PIC *did not* abide by the Boilerplate *as written.*

PIC consciously decided not to enforce the Purported 30-day Return Requirement. (Dkt. No. 75 ¶ 18; Dkt. No. 77, Ex. 9 at 29-31.) This conduct voids any "industry standard" argument PIC may wish to make now. *See Davis v. Dawson, Inc.*, 15 F. Supp. 2d 64, 108 (D. Mass. 1998) (course of performance and course of dealing trump industry standard in determining terms of parties' contract); *see also Keating v. Stadium Mgt. Corp.*, 24 Mass. App. Ct. 246, 251 (1987) ("There is no surer way to find out what the parties meant, than to see what they have done.") (quoting *Martino v. First Nat'l Bank,* 361 Mass. 325, 332 (1972) (internal quotation and citation omitted).) Very simply, the APA form boilerplate *is not* the "agreement" PIC seeks to enforce here. Indeed, the strict terms of the Boilerplate inextricably link the time period for returning negatives and transparencies—30 days—with the $1,500 amount and it is the purported failure to abide by the Purported 30-day Return Requirement that triggers a payment. PIC's failure to enforce the Purported 30-day Return Requirement is a material change to the APA form boilerplate that must render the $1,500 damage estimate a meaningless number. No reasonable juror could find that the $1,500 damage estimate would be a reasonable forecast of damage where negatives and transparencies were not requested to be returned for 10 years, when the actual Boilerplate ties the estimate to a 30-day return period.

PIC's paid "expert" admitted as much, explaining that photographers are willing to part with their transparencies and negatives "many years after the job is done . . . ." (Dkt. No. 77, Ex. 11 at 15.) Clearly, the "damage" suffered by a photographer for loss of transparencies and negatives diminishes over time. The $1,500 figure in the APA form boilerplate is calibrated based upon the Purported 30-day Return Requirement and cannot apply where the photographer does not seek to regain negatives and transparencies for 10 years.

## IV.   PIC'S ARGUMENTS IN SUPPORT OF ITS CLAIM THAT THE BOILERPLATE IS THE CONTRACT BETWEEN THE PARTIES MISS THE POINT.

Notwithstanding the facts that PIC never enforced the terms of the Boilerplate that it claims were in dispute and that PIC has spent pages in the parties' summary judgment motions

attempting to rewrite the purported agreements between the parties, PIC nonetheless still insists that the Boilerplate represents the agreement between the parties.  However, PIC has no answer to the undisputed law of Massachusetts that addition of new or different terms on an invoice after formation of a written contract is prohibited.  *Commonwealth v. Hull*, 296 Mass. 327, 333 (1937) ("the document or letter containing the qualifying provisions must be accepted by the offeree at or prior to formation of the contract."); *Agoos Kid Co. v. Blumenthal Import Corp.*,  282 Mass. 1, 14 (1932) (citations omitted) ("[S]tatements printed on the defendant's bill heads are no part of the contracts between the parties."); *Lalime & Partridge, Inc. v. Hobbs*, 255 Mass. 189, 192 (Mass. 1926) (citations omitted).

Instead, PIC claims, falsely, that Gillette "cites *no* evidence whatsoever that such contracts existed (Gillette Br. at 4-5), let alone evidence that an oral contract was formed for each of PIC's hundreds of Jobs for Gillette."  (PIC Br. at 7.)  Of course, Gillette has presented evidence of an oral agreement—namely that Gillette would own all rights to the photographs and would retain the films.  (Dkt. No. 99, Ex. 2 at 16-17, 131, 138; *Id.* Exs. 5, 7 at 67 and Ex. 14.) That PIC claims that no oral contract was formed for each of PIC's hundreds of Jobs for Gillette is particularly ironic since PIC itself claims that a 1992 conversation with Nadine Romano governed all such Jobs.

As for PIC's citation to its out of jurisdiction cases involving unrelated liquidated damages clauses (PIC Br. at 6-7), Gillette has already explained to the Court why such cases have no bearing here in its opposition to PIC's motion for summary judgment.  (Dkt. No. 104 at 9-11.)  As a result, Gillette will not rehearse those arguments again here.

## V.    PIC HAS FAILED TO OVERCOME THE LEGAL DEFICIENCIES IN ITS COPYRIGHT CLAIMS

### A.    The Statute Of Limitations

PIC does not dispute, because it cannot, the law governing statutes of limitation cited by Gillette in its moving brief.  (PIC Br. at 16-17.)  PIC's attempt to rely upon a Fourth Circuit case cannot overrule this Circuit's clear law that when a person "'has a mere hunch, hint, suspicion, or rumor of a claim . . . such suspicions do give rise to a *duty to inquire* into the possible existence of a claim in the exercise of due diligence.'  Once a duty to inquire is established, the

plaintiff is charged with the knowledge of what he or she would have uncovered through a reasonably diligent investigation." *Rakes v. United States*, 352 F. Supp. 2d 47, 70 (D. Mass. 2005) (Young, *Chief Judge*) (emphasis in original) (citations omitted). There is no dispute that with respect to each of the copyright claims identified in Gillette's moving brief, PIC was at least on inquiry notice, if not actual notice of the alleged claims.[8]

### 1.    Gillette Catalogs

In an attempt to defend its inaction with respect to alleged claims in catalogs that were in its possession for years, PIC defends itself by representing to the Court that "PIC was unaware of those infringements until after this lawsuit was filed." (PIC Br. at 18.) This statement is as false as it is irrelevant. Contrary to PIC's assertion to the Court now, in a letter dated September 29, 2003 (almost 6 months before institution of this action) PIC's counsel stated the following to in-house counsel for Gillette: "PIC also has seen numerous Gillette product catalogs in which the same picture was used in multiple years despite PIC having granted Gillette only a one-time use license." (Dkt No. 99, Ex. 12.) PIC's current misrepresentation to the Court is troubling. In any event, PIC cannot overcome inquiry notice by simply stating it never looked at the catalogs, which PIC does not dispute have been in its possession since shortly after their creation.

### 2.    Duplicate Transparencies

PIC attempts to quibble with the undisputed evidence that PIC was on actual notice of Gillette having made duplicates of images provided by PIC at Advanced Photographics, Inc. ("Advanced"). (PIC Br. at 17.) For example, PIC relies on testimony offered by Advanced's Vice-President late in his deposition after a break. This testimony does not change the fact that he unequivocally testified that he informed Paul Picone when he was made aware that Gillette was making duplicates of PIC's images. (Dkt. No. 99, Ex. 3 at 11-12.) Similarly, there is no dispute that Advanced Employee Joe Gannuscio alerted Paul Picone that Gillette was ordering duplicates of PIC's images directly. (Dkt. No. 99, Ex. 2 at 186-87; Ex. 4 at 5-6, 10-16.)

---

[8] PIC finally concedes that the "Latin American" photo is not actionable under the statute of limitations. (PIC Br. at 18, n.17.)

Regardless of PIC's attempt to spin, these events put Mr. Picone on inquiry notice of Gillette's duplication of images at Advanced well before the statute of limitations cut-off.[9]

### B.    PIC's Failure To Obtain Copyright Registrations

PIC's failure to obtain copyright registrations dooms any claim of infringement for: (1) the 4,500 transparencies and slides in Gillette's files, that PIC claims are infringing at pages 5-15 of its Supplemental Interrogatory Responses (Dkt. No. 99, Ex. 7 at 5-15); (2) the 6,700 allegedly unauthorized duplicates purportedly created for Gillette by Advanced Photographics (*id*. at 16-29); (3) 63 digital images that PIC obtained in third party discovery from retailer ShopKo (*id*. at 29-33); (4) 205 of the 220 alleged infringements in Gillette catalogs (*id.* at 35-44); (5) 12 of the 35 alleged Internet infringements (*id.* at 49-51); (6) the 28 alleged infringements obtained in third party discovery (*id*. at 51-53); (7) the three alleged infringements in Canadian catalogs (*id.* at 56); and (8) allegedly infringing product packaging.  (*id*. at 58-59.)

PIC's only defense is that it claims that it cannot register images because they were never returned.  (PIC Br. at 18.)  As discussed in Section III A *supra*, this argument is demonstrably false.  PIC also fails to explain why this argument would apply to the images that were produced to it by Gillette and by third parties in discovery, as well as to the catalogs it had in its possession for years.  Nor does it excuse PIC's failure to register copyright in the images before it gave them to Gillette.

The argument is also legally irrelevant.  The registration requirement is not discretionary; rather, this Court's subject matter jurisdiction over any of PIC's copyright claims is dependent upon plaintiff's ownership of a valid copyright registration.  *See, e.g., Morris v. Business Concepts, Inc.,* 283 F.3d 502, 505 (2d Cir. 2002); *see also I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.,* 307 F.Supp.2d 521, 526 (S.D.N.Y. 2004) ("registration requirement is jurisdictional").  Indeed, in *Dodd v. Fort Smith Special School Dist. No. 100*, 666 F. Supp. 1278, 1282 (W.D. Ark. 1987) the court held there that the "lack of registration is a result of the defendants' retention of the only copy of the manuscript, however, the Copyright Act does not

---

[9] PIC has presented *no evidence* of any duplicates of PIC's photographs made by Gillette at any other laboratory or of any duplicates obtained by Gillette from anyone after March 2000.  (Dkt. No. 99, Ex. 7 at 5-29.)

provide any exceptions from the registration requirement." PIC's weak arguments cannot overcome this jurisdictional requirement.

## VI.    PIC'S CONTINUED ATTEMPTS TO TAR GILLETTE'S BEHAVIOR IN THIS CASE ARE FALSE AND INAPPROPRIATE

Throughout this case, presumably to hide the weakness of its own claims, PIC has sought to tar Gillette with various accusations of "stonewalling" and discovery abuses. In connection with this set of motions, PIC has done it again, generally accusing Gillette of "spoliation of evidence" and "failure to comply with its discovery obligations." Gillette has been sanctioned based upon the Court's view that it did not comply with a requirement to submit a requisite affidavit. (Electronic Order 4/6/05.) As the Court is aware, Gillette respectfully disagrees with the Court's ruling on this issue. Moreover, pursuant to the Court's Order, because as of the date of the Court's Sanction Gillette had produced all foreign catalogs published or distributed since June 2000, PIC has not been prejudiced and no adverse inference can attach.

In any event, this sanction on a very narrow issue does not translate into the widespread discovery violations and spoliation alleged by PIC. Indeed, the Court has repeatedly reaffirmed that Gillette has complied with its discovery obligations, denying the substance of virtually all of PIC's five separate discovery motions. (*See* Dkt. Nos. 32, 36, 49, 63, & 64 and the Court's respective orders.)

In contrast, PIC's briefing on the summary judgment motions has revealed PIC's true colors, as it seeks to change its pleading and its legal theories, to repudiate its prior testimony, and, to prevaricate—all in a desperate attempt to avoid summary judgment. Consider the following:

- In a letter dated September 29, 2003 (almost 6 months before institution of this action) PIC's counsel represented to Gillette that "PIC also has seen numerous Gillette product catalogs in which the same picture was used in multiple years despite PIC having granted Gillette only a one-time use license." (Dkt No. 99, Ex. 12.) Now, in opposition to Gillette's Summary Judgment Motion, PIC represents it was unaware of any alleged catalog infringements "until after this lawsuit was filed." (PIC Br. at 18.)

- Notwithstanding its unfounded accusations of spoliation against Gillette, as outlined in Gillette's Motion in Limine, it is PIC that has spoliated evidence—allowing a piece of evidence key to Gillette's defense to degrade. (Dkt. No. 125.)

- In all three versions of its complaint, PIC alleged that Gillette had breached "hundreds of Agreements" over the parties' more than 10 year relationship and that such "Agreements" required return of photographic materials *within 30 days* of first publication. (SAC ¶¶ 9, 14, 53.) Confronted with its admitted failure to enforce the Purported 30-day Return Requirement, PIC now alleges a different oral agreement entered into in 1992 (PIC Br. At 2) or, alternatively, a claim of "bailment." (*Id*. at 14-15.)

- In all three versions of its complaint, PIC identifies its "standard terms and conditions" as the "Agreements" between the parties (SAC ¶¶ 9-10), which "standard terms and conditions" require that any changes to the "Agreement" "be in writing and signed by the party to be bound by the changes." (Dkt. No. 77, Exs. 13 & 14 ¶ 14.) Now, PIC claims that the parties agreed in 1992 to an "extension" of the Purported 30 day Return Requirement, for all of the more than 600 jobs performed over a more than 10-year period, without a single writing signed by either of the parties. (*See* PIC Br. At 2.)

- PIC initially alleged that the more than 600 invoices provided to Gillette represented separate integrated agreements and argued forcefully before the Court that any negotiations relating to the "Agreements" were superseded by the invoices and are barred by the parol evidence rule. (Dkt. No. 26 at 9.) Now, PIC seeks to rely upon alleged oral discussions in 1992 in an effort to change the terms of the purported agreements between the parties. (PIC Br. At 2.)

- At deposition and in response to Gillette's Interrogatories, PIC stated unequivocally that Gillette was *not* required to return any photographs from the first job performed in 1992. (Dkt. No. 99, Ex.2 at 16-17, Ex.7 at 67.) Now, PIC claims Gillette *was* required to return the photographs from the first job. (PIC Br. At 2.)

- At deposition, PIC's corporate designee testified that PIC kept a "duplicate copy" of "every view that was taken [for Gillette] during [a] particular project," that it "maintained an original copy for duplicating," and "an original" of every shot provided to Gillette. (Dkt. No. 99 at 28-29, 47-48.) Now, based upon changed testimony and a declaration, PIC claims to have maintained only one "inferior 'left-over' exposure" of each view provided to Gillette. (PIC Br. At 12.)

- At deposition, PIC's corporate designee testified that beginning in 1997, PIC kept a high resolution, digital copy of every photograph taken by PIC for Gillette. (Dkt. No. 99, Ex. 2 at 218-19), and that it considers these digital copies to be "original" and "reproducible" just as any transparency or negative. (Dkt. No. 99, Ex. 2 at 82.) Now, PIC offers a declaration recanting prior testimony and stating that it only scanned inferior exposures for "reference." (PIC Br. At 12.)

- Each of the catalogs for which PIC claims copyright infringement—which demonstrate use of PIC photographs beyond a year and outside the U.S.—were produced from PIC's own files and were received by PIC "within a year" of production. (Dkt. No. 99, Ex. 2 at 73-74, Exs. 17 & 22.) Nevertheless, in order to

evade waiver and the statute of limitations, PIC claims it did not "examine them carefully enough." (PIC Br. At 15.)

- PIC alleged that it "has had numerous inquiries by third parties to purchase such images for use as stock photos [and] … has repeatedly been forced to decline these inquiries" because of Gillette's purported refusal to return the transparencies. (Dkt. No. 99, Ex. 25 at 16.) Since this turned out to be false (Dkt. No.77, Ex. 10 at 28), PIC now claims that Paul Picone is "contemplating" entering into the stock photography business. (PIC Br. at 13, n.11.)

This is not an exhaustive list of PIC's back-pedaling, but it demonstrates PIC's *modus operandi* in this case. PIC's own unsupported accusations against Gillette pale in comparison. PIC desperately seeks to evade its own pleading and its own failure—over a period *of more than 10 years*—to enforce any of the purported conditions that now are at the core of its case.

## CONCLUSION

For the foregoing reasons, Gillette's motion should be granted in its entirety.

Dated:  May 12, 2005

GELB & GELB LLP

By:____/s/Richard M. Gelb/_____
    Richard M. Gelb (BBO#188240)
    rgelb@gelbgelb.com
    Robert S. Messinger (BBO# 651396)
    rmessinger@gelbgelb.com

20 Custom House Street
Boston, MA  02110
Tel: (617) 345-0010
Fax: (617) 345-0009

FROSS ZELNICK LEHRMAN & ZISSU, P.C.

By:___/s/Patrick T. Perkins/_____
    Patrick T. Perkins (Admitted *pro hac vice*)
    David Donahue (Admitted *pro hac vice*)
886 United Nations Plaza
New York, New York 10017
Ph: (212) 813-5900
Fax: (212) 813-5901

*Attorneys for Defendant/Counterclaim-Plaintiff The Gillette Company*