IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PHOTOGRAPHIC ILLUSTRATORS
CORPORATION,

    Plaintiff,

v.

THE GILLETTE COMPANY,

    Defendant.

Civil Action No. 04-CV-10913-WGY

**PIC'S OPPOSITION TO GILLETTE'S MOTION FOR
SANCTION DUE TO SPOLIATION OF EVIDENCE**

    PIC opposes Gillette's motion for sanction due to alleged spoliation of evidence by PIC. Gillette apparently hoped the evidence in this case would show that PIC kept high resolution digital copies of each and every one of the approximately 10,000 transparencies and negatives it provided to Gillette, since this is "one of Gillette's main defenses." (Gillette Mot. at 1). Gillette was therefore disappointed to find that the testimony and documentary evidence on this point were to the contrary. Undaunted, Gillette now requests the Court judicially declare the evidence to state the opposite of what it actually shows. This request should be denied.

    At his deposition, Mr. Picone testified that he did *not* keep digital copies of everything that he provided to Gillette:

> Q: Is it safe to say that everything you did for Gillette beginning in 1997 you had on an electronic file?
>
> A: ***No, I wouldn't say that, not everything.***
>
> Q: What percentage would you say?
>
> A: I couldn't guess because I wasn't scanning. I didn't do that. That's what I had technicians for. I have a full-time digital technician working for me, and all they do is maintain and download, scan and retrieve and update files.

(Ex. 10 to Docket # 77 at 221) (emphasis added).

Gillette's request that the Court declare the evidence to be its opposite is difficult to follow. It seems to have been inspired by the Court's entry of an evidentiary sanction for Gillette's contempt that is emphatically supported by all the relevant evidence that was produced (i.e., that Gillette has, in catalogs that it improperly withheld, used PIC's images beyond the scope of any license it obtained from PIC – just as it did in the catalogs that it did produce).

By contrast, Gillette's request for a "sanction" borders on the frivolous.  **First,** there is no order with which PIC has failed to comply (let alone twice, as Gillette did).

**Second,** the evidence shows that Mr. Picone never kept digital scans of most of the images in question – nor did he have any obligation or even motivation to do so.  Indeed, in requesting permission to maintain custody of his transparencies, Gillette assured him that his property was safe in their hands.  <u>See</u> e.g., Ex. 9 to Docket #77 at 27-28 ("[Nadine Romano] assured me that the film would be stored in a safe, secure environment, in a locked area."); Ex. 10 to Docket #77 at 22 ("[Jill Josephson] told me … they were secure in their files.").

**Third,** and perhaps most clearly dispositive, PIC never had any obligation to preserve any digital images that it did create – any loss of data occurred long before any anticipated litigation.  Gillette's motion selectively omitted the portion of PIC's deposition transcript that sets the time frame for the loss of data from the IOMEGA disks:

> Q. And you testified earlier that those disks that have that on there have since become corrupted; is that correct?
> A. Yes.  The earlier medium that we were using were IOMEGA products … but they had a flaw in them.  Over a period of time they would degrade. * * *
> Q. What is the state now of the Gillette images that are on […] these disks?
> A. Probably total degradation by this time.
> Q. Did you allow that to happen?
> A. Did I allow it to happen?  We started moving away from IOMEGA products into a more stable medium and Gillette was -- ***now we're getting into the year 2000.  Of course we stopped maintaining these files.***  No one was requesting them.

(Ex. 10 to Docket # 77 at 219-21) (emphasis added).

Gillette does not, and cannot, dispute that the IOMEGA disks in question fell into disuse in *2000*. By omitting this part of the transcript, Gillette tried to create the misleading impression that the data was lost more recently. PIC had no duty to maintain the IOMEGA disks in 2000, two years before it reasonably could have anticipated litigation, and four years before it actually filed suit. There can be no finding of spoliation before litigation is anticipated. <u>Silvestri v. General Motors Corp.</u>, 271 F.3d 583, 591 (4th Cir. 2001). Moreover, PIC, unlike Gillette, had no document retention policy.[1] Nor, of course, was PIC under any obligation to Gillette to maintain the IOMEGA disks because they were PIC's property, not Gillette's.

All of PIC's other digital images were stored on electronic media in PIC's Job Folders, and were produced to Gillette in discovery. PIC explained at deposition that the CDs produced in discovery correspond to the digital images it still had. <u>See</u> Ex. 10 to Docket #77 at 214-215 ("Q: And so was there more than one electronic directory or electronic form of Gillette images that PIC has? A: No, whatever is on the CD is basically – it's a background of what we have.").

Mr. Picone's Declaration confirmed his testimony that the digital scans did not correspond to "every" transparency and negative, and were only maintained during a three year window ending in 2000:

> For a limited time starting in approximately 1997, PIC began scanning digital copies of a single exposure of each "view" that it had retained from Gillette photo shoots. This scan was generally used for reference purposes only, because the best exposures had been provided to Gillette and a digital scan is of lesser quality than a photographic transparency.
>
> PIC stopped maintaining these digital scans in approximately 2000, in part because I believed (and had been led to believe) that PIC's images could all be obtained from Gillette upon request as the parties had agreed, and as required by PIC's Terms and Conditions. Since a digital scan is inferior to a transparency anyway, I saw no reason to maintain the digital scans.

(Docket #112 ¶¶ 28, 29).

---

[1] Gillette recently claimed that the document retention policy it produced in discovery is "out of date," and that now "Gillette has no document retention policy." <u>See</u> Bechet Decl. (Docket #69) ¶ 5.

- 3 -

Based on a single, one-word answer taken out of context from Mr. Picone's deposition (the word "Correct," quoted in bold on page 2 of Gillette's motion), Gillette would have the Court adopt an evidentiary sanction based on a fact that is simply untrue. PIC did not spend hours scanning every one of its transparencies before providing them to Gillette. As Mr. Picone painstakingly explained, PIC scanned only a single left-over image from each shoot – to be used as reference material, just as the left-over physical transparency itself served as reference material. At best, only a tiny percentage of images were scanned in this way. (Docket #112 ¶¶ 28, 29). Moreover, in many cases PIC could not scan even a *single* transparency from a shoot because Gillette had taken all of them:

> Q: Would you have given to Gillette any photograph of a product that had a certain view of a product, the copy of which you did not keep in your file?
>
> A: It's kind of a – whether I kept it or not is subjective. ***They sometimes just took everything. They would take the film.***
>
> Q: But what about the Polaroids?
>
> A: In some cases they took them and sometimes even without asking.

(Ex. 10 to Docket # 77 at 8) (emphasis added).

Gillette ignores this critical testimony.

Finally, in a further attempt to argue the merits of its "main defense" in this Motion *in Limine*, Gillette misrepresents the testimony of PIC's photography expert, Jeff Sedlik. Gillette claims that Mr. Sedlik testified that "high resolution digital scans such as those PIC kept of Gillette's images are equal in quality to original transparencies and are accepted by stock photo agencies." (Gillette Mot. at 2). Following is the passage from Mr. Sedlik's testimony that Gillette cites, *but does not quote*:

> Q: Is a scan better than a duplicate, better quality?
>
> A: *Assuming that it's a high resolution drum scan*, a scan can be equal in quality to an original.
>
> Q: Does that mean that there's no real loss to the photographer if he has maintained a scanned copy and the original is lost?
>
> A: The issue is that when you scan a photograph you scan it at a size and resolution setting that is appropriate for a specific use. So if you then take that original and resize it, you're losing the quality of the image. *If you did have a series of scans at a number of different resolutions that can cover every conceivable use, then that in my opinion would be, would suffice as having a second original but not one scan.*
>
> Q: And with an original, can you make reproductions in any size from an original without loss of quality? In other words, it's problematic from a scan specific resolution to do varying sizes, you say, but is that a similar problem with respect to an original or no?
>
> A: No. The scan creates the image in dots known as pixels, and the arrangement of those pixels for any different size is unique; whereas an original piece of film you can make it smaller, make it bigger, and you only lose one generation of quality when you make that print.

(Ex. 7 to Docket #77 at 166-167) (emphasis added).

Far from proving Gillette's point, Mr. Sedlik's testimony proves the opposite. For the limited number of transparencies that it did scan digitally, not only did PIC *not* scan them at multiple resolutions as would be required to effectively replace original photographic transparencies, but PIC used a standard (flatbed) scanner to create images at a resolution of only 450 dots per inch. (Ex. 10 to Docket #77 at 218). That resolution does not come close to the resolution produced by a drum scanner (11,000 dots per inch), which Mr. Sedlik testified must be used to equal the quality of an original piece of film. Futhermore, scanning a single image on a drum scanner can take several hours and is a highly involved process.

Review of the relevant evidence demonstrates that Gillette's *post hoc* account of events is simply incorrect. Gillette's argument should have been made, if at all, in a dispositive motion (in fact, Gillette did include precisely the same argument in its summary judgment briefing). A pre-trial motion is an inappropriate place for Gillette to re-argue its "main defense." PIC should not have been required to respond to the argument twice.

For the above reasons, Gillette's motion should be denied.

                                               Respectfully submitted,

                                               PHOTOGRAPHIC ILLUSTRATORS CORPORATION,

                                               By its counsel,

Dated: May 13, 2005                     /s/ Michael A. Albert
                                               Michael A. Albert, BBO #558566
                                               malbert@wolfgreenfield.com
                                             Michael N. Rader, BBO # 646990
                                             mrader@wolfgreenfield.com
                                             Adam J. Kessel, BBO # 661211
                                             akessel@wolfgreenfield.com
                                             WOLF, GREENFIELD & SACKS, P.C.
                                             600 Atlantic Ave.
                                             Boston, MA 02210
                                             (617) 646-8000