UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

-------------------------------X

PHOTOGRAPHIC ILLUSTRATORS       )
CORPORATION                     )
      Plaintiff,              )   04-10913   WGY
  vs.                           )
THE GILLETTE COMPANY            )
      Defendant.              )

-------------------------------X

      Deposition taken under the applicable provisions of the Massachusetts Rules of Civil Procedure by Lynda C. Vetter, Registered Professional Court Reporter and Notary Public of the State of Massachusetts, taken at the law offices of WOLF GREENFIELD, 600 Atlantic Avenue, Boston, Massachusetts, on Friday, March 25, 2005, commencing at 10:15 a.m.



**David Feldman**
Worldwide

805 Third Avenue, 8th Floor  |  New York, NY 10022  |  Main: (212) 705-8585  |  Fax: (212) 705-8552

## Page 46

1 production or into the spending of promotion.
2   Q.   You said that the senior executive
3 would only spend money -- I'm paraphrasing -- money
4 on advertising if he expects that his return will be
5 equal or more than that spent on advertising. But
6 that is an expectation, correct? You are referring
7 to expectation?
8   A.   Yes, it is. But they are not going to
9 go into something if they don't see there is a good
10 likelihood they will get this return.
11   Q.   Isn't it possible an advertising
12 campaign could fail or backfire?
13   A.   It could. And when that happens
14 usually heads roll at the advertising agency and also
15 sometimes within the company.
16   Q.   So it is possible, then, that profits
17 from that are supposedly attributable to a particular
18 advertising campaign, could be less than what was
19 spent on the advertising campaign?
20       MR. KESSEL: Objection, leading.
21   A.   Okay. They expect to make this much.
22 Otherwise they wouldn't spend it. Do they always get
23 what they expect? No, not the exact amount.
24 Sometimes they get less and sometimes more.
25   Q.   Do you know -- did you review any

## Page 47

1 Gillette documents or materials that stated that the
2 profits attributable to print advertising or blades
3 and razors in the US was 125,260,000?
4   A.   Did I, no.
5   Q.   So you don't know that to be the case;
6 correct?
7   A.   I did not see a document. I don't --
8 I'm not even sure that the CEO, for example, would
9 write that down. I'm saying the people who run the
10 company have an expectation if they are going to
11 invest in this, they expect to get at least that much
12 back.
13   Q.   So when you say that Gillette profited
14 125 million dollars from its print advertising for
15 bladed and razors in the US, this is an assumption --
16 this is based on the assumption that they are making
17 an equal return on their investment?
18   A.   They are making at least that much.
19 Otherwise they wouldn't be doing it.
20   Q.   Well, you are assuming that?
21   A.   Correct.
22   Q.   Okay, because the opposite assumption
23 would be: It doesn't make sense. I want to invest
24 125 million dollars so I can make two million.
25   A.   Well, it wouldn't make sense, I agree

## Page 48

1 with you, for an executive to make that conscious
2 decision, yes.
3   Q.   But you do agree it's possible that an
4 ad campaign could fail such that a 125 million dollar
5 ad campaign could yield only 100 million dollars in
6 profits, correct?
7   A.   You can end up with one hundred million
8 dollars when you expected 125. I wouldn't call that
9 a 125 million dollar campaign. But you could end up
10 with less, correct.
11   Q.   Okay. Have you ever read any
12 third-party publications or articles dealing with
13 this issue; this issue being whether a company can
14 expect an equal return on their advertising
15 investment in terms of profits?
16   A.   Read it? I have not. I have heard it
17 from for -- I will give you a for instance. I'm on
18 the board of directors of a company called Fastenal,
19 F-A-S-T-E-N-A-L. It's a billion dollar-plus
20 industrial supplier. And in a board meeting setting,
21 the CEO presented to the board that he wanted to or
22 was looking at investing in advertising. And
23 advertising is something that's -- I'm sorry. Not
24 investing in advertising. They already advertised.
25       He was considering investing beyond the

## Page 49

1 traditional way of doing it which is just fliers and
2 they don't do very many ads. He presented to us that
3 he had rejected the proposal to go forward with this
4 because the investment of 1.1 and a half million
5 dollars would not give him a one and a half million
6 dollar return. He could put it somewhere else.
7 That's the way business people make decisions. They
8 don't throw money somewheres, not a significant
9 amount, without the expectation it will pay off.
10   Q.   Have you ever heard of authors by the
11 last names of Sethorman (ph) or Tellis (ph)?
12   A.   Gerald Tellis? I have heard of him.
13   Q.   Yes. What have you heard of him?
14   A.   I have heard of him, not the first
15 name.
16   Q.   What have you heard of him?
17   A.   Just that I have heard of him. He is a
18 marketing professor.
19   Q.   Okay. So you have no reason to think
20 positively or negatively about his knowledge or
21 understanding?
22   A.   No. He is just a professor.
23   Q.   Have you ever read an article entitled
24 "Analysis of trade-off between advertising and
25 pricing by G. Tellis?

106

1  Q. And did you prepare an expert opinion
2 in the Timex case that was discussed early on in the
3 deposition?
4  A. Yes.
5  Q. In that opinion, did you form some
6 calculation or did you prepare an expert opinion that
7 related to the contribution of video to the
8 company's -- to Timex's profit?
9  A. Yes. I thought the question was if I
10 was aware of others that had done it. I stated
11 earlier because I was approached because I had done
12 this in the past.
13  Q. So if the question were -- I will ask
14 you this. Are you aware of this sort of estimate
15 ever having been done, whether by yourself or by
16 others?
17  A. Yes, by me.
18  Q. Did you do that in the Timex case?
19  A. Yes, I did.
20  Q. Did Gillette's attorneys ask you to
21 bring your textbooks to your deposition today?
22  A. Yes.
23  Q. And did you agree to do that?
24  A. Yes.
25  Q. And how much did the textbooks weigh?

107

1  A. Oh, 46 pounds.
2   MR. KESSEL: I have no further
3 questions.
4   EXAMINATION
5 BY MR. CHIAPPETTA:
6  Q. I may have asked this. But if I did, I
7 apologize for asking it again.
8  A. No.
9  Q. Did you draw any opinion as to whether
10 a print advertisement with Paul Picone's image would
11 be more or less effective if the image was replaced
12 by the image of another qualified and competent
13 photographer?
14  A. I did not include that in the report.
15 There were so many references to the fact they liked
16 working with him and thought his work was really
17 good -- no. I didn't.
18  Q. Do you have an opinion today as to
19 whether replacing his photographs with the
20 photographs of another competent and accomplished
21 photographer would have any impact on Gillette's
22 profits?
23  A. If competent -- if you are saying
24 someone who can do everything he does for the same
25 amount that he can't be differentiated from anybody

108

1 else, then the answer would be yes. My sense was
2 from --
3  Q. Your answer would be yes. The profits
4 would differ?
5  A. I'm sorry. My answer was if there was
6 someone who could do exactly what he does for the
7 same of amount of money and time and everything else
8 is exactly the same, then it wouldn't change
9 anything. My sense was that for various reasons he
10 does things either better, faster or something, that
11 allows the company -- not allows the company -- that
12 they want to use him.
13  Q. Do you have any expertise or
14 qualifications in determining the quality of
15 photographs or photography?
16  A. No. I mean, other than my own stuff
17 when I mess up. I'm not an expert on photographic
18 imagery.
19   MR. CHIAPPETTA: That's it.
20   (Deposition concluded at 1:22 p.m.)
21
22
23
24
25

109

1 ERRATA SHEET DISTRIBUTION INFORMATION
2 DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3 ERRATA SHEET DISTRIBUTION INFORMATION
4   The original of the Errata Sheet has been
5 delivered to Michael Chiappetta, Esquire.
6   When the Errata Sheet has been completed
7 by the deponent and signed, a copy thereof should be
8 delivered to each party of record and the ORIGINAL
9 forwarded to Michael Chiappetta, Esquire, to whom the
10 original deposition transcript was delivered.
11   INSTRUCTIONS TO DEPONENT
12   After reading this volume of your deposition,
13 please indicate any corrections or changes to your
14 testimony and the reasons therefor on the Errata
15 Sheet supplied to you and sign it. DO NOT make marks
16 or notations on the transcript volume itself. Add
17 additional sheets if necessary. Please refer to the
18 above instructions for errata sheet distribution.