

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

------------------------------X

PHOTOGRAPHIC ILLUSTRATORS )

CORPORATION )

        Plaintiff, )    04-10913  WGY

  vs. )

THE GILLETTE COMPANY )

        Defendant. )

------------------------------X

Deposition taken under the applicable provisions of the Massachusetts Rules of Civil Procedure by Lynda C. Vetter, Registered Professional Court Reporter and Notary Public of the State of Massachusetts, taken at the law offices of WOLF GREENFIELD, 600 Atlantic Avenue, Boston, Massachusetts, on Friday, March 25, 2005, commencing at 10:15 a.m.




**David Feldman**
W o r l d w i d e

```
 1  APPEARANCES:

 2

 3

 4  For the Plaintiff:    WOLF GREENFIELD
                          600 Atlantic Avenue
 5                        Boston, MA 02210
                          By:  Adam J. Kessel, Esq.
 6

 7
    For the Defendant:    FROSS, ZELNICK LEHRMAN & ZISSU,
 8                        P.C.
                          866 United Nations Plaza
 9                        First Avenue & 48th Street
                          New York, New York  10017
10                        By:  Michael Chiappetta, Esq.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

16

1   A. No. The notes were simply the name of
2   the law firm and the telephone number and Gillette
3   versus whatever -- it was mostly so I would know who
4   to call back to. But I didn't take notes about
5   what -- about facts.
6   Q. Okay. After you went through step one
7   and you looked at the facts, I assume you contacted
8   Wolf Greenfield or maybe they contacted you to
9   discuss your findings, is that correct? Let me
10  rephrase that. You indicated that it was a two-step
11  process. First you were going to look at the facts
12  before they would ask you to do anything. So I
13  assume you had to speak with them after you looked at
14  the facts. What is it that you told them when you
15  did speak with them?
16  A. First, it wasn't so much that I looked
17  at the facts. It was that I looked at -- they told
18  me that unlike the Polar Bear case, Gillette had not
19  or had not been ordered to produce internal
20  documents. And so that phase one was -- involved my
21  looking at what, how else could I come at this? And
22  then I came back to them and told them that using
23  available secondary information and public and other
24  publicly available information, I had a way of
25  estimating -- at that time I referred to it as

17

1  marketing value that Gillette illegally obtained by
2  using this large number of photographs over the
3  four-year period.
4       Q.   So unlike the Timex case, you did not
5  review any production or sales documents of Gillette
6  in connection with this matter?
7       A.   Correct. I did not have internal
8  production and sales documents, no. I did not.
9       Q.   What was your instructions after you
10 told the Wolf Greenfield firm that using available
11 secondary information and other publicly available
12 information, you had a way to estimate the value
13 illegally obtained by Gillette in using the
14 photographs?
15      A.   What were the instructions to me?
16 There were two things said. One was we would like --
17 no. The first thing was, had something to do with
18 the incredible time pressure. There was a week and a
19 half or something like that. They wanted to know
20 whether I would be able to free up enough time to be
21 able to do this. I said yes. I would.
22           Then they said: Then we would like to
23 have you do it. And I -- that was basically it.
24      Q.   At any point, did you ask the Wolf
25 Greenfield firm if you could have access to

18

1  Gillette's accounting records or documents?
2      A.   No, because I was told -- and again,
3  I'm not sure whether it was Michael Elbert or Mike
4  Rader that a request for such production had been
5  turned down.  So they told me that before I even
6  asked for it.
7      Q.   Did you ever indicate to the Wolf
8  Greenfield firm that could be a problem?
9      A.   I didn't use the word problem, no.
10     Q.   How did you describe the situation?
11     A.   I said it required a different
12 approach.
13     Q.   We will get to that approach in a
14 moment.
15     A.   Okay.
16     Q.   Have you ever used the approach that
17 you used in this case in connection with any other
18 expert opinion or analyses or articles?
19     A.   Let me break it up because there is
20 really three topics in there.  It could be using it
21 in expert opinions in trials.  The exact process --
22 let me back up.  Let me give the process a name.
23 Then I can answer the question.
24          The process that I used is a
25 traditional marketing forecasting method that's

19

1  referred to as a market build-up approach.  It
2  involves the use of expert opinion.  So have I used
3  that in court cases?  The market build-up approach,
4  I'm sure I have.  I'm not sure whether it's in one of
5  those four that I mentioned to you.  But it's a very
6  common practice used to take small parts to build up
7  a total number.
8             Have I done it for businesses?
9  Absolutely.  It's an integral part of a lot of
10 consulting projects.  And has it been published?  I
11 have made presentations inside companies, Power Point
12 decks -- a deck of slides.  There may have been two
13 to three-page executive summaries that went along
14 with those.  There are some of those.  I don't know
15 how many.
16        Q.    Okay.  Did you produce all of the
17 documents that you reviewed in connection with
18 preparing your report, Professor Hansen?
19        A.    To you folks?
20        Q.    Yes.
21        A.    Oh, everything except for the article.
22 I mean, you said that the article was not included in
23 there.  But I took my -- the entire stack from my
24 office.  Oh, and then I brought the books.  They are
25 in that suitcase (indicating.)