UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHOTOGRAPHIC ILLUSTRATORS CORPORATION,<br><br>  Plaintiff,<br><br>vs.<br><br>THE GILLETTE COMPANY,<br><br><br>  Defendant. | Civil Action No. 04-10913 WGY |

### GILLETTE'S MEMORANDUM OF LAW PURSUANT TO
### THE COURT'S REQUEST CONCERNING PIC'S COPYRIGHT CLAIMS

FROSS ZELNICK LEHRMAN & ZISSU, P.C.
  Patrick T. Perkins (Admitted *pro hac vice*)
  David Donahue (Admitted *pro hac vice*)
886 United Nations Plaza
New York, New York 10017
Ph: (212) 813-5900
Fax: (212) 813-5901

GELB & GELB LLP
  Richard M. Gelb (BBO#188240)
  Robert S. Messinger (BBO#651396)
20 Custom House Street
Boston, MA  02110
Tel: (617) 345-0010
Fax: (617) 345-0009
*Attorneys for Defendant/Counterclaim-Plaintiff*
*The Gillette Company*

Defendant The Gillette Company ("Gillette") hereby submits this Memorandum pursuant to the Court's request on May 18, 2005 that Gillette address the issue of whether PIC was unable to obtain copyright registrations due to any action of Gillette and further addressing what remains of PIC's copyright claims.

## Preliminary Statement

The Court has rightly dismissed all of PIC's copyright claims for alleged infringements where PIC does not own a copyright registration for the allegedly infringed photograph. PIC has, without any factual basis, repeatedly claimed to the Court that it was unable to obtain copyright registrations for many of the works it claims were infringed because Gillette refused to return PIC's original transparencies. This claim does not withstand even the mildest of scrutiny. The Copyright Office has instituted flexible registration regulations, permitting photocopies or even "alternative identifying material" to support a copyright registration. The Copyright Office even provides for further relief from the deposit requirement under special circumstances. Moreover, even if an application to register copyright is rejected by the Copyright Office, "the applicant is entitled to institute an action for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyrights." 17 U.S.C. § 411(a). PIC has had either in its possession or available to it for some time, all of the images it claims it could not register. PIC simply chose not to register them.

In sum, PIC's copyright claims for thousands of its identified alleged infringements are objectively unreasonable and have been from the outset of this action. Since as early as July 15, 2004 when Gillette made its motion to dismiss for, *inter alia*, PIC's failure to obtain copyright registrations, PIC has been on notice that registrations are essential to any copyright claim. Notwithstanding this knowledge, PIC did not obtain copyright registrations for thousands of alleged infringements but nonetheless forced Gillette to defend itself on these thousands of claims.

Because PIC cannot, as a matter of law, demonstrate that any act of Gillette prevented PIC from obtaining copyright registrations, the Court's dismissal of PIC's copyright

1

infringement claims for which PIC lacks copyright registrations should be dismissed with prejudice.

## FACTS

On May 7, 2004, PIC commenced this action for copyright infringement, unfair competition under the Lanham Act, breach of contract, fraud, and unfair and deceptive trade practices in violation of Mass. Gen. L. ch. 93A. (Dkt. No. 1.) On June 30, 2004, after having been informed by Gillette that Gillette would move to dismiss the complaint, PIC filed its First Amended Complaint. (Dkt. No. 8.) The only real substantive changes to PIC's First Amended Complaint were: (1) it dropped its claim of unfair competition under the Lanham Act; and (2) it added reference to the more the 600 job numbers PIC performed for Gillette. (*Compare* Dkt. Nos. 1 and 8.) In its First Amended Complaint, PIC defined "Photographs" as the photographs, transparencies, negatives and digital images that PIC took and provided to Gillette over the years. (Dkt. No. 8. ¶ 9.) The First Amended Complaint goes on to allege infringement generally of all "the Photographs." (*Id*. ¶¶ 49, 51.) Notwithstanding its allegation of widespread copyright infringement, PIC's pleading identified only four copyright registrations (*id*. ¶ 12), three specific allegations of copyright infringement (*id*. ¶¶ 21-23) (one of which was the so-called "Latin American Photo" that PIC later conceded was barred by the statute of limitations, something it knew when it filed its complaint), and alleged wide-spread duplication of transparencies through Advanced Photographics, Inc. ("Advanced"). (*Id*. ¶¶ 24-27.)

On July 15, 2004, Gillette moved to dismiss PIC's First Amended Complaint, including its copyright claims. Gillette's request for dismissal of PIC's copyright claims was based, in part, upon PIC's failure to obtain copyright registrations and its failure to allege the claimed infringements with sufficient specificity. (Dkt. No. 10 at 14-16.) After the Motion to Dismiss was fully briefed, on September 17, 2004, PIC filed a motion for leave to file its Second Amended Complaint. (Dkt. No. 14.) PIC's Second Amended Complaint referred to an additional six copyright registrations covering approximately 600 additional photographs but identified no new infringements. (*Id*. ¶¶ 14, 21-24.)

At oral argument on September 23, 2004, the Court queried counsel for PIC whether the Second Amended Complaint reflected all of PIC's registrations. In response, PIC's counsel stated "[t]hat's all we currently have. Now, if there are additional claims that come to light, I don't' mean to preclude us." (9/23/04 Trans. at 2.) The Court reiterated "[a]nd you're prepared to say we're not going to see anymore photographs unless they come to light in discovery. You haven't got others that you've sent it for registration?" In response, PIC's counsel stated "[n]o your Honor, we haven't." (*Id.* at 3.)

The Court permitted the copyright claims to go forward but ordered PIC to set forth in its mandatory disclosures the date and circumstances of any alleged infringements known as of that date. (*Id.* at 10.)[1]

On October 4, 2004, PIC served its Disclosures pursuant to Fed. R. Civ. P. 26(a)(1) on Gillette. In response to the Court's order of September 23, 2004 requiring identification of all alleged infringements of which it was aware, PIC identified eight alleged infringements—the three identified in its complaint and an additional eight purported infringements, all on Gillette's web site. (Declaration of David Donahue ("Donahue Decl."), filed concurrently herewith, Ex. 2 at 5-6.) As of October 4, 2004, PIC had not identified a single infringement in any Gillette catalog.

On March 1, 2005, Gillette moved to compel PIC to fully respond to Gillette's Interrogatories requiring PIC to "state the basis" of its copyright infringement and breach of contract claims. (Dkt. No. 53.) On March 7, 2005, the Court ordered PIC to supplement its responses to the interrogatories directed at the "basis" of PIC's claims by "1) producing all of the documents referred to therein, and 2) supplementing its responses as required by the rules for interrogatories inquiring 'state the basis for.'" (Electronic Order entered 3/7/05.) The Court further held that PIC would be limited at trial to the production of the documents produced and

---

[1] The Court dismissed PIC's contract claims to the extent premised on Gillette's use of photos outside the temporal and geographic scope of licenses and without the required copyright notices and dismissed PIC's 93A claim to the extent based upon Gillette's reproduction of photos without PIC's permission. (9/23/04 Hr'g Tr. at 8.)

3

identified in its supplemental responses. (*Id.*) On March 9, 2005 the Court further ordered "THE ORDER IS CLEAR THAT, UNLESS PROMPTLY SUPPLMENTED WITH EXPRESS AND DETAILED FACTUAL CLAIMS, THE PLAINTIFF WILL BE LIMITED AT TRIAL TO THE PRODUCTION OF THE DOCUMENTS SPECIFICALLY IDENTIFIED IN ANSWER TO THESE TWO INTERROGATORIES." (Electronic Order entered 3/9/05) (all caps in original).

> Interrogatory No. 1 stated the following:
>
> State the basis of any alleged copyright infringement by Gillette of any photo owned by you. To the extent not encompassed within the scope of L.R. 26.5 (a)(c)(8), your answer should also include:
>
> a.    the content of such photo
>
> b.    the date such photo was provided to Gillette;
>
> c.    the particular infringing act or acts alleged;
>
> d.    the date of such alleged infringing acts;
>
> e.    the job number assigned to each photo by you;
>
> f.    the particular invoice associated with such photo;
>
> g.    any consideration, including, without limitation, the amount of money received by you from Gillette for its use of the photo;
>
> h.    *the copyright registration number that covers such photo*;
>
> i.    the date you first learned of such infringing act.

(Dkt. No. 99, Ex. 7 at 2 (emphasis added).)

On March 17, 2005, PIC served its Supplemental Responses To Gillette's Interrogatory Nos. 1 and 2 (the "Supplemental Response"), a 219-page document purporting to set out the basis of PIC's claims, including its copyright claims. (Dkt. No. 99, Ex. 7.) In stating the basis of its copyright claims in the Supplemental Response, PIC categorized its claims as follows: (1) Unauthorized Duplication of Transparencies and Slides (*Id.* at 5-29) broken down as (i) duplicates produced from Gillette's files and (ii) duplicates made at Advanced; (2) Unauthorized Duplication of Digital Images (*id.* at 29-33); (3) Unauthorized Reproduction (*id.* at 33-59)

4

broken down as: (i) catalogs; (ii) Internet infringements; (iii) third-party infringements; (iv) foreign website use; (v) Latin American use; (vi) foreign catalog use; (vii) Spring 2004 images; and (viii) product packaging.

Based upon PIC's identification of its claims and the Court's Orders of March 7 and 9, 2005 holding that PIC would be held to its claims as set forth in the Supplemental Response, Gillette moved for summary judgment.  In seeking to dismiss PIC's copyright claims, Gillette moved, *inter alia*, that the vast bulk of PIC's claims should be dismissed because PIC failed to obtain copyright registrations.  (Dkt. No. 89 Mem. at 14-15.)

The Court allowed Gillette's motion for summary judgment as to photographs for which PIC did not obtain a registration.  However, it held that PIC would not be foreclosed in the future from seeking relief on "those images for which PIC has been *unable* to obtain copyright registrations because Gillette maintained possession of such images."  (5/19/05 Amended Order at 4) (emphasis added).

On May 18, 2005, counsel for the parties met with the Court for the Final Pretrial Conference.  At that conference, the Court asked the parties to brief whether PIC was, in fact, prevented by Gillette from obtaining copyright registrations by any act of Gillette.  As set forth below, PIC was not prevented by Gillette from obtaining copyright registrations and PIC's claims of copyright infringement for images for which it does not own registrations should be dismissed permanently, with prejudice.

## ARGUMENT

**I.   BECAUSE THE COPYRIGHT ACT AND THE REGULATIONS PROMULGATED BY THE COPYRIGHT OFFICE PROVIDE MULTIPLE MANNERS TO OBTAIN REGISTRATIONS, GILLETTE DID NOT PREVENT PIC FROM OBTAINING COPYRIGHT REGISTRATIONS**

In the Copyright Act, Congress delegated to the U.S. Copyright Office the task of promulgating regulations governing the mechanics of copyright registration and the deposit of registered works.  17 U.S.C. §§ 408(c), 409.  In delegating this task, the Congress instructed the Copyright Office to keep the deposit provisions flexible "so that there will be no obligation to

5

make deposit where it serves no purpose, so that only one copy or phonorecord may be deposited where two are not needed, and so that reasonable adjustments can be made to meet practical needs in special cases." H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. at 151 (1976).[2]

The flexibility mandated by Congress is evident in the regulations promulgated by the Copyright Office. For example, the Copyright Office allows for registration of a group of photographs under one registration. 37 C.F.R. § 202.20(c)(2)(xx). The Copyright Office regulation further provides a number of different formats in which registered photographs may be deposited, including in digital form, ummounted prints, contact sheets, or slides. 37 C.F.R. § 202(c)(2)(xx)(A)-(D). In addition, the Regulations allow for deposit of

> [a] format in which the photograph has been published (e.g., clippings from newspapers or magazines) . . . [or] [a] photocopy of each of the photographs included in the group, clearly depicting the photograph, provided that if registration is made pursuant to §202.3(b)(9) for group registration of photographs, the photocopy must be either a photocopy of an unmounted print measuring at least 3 inches by 3 inches (not to exceed 20 inches by 24 inches) or a photocopy of the photograph in a format in which it has been published, and if the photograph was published as a color photograph, the photocopy must be a color photocopy.

37 C.F.R. § 202(c)(2)(xx)(E)-(F).

Moreover, the Copyright Office has promulgated a regulation providing for "Special Relief" from the deposit requirement. Namely, upon application by a registrant, the Copyright Office is empowered to accept: (i) deposit of only one copy or even "alternative identifying material;" or (ii) deposit of incomplete copies or copies other than those comprising the "best edition." 37 C.F.R. § 202(d)(1)(i)-(ii).

The Copyright Office has also established a procedure to permit the expedited registration of works in the context of litigation. The so-called "Special Handling" is an expedited registration process available to copyright claimants in limited circumstances. Among

---

[2] Because of the unique 20-year drafting process that led to the 1976 Copyright Act, its legislative history has a special and judicially recognized status in interpreting the Act's meaning. *See Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 462 n.9 (1984); *see also Cmty. For Creative Non-Violence v. Reid*, 490 U.S. 730, 743 (1989); *Dumas v. Gommerman*, 865 F.2d 1093, 1099 (9th Cir. 1989), *disappr'd on other grounds*, *Reid*, 490 U.S. 730.

6

those approved circumstances is where there is pending or prospective litigation. (Donahue Decl. Ex. 5.) The Copyright Office makes "every attempt" to process special handling requests within five working days. (*Id.*)

In other words, the Copyright Office will accept just about any representation of a work for which registration is sought and, in the case of pending or prospective litigation, the Copyright Office will issue a registration in approximately five business days.

In the event the Copyright Office denies registration, the copyright claimant is not denied access to the Courts. The Copyright Act provides that, in the event a claimant's application is refused by the Copyright Office, "the applicant is entitled to institute an action for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyrights." 17 U.S.C. § 411(a).

As is established below, in each instance where PIC has claimed copyright infringement but has failed to obtain a registration, it is undisputed that PIC made *no effort* to avail itself of the Copyright Office's flexible regulations to obtain a registration. One thing is certain—PIC was *never* prevented from obtaining a copyright registration by any act of Gillette.

### A.     Alleged Unauthorized Duplication

PIC claims that any creation of duplicate transparencies or negatives constitutes a violation of the purported license agreement granted to Gillette and thus is copyright infringement. (Dkt. No. 99, Ex. 7 at 4.)[3] PIC's claims of copyright infringement fail because PIC owns no copyright registrations for any of the alleged infringements.

The vast bulk of PIC's copyright infringement claims fall under the category of allegedly unauthorized duplicates and are further broken down as follows: (1) 4,529 duplicate

---

[3] It is undisputed that the invoices refer to the rights granted to Gillette as "reproduction rights" and that such rights were granted to Gillette for one year. (Donahue Decl. Ex. 1 ¶ 9.) The term "reproduction" is not in any way modified or limited to exclude duplication. It is further undisputed that there is no evidence that any duplicates were made outside the one-year license period. PIC's argument is deficient on its face because it contradicts the plain language of the agreement. In fact, in its pleading PIC admitted that Gillette *did* in fact have the right to make duplicates of PIC images, provided such duplicates were made within one year. (SAC ¶ 25.)

transparencies and slides located at the offices of Gillette and produced to PIC in February 2005 (the "4,529 Duplicates"); (2) 6,821 duplicate negatives, transparencies, and digital images allegedly made at Advanced Photographics, Inc. (the "Advanced Duplicates"); and (3) 63 digital images (the "Digital Duplicates).

### 1.  The 4,529 Duplicates

On February 15, 2005, Gillette produced to PIC for inspection and copying, a filing cabinet containing old Braun files including thousands of transparencies and slides, including the 4,529 Duplicates. (Donahue Decl. ¶ 8; Dkt. No. 99, Ex. 7 at 6.) PIC's counsel made an initial review of such materials on that same day. (*Id.*) On February 17, 2005, in reference to the materials produced (including the 4,529 Duplicates), PIC's counsel wrote "[s]ince there is a large volume of material that we would like to have the opportunity to review *before incurring massive copying and scanning costs to our client*, and I am in depositions this week, and Mr. Picone is currently out of town, we would like to arrange to spend a good chunk of Monday [February 21, 2005] (when there are no depositions scheduled) at Gillette reviewing the materials that you are newly producing to decide *how to proceed with copying and scanning*." (Donahue Decl. Ex. 6) (emphasis added). The reference by PIC's counsel to "copying and scanning" was consistent with the parties' practice throughout the case. Indeed, earlier in the case, Gillette produced a large number of transparencies to PIC for inspection and copying. PIC opted to have the transparencies copied and they received them in full color, electronic format, bearing Bates Numbers GLTC 751-1425. (Donahue Decl. ¶ 7.)

At PIC's request, the produced materials were set aside in a room at Gillette for PIC's continued review. Indeed, in an e-mail dated February 28, 2005, PIC's counsel expressed gratitude that Gillette had held "the room and the materials." (Donahue Decl. Ex. 6.) PIC's counsel returned to review the documents several times, including, on at least one occasion, with PIC's principal Paul Picone, and compiled a detailed log of the materials produced. (Donahue Decl. ¶ 8; Dkt. No. 99, Ex. 7 at 6-15.) However, PIC designated only a small number of the produced documents to be photocopied. (Donahue Decl. ¶ 8.)

It is undisputed that PIC did not attempt to obtain a copyright registration for *any* of the 4,529 Duplicates. (Dkt. No. 99, Ex. 7 at 5-15.) However, it is clear from the undisputed facts that PIC's failure to obtain registrations for them had nothing to do with Gillette. Rather, PIC chose not to copy the transparencies and seek registrations for them. As early as February 15, 2005, the 4,529 Duplicates were produced for inspection and copying to PIC. (Donahue Decl. ¶ 8; Dkt. No. 99, Ex. 7 at 6.) While earlier in the litigation PIC opted to copy transparencies produced to it, in this instance—whether to cut costs or out of recognition of the weakness of its claim—PIC opted not to do so. (Donahue Decl. ¶¶ 7-8.) Had PIC obtained copies when the 4,529 Duplicates were produced, such copies could have served as the basis for registrations under the Copyright Office's flexible deposit requirements.

Moreover, by availing itself of the "special handling procedure," PIC could have obtained registrations on an expedited basis—certainly by the end of February 2005.

PIC owns no registrations for the 4,529 Duplicates because it did not do the work necessary to obtain them. PIC simply cannot claim that it was "unable" to obtain registrations to support its copyright infringement claims for the 4,529 Duplicates because of any act of Gillette.[4]

### 2. The Advanced Duplicates

PIC alleges that between August 1998 and March 2000, Gillette hired the Advanced photo lab create unauthorized duplicates, namely, 2,034 duplicate transparencies, 4,770 duplicate 35 mm negatives, and 17 duplicate digital images. (Dkt. No. 99, Ex. 7 at 23.)[5] PIC's alleged proof of duplicates is obtained entirely from invoices that PIC obtained directly from Advanced.

---

[4] Even if PIC did not have access to the 4,529 Duplicates, PIC concedes that it kept a duplicate original of "every view" provided to Gillette. (Dkt. No. 117 at 12.) Such duplicate views are sufficiently similar to the allegedly infringed images to meet the Copyright Office's deposit requirements. (*Compare* Donahue Decl. Ex. 9 *with* Ex. 10.) Indeed, these duplicate "views" must have been the basis for PIC's other copyright registrations in this case since it claims Gillette kept all of the best exposures. (Dkt. No. 117 at 12.)

[5] As with the 4,529 Duplicates above, PIC has no evidence that the Advanced Duplicates were made outside of the one-year license period.

9

In its Supplemental Response, PIC claims that the Advanced Duplicates "were made from transparencies contained in a box of PIC's photographic materials that was maintained at Advanced Photographics and from which Gillette placed the above orders for duplicates." (*Id.* at 24.)  At his deposition, Paul Picone testified that the PIC photographic materials that were allegedly infringed by the Advanced Duplicates were returned to him in 2002.  (Dkt. No. 77, Ex. 9 at 87-90.)

Thus, PIC has had the images allegedly infringed by the Advanced Duplicates *since 2002*.  Under the Copyright Office's flexible deposit requirements, PIC could have registered the images.  37 C.F.R. § 202(c)(2)(xx).  There is simply no argument that Gillette prevented PIC from obtaining a registration for the images allegedly infringed by the Advanced Duplicates.

### 3. The Digital Duplicates

In its Supplemental Response, PIC identifies 63 allegedly infringing digital images it claims to have received from third party ShopKo pursuant to subpoena.  (*Id*. at 29-33.)  Although discovery in this case opened in September 2004, PIC waited until January 31, 2005, just 15 days before the close of fact discovery, to serve third-party subpoenas.  (*See* Dkt. No. 44.)  Although PIC does not disclose in its Supplemental Response (as required) when it obtained the Digital Duplicates, PIC produced the allegedly infringing Digital Duplicates to Gillette on February 24, 2005.  (Donahue Decl. ¶ 9.)  Thus, PIC had them in plenty of time to obtain a copyright registration.

In its Supplemental Response, however, which PIC served on March 17, 2005, PIC states that it was "in the process of evaluating which of the above images is covered by a current copyright registration (subpart (h) of the Interrogatory), and which still need to be registered." (Dkt. No. 99, Ex. 7 at 33.)  However, in the more than two months since it served its Supplemental Response, PIC has made no such evaluation.  It is undisputed that the format in which the allegedly infringing Digital Duplicates were produced to PIC would have been acceptable to the Copyright Office to support a registration.  37 C.F.R. § 202(c)(2)(xx).  Gillette did not in any way prevent PIC from obtaining registrations of the Digital Duplicates.

### B.     Alleged Unauthorized Reproduction

In its Supplemental Response, PIC also identifies images that it claims Gillette has reproduced outside of the scope of the license granted to Gillette. These alleged infringements are broken down as follows: (1) catalogs (Dkt. No. 99, Ex 7 at 35-44); (2) third party uses (*id.* at 51-53); (3) foreign web site uses (*id.* at 54); (5) the Latin American photo (*id.* at 55-56); (6) foreign catalog uses (*id.* at 56-57); (7) Spring 2004 jobs (*id.* at 57); and (8) product packaging. (*Id.* at 58-59.) (The Latin American photo and the Spring 2004 jobs are not discussed since the former is out of the case and PIC owns registrations for the latter.)

As set forth below, as is the case with the allegedly unauthorized duplicates, PIC's failure to obtain copyright registrations was not in any way caused or contributed to by Gillette.

#### 1.     Gillette Catalogs

Of the approximately 220 alleged infringements PIC claims appear in Gillette catalogs, PIC concedes that it does not own copyright registrations for 205 of them. (Dkt. No. 99, Ex 7 at 35-44.) It is undisputed that PIC had these catalogs in its possession since prior to the commencement of the litigation. (Dkt. No. 77, Ex. 10 at 80-109; Dkt. No. 99, Exs. 12, 17, 22; *id.*, Ex. 19 at 107-109.) The Copyright Office regulations clearly permit registrations based upon photocopies of photographs in the format in which they have been published, *i.e.*, in the catalogs. 37 C.F.R. § 202(c)(2)(xx)(E)-(F). PIC has no excuse for its failure to register the allegedly infringing images in the Catalogs.[6]

#### 2.     Internet Images

PIC alleges 35 infringements on the Internet. (Dkt. No. 99, Ex. 7 at 49-51.) However, it does not own registrations for 13 of them. (*Id.*) That PIC owns no registrations for these

---

[6] PIC's infringement claims as to all of the Catalogs should be dismissed on a separate basis. In the Court's Order of September 23, 2004 the Court ordered PIC to set forth in its mandatory disclosures the date and circumstances of any alleged infringements known as of that date. (9/23/04 Transcript at 10.) PIC's mandatory disclosures served October 4, 2004, did not identify a single catalog infringement. (Donahue Decl. Ex. 2 at 4-5.) However, in a letter dated September 29, 2003 PIC's counsel represented that "PIC also has seen numerous Gillette product catalogs in which the same picture was used in multiple years despite PIC having granted Gillette only a one-time use license." (Dkt No. 99, Ex. 12.) Thus, PIC knew of alleged Catalog infringements *6 months* before filing the action but did not comply with the Court's Order to disclose such alleged infringements in its mandatory disclosures.

11

Internet Infringements is PIC's fault and PIC's fault alone. Under the Copyright Office regulations, PIC could have supported its registration with print outs from the web sites. *See* 37 C.F.R. § 202(c)(2)(xx)(E)-(F).

Indeed, in the Supplemental Response PIC concedes that it could register the images at issue, stating "[t]he remaining images are now in the process of being registered with the Copyright Office." (Dkt. No. 99, Ex. 7 at 45.) PIC, however, did not produce any application for copyright registration covering such images.

A review of the documents from PIC's production identified in its Supplemental Response as the purported Internet infringement demonstrates that PIC had the allegedly infringing images for some time. The Internet printouts produced by PIC show the date on which PIC had the alleged infringements in its possession. The allegedly infringing images are attached as Ex. 7 to the Donahue Declaration. The chart below sets forth the Bates Number of each alleged infringement for which PIC does not own a copyright registration in the order it appears in the Supplemental Response and the date printed on each printout.

| BATES NUMBER | DATE PRINTED OUT BY PIC |
|---|---|
| PIC 15692 | 1/25/05 |
| PIC 15691 | 1/25/05 |
| PIC 15689 | 1/25/05 |
| PIC 14912 | 9/22/04 |
| PIC 14915 | 9/22/04 |
| PIC 15687 | 10/4/04 |
| PIC 15688 | 10/4/04 |
| PIC 17163 | 2/11/05 |
| PIC 17169[7] | 2/11/05 |

---

[7] The referenced page contains no images. (Donahue Decl. Ex. 7.)

| | |
|---|---|
| PIC 17170 | 2/11/05 |
| PIC 17172 | 2/11/05 |
| PIC 17187 | 2/11/05 |
| PIC 17196 | 2/11/05 |

There can be no dispute that each of these alleged infringements could have been registered in plenty of time. PIC chose not to do it.

### 3.     **Third Party Images**

PIC alleges 28 infringing images obtained in third party discovery from the following retailers: Meijer, ShopKo, Fry's, Bed Bath & Beyond, and Fred Meyer. (Dkt. No. 99, Ex. 7 at 51-53.) PIC owns no registrations for any of the allegedly infringing images. (*Id*.) As set forth above, PIC waited until January 31, 2005 to serve third party discovery. (*See* Dkt. No. 44.) In any event, PIC received the images in plenty of time to obtain registrations. Indeed, PIC produced the allegedly infringing images to Gillette on February 24, 2005. (Donahue Decl. ¶ 9.) PIC's failure to register the images was caused by PIC's inaction, not any act of Gillette.

### 4.     **Foreign Web Sites**

PIC alleges infringement of four images—two on the Braun Japanese web site and two on the Gillette German web site. (Dkt. No. 99, Ex. 7 at 54). PIC concedes in the Supplemental Response that it identified the alleged infringements "within approximately the last month" prior to its service of the Supplement Response on March 17, 2005. (*Id*. at 55.) As with the images above, PIC could have submitted printouts of the web pages and obtained registrations covering these alleged infringements well before March 17, 2005.

### 5.     **Foreign Catalogs**

PIC alleges infringement of three images in Canadian catalogs for which it owns no registrations. (*Id.* at 56.) Incredibly, in identifying the allegedly infringed photographs, PIC points to photographs *from its own document production*. There can be no argument that PIC was unable to register the allegedly infringed images due to any action of Gillette.

13

### 6. Product Packaging

PIC alleges infringement of product packaging but has identified no copyright registrations for the photographs used in the packaging or the packaging itself. (*Id*. at 58-59.) In its Supplemental Response PIC concedes it discovered the alleged infringements on January 22, 2005. (*Id.* at 59.) Under the Copyright Office's regulations, copies of the packaging could have been deposited in support of an application for registration. Moreover, PIC concedes that the images allegedly infringed were contained *in its own document production*. (*Id*. at 58-59.) Thus, as with the categories above, PIC was not "unable" to register these images due to any action taken by Gillette.

## II. PIC WAS ABLE TO AND SHOULD HAVE REGISTERED ITS IMAGES BEFORE IT TURNED THEM OVER TO GILLETTE.

As set forth above, PIC was not prevented from obtaining any copyright registrations of allegedly infringed images by Gillette. Moreover, PIC had the opportunity to register the images *before* it provided them to Gillette.

The Advertising Photographers of America ("APA"), an organization of which Paul Picone is a member, and the originator of the invoice language that PIC claims is the contract between the parties, recommends that images be registered *before* they are provided to clients. The APA Business Handbook states:

> Mass copyright registration, **before the images ever leave the studio**, offers to distinct benefits. First, you will be availing yourself of the full protection and remedies of the Copyright Laws, potentially easing any infringement lawsuits while also giving the infringer considerable inducement to settle. Secondly you will be helping the entire photographic industry in our efforts to bring positive change to the way copyright statutes and regulations apply to photographs.

(Donahue Decl. Ex. 8 (emphasis in original).) The publication goes on to outline two separate methods for "registering up to 500 images in one easy step." It further states that these methods are "fast, cheap, and equally acceptable by the Copyright Office." (*Id*.) One of the methods explained allows duplication of 100 rolls of film in eight minutes, which duplicates are submitted

14

to the Copyright Office.  (*Id.*)  The second method involves the use of digital copies and a CD that is sent to the Copyright Office.  (*Id.*)

It is undisputed that PIC had the opportunity to create duplicates of its photographs and register them *before* it gave them to Gillette.  Thus, on this separate basis, PIC cannot claim that Gillette prevented it from obtaining copyright registrations.

### III.   THE REMAINING COPYRIGHT CLAIMS IN THE CASE ARE *DE MINIMIS*

The *only* copyright claims for which PIC owns copyright registrations and that have not been dismissed by the Court are:  (1) 22 alleged Catalog infringements (Dkt. No. 99, Ex. 7 at 35-44); and (2) 22 alleged Internet infringements (*Id.* at 49-51); and (3) copyright infringement claims relating to the Spring 2004 Projects.  These claims should be further cut back as follows.

#### A.   The Catalog Claims

With respect to the Catalog infringements, 15 of the 22 remaining claims pre-date May 2001 and thus are barred by the statute of limitations.  Moreover, because PIC failed to comply with the Court's Order of September 23, 2004 and did not identify the alleged Catalog infringements in its Mandatory Disclosures, PIC should be precluded from alleging any claims as to Catalog infringements.

#### B.   PIC's Claim Of Contributory Infringement

As for the remaining 22 instances of alleged Internet infringements, 16 of them are defective on their face because they represent alleged uses of PIC images on web sites neither owned nor controlled by Gillette.  Specifically, PIC alleges infringement of web sites of Wal-Mart, Bed, Bath and Beyond, Small Applicance.com, Fortunoff, Boscovs, Sears, and Kitchen Kapers.  (*Id*. at 49-51.)  PIC claims that it is entitled to hold Gillette responsible for these alleged third-party infringements on a theory of "contributory infringement."  (Dkt. No. 117 at 17.)  In so claiming, PIC concedes that Gillette may be held liable for contributory infringement only if Gillette "with knowledge of the infringing activity, induce[d], cause[d] or materially

15

contribute[d] to the infringing conduct . . . ." *Polygram Intern. Pub., Inc. v. Nevada/TIG, Inc.*, 855 F.Supp. 1314, 1333 -1334 (D. Mass. 1994) (citation omitted).

In its Supplemental Response in which it was required to "state the basis" of its claims, PIC has provided no factual support for any claim that Gillette induced, caused, or materially contributed to the infringing conduct of the third party web site owners. (Dkt. No. 99, Ex. 7 at 45-51.) Indeed, with the exception of Wal-Mart, PIC did not even take the deposition of the third-party web site owners.

Pursuant to the Court's Orders of March 7 and 9, 2005, PIC is limited to its claims as set forth in the Supplemental Response. As a result, as a matter of law, PIC cannot demonstrate contributory infringement for 16 of the remaining 22 alleged Internet infringements.

## CONCLUSION

For the reasons set forth herein, Gillette's motion should be granted.

May 24, 2005

GELB & GELB LLP

By:   /s/Richard M. Gelb/
      Richard M. Gelb (BBO#188240)
      rgelb@gelbgelb.com
      Robert S. Messinger (BBO# 651396)
      rmessinger@gelbgelb.com

20 Custom House Street
Boston, MA  02110
Tel: (617) 345-0010
Fax: (617) 345-0009

FROSS ZELNICK LEHRMAN & ZISSU, P.C.

By:   /s/Patrick T. Perkins/
      Patrick T. Perkins (Admitted *pro hac vice*)
      David Donahue (Admitted *pro hac vice*)
886 United Nations Plaza
New York, New York 10017
Ph: (212) 813-5900
Fax: (212) 813-5901

*Attorneys for Defendant The Gillette Company*