IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PHOTOGRAPHIC ILLUSTRATORS
CORPORATION,

        Plaintiff,

vs.

THE GILLETTE COMPANY,


        Defendant.

Civil Action No. 04-10913 WGY

---

## DEFENDANT'S SUPPLEMENTED RESPONSES TO PLAINTIFF'S INTERROGATORY NUMBERS 28 & 29

### INTERROGATORY NO. 28.

State the basis for each of the Affirmative Defenses set forth in Gillette's Amended Answer filed November 15, 2004, in detail sufficient to permit the Court to rule on a motion for summary judgment thereon.

### RESPONSE:

Gillette hereby incorporates by reference each of the "General Objections" set forth in Gillette's responses to PIC's First, Second and Third Sets of Interrogatories, as well as Gillette's specific objections set forth in its original responses to PIC's Interrogatory Nos. 28 through 30.

Moreover, in its original response to Interrogatory 28, Gillette advised PIC that Interrogatories 28 through 30 actually amounted to fifteen separate interrogatories and, as such, PIC's interrogatories exceeded the thirty-five interrogatory limit ordered by the Court. Gillette offered to provide responses to "seven of the fifteen interrogatories remaining in Interrogatories 28 through 30" if PIC designated which of seven of the fifteen interrogatories that it preferred for

Gillette to answer, or requested Gillette to choose which seven of the fifteen interrogatories to answer. In response, PIC served a Third Set of Interrogatories and accepted Gillette's responses thereto, thereby waiving and withdrawing Interrogatories 28 through 30. Accordingly, Gillette should not be required to supplement its response to Interrogatory Nos. 28 and 29.

Subject to and without waiving the foregoing objections, Gillette responds as follows:

**Affirmative Defense No. 1:**

Gillette's First Affirmative Defense is based on PIC's failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).[1] In an Order dated September 23, 2004, the Court granted Gillette's motion to dismiss PIC's claims for failure to state a claim upon which relief can be granted as to some of PIC's claims, but denied Gillette's motion as to other of PIC's claims. Thus, to the extent Gillette's Rule 12(b)(6) defense was based on PIC's failure to state the elements of its claims for relief under Federal Rule of Civil Procedure 8, the Court already has ruled on this issue, rendering it moot at this stage of the litigation.

In addition, Gillette's Memorandum in Support of its Motion for Summary Judgment, filed on April 8, 2005, sets forth in detail the reasons why the claims set forth in PIC's operative Complaint and Supplementary Responses to Gillette's Interrogatory Nos. 1 and 2 fail as a matter of law. Gillette hereby incorporates by reference such Memorandum and the evidence cited therein.

Moreover, PIC fails to state a claim for the reasons set forth below in Gillette's discussion of Gillette's eight other affirmative defenses.

---

[1] Although Gillette styled this defense as an "affirmative defense" it actually is a "defense." *Compare* Fed. R. Civ. P. 12 *with* Fed. R. Civ. P. 8(c).

Subject to, and notwithstanding the foregoing, Gillette reserves its right to raise the defense of failure to state a claim "at the trial on the merits" after the close of plaintiff's case in chief. *See* Fed. R. Civ. P. 12(h)(2).

**Affirmative Defense No. 2:**

Gillette's Second Affirmative Defense states that "[t]he purported 'Agreements' to which plaintiff refers in its Complaint are of no legal force or effect." By "purported 'Agreements'" Gillette's allegation refers to PIC's claim that Gillette and PIC entered into hundreds of agreements pursuant to "PIC's standard terms and conditions" which appeared in fine print on the reverse of PIC's invoices to Gillette and which PIC defined in its operative pleading as "the 'Agreement[s]'." (Second Amended Complaint ("SAC") ¶ 9.)

The purported Agreements are of no legal force or effect because the parties never agreed to them. Rather, the parties agreed to a "buyout" by Gillette of rights under to copyright in the photographic materials provided by PIC to Gillette and to Gillette's ownership of such photographic materials. PIC's first job for Gillette was in March 1992 and considered an "audition" for PIC. Prior to performing work on this job, PIC provided a written estimate, which contained the purported terms and conditions on its reverse side. The estimate was then revised to reflect the parties' agreement that Gillette would "buy-out" PIC's reproduction rights, such that Gillette would have "unlimited time and unlimited usage rights" in the photos. After performing the job, PIC sent an invoice to Gillette that contained the purported terms and conditions on the reverse side. "Buyout" and "unlimited usage" do not appear on the face of the invoice; instead, next to "Period of Use" on the face of the invoice, PIC typed "N/A," which means that the purported terms and conditions were "Not Applicable" to the first job. Thus, in connection with the first job PIC performed for Gillette, the parties agreed *before* any work was

performed that Gillette would own unlimited rights in any photographs produced, and that Gillette would keep the original transparencies and negatives provided by PIC. Thereafter, PIC *never* discussed the purported terms and conditions with any Gillette employee. Rather, on virtually every job PIC performed for Gillette between 1992 and mid-1994, PIC wrote "N/A" next to "Period of Use" on the front of its estimates and invoices, signifying that the terms on the reverse of the invoices were "not applicable." Although in 1994, PIC replaced "N/A" with the letters "T&C" on the front of the invoices, PIC did not discuss this change with Gillette or otherwise advise Gillette of it. PIC never suggested to Gillette prior to any given job that such job would be subject to the purported terms and conditions on the reverse of PIC's invoices. Under these circumstances, the parties did not mutually assent to the terms of the purported Agreements at any time and thus, the terms have no legal force or effect. Rather, each and every job PIC performed for Gillette involved a "buyout" by Gillette under which Gillette was entitled to unlimited use of the photographs and ownership of the physical photographic materials provided by PIC to Gillette. (Supporting documents: Declaration of Michael N. Rader in Support of PIC's Summary Judgment Motions ("Dkt. No. 77"), Exs. 13, 14 & 20-23; Declaration of David Donahue in Support of Gillette's Motion for Summary Judgment ("Dkt. No. 99"), Exs. 5-6, 13-16; PIC "Job Folder"[2] Nos. 3072, 3088, 3107, 3118, 3121, 3128, 3138, 3158, 3160, 3162, 3165, 3168, 3173, 3177, 3182, 3185, 3190, 3191, 3193, 3198, 3204, 3208, 3218, 3221, 3223, 3227, 3229, 3235, 3243, 3248, 3252, 3256, 3262, 3264, 3266, 3273, 3275, 3286, 3294,

---

[2] References to PIC's "Job Folders" refer to the folders for each PIC job for Gillette that PIC produced to Gillette in this action. Unless otherwise specified, a reference to a particular "Job Folder" shall include all the contents thereof, including duplicate and original transparencies, photographer's notes, invoices and correspondence, as well as any other documents associated with the particular job as identified by PIC at pages 75-199 of PIC's Supplemental Responses to Gillette's Interrogatory Nos. 1 and 2.

3295, 3296, 3301, 3313, 3319, 3320, 3322, 3323, 3325, 3329, 3337, 3339, 3345, 3346, 3350,

3353, 3354, 3356, 3358, 3360, 3366, 3367, 3373, 3384, 3391, 3392, 3396, 3399, 3401.)

Moreover, given that the terms and conditions on the back of PIC's invoices materially

differ from the terms agreed to by the parties, the terms and conditions cannot be incorporated

into the parties' agreements. (Supporting documents: Dkt. No. 77, Exs. 13 & 14; Dep. Ex. 59;

PIC's Job Folders (all).)

References to "PIC Job Folders (all)" above and hereinafter include the following Job

Folders that PIC produced in this litigation:

| | | | | | | |
|---|---|---|---|---|---|---|
| 3072 | 3256 | 3384 | 3526 | 3645 | 3770 | 3998 |
| 3088 | 3262 | 3391 | 3528 | 3646 | 3772 | 3999 |
| 3107 | 3264 | 3392 | 3529 | 3652 | 3778 | 4008 |
| 3118 | 3266 | 3396 | 3539 | 3655 | 3785 | 4010 |
| 3121 | 3273 | 3399 | 3546 | 3659 | 3804 | 4013 |
| 3128 | 3275 | 3401 | 3552 | 3662 | 3812 | 4016 |
| 3138 | 3286 | 3405 | 3553 | 3664 | 3819 | 4017 |
| 3158 | 3294 | 3416 | 3562 | 3666 | 3834 | 4031 |
| 3160 | 3295 | 3425 | 3566 | 3675 | 3835 | 4038 |
| 3162 | 3296 | 3431 | 3574 | 3676 | 3847 | 4043 |
| 3165 | 3301 | 3437 | 3577 | 3680 | 3848 | 4059 |
| 3168 | 3313 | 3439 | 3585 | 3688 | 3852 | 4070 |
| 3173 | 3319 | 3450 | 3589 | 3691 | 3885 | 4080 |
| 3177 | 3320 | 3462 | 3593 | 3692 | 3890 | 4084 |
| 3182 | 3322 | 3465 | 3596 | 3693 | 3891 | 4085 |
| 3185 | 3323 | 3466 | 3597 | 3695 | 3896 | 4091 |
| 3190 | 3325 | 3470 | 3600 | 3705 | 3898 | 4104 |
| 3191 | 3329 | 3477 | 3601 | 3719 | 3900 | 4105 |
| 3193 | 3337 | 3479 | 3602 | 3722 | 3907 | 4106 |
| 3198 | 3339 | 3481 | 3603 | 3726 | 3912 | 4108 |
| 3204 | 3345 | 3485 | 3604 | 3731 | 3924 | 4109 |
| 3208 | 3346 | 3489 | 3606 | 3738 | 3926 | 4111 |
| 3218 | 3350 | 3493 | 3607 | 3742 | 3944 | 4112 |
| 3221 | 3353 | 3496 | 3609 | 3743 | 3946 | 4121 |
| 3223 | 3354 | 3498 | 3612 | 3744 | 3959 | 4124 |
| 3227 | 3356 | 3499 | 3615 | 3748 | 3969 | 4132 |
| 3229 | 3358 | 3502 | 3617 | 3751 | 3976 | 4133 |
| 3235 | 3360 | 3507 | 3621 | 3752 | 3979 | 4144 |
| 3243 | 3366 | 3513 | 3626 | 3759 | 3987 | 4145 |
| 3248 | 3367 | 3519 | 3627 | 3763 | 3994 | 4147 |
| 3252 | 3373 | 3525 | 3630 | 3769 | 3997 | 4148 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 4150 | 4332 | 4510 | 4718 | 4967 | 5258 | 5441 |
| 4155 | 4344 | 4511 | 4721 | 4976 | 5260 | 5442 |
| 4158 | 4346 | 4516 | 4726 | 4981 | 5264 | 5443 |
| 4159 | 4351 | 4517 | 4728 | 4984 | 5268 | 5445 |
| 4168 | 4352 | 4527 | 4730 | 5011 | 5271 | 5446 |
| 4177 | 4355 | 4530 | 4741 | 5012 | 5273 | 5453 |
| 4178 | 4360 | 4531 | 4750 | 5016 | 5275 | 5455 |
| 4181 | 4363 | 4533 | 4755 | 5021 | 5277 | 5456 |
| 4186 | 4364 | 4534 | 4757 | 5030 | 5281 | 5465 |
| 4190 | 4369 | 4535 | 4759 | 5034 | 5282 | 5474 |
| 4200 | 4373 | 4537 | 4768 | 5037 | 5283 | 5475 |
| 4201 | 4375 | 4546 | 4771 | 5044 | 5293 | 5478 |
| 4202 | 4380 | 4556 | 4784 | 5051 | 5294 | 5481 |
| 4205 | 4381 | 4557 | 4791 | 5053 | 5300 | 5482 |
| 4206 | 4383 | 4559 | 4799 | 5055 | 5305 | 5483 |
| 4211 | 4384 | 4562 | 4806 | 5056 | 5314 | 5484 |
| 4213 | 4385 | 4566 | 4812 | 5088 | 5315 | 5486 |
| 4214 | 4400 | 4572 | 4816 | 5089 | 5321 | 5490 |
| 4217 | 4407 | 4573 | 4817 | 5107 | 5325 | 5494 |
| 4219 | 4409 | 4575 | 4818 | 5112 | 5328 | 5498 |
| 4220 | 4413 | 4577 | 4825 | 5118 | 5333 | 5500 |
| 4227 | 4418 | 4578 | 4826 | 5121 | 5336 | 5506 |
| 4230 | 4419 | 4579 | 4827 | 5122 | 5337 | 5507 |
| 4232 | 4422 | 4587 | 4832 | 5129 | 5338 | 5508 |
| 4245 | 4424 | 4590 | 4837 | 5141 | 5341 | 5509 |
| 4249 | 4429 | 4597 | 4839 | 5158 | 5342 | 5510 |
| 4256 | 4432 | 4601 | 4851 | 5160 | 5345 | 5511 |
| 4257 | 4433 | 4602 | 4852 | 5166 | 5350 | 5515 |
| 4264 | 4438 | 4613 | 4855 | 5170 | 5358 | 5517 |
| 4266 | 4439 | 4614 | 4867 | 5179 | 5359 | 5519 |
| 4268 | 4446 | 4621 | 4871 | 5188 | 5360 | 5521 |
| 4270 | 4448 | 4626 | 4877 | 5189 | 5361 | 5533 |
| 4277 | 4451 | 4630 | 4881 | 5191 | 5364 | 5538 |
| 4287 | 4452 | 4631 | 4887 | 5197 | 5367 | 5539 |
| 4288 | 4455 | 4639 | 4889 | 5198 | 5375 | 5545 |
| 4289 | 4459 | 4649 | 4896 | 5202 | 5377 | 5548 |
| 4290 | 4460 | 4671 | 4897 | 5206 | 5378 | 5552 |
| 4291 | 4468 | 4675 | 4898 | 5212 | 5394 | 5553 |
| 4299 | 4472 | 4676 | 4899 | 5213 | 5395 | 5555 |
| 4309 | 4477 | 4687 | 4903 | 5219 | 5409 | 5557 |
| 4311 | 4482 | 4690 | 4928 | 5224 | 5414 | 5558 |
| 4314 | 4487 | 4691 | 4930 | 5231 | 5416 | 5559 |
| 4321 | 4492 | 4702 | 4933 | 5236 | 5419 | 5560 |
| 4324 | 4500 | 4709 | 4938 | 5248 | 5421 | 5564 |
| 4325 | 4501 | 4715 | 4939 | 5249 | 5431 | 5569 |
| 4330 | 4506 | 4716 | 4955 | 5250 | 5433 | 5577 |
| 4331 | 4508 | 4717 | 4965 | 5254 | 5436 | 5580 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 5581 | 5638 | 5730 | 5810 | 5876 | 5922 | 5998 |
| 5583 | 5639 | 5732 | 5811 | 5880 | 5924 | 6008 |
| 5584 | 5641 | 5746 | 5828 | 5881 | 5940 | 6011 |
| 5592 | 5648 | 5749 | 5830 | 5882 | 5950 | 6016 |
| 5593 | 5651 | 5756 | 5831 | 5883 | 5952 | 6045 |
| 5594 | 5659 | 5760 | 5836 | 5893 | 5954 | 6053 |
| 5595 | 5660 | 5766 | 5838 | 5898 | 5955 | 6067 |
| 5596 | 5669 | 5772 | 5840 | 5899 | 5956 | 6076 |
| 5599 | 5684 | 5785 | 5846 | 5904 | 5968 | 6080 |
| 5602 | 5685 | 5787 | 5848 | 5908 | 5975 | 6084 |
| 5605 | 5687 | 5790 | 5850 | 5911 | 5979 | 6365 |
| 5607 | 5693 | 5793 | 5852 | 5912 | 5980 | 6377 |
| 5610 | 5709 | 5806 | 5855 | 5917 | 5981 | 6382 |
| 5613 | 5716 | 5807 | 5862 | 5918 | 5987 | 6400 |
| 5615 | 5728 | 5808 | 5873 | 5921 | 5989 | |

The purported Agreements also are of no legal force or effect because they appear on non-contractual documents—i.e., invoices—submitted to Gillette under circumstances that would not make a reasonable person aware that the invoices were intended to constitute a written agreement. For every job PIC performed for Gillette, PIC would first perform the work and provide original transparencies and negatives to Gillette and, sometime *thereafter*, would forward an invoice to Gillette for payment containing the purported terms and conditions on the reverse side. PIC did not sign the invoices, require Gillette to countersign the invoices, or require Gillette to return the invoices. Gillette did not sign the invoices other than for internal purposes to signify that payment was warranted, and Gillette did not return the invoices to PIC. PIC also did not draw attention to the terms and conditions on the reverse of the invoices in any way. When PIC provided photographic transparencies to Gillette, it usually sent the transparencies to Gillette in a white cardboard envelope or a Kodak film cardboard box. PIC did not enclose with the transparencies any type of "delivery memorandum," inventory list or index that set forth terms and conditions proposed or required by PIC or that identified the number or type of transparencies enclosed. Nor did PIC seal the packages with a label stating that if

Gillette opened the package and used the enclosed transparencies, Gillette would agree to be bound by terms and conditions proposed or required by PIC. Because PIC's invoices did not constitute contractual documents and were not treated or regarded as such by the parties, the purported "Agreements" referred to by PIC were of no legal force or effect. (Supporting documents: Dkt. No. 77, Exs. 13 & 14; Dep. Ex. 59; PIC Job Folders (all); PIC 00004-00493; GLTC 00771-01403, 01773-03220)

The conduct of the parties throughout their course of performance of their oral agreements and throughout the entirety of their course of dealing also shows that the purported terms and conditions of the so-called "Agreements" did not apply to the parties' relationship, which lends further support to Gillette's claim that the so-called "Agreements" are of no legal force or effect. (*See* discussion of Affirmative Defense 6, below.)

PIC's purported Agreements also are of no legal force or effect because certain of its provisions: (1) are unconscionable; (2) were waived by PIC; and/or (3) PIC is precluded from claiming otherwise by the doctrines of estoppel and acquiescence. (*See* discussion of Affirmative Defenses 3 & 6, below.)

**Affirmative Defense No. 3: Unconscionability**

Gillette's Third Affirmative Defense states that "[t]he purported 'Agreements' to which plaintiff refers in its Complaint are unenforceable because they are unconscionable, contrary to public policy and/or unfair under the circumstances of the case."

The purported Agreements are unconscionable because they purport to exact a $1500.00 penalty on Gillette for Gillette's alleged failure to return photographic materials provided by PIC to Gillette within 30 days. Indeed, PIC alleges that under the terms of the purported Agreements, Gillette is required to return original transparencies and negatives to PIC within thirty days of

8

"first publication" (the "Purported 30-day Return Requirement"), which PIC claims to mean first receipt by Gillette, and that, failing strict compliance with such requirement, Gillette is required to pay PIC $1500.00 in "liquidated damages" for each original negative or transparency not returned (the "Late Penalty"). PIC contends that the Late Penalty applies whether Gillette returns the photographs on the 31st day after first publication or never returns the photographs at all. However, the $1500 Late Penalty bears no relationship to any loss the parties anticipated PIC would suffer due to Gillette's failure comply with the Purported 30-day Return Requirement. Indeed, PIC has conceded that the amount never had any relationship to any loss PIC thought it might suffer if its negatives and transparencies were not returned within 30 days, and that it had "no idea" what the basis was for the amount. Moreover, PIC views the amount as "boilerplate" and has conceded the Late Penalty was *not* intended to replace a negative or transparency that might be lost.

The punitive nature of the $1500.00 Late Penalty is evidenced by the fact that PIC retained an original or duplicate original transparency and/or a high-resolution, reproducible digital scan of every image it provided to Gillette. For example,

- In a meeting at his studio in March 1, 2004, Paul Picone told Gillette employee Beth Cooper that he kept original copies of all images that PIC provided to Gillette.

- At that same March 1, 2004 meeting, Steve, the PIC assistant in charge of its digital files told Ms. Cooper that PIC keeps high resolution scans of all images PIC provides to Gillette.

9

- On prior occasions, PIC assistants, including Dan Burgess and Kelly Harstad, told Ms. Cooper that PIC kept originals of images it provided to Gillette for purposes of providing duplicates upon Gillette's request.

- On numerous occasions throughout the course of her dealings with PIC, Gillette employee Jill Josephson requested PIC to provide a duplicate transparency of images PIC previously had provided to Gillette and PIC fulfilled the request by obtaining duplicates from its own files or from files kept by Advanced Photographics.

- Picone also told Ms. Josephson that he was scanning images of Gillette's products and keeping copies of the scans as backups in case the original transparencies were lost or misplaced.

- On numerous occasions Picone told Gillette employee Brenda Tattan not to worry if Gillette needed a duplicate transparency and could not find the copy previously provided to it because PIC kept reproducible transparencies in its Job Folders.

- When PIC began scanning copies of Gillette images Picone told Ms. Tattan that PIC intended to keep a "library" of images of photographs provided to Gillette so that PIC could make copies of such images for Gillette upon request.

- On numerous occasions, Picone and his assistants, including Kelly Harstad, told Ms. Tattan that PIC was maintaining a library of reproducible images provided to Gillette for purposes of providing duplicates to Gillette on demand.

- PIC produced business records from its files evidencing that Paul Picone and/or his assistants repeatedly advised Gillette employees that PIC was keeping high-resolution scans of images it provided to Gillette. (Supporting documents: Dkt.

No. 77, Exs. 47, 51, 52; Dkt. No. 99, Ex. 22; Declaration of Patrick T. Perkins in Opposition to PIC's Motions for Summary Judgment ("Dkt. No. 118"), Exs. 1, 4; PIC Job Folders; PIC Job Folders 5056, 5166, 5188, 5197, 5212, 5224, 5545, 5559, 5595, 5596, 5599, 5607, 5613, 5655, 5660, 5730, 5746, 5756, 5790, 5838, 5852, 5862, 5952, 5975, 5980, 5981.)

- Business records produced from PIC's files prove that PIC kept original and/or duplicate original copies of images it provided to Gillette and that Paul Picone and/or his assistants repeatedly advised Gillette employees that PIC was keeping duplicate original transparencies of images it provided to Gillette. (Supporting documents: Dkt. No. 77, Exs. 51, 52; Dkt. No. 99, Ex. 22; Dkt. No. 118, Exs. 1, 4, 11; PIC's Job Folders (all); PIC 003976, 005875, 006126; PIC Job Folders 5056, 5166, 5188, 5197, 5212, 5224, 5455, 5545, 5559, 5595, 5596, 5599, 5607, 5613, 5655, 5660, 5730, 5746, 5756, 5599; 5790, 5838, 5852, 5862, 5952, 5975, 5980, 5981.)

- Correspondence, notes and PIC invoices, all produced from PIC's files, show that PIC scanned Gillette images to a master digital file and kept original or duplicate transparencies in a master chrome file and/or binders. (Supporting documents: Dkt. No. 77, Exs. 47, 51, 52; Dkt. No. 99, Ex. 22; Dkt. No. 118, Exs. 1, 4, 11; PIC Job Folders (all); PIC Job Folders 5056, 5166, 5188, 5197, 5212, 5224, 5455, 5545, 5559, 5595, 5596, 5599, 5607, 5613, 5655, 5660, 5730, 5746, 5756, 5599; 5790, 5838, 5852, 5862, 5952, 5975, 5980, 5981.)

Thus, PIC knew *at the outset of each job* it performed for Gillette that it could suffer no loss as a result of Gillette's failure to return original negatives and transparencies within 30 days.

The punitive nature of the $1500 Late Penalty also is evidenced by the fact that the photographs PIC provided to Gillette—which were of Gillette's own consumer products, display materials and promotional materials—were of no value to PIC or to anyone other than Gillette. Indeed, PIC has conceded that it never has used any photograph that it provided to Gillette for any other purpose. PIC also concedes that during a ten-year period, it never insisted upon the return of any original negative or transparency and claims that in 2000 it ceased maintaining the disks containing high resolution digital scans of all of the past work performed for Gillette because PIC had no use for them. Based on the foregoing, PIC knew, at the time it entered into each contract with Gillette—and certainly no later than May 7, 1998, the cut-off date for the statute of limitations on PIC's breach of contract claims—that the Late Penalty bore no relationship to any possible loss PIC could anticipate suffering.

### Affirmative Defense No. 4:  Failure to Plead Fraud With Particularity

This defense is moot at this stage in the litigation.

### Affirmative Defense No. 5:  Gillette Not Required to Admit or Deny

This defense is moot at this stage in the litigation.

### Affirmative Defense No. 6:  Acquiescence, Laches, Waiver, Estoppel

PIC claims breach of contract against Gillette based on Gillette's alleged breach of the Purported 30-day Return Requirement and claims entitlement under the Late Penalty to $1500 per original negative and transparency not returned.  However, it is undisputed that from 1992 until 2002, PIC did not attempt to enforce the Purported 30-day Return Requirement or the attendant Late Penalty, never once asking for the return of photographs and never once charging Gillette $1,500 for any transparency it failed to return within 30 days of receipt.  PIC has conceded that it chose not to enforce these provisions because it wanted to continue its

12

relationship with Gillette. It is further undisputed that PIC did not provide any written inventory of materials it provided to Gillette, nor did it alert Gillette with any writing on the packages containing its materials that Gillette's failure to return the materials within 30 days would require Gillette to pay PIC $1,500 per image. These actions (or inactions) on the part of PIC clearly establish a waiver of the Purported 30-day Return Requirement and its attendant Late Penalty. Accordingly, PIC's breach of contract claims against Gillette based on Gillette's alleged failure to comply with the Purported 30-day Return Requirement fail. (Supporting documents: Dkt. No. 77, Exs. 13 & 14; Dep. Ex. 59; PIC 00004-00493; GLTC 00771-01403.)

PIC alleges copyright infringement against Gillette based on Gillette's failure to comply with the purported terms and conditions in the purported Agreements limiting Gillette's license of the photographs provided by PIC to one-year in the United States only, forbidding Gillette to permit third-parties to use the photographs, and requiring Gillette to identify PIC as the copyright owner of the photographs on Gillette's Sales Materials. To the extent the Agreements are held to have governed the parties' dealings, PIC waived these conditions.

Between 1992 and 2002, PIC was on notice that its photographs were regularly used beyond the purported one-year limit, outside the United States, on media other than that listed on the front of the invoices, and by third parties who sold Gillette products. With respect to use beyond one year, PIC does not dispute that Gillette provided copies of its 1995 through 2002 yearly Braun catalogs to PIC within the year of each catalog's respective production date, that such catalogs contained numerous PIC photographs used outside the purported one-year limit, and that such catalogs were reviewed by PIC personnel. With respect to PIC's knowledge of Gillette's foreign uses, Braun's 1995, 1996, 1997, 1998 and 1999 catalogs produced from PIC's files each prominently displayed the address of "Braun Canada Ltd." on the back cover. Moreover, without objecting or increasing its purported licensing fees, PIC: (1) knew that

Gillette was sending photographic transparencies to a Braun project manager and to a Gillette

vendor, both located in Canada; (2) sent transparencies to Gillette's offices in the Dominican

Republic; and (3) as early as 1998, was aware of Gillette's use of one of its images in Spanish-

language marketing material. With respect to third-party use, on numerous occasions throughout

1992-2002, PIC either provided photographs to Gillette that PIC knew were to be used by third

party sellers of Gillette's products or itself provided photographs to Gillette's vendors for their

use without any increase in fees, including Bloomingdale's, Costco, CVS, Dillard's, Duane

Reade, Eckerd, Filene's, Fortunoff, Hecht's, K-Mart, Lowe's, QVC, Sears, Staples, and Wal-

Mart. (Supporting documents: Dkt. No. 77, Exs. 13, 14, 53, 59, 60, 64-66; Dkt. No. 99, Exs. 17,

18, 20, 21, 22; Dkt. No. 118, Exs. 3, 11; PIC Job Folders (all); PIC Job Folders 3373, 3392,

3396, 3450, 3502, 3577, 3589, 3617, 3630, 3646, 3891, 3924, 4121, 4578, 4631, 4687, 4709,

4715, 4791, 4818, 4877, 5166, 5224, 5231, 5453, 5455, 5500, 5559, 5596, 5559, 5605, 5613,

5615, 5639, 5688, 5746, 5756, 5850; GLTC 00239-241, 00246-00248, 00251-00252, 00420-

00422; PIC 00424-00662, 14280-14480, 14493-14581, 14725-14752.)

Indeed, during the years she was responsible for designing Braun's product catalogs (i.e.,

the mid to late-1990s) Gillette employee Jill Josephson told PIC prior to creation of each catalog

that Gillette intended to use some of the photographs provided by PIC for prior yearly catalogs,

but PIC never objected to the practice or requested additional consideration from Gillette for use

beyond the supposed one-year license. Moreover, non-party Anna Madden testified at her

deposition that during her employment with Gillette's Business Communications department

from 1997-2002, she informed PIC that: (1) she on occasion would send transparencies to

Canada for use by a Braun Canada Project Manager; (2) she used transparencies provided by PIC

for multiple purposes; and (3) transparencies provided by PIC to Gillette also were provided to

Gillette's customers for their use. Yet PIC never complained to Ms. Madden about Gillette's use

of the images at any time. Indeed, in the regular course of business, Gillette's employees regularly informed PIC about the details of Gillette's use of the photographs, but PIC *never* complained.

PIC also expressly waived the purported copyright notice requirement. Indeed, PIC claims that prior to performing work for Gillette, PIC was told that "it would be difficult" to place an acknowledgement of PIC's copyright on Gillette's selling materials. Nevertheless, PIC never told Gillette it would not do further work for Gillette unless credited, even after PIC was aware that Gillette was not providing such credit. Moreover, PIC kept in its files copies of Gillette's yearly catalogs from 1995 through 2002, which it received from Gillette within one year of production and which it reviewed when received. None of these catalogs contain any copyright notice acknowledging PIC's copyright ownership. (Supporting documents: Dkt. No. 77, Exs. 53, 59, 60, 64-66; Dkt. No. 99, Exs. 17, 22; PIC 00424-00662, 14280-14480, 14493-14581, 14725-14752.)

PIC claims in its Supplemental Interrogatory Responses that Gillette impermissibly obtained duplicate transparencies from third-party laboratories such as Advanced Photographics, Inc., and that such conduct constitutes copyright infringement by Gillette. However, to the extent that PIC's purported Agreements with Gillette precluded Gillette from obtaining duplicate transparencies from third-parties, PIC waived any such limitation. The following undisputed facts show that PIC was aware of Gillette's duplication of PIC images no later than March 2000, and likely, much earlier than that: (1) PIC has not submitted any evidence that Gillette obtained duplicate transparencies of PIC images from third parties at any time after March 2000; (2) Jason Roopenian, the Vice President of Advanced Photographics, Inc., testified that when he was made aware that Gillette was making duplicates of PIC's images he informed PIC's president, Paul Picone; (3) Advanced Photographics' former managerial employee Joe Gannuscio, who worked

15

there between 1994 and 2001, testified that he had alerted Paul Picone that Gillette was ordering duplicates of PIC's images at the time Gillette ordered such duplicates; and (4) Picone conceded at his deposition that Mr. Gannuscio had contacted him "several times over duplicating of images" by Gillette. Because PIC knew or should have known that Gillette was obtaining duplicate transparencies from a third party but took no action to prevent such conduct, PIC waived any purported limitation on Gillette's right to obtain such duplicate transparencies. (Supporting documents: PIC 15707-15833; ADV 1-54.)

PIC's breach of contract claims based on Gillette's failure to comply with the 30-day Return Requirement also are barred by the doctrines of laches, acquiescence and estoppel. PIC has unreasonably and inexcusably delayed in bringing suit and in enforcing the Purported 30-Day Return Requirement. For more than 600 separate jobs, PIC was aware that Gillette did not return its transparencies to PIC within 30 days of receipt. Yet PIC took no action and continued to perform new jobs for Gillette. In reliance upon PIC's failure for more than 10 years to enforce the purported 30-day Return Requirement and the Late Penalty, Gillette had no reason to believe that it would be required at some unspecified future date to return original transparencies and negatives or be charged $1500 for each transparency or negative not returned. Moreover, PIC's failure for 10 years to request the return of a single transparency or negative and its failure to charge $1,500 for a single unreturned transparency or negative, can only be interpreted in one way—PIC did not want the transparencies and negatives back. Gillette had a right to rely upon PIC's failure for 10 years to ask for the return of any negatives or transparencies. This reliance by Gillette was all the more reasonable based upon PIC's failure to include any written inventory of materials it provided to Gillette and its failure to alert Gillette with any writing on the packages containing its materials that Gillette's failure to return the materials within 30 days

would require Gillette to pay PIC a $1,500 Late Penalty per image. (Supporting documents: PIC 00004-00493; GLTC 00771-1403.)

Gillette's reliance on PIC's inaction is further justified by the undisputed fact that PIC kept an original or duplicate original transparency and/or a high-resolution, reproducible digital scan of every image it provided to Gillette. PIC repeatedly made Gillette employees aware that PIC was creating and storing duplicates of its images of Gillette products. Thus, Gillette had no reason to believe PIC would require the return of its transparencies and negatives since PIC retained reproducible copies of every photograph that it provided to Gillette. The doctrines of laches and estoppel thereby preclude any attempt by PIC now to enforce the Purported 30-day Return Requirement and its attendant Late Penalty. (Supporting documents: Dkt. No. 77, Exs. 47, 51, 52; Dkt. No. 99, Ex. 22; Dkt. No. 118, Exs. 1, 4; PIC Job Folders (all); PIC 003976, 005875, 006126; PIC Job Folders 5056, 5166, 5188, 5197, 5212, 5224, 5545, 5559, 5595, 5596, 5599, 5607, 5613, 5655, 5660, 5730, 5746, 5756, 5790, 5838, 5852, 5862, 5952, 5975, 5980, 5981.)

PIC's copyright infringement claims against PIC also are barred by the doctrines of laches, acquiescence and estoppel. For more than 10 years PIC knowingly allowed Gillette to make unlimited use of its photographs without ever enforcing the purported terms it seeks now to enforce. As a result, Gillette had no reason to believe that it could not use PIC photographs beyond one year, outside the United States, and on media other than that identified on the face of the invoices, nor did it have any reason to believe it could not provide photographs to its third party customers. Rather, it correctly relied on PIC's non-action as evidence that the parties' agreements imposed no temporal, geographic or media use restrictions on Gillette's use of the photographs provided by PIC to Gillette and imposed no requirement to use a copyright notice, either. (Supporting documents: Dkt. No. 77, Exs. 13, 14, 53, 59, 60, 64-66; Dkt. No. 99, Exs.

17, 18, 20, 21, 22; Dkt. No. 118, Exs. 3, 11;  PIC Job Folders (all); PIC Job Folders 3373, 3392,

3396, 3450, 3502, 3577, 3589, 3617, 3630, 3646, 3891, 3924, 4121, 4578, 4631, 4687, 4709,

4715, 4791, 4818, 4877, 5166, 5224, 5231, 5453, 5455, 5500, 5559, 5596, 5559, 5605, 5613,

5615, 5639, 5688, 5746, 5756, 5850; GLTC 00239-241, 00246-00248, 00251-00252, 00420-

00422; PIC 00424-00662, 14280-14480, 14493-14581, 14725-14752.)

**Affirmative Defense No. 7:  Statute of Limitations**

In this action, PIC is seeking to recover for alleged breaches of contract that occurred as

early as twelve years ago, alleged instances of copyright infringement that occurred as early as

eight years ago and alleged fraudulent misrepresentations made four years ago.  PIC knew or

should have known about its claims against Gillette well beyond the applicable statutes of

limitation.  Thus the relevant statutes of limitation bar PIC's claims.

**a.      Copyright Infringement**

Copyright infringement claims are subject to a three-year statute of limitations.  PIC

claims copyright infringement based upon Gillette's alleged duplication of PIC images made for

Gillette by Advanced Photographics between January 1998 and March 2000.  The entirety of

such alleged duplication took place before well before May 7, 2001, the cut off date for any

copyright claim in this case.  The following undisputed facts demonstrate that PIC knew no later

than 2000 that Advanced Photographics was allegedly making unauthorized duplicates of PIC's

images for Gillette:  (1) Jason Roopenian, the Vice President of Advanced Photographics,

testified that when he was made aware that Gillette was making duplicates of PIC's images he

informed PIC's president, Paul Picone; (2) Advanced Photographics' former managerial

employee Joe Gannuscio, who worked there between 1994 and 2001, testified that he had alerted

Paul Picone that Gillette was ordering duplicates of PIC's images; and (3) Picone conceded at his

18

deposition that Mr. Gannuscio had contacted him "several times over duplicating of images" by Gillette. Because PIC was aware of alleged unauthorized duplication of images by Gillette while it was allegedly taking place, and because it is undisputed that no duplicates of any images were made for Gillette by Advanced Photographics after March 2000, PIC was on actual notice, and certainly on inquiry notice, of the purported unauthorized duplication well before the statute of limitations cut-off date. Accordingly, its copyright claims based on unauthorized duplication by Gillette are time-barred. (Supporting documents: PIC 15707-15833; ADV 1-54.) Thus, PIC's copyright infringement claims based on Gillette's alleged duplication of images are time-barred.

PIC also alleges copyright infringement based upon Gillette's use of PIC's photographs in catalogs dated 1996-2002. However, each of the catalogs for which PIC claims copyright infringement was produced from PIC's own files. PIC has conceded that Gillette voluntarily gave PIC a copy of each catalog "within a year" of production and that PIC personnel reviewed them. Because the catalogs came from its own files, PIC cannot claim it was not on actual or even inquiry notice of the purported infringements evidenced thereby. As a result, any copyright claims relating to Gillette's catalogs for 1996-2001 are time barred. (Supporting documents: Dkt. No. 77, Exs. 53, 59, 60, 64-66; Dkt. No. 99, Exs. 17, 22; PIC 00424-00662, 14280-14480, 14493-14581, 14725-14752.)

PIC also claims copyright infringement based upon alleged use of one of its photographs in a Spanish-language publication. However, at deposition, PIC conceded that it had the allegedly infringing photograph in its possession as early as 1998. Thus, any copyright claim based upon this photograph is also time barred.

**b.    Breach of Contract**

The statute of limitations for breach of contract claims is six years from the date of accrual. PIC alleges that Gillette breached its contracts with PIC by failing to comply with the

Purported 30-day Return Requirement.  PIC instituted this action on May 7, 2004, its breach of

contract claims arising out of Gillette's failure to return photographs to PIC prior to May 7, 1998

are time-barred.  Thus, PIC's breach of contract claims for the following PIC job numbers are

time-barred:

| | | | | | | |
|---|---|---|---|---|---|---|
| 3088 | 3296 | 3477 | 3615 | 3778 | 4059 | 4217 |
| 3107 | 3301 | 3479 | 3617 | 3785 | 4070 | 4219 |
| 3118 | 3313 | 3481 | 3621 | 3804 | 4080 | 4220 |
| 3121 | 3319 | 3485 | 3626 | 3812 | 4084 | 4227 |
| 3128 | 3320 | 3489 | 3627 | 3819 | 4085 | 4230 |
| 3138 | 3322 | 3493 | 3630 | 3834 | 4091 | 4232 |
| 3158 | 3323 | 3496 | 3645 | 3835 | 4104 | 4245 |
| 3160 | 3325 | 3498 | 3646 | 3847 | 4105 | 4249 |
| 3162 | 3329 | 3499 | 3652 | 3848 | 4106 | 4256 |
| 3165 | 3337 | 3502 | 3655 | 3852 | 4108 | 4257 |
| 3168 | 3339 | 3507 | 3659 | 3885 | 4109 | 4264 |
| 3173 | 3345 | 3513 | 3662 | 3890 | 4111 | 4266 |
| 3177 | 3346 | 3519 | 3664 | 3891 | 4112 | 4268 |
| 3182 | 3350 | 3525 | 3666 | 3896 | 4121 | 4270 |
| 3185 | 3353 | 3526 | 3675 | 3898 | 4124 | 4277 |
| 3190 | 3354 | 3528 | 3676 | 3900 | 4132 | 4287 |
| 3191 | 3356 | 3529 | 3680 | 3907 | 4133 | 4288 |
| 3193 | 3358 | 3539 | 3688 | 3912 | 4144 | 4289 |
| 3198 | 3360 | 3546 | 3691 | 3924 | 4145 | 4290 |
| 3204 | 3366 | 3552 | 3692 | 3926 | 4147 | 4291 |
| 3208 | 3367 | 3553 | 3693 | 3944 | 4148 | 4299 |
| 3218 | 3373 | 3562 | 3695 | 3946 | 4150 | 4309 |
| 3221 | 3384 | 3566 | 3705 | 3959 | 4155 | 4311 |
| 3223 | 3391 | 3574 | 3719 | 3969 | 4158 | 4314 |
| 3227 | 3392 | 3577 | 3722 | 3976 | 4159 | 4321 |
| 3229 | 3396 | 3585 | 3726 | 3979 | 4168 | 4324 |
| 3235 | 3399 | 3589 | 3731 | 3987 | 4177 | 4325 |
| 3243 | 3401 | 3593 | 3738 | 3994 | 4178 | 4330 |
| 3248 | 3405 | 3596 | 3742 | 3997 | 4181 | 4331 |
| 3252 | 3416 | 3597 | 3743 | 3998 | 4186 | 4332 |
| 3256 | 3425 | 3600 | 3744 | 3999 | 4190 | 4344 |
| 3262 | 3431 | 3601 | 3748 | 4008 | 4200 | 4346 |
| 3264 | 3437 | 3602 | 3751 | 4010 | 4201 | 4351 |
| 3266 | 3439 | 3603 | 3752 | 4013 | 4202 | 4352 |
| 3273 | 3450 | 3604 | 3759 | 4016 | 4205 | 4355 |
| 3275 | 3462 | 3606 | 3763 | 4017 | 4206 | 4360 |
| 3286 | 3465 | 3607 | 3769 | 4031 | 4211 | 4363 |
| 3294 | 3466 | 3609 | 3770 | 4038 | 4213 | 4364 |
| 3295 | 3470 | 3612 | 3772 | 4043 | 4214 | 4369 |

| | | | | | |
|---|---|---|---|---|---|
| 4373 | 4385 | 4419 | 4438 | 4455 | 4482 |
| 4375 | 4400 | 4422 | 4439 | 4459 | 4487 |
| 4380 | 4407 | 4424 | 4446 | 4460 | 4492 |
| 4381 | 4409 | 4429 | 4448 | 4468 | 4500 |
| 4383 | 4413 | 4432 | 4451 | 4472 | 4501 |
| 4384 | 4418 | 4433 | 4452 | 4477 | 4506 |

(Supporting documents:  PIC's Job Folders for the above-mentioned Jobs.)

    c.    **Fraud**

The statute of limitations for fraud claims under Massachusetts law is three years from the date of accrual.  The limitations period begins to run on the date the plaintiff learns or reasonably should have learned of the alleged misrepresentation.

PIC claims that former Gillette employee Anna Madden misrepresented to PIC in spring 2001 that Gillette had a reduced need for duplicates and concealed from PIC the allegedly true fact that Gillette was obtaining duplicates of PIC's images from third-party laboratories, such as Advanced Photographics.  However, the following undisputed facts show that PIC was aware of Gillette's duplication of PIC images no later than March 2000:  (1) PIC has not submitted any evidence that Gillette obtained duplicate transparencies of PIC images from third parties at any time after March 2000; (2) Jason Roopenian, the Vice President of Advanced Photographics testified that when he was made aware that Gillette was making duplicates of PIC's images he informed PIC's president, Paul Picone; (3) Advanced Photographics' former managerial employee Joe Gannuscio, who worked there between 1994 and 2001, testified that he had alerted Paul Picone that Gillette was ordering duplicates of PIC's images at the time Gillette ordered such duplicates; and (4) Picone conceded at his deposition that Mr. Gannuscio had contacted him "several times over duplicating of images" by Gillette.  Because PIC knew or should have known that Ms. Madden's alleged misstatement was false as soon as the statement was made in March

2001, its cause of action for fraud accrued at that time, more than three years before PIC commenced this action.  (Supporting documents:  PIC 15707-15833; ADV 1-54.)

**Affirmative Defense No. 8:  Unclean Hands**

Gillette incorporates by reference its Supplemented Response to Interrogatory No. 29, below.

**Affirmative Defense No. 9:  Fraudulent Conduct**

Gillette incorporates by reference its Supplemented Response to Interrogatory No. 29, below.

**Affirmative Defense No. 10:  License**

PIC and Gillette agreed to an express "buyout" by Gillette of rights under to copyright in the photographic materials provided by PIC to Gillette and to Gillette's ownership of such photographic materials.  PIC's first job for Gillette was in March 1992 and considered an "audition" for PIC.  Prior to performing work on this job, PIC provided a written estimate, which contained the purported terms and conditions on its reverse side.  The estimate was then revised to reflect the parties' agreement that Gillette would "buy-out" PIC's reproduction rights, such that Gillette would have "unlimited time and unlimited usage rights" in the photos.  After performing the job, PIC sent an invoice to Gillette that contained the purported terms and conditions on the reverse side.  "Buyout" and "unlimited usage" do not appear on the face of the invoice; instead, next to "Period of Use" on the face of the invoice, PIC typed "N/A," which means that the purported terms and conditions were "Not Applicable" to the first job.  Thus, in connection with the first job PIC performed for Gillette, the parties agreed *before* any work was performed that Gillette would own unlimited rights in any photographs produced, and that Gillette would keep the original transparencies and negatives provided by PIC.  Thereafter, PIC

*never* discussed the purported terms and conditions with any Gillette employee. Rather, on virtually every job PIC performed for Gillette between 1992 and mid-1994, PIC wrote "N/A" next to "Period of Use" on the front of its estimates and invoices, signifying that the terms on the reverse of the invoices were "not applicable." Although in 1994, PIC replaced "N/A" with the letters "T&C" on the front of the invoices, PIC did not discuss this change with Gillette or otherwise advise Gillette of it. PIC never suggested to Gillette prior to any given job that such job would be subject to the purported terms and conditions on the reverse of PIC's invoices. Under these circumstances, each and every job PIC performed for Gillette involved a "buyout" by Gillette under which Gillette was entitled to an unlimited license to use the photographs and ownership of the physical photographic materials provided by PIC to Gillette. Accordingly, Gillette's use of the photographs was permissible under the parties' agreements. (Supporting documents: Dkt. No. 77, Exs. 13, 14 & 20-23; Dkt. No. 99, Exs. 5-6, 13-16; PIC Job Folders 3072, 3088, 3107, 3118, 3121, 3128, 3138, 3158, 3160, 3162, 3165, 3168, 3173, 3177, 3182, 3185, 3190, 3191, 3193, 3198, 3204, 3208, 3218, 3221, 3223, 3227, 3229, 3235, 3243, 3248, 3252, 3256, 3262, 3264, 3266, 3273, 3275, 3286, 3294, 3295, 3296, 3301, 3313, 3319, 3320, 3322, 3323, 3325, 3329, 3337, 3339, 3345, 3346, 3350, 3353, 3354, 3356, 3358, 3360, 3366, 3367, 3373, 3384, 3391, 3392, 3396, 3399, 3401.)

Moreover, even if they had not so agreed, Gillette clearly had a license to use the photographs provided by PIC in the manner established by the parties' decade-long course of dealing and course of performance. Indeed, for each job PIC performed for Gillette, Gillette requested PIC to create photographs of Gillette's own consumer products, display materials and promotional materials for Gillette's use, PIC received and accepted substantial consideration (amounting to a total of at least $1 million), and PIC knew that Gillette intended to make use of

the photographs in promotional and marketing materials. (Dkt. No. 77, Exs. 13, 14; PIC's Job Folders (all).)

The fact that PIC was aware of the manner in which Gillette used the photographs throughout the parties' course of dealing but never objected to such use further supports a finding that Gillette's use of the photographs was licensed by PIC. Between 1992 and 2002, PIC was on notice that its photographs were regularly used beyond the purported one-year limit, outside the United States, on media other than that listed on the front of the invoices, and by third parties who sold Gillette products. With respect to use beyond one year, PIC does not dispute that Gillette provided copies of its 1995 through 2002 yearly Braun catalogs to PIC within the year of each catalog's respective production date, that such catalogs contained numerous PIC photographs used outside the purported one-year limit, and that such catalogs were reviewed by PIC personnel. With respect to PIC's knowledge of Gillette's foreign uses, Braun's 1995, 1996, 1997, 1998 and 1999 catalogs produced from PIC's files each prominently displayed the address of "Braun Canada Ltd." on the back cover. Moreover, without objecting or increasing its purported licensing fees, PIC: (1) knew that Gillette was sending photographic transparencies to a Braun project manager and to a Gillette vendor, both located in Canada; (2) sent transparencies to Gillette's offices in the Dominican Republic; and (3) as early as 1998, was aware of Gillette's use of one of its images in Spanish-language marketing material. With respect to third-party use, on numerous occasions throughout 1992-2002, PIC either provided photographs to Gillette that PIC knew were to be used by third party sellers of Gillette's products or itself provided photographs to Gillette's vendors for their use without any increase in fees, including Bloomingdale's, Costco, CVS, Dillard's, Duane Reade, Eckerd, Filene's, Fortunoff, Hecht's, K-Mart, Lowe's, QVC, Sears, Staples, and Wal-Mart. (Supporting documents: Dkt. No. 77, Exs. 13, 14, 53, 59, 60, 64-66; Dkt. No. 99, Exs. 17, 18, 20, 21, 22; Dkt. No. 118, Exs. 3, 11; PIC Job

Folders (all); PIC Job Folders 3373, 3392, 3396, 3450, 3502, 3577, 3589, 3617, 3630, 3646, 3891, 3924, 4121, 4578, 4631, 4687, 4709, 4715, 4791, 4818, 4877, 5166, 5224, 5231, 5453, 5455, 5500, 5559, 5596, 5559, 5605, 5613, 5615, 5639, 5688, 5746, 5756, 5850; GLTC 00239-241, 00246-00248, 00251-00252, 00420-00422; PIC 00424-00662, 14280-14480, 14493-14581, 14725-14752.)

PIC also knew that Gillette was using photographs provided by PIC without including a copyright notice attributing ownership of copyright to PIC, which PIC claims was a condition of its license to Gillette. Nevertheless, PIC never told Gillette it would not do further work for it unless credited, even after PIC was aware that Gillette was not providing such credit: for example, PIC kept in its files copies of Gillette Catalogs from 1995 through 2002 that it received from Gillette within one year of production and that it reviewed when received. None of these catalogs contain any copyright notice acknowledging PIC's copyright ownership. (Supporting documents: Dkt. No. 77, Exs. 53, 59, 60, 64-66; Dkt. No. 99, Exs. 17, 22; PIC 00424-00662, 14280-14480, 14493-14581, 14725-14752.)

PIC claims in its Supplemental Interrogatory Responses that Gillette impermissibly obtained duplicate transparencies from third-party laboratories such as Advanced Photographics, Inc., and that such conduct constitutes copyright infringement by Gillette. However, to the extent that PIC's purported Agreements applied, such purported Agreements granted to Gillette one-year "reproduction rights" of the photographs. Given that duplication is a subset of reproduction, Gillette's reproduction of PIC's photographs was permissible even if the purported Agreements were to have applied to the parties' relationship. (Supporting documents: Dkt. No. 77, Exs. 13, 14.)

PIC also knew about, but did not object to, Gillette's alleged use of third-party laboratory Advanced Photographics, Inc. to obtain duplicate transparencies of photographs provided by

PIC. The following undisputed facts show that PIC was aware of Gillette's duplication of PIC images no later than March 2000: (1) PIC has not submitted any evidence that Gillette obtained duplicate transparencies of PIC images from third parties at any time after March 2000; (2) Jason Roopenian, the Vice President of Advanced Photographics testified that when he was made aware that Gillette was making duplicates of PIC's images he informed PIC's president, Paul Picone; (3) Advanced Photographics' former managerial employee Joe Gannuscio, who worked there between 1994 and 2001, testified that he had alerted Paul Picone that Gillette was ordering duplicates of PIC's images at the time Gillette ordered such duplicates; and (4) Picone conceded at his deposition that Mr. Gannuscio had contacted him "several times over duplicating of images" by Gillette. (Supporting documents: PIC 15707-15833; ADV 1-54.)

In the alternative, Gillette owned the right to use the photographs because it was the author and/or a joint author of the photographs, and, as such, the owner of the copyright in the images, by virtue of serving as the "art director" in connection with the creation of the photographs and participating in and/or directing the creation of the photographs and packaging that PIC has identified as infringing works. (Supporting documents: Dkt. No. 77, Exs. 13, 14; PIC's Job Folders (all); PIC 15920-17160; GLTC 00426-00742; Dep. Ex. 59; PIC Job Folders 5219, 5367, 5409, 5478.)

**INTERROGATORY NO. 29.**

State the basis for each of Gillette's Counterclaims filed November 15, 2004 in detail sufficient to permit the Court to rule on a motion for summary judgment thereon.

**RESPONSE:**

Gillette incorporates by reference its objections to Interrogatory No. 28, above. Subject to and without waiving the foregoing objections, Gillette supplements its response to Interrogatory No. 29 as follows:

Gillette's remaining counterclaims for breach of contract, fraud, estoppel and under Mass. Gen. L. chapter 93A, Section 11 (the "chapter 93A claim") all are based on PIC's and Picone's improper conduct in connection with four projects PIC performed for Gillette in March and April of 2004 (the "Spring 2004 Projects"), just before PIC filed this action against Gillette on May 7, 2004.[3]

PIC performed hundreds of jobs for Gillette from 1992 through 2002 without incident. In October 2002, however, piqued by his mistaken belief that Gillette no longer intended to use PIC as a vendor of photographic services, Picone purported to terminate the parties' relationship and made outrageous demands on Gillette based on purported "terms and conditions" that were buried on the back of PIC's invoices and never had governed the parties' dealings. For example, PIC demanded that Gillette gather and return each transparency PIC had provided to Gillette over their ten-year relationship, threatening to impose a $1500 late penalty if Gillette failed to comply with PIC's demand. Moreover, PIC claimed for the first time that Gillette's use of the photographs in accordance with the parties' longstanding course of dealing was prohibited by the purported terms and conditions. (Dkt. No. 77, Exs. 26, 27; Dkt. No. 99, Ex. 12; GLTC 00242-00242-6.)

Shortly after PIC first lodged its unfounded claims, the parties ceased doing business with each other for approximately one year. Nevertheless, during the Spring of 2004, Beth Cooper, Senior Project Manager in Gillette's Oral-B/Braun group, contacted Picone to discuss the possibility of retaining him to photograph Gillette products in connection with the upcoming 2004 International Housewares trade show.

---

[3] Gillette's other counterclaim against PIC and Picone for trademark infringement was dismissed by the Court in December 2004.

Ms. Cooper met with Picone at the beginning of March 2004 and Picone agreed to work on the 2004 Housewares Show project and three other projects. Both parties proceeded with these projects, which were completed before the end of April 2004.[4] (Supporting documents: GLTC 00184-00188, 00190, 00196-00238; PIC Job Folders 6365, 6377, 6382, 6400.)

PIC never proposed new fee terms for the 2004 Projects; the parties' agreement was that the customary terms from the parties' prior dealings would apply. Nonetheless, well after the projects were completed, and one week after PIC filed suit against Gillette, PIC issued invoices for the 2004 Projects that bore no relation to the amounts it customarily charged Gillette for similar work over the years. In fact, the charge for the 2004 Housewares Show project— $63,000—was *three times* the highest invoice PIC had ever sent her before. (Supporting documents: GLTC 00184-00188; PIC Job Folders (all); PIC Job Folders 6365, 6377, 6382, 6400; Dkt. No. 77, Exs.13-15.)

At her deposition, Ms. Cooper testified that, based on several years of experience working with PIC, including well over 100 separate projects for which she engaged PIC on behalf of Gillette, almost nothing about the charges on the 2004 invoices was in keeping with PIC's customary charges to Gillette. Specifically, she testified that:

- PIC had done similar jobs for her, and based on that and her analysis of the components of the total bill, Ms. Cooper's expectation was that charges for the 2004 Housewares project "would have been nowhere in the vicinity of $63,000" that PIC charged, which she determined was "[e]xorbitantly high" as were other of the 2004 invoices.

---

[4] At the March 1, 2004 meeting, Picone also aggressively attempted to solicit new business from Gillette. Picone gave Ms. Cooper promotional NASCAR photographs he had taken for another of his clients, Osram Sylvania, Inc., and asked her to forward the photographs to circulate the photographs at Gillette, with the hope that Gillette would hire PIC to photograph Gillette's NASCAR promotions. Ms. Cooper forwarded PIC's photographs to Gillette employee Julie Washington, but PIC sued Gillette soon thereafter, and no business arose from Picone's solicitation. (Supporting documents: GLTC 00191-00192, GLTC 00751-00795.)

- The $43,000 in "day rate" charges for the 2004 Housewares Project represented 30-40 days of work, which was not done for this project.

- Mr. Picone historically worked within Gillette's budgets, and before incurring expenses out of the norm he would need to first advise Gillette and obtain approval.

- PIC did not impose "rush" charges for a similar job 2 years earlier, let alone double the rates as PIC did in the invoices for the 2004 Projects.

- PIC did not complete the 2004 Housewares Project the same day it was ordered, and PIC never before increased its charges merely to *commence* a job the same day it was ordered—which PIC now calls "same day" service—or even consulted Ms. Cooper about such a service.

Ms. Cooper also testified that it was understood by the parties that PIC was to seek approval before incurring costs disproportionate to prior jobs for Ms. Cooper, and that PIC did not do so with respect to the Spring 2004 Projects. (As a result of PIC's gross overcharges in connection with the Spring 2004 Projects and the ongoing litigation between the parties, Gillette has refrained from paying the amounts stated in PIC's invoices.)

In addition, the parties did not enter into any written agreement, or even exchange correspondence, concerning the terms governing the 2004 Projects at the time PIC secured the jobs or at any other point prior to their completion. However, clear understandings were reached based on contemporaneous oral discussions between the parties, the conduct of the parties, and the lengthy course of prior dealings between them. Specifically: (1) Gillette made PIC aware from the outset of the 2004 Projects that Gillette would not engage PIC under the terms set forth in the Boilerplate; (2) PIC, knowing this, accepted the engagement and went ahead with the 2004 Projects; and (3) the parties agreed that, at least until they executed a stand-alone contract governing their overall relationship, issues not covered by express oral agreements concerning the 2004 Project.

Moreover, Ms. Cooper specifically asked that the language be removed from the back of the invoices to be issued for the 2004 Projects, and Picone specifically indicated that he was

"agreeable" to this. Indeed, PIC, by unequivocal words and/or deeds, promised not to claim use of the 2004 Project photos was subject to the purported terms. The parties *never* discussed, let alone agreed to, the terms and conditions on the back of the invoice and those terms *never* governed their relationship. Nevertheless, in direct contravention of the parties' agreement, one week *after* commencing this action against Gillette, PIC sent invoices purportedly for the Spring 2004 projects that bore the terms and conditions on the reverse side. In early June 2004, while the parties were involved in litigation, Picone telephoned Ms. Cooper and left a voice message asking Ms. Cooper to "push through the invoices" and explaining that he kept the terms and conditions on the back of the invoices "based on his attorney's advice" but that he amended the invoices to "give unlimited use in certain areas." (Picone did not disclose that he had increased his "day rate" by 200% to reflect the so-called amendment to reflect unlimited use and for supposed "same-day service.") Picone closed by saying "sorry things are working out this way but that's the way it goes." (Supporting documents: PIC Job Folders 6365, 6377, 6382, 6400; GLTC 00184-00188, 07069.)

Gillette reasonably relied, to its detriment, on the expectation Picone created that he would undertake the 2004 Projects on essentially the same terms he always had: it is plain from Ms. Cooper's testimony that Gillette used Picone rather than a different photographer based on this expectation. Yet PIC not only broke its promise not to claim that the purported terms on the back of its invoices applied to the parties dealings, it broke its promise not to charge more than its customary rate.

30

Respectfully submitted,

FROSS ZELNICK LEHRMAN & ZISSU, P.C.

By: _____
Patrick T. Perkins (Admitted *pro hac vice)*
David Donahue (Admitted *pro hac vice)*
886 United Nations Plaza
New York, New York 10017
Ph: (212) 813-5900
Fax: (212) 813-5901

GELB & GELB LLP
Richard M. Gelb (BBO#188240)
Robert S. Messinger (BBO# 651396)
20 Custom House Street
Boston, MA 02110
Tel: (617) 345-0010
Fax: (617) 345-0009

*Attorneys for Defendant The Gillette Company*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing DEFENDANT'S SUPPLEMENTED

RESPONSES TO PLAINTIFF'S INTERROGATORY NUMBERS 28 & 29 was served by

regular mail, on May 9, 2005, to Michael A. Albert, Esq., Wolf, Greenfield & Sacks, P.C., 600

Atlantic Avenue, Boston, MA  02210, counsel for Plaintiff Photographic Illustrators Corp.

_____
David Donahue

I:\ddonahue\GLTC\COURT DOCS\050427-0420298- Supplemental Resp. to PIC's Second Interrogatories-dd.doc

## VERIFICATION

I am Trademark Counsel, Assistant Secretary of Defendant/Counterclaim-Plaintiff The Gillette Company and am authorized to make this verification on its behalf. I am familiar with the contents of Defendant's Supplemented Responses to Plaintiff's Interrogatory Numbers 28 and 29. I am informed and believe that the matters stated therein are true and, on that ground, declare under penalty of perjury that the same are true and correct.

Date: May 6, 2005

Raymond J. De Vellis