IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHOTOGRAPHIC ILLUSTRATORS CORPORATION,<br><br>    Plaintiff,<br><br>v.<br><br>THE GILLETTE COMPANY,<br><br>    Defendant. | Civil Action No. 04-CV-10913-WGY |

**PIC'S OPPOSITION TO GILLETTE'S MEMORANDUM OF LAW
CONCERNING PIC'S COPYRIGHT CLAIMS**

Gillette's motion for reconsideration should be denied.

In response to the parties' summary judgment motions, the Court ruled that PIC is not foreclosed from seeking relief for copyright infringement with respect to images that Gillette refused to return to PIC, thus interfering with PIC's ability to register the copyrights in those images. (Docket #147).

At a hearing in chambers on May 18, 2005, Gillette's counsel expressed its view that Gillette's failure to return PIC's images did not, in fact, interfere with PIC's ability to secure copyright registrations, and requested the opportunity to file a brief addressing this issue. The Court granted Gillette leave to do so.

Gillette then filed a brief on a host of issues that it neither sought nor obtained leave to address. This includes re-argument of defenses that were previously rejected by the Court (such as statute of limitations) and others that were not timely presented in Gillette's summary judgment papers (like Gillette's purported defense to PIC's contributory infringement claims).

Gillette's arguments, on both the authorized and unauthorized issues, are without merit and its motion should be denied.

**I.    FACTUAL BACKGROUND**

Gillette's strategy throughout this action has been to compromise PIC's ability to prosecute its case in any way possible.  **First,** Gillette successfully pushed for an expedited case schedule over PIC's objections that a significant amount of discovery and analysis would be required due to the voluminous nature of PIC's work for Gillette and Gillette's infringements. (Docket #19 – Hearing Transcript).

**Second,** after securing an expedited schedule that allowed just over four months for discovery – October 2004 through February 25, 2005 (see Docket #22), Gillette stonewalled and delayed in discovery until the last possible moment.

By the end of January 2005, with just a month remaining in discovery, Gillette had produced only a handful of documents responsive to PIC's requests.  On January 25, PIC was forced to file a motion to compel production of documents falling into ten categories, including "Documents Concerning Gillette's Reproduction of PIC's Images." (Docket #33).

The Court granted-in-part PIC's motion on February 1.  On February 15, PIC filed a motion to hold Gillette in contempt of the Court's February 1 Order for continued failure to produce documents as required. (Docket #49).  Late that same afternoon, following notification that PIC had file its Contempt Motion, Gillette produced – for the first time – *thousands* of transparencies and negatives that had been duplicated from PIC's images, as well as thousands of pieces of original film that Gillette previously denied having.

The "produced" film was stuffed into file folders piled into oversized boxes in no apparent order, then made available to PIC for inspection in a small conference room. (Docket #56).  *None of the film was actually returned to PIC*.

These files of original and duplicated film, produced just days before the close of discovery, and only after PIC had been forced to file a Contempt Motion, constitute important

- 2 -

evidence of Gillette's copyright infringement. The parties' contracts do not permit duplication of transparencies on the scale evidenced in the belatedly-produced files, the only purpose of which is to facilitate further unauthorized copying downstream (for example, by third parties).[1]

The **third** prong in Gillette's strategy, after securing an expedited schedule and eating up almost the entire schedule with stalling tactics, was to file the present motion seeking to exclude PIC from later asserting copyright registrations that it was unable to obtain during the short time frame of this case due to Gillette's stonewalling. The tactic is unfair and contrary to law. Gillette's motion should be denied.

## II.     ARGUMENT

### A.     Gillette Prevented PIC From Obtaining Relevant Copyright Registrations.

This is not a garden-variety copyright case in which the plaintiff knows, ahead of time, which of its works have been infringed by the defendant. Although PIC knew that Gillette had infringed its copyrights, and further knew (and pled) some specific infringements, it needed discovery from Gillette to identify the full scope of Gillette's infringement. Gillette knew this, and strategized accordingly.

The mechanics of identifying copyright infringements and registering the appropriate images with the Copyright Office are complex. In its brief, Gillette discusses various options that were theoretically open to PIC, but ignores the key bottlenecks that made it impossible, as a practical matter, for PIC to register copyrights in many infringed images that were produced by Gillette just three months ago, and within days of the close of discovery in this case. Some background is in order to explain the process.

---

[1] Gillette sought summary judgment that such duplication was not infringing, and that motion was denied. Gillette improperly re-argues the point in this brief too. (Gillette Br. at 7 n.3).

Over the years, PIC performed approximately 650 separate photographic Jobs for Gillette. PIC then provided Gillette with over 10,000 original pieces of film (e.g., transparencies, and negatives), grouped together and labeled by Job Number for delivery.

PIC's Job Number serves as a straightforward mechanism for determining the approximate date that each image was published to Gillette – which, as discussed below, is an important piece of information that the Copyright Office requires for registration purposes.

Although PIC was assured repeatedly by Gillette personnel that its film was being kept in an organized and secure fashion, see Ex. 9 to Docket #77 at 27-28, Gillette's production demonstrates that this was emphatically not the case. The thousands of original and duplicate pieces of film in the folders produced by Gillette have no temporal organization at all.[2]

This is an extremely important point because the Copyright Office requires that all images be identified by publication date as a pre-requisite to registration. This applies to both individual and group registrations, which are processed on the same Form VA. See 37 C.F.R. § 202.3(b)(1)(iii)-(b)(2). That form, available for download from the Copyright Office web site,[3] requires the date of publication of each work sought to be registered. The group registration continuation form GR/PPh/CON, on which additional photographs in a "group" are registered, likewise requires a publication date for each photograph.[4] Moreover, group registration additionally requires that all the photographs in the group be published in the same calendar year. See 37 C.F.R. § 202.20(c)(2)(xx). The copyright will not be granted unless this information is supplied, per 37 C.F.R. § 202.3(c)(2). Even if the infringing work is used as a substitute deposit, as Gillette suggests, this does not alter the date requirement. See 37 C.F.R. § 202(d).

---

[2] In correspondence, Gillette's counsel indicated that Gillette will not organize PIC's film by Job Number when returning it pursuant to the Court's Order. Instead, notwithstanding its promises to maintain PIC's film with proper organization, Gillette will put the burden of reorganizing the film on PIC.

[3] http://www.copyright.gov/forms/formvai.pdf.

[4] See Form GR/PPh/CON, available for download at http://www.copyright.gov/forms/formgr_pph_con.pdf.

Thus, in order for PIC to file copyright applications (including under any of the various provisions suggested by Gillette), it must first discern the date of first publication of each and every image that it seeks to register. This is an extremely time-consuming process.

In the case of infringing duplicate transparencies made by Gillette and produced for the first time on February 15, 2005, PIC would first have needed to make legible copies of each duplicate transparency, most likely by either scanning or color photocopying. This is a time-consuming process in and of itself. PIC's document production to Gillette took several weeks for the copy vendor to complete because scanning photographic transparencies is very labor-intensive.

Next, PIC would have needed to match each copy of an infringing transparency to the Job Folder from which it came, in order to determine the date of first publication of the image. This is an arduous task for many reasons. Such matching is possible only if sufficient information (such as left-over transparencies or Polaroids) remains in the Job Folder to make a positive match. In some cases, PIC might search all 650 of its Job Folders only to discover that finding a match is not possible, since (as discussed in other briefing) Gillette personnel sometimes took all of the film from a shoot, leaving nothing with PIC. Unless Mr. Picone is able to recall the specific shoot and set-up in question from the several hundred he performed for Gillette, making a match would then be impossible.

Yet another problem is that PIC sometimes photographed the same or similar products for Gillette on multiple occasions. Thus, there would sometimes be multiple Job Folders that *could* have been the source of a particular infringing image, and further investigation is necessary to determine which one it was. This would involve close analysis of the images themselves, as well as review of correspondence, notes and emails contained in the respective Job Folders.

For PIC to complete this process in the time available following Gillette's belated February 15, 2005 production would have been impossible. PIC understands the importance of providing adequate notice regarding the scope of trial, and is absolutely prepared to "do the work" (as Gillette facetiously put it, see Gillette Br. at 9) required by the Court to accomplish this. PIC merely suggests, respectfully, that it should not be precluded from pursuing such claims because of Gillette's delay in producing discovery. In short, Gillette should not be permitted to get away with several thousand copyright infringements through unauthorized duplication (Gillette Br. at 8-9) merely because it squeezed PIC so hard in discovery that no time remained for PIC to prosecute such legitimate claims.

Gillette's fallback suggestion that PIC could create jurisdiction by filing an invalid copyright application (e.g., one without the required publication date) and then serving the Copyright Office with a copy of the complaint is inapplicable here.

Occasionally, the Copyright Office rejects a work as not copyrightable (e.g., for failing to meet the minimum threshold for creativity or originality), and the author can then litigate the issue of copyrightability after having failed to obtain a registration. E.g., Gemveto Jewelry Co., Inc. v. Jeff Cooper, Inc., 568 F. Supp. 319 (D.C.N.Y. 1983). The issue here, however, is not whether or not PIC's photographs meet the minimum threshold for copyright protection, but rather the procedural requirement that the forms be filled out properly – something PIC could never have done in the short time allotted to it after Gillette's belated document production.

In this context, it is important to remember that in the short time period following Gillette's belated February 15 production, the parties were (a) taking depositions of fact witnesses during most of the rest of February, as well as some in March that were held over past the discovery deadline; (b) conducting expert discovery in March; and (c) briefing summary judgment and various other motions in April and May. Gillette should not be permitted to

benefit from making it physically impossible for PIC to complete the copyright registration process during this time period through its late production.

Finally, it bears repeating that PIC demanded the return of its film repeatedly in 2002 and 2003, well before filing this lawsuit as a last resort. If Gillette had returned PIC's film then, as required by the parties' contracts, PIC would have had ample time to conduct the arduous process of matching up film and Job Folders in order to obtain the appropriate registrations before filing suit. Instead, Gillette falsely insisted that it did not have more than a tiny fraction of PIC's film.

Also supporting the Court's holding is the fact that Gillette's production of thousands of transparencies and negatives occurred well after the January 31, 2005 deadline for amendments to the pleadings in this case. Even if PIC had somehow been able to undertake the massive set of tasks outlined above immediately after Gillette's belated production in February 2005, Gillette would undoubtedly have moved to preclude PIC from enforcing any additional copyright registrations because the deadline for amending the pleadings had already passed.

The discussion above with respect to unauthorized duplicates produced by Gillette on February 15 also applies to the other categories of infringements identified by Gillette in its motion. Although some of the infringements were in PIC's possession earlier than February 15, PIC is severely handicapped in matching such infringements to Job Folders and identifying publication dates without access to its original transparencies (which Gillette says it is now in the process of returning as required by the Court's Order). As noted above, some of PIC's Job Folders contain no extant samples of the views shot by PIC in that particular Job. In other cases representative samples of some views were retained, while others were not. Only when the original film now being returned by Gillette is matched to PIC's Job Folders will PIC be able to begin the process of matching up infringements to the respective Jobs.

Thus, the process required for the infringements Gillette committed in catalogs, internet images, third-party images,[5] foreign web sites and catalogs and product packaging, is even more arduous than that outlined above for the unauthorized duplicates; it has two time-consuming steps instead of one. First, the original film now being returned must be matched to Job Folders, to ensure that appropriate reference material is contained in the Job Folders for matching with the listed types of infringements. Once that step is complete, the second step can begin – namely, matching infringements against Job Folders.

The process for Gillette's infringing duplications through Advanced Photographics is further complicated still. In the case of Advanced, the infringements are reflected on invoices, many of which only indicate the Product Code for the item being duplicated. Many of the files produced by Gillette on February 15 are marked with product codes; these must be reviewed for matches with the Advanced Photographics invoices before infringement can be established.

In short, there is no question that Gillette's untimely production in this case prevented PIC from obtaining copyright registrations for many of Gillette's infringements. Gillette should not be permitted to profit from this; the Court's ruling ought not be disturbed.[6]

### B.    PIC's Ability to Register Images Prior to Gillette's Infringement Is Irrelevant

Gillette's argument that PIC should be precluded from pressing its copyright claims because it could have registered its images before turning them over to Gillette during the parties' 12 year relationship is a non-sequitur to the Court's holding that:

---

[5] Gillette's accusation that PIC "waited until January 31, 2005 to serve third party discovery" (Br. at 13) rings hollow in light of the fact that many of the documents produced in third party discovery originated with Gillette but were never produced by Gillette. For example, ShopKo produced two Gillette CDs labeled "Recommended Retailer Ads" for the year 2003, containing a significant number of copyright infringements. Despite the fact these CDs were created by Gillette and distributed to retailers, they were <u>never</u> produced in discovery. PIC should not be penalized for Gillette's failure to produce responsive material that it must have had in its possession.

[6] In this regard, it is important to note that the high burden for a reconsideration motion has not been met here.

> To the extent PIC has not registered copyrights, as to such claims summary judgment is ALLOWED; however, this case will proceed to trial on those images for which copyright registrations have been obtained, and will be administrative closed as to those images for which PIC has been unable to obtain copyright registrations because Gillette maintained possession of such images. **PIC is not foreclosed from seeking relief on such claims in the future.**

(Docket #147 at 4) (emphasis supplied). Under Gillette's reasoning, the Court's ruling permitting PIC to seek relief in the future would be a nullity.

Moreover, although it was theoretically possible for PIC to register its copyrights before turning them over to Gillette, there is no such requirement in copyright law. Failure to register before turning images over to a client may affect the author's ability to obtain statutory damages, but does not, as a matter of law, prevent the author from suing for copyright infringement.

In any event, given that PIC had been assured repeatedly that Gillette would respect its copyrights, PIC saw no reason to embark on such an ambitious registration program over the years. Moreover, PIC often worked on extremely short deadlines for Gillette, and as a practical matter it would not have been possible for it to register its copyrights prior to providing images to Gillette, on the deadlines that Gillette required. What is more, as Mr. Picone testified at his deposition, in some cases Gillette personnel took every piece of film after a shoot, including Polaroids, leaving PIC with nothing to register. (Ex. 10 to Docket #77 at 8).

### C. Gillette's Statute of Limitations and Contributory Infringement Arguments Are Untimely and Without Merit.

Gillette, apparently believing it was granted *carte blanche* to reargue issues already covered in the parties' summary judgment motions, contends that certain of PIC's copyright claims should be barred by the statute of limitations and, in an argument presented for this first time here, that PIC's claim of contributory infringement should be excluded on the basis of PIC's discovery responses. The arguments are both procedurally improper and substantively without merit.

### 1. Statute of Limitations

The Court's revised Order was clear that the only claim barred under the statute of limitations related to Gillette's use of an image of Mr. Picone's kitchen in a Latin American publication. See Docket #147 at 3-4 ("Gillette's Motion for Summary Judgment as to the Latin American image is ALLOWED … In all other respects, Gillette's Motion for Summary Judgment on Copyright Infringement in DENIED."). Gillette unsuccessfully argued the statute of limitations at length in its summary judgment papers. See Docket #89 at 13-14; Docket #102 at 7-11. Gillette also already reargued the point in its Motion in Limine. See Docket #126 at 1-3. The Court did not invite a motion for reconsideration on the copyright statute of limitations, and Gillette's fourth pass at the argument should be rejected.

In any event, PIC did not discover the challenged catalog infringements until after this suit was filed. See Ex. 10 to Docket #77 (3/24/05 Picone Depo.) at 79-80, 87-88. See also Docket #117 at 18-20; John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 186 F. Supp. 2d 1, 5-6 (D. Mass. 2002) (Young, C.J.) (holding that "[a] genuine issue of material fact remained as to whether [the plaintiff] knew or, in the exercise of reasonable diligence should have known that [the defendant] infringed its copyright more than three years before it lodged its complaint.")

### 2. Contributory Infringement

Gillette has been on notice of PIC's contributory infringement claims at least since January 25, 2005, when PIC explained in its Motion to Compel that Gillette had transferred PIC's images to third parties without permission. (Docket #32.) PIC further provided a detailed account of its claim for contributory infringement on March 4, when PIC served its first supplemental interrogatory responses explaining that "[u]nauthorized duplication of PIC transparencies for the purpose of distributing or conveying these duplicates to third parties for

inclusion in third-party catalogs and other print materials outside Gillette or outside of the Gillette business unit licensed to use the images, constitutes contributory copyright infringement." (Ex. A to Docket #58).  Gillette could have challenged the sufficiency of PIC's interrogatory responses at that time, or again when PIC served its 219-page second supplemental responses on March 17 (Ex. 7 to Docket #99), or in its summary judgment motion (Docket #89) or in its opposition to PIC's summary judgment motion (Docket #102).  Gillette should have raised this issue earlier if at all, and it is clearly beyond the scope of the leave granted by the Court for the instant motion.

      Gillette is also wrong on the facts.  PIC's document production, interrogatory responses, and the depositions of Gillette witnesses clearly establish that Gillette provided PIC's images to third parties without authorization.  Several Gillette witnesses testified that Gillette incorporated PIC's images into a digital library, which was then made available to Gillette's customers. See Ex. 50 to Docket #77 (3/9/05 Mallette Depo.) at 29 ("Q: Was there a time at which you included Mr. Picone's Photographs in the digital library? A: Yes."); Ex. 49 to Docket #77 (3/4/05 Madden Depo.) at 103 ("Q: Were images or pictures taken by Mr. Picone included in that library? […] A: I provided them with images that I had in my files from him, yes."); 3/18/05 Condakes Depo. (Attached as Ex. A) at 21-22 ("Q: Okay. What's the digital library? […] A: It's an Internet site that Gillette supports with photographs of its products.  **And vendors can go in there and access photographs of Gillette's products**.") (emphasis supplied).  There is ample evidence in the record to support PIC's contributory infringement claim, and Gillette's argument is thus without merit.

### III.  CONCLUSION

For the above reasons, Gillette's motion should be denied.

Respectfully submitted,

PHOTOGRAPHIC ILLUSTRATORS CORP.

By its counsel,

Dated: May 31, 2005         /s/ Michael N. Rader
Michael A. Albert, BBO #558566
malbert@wolfgreenfield.com
Michael N. Rader, BBO # 646990
mrader@wolfgreenfield.com
Adam J. Kessel, BBO # 661211
akessel@wolfgreenfield.com
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000